# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *v.* | ) | |
| | ) | Case No. 16-cr-370 (CM) |
| MATTHEW CONNOLLY AND | ) | |
| GAVIN BLACK, | ) | |
| | ) | |
| *Defendants.* | ) | |

_____

**UNITED STATES' RESPONSE IN OPPOSITION TO THE DEFENDANTS'
JOINT MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.  The Indictment Alleges a Violation of the Wire Fraud Statute, *NOT* a Violation of a

        BBA Rule ............................................................................................................... 2

    II. The Indictment Does Not Need to Allege That the Defendants Violated a BBA Rule ....... 5

    III.The Wire Fraud Statute is Not Unconstitutionally Vague .................................................. 9

        A.  Fair Notice ...................................................................................................... 9

        B.  Arbitrary and Discriminatory Enforcement ................................................... 14

CONCLUSION ............................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Badders v. United States*, 240 U.S. 391 (1916) ............................................................... 5

*Broadrick v. Okla.*, 413 U.S. 601 (1973) .......................................................................... 14

*Bryan v. United States*, 524 U.S. 184 (1998) ..................................................................... 7

*Colautti v. Franklin*, 439 U.S. 379 (1979) ....................................................................... 10

*Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612 (2d Cir. 2011) ......................... 15

*Hygrade Provision Co. v. Sherman*, 266 U.S. 497 (1925) ....................................................... 10

*Kolender v. Lawson*, 461 U.S. 352 (1983) ..................................................................... 9, 14

*McNally v. United States*, 483 U.S. 350, 358 (1987) ..................................................... 10, 11, 14

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ..................................................... 14

*Scharff v. Claridge Gardens, Inc.*, No. 88-cv-2047, 1990 WL 186879 (S.D.N.Y. Nov. 21, 1990) 6

*Schmuck v. United States*, 489 U.S. 705 (1989) ................................................................. 5

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................................. 10

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................................ 14

*Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007) ........................................................... 14

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ................................................... 9, 11

*United States v. Allen*,  160 F. Supp. 3d 698 (Feb. 16, 2016) ................................................... 5

*United States v. Allen*, 864 F.3d 63 (2017) ..................................................................... 8

*United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977) ................................................... 6, 8

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ................................................. 8, 10, 11, 15

United States v. Bongiorno, No. 05-cr-390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006)

........................................................................................................... 12, 13

*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. June 5, 2008) ........................................... 12

*United States v. Bustos de la Pava*, 268 F.3d 157 (2d Cir. 2001) ............................................. 1, 2

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. Aug. 10, 2010) ..................................... 7, 9

*United States v. Finnerty*, No. 05-cr-393 (DC), 2006 WL 2802042 (S.D.N.Y. Oct. 2, 2006) 6, 12,

13, 15

*United States v. Foshee*, 606 F.2d 111 (5th Cir. 1979) ........................................................ 6

*United States v. Frost*, 321 F.3d 738 (8th Cir. 2003) ........................................................ 6

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) .............................................. 1

*United States v. Green*, 592 F.3d 1057 (9th Cir. 2010) ................................................ 5

*United States v. Hayes*, 118 F. Supp. 3d 620 (S.D.N.Y. Aug. 3, 2015) ................................. 10, 11

*United States v. Louderman*, 576 F.2d 1383 (9th Cir. 1978) ......................................... 6

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982) ........................................ 10, 11

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ................................................. 6

*United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) ............................................ 7

*United States v. Ragen*, 314 U.S. 513 (1942) ...................................................... 9

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) ................................................ 6

*United States v. Rybicki*, 287 F.3d 257 (2d Cir. 2002) ............................................ 10

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ............................................ 6

*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) ........................................ 12

**Statutes**

18 U.S.C § 1344 .................................................................................. 2

18 U.S.C. § 1343 ........................................................................ 5, 6, 7, 9, 10, 11, 14

18. U.S.C. § 1349 .................................................................................. 2

26 U.S.C. § 7206(1) ............................................................................ 6, 7

## INTRODUCTION

This case is about the defendants' scheme to make money at the expense of unwitting counterparties through biased and dishonest LIBOR submissions designed to benefit Deutsche Bank's trading positions.  The Superseding Indictment ("indictment") lays that out clearly and in great detail.  Despite the defendants' insistence to the contrary – both here and in their motion to compel – the charges in the indictment are not about fraud on the British Bankers Association ("BBA") and whether the BBA knew of LIBOR manipulation, whether the BBA took appropriate action to thwart LIBOR manipulation, or whether the BBA had an explicit rule stating that traders could not manipulate LIBOR to benefit Deutsche Bank's trading positions.

The answers to those questions are irrelevant to the sufficiency of the indictment.  As set forth below, there is no need for the indictment to allege that they broke any specific BBA rule explicitly forbidding the manipulation that took place in this case. Instead, the indictment must allege that the defendants' conduct violated the charged fraud statutes.  Similarly, the defendants' arguments that the wire fraud statute is unconstitutionally vague as applied in this case fails because wire fraud has a *mens rea* requirement and the conduct alleged fits squarely within the "hard core" prohibitions of the statute.

## ARGUMENT

To overcome a motion to dismiss, an indictment only needs to be "a plain, concise and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and "sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events," *United States v. Bustos de la Pava*, 268 F.3d 157, 162 (2d Cir. 2001).  Moreover, in evaluating a motion to dismiss, the Court should not look beyond the four corners of the indictment.  *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  Importantly, "[a]n

indictment . . . need not be perfect, and common sense and reason are more important than technicalities." *Bustos de la Pava*, 268 F.3d at 162.

## I.      The Indictment Alleges a Violation of the Wire Fraud Statute, *NOT* a Violation of a BBA Rule

Here, both a plain reading and a common sense reading of the indictment reveal that the defendants are charged with violating the wire fraud statute,[1] not a BBA rule, through their use of biased and dishonest LIBOR submissions designed to make money at the expense of counterparties.  As the indictment clearly alleges, the defendants "engaged in a scheme to obtain money and property by making false and fraudulent USD LIBOR submissions to the BBA for inclusion in the calculation of USD LIBOR representing that the rates submitted were an unbiased and honest estimate of [Deutsche Bank's] borrowing costs when in fact the submissions reflected rates that were designed to benefit their trading positions."  Superseding Indictment ¶ 26, ECF No. 22.  And the victims of the scheme were counterparties on the opposite sides of those trading positions.  *Id.* ("[T]he defendants and their co-conspirators knew and foresaw that Deutsche Bank had counterparties in the United States which had taken financial positions that would be negatively affected by the scheme to manipulate the USD LIBOR benchmark interest rate.").  That is the crux of the charges against the defendants.

The defendants, on the other hand, are trying to turn this case into something that it is not. Through this motion and their motion to compel, the defendants are attempting to lay the

---

[1]      To be accurate, count one of the indictment alleges a violation of § 1349, conspiracy to commit wire fraud and bank fraud, and counts two through eleven allege violations of § 1343, the wire fraud statute.  The defendants challenge to the indictment does not relate to the conspiracy count, except to the extent it is premised on wire fraud.  For that reason, the government's brief is framed around § 1343.  The defendants also make conclusory claims that the bank fraud statute (§ 1344) is unconstitutionally vague, but since there are no substantive bank fraud counts, the government does not address those claims here.

foundation to introduce evidence at trial calculated to distract the jury from the defendants' own wrongdoing.  Central to the defendants' efforts is their attempt to convert this prosecution into a trial of the BBA.  The defendants' briefs are replete with claims about BBA rules, oversight, knowledge, and the like.  They go so far as to claim that "[t]he Government's theory of prosecution is that Defendants deceived the BBA" and therefore "the BBA's knowledge (or lack thereof) is central to the Government's theory of prosecution."  Defs.' Mem. in Supp. of Am. Mot. to Compel ("Defs.' MTC Br.") at 8, 11, ECF No. 117.

This case is *not* about the BBA.[2]  To be sure, the BBA formulated the query that panel banks answered in making their daily LIBOR submissions.  It was that submission process the defendants used as their tool to execute their scheme. They had privileged access to the LIBOR setting process and exploited it to benefit themselves and their bank.  That is the extent of the BBA's relevance for the purposes of evaluating the sufficiency of the indictment.  The BBA is not the victim in this case, so it simply does not matter – for purposes of alleging any element of the charged crimes – whether the BBA was in the dark about LIBOR manipulation, complicit in LIBOR manipulation, or somewhere in between.  It likewise does not matter, insofar as the indictment is concerned, whether the BBA had a rule or made a specific statement that explicitly forbade manipulation to account for trading positions before, during, or after the conspiracy, in the same way that it does not matter whether Deutsche Bank, for example, had a specific rule

---

[2]     This case is also not about the Bank of England or anything that institution may have communicated to Barclays.  See Defs.' MTC Br. at 14-17.

that employees cannot deceive and cheat their counterparties.  The indictment's adequacy does not turn on the answers to those questions.[3]

What matters is that the indictment alleges that the defendants and their co-conspirators knew that Deutsche Bank's trading positions were not supposed to be considered in making daily LIBOR submissions, but then did it anyway to benefit the bank and themselves at the expense of unwitting counterparties.[4]  However, the defendants – inappropriately using an array of factual assertions from beyond the four corners of the indictment – argue that the indictment should be dismissed because (1) it does not allege that the defendants violated a BBA rule, and (2) the wire fraud statute, as applied in this case to the BBA definition of LIBOR, is unconstitutionally vague. Neither argument has merit.

---

[3]     Indeed, evidence relating to the BBA was not the central feature of the government's prosecution of Rabobank traders before Judge Rakoff in 2015, and the government does not intend to make the BBA the central feature in this case.  But to be clear, at trial the government will likely – as it did before Judge Rakoff – introduce BBA-related evidence to establish the basic LIBOR framework and the parameters of what considerations were either relevant or irrelevant to estimating the bank's borrowing costs.  Likewise, the government is not saying here that the BBA's statements to the defendants (if such statements exist) are never admissible to prove the defendants' state of mind; that is a determination to be made on a case-by-case basis. Rather, for purposes of a motion to dismiss, the extrinsic BBA evidence raised by the defendants is beyond the four corners of the indictment and not properly considered at this stage of the proceedings.

[4]     Even if a handful of counterparties engaged in similar schemes – and therefore in the defendants' view were not unwitting – that does not undermine the government's theory of the case.  See Defs.' MTC Br. at 12-14.  The defendants' scheme was indiscriminant and may very well have ensnared a few equally bad actors along the way in addition to the thousands of other counterparties, but the defendants' misrepresentations were no less fraudulent or material as a result.

**II.      The Indictment Does Not Need to Allege That the Defendants Violated a BBA Rule**

The defendants argue that the charges depend on the violation of a BBA rule that explicitly forbade their alleged conduct, and because the indictment does not identify any such rule, it must be dismissed.  Their argument fails for a number of reasons.  For starters, the defendants' premise is mistaken.  As discussed above, the charges do not depend on the violation of a BBA rule.  The indictment clearly charges the defendants and their co-conspirators with making biased and dishonest LIBOR submissions; the BBA asked them a question, and they provided fraudulent answers.  The BBA did not have to specifically say anything along the lines of "you are not allowed to provide a dishonest LIBOR submission" or "traders are not permitted to change the submission based on their own interest in order to cheat their counterparties" for the answers to be fraudulent.  As Judge Rakoff explained in *United States v. Allen*, "[c]riminal liability in this case is being applied for making these false or fraudulent representations – *not simply for the failure to follow BBA rules*."  160 F. Supp. 3d 698, 702 (Feb. 16, 2016) (emphasis added).

Second, and more generally, wire fraud charges do not need to be predicated on a violation of some other law, regulation, or rule.  The statute prohibits *any* scheme, furthered through use of interstate or foreign wires, to deprive another of money or property by false or fraudulent pretenses, *cf. Badders v. United States*, 240 U.S. 391, 393 (1916) (Holmes, J.), but makes no mention of an underlying legal-, regulatory-, or rule-violation requirement, *see* 18 U.S.C. § 1343.  And the case law bears that out.[5]  Indeed, the federal fraud statutes have

---

[5]      *See, e.g.*, *Schmuck v. United States*, 489 U.S. 705, 721 (1989) ("[T]he elements of the offense of odometer tampering are not a subset of the elements of the crime of mail fraud."); *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) ("A defendant's conduct need not

traditionally been used to thwart innovative schemes hatched before "legislation has been passed more directly addressing specific fraudulent conduct." *United States v. Reed*, 639 F.2d 896, 905 (2d Cir. 1981). Reading a requirement into § 1343 that there must be some underlying violation would turn that purpose on its head.

The defendants rely heavily on *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), to support their argument that the government must allege that the defendants violated a BBA rule, but to no avail. *Pirro* involved a "willful" omission of an "ownership interest" in an S-corporation from a tax return in violation of 26 U.S.C. § 7206(1), not 18 U.S.C. § 1343. In the context of the federal tax code – described by the Second Circuit as "[o]ne of the most esoteric areas of the law" – the standard for willfulness is high and requires offenses to be "predicated upon a voluntary, intentional violation of a known legal duty." 212 F.3d at 90 (citations

---

otherwise be illegal in the sense that the government must also prove that the defendant's conduct violated a specific statute or regulation."); *United States v. Frost*, 321 F.3d 738, 741 (8th Cir. 2003) ("We do not agree that the government, having proved beyond a reasonable doubt each element of the offense, must also prove a violation of Arkansas law."); *United States v. Foshee*, 606 F.2d 111, 113 (5th Cir. 1979) ("The federal mail fraud statute prohibits use of postal services in furtherance of fraudulent schemes, whether or not prohibited by state law."); *United States v. Louderman*, 576 F.2d 1383, 1387 (9th Cir. 1978) ("Furthermore, state law is irrelevant in determining whether a certain course of conduct is violative of the wire fraud statute."); *United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir. 1977) (explaining that "if defendants were engaged in a fraudulent course of conduct, whether or not that conduct was approved by a state administrative agency may be immaterial on the issue of legality"); *United States v. Finnerty*, No. 05-cr-393 (DC), 2006 WL 2802042, at *8 (S.D.N.Y. Oct. 2, 2006) ("How the NYSE defines conduct . . . does not preclude prosecution if that alleged conduct falls within the ambit of the statute."); *Scharff v. Claridge Gardens, Inc.*, No. 88-cv-2047, 1990 WL 186879, at *4 (S.D.N.Y. Nov. 21, 1990) ("Such a broad construction of the statute effectuates its fundamental purpose to 'prevent the Postal Service from being used to carry out fraudulent schemes, *regardless of what is the exact nature of the scheme and regardless of whether it happens to be forbidden by state law*.'" (emphasis in original) (citation omitted)). The cases cited involve a mix of wire fraud and mail fraud. However, because § 1341 and § 1343 are treated as substantively identical, cases interpreting mail fraud apply equally to cases interpreting wire fraud. *See United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991).

omitted).  Because the indictment did not describe what that "known legal duty" was, "more factual detail was needed just to plead the essential elements of the charged offense."  *United States v. D'Amico*, 734 F. Supp. 2d 321, 334 (S.D.N.Y. Aug. 10, 2010) (McMahon, J.) (distinguishing *Pirro*).  There is no such requirement in 18 U.S.C. § 1343.

Unlike 26 U.S.C. § 7206(1), the *mens rea* required by the wire fraud statute does not need to be predicated on a "voluntary, intentional violation of a known legal duty."[6]  That is because the wire fraud statute is not "esoteric" or "highly technical [and] present[ing] the danger of ensnaring individuals engaged in *apparently innocent* conduct." *Bryan v. United States*, 524 U.S. 184, 194 (1998) (emphasis added).  To be sure, the government must allege and prove at trial that the defendants had the requisite *mens rea*, but that means the government must allege and prove "the intent to defraud . . . and *not* the intent to violate a statute," *United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) (emphasis added), or in this case, *not* the intent to violate a specific BBA rule.  The indictment plainly alleges the requisite intent, *see, e.g.*, Superseding Indictment ¶¶ 25-26, and no more detail is required.  *See D'Amico*, 734 F. Supp. 2d at 334.

The defendants make two additional arguments that merit little discussion.  The first assumes the "BBA's LIBOR definition is the applicable rule" and concludes that, if the definition is the rate at which a panel bank "could" borrow, then the indictment must be dismissed for failing to allege that Deutsche Bank "could not" borrow at the submitted rates.  Defs.' Mem. in Supp. of Am. Mot. to Dismiss ("Defs.' MTD Br.") at 10-11, ECF No. 112.  In essence, the defendants' argument is that the indictment fails to allege that Deutsche Bank's

---

[6]      *See* footnote 5 above.

7

submissions were objectively false.  The indictment does not need to make such an allegation.[7]

Wire fraud charges can be supported equally by expressions of "opinions not honestly held,"

misleading "half-truths," omissions, and the like, *United States v. Autuori*, 212 F.3d 105, 118-19

(2d Cir. 2000) (quoting *United States v. Amrep Corp.*, 560 F.2d 539, 544 (2d Cir. 1977) ("The

expression of an opinion not honestly entertained is a factual misrepresentation.")), which is

exactly what biased and dishonest LIBOR submissions are.

The defendants next claim that the Second Circuit in *United States v. Allen*, 864 F.3d 63

(2017), repudiated the so-called "best estimate" requirement of the indictment by noting that

"there existed a 'range' of reasonable LIBOR submissions."  Defs.' MTD Br. at 11-12 (citing

*Allen*, slip op. at 22).  Aside from the fact that "best estimate" is nowhere to be found in the

indictment, which instead clearly states "unbiased and honest estimate," Superseding Indictment

¶ 8, the existence of a range does not mean trading positions are a permissible consideration in

making either a "best estimate" or an "unbiased and honest estimate."  In any event, there was no

repudiation of the government's theory of the case in *Allen*: although the defendants cite to page

22 of the *Allen* slip opinion for that proposition, they conveniently ignore the Second Circuit's

observation on page 21 that "[the defendants] agreed with the Government that making

submissions based on the interests of . . . trading positions was not permitted."[8]  *Allen*, 864 F.3d

---

[7]     Defendants' theory that the government must show that Deutsche Bank "could not"
borrow at the submitted rates is nonsensical.  If that were the case, panel banks could truthfully
submit *anything* above the lowest rate.  For example, under the defendants' theory, if the lowest
rate Deutsche Bank could obtain were 5%, the bank could truthfully submit 5%, 10%, 100%,
1000%, and so on, because a lender will always take the highest rate it can get.  Clearly, that is
not the information the BBA's inquiry was intended to elicit.
[8]     In *Allen*, the Second Circuit only addressed the *Kastigar* issue, which will be taken up
separately in this case.  *Allen* did not address the government's theory of prosecution and the
*Allen* Court's description of the case should not be cherry-picked for arguments the Court did not

at 74.  The Second Circuit did not reach that issue as the defendants in *Allen* did not raise it as an argument.

Therefore, the indictment does not need to allege that a particular BBA rule was violated or that Deutsche Bank's submissions were objectively false.  Thus, the indictment should not be dismissed.

## III.    The Wire Fraud Statute is Not Unconstitutionally Vague

The indictment is also not defective due to any alleged vagueness of the wire fraud statute.  Attacks on the constitutionality of the wire fraud statute face strong headwinds.  A criminal statute need only provide (1) "sufficient definiteness that ordinary people can understand what conduct is prohibited [*i.e.*, fair notice]," (2) "in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  Section 1343, as applied in this case, passes muster on both counts.

### A.    *Fair Notice*

"The idea of fair warning[9] is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  *United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011) (quotation marks omitted).  Its purpose is to avoid creating "a trap for those who act in good faith."  *United States v. Ragen*, 314 U.S. 513, 524 (1942).  The mindset of a person who acts in *bad* faith, however, is "inconsistent with surprised innocence," *id.*, and therefore "the constitutionality of a vague statutory standard is closely related to whether

_____

reach.  *See D'Amico*, 734 F. Supp. 2d at 334 ("[Q]uoting favorable language from higher courts does not make it applicable to the case at bar.").

9       The terms "fair notice" and "fair warning" mean the same thing in this context and the case law uses them interchangeably.

that standard incorporates a requirement of *mens rea*," *Colautti v. Franklin*, 439 U.S. 379, 395 (1979).

The wire fraud statute plainly provides fair notice of its prohibitions. *United States v. Hayes*, 118 F. Supp. 3d 620, 629 (S.D.N.Y. Aug. 3, 2015) (holding that the wire fraud statute is not unconstitutionally vague in another LIBOR prosecution). Since 1952, the statute has criminalized the use of interstate or foreign wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1343. The statute is not violated by mistake or by misguided do-gooders. Instead, it prohibits schemes to obtain money or property by way of "trick, deceit, chicane or overreaching," through "dishonest methods," *McNally v. United States*, 483 U.S. 350, 358 (1987), or means that "depart[] from community standards of fair play and candid dealings," *Autuori*, 212 F.3d at 115 (quotation marks omitted). In other words, a bad purpose and intent is a prerequisite to running afoul of the statute.

Because the wire fraud statute requires a bad intent, it is not susceptible to trapping persons who act in good faith. *See Skilling v. United States*, 561 U.S. 358, 412 (2010) (explaining in an honest services wire fraud case that the statute's "*mens rea* requirement further blunts any notice concern"). *See also United States v. Rybicki*, 287 F.3d 257, 263 (2d Cir. 2002); *United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir. 1982); c*f. Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 502-03 (1925) ("[S]ince the statutes [at issue] require a specific intent to defraud in order to encounter their prohibitions, the hazard of prosecution which appellants fear loses whatever substantial foundation it might have in the absence of such a requirement."). Likewise, the Second Circuit observed long ago that the mail fraud statute – with the identical *mens rea* as the wire fraud statute – "has withstood repeated challenges which have raised the

10

claim that it does not provide fair notice and warning of the conduct proscribed by the statute." *Margiotta*, 688 F.2d at 129.

There is no question that the wire fraud statute provided fair notice that the defendants' conduct, as alleged in the indictment, was illegal. Taking the allegations in the indictment as true, the defendants engaged in a scheme to make biased and dishonest LIBOR submissions to benefit Deutsche Bank and themselves at the expense of unwitting counterparties. The scheme therefore achieved its ends "by trick, deceit, chicane or overreaching" and "by dishonest methods," *McNally,* 483 U.S. at 358, and by means that "depart[ed] from community standards of fair play and candid dealings," *Autuori*, 212 F.3d at 115. Such a scheme is "self-evidently criminal" under § 1343 and the defendants "were not ensnared by a trap laid for the unwary." *Al Kassar*, 660 F.3d at 119. Indeed, Judge Crotty arrived at the same conclusion in another LIBOR prosecution. *Hayes*, 118 F. Supp. 3d at 629.

The defendants' arguments to the contrary are unavailing. First, they fall back on their earlier premise that the charges turn on an underlying violation of a rule or legal duty and argue that "the fair warning requirement extends beyond the statutory text and requires that the underlying rule or duty be sufficiently clear so as to provide fair warning that the conduct at issue was prohibited." Defs.' MTD Br. at 13-14. However, as discussed above, the defendants' premise is mistaken because it severely distorts the allegations in the indictment. Liability is not premised on violation of an underlying rule or duty: the defendants conspired with others to give biased and dishonest answers to a question posed by the BBA.

Nevertheless, based on their mistaken premise, the defendants further argue that the government must demonstrate that there is no "reasonable interpretation of the BBA definition" under which it would be acceptable to account for trading positions in making LIBOR

submissions.  *See* Defs.' MTD Br. at 15.  The government needs to do no such thing, especially in response to a motion to dismiss.[10]  And the cases the defendants rely on do not support their argument.  In *United States v. Bryant*, the indictment charged the defendant with fraud based on allegations that he had breached affirmative duties created by his employment contract, and the court held that the contract must leave no room for doubt that the defendant's actions breached his affirmative duties to comport with the fair notice requirement.  556 F. Supp. 2d 378, 448 (D.N.J. June 5, 2008).  *Bryant* does not apply here because there are no allegations in this case that the defendants violated a contractual or other legal duty.  In *United States v. Whiteside*, also cited by the defendants, an indictment was dismissed because the government had failed to prove that the defendant made a false statement.  285 F.3d 1345, 1351-53 (11th Cir. 2002).  Fair notice was not even at issue.

        The defendants' citations to *United States v. Finnerty* and *United States v. Bongiorno*, are equally unavailing.  In *Finnerty*, the defendants, who were charged with securities fraud, claimed that they did not have fair notice because the alleged conduct had not been explicitly defined as fraudulent by the NYSE.  The Court disagreed: "How the NYSE defines conduct . . . does not preclude prosecution if that alleged conduct falls within the ambit of the statute."  No. 05-cr-393 (DC), 2006 WL 2802042, at *8 (S.D.N.Y. Oct. 2, 2006).  Analogizing the BBA to the NYSE, *Finnerty* actually undercuts the defendants' position.  And in *Bongiorno*, which involved charges and fair notice claims very similar to those in *Finnerty*, the Court held that the defendants had fair notice for numerous reasons, including the fact that their conduct was clearly prohibited by

_____

[10]     The government is not arguing that the defendants cannot put on evidence that a reasonable interpretation would allow for the accommodation of trading positions.  Again, the admissibility of such evidence should be determined on a case-by-case basis.  However, that is an issue for trial, not a motion to dismiss.

NYSE rules.  No. 05-cr-390 (SHS), 2006 WL 1140864, at *9 (S.D.N.Y. May 1, 2006).

However, the NYSE's clear prohibition was by no means essential to the Court's rationale.  In

any event, merely because the existence of a clear prohibition means the defendants had fair

notice, the inverse – the absence of a clear prohibition means the defendants did not have fair

notice – does not automatically follow.

      The defendants also argue that the BBA definition did not provide fair notice.  Defs.'

MTD Br. at 16-19.  Notwithstanding the slew of factual assertions from outside the four corners

of the indictment that the defendants rely upon, the immediately preceding paragraphs of this

brief adequately demonstrate that the BBA definition is not what needs to provide fair notice.

The wire fraud statute needs to provide fair notice, and it does.

      Finally, the defendants argue that the BBA knew about LIBOR manipulation but took no

action to stop it.  Defs.' MTD Br. at 19-21.  It is puzzling how this argument is relevant in the

context of a motion to dismiss for lack of fair notice, and the defendants seem to acknowledge as

much.  *See id.* at 20 (stating that "consideration of such evidence is not necessary to hold that the

Indictment fails as a matter of law").  But even so, any failure of the BBA to end manipulation is

of no moment, as was recognized in the very cases cited by the defendants.  *See Finnerty*, 2006

WL 2802042, at *8 ("But as Judge Stein correctly points out in *Bongiorno*, the NYSE's more

lenient enforcement of the alleged conduct 'cannot preclude prosecution for conduct that falls

within the ambit of the statute.'  *Bongiorno*, 2006 WL 1140864, at *9.").

B.        Arbitrary and Discriminatory Enforcement

The purpose of the arbitrary-and-discriminatory-enforcement prong of the vagueness

doctrine is to rein in "[s]tatutory language of such a standardless sweep [that it] allows

policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415

U.S. 566, 575 (1974).  Statutory language must therefore "establish minimal guidelines to govern

law enforcement." *Id.* at 574.[11]

The wire fraud statute is anything but standardless.  It prohibits a very specific means of

obtaining money or property, that is, through "trick, deceit, chicane or overreaching" and other

"dishonest methods," *McNally,* 483 U.S. at 358, and therefore does not lend itself to enforcement

by whim or "personal predilections."  The alleged scheme – making biased and dishonest

LIBOR submissions at the expense of unwitting counterparties – falls squarely within what is

often referred to as the "hard core" prohibitions of the statute and, as a result, does not give rise

to concerns about arbitrary and discriminatory enforcement.  *See, e.g.*, *Smith*, 415 U.S. at 577-78

("To be sure, there are statutes that by their terms or as authoritatively construed apply without

question to certain activities, but whose application to other behavior is uncertain.  The hard-core

violator concept makes some sense with regard to such statutes."); *Broadrick v. Okla.*, 413 U.S.

601, 608 (1973) ("[E]ven if the outermost boundaries of [a statute] may be imprecise, any such

uncertainty has little relevance . . . where [the] conduct falls squarely within the 'hard core' of

the statute's proscriptions . . . ."); *Thibodeau v. Portuondo*, 486 F.3d 61, 67-68 (2d Cir. 2007)

---

[11]      For example, in *Smith*, the Supreme Court struck down a flag-misuse statute on those
grounds that imposed criminal sanctions on anyone who "treats contemptuously the flag of the
United States." *Id.* at 568-69.  In *Kolender*, a statute that required an individual to provide
"credible and reliable" identification upon request of a police officer was also struck down." 461
U.S. at 355-56.  And in *Papachristou v. City of Jacksonville*, a "vagrancy" ordinance fell, too.
405 U.S. 156, 156 (1972).

(explaining that "courts undertaking an as-applied challenge may determine either (1) that a statute as a general matter provides sufficiently clear standards to minimize the risk of arbitrary enforcement or (2) that, even without such standards, the conduct at issue falls within the core of the statute's prohibition"); *Autuori*, 212 F.3d at 115 (explaining that a scheme to defraud "is characterized by a departure from community standards of fair play and candid dealings" (quotation marks omitted)).[12]

The defendants' argument, which once again focuses on the alleged lack of clarity provided by the BBA, misses the point.  The issue is whether the statute – not anything promulgated by the BBA – is vague.  *See Finnerty*, 2006 WL 2802042, at *8.  Accordingly, the wire fraud statute, as applied in this case, is not unconstitutionally vague and the indictment should not be dismissed.

## CONCLUSION

The indictment complies with Rule 7(c)(1), provides "a plain, concise and definite written statement of the essential facts constituting the offense charged."  Accordingly, the Court should deny the defendants' motion to dismiss in its entirety.


SANDRA MOSER                           JEFFREY D. MARTINO
Acting Chief, Fraud Section            Chief, New York Office
Criminal Division                      Antitrust Division
United States Department of Justice    United States Department of Justice


_____/s/_____             _____/s/_____
CAROL L. SIPPERLY                      MICHAEL T. KOENIG
Assistant Chief                        Trial Attorney
ALISON L. ANDERSON                     Antitrust Division

---

[12]    The defendants also cite to *Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 622 (2d Cir. 2011), a case relating to a local zoning ordinance and not a Title 18 criminal statute, is easily distinguished because the zoning ordinance violation there was not a "hard core" violation and the ordinance did not require *mens rea*.

RICHARD A. POWERS                    United States Department of Justice
Trial Attorneys                      (202) 616-2165
Criminal Division, Fraud Section
United States Department of Justice