UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/19/17

UNITED STATES OF AMERICA,

- v. -

S1 16 CR 370 (CM)

MATTHEW CONNOLLY, and
GAVIN CAMPBELL BLACK,

Defendants.

—————————————————————————— x

## DECISION AND ORDER ON DEFENDANTS' PRETRIAL MOTIONS

McMahon, C.J.:

Defendants Matthew Connolly and Gavin Campbell Black are charged in the

Superseding Indictment with conspiracy to commit wire fraud and bank fraud, pursuant to 18

U.S.C. § 1349 (Count 1), and ten counts of wire fraud, pursuant to 18 U.S.C. § 1343 (Counts 2-

11).

This case arises out of the now-infamous "LIBOR-fixing" that took place in the early years

of this century. LIBOR (London Interbank Offer Rate) is the interest rate benchmark at which banks

offer to lend money to one another (at some future date, e.g., one month, six month, one year) in the

wholesale money markets in London, and is the standard financial index used in the United States

and other capital markets. The Indictment alleges that the defendants were part of a scheme

between 2004 and 2011 to cause Deutsche Bank, their employer—one of the sixteen

"Submitter" banks whose estimated borrowing costs were used by the British Banking

Association (BBA), a private entity, to set LIBORs in U.S. Dollars—to submit "false and

fraudulent USD LIBOR submissions" to BBA. The Indictment charges that the LIBOR

1

submissions were "false and fraudulent" because they were not "unbiased and honest," in that they took into account considerations other than what the true cost would be for Deutsche Bank to borrow from other banks at some future date certain—most notably, the trading positions of the defendants and their coconspirators, which had the potential (assuming the Deutsche Bank submission was factored into any particular LIBOR) to "benefit their trading positions" at the expense of counterparties to those trades. The "false and fraudulent submissions" were never communicated to those counterparties, but to the extent that they were (or might have been) used to calculate the day's LIBOR (which depended on whether they were in the mid-range of the 16 submissions for any tenor), they allegedly caused those counterparties "to be susceptible to substantial risk of loss and to suffer actual loss." (Superseding Indictment ("SI" or 'Indictment") ¶ 26). Four such counterparties allegedly were or might have been defrauded; they are identified in the Indictment as Banks A-D." (*See* SI ¶¶ 26 and 27(f).)

Before the Court are a series of pretrial motions filed by the defendants. First, defendants move to dismiss the Superseding Indictment, pursuant to Federal Rule of Criminal Procedure 12(b). Defendants argue that the Indictment should be dismissed because: (1) "it does not identify the BBA LIBOR rule (or any other BBA guidance) on which the Government purports to rely;" (2) "fails as a matter of law because the BBA's LIBOR definition—which appears to be the basis for the alleged scheme even though it is not set forth in the Indictment—neither imposed a best estimate requirement nor prohibited consideration of derivatives trading positions in making LIBOR submissions;" and (3) "the lack of clear standards from the BBA invited arbitrary enforcement of the wire fraud and bank fraud statutes as applied here—therefore, the conspiracy and wire fraud charges set forth in

the Indictment as applied in this case are impermissibly vague [and] violate due process."
Defs.' MTD Br. at 2–3.

If this motion be denied, defendants ask that the Court hold a hearing pursuant to
*Kastigar v. United States*, 406 U.S. 441 (1972), to determine whether the prosecution of this
case was tainted in any way by the testimony Mr. Black was compelled to give in a proceeding
before the United Kingdom's Financial Conduct Authority ("FCA").

Finally, defendants continue their quest for additional discovery from the Government,
this time seeking: (1) additional BBA materials; (2) additional material from the other LIBOR
investigations; and (3) additional BoE materials. Defendants also ask the Court to reconsider
its order on March 2, 2017 denying their earlier motion to compel.

### 1. The Motion to Dismiss the Indictment

To overcome a motion to dismiss, an indictment only needs to be "a plain, concise and
definite written statement of the essential facts constituting the offense charged," Fed. R. Crim.
P. 7 (c) (1), and "sufficiently inform the defendant of the charges against him and provide
enough detail so that he may plead double jeopardy in a future prosecution based on the same
set of events," *United States v. Bustos de la Pava*, 268 F.3d 157, 162 (2d Cir. 2001). In
evaluating a motion to dismiss, the Court should not look beyond the four corners of the
indictment. *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). Of course, "An
indictment . . . need not be perfect, and common sense and reason are more important than
technicalities." *Bustos de la Pava*, 268 F.3d at 162.

3

*Conspiracy to Commit Bank & Wire Fraud and Wire Fraud—Sufficiency of Allegations*

The Superseding Indictment sufficiently pleads a conspiracy to commit wire and bank fraud, as well as substantive wire fraud.

The "essential elements of a wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.2004), cert. denied, 544 U.S. 1017 (2005). To show a scheme to defraud, the Government must present proof that defendants possessed a fraudulent intent. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987). It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, doing something more than merely deceiving the victim. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir.1970).

To meet its burden that defendants are guilty of bank fraud, the Government must prove beyond a reasonable doubt that the defendants knowingly executed, or attempted to execute, a scheme or artifice: "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . . ." 18 U.S.C. § 1344. Although a bank need not be the immediate victim of the fraud, the Government is required to prove that a bank was an actual or intended victim, *see, e.g., United States v. Barrett*, 178 F.3d 643, 646–48 (2d Cir.1999), and that the defendant "engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss," *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d

4

Cir.), cert. denied, 504 U.S. 926 (1992); *see United States v. Rodriguez,* 140 F.3d 163, 167–68 (2d Cir. 1998).

It should be noted that Congress modeled the bank fraud statute on the mail and wire fraud statutes, indicating that it wanted the bank fraud statute to be just as broad as the mail and wire fraud statutes. *See* H.R.Rep. No. 901 at 4; *United States v. Bonallo,* 858 F.2d 1427, 1432–33 (9th Cir.1988). "Common sense" must inform the reading of the indictment; and the bank fraud statute itself, enacted to protect banks' financial integrity, "should be read expansively." *United States v. Stavroulakis*, 952 F.2d at 686.

An indictment charging conspiracy "need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense." *United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir.1995). Thus, a properly pleaded bank fraud and wire fraud conspiracy must allege: (1) that two or more persons entered into an agreement to commit bank fraud and/or wire fraud, and (2) that the defendants knowingly and willfully joined in the agreement.

Here, the Indictment charges defendants and their co-conspirators (two or more persons) with engaging in a scheme to obtain money by false pretenses from various financial institutions (Banks A-D) by making biased and dishonest submissions (false statements) to the BBA (a third party, not the alleged victim), with the intention that those submissions would be used in setting USD LIBORs across various tenors (time periods) in ways that would cause the victim banks to be (or risk being) the losing parties in various derivatives trades (*see* Indictment "The Scheme" at ¶ 26). It also charges that, in furtherance of the scheme, the defendants and their coconspirators made numerous electronic communications (use of the wires) (Indictment "Overt Acts" and "Wire Fraud" Sections at ¶¶ 14–24). Conspiracy (check), wire fraud (check), bank fraud

5

(check)—the Indictment sufficiently informs the defendants of the charges against them with enough detail to preclude a future prosecution based on the same set of events. *See United States v. Bustos De La Pava,* 268 F.3d at 162.

The defendants are wrong that the Indictment is rendered legally insufficient because it failed to allege that BBA had an explicit rule stating that traders could not adjust LIBOR to benefit Deutsche Bank's trading positions. At this juncture, on a motion to dismiss pursuant to Rule 12(b) (6), the Indictment does not have to specifically say anything along the lines of "BBA Rule ABC, specifically prohibits traders and submitters from considering either their bank's or their own trading position, when formulating their LIBOR submissions."

And this is not the *Pirro* case, on which defendants' rely on for the force of their argument. *United States v. Pirro*, 212 F3d 86 (2d Cir 2000). *Pirro* involved a "willful" omission of an "ownership interest" in an S-corporation from a tax return in violation of 26 U.S.C. § 7206(1), not 18 U.S.C. § 1343. In the context of the federal tax code—described by the Second Circuit as "[o]ne of the most esoteric areas of the law"—the standard for willfulness is high and requires offenses to be "predicated upon a voluntary, intentional violation of a known legal duty." 212 F.3d at 90 (citations omitted). Because the indictment did not describe what that "known legal duty" was, "more factual detail was needed just to plead the essential elements of the charged offense." *United States v. D'Amico*, 734 F. Supp. 2d 321, 334 (S.D.N.Y. Aug. 10, 2010) (McMahon, J.) (distinguishing *Pirro*). There is no such requirement in 18 U.S.C. § 1343.

That said, the defense raises some interesting arguments that will no doubt resurface at the trial. The Government will have to prove that the defendants made (or, since neither defendant

6

was a submitter, "caused to be made") a "false or fraudulent" statement concerning estimated

borrowing costs to the BBA. As the Second Circuit recently observed in *United States v. Allen*,

864 F.3d 63, 75 (2d Cir. 2017), "LIBOR submissions were necessarily imprecise even when there

was decent market information, such that, at any given time, there existed a "range" of reasonable

LIBOR submissions." Furthermore, since the bank and wire fraud statutes have a *mens rea*

requirement, the Government will have to establish that the defendants caused the false and

fraudulent statements to be made both "knowingly" (that is, the defendants knew that the

statement they made was false) and "with intent to defraud."

Though it insists that "evidence relating to the BBA was not the central feature of the

government's prosecution of Rabobank traders before Judge Rakoff in 2015, and the Government

does not intend to make the BBA the central feature in this case," Govt. Memo in Opp at 4, n.3,

the Government admits that it will "likely" have to introduce evidence about the BBA's LIBOR-

setting procedures (since the allegedly fraudulent representations—which are the only "false or

fraudulent pretenses" alleged in the Indictment—were made to the BBA and to no one else). I,

for one, can see no way around the need for such evidence, at least given what I know today. The

Indictment states that, "A Contributing Panel bank's submission was to be an unbiased and

honest estimate of that bank's borrowing costs, and not altered to reflect trading positions that

stood to gain or lose based on LIBORs." (*See* SI ¶¶ 12–13) The question submitters were asked

to answer in their LIBOR submissions, however, says nothing about "unbiased and honest"

estimates of borrowing costs; neither does the BBA's LIBOR definition during the period

encompassed by the conspiracy. Someone is going to have to testify about the expectations of the

BBA, or this case will be on precarious footing at the close of the Government's evidence.

The Government also acknowledges— as it must, at least since the Second Circuit's decision in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015)—that evidence of statements made by the BBA to defendants and others about LIBOR may well be admissible on the issue of defendants' state of mind, *Id.* Similar evidence may also be admissible to establish whether any of the victims were aware that submitting banks took their own trading positions into account when offering their LIBOR submissions to the BBA. This might well bear on the issue of whether it was possible to commit any fraud here (especially if any of the "victims" were themselves LIBOR Submitters) or whether the victims cared one way or another (which goes to materiality). Indeed, this Court, in a case alleging insurance fraud, admitted evidence about the expectations of insurance companies that issued so-called STOLI (Stranger-Initiated Life Insurance) policies; the evidence went to the issue of materiality. *See United States v. Binday*, No. 12 CR 152 (CM), 2013 WL 12154927, *1 (S.D.N.Y. Sept. 16, 2013) (Decision on *In Limine* Motions).

The court can and will make no final decision on the admissibility of particular items of evidence until trial; but I am constrained to note in advance of trial that the defense has raised what appear, at first blush, to be legitimate points.[1] While those points do not compel dismissal of the Indictment at this pre-evidentiary stage, they have implications for, *inter alia*, the Government's discovery and *Brady* obligations to defendants. (*See infra.* at 25–27).

---

[1] While the Second Circuit in *Allen* disposed of the case on but one of the many issues raised by Appellants—the *Kastigar* issue, which is discussed below—the panel indicated that the defense had raised "a number of substantial issues on appeal." *United States v. Allen*, 864 F.3d at 79. Those same "substantial issues"—which relate *inter alia* to the admissibility of evidence, the existence of any duty to give what the Indictment described as an "honest view" of borrowing costs, and the Government's purported failure to identify any BBA rule that was violated—are identical to the issues raised by defendants' motion. I am fully aware that these issues will be raised again and again during the trial. That is the time for dealing with them—not on a motion to dismiss a perfectly well-pleaded indictment.

8

The motion to dismiss the Indictment is, therefore, denied.

*Due Process-Vagueness Challenge to Fraud Statutes As Applied to Present Case*

Defendants next argue that, as applied to this case, the wire fraud and bank fraud statutes failed to provide defendants with fair warning that their conduct could constitute a crime, and failed to provide sufficiently clear standards to prevent discriminatory enforcement. Consistent with their argument challenging the sufficiency of the Indictment, defendants argue "that if BBA's LIBOR definition did not prohibit submitters from factoring its Bank's trading position, no reasonable person would understand that these submissions could expose that person to criminal sanctions. In other words, if the submissions were not prohibited, or, if they were allowed, the conduct would not be wrong in and of itself." Defs.' MTD Reply Br. at 7.

The Government counters—as it did when fending off defendants' sufficiency challenge—that it is the fraud statutes charged in the Indictment that should be the focus of the due-process analysis, not anything the BBA had to say about LIBOR submissions.

A criminal statute must provide (1) "sufficient definiteness that ordinary people can understand what conduct is prohibited [*i.e.*, fair notice]," (2) "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

"The idea of fair warning is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011) (quotation marks omitted). Its purpose is to avoid creating "a trap for those who act in good faith." *United States v. Ragen*, 314 U.S. 513, 524 (1942). The

mindset of a person who acts in *bad* faith, however, is "inconsistent with surprised innocence," *id.*, and therefore "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*," *Colautti v. Franklin*, 439 U.S. 379, 395 (1979).

The wire and bank fraud statute plainly provide fair notice of its prohibitions. *United States v. Hayes*, 118 F. Supp. 3d 620, 629 (S.D.N.Y. Aug. 3, 2015) (holding that the wire fraud statute is not unconstitutionally vague in another LIBOR prosecution). The wire fraud statute criminalizes the use of interstate or foreign wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1343. The statute is not violated by mistake or by misguided do-gooders. Instead, it prohibits schemes to obtain money or property by way of "trick, deceit, chicane or overreaching," through "dishonest methods," *McNally v. United States*, 483 U.S. 350, 358 (1987), or means that "depart[] from community standards of fair play and candid dealings," *Autuori*, 212 F.3d at 115 (quotation marks omitted). In other words, a bad purpose and intent is a prerequisite to running afoul of the statute. The same is true for the bank fraud statute. The federal bank fraud statute criminalizes "**knowingly** execut[ing], or attempt[ing] to execute, a scheme or artifice . . . to defraud a financial institution." A person does not violate the statue by mistake.

Since both statutes requires a bad intent, they are not susceptible to trapping persons who act in good faith. *See Skilling v. United States*, 561 U.S. 358, 412 (2010) (explaining in an honest services wire fraud case that the statute's "*mens rea* requirement further blunts any notice concern"). *See also United States v. Rybicki*, 287 F.3d 257, 263 (2d Cir. 2002); *United*

*States v. Margiotta*, 688 F.2d 108, 129 (2d Cir. 1982); *cf. Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 502–03 (1925) ("[S]ince the statutes [at issue] require a specific intent to defraud in order to encounter their prohibitions, the hazard of prosecution which appellants fear loses whatever substantial foundation it might have in the absence of such a requirement."). The Second Circuit observed long ago that the mail fraud statute—with the identical *mens rea* as the wire fraud statute—"has withstood repeated challenges which have raised the claim that it does not provide fair notice and warning of the conduct proscribed by the statute." *Margiotta*, 688 F.2d at 129.

Here, the wire fraud statute and the bank fraud statutes provided fair notice that the defendants' conduct, as alleged in the indictment, was illegal. Accepting the allegations in the indictment as true, as this Court must on a motion to dismiss, the defendants engaged in a scheme to make biased and dishonest LIBOR submissions to benefit Deutsche Bank and themselves at the expense of unwitting counterparties. The scheme therefore achieved its ends "by trick, deceit, chicane or overreaching" and "by dishonest methods," *McNally,* 483 U.S. at 358, and by means that "depart[ed] from community standards of fair play and candid dealings," *Autuori*, 212 F.3d at 115. Such a scheme is "self-evidently criminal" under both the wire and bank fraud statutes. Accordingly, defendants cannot be said to have been "ensnared by a trap laid for the unwary." *Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011).

Regarding the arbitrary-and-discriminatory-enforcement prong of the vagueness doctrine, defendants, once again, focuses on the alleged lack of clarity provided by the BBA. But it is the wire fraud and the bank fraud statutes—not anything promulgated by the BBA— that is germane to the instant analysis. *See United States v. Finnerty*, 2006 WL 2802042, at *8.

Indeed, the purpose of the arbitrary-and-discriminatory-enforcement prong of the vagueness doctrine is to rein in "[s]tatutory language of such a standardless sweep [that it] allows policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Statutory language must therefore "establish minimal guidelines to govern law enforcement." *Id.* at 574. For example, in *Smith*, the Supreme Court struck down a flag-misuse statute on those grounds that imposed criminal sanctions on anyone who "treats contemptuously the flag of the United States." *Id.* at 568–69.

Here, the wire and bank fraud statutes have clearly delineated standards. Neither statute lends itself to enforcement by whim or "personal predilections." The alleged scheme—making biased and dishonest LIBOR submissions at the expense of unwitting counterparties—falls squarely within what is often referred to as the "hard core" prohibitions of the statute and, as a result, does not give rise to concerns about arbitrary and discriminatory enforcement. *See, e.g.*, *Smith*, 415 U.S. at 577–78 ("To be sure, there are statutes that by their terms or as authoritatively construed apply without question to certain activities, but whose application to other behavior is uncertain. The hard-core violator concept makes some sense with regard to such statutes.").

Accordingly, the wire fraud statute and bank fraud statutes were not unconstitutionally vague, as applied to the facts in the Indictment.

The underlying argument that defendants' propounded in their motion to dismiss was that they committed no crime because the BBA permitted defendants to consider and factor in their trading positions when submitting LIBOR. The disposition of such a motion is at this stage premature; it is a motion more properly addressed to the Court in a motion made—at the

earliest—after the Government has presented all of its evidence; or, if necessary, in an argument to the jury in summation.

2. The Motion for a *Kastigar* Hearing

In the alternative, Defendants move, prior to trial, for dismissal of the indictment, on the ground that testimony given by defendant Gavin Campbell Black, a UK citizen, which testimony given to the UK's Financial Conduct Authority by compulsion, was used to procure the indictment against them. They ask the court to hold a hearing prior to ruling on this aspect of their motion to dismiss.

To the extent that defendant Connolly moves to dismiss the indictment as against him on this ground, the motion is denied. As the *Allen* court recognized, *Kastigar v. United States*, 406 U.S. 441 (1972), requires the Government to refrain from the direct or indirect use of an individual's compelled testimony—but that requirement extends only to the individual whose testimony was compelled. *See United States v. Allen*, 864 F.3d 63 (2d Cir. 2017) ("[W]hether testimony given by an individual involuntarily under the legal compulsion of a foreign power may be used against that individual in a criminal case."). Connolly was not—indeed, could not have been—compelled to give testimony to the FCA or anyone else in the UK, so there exists no testimony compelled FROM HIM that could be used AGAINST HIM. There is no *Kastigar* issue as to Connolly.

However, Black's motion for a Kastigar hearing is granted.

The Indictment must be dismissed as against Black if the presentation to the grand jury included information that came directly from or that was derived, directly or indirectly, from his own compelled testimony, and where the use is not found to be harmless beyond a reasonable

13

doubt. *See United States v. Allen*, 864 F.3d 63 (2d Cir. 2017); *United States v. Serrano*, 870 F.2d

1, 14–16 (1st Cir. 1989); *United States v. Byrd*, 765 F.2d 1524, 1529 n.8 (11th Cir. 1985); *United

States v. Gregory*, 730 F.2d 692, 698 (11th Cir. 1984); *United States v. Beery*, 678 F.2d 856, 860

& n.3, 863 (10th Cir. 1982); *United States v. Shelton*, 669 F.2d 446, 464 (7th Cir. 1982).

Where, as here, the defendant has given compelled testimony prior to indictment, the

Government has "the heavy burden of proving that all of the evidence it proposes to use was

derived from legitimate independent sources." *Kastigar*, 406 U.S. at 461–62. A trial court must

normally hold a hearing (a "*Kastigar* hearing") for the purpose of allowing the Government to

demonstrate that it obtained all of the evidence it proposes to use from sources independent of

the compelled testimony. *See, e.g.*, *United States v. Rinaldi*, 808 F.2d 1579, 1584 (D.C. Cir.

1987); *United States v. Garrett*, 797 F.2d 656, 663–65 (8th Cir. 1986); *United States v.

Zielezinski*, 740 F.2d 727, 733 (9th Cir. 1984); *Beery*, 678 F.2d at 863.

As the Court pointed out in *United States v. North*, 910 F.2d 843, 854 (D.C. Cir. 1990)—

a case on which the Second Circuit relied in *Allen* because of its "helpful" legal standards, *see

Allen, supra.*, 864 F.3d at 93—a trial court may hold a *Kastigar* hearing pre-trial, post-trial, mid-

trial (as evidence is offered), or it may employ some combination of these methods. Whenever

the hearing is held, the failure of the Government to meet its burden can have most drastic

consequences. One commentator has stated that "if the tainted evidence was presented to the

grand jury, the indictment will be dismissed; when tainted evidence is introduced at trial, the

defendant is entitled to a new trial. Defendants are afforded similar protections against

nonevidentiary uses of immunized testimony." *North*, 910 F.2d at 854 (internal alterations

14

omitted) (quoting John A. Darrow, *White Collar Crime: Fifth Survey of Law—Immunity*, 26 AM.

CRIM. L. REV. 1169, 1179 (1989)).

A district court holding a *Kastigar* hearing "'must make specific findings on the

independent nature of this proposed [allegedly tainted] evidence.'" *North*, 910 F.2d at 854–55

(quoting *Rinaldi*, 808 F.2d at 1584). Because the burden is upon the government, the appellate

court "'may not infer findings favorable to it on these questions.'" *Id.* at 855 (quoting *Rinaldi*,

808 F.2d at 1583).

> The nature of the hearing that must be held is, quite frankly, onerous:
>
> On remand, if the prosecution is to continue, the District Court must hold a full *Kastigar* hearing that will inquire into the *content* as well as the *sources* of the grand jury and trial witnesses' testimony. That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item. For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the Office of Independent Counsel in questioning the witness. This burden may be met by establishing that the witness was never exposed to North's immunized testimony, or that the allegedly tainted testimony contains no evidence not "canned" by the prosecution before such exposure occurred. Unless the District Court can make express findings that the Government has carried this heavy burden as to the content of all of the testimony of each witness, that testimony cannot survive the *Kastigar* test. We remind the prosecution that the *Kastigar* burden is "heavy" not because of the evidentiary standard, but because of the constitutional standard: the Government has to meet its proof only by a preponderance of the evidence, but *any* failure to meet that standard must result in exclusion of the testimony.

*North*, 910 F.2d at 872–73. Furthermore, "If the District Court finds that the Government has

failed to carry its burden with respect to any item or part of the testimony of any grand jury or

trial witness, it must consider whether that failure is harmless beyond a reasonable doubt." *Id.* at

873. And "If the District Court concludes that the government's failure to carry its burden with

respect to that particular witness or item is harmless beyond a reasonable doubt, the District

Court must memorialize its conclusions and rationales in writing." *Id.*

*Kastigar* vindicates a constitutional right. By indicting an individual who was compelled to give testimony by a foreign government, the Government ran the risk that it would have to subject itself to a *Kastigar* hearing. Once the defendant demonstrates that he has been compelled to testify—and that the Government had access to that testimony—the defendant has no burden to prove that a hearing is required. *See Kastigar*, 406 U.S. at 460; *Allen*, 864 F.3d at 87. And no court of which I am aware has indicated that the defense has to make any particular showing in order to warrant a hearing; the Government has to establish, at this point, that it did not obtain the indictment by using compelled testimony directly or indirectly.

The Government's position in *Allen* was and continues to be that no *Kastigar* hearing is required because *Kastigar* applies only to testimony compelled by the United States itself, not to testimony compelled by a foreign sovereign unconstrained by the Fifth Amendment. Indeed, the Government has recently moved for reconsideration or a hearing *en banc* in *Allen* on that very ground. *See United States v. Allen*, 16-898(L), Petition for Rehearing or Rehearing En Banc, ECF #136, filed 10/02/2017, *passim*. I rather imagine that the Government will petition for certiorari if the Second Circuit does not reverse itself in *Allen*. But the decision is on the books today, and this court is bound to follow it. The defendants have speedy trial rights, and this court has no intention of waiting while events play themselves out in *Allen*—a case in which no one has much incentive to speed matters up.

In this case, the Government takes another tack as well. It argues that no *Kastigar* hearing is required because no witness and no member of the prosecution team was ever exposed to Black's compelled testimony. This, it insists, takes the case out from under the rule in *North*, 910 F.2d at 863—where the witnesses were admittedly "soaked in" Oliver North's compelled (and

nationally televised) Congressional testimony—as well as the rule in *Allen*, 864 F.3d at 68—

where the Government's chief cooperating witness read and annotated compelled testimony and

altered his own recollections in reliance thereon.

The Government's unsworn representation to this effect is plainly insufficient. *Allen*, 864

F.3d at 94 (requiring testimony "under oath"). The Government's failure (or deliberate refusal)

to provide sworn evidence is alone sufficient for the court to order a hearing of some sort so that

*Kastigar* issues can be explored. Therefore, the motion for a *Kastigar* hearing must be granted.

The Government also indicates that no *Kastigar* hearing is required because Black did

not give incriminating testimony. If this court required proof that the trial team was shielded

behind a "Chinese wall," and had nothing to do with the preparation of the Kastigar brief, I

would need to look no further than that argument. As the defense noted, the Government will

argue at trial that Black's self-exculpatory statements and explanations are incriminating because

they are contradicted by other evidence and so are untrue.  Black admitted to having

communicated with DB LIBOR submitters about the setting of rates, using words (many of them

captured in emails) that could certainly be understood as requests to have the DB submitters

consider his positions in setting their LIBOR submissions.  The fact that he offered exculpatory

explanations for what he said does not necessarily mean that his testimony was not incriminating

in the "false exculpatory" sense.

The Government has indicated that Black's compelled FCA testimony was not read to the

grand jury. And while the prosecution team has not testified under oath that none of them

reviewed Black's grand jury testimony, I anticipate that, when affidavits are provided, they will

confirm what the Government has insisted all along – none of the prosecutors read Black's testimony.[2]

But no such testimony has as yet been proffered.

Given the importance of this issue, the court will review the grand jury transcript, so I can confirm the Government's representation. And I will accept affidavits from the Government's trial team and agents on this subject. Only if an affidavit reveals that someone was exposed to the FCA testimony will that individual need to be cross examined at the *Kastigar* hearing.

Assuming, however, that the Government's position is borne out, the compelled testimony was, therefore, not used "directly" to obtain the indictment.

The question, then, becomes whether Black's testimony was used "indirectly." There are two ways in which that could have occurred:

First, some witness before the grand jury who had been exposed to Black's testimony—directly or indirectly through another person who was exposed to the testimony—had his testimony "shape[d], alter[ed], or affect[ed]" by Black's compelled testimony, and possibly even if the witness used Black's testimony to "refresh his memory, focus or organize his thoughts." *Allen*, 864 F.3d 93.

Second, if the Government obtained investigative leads for evidence that was presented to the grand jury via Black's testimony.

Turning to the first of these possibilities: In *Allen*, 864 F.3d 100, the compelled testimony from defendants Allen and Conti was reviewed by cooperator Robson (before he became a

---

[2] After looking at the transcript of the compelled testimony, I confirm the Government's representation (known to Black) that no member of the US team, and no US person other than Black's own US lawyer, was present at the FCA interview.

cooperator). Robson was then debriefed by FBI Agent Weeks, and gave Weeks information that Weeks could not have obtained from any other source. Weeks transmitted some of that information to the grand jury. This, the Second Circuit held, qualified as "presenting compelled testimony to the grand jury" and warranted dismissing the indictment unless the Government could prove beyond a reasonable doubt the grand jury would have indicted Allen and Conti absent that testimony. In *Allen*, the Government failed to meet its burden, because material parts of the agent's testimony derived exclusively from Robson, who had been exposed to the compelled testimony. *Id.* at 100–01. Therefore, the indictment was dismissed.

In this case: Special Agent Weeks again testified before the grand jury. He will testify that he did not review Black's compelled testimony.

I do not know if any other witnesses testified before the grand jury. A review of the minutes would allow me to assess this.

The Government has presented unsworn evidence, in the form of a letter from the Serious Fraud Office of the UK Crown Prosecution Service, listing a number of individuals who were shown Black's compelled testimony or a "detailed summary" thereof. They are:

Darrell Read
Colin Goodman
Danny Wilkinson
Terry Farr
James Gilmour
Noel Cryan
Vijay Merchant
Ryan Reich
Alex Pabon
Stylianos Contogoulas
Jonathan Mathew
Peter Johnson
Christian Bittar
Phillipe Moryoussef

Carlo Palombo
Sisse Bohart
Colin Bermingham
Achim Kraemer
Counsel for all of the above

Of these individuals, the only ones who names I have thus far encountered in this case are

Christian Bittar (who, I am advised, may be a witness in this case) and Phillipe Moryoussef. But

the Government advises that none of these individuals will be called to testify at trial, and I

assume a review of the grand jury minutes will confirm that none of them testified before the

grand jury.

Unfortunately that does not dispose of the issue. We must then, at a minimum, explore

whether the testimony of anyone who did appear before the grand jury was "shaped, altered or

affected" by exposure to Black's FCA testimony.

One way in which that could have happened, of course, is if a witness' recollection was

refreshed (as Robson's was) by exposure to Black's FCA testimony. I assume that the

Government's agents and prosecutors will testify under oath that no witness before the grand

jury had access to Black's compelled FCA testimony prior to testifying before the grand jury,

and that his testimony was not used during preparation to, say, refresh the recollection of any

witness who did testify before the grand jury. As long as that is attested to under oath, it will

suffice.

But that is the easy part.

Special Agent Weeks testified before the grand jury. I have no idea to which, if any, of

the individuals who did see Black's compelled testimony spoke to Special Agent Weeks before

he testified in the grand jury, or whether he reviewed statements or testimony taken from any of

these individuals prior to giving his grand jury testimony. I also do not know what sort of review of the compelled testimony of Black any of these individuals might have undertaken prior to speaking with or giving statements to or testimony that might have been read by Weeks. As of this moment, any one of them could conceivably have been the source of information taken from Black's testimony that was conveyed to the grand jury via Weeks and that could have come from no other source. That possibility needs to be eliminated. I would need to know (1) which of these witnesses he interviewed, and when (the "when" being important to the *Kastigar* analysis); (2) which witnesses gave interviews that he reviewed, and when he reviewed them; (3) what, if any, of Weeks' grand jury testimony correlates with things revealed by these witnesses in interviews or 302s that were reviewed by Weeks prior to his grand jury testimony; (4) whether any of that correlated evidence can be tied back to Black's compelled testimony; and (5) if it can be, whether Weeks had an independent source for that correlated testimony.

The three cooperators who, I am advised, are going to testify in this case—King, Parietti and Curtler—are not on the list of individuals to whom the SFO gave copies of the testimony. The Government represents that they have not seen the compelled testimony from any other source. Sworn statements from each of them confirming this would be required before I could reach that conclusion.  But anything less than sworn statements is insufficient.

The defense argues that a hearing is needed to explore contacts between the prosecution team and members of the FCA or SFO teams. The defense is correct to the following extent: the Government admits that an FCA lawyer, Michael Prange, who was present at (indeed, conducted) Black's compelled interview sat in during King's proffer and asked "a small handful

of clarifying questions." That was not a particularly bright thing for the Government to allow; the possibility of taint is not entirely hypothetical.

The Government must produce Prange for testimony under oath and, identify the questions he asked during the King proffer. Prange will have to identify under oath a source other than Black for anything he asked King during the proffer. And either he or someone else will also have to testify about his contacts with the prosecution team prior to the presentation of the case to the grand jury, so that the court can rule out the possibility that he (inadvertently or not) told the Government something about Black's compelled testimony of which it was not already independently aware. As the DC Circuit said in *North*, this sort of inquiry tends to be intrusive, and must go "line-by-line" (which, in this particular situation means going step by step through Prange's contacts with the Government's prosecution team). *North*, 910 F.2d at 872.

Prange's attendance at King's proffer and his active participation therein removes this case from the ambit of *United States v. Bagdis*, 488 F. App'x 593 (3d Cir. 2012), were that decision controlling (which it is not). Not only has the Government shown nothing (by refusing to place itself under oath), but it has admitted to a situation (Prange's presence at and participation in King's proffer) that might call into question the existence of an impermeable wall between the Government's prosecution team and the compelled testimony. The defense was not in "the room where it happened;" it is not required to demonstrate that something happened before the court must make inquiry. The Government concedes a situation in which something might have happened. The court needs to negate that possibility.

The defense also raises the possibility that Black's compelled testimony might have become public in some manner, shape or form, such that someone—Special Agent Weeks, a

cooperator, someone else who testified before the grand jury—could (which is to say, might) have been exposed to it. This is sheer speculation on the part of the defense, and the FCA and the SFO deny that they made the testimony public.

Specifically, the Government has produced a letter that it received from the FSA in which FSA says *inter alia* that it did not share Black's compelled testimony with "any other individuals during their compelled testimony." (Government Response in Opposition to Defendants' Joint Amended *Kastigar* Motion, Exhibit C, Letter from FCA dated August 30, 2017). Similarly, the SFO has provided the court with an unsworn letter indicating that it did not rely on the content of Black's compelled testimony in any public charging document or press release; and the FCA has similarly indicated that it did not rely on the compelled testimony in preparing its "Final Notice" in respect of Deutsche Bank. (*Id.*, Exhibit D, Letter from SFO dated August 24, 2017). Once attested to under oath, this would be powerful evidence that no such thing occurred—particularly because of prohibitions on the extraneous use of compelled testimony under UK law, with which this court is perfectly willing to presume the UK authorities complied.

In its letter (Exhibit D), the SFO also says that, "to the best of our knowledge," Black's testimony was not referred to in any proceedings in open court in any cases being prosecuted by the CPS. Putting most of this under oath would satisfy the court that it was so. However—and I recognize the burden being imposed on our brothers and sisters overseas—I cannot accept a "to the best of our knowledge" representation, even under oath, as sufficient, given the Government's heavy burden under *Kastigar*. I would require that someone—either from the SFO or from the Government's taint team—review publicly available transcripts from the UK cases, to confirm that the "best of our knowledge" at the SFO is in fact correct.

23

As the Government correctly points out, any witness who testified before the grand jury (or who is expected to testify at trial) could overcome the force of Black's hypothetical simply by testifying under oath that s/he could not have been exposed to anything from Black's testimony because s/he (1) did not review any charging document in any case; (2) did not attend any trial of any case prosecuted by the SFO or otherwise review testimony given at those proceedings; (3) did not discuss the testimony or anything derived therefrom with any person who has been identified as having been exposed to it (the Second Circuit's decision in *United States v. Nanni*, 59 F.3d 1425 (2d Cir. 1995), having made it clear that a witness can be tainted even by talking to a person who was exposed to the testimony about the case). Unfortunately, I cannot accede to the Government's request that we avoid the time and expense involved in that undertaking.

Of course, to the extent that the Government obtained information prior to Black's giving compelled testimony, it is perfectly free to proceed on the basis of that information, even though the same information came out during the compelled testimony. But it is the Government's burden to establish that it had cabined information sufficient to support the allegations of the indictment.

I have reviewed both the FBI 302 of Black's interview with the DoJ and the subsequent (by several days) FCA testimony given by Black (the compelled testimony). The FCA testimony covered more territory; it was a longer interview and its questioners confronted Black with more documents and tapes—including some that Black manifestly had not been confronted with by the DoJ (I know this because his counsel and FCA representatives indicated that Black and his lawyers had not seen those materials until the day of the FCA interview). However, the general

24

tenor of the interview and the compelled testimony was identical, both in the topics covered and in Black's exculpatory explanations of what he meant or must have meant by particular statements. Therefore, in assessing the motion, it will be necessary for the Government to correlate information presented to the grand jury with information that it had in its possession—by way of interviews or documents/tapes/other hard evidence—prior to Black's giving compelled testimony. Only the Government can undertake that page by page, line by line exercise. It should get started.

3. The Motion to Compel Government to Produce Brady Material

Finally, defendants move to compel the Government to produce further discovery pursuant to Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

For the most part, the motion is a rehash of issues the court has already addresses in extensive opinions, *see United States v. Connolly and Black*, 16 CR 370, ECF docket entries #61, #76 and #89. I have no basis to reconsider any of my prior decisions. In particular, I disagree with Defendants' assertion that anything in *United States v. Allen* renders this court's decision concerning the scope of documents that are in the possession, custody or control of the Justice Department erroneous. The Second Circuit in *Allen* held one thing and one thing only—testimony compelled by a foreign sovereign is "compelled testimony" for purposes of the Fifth Amendment. It did not rule (indeed, was not asked to rule) that documents in the possession of a foreign sovereign, but not in the possession of the Department of Justice, are in the "possession, custody and control" of DoJ simply because the United States and the foreign sovereign cooperated with one another in investigating the same alleged misconduct. I reject categorically the defense argument that *Allen* stands for the latter proposition.

25

Of course, if the prosecution team went to England, reviewed files, took notes, went home with the notes but not copies of the files, and indicted on the basis of the information it saw abroad, it needs to include what it accessed abroad among the materials that must be produced if otherwise discoverable. That should go without saying. From what I presently know, that did not happen.

The Government's response to defendants' motion to compel is replete with attestations that the Government is aware of its obligations under *Brady,* takes its responsibility to comply with that obligation seriously, and has erred on the side of caution by providing defendants with more information than is require under the rules. *See e.g.*, Government Response to Joint Amended Motion to Compel, ECF No. 130. However, where *Brady* and Rule 16(a)(1)(E)(i) are concerned, the Government—notwithstanding its suggestion otherwise—may be playing matters a little too close to the vest for comfort.

The recent Second Circuit decision in *Litvak*, 808 F.3d 160, makes quite clear that evidence the Government appears to consider irrelevant may well be very relevant. For example, there is apparently evidence that the British Banking Association, which is solely responsible for the setting of LIBOR, was aware that, as early as 2005, its submitter banks took institutional interests (such as derivatives positions) into account. Not only did it do nothing to stop the practice, it accepted the practice as common:

> Some companies will quote rates to suit their current position. It has always been the way . . . [There was] a consensus amongst banks that Sterling LIBOR and US Dollar are being set 3 - 4 basis points above the true cash rate. . . . Those banks whose main business is in derivatives or loans are perfectly happy with this, as it is to their advantage.

(Defendants' Motion to Compel at 9–10, quoting BBA documents). This sort of evidence

could well prove relevant on the issue of fraudulent intent, good faith and/or materiality. The Government's laser-like focus on the obviously impermissible argument that, "Everybody's doing it, so it couldn't possibly be illegal" ignores the fact that evidence relating to these points could be introduced for the limited purpose of creating a reasonable doubt about a defendant's intent to defraud. *Litvak*, 808 F.3d at 188–190.

In *Litvak*, the conviction was reversed because the District Court excluded evidence of a nature similar to the Requested Information, even for the limited purpose of demonstrating the defendant's good faith belief that his actions were "proper and not in furtherance of any unlawful activity." *Id.* at 190. This court, bound by Second Circuit precedent, will have to follow *Litvak* in determining the admissibility of evidence (though the Government can rest assured that I will foreclose impermissible arguments and suggestions of jury nullification). The Government must keep that fact in mind when assessing its *Brady* obligations. Obviously, if the defense has access to documents that appear in the public files of other cases, the Government has no obligation to offer a second copy. But if the Government chooses to assign an unduly narrow definition to words like "relevant" or "exculpatory," and fails to turn over material of which defendants are unaware that relates to these obvious defenses, it may find itself in an uncomfortable position during the trial—and even afterwards, should it be discovered after a conviction that potentially exculpatory material was not turned over.

Finally, the Government has moved for reciprocal discovery pursuant to Fed. R. Crim. P. 16(b)(1). Govt. Opposition to AJMTC at 8 n.4. If a defendant requests discovery pursuant to Rule 16(a)(1)(E), Rule 16(b)(1) requires the defense to produce the documents it "intends to use [] in [their] case-in-chief at trial." Fed. R. Crim.P. 16(b)(1). The motion is granted. If either

Mr. Connolly or Mr. Black decides that he will be putting on a defense case, he must provide the Government with discovery, as defined in Rule 16(b)(1). The time for that production, however, is not today, since I am reasonably certain that no decision has been made about putting on a defense case. If one has, however, then Defendants are, however, reminded of their obligation under Rule 16(b)(1).

This constitutes the decision and order of the Court.

October 19, 2017

Chief United States District Judge

BY ECF TO ALL COUNSEL

28