**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW CONNOLLY and<br>GAVIN CAMPBELL BLACK,<br><br>*Defendants*. | No. 1:16-cr-00370 (CM)<br><br>ECF Case<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' JOINT OPPOSITION TO THE
## UNITED STATES' COMBINED MOTIONS *IN LIMINE*

**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090

*Attorneys for Defendant Matthew Connolly*

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ................................................................................................. 3

I.     DUE PROCESS PRINCIPLES SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING THE PROPOSED COUNTERPARTY AND COOPERATOR TESTIMONY ......................................................................................... 3

II.    THE GOVERNMENT SHOULD BE ESTOPPED FROM PROCEEDING ON A THEORY THAT CONTRADICTS ITS INDICTMENT AND ITS PRIOR REPRESENTATIONS TO THE COURT ........................................................ 5

III.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING THE PROPOSED COUNTERPARTY AND COOPERATOR TESTIMONY UNDER RULES 401 AND 403 ............................................................... 7

     A.    The Proposed Testimony Does Not Pertain to a Term of the Contract ................ 9

     B.    The "Conduit Theory" Does Not Save the Government's Claims ....................... 10

     C.    The Counterparties' and Cooperators' Interpretations of the BBA LIBOR Definition Is Not a Proper Subject for Lay Opinion Testimony .......................... 13

IV.   THE COURT SHOULD NOT PREEMPTIVELY LIMIT DEFENDANTS' ABILITY TO INTRODUCE RELEVANT EVIDENCE OF COUNTERPARTIES' CONSIDERATION OF TRADING POSITIONS IN LIBOR SUBMISSIONS ............. 16

V.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ADMITTING EVIDENCE OF LIBOR ENFORCEMENTS AND RESOLUTIONS ............................ 17

     A.    Defendants' Alleged Actions Did Not Proximately Cause Any Loss to Deutsche Bank ....................................................................................... 18

     B.    Deutsche Bank's LIBOR Settlements Are Unfairly Prejudicial and Likely to Confuse the Issues and Mislead the Jury ........................................ 20

VI.   THE COURT SHOULD NOT PRECLUDE DEFENDANTS FROM INTRODUCING LEGALLY PERMISSIBLE EVIDENCE ........................................... 22

VII.  THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING TESTIMONY ABOUT THE ACCURACY OF AUDIO TRANSCRIPTS ................... 23

VIII. DEFENDANTS SHOULD HAVE THE OPPORTUNITY TO OBJECT TO THE GOVERNMENT'S SUMMARY EXHIBITS IN ADVANCE OF TRIAL ................... 24

IX.   DEFENDANTS WILL NOT ATTEMPT TO INTRODUCE EVIDENCE IN VIOLATION OF THEIR DISCOVERY OBLIGATIONS ........................................... 25

X.      DEFENDANTS SHOULD BE PERMITTED TO INTRODUCE EVIDENCE
        THAT OTHER GOVERNMENT AGENCIES HAVE SUED THE BBA IN
        CONNECTION WITH THE CONDUCT ALLEGED IN THE INDICTMENT............. 26

CONCLUSION.......................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) .................................................................................................. 13

*Arista Records LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ....................................................................... 29

*Bank of China, N.Y. Branch v. NBM LLC*,
  359 F.3d 171 (2d Cir. 2004) ...................................................................................... 15

*Cornell Univ. v. Hewlett-Packard Co.*,
  No. 01-cv-1974, 2008 WL 11274580 (N.D.N.Y. May 14, 2008) ............................ 21

*Deutsche Bank Nat'l Trust Co. v. F.D.I.C.*,
  784 F. Supp. 2d 1142 (C.D. Cal. 2011) ..................................................................... 28

*F.D.I.C. v. Johnson*,
  35 F. Supp. 3d 1286 (D. Nev. 2014) .......................................................................... 28

*In re Motivation Res., Inc.*,
  158 B.R. 184 (Bankr. C.D. Cal. 1993) ...................................................................... 28

*In re Reserve Fund Sec. & Derivative Litig.*,
  No. 09-cv-4346, 2012 WL 12354234 (S.D.N.Y. Oct. 3, 2012) ............................... 30

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999) ...................................................................................... 19

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017) ....................................................................... 20

*Neder v. United States*,
  527 U.S. 1 (1999) ....................................................................................................... 12

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ..................................................................................................... 5

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ..................................................................................................... 5

*Phoenix Assocs. III v. Stone,*
   60 F.3d 95 (2d Cir. 1995) ................................................................................ 30

*United States v. Allen,*
   864 F.3d 63 (2d Cir. 2017) ............................................................................... 11

*United States v. Bank of N.Y. Mellon,*
   941 F. Supp. 2d 438 (S.D.N.Y. 2013) ............................................................. 18

*United States v. Bouyea,*
   152 F.3d 192 (2d Cir. 1998) ............................................................................. 19

*United States v. Buncich,*
   No. 16-cr-161, 2017 WL 4712180 (N.D. Ind. July 27, 2017) .......................... 22

*United States v. Citron,*
   783 F.2d 307 (2d Cir. 1986) ...................................................................... 24, 25

*United States v. Countrywide Fin. Corp.,*
   961 F. Supp. 2d 598 (S.D.N.Y. 2013) ............................................................. 19

*United States v. Davis,*
   No. 09-cr-343, 2009 WL 3646459 (E.D. Pa. Nov. 4, 2009) ............................ 21

*United States v. Doyle,*
   130 F.3d 523 (2d Cir. 1997) ............................................................................. 23

*United States v. Ferguson,*
   676 F.3d 260 (2d Cir. 2011) ............................................................................. 25

*United States v. GAF Corp.,*
   928 F.2d 1253 (2d Cir. 1991) ........................................................................... 28

*United States v. Grinage,*
   390 F.3d 746 (2d Cir. 2004) ...................................................................... 14, 15

*United States v. Gupta,*
   747 F.3d 111 (2d Cir. 2014) ............................................................................. 22

*United States v. Hall,*
   178 F.2d 853 (2d Cir. 1950) ............................................................................. 21

*United States v. Heinz,*
    790 F.3d 365 (2d. Cir. 2015) ............................................................................. 19

*United States v. Jasper,*
    No. 00-cr-825, 2003 WL 221740 (S.D.N.Y. Jan. 31, 2003) ................................ 25

*United States v. Johnson,*
    683 F. App'x 241 (4th Cir. 2017) .................................................................... 11, 12

*United States v. Kaplan,*
    490 F.3d 110 (2d Cir. 2007) .............................................................................. 13

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015) ......................................................................... 16, 17

*United States v. Martin,*
    411 F. Supp. 2d 370 (S.D.N.Y. 2006) ............................................................... 12

*United States v. McMillan,*
    600 F.3d 434 (5th Cir. 2010) ............................................................................. 15

*United States v. O'Connor,*
    237 F.2d 466 (2d Cir. 1956) .............................................................................. 24

*United States v. Paloscio,*
    No. 99-cr-1199, 2002 WL 1585835 (S.D.N.Y. July 17, 2002) ............................ 28

*United States v. Pierre,*
    781 F.2d 329 (2d Cir. 1986) .............................................................................. 30

*United States v. Rea,*
    958 F.2d 1206 (2d Cir. 1992) ............................................................................ 14

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007) .............................................................................. 15

*United States v. Riley,*
    638 F. App'x 56 (2d. Cir. 2016) ....................................................................... 22

*United States v. Rosa,*
    17 F.3d 1531 (2d Cir. 1994) .............................................................................. 24

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*,
    831 F. Supp. 2d 779 (S.D.N.Y. 2011) ...................................................................... 21

*United States v. Russo*,
    110 F.3d 948 (2d Cir. 1997) ................................................................................. 23

*United States v. Sheiner*,
    273 F. Supp. 977 (S.D.N.Y. 1967) ................................................................. 11, 12

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987) ................................................................................. 17

*United States v. Tangen*,
    No. 15-cr-73, 2016 WL 3676451 (E.D. Wash. July 7, 2016) ................................ 23

*United States v. Weaver*,
    860 F.3d 90 (2d Cir. 2017) ............................................................................. 12, 13

*Universal Health Servs., Inc. v. United States*,
    136 S. Ct. 1989 (2016) ........................................................................................ 10

STATUTES

18 U.S.C. § 3293 ............................................................................................................ 18

## Rules

Federal Rule of Criminal Procedure 16 .................................................................. 25

Federal Rule of Evidence 106.............................................................................. 30

Federal Rule of Evidence 401 ......................................................................... 7, 28

Federal Rule of Evidence 402 .............................................................................. 22

Federal Rule of Evidence 403 ......................................................................... *passim*

Federal Rule of Evidence 404 .............................................................................. 22

Federal Rule of Evidence 405 ......................................................................... 22, 23

Federal Rule of Evidence 608 .............................................................................. 22

Federal Rule of Evidence 701 ......................................................................... 13, 15

Federal Rule of Evidence 801 ..................................................................... 26, 28, 30

Federal Rule of Evidence 807................................................................. 26, 28, 29, 30

## Other Authorities

Filmon M. Sexton, *The Financial Institutions Reform, Recovery, and Enforcement Act of 1989: The Effect of the "Self Affecting" Theory on Financial Institutions,* 19 N.C. Banking Inst. 263 (2015) ............................................................................. 18

## PRELIMINARY STATEMENT

The Government's primary motions *in limine* assert that it should be permitted to change its theory of the case two months before trial so that it can present evidence designed to mislead the jury into believing that the BBA's LIBOR definition meant something other than what the BBA promulgated.[1]  In investigating this case, the Government apparently did not interview any witnesses from the BBA.  Had it done so, it would have learned that the BBA did not require LIBOR submissions to be "unbiased and honest," as those terms are used by the Government.  The Government knows that the LIBOR standard it created *post hoc* never existed.  Defendants have also provided the Government with multiple documents, including the BBA's public filing in a United Kingdom court proceeding, that demonstrate that the BBA did not prohibit Panel Banks from taking into account institutional interests, such as trading positions, when making their LIBOR submissions.

The Government nevertheless seeks this Court's authorization to present evidence from which it will argue that the jury should substitute the Government's false construction of LIBOR for the BBA's actual understanding and application of its LIBOR definition.  It should not be permitted to do so.  First, the Due Process Clause prevents the Government from obtaining a conviction based on false and misleading evidence.  Second, because the Government previously represented to the Court that the only false statements alleged in the Indictment were made to the BBA, the Government should be estopped from introducing evidence in support of a new theory that contradicts these representations.  Third, despite the Court's instruction that the issues of falsity and materiality must be established through the testimony of a BBA representative, the Government seeks to substantiate its new theory by offering counterparty and cooperator

---

[1] Capitalized terms used herein but not defined shall have the meaning ascribed to them in Defendants' Joint Combined Motions *in Limine*.

testimony about these elements. Any counterparty or cooperator testimony offered on these points, however, would be irrelevant, prejudicial, misleading, and inadmissible hearsay.

In addition, the Court should deny the Government's other motions *in limine*. For example, the Court should not preemptively limit the Defendants' ability to present evidence of other Panel Banks' consideration of trading positions because, *inter alia*, this evidence shows the absence of fraudulent intent, and the Government should not be permitted to limit Defendants from introducing this evidence while at the same time reserving its right to do so itself. The Government's motion to introduce evidence of Deutsche Bank's civil and criminal resolutions also should be denied—the unfair prejudice of such evidence outweighs any probative value, and it would invite the jury to conflate Deutsche Bank's business decision to resolve sweeping multi-agency, multi-jurisdictional allegations (that go far beyond this indictment) with the question of Defendants' culpability. The Government's motion to preclude Defendants from offering evidence that it casts as disguised attempts at jury nullification should be rejected, as Defendants should not be denied their right to offer evidence that is admissible under the Federal Rules. The Court should deny the Government's motions to introduce summary exhibits and to preclude Defendants from offering evidence not provided in accordance with their discovery obligation as premature because the Government has yet to produce any summary exhibits to Defendants or the Court, and Defendants' reciprocal discovery is not due at this time. Finally, the Court should deny the Government's motion to preclude statements from the FDIC complaints, as such evidence bears directly on whether the BBA was deceived.

## ARGUMENT

**I.      DUE PROCESS PRINCIPLES SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING THE PROPOSED COUNTERPARTY AND COOPERATOR TESTIMONY**

Under principles of due process, the Government should be precluded from offering counterparty and cooperator testimony to prove that the LIBOR fixing was "manipulated." [*See* Dkt. No. 227 ("Defs. MILs") Section V (citing cases that demonstrate that the Due Process Clause prohibits the Government from obtaining a conviction based on the introduction of false or misleading evidence).] The Government seeks to introduce this evidence based on its repeated mantra that "common sense" dictates that the BBA would have never designed LIBOR to permit Panel Banks to consider derivatives positions when making their LIBOR submissions. [*See, e.g.*, Dkt. No. 217 ("Gov't Br.") at 3, 18, 26-27 (referencing the Government's purportedly common-sense interpretation of the BBA's LIBOR definition).] For example, the Government states that what it is "pointing out by using 'honest and unbiased' is that it is common sense that any question or request expects participants to answer truthfully and is something that does not need to be said." (*Id.* at 18.) The Government similarly argues that "the jury is entitled to infer from the fact that the BBA set up a benchmark to measure borrowing costs and to which was tied trillions of dollars in derivatives contracts that the BBA would not have approved of an arrangement in which panel banks submitted whatever number they thought would make them the most money." (*Id.* at 25.)

The problem with the Government's argument is that the BBA did not design the system according to the Government's "common sense" perspective. This is reflected not only by contemporaneous documents, but also by the BBA's own statements. As detailed in Section V of Defendants' motions *in limine*, the BBA (1) was aware that Panel Banks factored institutional

interests into their LIBOR submissions, (2) accepted this practice, and (3) did not believe any single Panel Bank could materially manipulate LIBOR because of the trimmed mean methodology.  (*See* Defs. MILs at 14-15); [*see also* Dkt. No. 145 ("Oct. 19 Decision") at 26 (discussing the evidence showing that the BBA "[n]ot only did . . . nothing to stop the practice [of submitter banks taking institutional interests (such as derivatives positions) into account], it accepted the practice as common").]  Given this evidence, the Government is constitutionally barred from seeking to introduce evidence for the purpose of having the jury make a finding that it knows to be untrue.

In the face of this contrary evidence, the Government should not be permitted to use counterparty or cooperator evidence as a substitute for BBA evidence.  The BBA was "solely responsible for the setting of LIBOR."  (Oct. 19 Decision at 26.)  As a result, any LIBOR submission or fix necessarily was not "manipulated" if it complied with the BBA's rules, as written and interpreted by the BBA.  The Government cannot make an end run around the necessity for BBA evidence by using counterparties or cooperators to suggest that the BBA's LIBOR definition means something that the BBA never articulated and the evidence demonstrates is untrue.

The Court should also reject the Government's attempt to support its untenable position through a series of rhetorical questions as to why the BBA would have permitted LIBOR submitters to take into account their banks' trading positions.  (*See* Gov't Br. at 26.)  Rather than asking these questions rhetorically on the eve of trial, the Government should have posed them directly to the BBA prior to indicting Defendants.  At this stage, the "why" no longer matters because the BBA has made clear that the Government's interpretation of the LIBOR definition is wrong.  This is demonstrated by both direct and circumstantial evidence, including, but not

limited to:  (1) allegations by the FDIC, another Government agency; (2) the BBA's response to these allegations; and (3) internal BBA documents created during the time period at issue in this case.  (*See, e.g.*, Defs. MILs at 14-15; Oct. 19 Decision at 26.)  The Government should have investigated the BBA's actual practices before indicting Defendants based on their own inaccurate assumptions, and the Government's insistence on proceeding in spite of this failing is an affront to Defendants' due process rights.

Accordingly, the Government should be precluded from introducing the proposed counterparty or cooperator testimony under principles of due process.

## II.     THE GOVERNMENT SHOULD BE ESTOPPED FROM PROCEEDING ON A THEORY THAT CONTRADICTS ITS INDICTMENT AND ITS PRIOR REPRESENTATIONS TO THE COURT

The Government should be estopped from proceeding on its new theory because it conflicts with its prior representations to the Court.  In its brief, the Government asserts that it did not intend to leave the Court with the impression that "the parties were in agreement that the false statements were not made directly to the counterparty victims."  (Gov't Br. at 17 n.9.)  Such an assertion is remarkable because the Government has repeatedly made this precise representation throughout the course of this case.

The doctrine of judicial estoppel dictates that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  This rule "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000), and from "deriv[ing] an unfair advantage or impos[ing] an unfair detriment on the opposing party," *New Hampshire*, 532 U.S. at 751.

In this case, the Government now asserts that it intends to prove at trial that Defendants made or caused to be made two categories of alleged false statements directly to Deutsche Bank's counterparties:  (1) the false promise to pay or receive LIBOR at the inception of certain swap agreements; and (2) the transmission of false LIBOR fixings during the course of those agreements.  The Indictment, however, does not allege that any false statements were made to the counterparties or that Defendants deceived the counterparties in any way.  Rather, the Indictment alleges a scheme to make "false and fraudulent" LIBOR submissions ***to the BBA*** for the purpose of influencing the BBA's setting of the LIBOR rate.  (*See* SI ¶¶ 25, 26 (emphasis added).)

The Government has maintained this theory of the case throughout.  For example, in the very first line of its opposition to Defendants' motion to dismiss, the Government argued that "[t]his case is about the defendants' scheme to make money at the expense of unwitting counterparties through ***biased and dishonest LIBOR submissions*** designed to benefit Deutsche Bank's trading positions."  [Dkt. No. 122 at 1 (emphasis added).]  Later in that same brief, the Government stated:  "The indictment clearly charges the defendants and their co-conspirators with making biased and dishonest LIBOR submissions; the BBA asked them a question, and they provided fraudulent answers."  [*Id.* at 5.]  Notably, the Government's opposition was filed three months after the decision on Defendants' motion for a bill of particulars in which the Court stated:  "The false statements specified in the Indictment were not made to the victims of the fraud; rather, they were made to the BBA, which unwittingly utilized those false statements to set various LIBOR benchmark rates in ways that allegedly favored DB's position in various derivatives trades, thereby causing losses to various third parties."  [Dkt. No. 89 ("May 24 Decision") at 4.]  Thus, the Government not only failed to point out any issue that it had with the

Court's conclusion, but it also adopted this conclusion by reaffirming that the only false statements alleged in the Indictment were contained in Deutsche Bank's LIBOR submissions to the BBA.

Moreover, in its December 7, 2017 brief regarding the necessity of a BBA witness, the Government did more than merely point out that "cases discussing the convergence theory support the proposition that it does not matter to whom a statement was made." (Gov't Br. at 17 n.9.)   Rather, the Government affirmatively represented that the Indictment alleged a non-convergence theory of fraud, stating:  "Because the wire fraud statute, 18 U.S.C. § 1343, does not require 'convergence' between the party who receives a false and fraudulent statement and the party whose property interests are threatened, the scheme falls within the ambit of the statute where the defendants made fraudulent statements to *the BBA* for the purpose of cheating Deutsche Bank's *counterparties* out of money."  [Dkt. No. 159 at 3 (emphasis in original).]  This is further evidence that, until two weeks ago, the Government was still proceeding on the theory that the allegedly false statements were made to the BBA, not to Deutsche Bank's counterparties.

Accordingly, the Government should be estopped from contradicting its prior representations to the Court and Defendants, and the Court should preclude it from proceeding on the inconsistent theory identified for the first time in its motions *in limine*.

## III.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM OFFERING THE PROPOSED COUNTERPARTY AND COOPERATOR TESTIMONY UNDER RULES 401 AND 403

The proposed counterparty and cooperator testimony is inadmissible under Rules 401 and 403 because it is irrelevant and unfairly prejudicial.  First, in asserting that this evidence is admissible, the Government conflates a LIBOR submission with the LIBOR fix.   The Government at once states that its "central allegation is that defendants schemed and conspired to

submit false and fraudulent ***LIBOR submissions***" (Gov't Br. at 28 (emphasis added)), but then contends that it is relying on "two categories of false and misleading statements," which it identifies as the promise to pay, and the transmission of, a "manipulated ***LIBOR fix***[]" (*id.* at 11 (emphasis added)).  This newfound focus on "the manipulated LIBOR fixing" (*e.g.*, Gov't Br. at 16) is a marked departure from the Indictment (*see* SI ¶ 26 (the allegedly false or fraudulent statements are Deutsche Bank's "USD LIBOR submissions to the BBA for inclusion in the calculation of USD LIBOR")), and the Government's long-standing position that it intended to prove "decei[t] by the fraudulent [LIBOR] submissions that the defendants caused Deutsche Bank to submit" [Dkt. No. 159 at 1].  (*See supra* Section II.)

The Government also takes a series of contradictory positions concerning whether it is required to prove that any statements were false in the first place.  The Government argues that counterparty and cooperator testimony is admissible to prove falsity and that it proves that the scheme was not "mere 'fraud in the air'" (Gov't Br. at 31-34), while at the same time asserting that "[a]rgument[s] that Deutsche Bank's LIBOR submissions were not 'false' because they fell within a 'reasonable range' of estimates or that because Deutsche Bank may have still been able to borrow at the manipulated rate, there is no fraud—are wrong as a matter of law."  (*Id.* at 31 n.16.)

Notwithstanding the Government's contradictory assertions, the Court has already resolved both of these issues.  The Court explained that "[t]he false statements specified in the Indictment were not made to the victims of the fraud; rather, they were made to the BBA, which unwittingly utilized those false statements to set various LIBOR benchmark rates."  (May 24 Decision at 4.)  The Court further stated that "[t]he Government will have to prove that the defendants made (or, since neither defendant was a submitter, 'caused to be made') a 'false or

8

fraudulent' statement concerning estimated borrowing costs to the BBA." (Oct. 19 Decision at 6-7.)

Neither counterparty nor cooperator testimony is relevant to the determination of whether Deutsche Bank's LIBOR submissions to the BBA were false or material, or even whether the LIBOR fix derived therefrom was, to use the Government's word, "manipulated." Given the BBA's control of the LIBOR setting process, the counterparties and cooperators cannot properly testify regarding falsity and materiality, and any such testimony from these witnesses about the BBA's understanding of LIBOR would be hearsay. While the Government asserts that cooperator and counterparty testimony will be offered to establish the meaning of an objectively unambiguous contractual term, the Government in reality seeks to use the testimony improperly to establish the meaning of the BBA's rule governing the process used by Panel Banks to make LIBOR submissions—which was not contained in the counterparties' agreements with Deutsche Bank. As such, the proposed testimony is irrelevant and unfairly prejudicial because neither the counterparties nor the cooperators are competent witnesses to speak for the BBA.

## A. THE PROPOSED TESTIMONY DOES NOT PERTAIN TO A TERM OF THE CONTRACT

Defendants did not cause a false statement to be made to the counterparties because no representation was made to the counterparties concerning the BBA's calculation of LIBOR or the LIBOR submission process. Deutsche Bank's contracts with counterparties called for one party to pay a fixed rate and another party to pay a variable rate tied to the LIBOR fix, which was calculated and administered by the BBA. (*See* SI ¶¶ 1-4.) There is no allegation that the swap agreements contained any representation concerning the LIBOR submission process, the considerations that Deutsche Bank would factor into the number it submitted to the BBA, or the manner in which the BBA calculated LIBOR.

As such, the Government has not alleged that a false statement was made to the counterparties.  The Government cannot avoid this fact simply by labeling the LIBOR fixing as "manipulated."  As alleged, the LIBOR fixing was nothing more than a series of rates that the BBA caused to be published at or before 12:00 p.m. London time every business day (SI ¶ 3), and the Government has not alleged that Deutsche Bank, in any instance, failed to pay or receive the contracted amount.  In the absence of such evidence, the Government has not demonstrated that counterparties received any false or fraudulent statement.  *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016) ("Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." (internal quotation marks and alteration omitted)).  Because the LIBOR submission process and the factors Panel Banks could consider in making their submissions were not terms of the contracts at issue, counterparties and cooperators are not appropriate witnesses to provide the proposed testimony.

### B.     THE "CONDUIT THEORY" DOES NOT SAVE THE GOVERNMENT'S CLAIMS

The Government's attempted application of a "conduit theory" is still based on a faulty premise.  As the Government explains, "Deutsche Bank's counterparties . . . thought the swaps would be settled based on ***honest and unbiased*** LIBOR . . . when in fact they were settled on a number that was skewed to reflect Deutsche Bank's financial interests."  (Gov't Br. at 18 (emphasis added).)  This statement demonstrates that the Government's conduit theory—like the all of its previous theories—depends on replacing the actual BBA LIBOR definition with the definition developed by the Government *post hoc*.  Repackaging its allegations using the "conduit theory" does not solve this problem for the Government.  "The question submitters were asked to answer in their LIBOR submissions . . . says nothing about 'unbiased and honest' estimates of borrowing costs; neither does the BBA's LIBOR definition," which asks only the

rate at which a bank could borrow funds at 11:00am.  (Oct. 19 Decision at 7); *see United States v. Allen*, 864 F.3d 63, 70-71 (2d Cir. 2017).  Counterparties have no foundational basis to explain the definition or testify concerning the BBA's interpretation of its own rules.  This core deficiency is not remedied by the Government's invocation of the "conduit theory."

The cases cited by the Government to prop up its theory are unavailing.  The Government primarily relies on *United States v. Sheiner*, 273 F. Supp. 977 (S.D.N.Y. 1967), and *United States v. Johnson*, 683 F. App'x 241 (4th Cir. 2017)—one over-fifty-year-old case and one unpublished case from another Circuit.  (*See* Gov't Br. at 19-20.)  According to the Government, "*Shieiner* [*sic*] and *Johnson* are instructive because Messrs. Black and Connolly used Thomson Reuters to transmit false statements to Deutsche Bank's counterparties in much the same way as Shienier [*sic*] used the trade magazine and Johnson used Experian to funnel fraudulent information to lenders." (*Id.* at 20.)

This analysis misses the mark.  First, any allegedly false statement here is false only under the Government's invented LIBOR standard, not the BBA's definition, whereas the false statements in *Sheiner* and *Johnson* were false under any objective measure.  *See Sheiner*, 273 F. Supp. at 980, 983 (advertising coins as containing mint errors when they were in fact altered after minting); *Johnson*, 683 F. App'x at 244 (fabricating clients' credit history in reports to credit agencies).

Second, the Government's analogizing omits all reference to the BBA; in so doing, the Government obscures the fact that the BBA was more than the mere conduit by which Panel Bank submissions were conveyed to the market.  In *Sheiner*, the newspaper simply published the advertisement sent in by the defendants, *see Sheiner*, 273 F. Supp. at 980; in *Johnson*, the credit information was transmitted directly to lenders through credit reports, *see Johnson*, 683 F. App'x

11

at 252. Here, by contrast, the BBA received the submissions and then applied a formula, of its own device, that generated the various LIBORs across all tenors and currencies. As the Government admits, the BBA not only received the various LIBOR submissions from the Panel Banks, but also "excluded the eight outlying submissions before calculating the fix, raised questions about aberrant submissions, and allowed for only sophisticated financial institutions to be on the panel." (Gov't Br. at 26.)[2] And because each LIBOR submission was a numeric response to a question posed by the BBA, the BBA, not the counterparties, would be the recipient of the purportedly false statements. Therefore, the BBA, rather than the counterparties, is analogous to the coin purchasers in *Sheiner* and the lenders in *Johnson*—it is the decisionmaker to whom the statements are addressed. *See Neder v. United States*, 527 U.S. 1, 16 (1999); *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017).

The "horse doping" cases, if relevant at all, militate against allowing counterparties to provide materiality testimony.[3] (*See* Gov't Br. at 20-22.) In horse doping cases, the basis of the wire fraud charge was the defendant's "breaking the rules of the horserace by doping a horse." *United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006). By analogy, in this case, the Government is trying to change the rules after-the-fact to suit its theory, as opposed to showing that Defendants broke the rules as written and as applied by the BBA during the time period of the alleged conspiracy. Before even reaching the materiality question, the Government must first

---

[2] The BBA has also taken the position that it did not serve as a conduit, as Panel Banks did not make any representations to the market in the setting of LIBOR. The BBA Response "denied that the Panel Banks made any representation (either express or implied) in relation to the accuracy of the daily USD LIBOR fix. The Panel Banks were not in a position to do so, since they were not involved in the calculation of the daily USD LIBOR fix and the USD LIBOR fix was not published on their behalf." [Dkt. No. 218-1 ¶ 181(d).]

[3] None of the horse doping cases cited by the Government addresses the question of materiality under the wire fraud statute. In fact, the Government concedes that the cases "do not identify the witnesses whom the government called to prove materiality." (Gov't Br. at 21.)

demonstrate that Defendants broke the BBA's LIBOR rules, something it cannot do. Soliciting counterparty testimony about materiality for statements that the Government has not first demonstrated were false under the BBA LIBOR rule is putting the cart before the horse.

Accordingly, the Government's attempt to introduce the proposed cooperator and counterparty testimony on the basis that false or fraudulent statements were conveyed to counterparties through a conduit rests on inconsistent allegations, inaccurate assumptions, and inapplicable case law. The Government's request should therefore be denied.[4]

### C. THE COUNTERPARTIES' AND COOPERATORS' INTERPRETATIONS OF THE BBA LIBOR DEFINITION IS NOT A PROPER SUBJECT FOR LAY OPINION TESTIMONY

The counterparties' and cooperators' interpretations of the BBA's LIBOR definition are not a proper subject for lay opinion testimony. The admissibility of lay opinion testimony is governed by Rule 701, which imposes certain foundational requirements "to ensure that lay opinion testimony is reliable and does not usurp the jury's role as fact-finder." *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007). Rule 701 requires that lay opinion testimony be "(a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The

---

[4] Although not directly argued in the Government's motions *in limine*, the Court should also preclude the Government from introducing counterparty materiality testimony based on a fraud-on-the-market theory. Fraud-on-the-market is typically invoked in civil securities act cases as a means to prove **reliance**. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466-67 (2013). Even a civil litigant cannot use fraud-on-the-market to prove materiality. *See id.* In fact, the Supreme Court has made clear that proof of materiality is "an essential predicate of the fraud-on-the-market theory," and that "the fraud-on-the-market theory cannot apply absent a *material* misrepresentation or omission." *Id.* Because reliance is not an element of the charged offenses, *see, e.g.*, *Weaver*, 860 F.3d at 95, the fraud-on-the-market theory has no application to this case.

Government's proposed testimony, on its face, is not an appropriate subject for lay opinion testimony for several reasons.

First, the Government cannot use the counterparties or cooperators to prove falsity because they are not proper substitutes for a BBA witness. Given the BBA's authority over the LIBOR submission process, the cooperators' and counterparties' subjective understanding of the LIBOR definition is neither relevant nor helpful to the jury in this case. In adopting its definition, the BBA did not include an "honest and unbiased" standard or prohibit Panel Banks from considering their trading positions. (*See* Oct. 19 Decision at 7.) The counterparties and cooperators are not in a position to explain or second-guess that decision, nor are they competent to testify that the definition, as written, implicitly imposed the standard created *post hoc* by the Government. Any counterparty or cooperator testimony about the BBA's definition or its statements about LIBOR also would be hearsay. Moreover, the Government's proposed use of this testimony is especially problematic (and unfairly prejudicial) given the contemporaneous evidence demonstrating that the BBA did not interpret its LIBOR definition as requiring "unbiased and honest" submissions, as those terms are used by the Government. (*See supra* Section I.) The proposed testimony would also be highly speculative, as it would come from witnesses whom the Government concedes had only "general[] [knowledge] that LIBOR represented cash, or lending or borrowing costs." (Gov't Br. at 9 n.4.) The proposed testimony is therefore not helpful to the jury and would unfairly prejudice Defendants. *See* Fed. R. Evid. 403.

Second, the proposed testimony is inadmissible because it would usurp the function of the jury by providing an opinion that "'would merely tell the jury what result to reach.'" *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004) (quoting *United States v. Rea*, 958 F.2d

1206, 1215 (2d Cir. 1992)).  By opining on the meaning of the BBA's LIBOR definition, the counterparties and cooperators would be intruding on the province of the jury by giving direction through their opinion testimony concerning the inferences that should be drawn from the objective facts of the case.  As the Second Circuit has stated, "[t]hat is not the point of lay opinion evidence."  *Id.* at 750.

Third, the proposed testimony is improper lay opinion testimony because it is based on specialized knowledge.  Rule 701's specialized knowledge restriction precludes a witness from providing lay opinion testimony that is grounded in his or her extensive experience in the industry.  *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004).  The counterparties' and cooperators' proposed opinion testimony is therefore improper because, as the Government concedes, they "will . . . base their knowledge on their personal experiences working at Deutsche Bank or their respective institutions."  (Gov't Br. at 30.)

The cases cited by the Government permitting witnesses to give primarily factual testimony concerning matters learned during an investigation conducted during the time period at issue are distinguishable from the present situation.  (*See* Gov't Br. at 29-30 (citing *United States v. Rigas*, 490 F.3d 208, 222-25 (2d Cir. 2007); *United States v. McMillan*, 600 F.3d 434, 455-457 (5th Cir. 2010)).)  While a witness may testify as to his or her factual perceptions made during his or her personal investigation of the activities at issue, Rule 701 does not permit opinion testimony that is "not a product of [the] investigation, but rather reflected specialized knowledge [the witness] has because of his extensive experience" in the relevant industry.  *Bank of China*, 359 F.3d at 182.  The Court should therefore conclude that the counterparties' and cooperators' interpretation of the BBA's LIBOR definition is not a proper subject for lay opinion testimony.

**IV.**     **THE COURT SHOULD NOT PREEMPTIVELY LIMIT DEFENDANTS'
ABILITY TO INTRODUCE RELEVANT EVIDENCE OF COUNTERPARTIES'
CONSIDERATION OF TRADING POSITIONS IN LIBOR SUBMISSIONS**

The Government asks that the Court "limit the introduction of evidence that other panel banks manipulated LIBOR." (Gov't Br. at 39.) The Government makes this request despite its concession that "evidence of LIBOR manipulation at other banks could possibly be relevant" and its intention to "introduce such evidence" in its own case-in-chief. (*Id.* at 35.) Essentially, the Government is requesting that the Court impose some undefined stricture on Defendants' case while retaining the unfettered ability to introduce similar evidence itself. This request should be denied.

The Court has already cautioned the Government that "evidence the Government appears to consider irrelevant may well be very relevant." (Oct. 19 Decision at 26.) In particular, the Court explained that evidence that other Panel Banks took institutional interests such as derivatives trading positions into account "could well prove relevant on the issue of fraudulent intent, good faith and/or materiality," and advised the Government not to maintain a "laser-like focus on the obviously impermissible argument that, 'Everybody's doing it, so it couldn't possibly be illegal.'" (*Id.* at 27.) Nonetheless, the Government wrongly claims that Defendants would seek to introduce evidence pertaining to other Panel Banks merely as "evidence that others were doing it too." (Gov't Br. at 35.)

That misses the point. The fact that certain Deutsche Bank counterparties were considering derivatives trading positions in their LIBOR submissions is probative of the absence of an intent to defraud and Defendants' good faith. *See United States v. Litvak*, 808 F.3d 160, 189-90 (2d Cir. 2015). While the Government reflexively labels this conduct as manipulative, the fact that other submitters did not interpret the BBA's rules in the same manner as the

Government further evidences the reasonableness of Defendants' belief that the BBA did not *sub silentio* prohibit submitters from taking institutional concerns into account in their LIBOR submissions. Indeed, given that many of these submitters worked for counterparties to Deutsche Bank's trades, this evidence would provide the jury "a fair basis upon which to infer" that Defendants could not have operated with an intent to deceive. *Id.* at 190; *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent.").

Moreover, the Government's argument that the Court should preclude evidence concerning other Panel Banks' interpretation of the LIBOR rules is inconsistent with other arguments that it has made in the motions *in limine*. The Government cannot on the one hand assert that the counterparties and cooperators are competent to testify concerning their understanding of the BBA's LIBOR definition (which they are not, for the reasons discussed *supra*), but on the other hand assert that evidence of the understandings of other Panel Banks is not similarly admissible. Nor should the Government be permitted to present summary charts or other evidence concerning the submissions of other Panel Banks yet obtain a bar to any evidence concerning how the other Panel Banks arrived at those submissions.

Accordingly, the Court should reject the Government's attempt to place some undefined limit on Defendants' ability to introduce manifestly relevant evidence that certain Panel Banks considered derivatives trading positions in their LIBOR submissions.

**V.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ADMITTING EVIDENCE OF LIBOR ENFORCEMENTS AND RESOLUTIONS**

The Court should preclude the Government from admitting evidence of Deutsche Bank's LIBOR resolutions, including settlements with the Department of Justice ("DOJ"). The Government asserts that this evidence is admissible to establish the applicability of 18 U.S.C.

§ 3293(2), the FIRREA provision that extends the statute of limitations for wire fraud and wire fraud conspiracy from five years to ten years "if the offense affects a financial institution." Evidence of these settlement agreements is not relevant because any losses arising from these agreements were proximately caused by Deutsche Bank's own LIBOR submission policies and practices as opposed to any incidental conduct of Defendants in following them.  In addition, this evidence is inadmissible under Rule 403 because any minimal relevance is substantially outweighed by the danger of unfair prejudice.

### A.   DEFENDANTS' ALLEGED ACTIONS DID NOT PROXIMATELY CAUSE ANY LOSS TO DEUTSCHE BANK

The Government should not be permitted to introduce Deutsche Bank's LIBOR resolutions as evidence that the charged offenses "affect[ed]" Deutsche Bank as a financial institution because Deutsche Bank's policies and practices, not Defendants' alleged actions in following them, were the proximate cause of any losses connected to these settlements.  The Government seeks to introduce the proffered evidence under what has been referred to as the "self-affecting theory."  *See* Filmon M. Sexton, *The Financial Institutions Reform, Recovery, and Enforcement Act of 1989: The Effect of the "Self Affecting" Theory on Financial Institutions*, 19 N.C. Banking Inst. 263 (2015).  The self-affecting theory, which one commentator likened to "the government prosecuting someone for attempted murder after that person failed to commit suicide," *id.* at 263, allows the Government to argue that a bank was "affect[ed]" by a fraudulent scheme even though the bank was not victimized by the scheme, but was both the perpetrator and the alleged affected entity.  *See, e.g.*, *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 458-59 (S.D.N.Y. 2013).

The Second Circuit and courts within this District have applied this theory when the bank itself is the defendant or where a defendant employee is not acting pursuant to company policy.

*See United States v. Heinz*, 790 F.3d 365, 367 (2d. Cir. 2015); *United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 605 (S.D.N.Y. 2013).   It has not been applied, however, to a defendant employee who is acting pursuant to a companywide practice set by others in the bank. The Court should decline to do so in this case.

In *United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998)—the first Second Circuit case to address the meaning of the word "affects" in the FIRREA extender statute—the court construed the relevant provision as imposing a proximate-cause like standard which requires a "sufficiently direct" nexus between the alleged conduct and the effect on the financial institution.  *Id.* at 195. While *Bouyea* did not define the boundaries of this standard, the concept of "proximate cause [is used] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999) (internal quotation marks omitted) (alteration in original).   Proximate cause requires a direct and foreseeable relationship between the injury asserted and the alleged injurious conduct.  *Id.*; *see also Heinz*, 790 F.3d at 367 ("[T]he banks incurred significant payments and related fees, which were foreseeable to the Defendants at the time of their fraudulent activity.").

Here, Defendants' alleged actions are, at most, a remote and incidental cause of any loss to Deutsche Bank as a result of its settlements with the Government.   Deutsche Bank's management and supervisory personnel, including the Government's cooperators, adopted policies and practices in which submitters and traders were encouraged to discuss openly trading positions, and submitters were encouraged to take these positions into account in the bank's LIBOR submissions.  It was the bank's adoption and promotion of these practices and its failure to adopt LIBOR training and compliance—not a few conversations between Defendants and

their colleagues—that were the proximate cause of Deutsche Bank's investigation, settlements and any losses connected thereto. Accordingly, Deutsche Bank's LIBOR resolutions are not relevant to the issue of whether the FIRREA statute of limitations extender applies in this case. Furthermore, there was no rule prohibiting the alleged conduct during the time of the alleged conspiracy and any investigation, charge or settlement was not reasonably foreseeable.

**B.   DEUTSCHE BANK'S LIBOR SETTLEMENTS ARE UNFAIRLY PREJUDICIAL AND LIKELY TO CONFUSE THE ISSUES AND MISLEAD THE JURY**

The fact that Deutsche Bank settled global civil and criminal allegations by multiple regulators is of minimal relevance to Defendants' guilt. Corporate resolutions result from complex cost-benefit analyses that may have no bearing on the merits of the investigation or litigation. *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (concluding that settlement agreements "carry little evidentiary weight because they are too tightly bound to the incentive to avoid litigation to cast much light on the underlying merits of the case" (internal quotation marks omitted)). Evidence of settlements is not only minimally relevant, but also unfairly prejudicial, because it suggests liability and invites the jury to hold Defendants guilty by association.

The Government should not be permitted to introduce these sweeping corporate settlements in order to show that the "allegations giving rise to this case are the same as those covered, ***in part***, by the April 23, 2015 settlement between Deutsche Bank and DOJ." (Gov't Br. at 42 (emphasis added).) In fact, Deutsche Bank's settlement encompassed conduct that was unrelated to the charges in this case. For example, Deutsche Bank's settlement with the Government concluded that "numerous DB employees engaged in regular efforts to manipulate ***EURIBOR*** to benefit DB's trading positions." [Dkt. No. 233-2, Statement of Facts ¶ 37 (emphasis added).] Admission of such evidence would impermissibly cause the jury to conflate

Defendants' culpability with the cost that Deutsche Bank was willing to pay to obtain a global resolution associated with interest-rate benchmark submissions, including those unrelated to Defendants' alleged conduct.  Defendants have "the right to stand or fall with the proof of the charge made against [them]," and not by evidence against "somebody else."  *United States v. Hall*, 178 F.2d 853, 854 (2d Cir. 1950).

Recognizing the prejudice that would occur if the Deutsche Bank settlements are admitted, the Government suggests that the Court could provide a "limiting instruction so that the jury only considers this evidence to establish the effect on Deutsche Bank as alleged in the superseding indictment and not as proof of guilt."  (Gov't Br. at 43.)  But even "a carefully crafted limiting instruction might not eliminate the prejudicial effect of the agreement."  *See United States v. Davis*, No. 09-cr-343, 2009 WL 3646459, at *5 (E.D. Pa. Nov. 4, 2009).[5] Rather than run the risk of misleading the jury with evidence of dubious relevance, the Court should preclude the Government from introducing select evidence of Deutsche Bank's LIBOR-related settlements.

At a minimum, any references to monetary amounts paid by Deutsche Bank should be excluded or redacted prior to any jury publication.  *See, e.g.*, *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 831 F. Supp. 2d 779, 785 (S.D.N.Y. 2011) ("To prove the applicability of § 3293, the Government need not disclose the specific monetary figures or other terms of the settlements."); *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-cv-1974, 2008 WL 11274580, at *8 (N.D.N.Y. May 14, 2008) (granting Hewlett-Packard's motion *in limine* seeking exclusion of dollar amounts of other litigation settlements and awards).  Deutsche Bank's monetary

---

[5] Defendants of course understand that an appropriate exception would be made to allow the Government to elicit testimony and other evidence relating to James King's non-prosecution agreement, and the guilty pleas entered by Michael Curtler and Timothy Parietti, all of whom are anticipated to testify at trial.

settlements will assuredly lead the jury to conflate corporate-settlement amounts with a commensurate perception of Defendants' culpability, which represents exactly the type of unfair prejudice against which Rule 403 provides protection.

## VI.   THE COURT SHOULD NOT PRECLUDE DEFENDANTS FROM INTRODUCING LEGALLY PERMISSIBLE EVIDENCE

Defendants reserve the right to introduce any evidence admissible under the Federal Rules and oppose any motions by the Government seeking prophylactic rulings to curtail that right. *See, e.g.*, Fed. R. Evid. 402, 404, 405, 608. The Court should not preclude Defendants from offering admissible evidence simply because the Government characterizes it as "nullification" evidence. (*See* Gov't Br. at 44.)

Attempts by the Government to cast background information regarding Defendants' livelihoods, families, or personal lives as "nullification" evidence are inappropriate and should be rejected. Evidence of a person's family or home life, whether offered as character evidence or merely as background information relevant to a person's circumstance or mindset, is often admissible. *See, e.g.*, *United States v. Buncich*, No. 16-cr-161, 2017 WL 4712180, at *3 (N.D. Ind. July 27, 2017) (permitting references to defendant's wife and children as admissible background evidence that passes muster under Rule 403, despite placing limitations on depth of those discussions).

When appropriate, a defendant may offer character evidence of a "pertinent trait" pursuant to Rule 404(a)(2)(A). As the Government has noted (Gov't Br. at 44), Defendants are permitted to "offer evidence of a personal opinion or [their] reputation[s] for a pertinent character trait," such as honesty. *United States v. Riley*, 638 F. App'x 56, 64 (2d Cir. 2016); Fed. R. Evid. 405(a); *see also United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014) (noting that the district court allowed the defendant to call several witnesses who testified to their opinions

that the defendant was an honest person); *United States v. Russo*, 110 F.3d 948, 951 (2d Cir. 1997) (noting that the district court allowed the defendant to call four character witnesses to testify to the defendant's honesty and integrity).  Personal opinion or reputation evidence is therefore not the same as "nullification" evidence.

A defendant is also permitted to prove his character by specific instances of conduct where that character trait is an essential element of the charges at hand.  Fed. R. Evid. 405(b); *see also United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997) (explaining that such evidence is allowed when a defendant's "character itself is an issue under substantive law" (internal quotation marks omitted)).  In the fraud context in particular, "specific instances of truthful or honest conduct by [a] Defendant are admissible under Rule 405(b) as fraud is an 'essential element' of Defendant's charges."  *United States v. Tangen*, No. 15-cr-73, 2016 WL 3676451, at *2 (E.D. Wash. July 7, 2016).  Defendants therefore reserve the right to introduce any permissible evidence at trial—which may include personal information and background evidence regarding their livelihoods, families, or personal lives—if they deem it relevant to any issue or argument.  This may take the form of merely incidental or background information, or evidence purposely aimed at establishing a certain character trait, and a motion *in limine* prohibiting any such references before they are offered is a premature and inappropriate vehicle to challenge their potential admissibility.

## VII.     THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING TESTIMONY ABOUT THE ACCURACY OF AUDIO TRANSCRIPTS

The Government seeks to provide transcripts of audio calls to the jury as aids for its deliberation.  (*See* Gov't Br. at 45.)  Defendants do not object to the Government's providing transcripts of audio calls to the jury, so long as Defendants are similarly able to provide to the jury transcripts of audio calls that they seek to admit into evidence and the parties stipulate to the

contents of the audio call transcripts.  If the parties cannot agree to a stipulation as to the contents of an audio call, the Government should not be permitted to have its witnesses simply testify that they "have reviewed the transcripts" and can attest to "their accuracy."  (*Id.*)  It is well established that "transcripts themselves are not evidence" and are appropriately "used only as aids in listening to the audio tapes and as nonbinding guides that are subject to the jurors' own assessment of the transcripts' accuracy."  *United States v. Rosa*, 17 F.3d 1531, 1548 (2d Cir. 1994).  The Government should not be allowed to circumvent this rule by having its witnesses testify as to the accuracy of any transcript, thus resolving the issue of a disputed transcript on the Government's terms and potentially misleading the jury into thinking that the disputed transcript is evidence unto itself.

## VIII.        DEFENDANTS SHOULD HAVE THE OPPORTUNITY TO OBJECT TO THE GOVERNMENT'S SUMMARY EXHIBITS IN ADVANCE OF TRIAL

The Government has indicated that it "plans to introduce a number of summary exhibits into evidence pursuant to [Rule 1006]."  (Gov't Br. at 46.)  The Government further stated that it will provide Defendants, by June 1, 2018, "preliminary summary exhibits, as well as a chart indicating what records serve as the underlying documents for each summary exhibit."  (*Id.* at 47.)  At this stage, Defendants do not have sufficient information to determine whether they will object to the introduction of the Government's summary exhibits.   Therefore, Defendants respectfully request the opportunity to object after the exhibits are provided on June 1, 2018.

"Summary charts should not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence," and "[c]ourts have long required that district courts ascertain that summary charts 'fairly represent and summarize the evidence upon which they are based.'"  *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986) (quoting *United States v. O'Connor*, 237 F.2d 466, 475 (2d Cir. 1956)).   "Unless this

requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it." *Id.* (citing Fed. R. Evid. 403).

Here, based on the limited information the Government has provided, Defendants cannot know whether the Government's proposed summary charts meet this requirement.[6]  In particular, exhibits that will purport to summarize the submission data from Panel Banks must be carefully scrutinized to ensure that the numbers are not being manipulated or arranged in such a way as to be unduly "prejudicial" and capable of being "exploited" by the Government.  *United States v. Ferguson*, 676 F.3d 260, 274 (2d Cir. 2011).   Indeed, Defendants are concerned that the Government will use charts that purport to be "summaries" to advance arguments that are, in fact, "without foundation."  *Id.* at 275.

That said, rather that object to charts that have not yet been provided, Defendants respectfully request the opportunity to move to exclude such charts after they have been reviewed.  Without seeing the charts themselves, "the Court is not in a position to decide whether the proffered summary charts may be used at trial."  *United States v. Jasper*, No. 00-cr-825, 2003 WL 221740, at *2 (S.D.N.Y. Jan. 31, 2003).  Moreover, the Court should "not allow any charts if [Defendants'] counsel has not had a reasonable opportunity to review them in advance and to consider any objection or corrections thereto."  *Id.*

## IX.  DEFENDANTS WILL NOT ATTEMPT TO INTRODUCE EVIDENCE IN VIOLATION OF THEIR DISCOVERY OBLIGATIONS

This Court has already granted the Government's motion for reciprocal discovery pursuant to Federal Rule of Criminal Procedure 16.  (Oct. 19 Decision at 27.)  In granting the motion, the Court noted that "[t]he time for that production" is when a "decision has been made

---

[6] Defendants have already moved to exclude evidence concerning their compensation (*see* Defs. MILs at 39-40), which may moot one of the Government's proposed summary exhibits.

about putting on a defense case."  (*Id.* at 28.)  Accordingly, Defendants are, of course, aware of their discovery obligations and continue to meet them.  Defendants will timely provide any reciprocal discovery such that the Government "is not faced with the untenable choice between delays during trial or being significantly prejudiced."  (Gov't Br. at 48.)

## X.   DEFENDANTS SHOULD BE PERMITTED TO INTRODUCE EVIDENCE THAT OTHER GOVERNMENT AGENCIES HAVE SUED THE BBA IN CONNECTION WITH THE CONDUCT ALLEGED IN THE INDICTMENT

The Government seeks to preclude Defendants from introducing into evidence portions of complaints filed by the FDIC in the United Kingdom and other jurisdictions ("FDIC Complaints").  The Government argues that any such statements would be inadmissible hearsay because they are not attributable to the DOJ.  (*See* Gov't Br. at 48.)  The Court should not credit this conclusory argument, and evidence from the FDIC Complaints and other Government filings should be admissible as statements of a party-opponent, *see* Fed. R. Evid. 801(d)(2), or under the residual exception to the hearsay rule, *see* Fed. R. Evid. 807.  Alternatively, such evidence should be admitted as non-hearsay because it would be offered not for its truth, but to prove that the BBA was fully aware of the conduct alleged in the Indictment.

As this Court is aware, the FDIC filed a Particulars of Claim in the U.K.'s High Court against numerous financial institutions and the BBA ("FDIC Particulars").  The FDIC Particulars alleges that the BBA: (i) was ***aware of and accepted the practice*** of Panel Banks taking their derivatives positions into account in their LIBOR submissions; (ii) understood that LIBOR submissions ***did not reflect good-faith estimates*** of Panel Bank's cost of borrowing; and (iii) ***"participated in," "facilitated" and/or "directed" the type of conduct*** alleged in the Indictment. [Dkt. No. 183-1 at 5 ¶3(9), 8-9 ¶3(11)(c)-(f), 48-50 ¶¶74(11)-(20) (emphasis added).]

Additionally, the FDIC, as well as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), government-sponsored enterprises that are effectively owned by the federal government, and numerous other parties, brought LIBOR-related litigation against the BBA and Panel Banks in the United States, which was consolidated into a multi-district litigation in this Court before the Hon. Naomi Reice Buchwald (together with the FDIC Complaint, the "Government Complaints"). The FDIC in fact brought two separate suits in this Court against the BBA, among other parties. (*See* Case Nos. 14-cv-1757; 18-cv-1540.) These lawsuits also alleged, among other things, that the BBA was told that Panel Banks' LIBOR submissions did not reflect good-faith estimates of a bank's cost of borrowing. [*See, e.g.*, Dkt. No. 183-2 ¶¶ 1-2 ("BBA participated in the alleged scheme [to suppress USD LIBOR to their advantage] to protect the revenue stream it generated from selling LIBOR licenses and to appease the Panel Bank Defendants that were members of the BBA."), ¶¶ 244-48 (alleging that "the BBA falsely represented that . . . it did not believe that Panel Bank Defendant[s] had submitted false rates," and "falsely represented that . . . the Panel Bank Defendants' USD LIBOR submissions were honest and accurate" or "'truly reflective of their perceived borrowing costs'").]

As a threshold matter, Defendants should be permitted to introduce evidence showing that the FDIC and other governmental agencies have filed complaints against the BBA alleging that the BBA was fully aware of the alleged conduct and LIBOR's supposed inaccuracies. The fact that any governmental agency has sued the BBA bears directly on whether the jury should credit the Government's theory underlying the Indictment—that the BBA was deceived. That departments and agencies of the federal government have asserted that the BBA knew about the practice underlying the charges in this case provides further evidence that the BBA was not

deceived.  As a matter of fundamental fairness, the jury is entitled to know that different arms of

the Government are asserting contradictory positions about what the BBA knew and permitted

regarding LIBOR submissions during the Indictment period.  Thus, this evidence is highly

probative and should be admitted pursuant to Rule 401.

The statements in the Government Complaints are attributable to the Government and are

therefore admissible for their truth under Rule 801(d)(2).  It is well established that a criminal

defendant may introduce prior statements of the Government as Rule 801(d)(2) admissions.  *See,*

*e.g.*, *United States v. GAF Corp.*, 928 F.2d 1253, 1260-62 (2d Cir. 1991); *United States v.*

*Paloscio*, No. 99-cr-1199, 2002 WL 1585835, at *2 (S.D.N.Y. July 17, 2002).  Here, the

Government attempts to address this issue by arguing that the FDIC "is not acting in its interest

as an agency of the United States, but, rather, is acting as a receiver on behalf of failed banks."

(Gov't Br. at 48-49.)  But the cases cited by the Government actually cut against its argument

that the FDIC, when acting as a receiver, is not a governmental actor because, in those cases, the

FDIC claimed the benefit of sovereign immunity.  *See Deutsche Bank Nat'l Trust Co. v.*

*F.D.I.C.*, 784 F. Supp. 2d 1142, 1163-65 (C.D. Cal. 2011); *F.D.I.C. v. Johnson*, 35 F. Supp. 3d

1286, 1295-98 (D. Nev. 2014); *see also, e.g.*, *In re Motivation Res., Inc.*, 158 B.R. 184, 187

(Bankr. C.D. Cal. 1993) ("The FDIC, in either of its capacities, is at the very least an

instrumentality of the federal government.").  Moreover, counsel for the FDIC attested to the

truth of the allegations in the FDIC Particulars.  Accordingly, statements in the Government

Complaints should be attributable to the Government and admitted under Rule 801(d)(2).

The portions of the Government Complaints concerning the BBA's knowledge are also

admissible under Rule 807, which permits the admission of out-of-court statements that (1) have

"equivalent circumstantial guarantees of trustworthiness," (2) are "offered as evidence of a

28

material fact," and (3) are "more probative on the point . . . than any other evidence that the proponent can obtain through reasonable efforts," where (4) such admission serves the "interests of justice." Fed. R. Evid. 807. Here, the Government Complaints, as court filings, have clear indicia of trustworthiness. Moreover, the portions of these documents that Defendants intend to introduce are plainly evidence of a material fact. Their admission will also serve the interests of justice, as they bear on the BBA's expectations concerning LIBOR submissions, which is essential to determine whether Defendants' alleged statements were false and/or material. Thus, Rule 807 provides an alternative method for admitting the Government Complaints.

This Court has recognized that the FDIC Particulars is admissible hearsay evidence. At the November 30, 2017 hearing, defense counsel informed the Court that the FDIC sued the BBA in London on the theory that the BBA "tolerated," "were involved in" and "orchestrated" any potential problem with LIBOR. (*See* Nov. 30, 2017 Tr. at 7:16-23.) The Court stated that the FDIC Particulars "will come in" (*id*. at 8:4) and that "if the United States of America has gone to London and accused the BBA of being complicit in this, it will come out before the jury. And if that means that hearsay comes in, then hearsay is going to come in" (*id*. at 23:20-24).

In the alternative, statements from the Government Complaints should be admitted as non-hearsay evidence that the BBA: (1) was aware of and accepted the practice of considering derivatives positions when making LIBOR submissions; and (2) understood that Panel Bank submissions were not good faith estimates of actual borrowing costs. "Out-of-court statements are . . . not considered hearsay if used to prove notice or knowledge." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011). The Government Complaints highlight that the BBA was aware of the conduct alleged in the Indictment and therefore was not

deceived.  Thus, the Government Complaints are also admissible for the non-hearsay purpose of demonstrating the BBA's knowledge.

If portions of the Government Complaints are admitted, the Government should not be permitted to offer "additional statements" from the Government Complaints "in response."  (*See* Gov't Br. at 48).  "Rule 106 is aimed at permitting excerpts of testimony or other evidence to be understood in context; its purpose is not to permit an adversary to create a full record as to a particular issue."  *In re Reserve Fund Sec. & Derivative Litig.*, No. 09-cv-4346, 2012 WL 12354234, at *5 (S.D.N.Y. Oct. 3, 2012).  The context of the Government Complaints is clear, and the Government's cherry-picking of additional statements will be more likely to confuse the issues and mislead the jury than provide helpful background information.  In addition, "Rule 106 does not compel admission of otherwise inadmissible helpful evidence." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 103 (2d Cir. 1995) (internal quotation marks omitted).  The Government has not made a showing that Rule 801(d)(2) or Rule 807 applies to their responsive statements, nor have they articulated the non-hearsay purpose for their admission.  Defendants therefore respectfully request that the Court deny the Government's request to admit "additional statements" from the Government Complaints.[7]

Fundamental fairness requires that the jury be made aware that other government entities have asserted in other jurisdictions that the BBA was not deceived, but rather was told about, tolerated, "facilitated" and "directed" the alleged conduct, evidence that challenges, head on, the

---

[7] If the Court grants the Government's request, "[u]nder Rule 106, if the original evidence was admitted only for a limited purpose, then the additional material should be similarly limited." *United States v. Pierre*, 781 F.2d 329, 332 n.2 (2d Cir. 1986) (internal quotation marks omitted). Here, the evidence from the Government Complaints would be admitted for the limited purpose of demonstrating the knowledge and expectations of the BBA; the Government's responsive statements should thus be limited to that topic, if admitted at all.

Government's theory in this case.  Accordingly, the Court should deny the Government's motion to exclude evidence regarding the Government Complaints. [8]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Government's motions in *limine* and grant such other relief as may be just and proper.

Dated:  New York, New York
        April 30, 2018

                            Respectfully Submitted:

By: S/ Kenneth M. Breen              By: S/ Seth L. Levine
     (electronic signature with permission)       Seth L. Levine
     Kenneth M. Breen                    Scott B. Klugman
     John P. Nowak                       Miriam L. Alinikoff
     Phara A. Guberman
     Jane H. Yoon
     Amanda L. Pober

**PAUL HASTINGS LLP**                 **LEVINE LEE LLP**
200 Park Avenue                      650 Fifth Avenue, 13th Floor
New York, New York 10166          New York, New York 10019
Telephone:  (212) 318-6000         Telephone:  (212) 223-4400
Facsimile:  (212) 319-4090          Facsimile:  (212) 223-4425
kennethbreen@paulhastings.com     slevine@levinelee.com
johnnowak@paulhastings.com       sklugman@levinelee.com
pharaguberman@paulhastings.com   malinikoff@levinelee.com
janeyoon@paulhastings.com
amandapober@paulhasings.com

*Attorneys for Defendant Matthew Connolly*    *Attorneys for Defendant Gavin Campbell Black*

---

[8] The Court should deny the Government's request that the Court order Defendants to identify each statement from the Government Complaints they intend to offer at trial.  (*See* Gov't Br. at 48.)  The Government cites no authority for such a request, and Defendants have no obligation at this time to identify to the Government each allegation in the Government Complaints that they may wish to focus on at trial.