UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

UNITED STATES OF AMERICA,

    -against-                                                              S1 16 Cr. 370 (CM)

MATTHEW CONNOLLY AND
GAVIN CAMPBELL BLACK

      Defendants.

——————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/15/18

## DECISION ON GOVERNMENT'S MOTIONS IN LIMINE

McMahon, C.J.:

The court, for its decision on the Government's motions *in limine*:

*The Indictment*

The indictment in this case charges the defendants with ten counts of substantive wire fraud and one count of conspiracy to commit wire and bank fraud.

The essential elements of wire fraud under 18 U.S.C. § 1343 are: (i) a scheme to defraud; (ii) in order to obtain money or property; (iii) by means of false and fraudulent pretenses, representations or promises; (iv) furthered by the use of interstate wires. *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). "It is not required that the victims of the scheme in fact suffered harm, but 'the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims.'" *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006)). In order to prove the existence of a scheme to defraud, the Government must also prove "that the misrepresentations were material." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks

omitted) (quoting *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)).

The indictment is rather more factually fulsome than are most indictments that emanate from the United States Attorney's Office in this district. It describes in considerable detail the charges against the defendants, as follows:

1.     LIBOR was calculated every London business day by averaging the interest rates at which sixteen designated banks (the "Contributor Panel" banks) estimated that they could borrow unsecured funds from other banks across ten currencies, including the U.S. Dollar. One of those banks was Deutsche Bank AG (hereinafter "Deutsche Bank"). (*See* Superseding Indictment ("Sup. Ind.") ¶¶ 2, 9, Dkt. No. 22.)

2.     Thomson Reuters, acting as agent for the British Bankers' Association ("BBA"), received the Contributor Panel banks' submissions at or before approximately 11:10 A.M., ranked the submissions from highest to lowest, excluded the four highest and four lowest submissions, and averaged the middle eight submissions to determine the official USD LIBOR setting. (*See id.* at ¶ 2.)

3.     The rate so calculated was used to settle trades and as a reference point for various financial products. Because trades were settled based on the published USD LIBOR, the profitability of various trades and books of trades referenced in the indictment depended on the direction in which USD LIBOR moved. (*See id.* at ¶¶ 17-19.)

4.     Thomson Reuters published the LIBORs at 12:00 noon to various outlets, including Bloomberg LP, which transmitted the LIBORs to servers located in the United States and elsewhere. Pursuant to its own service agreements with various customers, Thomson Reuters also

transmitted the rates to servers and traders of LIBOR-based financial products around the world. (*See id.* at ¶ 3.)

5.      "A Contributor Panel bank's submission was to be an unbiased and honest estimate of the bank's borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on LIBORs." (*Id.* at ¶ 8.)

6.      The defendants allegedly devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and did so by *"transmit[ting] certain wire communications [consisting of] . . . false and fraudulent statements intended to influence and manipulate the benchmark interest rates* to which the profitability of their interest rate derivative trades were tied." (*Id.* at ¶ 25) (emphasis added).

7.      Specifically, defendants were charged with "*making false and fraudulent USD LIBOR submissions **to the BBA** for inclusion in the calculation of USD LIBOR* representing that the rates submitted were an unbiased and honest estimate of the bank's borrowing costs when in fact the submissions reflected rates that were designated to benefit their trading positions." (*Id.* at ¶ 26) (emphasis added).

8.      The following losses were allegedly incurred as a result of the false and fraudulent submissions made to the BBA:

> first, financial institutions, including but not limited to Bank A, Bank B, Bank C and Bank D, entered into trades in which their positions were opposite to those of defendants and their co-conspirators; and
>
> second, Deutsche Bank conducted a substantial internal investigation, risked sustaining significant harm to its commercial and financial reputation, and ended up paying serious penalties.

(*See id.* at ¶ 26.)

9.      The indictment describes in great detail the "manners and means" by which defendants allegedly attempted to manipulate LIBOR using the wires. These particulars include the following and only the following:

(a)      Deutsche Bank traders, including defendants, asked Deutsche Bank LIBOR submitters to make LIBOR submissions that were false (that is, borrowing estimates that were biased and dishonest) and fraudulent and which were designed to benefit traders' positions rather than making submissions that reflected an unbiased and honestly held estimate of the rate at which Deutsche Bank could borrow unsecured funds. The submitters accommodated those requests by making false and fraudulent USD LIBOR submissions that were designed to benefit traders' positions rather than making submissions that reflected an unbiased estimate of the rate at which Deutsche Bank could borrow unsecured funds.

(b)      Defendant Connolly directed someone named Timothy Parietti to advise other individuals at Deutsche Bank about LIBOR-based derivatives positions so that the submitters could take those positions into account by making false and fraudulent LIBOR submissions.

(c)      Various Deutsche Bank employees, including defendants, coordinated to take into account Deutsche Bank's financial interests tied to LIBOR when submitting its USD LIBOR rates on a particular day.

(d)      On occasion, Submitter A accommodated those requests.

(e)      When Michael Curtler (the Government's principal cooperator) was the back-up submitter, he too accommodated requests to manipulate Deutsche Bank's USD LIBOR submissions to help their trading positions by causing false and fraudulent Deutsche Bank USD LIBOR submissions to be made. Curtler also took his own trading positions into account.

(f)      The manipulations and attempted manipulations of Deutsche Bank's USD LIBOR submissions and the published USD LIBOR rate were intended to benefit Deutsche Bank and its traders' trading positions to the detriment of, *inter alia*, Banks A, B, C and D.

(g)      Deutsche Bank traders including defendant Black asked and encouraged Submitter A to contact individuals outside Deutsche Bank, including brokers and others, to push for USD LIBOR submissions by other Contributor Panel banks that would benefit their trading positions. These discussions were had with, among other banks, Rabobank.[1]

---

[1] Rabobank was the bank involved in the Government's only other criminal LIBOR prosecution, *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017).

4

(*See id.* at ¶ 27.)

10.     The indictment lists a number of overt acts, "among others." All of them relate to alleged efforts by Deutsche Bank employees to influence the LIBOR submissions that were made to Thomson Reuters, acting as agent for the BBA, for the purpose of setting particular LIBORs on particular days. None of the identified overt acts involves the transmission of Deutsche Bank's LIBOR submissions – the only statements identified in the indictment as false and fraudulent – directly to the bank's trading counterparties, either by Deutsche Bank or by Thomson Reuters. (*See id.* at ¶¶ 28-48.)

11.     The above allegations relate specifically to the conspiracy count, Count 1 of the indictment. Counts 2 through 11 of the indictment charge ten wire frauds, each count identifying a single wired communication that allegedly furthered the scheme underlying the conspiracy count charged in Count 1. These ten communications can be divided into three separate types:

(a) Counts 2, 3 and 4 charge wire communications involving one of the two named defendants that were internal to Deutsche Bank and were allegedly designed to induce Deutsche Bank's USD LIBOR submitter to tailor his submission to the defendant's preferences in reference to his trades;

(b) Counts 5, 6 and 7 charge wires transfers settling three trades from the two named defendants' trade books that were tied to LIBOR; and

(c) Counts 8, 9, 10 and 11 charge wire communications consisting of the publication by Thomson Reuters of a particular day's USD LIBORs, together with the 16 underlying submissions by the Contributor Panel banks that were used or not used to set those LIBORs.

(*See id.* at ¶ 51.)

In sum: the detailed factual allegations underlying the indictment charges the defendants with participating in a scheme to defraud that was perpetrated (1) by making materially false and fraudulent representations about Deutsche Bank's cash borrowing costs; (2) to the BBA; (3) for

the purpose of influencing its setting of USD LIBORs (*i.e.*, that is the decision to which the false statements are material).

*Government's First Motion in Limine (Materiality)*

### (a) The Government Can Prove Materiality to the Counterparties Under its New Theory of a Convergent Scheme to Defraud by Eliciting the Testimony from Counterparties

I have summarized the indictment fulsomely at the outset of this opinion because the Government describes the charged conspiracy in its motion papers so differently.

In its motion, the Government contends that the defendants made, not one, but two different types of false and misleading statements or representations in furtherance of their conspiracy to obtain money and property from their trading counterparties by manipulating LIBOR.

Neither consists of a false and fraudulent submission made *to the BBA* (via Thomson Reuters), which did not represent an "honest and unbiased" estimate of the rate at which Deutsche Bank could borrow unsecured funds, and which the BBA was supposed to use in setting various USD LIBORs.

Rather, the Government now relies on statements allegedly made (or omitted to be made) directly to the victims of the fraudulent scheme – the counterparties to Deutsche Bank's trades. To be specific, the Government argues that, "For both categories of false and misleading representations, the defendants and their coconspirators intended to mislead the counterparties *by the statements transmitted to them* [*i.e.*, to the counterparties]." (Mem. of Law in Supp. of Combined Mots. in Lim. ("Gov't Br.") at 2, Dkt. No. 217) (emphasis added).

The first type of false statement identified in the motion is an alleged misstatement of intent – or, perhaps, a materially false and fraudulent pretense.

The Government contends that, at the time they entered into trades with the counterparties, defendants and their co-conspirators falsely promised to settle the trades on the basis of "LIBOR,"

when in fact it was their undisclosed intention to settle up on the basis of "a manipulated LIBOR when it suited their own financial interests." (Gov't Br. at 1.) Put otherwise, the theory seems to be this:

> (1) the swap contracts stipulated that the trade would settle at LIBOR;
>
> (2) fairly understood, that meant LIBOR calculated without any sort of manipulated (or, to use the Government's own language, based on "honest and unbiased") data;
>
> (3) the defendants entered into those contracts knowing that they would, from time to time, try to manipulate LIBORs to suit their interests, in violation of the terms of the contracts; and
>
> (4) defendants and their co-conspirators did not disclose that this was their intention at the time the swap contracts were formed.

Under this theory, the materially false and fraudulent pretenses or representations that were used to carry out the scheme to defraud are not the submissions, but rather the representation that the trades would be settled at LIBOR when it was Deutsche Bank's intention to settle at something the Government calls "manipulated LIBOR." These pretenses or representations were allegedly material to the counterparties because, had the counterparties known that Deutsche Bank did not intend, in every instance, to settle up at a LIBOR that was calculated in an honest and unbiased manner, they would never have entered into swaps trades with Deutsche Bank.

The second type of allegedly false statement is the retransmission of the LIBORs and the underlying submissions (some of which were the allegedly false and fraudulent statements made by Deutsche Bank's submitters) into the marketplace – which marketplace of course included Deutsche Bank's trading counterparties. This retransmission was done by Thomson Reuters, which was acting at the behest of the BBA, in accordance with the latter's policy of publishing the underlying LIBOR submissions along with LIBORs after LIBORs had been set. I do not understand the Government to suggest that Deutsche Bank itself caused Thomson Reuters to

7

retransmit its daily submissions, but rather that Deutsche Bank knew that this was occurring in the ordinary course.

The retransmission of Deutsche Bank's allegedly false and fraudulent submissions by Thomson Reuters was allegedly material to the counterparties because, had the counterparties known that the submissions were false and that LIBOR had been manipulated, they could have taken steps to protect themselves from the losses they suffered on trades affected by the manipulation – by entering into a hedge trade to offset losses, alerting compliance and legal to take possible action, or even prematurely closing out the contracts.

Neither of these arguments is apparent from the face of the indictment. Counts 8-11 of the indictment identify four re-transmissions of this type of information by Thomson Reuters as the wire communications underlying substantive wire fraud counts; but because the wired communication in a wire fraud case need not be the actual false and fraudulent statement, *Williams v. Affinion Grp.*, LLC, No. 16-3292-CV, 2018 WL 2090267, at *6 (2d Cir. May 7, 2018), there is no way to tell from the text of the indictment that Thomson Reuters' statements to the marketplace are alleged to be false and fraudulent. The only statements expressly identified as "false and fraudulent" in the indictment are Deutsche Bank's submissions to the BBA as the false and fraudulent statements at issue in this case. Indeed, a good argument can be made that Thomson Reuters' transmissions were true, since they consisted of the actual LIBORs that were in fact set by the BBA on that particular day – no other LIBORs were set on those four days -- and the actual Contributor Panel bank submissions on which the LIBOR settings were based.

This case has been litigated actively and vigorously since it was indicted some twenty-four months. At no point during all this time did the Government ever apprise the court that its case was predicated on the types of statement described above. Rather, its theory has consistently been

that the false and fraudulent statements made by defendants and their co-conspirators were the doctored LIBOR submissions that were made to the BBA (via Thomson Reuters) during the LIBOR-setting process. We have had extensive briefing and oral argument on that basis. Every decision in this case – most particularly, the "non-decision" outlining the court's response to the parties' arguments on proof of materiality and falsity, which was filed by the court six weeks ago – discusses the non-convergent fraud scheme articulated by the Government in the indictment.[2]

And now, a scant six weeks before trial, the Government switches horses. Whether or not the defendants feel sandbagged – and I would be surprised if they did not – the court feels sandbagged.[3]

That said, the Government's new theory solves one problem for it. The Supreme Court has quite recently emphasized that a false and fraudulent statement will not support a federal fraud conviction unless it was material to some decision that had to be taken by the person **to** whom the statement was made. *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016). The court had expressed considerable skepticism about the Government's ability to prove that Deutsche Bank's statements were material to the BBA – the party whose "expectations" the Government has long represented it would have to demonstrate (*see* Nov. 30, 2017 Hr'g Tr. at 37) – without calling a witness from the BBA. (*See* Dkt. No. 203 at 11-12.).

---

[2] Nor, as far as appears from the appellate briefs, did the Government ever make this argument in *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017).

[3] The Government – fully cognizant that the court might not be thrilled that it has radically altered its approach to this case after defendants and I have put in so much work on an entirely different theory – inserts a footnote into its moving brief to try to convince the court that it has been arguing all along a convergent fraud scheme in which false statements were made directly to Deutsche Bank's trading counterparties. (*See* Gov't Br. at 17 n.9). This is insulting to the court and unworthy of the Department of Justice.

However, if Deutsche Bank's misstatements were made directly to the counterparties, then the Government can most certainly rely on counterparty testimony to establish that Deutsche Bank's false statements and pretenses were material *to some decision that had to be made by them.* Put otherwise, if the Government now plans to prove a convergent fraud, rather than a non-convergent fraud, then the best – indeed, the only – witnesses on the subject of materiality are the alleged recipients of Deutsche Bank's statements, who in this instance are also the victims of the fraudulent scheme.

Defendants argue that the Government should be judicially estopped from proceeding on its new theory, since it contradicts both the text of the indictment and its numerous prior representations to the court.

Unfortunately for defendants, judicial estoppel does not apply in this instance.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 228 (2000). The doctrine is often relied on in civil actions to prevent a party from taking inconsistent positions in two different proceedings.

There is no consensus among courts as to whether judicial estoppel even applies in the context of criminal prosecutions. *See United States v. D'Amico*, 734 F. Supp. 2d 321, 351–52 (S.D.N.Y. 2010); *United States v. Urso*, 369 F. Supp. 2d 254, 263–64 (E.D.N.Y. 2005). But when it has been invoked in the criminal context, it was because the Government took inconsistent positions in two separate proceedings. For example, in in *Stumpf v. Mitchell,* 367 F.3d 594, 613 (6th Cir.2004), *judgment rev'd in part on other grounds, Bradshaw v. Stumpf,* 545 U.S. 175 (2005), the prosecution argued, in two different trials, that each of two different defendants was "the one to pull the trigger, resulting in the fatal shots" to the same murder victim. Similarly, in *Thompson*

*v. Calderon,* 120 F.3d 1045, 1057–59 (9th Cir. 1997) (en banc plurality), *rev'd on other grounds,* 523 U.S. 538 (1998), the court held that a defendant's due process rights were violated where the prosecution argued at his trial that he alone committed a murder, but argued at a subsequent trial that another defendant actually committed the same murder and, in doing so, "discredited the very evidence" it had offered in the first trial.

This court has found no case, civil or criminal, in which judicial estoppel was applied because the Government took inconsistent positions in the same case. The Second Circuit has emphasized that judicial estoppel "applies 'only when a tribunal in a prior *separate* proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision.'" *United States v. Quinones,* 511 F.3d 289, 321 n.22 (2d Cir. 2007) (quoting *Adler v. Pataki,* 185 F.3d 35, 41 n.3 (2d Cir. 1999) (emphasis in original).

Defendants cite two Supreme Court cases, but neither convinces this court that judicial estoppel could properly be invoked here. *See New Hampshire v. Maine,* 532 U.S. 742, 749 (2001); *Pegram v. Herdrich,* 530 U.S. 211, 228 n.8 (2000). First, both are civil cases. In *New Hampshire,* the inconsistent theories at issue arose in two separate actions that were filed decades apart. 532 U.S. at 751. And in *Pegram,* the court rejected the respondent's invocation of judicial estoppel within a single case because the petitioners' representations were not in fact inconsistent. 530 U.S. at 228 n.8.

Under the *Pegram* decision, judicial estoppel cannot be applied in this case, because the doctrine is not triggered unless the party (here, the Government) takes positions that are actually inconsistent. Courts have repeatedly emphasized that judicial estoppel applies "only where the government's trial theories are inherently factually contradictory and thus *are irreconcilable.*" *Urso,* 369 F. Supp. 2d at 264. That is, "judicial estoppel may be applied to prevent a due process

violation, if ever, only where there is a clear and categorical repugnance between the government's two theories of the case." *Id.*; *see also D'Amico*, 734 F. Supp. 2d at 351–52; *United States v. Fell*, 2016 WL 1290416, at \*12 (D. Vt. Mar. 30, 2016); *United States v. Binday*, 804 F.3d 558, 599–600 (2d Cir. 2015); *United States v. Ghavami*, 23 F. Supp. 3d 148, 164–65 (S.D.N.Y. 2014); *United States v. Solano*, 402 F. App'x 569, 570 (2d Cir. 2010).

Here, there is no inconsistency. The Government's new convergent fraud theory is not inconsistent with its original non-convergent fraud theory; it is certainly not irreconcilable with the non-convergent fraud theory. Both types of fraud could have been committed simultaneously. Indeed, it is possible that the Government wishes to offer evidence in support of both theories at trial; it has made *in limine* motions that are consistent with arguing both theories to the jury, in the hope that at least one of them will appeal to the trier of fact. Parties argue in the alternative all the time without triggering judicial estoppel.

Therefore, defendants cannot invoke judicial estoppel to stop the Government from proving a convergent fraud.

Of course, while defendants argue judicial estoppel today, it seems clear enough that they are tiptoeing around the real due process challenge to the Government's change of theory: an argument that the Government is working either a constructive amendment or a prejudicial variance to the crimes charged in the indictment. The former occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted; the latter when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment. *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012).

Neither side's briefs address constructive amendment or variance. That is perfectly understandable, because these issues only ripen when the Government has actually put in its case. There is no way that the court could address these issues until after the Government's evidence comes in.

However, I can see a motion challenging the Government's change of theory on both grounds coming down the pike – and I can do at least one thing now to avoid problems later.

While a constructive amendment is a *per se* Fifth Amendment violation, *United States v. McCourty*, 562 F.3d 458, 470 (2d Cir. 2009); a variance violates due process only when it works "substantial prejudice" at trial. *See United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001). Indeed, "A variance between allegation and proof is not fatal unless the defendant has been thereby deprived of an adequate opportunity to prepare a defense or has been exposed to a risk of being prosecuted twice for the same offense." *United States v. Ratliff-White*, 493 F.3d 812, 822 (7th Cir. 2007) (internal citation and quotation omitted).

In order to eliminate the possibility that any variance would prove prejudicial to defendants, I am prepared to adjourn the trial until September 10, 2018. This would give the defendants additional time to prepare to meet the Government's anticipated case.[4] Defense counsel should advise the court about whether they wish to take the court up on this offer by the close of business of May 17, 2018.

The Government's motion *in limine* seeking permission to elicit testimony on the issue of materiality to the counterparties from the counterparties themselves is GRANTED.

### (b) Proof of Materiality to the BBA With Testimony from Counterparties, Cooperators and Experts

---

[4] It would also give the parties more time for the Rule 15 depositions if those are going to be taken. (*See* Decision and Order on Cross-Mots. to Take Rule 15 Deps., Dkt. No. 261.)

The Government also argues that, if the Court requires it to prove the materiality of the statements to the BBA itself, it should be permitted to do so without testimony from a BBA witness. Since the Government intends to proceed on its new theory of convergent fraud, it is possible that the court does not even need to address this argument.

However, should the Government decide to prove its original non-convergent fraud theory, then it must prove that Deutsche Bank's statements were material *to the BBA*. And that evidence cannot come from its cooperators or from the counterparties. So to the extent that the Government asks the court to rule otherwise, its motion is DENIED.

As the Supreme Court explained in *United States v. Gaudin*, 515 U.S. 506, 509 (1995), determining materiality breaks down into three questions: (1) "what statement was made;" (2) "what decision was the [recipient of the statement] trying to make;" and (3) "whether the statement was material to the decision." A statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). In assessing materiality, the trier of fact "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016)). Therefore, to establish materiality to the BBA, the Government would have to prove that defendants and their co-conspirators' submissions had a natural tendency to influence, or were capable of influencing, the BBA's decision in setting particular LIBORs.

The Government contends that it can prove materiality to the BBA in a non-convergent fraud case through "circumstantial evidence," without the need for testimony from a representative of the BBA. I fully agree that "circumstantial evidence" can be used to establish materiality.

14

However, that "circumstantial evidence" must be independently admissible. I see no way that the counterparties or cooperators could provide the "circumstantial evidence" the Government requires. Counterparties and cooperators can testify that they have read published information about LIBOR on the BBA's website; but they cannot testify about whether any given submission was material to the BBA itself. Their testimony would be speculative; it would not come in as permissible lay opinion testimony under Rule 701 because it is not based on the witnesses' own perceptions of the BBA and would usurp the role of the jury; and it would necessarily rely on hearsay.

The Government argues that the evidence about the BBA that it proposes to introduce through counterparties and cooperators is not hearsay for two reasons. First, because LIBOR is a term of a swaps contract, it contends that the definition of LIBOR and how LIBOR is calculated constitute "legally operative language," which is not hearsay under Rule 801. Second, the Government argues that the question asked of the LIBOR submitters is not hearsay, under the familiar rule that questions are not assertions. *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012); *accord Headley v. Tilghman*, 53 F.3d 472, 476–77 (2d Cir. 1995); *United States v. Oguns*, 921 F.2d 442, 448–49 (2d Cir. 1990).

I reject the Government's "legally operative language" argument. How LIBOR is calculated and what is material to the entity calculating it are not things that have "legal significance independent of the truth of any statement in it." *Crawford v. Franklin Credit Mgmt. Corp.*, 2015 WL 1378882, at *3 (S.D.N.Y. Mar. 26, 2015) (quoting *Ryan v. State*, 1999 WL 59982, at *3 (N.D. Ill. Feb. 3, 1999)). A contract is not hearsay, because its language binds parties to its terms without regard to the truth of the statements in the contract. *Arasimowicz v. Bestfoods, Inc.*, 81 F. Supp. 2d 526, 530 (S.D.N.Y. 2000). But how LIBOR is calculated and what is material to

the entity performing that calculation is not "a contract." The word "LIBOR" is a term of a contract, and so it, like every other term of the contract, is legally operative; the word is admissible because the entire text of the swaps contract is admissible. But the understanding of a contracting party about what is or is not material to the entity that is charged with calculating LIBOR – the BBA – is not legally operative language.

I agree that the question asked by the BBA to its Contributor Panel banks is not hearsay, and so is admissible from any witness (or from the BBA's old web site) for that reason alone. But that only gets the question itself into evidence – not anyone's understanding of what the BBA expected by way of an answer.[5]

So I cannot see how the counterparty-victims could possibly give any admissible testimony about what is material to the BBA – except for information they might have been told, which is inadmissible hearsay, since it is being offered for the truth of the matter asserted (*i.e.*, what "must be" material to the BBA), or their own opinion about what would/could/should have been material, which is irrelevant.

The same goes for the cooperators. Michael Curtler, who was a Deutsche Bank submitter on occasion and so participated in the LIBOR-calculating process, will offer testimony about "a BBA committee comprised of industry representatives tasked with administering LIBOR" in which he participated. (Gov't Br. at 25–26.). Curtler can certainly testify to how the process worked, including how LIBOR is calculated. As for whether he can testify about conversations

---

[5] While I have been as slipshod in my shorthand as everyone else, it is time to be quite precise. The definition of LIBOR is not a question. The BBA's question defines what a Contributor Panel bank's submission should be; it does not define LIBOR itself. Sixteen different banks answer that question every day – and then the BBA calculates LIBOR using their responses. I understand the definition of LIBOR to be the average of eight of the sixteen answers the BBA receives to that question from its Contributor Panel banks, calculated by throwing out the four highest submitted rates and the four lowest rates. That is not a question.

that were held during meetings with persons who are not parties to this case and who are not designated as co-conspirators – which includes the BBA – I cannot and will not rule in a vacuum. I will need to rule on a question by question basis.

Even the Government's proposed expert testimony on materiality *to the BBA* appears to suffer from a related flaw. The Government's expert, Dr. Youle, will testify that LIBOR was the most widely-referenced benchmark in the world. In rebuffing defendants' challenges to Dr. Youle's testimony, the court has concluded that evidence about the ubiquity and importance of LIBOR can come in, and that a highly credentialed expert witness like Dr. Youle is the natural vehicle for introducing it. (*See infra* pp. 18–19.) But that testimony at best proves that LIBOR is material to the people who operate in financial markets. It does not prove that Deutsche Bank's LIBOR submissions were material to the BBA.

One item of the Government's proposed "circumstantial evidence" is, however, plainly admissible. The Government advises that cooperating witnesses will testify that BBA representatives called Contributor Panel banks from time to time to inquire into aberrant submissions. If such testimony is offered for the fact that these calls were made, and the Government wishes to argue to the jury that this evidence shows that accurate (or "honest and unbiased") submissions themselves were material to the BBA's decision, it is perfectly free to do so. The Government cannot establish materiality *to the BBA* by asking about the beliefs or surmises of the counterparties or the cooperators; but actions taken by the BBA that evidence the materiality of the submissions - which may or may not be provable by cooperator testimony - are a horse of a different color.[6]

---

[6] Neither the Government nor the defense has addressed the possibility (first raised by the Court in its March 29, 2018 "Thoughts" Order) that the very process by which the BBA calculates LIBORs – taking in 16 submissions, throwing our 8 and averaging the rest in order to arrive at the world's most important benchmark interest rate – establishes, without the need for any other evidence, that the content of all 16 submissions were necessarily material to the

In the final analysis, the Government has to decide whether or not to press its original non-congruent fraud theory – and, if it does, whether it needs to call a witness from the BBA in order to establish that receipt of "honest and unbiased" submissions from the Contributor Panel banks were material to its decisions. The court will not, however, bend the rules of evidence in order to obviate the possibility of cross-examination that might cast doubt on the issue.

*Government's Second Motion in Limine (Falsity)*

The Government's second motion *in limine* is addressed to the proof to be offered on the question of falsity.

The BBA sets LIBOR by asking Contributor Panel banks the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" The Government has at various times argued that the meaning of this definition of LIBOR is "clear from the plain language itself," "common sense," or "self-evident." (*See* Gov't Br. at 3, 12, 18, 29; Dkt. No. 252, at 13.) That being so, it argues that it can ask its cooperators and counterparties questions about their understanding of what this question means, with no need to elicit evidence from the BBA, which devised it.

The Government is correct.

The Government's expert, Dr. Youle, will testify about the importance of LIBOR in the financial marketplace and the many uses to which it is put – including its foundational role in the

---

"decision" (*i.e.*, the calculation). Under the Supreme Court's "naturally influences or is capable of influencing a decision" test for materiality, no more would seem to be required. Since LIBOR is a simple mathematical construct (a *really* simple mathematical construct), lay jurors could readily conclude, just from knowing how LIBOR is calculated, that every submission has a tendency to influence the ultimate result, either by being one of the eight submissions that are averaged or by being one of the outliers (which influences which other submissions will be used in the calculation). I gather that the defense is aware of evidence suggesting that the BBA itself may not have believed this to be true, and I don't know how that impacts the Government's ability to rely on what I previously called a "*res ipsa loquitur*" materiality argument. I am, as trial judges so often are, operating with one hand tied behind my back. I look forward to seeing how this develops at the trial.

making of investment (and other) contracts. (Dkt. No. 252, at 15.) I imagine that he will also opine that because of LIBOR's ubiquity in the financial marketplace, it is imperative that everyone in the market have a common understanding of what LIBOR means. The court will allow that testimony.

Turning to the question put to the Contributor Panel banks: according to the Government, the BBA question employs terms that have a commonly-held understanding in the marketplace. For example, the BBA asks the Contributor Panel banks, "At what rate could you borrow *funds*?" If the word "funds" has a commonly understood meaning in the financial markets (and it does), then someone who is familiar with the markets can testify to what that common understanding is. In the financial markets, "funds" is a synonym for "cash." Any witness who is familiar with the marketplace for funds can certainly so testify, including Dr. Youle; that witness need not come from the BBA.

The word "rate" in the BBA's question is singular. While the Second Circuit and others have expressed the view that LIBOR submissions can encompass a range of rates, *see, e.g., United States v. Allen*, 864 F.3d 63, 75 (2d Cir. 2017), the BBA's question by its terms calls for each individual Contributor Panel bank to submit one and only one rate. The singularity of the rate to be submitted is underscored by the fact that the BBA's question asks for the rate at which the Contributor Panel bank could borrow, "by asking for and *then accepting* offers in a *reasonable* market." The question asks the Contributor Panel bank to assume that they would go into the market at 11 am and ask for bids from lenders of "funds" (cash). Banks trade cash on that basis all the time, so someone familiar with the financial markets can testify about that process – Dr. Youle, for one, seems to be familiar with that market. I imagine that such a witness will testify that the hypothetical Contributor Panel bank who asked for bids might receive more than one bid, thus

allowing the bank to choose which offer to accept. And since the BBA also asks the Contributor Panel banks to select which of those offers would have been "accepted," a witness who is familiar with the cash trading practices of banks can doubtless testify that the *reasonable* bank, operating in a *reasonable* market, would accept the bid that would require it to pay the lowest possible amount of interest – the lowest bid – because that is how banks in a *reasonable* market do business.

All of this testimony can come in from regular participants in or students of the financial markets. It need not come from the BBA.

Additionally, evidence about the process that Deutsche Bank used to create its submissions is most certainly admissible on the issue of falsity. The Government can, for example, elicit evidence from cooperators about Deutsche Bank's use of something called "the Pricer" to set LIBOR submissions in the ordinary course. (Gov't Br. at 31.) These individuals can testify about what the Pricer algorithm calculated (which the Government represents to be Deutsche Bank's estimate of its actual borrowing cost for cash at particular tenors on particular dates), how it made that calculation (assuming they know), whether and when the Pricer's results were submitted to the BBA, whether and when they were not used, and why they were not used. Assuming the evidence supports it, the Government can certainly argue to the jury that variations from the Pricer results fell on days when requests for shadings were made by traders, and it can argue that this shows that submissions that varied from the Pricer results were either expressly false, impliedly false, or misleading half-truths. The court will give jury instructions about falsity that conform to Supreme Court precedent and the law in this Circuit – both of which make it clear that a statement is false and fraudulent for purposes of the wire fraud statute if it is actually false, impliedly false, or misleadingly half-true. *See, e.g., Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2001 (2016) ("A statement that misleadingly omits critical facts is a misrepresentation irrespective

of whether the other party has expressly signaled the importance of the qualifying information."); *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) ("[A] seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths."); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose . . . [I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." (citations omitted) (quoting *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982)); *United States v. Allen*, 160 F. Supp. 3d 698, 702-03 (S.D.N.Y. 2016) (rejecting defendants challenge to the idea that "implicit false statements" were actionable under the wire fraud statute noting that "deception . . . irreducibly entails some act that gives the victim a false impression" (quoting *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)).

Finally, under the Government's new theory of convergent fraud – that the false and fraudulent representations were made directly to the counterparties during the formation of the swaps trading contracts – falsity relates, not to the submissions made to the BBA, but rather to Deutsche Bank's undisclosed intent in entering those contracts – its false pretenses. In no event could evidence of falsity come from the BBA under this theory. I imagine that testimony will be elicited from cooperators.

The Government's motion is GRANTED.


*Government's Third Motion in Limine*

The Government's motion to exclude all evidence about the practices of some of Deutsche Bank's counterparties with respect to LIBOR submissions is DENIED, but without prejudice to objections made to specific questions or exhibits during the trial.

21

The Government takes its cooperators as it finds them – and that goes for banks as well as drug dealers and murderers. The Government admits that the evidence it seeks to exclude wholesale is potentially relevant. The court has already indicated that the evidence the Government seeks to exclude may prove relevant to the state of mind of the defendants under recent Second Circuit precedent. *See United States v. Litvak*, 808 F.3d 160, 189–90 (2d Cir. 2015). However, the court has already assured the Government that it will deliver a jury instruction to the effect that "everybody's doing it" is NOT a defense to criminal liability, and that any such evidence (assuming it to be admitted) is admitted for the limited purpose of addressing whether the Government has proved beyond a reasonable doubt that the defendants possessed the state of mind necessary to commit the crime of wire fraud. The court will not make those rulings "in the air," as the Government asks me to do today. When evidence that the Government finds objectionable is asked for at trial, it should object – at which time defendants bear the burden of convincing the court that any testimony they seek to elicit is both relevant and more probative than prejudicial.

*Government's Fourth Motion in Limine*

The Government's motion for permission to introduce evidence of the Deutsche Bank settlement and deferred prosecution agreement for the limited purpose of establishing the applicability of 18 U.S.C. § 3293(2) is GRANTED.

The defense really has no argument other than that Deutsche Bank's admissions are not evidence that can be considered against the defendants on the question of whether they violated the wire fraud and conspiracy statute; it is relevant only to the statute of limitations. The jury will be instructed as to the limited purpose for which such evidence may be considered and will be advised in no uncertain terms that Deutsche Bank's admission is not evidence that either defendant committed a crime.

*Government's Fifth Motion in Limine*

The Government has moved to bar the introduction of "evidence or arguments with little or no probative value that promote jury nullification." I understand the Government to be arguing that the court should bar, in advance of trial, the introduction of any evidence or arguments that are inconsistent with the Government's belief that the defendants are guilty." The motion is DENIED.   If the Government believes that the defense is making an improper argument or is trying to introduce inadmissible evidence, I imagine that it will jump up and object.   And at that time the court will be able to make a ruling.

*Government's Sixth Motion in Limine*

This motion addresses what items the jurors may have with them during deliberations. The Government really did not need to make an *in limine* motion addressing this; it is not a subject for pre-trial determination. However, for the elucidation of the out-of-town trial team,  juries in my trials always have both the transcripts of audio recordings (which will be given to them during the trial) and the recordings themselves (the actual evidence) in the jury room, together with a machine that will allow them to play the recordings as they wish.

*Government's Seventh Motion in Limine*

The Government's motion addressed to its summary exhibits will be decided once the Government gives the defense and the court copies of the summary exhibits. The Government needs to give the defense copies of the proposed summary exhibits sufficiently in advance of the final pre-trial conference (currently set for May 22) so that the defense can consider whether to stipulate to their admissibility. I will make rulings at that conference.

No summary exhibit will be admitted unless the underlying data are already in evidence. The Government may not show summary exhibits to the jury during its opening statement.

*Government's Eighth Motion in Limine*

The Government's motion anticipating that the defense will fail to comply with its reciprocal discovery obligations is DENIED – at the very least, because it is premature, since the defense has not yet violated any reciprocal discovery obligations. Given defense counsels' sterling reputations, I deem it unlikely that they will do so.

*Government's Ninth Motion in Limine*

The Government motion to bar the defense from introducing statements made by another agency of the United States (the FDIC) that are relevant to positions taken by the Government in this matter is DENIED. These statements may be introduced as party admissions, the United States being the party. While the FDIC and the Department of Justice are separate agencies, the fact that one Government agency reached conclusions that may not accord with those of the Department of Justice could prove highly relevant.

Moreover, the Government may not introduce its own statements, so the subsidiary motion asking for leave to introduce other portions of the FDIC's complaints or filings is DENIED – just as I would deny a motion from a defendant who sought to introduce portions of a prior statement that were not relied on by the Government.

This constitutes the decision and order of the court. The Clerk of Court should remove the motion at Dkt. No. 217 from the court's list of open criminal motions.

Dated: May 15, 2018

_____
Chief Judge

BY ECF TO ALL COUNSEL