UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) |
| v. | ) ) 16-cr-370 (CM) |
| MATTHEW CONNOLLY AND GAVIN BLACK, | ) ) ) |
| *Defendants*. | ) ) ) |

# UNITED STATES' REPLY IN SUPPORT OF MOTION TO EXCLUDE CERTAIN PORTIONS OF DEFENDANTS' ANTICIPATED EXPERT TESTIMONY

Defendants' response to the government's motion to exclude expert testimony magnifies the need for further information regarding the bases and reasons underlying their proposed expert testimony. While Defendants claim their expert notices "adequately set forth" the bases and reasons for their experts' opinions, the only bases they identify consist of such vast categories as "publicly available market data" and "market events," and generic references to "Deutsche Bank data" produced in discovery. (Defs.' Joint Opp., ECF No. 301 at 2-3, 14.) Nowhere do they explain what specific data sets their experts relied on for their calculations and other data-driven analyses, including Mr. Evans' "assess[ment of] individual transactions," "calculat[ions of] daily resets," "various analyses," or "comprehensive review of all of the positions between particular counterparties and Deutsche Bank" (ECF No. 287 at 2-3), or Dr. Arnold's "analysis of the data produced by the [g]overnment" (ECF No. 288 at 3). The government believes at least some of these analyses may be based on trader-specific "net reset position" analyses prepared and produced by Deutsche Bank in anticipation of litigation, which may well be unreliable and an improper basis for expert testimony. But the government needs to know what exactly Defendants' proposed experts relied on to make this determination. To say simply that their experts relied on unspecified data and events provides no meaningful opportunity for the government, or Court, to evaluate their experts' opinions or calculations, and falls far short of Federal Rule of Criminal Procedure 16(b)(1)(C)'s requirements.

Defendants attempt to side-step the bases for their proposed experts' opinions by focusing their argument on the purported relevance of those opinions—specifically regarding the net positioning of traders and counterparties, as well as LIBOR submissions within a so-called

1

reasonable range.[1]  Defendants' arguments as to relevance not only misconstrue the government's positions, but also demonstrate why further disclosures are needed now to evaluate the relevance, reliability, and likely prejudicial effect of their proposed expert testimony and avoid delays at trial.  Defendants should be required to supplement their expert disclosures immediately to provide the bases and reasons underlying their proposed expert testimony, or the testimony should be excluded.  Moreover, given the lateness of any supplemental disclosures, the government should have an opportunity to examine Defendants' experts outside the presence of the jury and before they give any testimony at trial.  Simply requiring Defendants to do what they should have done in the first place would provide an incentive for litigants to ignore the rules of expert disclosure—either they get away with insufficient disclosures or, at worst, they delay the need to make proper disclosures.  Providing the government an opportunity to question Defendants' experts in advance would help avoid this situation and manage the prejudice that would otherwise result from what would effectively be eleventh-hour disclosures.

I.      **Defendants' Deficient Disclosure of the "Bases and Reasons" for Their Proposed Experts' Opinions Will Cause Delays at Trial**

As set forth in the government's motion, the Federal Rules of Criminal Procedure envision expert disclosures sufficient to give the government enough information to evaluate a defense expert's reasoning and analysis, prepare for cross examination, and object if appropriate. *See, e.g.*, Fed. R. Crim. P. 16(b)(1)(C) (requiring a written summary describing the "bases and reasons" for an expert's opinions); Fed. R. Crim. P. 16, Adv. Comm. Notes, 1993 Am. (purpose

---

[1] With respect to two other categories of proposed expert testimony, Dr. Arnold's opinions regarding the adequacy of the government's discovery and the sufficiency of the evidence to establish the alleged conspiracy, Defendants have clarified that (contrary to their expert notices) they are not, in fact, seeking to offer such testimony.  (ECF No. 301 at 2 ("Dr. Arnold will not testify concerning the adequacy of the Government's discovery, the law of conspiracy, or that there was 'no harm, no foul.'").)

of the rule is to minimize surprise and reduce the need for continuances by providing a "fair opportunity to test the merit of the expert's testimony"). Defendants protest that, should they be forced to provide further disclosure, the government may subsequently file another motion objecting to certain portions of Dr. Arnold's, Mr. Evans', and Mr. Rooke's testimony. (ECF No. 301 at 7 n.2). But this is precisely the process contemplated by Rule 16(b)(1)(C). A party seeking to introduce expert testimony must provide sufficient information for the opposing party to determine if it is objectionable, and if it is, to raise objections with the Court in advance of trial.

Defendants' response underscores how far short of the standard their disclosures fall. Much of their proposed expert testimony is data-driven and necessarily relies on calculations and other mathematical analyses. The proposed expert testimony regarding Deutsche Bank traders' and counterparties' net positioning is a good example, and Defendants' expert notices themselves reference calculations and data analyses underlying their opinions. (*See, e.g.*, ECF No. 287 at 2-3 (Mr. Evans "assessed individual transactions, as well as calculated daily resets for the New York desk, the London desk and certain individual traders," and conduced "various analyses" and a "comprehensive review of all of the positions between particular counterparties and Deutsche Bank"); ECF No. 288 at 3 (Dr. Arnold's opinions rest on an "analysis of the data produced by the [g]overnment").)

But rather than identify what data their experts have used or producing their calculations, Defendants continue to refer the government to such broad and unhelpful categories as "publicly available market data relied on in the industry" and "market events." (ECF No. 301 at 14.) To the extent their experts have relied on public data and market events, Defendants need to identify specifically *what* data and *which* events. Even where Defendants point to "Deutsche Bank data"

3

produced in this case, they fail to identify with any specificity on what particular data sets (for example, which data, for which traders or counterparties, and for what time periods) or calculations their proposed experts' opinions are based. (*Id.*)  Defendants themselves have characterized the data produced in this case as "voluminous," so much so they believed a bill of particulars was needed. (*See, e.g.*, ECF No. 69, Mem. of Law in Support of Mot. For Bill of Particulars at 9.)  In seeking a bill of particulars, Defendants argued they had been "left in the dark" and "open to surprise" by the millions of pages of data produced. (*Id.*at 1).  But here, Defendants' failure to identify the specific data on which their proposed experts are relying has left the government in the dark and unable to meaningfully evaluate their experts' work.

Defendants' continued refusal to provide the bases and reasons for their proposed experts' opinions, or even the data upon which their calculations are based, will cause delays during trial, as the government will be unable to fully evaluate or raise challenges to the experts' methodologies in advance.  This is contrary to the goals of Rule 16(b)(1)(C).  *See also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993) (court must assess whether the reasoning or methodology underlying an expert's testimony is "scientifically valid" and "properly can be applied to the facts at issue").  And ultimately, it is the jury that will bear the burden of Defendants' noncompliance.  The expert disclosure rules exist to facilitate effective cross examination, which in turn enables the jury to observe any weaknesses in an expert's testimony.  Without sufficient expert disclosures, cross examination will not be as effective, and the testimony will not be adequately tested for the jury.  Defendants should thus be ordered to provide the bases and reasons for their experts' proposed testimony, including the specific data and calculations on which it is based.  If they refuse, they should not be permitted to introduce the experts' testimony at trial.

## II.   Defendants' Proposed Expert Testimony Regarding Traders' Net Positioning May Be Based on Unreliable Analyses Prepared in Anticipation of Litigation

The government is concerned that Defendants' proposed experts' opinions regarding traders' positioning may be based on trader-specific "net reset position" analyses prepared by Deutsche Bank in anticipation of litigation, which likely are unreliable and would make the experts' testimony unreliable and prejudicial as well.  In particular, Defendants seek to offer expert testimony regarding the net positioning of traders, including that Defendant Black's trading book was not positioned to benefit from the alleged fraud, and that the trading positions of alleged co-conspirators were inconsistent with coordinated action.  (*See* ECF No. 288 at 4; ECF No. 301 at 7, 11.)  Such testimony would require an analysis of numerous trading positions individually and collectively.  While Defendants have not identified what data their experts have considered or relied on in their analyses, their expert notices refer to "net notional positions for certain Deutsche Bank traders in New York and London" (ECF No. 287 at 1), and the "totality of the trading positions held by Deutsche Bank traders" (ECF No. 288 at 4).  The government thus believes these analyses may in fact be, or be based on, a number of trader-specific analyses "of net reset positions" produced by Deutsche Bank to the government during the course of this investigation.  *See* Exhibit A, June 23, 2014 Letter from Deutsche Bank counsel to the government (enclosing "an analysis of net reset positions (in notional equivalent) … on trading books mapped to Christian Bittar," a Deutsche Bank trader).  Deutsche Bank produced similar analyses for other Deutsche Bank traders' trading books, including for Defendant Black, in the same timeframe.

These "net reset position" analyses may well be unreliable and inadmissible.  As Deutsche Bank's production letter makes clear, the analyses are "not a record maintained in the ordinary course of business by Deutsche Bank"—to the contrary, they were created in

5

anticipation of litigation by Deutsche Bank, which provided little explanation as to how they were prepared. *Id.* at 2. Nor did Deutsche Bank make any representation that they were based on complete data. *See id.* (enclosing appendix of Mr. Bittar's 2005 trading books, and explaining the "net reset positions (in notional equivalent) for Christian Bittar for the year 2005 were calculated only on the basis of the trading books detailed in this statement due to the limited availability of other resources from this period"). Bottom line, these analyses, which contain book-to-trader mapping, would have required someone to decide which trades would be attributed to certain traders. There is simply no foundation established for this process.

To the extent Defendants' proposed expert testimony is based on Deutsche Bank's net reset position analyses, it too is likely unreliable and prejudicial, and should be excluded from trial. *See* Federal Rule of Evidence 702 (requiring expert testimony to be based on "sufficient facts or data" and "reliable principles and methods"); Federal Rule of Evidence 703 (where an expert has based their opinions on inadmissible facts or data, they may be disclosed to the jury "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect"). And to the extent Defendants' proposed expert testimony is based on some other data or analyses, Defendants should identify that data and analyses. That the government is left to guess that Deutsche Bank's net reset position analyses form the basis of Defendants' expert testimony regarding traders' net positions highlights the need for further expert disclosures in advance of their testimony at trial.

### III. Defendants' Proposed Expert Testimony Regarding Counterparties' Net Positioning Rests on a Mischaracterization of the Government's Case and Is Irrelevant

Defendants continue to withhold the calculations and analyses on which Mr. Evans' and Dr. Arnold's proposed testimony regarding net benefit or harm to Deutsche Bank's counterparties is based, focusing instead on its purported relevance. Not only is this contrary to

6

Rule 16(b)(1)(C)'s disclosure requirements, but Defendants' proposed expert testimony that counterparties were not harmed is irrelevant and should not be allowed at trial.

In arguing for relevance, Defendants mischaracterize the government's case in chief. Defendants claim the government plans to show "that particular counterparties suffered a loss on particular dates." (ECF No. 301 at 9.) This is not the case. Instead, the government intends to show counterparties were "susceptible to substantial risk of loss" by showing certain counterparties were vulnerable to manipulation on certain contracts. (*See* ECF No. 22, Superseding Indictment at ¶ 26.)

In contrast to vulnerability to harm, actual harm or benefit to counterparties would be relevant only if Defendants were aware of such harm or benefit. The net harm or benefit to a particular counterparty would be dependent on that counterparty's entire trading book, including trades with Deutsche Bank as well as many other institutions and individuals. Defendants have made no such claim they were aware of all trades a given counterparty had with Deutsche Bank or other entities on a given day, nor would such a claim make sense.[2] And it is unclear what trades are included in the counterparty data Defendants' experts rely on, and whether their data extends beyond the Deutsche Bank trading desks at the heart of or related to the conspiracy. Also unclear from Defendants' expert notices are the dates of the counterparty contracts the experts are relying on and whether Defendants are suggesting counterparties net benefitted on specific manipulation dates, dates within the vicinity of manipulation dates, or over time. A counterparty's net positioning, and the benefit or harm that counterparty may have experienced,

---

[2] Even if Defendants were aware of all the trades a particular counterparty had with Deutsche Bank, there is no realistic way for them to have been aware of or assessed the counterparty's net positioning more broadly.

is thus irrelevant to Defendants' motives or intent, and their experts should not be permitted to offer such testimony.

While it could potentially be appropriate for Defendants' experts to opine that particular counterparties were not vulnerable to harm on *particular* contracts with Deutsche Bank or co-conspirators, their expert notices refer to "net benefit[]" to counterparties (ECF No. 287 at 3) and counterparties' positioning to be harmed by "various" submissions (ECF No. 288 at 4), rather than specific contracts. For expert testimony on particular contracts to be appropriate, Defendants would need to identify the particular contracts their experts intend to opine on and what data they are relying upon for their opinions. Defendants have not done this, nor have they provided any other information about the counterparty contracts on which their experts rely.[3]

*****

Defendants should identify the bases and reasons for their proposed expert testimony, including their experts' opinions regarding the net positioning of Deutsche Bank's traders and counterparties, and the so-called "reasonable range" for LIBOR submissions. Absent further disclosures, the parties will be forced to address these issues—including the possible relevance, reliability, and prejudice of such testimony—during trial, causing delay for the Court and jury.

---

[3] As with the net positioning of Deutsche Bank traders and counterparties, Defendants refuse to provide the bases and reasons for their proposed expert testimony regarding LIBOR submissions within a "reasonable range" and instead focus on its purported relevance. Here their relevance argument rests on a blatant mis-citation of the government's brief. Defendants acknowledge the government's position that "whether the rates submitted were 'reasonable' or even an accurate reflection of Deutsche Bank's borrowing costs does not—standing alone—completely absolve Defendants." (ECF No. 301 at 4 (quoting ECF No. 291 at 13).) But they then make the opposite assertion, that "[i]n fact, the submission of LIBOR rates that were reasonable or even . . . accurate reflection[s] of Deutsche Bank's borrowing costs *would* completely absolve Defendants"—and *again* cite the government's motion as support. (ECF No. 301 at 4 (quoting ECF No. 291 at 13) (internal quotations omitted).) Such gamesmanship is inappropriate and does not take the place of the disclosures required by Rule 16(b)(1)(C).

Should Defendants persist in their refusal to provide the required disclosures, the appropriate remedy is to preclude their proposed experts' testimony at trial.

Respectfully submitted,

| | |
|---|---|
| SANDRA MOSER | JAMES J. FREDRICKS |
| Acting Chief, Fraud Section | Acting Chief, Washington Criminal II Section |
| Criminal Division | Antitrust Division |
| United States Department of Justice | United States Department of Justice |
| | |
| /s/ | /s/ |
| CAROL L. SIPPERLY | MICHAEL T. KOENIG |
| Senior Litigation Counsel | CHRISTINA J. BROWN |
| ALISON L. ANDERSON | Trial Attorneys |
| Trial Attorney | Antitrust Division |
| Criminal Division, Fraud Section | United States Department of Justice |
| United States Department of Justice | |