Case 1:16-cr-00370-CM   Document 322   Filed 09/27/18   Page 1 of 5



U.S. Department of Justice

Criminal Division

---

*Fraud Section*  *Christina J. Brown*
*(202) 598-8839*
*christina.brown@usdoj.gov*
*450 5th Street NW*
*Washington, D.C. 20530*

**VIA ECF**                                                September 27, 2018

Honorable Colleen McMahon
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    <u>United States v. Connolly and Black, 16-CR-370 (CM)</u>

Dear Chief Judge McMahon:

      Per the Court's order, the government hereby provides prior disclosures to the defense regarding potential deficiencies in Deutsche Bank's trade data.  (*See* Sept. 26, 2018 Prelim. Tr. 993:9-20, 994:22-24.)  As demonstrated by this submission, the government has repeatedly provided the defense with such information—including potential deficiencies relating to net notional positions and book-to-trader mapping—throughout the course of this litigation.  The government has also made clear throughout the case that it does not intend to rely on analyses of net notional positions or book-to-trader mapping to prove its case in chief.

      Notwithstanding the government's intention to not use net notional analysis, the government produced the net notional (or net reset) analyses provided by Deutsche Bank to the defense.  Indeed, within these analyses, the defense received net positioning that many times supported, and at other times did not support, the government's theory of the case on the reset dates at issue in this case.  And the government provided these analyses to the defense in 2016.  While the government does not believe these analyses undermine the government's case in chief, given their limitations, we have chosen not to rely on them.  And although the government does not believe this information constitutes *Brady* material, as it does not exculpate defendants from either the conspiracy or wire fraud charges, the government has disclosed the net notional positioning analysis spreadsheets and related information to the defense.

      Specifically, the government has disclosed the following information to the defense and/or the Court:

- Cover letters from Deutsche Bank counsel Paul Weiss to the government enclosing the net notional positioning analysis spreadsheets, showing on any given day what Deutsche Bank determined was a trader's net position, produced to the defense in November 2016

(attached hereto as Exhibit A).  The cover letters identify potential limitations and reliability issues, including:

> "We would like to note an important qualification concerning the analyses we are producing as a result of the presence of internal mirror trades in these books. Specifically, in cases where both the mirror trade and its corresponding internal trade are booked within a single trader's books, the effect on the trader's net reset position is zero, since the two trades will completely offset one another. However, in cases where only one of the paired trades is in one trader's book, and the corresponding trade is booked in another trader's book, the traders' net reset positions will each reflect either the positive or negative impact of the trade recorded in their respective books and will not reflect the offsetting effect of the corresponding trade in the other book."  (DOJ-A-0001033.)

> "In the cases of Maine, Dux, and Takata, Deutsche Bank has been able to use several sources, each with varying degrees of reliability, to reconstruct the book-to-trader mappings set forth in Appendix 1.  While the Bank is reasonably confident that the book-to-trader mappings listed in Appendix 1 are accurate and reliable, it is possible that they may reflect errors or omissions owing to limitations in the sources used in their reconstruction. . . .

> Regarding other traders, Deutsche Bank has been attempting to determine whether it is possible, given the quality and availability of various sources, to map derivatives and cash books to individual traders to an appropriate level of confidence.  Deutsche Bank has had some success in mapping King's and Curtler's derivatives trading books and is reasonably confident that the books listed at Appendix 2 belonged to them.  We note, however, that given the limitations of the source materials used in reconstructing these mappings, there is a material risk that they are incomplete."  (DOJ-A-0012600.)

- Letter from the government to defense counsel dated May 2, 2017, providing a summary of notes from a March 6, 2013 meeting with Deutsche Bank representatives regarding trade data (attached hereto as Exhibit B).  The notes walk through Deutsche Bank's RMS, Kondor, and Summit databases in detail, describe data fields (such as "lastfixeddate" and "notional"), note the possibility of trader mapping (ltr. at 7-8), and explain that "DB provided cornerstone" with its extracted data (ltr. at 1).

- Letter from the government to defense counsel dated May 2, 2017, answering defense counsel's questions regarding Deutsche Bank's trade data (attached hereto as Exhibit C).

- "Deutsche Bank Trading Data Presentation" slides presented by the government to defense counsel on April 18, 2017, describing the trade data, amalgamated spreadsheets, and data fields (attached hereto as Exhibit D).

- Letter from the government to defense counsel dated March 2, 2017, describing how it used Deutsche Bank's trade data to identify counterparties (attached hereto as Exhibit E).

- "Deutsche Bank IBOR Investigation: Document, Audio and Data Review" slides presented by Deutsche Bank counsel Paul Weiss to the government on January 31, 2014 and subsequently produced to the defense (attached hereto as Exhibit F). Slides 45-46 describe Deutsche Bank's data and include the government's handwritten attorney notes.

- Government's typed and handwritten attorney notes describing Deutsche Bank's trading data, produced to the defense in December 2017 (attached hereto as Exhibit G).

- Government's typed and handwritten attorney notes describing examples in which trader's net notional positions did not align with their requests to move LIBOR submissions, produced to the defense in December 2017 (attached hereto as Exhibit H).

- Government's typed and handwritten attorney notes, including from calls with Deutsche Bank's counsel, describing issues impacting trade data and net notional analyses, produced to the defense in December 2017 (attached hereto as Exhibit I), including:

    "Omissions. . .
       Upon conducting net notional analysis, it emerged that mirror trades were used in which the same trade is reflected in two separate books (these trades are linked across the two books; amendments to the trade in one book is reflected in the other book and vice-versa)." (DOJ-A-0010116.)

    "Possible Omissions per Trader. . .
    Trades relevant to Net Notional Analysis
       Upon re-checking/evaluation, it may affect book-to-trader mapping and trade-to-trader mapping previously produced to the DOJ" (DOJ-A-0010117.)

- Government's own analyses done from the data, book-to-trader mapping, and net notional information provided by Deutsche Bank (and given to the defense), produced to the defense on August 9, 2018, including: email and attachment (3500-KD-32, 33) providing "exposure for each trader we have a book for, as well as the aggregate of books for which we don't yet have mapping," including dates where the positioning did not support the government's allegation (attached hereto as Exhibit J); email and attachment (3500-KD-34, 35) providing trader exposures for additional days (attached hereto as Exhibit K); and DV01 spreadsheet (3500-KD-128) providing attempted analysis of trader net notional positions and exposure per basis point on given dates. (The DV01 spreadsheet was included with the exhibits provided to the Court on a thumb drive before trial. We have not separately attached it hereto given its large volume (66 MB).)

As the attached disclosures make clear, the government has been forthcoming with the defense and the Court throughout the case regarding the available data, analyses of the data, and the potential limitations of those analyses.

The government has also consistently maintained that it would not be relying on analysis of traders' net notional positions or book-to-trader mapping. Indeed, the universe of 215 trades and 43 fixing dates the government identified in response to the Court's bill-of-particulars order is far too few to perform any such analysis of a trader's *net* position. (*See* ECF No. 152 and 152-4.) Throughout the extensive litigation of this case, the data has been a repeated topic of litigation, and the government has made very clear that it would not be including net notional analysis it its case-in-chief:

- Letter from the government to the Court on November 28, 2017, ECF No. 152, responding to defendants' motion for an adjournment of the trial date and providing a roadmap of the government's case in chief (attached hereto as Exhibit L):

    "Indeed, the most important takeaway for present purposes is that the scope of the Government's case-in-chief will not encompass specific trades to definitively prove net exposure on any given day. In other words, when there was a manipulation attempt on a particular day, the Government has no intention of then marching a cooperator or other witness through each and every trade that was fixing on that day in order to show that a successful manipulation would have benefitted the Defendants and their co-conspirators." (Ltr. at 3.)

- Transcript of May 3, 2017 hearing, ECF No. 84, in which the government described communications with defense counsel regarding Deutsche Bank's trade data, imperfections in the data, and the government's lack of reliance on the data (attached hereto as Exhibit M):

    "The other thing that I would like to add, your Honor, is that, the data -- and while we have continued to go back and forth and this has been a continuing conversation with defense and we continue to come back to them and answer their questions about the data, the crux of the government's case is not the trade data." (ECF No. 84, Hrg. Tr. 42:22-43:2.)

    "This data is not perfect and Mr. Levine is correct that Deutsche Bank's data isn't, and in fact we provided to them the notes of the meeting in which Deutsche Bank gave us their data and they talked us through it. So we provided them those notes. So they have what we have. And the data is not perfect, and that is why we have to go back and check and look into these things. And that's why it is not going to be the crux of our case." (ECF No. 84, Hrg. Tr. 43:20-44:2.)

    "Your Honor, I would just add that when you hear Mr. Levine talking, it's problems with the data, and there are problems with the data. And all we can do is tell the defense what we know, and all we can do is share with the defense all of the data. We can share with them what we know. We can share with them our understanding and what is it that the government has figured out. But we can't go back and fix

Deutsche Bank's data.  We can't ask them to have had a better system.  We can't go back and ask them to map, you know, these -- to the traders directly, and these are all arguments." (ECF No. 84, Hrg. Tr. 49:8-17.)

"These are all arguments that they can make at trial, and they can poke the data, they can use the data, they can make all those arguments, but we can't go back and fix the evidence, and that's what they are wanting us to do."  (ECF No. 84, Hrg. Tr. 49:21-25.)

Moreover, defense counsels' own prior statements are inconsistent with any presently stated impression that the government had intended to rely on net notional or book-to-trader mapping analyses:

- "Well, how do they know which direction, what Deutsche Bank was sitting in terms of their net position on a particular day if they haven't looked at all the trades?  Because, you know, you have a zillion trades.  They add up to a sum." (ECF No. 84, May 3, 2017 Hrg. Tr. 34:21-24.)

- "Now, I understand the government has told us in a letter that they intend to put on a case with no -- sounds like trading data, they don't intend to prove anything else happened." (Nov. 30, 2017 Hrg. Tr. 4:17-20, attached hereto as Exhibit N.)

As this submission makes abundantly clear, the government has met and exceeded its discovery obligations throughout this case.  Defense counsels' statements demonstrate not only that they have appreciated any data deficiencies or inconsistencies for a very long time, but also that they have alternatively used them as both a sword and a shield when it suited their needs.  Moreover, this week's tactics were a microcosm of defense counsels' overarching strategy to use confusion, hyperbole, and personal attacks to impede the efficient presentation of the government's evidence.  It is time for the delay to end and the evidence to be put to the jury.

Sincerely,

/s/
CAROL L. SIPPERLY
Senior Litigation Counsel
ALISON L. ANDERSON
Trial Attorney
Criminal Division—Fraud Section
United States Department of Justice

MICHAEL T. KOENIG
CHRISTINA J. BROWN
Trial Attorneys
Antitrust Division
United States Department of Justice