### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

*Defendants*.

No. 1:16-cr-00370 (CM)

ECF Case

**ORAL ARGUMENT REQUESTED**

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MATTHEW CONNOLLY'S MOTION FOR A JUDGMENT OF ACQUITTAL OR NEW TRIAL

**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
kennethbreen@paulhastings.com
pharaguberman@paulhastings.com
janeyoon@paulhastings.com

*Attorneys for Defendant Matthew Connolly*

# TABLE OF CONTENTS

                                                                                            **Page**

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ............................................................................................... 3

    Summary of the Offenses Charged in the Indictment.................................... 3

    The Government's Case at Trial .................................................................... 4

LEGAL STANDARD......................................................................................... 6

ARGUMENT ................................................................................................... 7

I.     THE PROSECUTION OF MATTHEW CONNOLLY IS TIME-BARRED.................. 7

    A.    The Government Failed to Establish that the Alleged Scheme Affected Deutsche Bank ....................................................................... 8

    B.    The Government Failed to Prove that the Alleged Scheme Affected Counterparty Banks .................................................................. 9

II.    THE GOVERNMENT FAILED TO SHOW THE FALSITY OF ANY STATEMENTS................................................................................... 10

    A.    The BBA's LIBOR Instructions Are the Sole Determinant of Falsity ............... 10

    B.    The Government Failed to Prove the Falsity of Any USD LIBOR Submissions ................................................................................. 11

    C.    LIBOR Submissions Cannot Be "Partially False" or "Half Truths" ................. 14

III.   THE GOVERNMENT FAILED TO SHOW THAT ANY COUNTERPARTIES WERE DEFRAUDED ..................................................................... 15

    A.    The Government Did Not Establish a Duty to Disclose ...................................... 16

    B.    The Trial Record Does Not Support a Conviction for Fraud by "Conduit" ........ 18

    C.    The Government Could Not Show that Any Counterparty Bank Was Deprived of the Essential Object of Their Bargain............................. 21

IV.   THE GOVERNMENT FAILED TO PROVE THAT ANY STATEMENTS WERE MATERIAL.................................................................................... 23

    A.    The Government Presented Insufficient and Misleading Evidence in Its Attempt to Prove that Submissions Were Material to Counterparty Banks ........ 23

         1.    Counterparty Witnesses Lacked Foundation to Speak to Materiality ................................................................................. 23

         2.    Materiality Testimony Was Legally Misleading ..................................... 25

    B.    The Government Did Not Prove the Materiality of a Single Submission to the BBA ....................................................................... 27

V.    THE GOVERNMENT FAILED TO PROVE THAT MR. CONNOLLY ACTED WITH FRAUDULENT INTENT ................................................................ 30

# TABLE OF CONTENTS
(continued)

                                                                              **Page**

A.     The Government Failed to Disprove Good Faith and Provided an
       Insufficient Basis for a Juror to Find that Mr. Connolly Acted With
       Fraudulent Intent ........................................................................... 30

       1.     Documentary Evidence Is Inconsistent with Fraudulent Intent ............. 31

       2.     Testimonial Evidence Does Not Establish Intent ................................... 32

       3.     Good Faith Belief in the Discretion Afforded to Submitters .................. 33

       4.     Mr. Connolly's Own Words Negate Fraudulent Intent .......................... 35

B.     The Government Failed to Show Mr. Connolly Had Sufficient
       Constitutional Notice to Act with Fraudulent Intent ............................ 36

       1.     Market Views Belie the Government's Case ........................................... 36

       2.     Permissive BBA Guidelines and DB Policies ........................................ 38

VI.    THE EVIDENCE CANNOT JUSTIFY A GUILTY VERDICT ON THE
       REMAINING SUBSTANTIVE WIRE FRAUD COUNTS TWO AND NINE ............ 40

A.     Count Two ........................................................................................ 41

B.     Count Nine ....................................................................................... 41

VII.   THE GOVERNMENT FAILED TO PROVE A CONSPIRACY, OR THAT
       MATTHEW CONNOLLY KNOWINGLY JOINED ONE ....................................... 42

VIII.  IF THE COURT DOES NOT ENTER A JUDGMENT OF ACQUITTAL, IN
       THE INTEREST OF JUSTICE, THE COURT SHOULD GRANT MR.
       CONNOLLY A NEW TRIAL PURSUANT TO RULE 33 ...................................... 44

A.     Rule 33 Legal Standard ...................................................................... 44

B.     The Indictment was Constructively Amended ...................................... 45

       1.     Legal Standard for Finding a Constructive Amendment ....................... 46

       2.     The Government's Theory Under Which It Convicted Defendants
              at Trial Was Not Charged by the Grand Jury ...................................... 49

       3.     The Government's New Theory Modified Essential Elements of
              the Charged Offenses ......................................................................... 51

       4.     Alternatively, the Government's Evidence Effectuated a
              Prejudicial Variance Warranting Dismissal of the Indictment ............... 52

C.     Defendants Should Be Granted a Dismissal of the Indictment Due to the
       Prosecution's Misconduct .................................................................. 53

CONCLUSION ........................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bruff v. Mali,*
   36 N.Y. 200 (1867) ...................................................................................................19

*Darden v. Wainwright,*
   477 U.S. 168 (1986).................................................................................................53

*Eaton Cole & Burnham Co. v. Avery,*
   83 N.Y. 31 (1880) ....................................................................................................19

*Emery v. Am. Gen. Fin., Inc.,*
   71 F.3d 1343 (7th Cir. 1995) ...................................................................................14

*Gaither v. United States,*
   413 F.2d 1061 (D.C. Cir. 1969) ...............................................................................46

*Jackson v. United States,*
   359 F.2d 260 (D.C.Cir.1966) ...................................................................................47

*Jackson v. Virginia,*
   443 U.S. 307 (1979)..................................................................................................54

*McNally v. United States,*
   483 U.S. 350 (1987)..................................................................................................41

*Mun. Corp. of Bremanger v. Citigroup Glob. Markets Inc.,*
   555 F. App'x 85 (2d Cir. 2014) ...............................................................................21

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.,*
   822 F.3d 650 (2d Cir. 2016).....................................................................................16

*Pasternack v. Laboratory Corp. of America Holdings,*
   27 N.Y.3d 817 (2016) ..............................................................................................19

*Securities Investor Protection Corporation v. BDO Seidman, L.L.P.,*
   95 N.Y.2d 702 (2001) .........................................................................................20, 21

*Stirone v. United States,*
   361 U.S. 212 (1960)............................................................................................46, 47

*Tibbs v. Fla.,*
   457 U.S. 31 (1982)....................................................................................................44

*United States v. Autuori,*
   212 F.3d 105 (2d Cir. 2000).................................................................................14, 16

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Bank of N.Y. Mellon*,
   941 F. Supp. 2d 438 (S.D.N.Y. 2013)..............................................................................7, 8, 9

*United States v. Barrett*,
   496 F.3d 1079 (10th Cir. 2007) .............................................................................................44

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015)............................................................................................14, 26

*United States v. Bowen*,
   799 F.3d 336 (5th Cir. 2015) ................................................................................................44

*United States v. Bryant*,
   556 F. Supp. 2d 378 (D.N.J. 2008) ................................................................................10, 30

*United States v. Carpenter*,
   405 F. Supp. 2d 85 (D. Mass. 2005), *aff'd in part, appeal dismissed in part*,
   494 F.3d 13 (1st Cir. 2007).....................................................................................................14

*United States v. Chalmers*,
   474 F. Supp. 2d 555 (S.D.N.Y. 2007)..................................................................................41

*United States v. Cromitie*,
   781 F. Supp. 2d 211 (S.D.N.Y. 2011), *aff'd*, 727 F.3d 194 (2d Cir. 2013) ......................53, 54

*United States v. Cruz*,
   785 F.2d 399 (2d Cir. 1986)...................................................................................................44

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994).............................................................................................6, 33

*United States v. D'Amelio*,
   636 F. Supp. 2d 234 (S.D.N.Y. 2009), *rev'd and remanded*, 683 F.3d 412
   (2d Cir. 2012)..........................................................................................................................44

*United States v. D'Amelio*,
   683 F.3d 412 (2d Cir. 2012)...................................................................................................47

*United States v. Feola*,
   420 U.S. 671 (1975)................................................................................................................42

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001)............................................................................................44, 45

*United States v. Garcia*,
   992 F.2d 409 (2d Cir. 1993)...................................................................................................42

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Gaudin*,
  515 U.S. 506 (1995)...........................................................................................24, 26, 28, 51

*United States v. Ghavami*,
  23 F. Supp. 3d 148 (S.D.N.Y. 2014).......................................................................................7

*United States v. Glenn*,
  312 F.3d 58 (2d Cir. 2002).....................................................................................................36

*United States v. Heinz*,
  790 F.3d 365 (2d Cir. 2015).....................................................................................................7

*United States v. Helmsley*,
  941 F.2d 71 (2d Cir.1991)......................................................................................................53

*United States v. Kapelioujnyj*,
  547 F.3d 149 (2d Cir. 2008).....................................................................................................6

*United States v. Klein*,
  No. 16-CR-442 (JMA), 2017 WL 1316999 (E.D.N.Y. Feb. 10, 2017)..................................48

*United States v. Lahey*,
  967 F. Supp. 2d 731 (S.D.N.Y. 2013)....................................................................................40

*United States v. LaMorte*,
  950 F.2d 80 (2d Cir.1991), *cert. denied*, 504 U.S. 909 (1992).............................................53

*United States v. Lanier*,
  520 U.S. 259 (1997)..........................................................................................................30, 40

*United States v. Lewis*,
  67 F.3d 225 (9th Cir. 1995) ...................................................................................................26

*United States v. Litvak*,
  808 F.3d 160 (2d Cir. 2015)........................................................................................24, 28, 33

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018)..........................................................................................25, 26, 27

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008)..............................................................................................6, 43

*United States v. Miller*,
  471 U.S. 130 (1985)................................................................................................................47

*United States v. Milstein*,
  401 F.3d 53 (2d Cir. 2005)...............................................................................................47, 50

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994) ........................................................................26, 42

*United States v. Mollica*,
    849 F.2d 723 (2d Cir. 1988) ........................................................................48, 50

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir.1991) .........................................................................6, 33

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000) ..........................................................................30, 36

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007) .................................................................... *passim*

*United States v. Rose*,
    590 F.2d 232 (7th Cir. 1978) ...........................................................................42

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir.1977) ................................................................................48

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*,
    831 F. Supp. 2d 779 (S.D.N.Y. 2011) .............................................................8

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ..........................................................................44

*United States v. Schwartz*,
    924 F.2d 410 (2d Cir.1991) ..............................................................................41

*United States v. Stacks*,
    821 F.3d 1038 (8th Cir. 2016) ....................................................................36, 37

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987) ..............................................................................30

*United States v. Weaver*,
    860 F.3d 90 (2d Cir. 2017) ........................................................................23, 28

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ...........................................................................22

*United States v. Weiss*,
    752 F.2d 777 (2d Cir) (Newman, J., dissenting in part), *cert. denied*,
    474 U.S. 911 (1985) .........................................................................................48

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Whiteside,*
  285 F.3d 1345 (11th Cir. 2002) ......................................................................10, 30

*United States v. Wiley,*
  846 F.2d 150 (2d Cir. 1988)....................................................................................15

*United States v. Wilkerson,*
  656 F. Supp. 2d 22 (D.D.C. 2009) ........................................................................44

*United States v. Zingaro,*
  858 F.2d 94 (1988).............................................................................................48, 53

*Universal Health Services, Inc. v. United States,*
  136 S.Ct. 1989 (2016)..............................................................................................28

**Statutes**

18 U.S.C.
  § 371...........................................................................................................................48
  § 3282...........................................................................................................................7
  § 3293(2).................................................................................................................3, 10

U.S. Const. Amend. V ................................................................................. *passim*

**Rules**

Fed. R. Crim. P.
  29.............................................................................................................. *passim*
  33.............................................................................................................. *passim*
  33(a) ............................................................................................................................44

Defendant Matthew Connolly, through his undersigned counsel, respectfully submits the following motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29, or alternatively, for a new trial pursuant to Fed. R. Crim. P. 33. While Matthew Connolly submits this motion brief to address facts and issues specific to his case, he respectfully joins the arguments set forth in Gavin Black's motion that apply equally to both defendants.

## PRELIMINARY STATEMENT

Matthew Connolly respectfully submits that all counts of conviction against him be vacated in favor of acquittal. ***First***, the prosecution of Matthew Connolly is time-barred, as the government failed to prove that the alleged scheme "affected a financial institution." The ten-year statute of limitations should not apply to this case. ***Second***, the government failed to prove that any of the submissions—the only statements at issue in this case—were actually false. They presented no borrowing data against which any of the submissions could be measured, and no other evidence to show that the submissions at issue in this case deviated from the BBA's LIBOR Instructions. Moreover, not one cooperating witness ("Cooperator") testified that he either submitted, or caused to be submitted, false LIBOR estimates. ***Third,*** the government failed to prove any fraud on Deutsche Bank's ("DB" or "the Bank") trade counterparties ("Counterparties"). The sole theory of convergent fraud available to the government was that USD LIBOR settings were false statements published or caused to be published by the Defendants to counterparties in the market, via Thomson Reuters as a conduit. LIBOR, however, was the independent statement of the BBA, not the Defendants; thus, Thomson Reuters was not a "conduit" for Defendants' statements. Under the relevant case law, even if LIBOR reflected in part the allegedly false statements from the Defendants (*i.e.*, the submissions), that does not alter its status as an independent statement of the BBA, which retained exclusive control and discretion in what settings to fix. ***Fourth,*** the government's evidence on materiality was

woefully insufficient.  The counterparties were inadequately situated within their job functions to address materiality, and the government failed to present a BBA witness.  That the BBA applied a "trimmed mean" process to all 16 submissions does not, standing alone, establish the materiality of each Panel Bank's submission.  If anything, the evidence showed that the BBA consciously removed, through its methodology, half of the submissions it received, as unrepresentative, irrelevant—indeed, *immaterial*—to where LIBOR should be set on any given day.  **_Fifth_**, the evidence on fraudulent intent fell short.  There simply was no evidence that Mr. Connolly intended to deceive or defraud *anyone*.  **_Sixth_**, as detailed more fully below, there was insufficient evidence in support of the substantive counts of wire fraud against Mr. Connolly.  **_Seventh_**, the evidence of the charged conspiracy also was deficient—the government presented insufficient evidence to prove Mr. Connolly knowingly and willfully entered into an unlawful agreement.  Mr. Connolly, who supervised traders but did not have his own derivatives positions, and who left the Bank long before the BBA began exploring the possibility of offering the market clearer guidance around LIBOR, was not on fair notice that his conduct, which was directed and sanctioned by others at the Bank, was a crime.

In addition, Mr. Connolly respectfully submits that he is entitled to relief under Rule 33 of the Federal Rules of Criminal Procedure on the foregoing grounds, and because: (1) the Indictment was constructively amended; (2) the trial record worked a prejudicial variance; and (3) prosecutorial misconduct warrants dismissal of the Indictment.

## BACKGROUND

### Summary of the Offenses Charged in the Indictment

The Indictment charged Mr. Connolly and his co-Defendant Gavin Campbell Black ("Mr. Black") with conspiracy to commit wire fraud and bank fraud (Count One), and wire fraud, and aiding and abetting wire fraud (Counts Two to Eleven).  (SI ¶¶ 25–48, 49–51).  Mr. Connolly was charged in Count One, and initially in seven substantive counts of wire fraud.  These substantive counts were based upon emails from Mr. Connolly to Mr. King regarding LIBOR submissions (Counts Two and Three); wire transfers resulting from the settlement of trades that Mr. Connolly did not execute and involving Counterparties that did not testify in this case (Counts Five and Seven); and three LIBOR publication counts, two of which bore no relation to Mr. Connolly (Counts Eight and Ten), and another of which recycled the same non-fraudulent email underlying Count Two by affixing it to a new wire (Count Nine).  (SI ¶¶ 49–51).

Prior to trial, the Court noted that "the Indictment charges the defendants with participating in a scheme to defraud that was perpetrated (1) by making materially false and fraudulent representations about Deutsche Bank's cash borrowing costs; (2) to the BBA; (3) for the purpose of influencing its setting of USD LIBORs (*i.e.,* that is the decision to which the false statements are material)."  (Decision on Government's Motions in Limine ("Gov't MILs Decision"), May 5, 2018, Dkt. 262 at 5–6.)  The Indictment's only references to specific Counterparties are limited to provisions alleging that those banks were third-party financial institutions "affected" by the alleged fraud on the BBA, for purposes of 18 U.S.C. § 3293(2).  (*See, e.g*., SI ¶¶ 21–24, 25, 26).  Nevertheless, the government pursued a different, and constantly shifting, theory of its case at trial.

**The Government's Case at Trial**

The government's opening statement emphasized that the Defendants, along with their colleagues, schemed and conspired to "cheat" their trade Counterparties; that they were "so greedy that they abused their bank's inside role in determining" LIBOR.[1]  Introducing the Cooperators to the jury, the government explained that James King was "primarily" DB's LIBOR submitter, and that he was "expected to tell the truth about what interest rate he thought he would have to pay to borrow money."[2]  In the government's opening, the prosecutors promised to offer the testimony of "accomplices" who will admit that what they did was wrong, and that "skewing" LIBOR submissions "was dishonest." [3]  This would include the testimony of Mr. Connolly's "rainmaker," Timothy Parietti, who would testify that Mr. Connolly "told him" to reach out to James King to get him to "move his LIBOR submissions in whatever direction helped benefit Tim Parietti and his trades and make Deutsche Bank more money."[4]

Repeatedly conflating DB's duties to the BBA as a Panel Bank member with DB's contractual duties (or lack thereof) to its Counterparties, the government alleged in its opening statement that the Defendants "cheated" and "defrauded" businesses "around the world,"[5] that they "put [] trades on with their counterparties . . . all the while knowing that they could and they would stack the deck" against them by "secretly moving" the LIBOR rate in their favor,[6]

---

[1] (Ms. Anderson Opening Statement, Tr. 43:25 – 44:6).

[2] (Ms. Anderson Opening Statement, Tr. 46:1–10).

[3] (Ms. Anderson Opening Statement, Tr. 53:11–14, 54:21 – 55:2).

[4] (Ms. Anderson Opening Statement, Tr. 55:3–15).

[5] (Ms. Anderson Opening Statement, Tr. 44:11–13).

[6] (Ms. Anderson Opening Statement, Tr. 51:12–16).

"stealing money from their counterparties' pockets."[7]  On the other side of those transactions, the government committed to presenting the testimony of "some of those businesses that the defendants cheated."[8]  But despite the meandering accusations and nefarious characterizations of the Defendants interactions, the government's opening statement was conspicuously devoid of conduct constituting a cognizable fraud.

After the government rested, it voluntarily dismissed Counts Five, Six, and Seven of the Indictment.[9]  The Court then heard oral motions pursuant Rule 29 and further ordered the dismissal of Count Four against Mr. Black prior to jury deliberations.[10]  Similarly, after hearing arguments based on the case law on contract-based frauds in the Second Circuit, the Court dismissed one of the three theories of the case advanced by the government at trial—a "convergent" fraud on Counterparties "at the time of contracting"[11]—leaving a non-convergent fraud on the BBA and the "conduit" fraud on Counterparties as separate bases for the jury's deliberations.[12]

In its summation, the government reiterated that ever-shifting description of its own case. "[T]he defendants and their co-conspirators ran a scam designed to get over on their

---

[7] (Ms. Anderson Opening Statement, Tr. 51:20–25).

[8] (Ms. Anderson Opening Statement, Tr. 52:16–17).

[9] "MS. SIPPERLY: Yes, we'll rest and we'll not be going forward to Counts Five, Six and Seven; THE COURT: Those counts are dismissed." (Tr. 2451:1–3).

[10] "THE COURT: I'm talking about Count Four. I said I had very specific questions for you; MS. SIPPERLY: Oh, okay; THE COURT: Count Four is dismissed." (Tr. 2523:5–8).

[11] "THE COURT: I've already told you that there is no possibility that the government can prove misrepresentation at the time of the trade. It's out of the case. That [time-of-contracting] theory articulated yesterday is out of the case." (Tr. 2517:19–22).

[12] (Tr. 2517:22 – 2518:1).

counterparties."[13]  "They wanted to rig the rate so that their trades would be more profitable at the expense of somebody else."[14]  "The BBA does not have to be defrauded.  There's no argument that the defendants were trying to take money or property from the BBA.  It was the counterparties here in the United States that are alleged to have been defrauded, that were defrauded."[15]  But under any of its proffered theories, even applying the generous Rule 29 standard, the government fell woefully short of proving its case.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29.  The relevant inquiry in deciding a motion for judgment of acquittal is whether the government introduced against Mr. Connolly "sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged ha[d] been proven beyond a reasonable doubt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  It is not enough for the government to introduce evidence "at least as consistent with innocence as with guilt."  *Id.* (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991)).  Although the Court should defer to the jury's assessment of witness credibility, conflicting testimony, and the jury's choice of competing inferences that can be drawn from the evidence, "specious inferences" should not be credited.  *See United States v. Kapelioujnyj*, 547 F.3d 149, 153 (2d Cir. 2008) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir.

---

[13] (Ms. Sipperly Summation, Tr. 2626:11–13).

[14] (Ms. Sipperly Summation, Tr. 2631:5–7).

[15] (Ms. Anderson Rebuttal Summation, Tr. 2853:21–25).

2008)).  Based on the deficiencies in the government's case, Mr. Connolly should never have been found guilty beyond a reasonable doubt.

## ARGUMENT

## I.     THE PROSECUTION OF MATTHEW CONNOLLY IS TIME-BARRED

The government failed to establish that the charged offenses affected a financial institution for purposes of the applicable statute of limitations.  Matthew Connolly respectfully submits that the counts of conviction are time-barred, and as such, a judgment of acquittal should be entered.  Although the Indictment charged a conspiracy spanning from "in or about 2004 through at least in or about 2011," (SI ¶ 25), it was undisputed—and the jury was so instructed— that Mr. Connolly did not continue as a member of the alleged conspiracy after he left Deutsche Bank in March 2008.  (SI ¶ 10).  As such, the customary five-year statute of limitations applicable to the wire fraud and related conspiracy statutes should have time-barred this Indictment, which was returned eight years later, in May 2016.  *See* 18 U.S.C. § 3282.

In pre-trial motions, the government asserted that it could, and would, show that the wire fraud scheme "affected a financial institution" by establishing both a self-affecting theory of the impact on Deutsche Bank, and showing loss or substantial risk of loss to DB's counterparties.  (*See* Dkt. 217 at 39–43).  By the close of trial, the government had not done so.  It failed to prove that any financial institution was directly affected by the alleged scheme, through exposure to "a new or increased risk of loss," *see United States v. Ghavami*, 23 F. Supp. 3d 148, 159 (S.D.N.Y. 2014), much less prove that such an impact was reasonably foreseeable at the time, which it is required to do.  *United States v. Bank of N.Y.  Mellon*, 941 F. Supp. 2d 438, 460 (S.D.N.Y. 2013); *see also United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (finding an affect on a financial institution where "significant payments and related fees" incurred by banks "were

foreseeable to the Defendants at the time of their fraudulent activity").  For the reasons set forth more fully below, the ten-year statute of limitations should not apply, and a judgment of acquittal should be entered on all counts.

A.    **The Government Failed to Establish that the Alleged Scheme Affected Deutsche Bank**

The government failed to establish a "self-affecting" theory at trial because it did not show that Deutsche Bank was exposed to loss or increased risk of loss by Defendants' alleged conduct.  (*See* SI ¶ 26 (alleging a self-affecting theory based on Deutsche Bank's internal investigation and the penalties paid to the Government in the Superseding Indictment)).  There was no evidence of a "substantial internal investigation," settlement agreements, fines, or of any harm sustained to DB's commercial or financial reputation.  *See United States v. Rubin/Chambers, Dunhill Ins. Servs*., 831 F. Supp. 2d 779, 783–85 (S.D.N.Y. 2011) (finding that the sheer existence of a settlement agreement, without an admission of guilt, was "not direct evidence of an effect on a financial institution.").  Further, there was no evidence of a nexus between Defendants' alleged conduct and any investigation conducted by Deutsche Bank.  *See Bank of N.Y.  Mellon*, 941 F. Supp. 2d at 459 (holding that a "proximate" nexus between the alleged conduct and the effect on the financial institution is required for the 10-year statute of limitations to apply).

The government's evidence of an effect on Deutsche Bank is deficient, and fails to support the ten-year limitations period.

**B.      The Government Failed to Prove that the Alleged Scheme Affected Counterparty Banks**

The government also failed to show that DB's counterparties were "affected" by the alleged scheme because it failed to establish that there was any loss or substantial risk of loss to any of DB's counterparties.

The government presented three counterparty witnesses, all from the Federal Home Loan Banks—alleged victims.  First, none of these witnesses interacted or otherwise traded with Mr. Connolly.  Second, every one of these witnesses testified that they were not permitted to take on risk in trades; rather, they engaged in the practice of hedging in all trades with DB, including those at issue in this case, structuring investments to avoid risk of loss.  (*See, e.g.*, testimony of Mr. Maroun, Tr. 1430:2–17; testimony of Ms. Hunter, Tr. 1576:1–7; testimony of Ms. Konich, Tr. 2199:3–16).

Third, the trading evidence that the government presented—single trade confirmations— cannot establish whether a financial institution was at risk of loss.  The government failed to establish that DB's LIBOR submission itself caused any loss or substantial risk of loss to any of these counterparties.  Rather, there was testimony about Counterparties' awareness of LIBOR's trimmed average and the minimal impact (if any) that any submission could have, and no testimony that the DB submission itself impacted anything.  (*See, e.g.*, testimony of Mr. Maroun, Tr. 1421:20 – 1422:17).  In fact, the government's theory only works if DB's submission actually moved the LIBOR setting, and there was no testimony that DB's submission was the cause of any changes in the setting on any day.

Indeed, this record exemplifies the type of evidentiary failure contemplated by *Bank of N.Y. Mellon* at 459–60—one where any impact on the counterparty would be "so attenuated, so remote, so indirect that . . . it does not in any meaningful sense affect the institution."  The

government has not met its burden.  Affirming the application of  18 U.S.C. § 3293(2) on this trial record would effectuate an unlimited application of a ten-year statute of limitations to every conceivable financial prosecution.  The statute must implicate an evidentiary limitation—one that accounts for the risk inherent in sophisticated financial trading.  The counts of conviction against Mr. Connolly are time-barred.

For all of the foregoing reasons, there is insufficient evidence that the alleged conduct "affected a financial institution."  The five-year statute of limitations should apply, and all counts of conviction against Mr. Connolly should be vacated in favor of a judgment of acquittal.

## II.   THE GOVERNMENT FAILED TO SHOW THE FALSITY OF ANY STATEMENTS

### A.   The BBA's LIBOR Instructions Are the Sole Determinant of Falsity

A "scheme to defraud" requires the government to prove "that the defendant engaged in a deceptive course of conduct by making material *misrepresentations.*"  *See United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (emphasis added).  Where, as here, "the truth or falsity of a statement centers on an interpretative question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law." *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002). Stated another way, the government must negate the proposition that "any reasonable interpretation" of the law or rule permitted the conduct, or that the alleged misrepresentation was "unambiguously prohibit[ed]."  *See United States v. Bryant*, 556 F. Supp. 2d 378, 444 (D.N.J. 2008).

In this case, the Indictment alleges that Mr. Connolly engaged in a scheme to make, or cause to be made, "false and fraudulent statements" and "transmi[ssions]" in connection with DB's LIBOR submission.  (SI ¶¶ 25, 49–51).  Because the alleged misrepresentations were

certain LIBOR submissions, the BBA's LIBOR Instructions, which set forth the definition of LIBOR, were effectively incorporated into the wire fraud statute, and were the standard by which the falsity of DB's LIBOR submissions were to be measured.[16]

At all times relevant to the Indictment, the BBA's LIBOR Instructions defined the LIBOR submission as follows: "An individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds in London, were it to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 1100."  (GX 1-803).

Thus, the government had a specific evidentiary burden to meet in this case—to present the DB's borrowing data to prove that the relevant LIBOR submissions were not justified.  It failed to meet this burden.

### B.  The Government Failed to Prove the Falsity of Any USD LIBOR Submissions

The government failed to present any evidence demonstrating that DB was, in fact, *unable* to borrow funds at the submitted rates.  Indeed, it failed to introduce any borrowing data at all.  The government instead adduced the following, which, taken together, was woefully insufficient to prove that DB's LIBOR submissions were false:

- Emails (*e.g.*, GX 1-023) and Bloomberg chats (*e.g.*, GX 1-024) containing LIBOR requests by specific traders—only a fraction of which were sent by Mr. Connolly;

- Expert testimony stating that LIBOR was a "very important" rate referenced by many financial products (*e.g.*, testimony of Mr. Youle, Tr. 127:3 – 128:6; testimony of Mr. Parietti, Tr. 1010:3–10);

---

[16] (Tr. 2574: 7–18 (Charge Conference) (agreeing with Defendants that because the Government brought a criminal fraud prosecution based on the alleged violation of the BBA's LIBOR Instructions, those Instructions "effectively . . . g[ot] incorporated into the wire fraud statute")).

- Testimony from James King (DB's "principal" USD LIBOR Submitter) commenting that, on certain request days, he manually overrode the rate he *may* have otherwise submitted (Tr. 313:2–11), which was based on a dynamic "pricer" spreadsheet that he conceded that (1) he did not create, and did not know who did (Tr. 781:14–16; 785:10–16); (2) Appeared to include algorithmic indicators from other *derivatives and DB trade* figures (Tr. 567:4 – 568:3); (3) was only one unofficial method (out of many) that could be used to arrive at a LIBOR-submission estimation (Tr. 573:4 – 574:11); (4) he often overrode algorithms for benign reasons (Tr. 568:17 – 572:3); (5) was neither required nor suggested by DB or the BBA as a rate-submission procedure, much less as the exclusive authority on a bank's LIBOR submission; and (6) proved to be unreliable by the beginning of the Financial Crisis (Tr. 786:1–15);

- Submission evidence purporting to show how DB submissions "affected" the LIBOR rate from one day to another (*e.g.*, GX 1-455; testimony of Mr. King, Tr. 302:1–10; testimony of Mr. Curtler, Tr. 1618:2–22); and

- Testimony from Cooperators and a Counterparty stating that it was "wrong," "biased," and an "unfair advantage" to consider trade positions in LIBOR submissions (*e.g.*, testimony of Mr. King, Tr. 278:4–20; testimony of Mr. Parietti, Tr. 1010:3–10; testimony of Mr. Curtler, Tr. 1678:21 – 1679:3; testimony of Ms. Konich, Tr. 2197:6–19).

Even the latter category of evidence—specifically, testimony from DB's submitter, Michael Curtler—exposed the insufficiency of the evidence of falsity.  Mr. Curtler, who oversaw DB's USD LIBOR submission process, testified that *he did not have any reason to believe that DB couldn't borrow cash at the rates in question, and that he had "nothing" on which to base the notion that a submission in question was "in any way inconsistent with market factors."* (Tr. 2127:13–18 (emphasis added)).

To the contrary, Mr. Curtler attested that the LIBOR submission process permitted Panel Banks a certain "leeway" in setting LIBOR (Tr. 2173:8–11 (testifying that a 2008 industry publication said that banks had "leeway" in setting LIBOR submissions)).  And Mr. King testified that the BBA left the term "reasonable market size" undefined, even after the (unrelated) news reporting of "low-balling" raised new scrutiny on the LIBOR Definition—meaning that Banks borrowed cash at different costs on the same day, depending on the "size" of the market.

(Tr. 667:9–13).   Indeed, key participants in the LIBOR markets confirmed the notion of a "reasonable range" during the period of the Indictment.

Despite controversy surrounding the so-called "low-balling" issue in 2008, the BBA explicitly decided to leave its LIBOR Definition unchanged, and the term "reasonable market size" undefined. (GX 1-803; DX 1171A ¶ 12.2 (stating that the BBA's decision not to define "reasonable market size" was "intentional")).   Indeed, in response to the BBA's outreach to the market on that very issue, the Chicago Mercantile Exchange ("CME")—one of the largest (and most-respected) derivatives exchanges in the world—explicitly validated the notion of a range of borrowing costs within which a Panel Bank can make an entirely accurate LIBOR submission. (DX 9044A at 7).

The government failed to establish the falsity of any DB submission relevant to this case. Even granting the government all reasonable inferences from the above evidence, the government failed to prove the falsity of a single submission made, or caused to be made, by any DB employee, much less Mr. Connolly.   Further, Mr. Connolly was not involved in, or associated with, a single phone conversation or communication between the BBA (*e.g.*, John Ewan) and DB personnel (*e.g.*, Messrs. Curtler or King).   The government could not point to any statements made, or caused to be made, by Mr. Connolly in this case.

This complete failure of proof of falsity is fatal to the government's case.

### C.    LIBOR Submissions Cannot Be "Partially False" or "Half Truths"

Mr. Connolly recognizes that, prior to trial, this Court committed to charging the jury in a manner consistent with this Circuit's general case law on wire fraud.[17]  *See also United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("[I]t is just as unlawful to speak 'half-truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.").  But "half-truths" are "partial omissions" by another name.  *See, e.g.*, *United States v. Carpenter*, 405 F. Supp. 2d 85, 92 (D. Mass. 2005), *aff'd in part, appeal dismissed in part*, 494 F.3d 13 (1st Cir. 2007) ("Put another way, the fraudulent scheme alleged in the indictment included the 'omission' to clarify the half-truths that the defendant directed toward the exchangors"); *see also Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995) (analyzing a mail fraud claim, characterizing a half-truth as "usually the same thing" as a misleading omission).  And as the Government conceded, this case was not charged as an omission case,[18] and no form of omission (material or partial) should have provided a basis for the jury's verdict.

Indeed, other cases raising the concepts of partial falsity or misleading half-truths involve multi-faceted statements.  *See, e.g.*, *United States v. Binday*, 804 F.3d 558, 565–67 (2d Cir. 2015) (affirming conviction where evidence showed that defendants caused applicants to submit life-insurance applications partially omitting some relevant information, without which the

---

[17] "The Court will give jury instructions about falsity that conform to Supreme Court precedent and the law in this Circuit—both of which make it clear that a statement is false and fraudulent for purposes of the wire fraud statute if it is actually false, impliedly false, or misleadingly false."  (Gov't MILs Decision, Dkt. 262 at 20–21).

[18] "[MS. SIPPERLY:] This is not an omission case. You know, we would not ask for an omission instruction, and we don't need the duty instruction. This is not an omission case." (Charging Conference, Tr. 2569:9–11).

insurers were unlikely to insure); *United States v. Wiley*, 846 F.2d 150, 152 (2d Cir. 1988) (affirming fraud conviction where, among other misrepresentations, defendants failed to disclose conflicts of interest).  Here, DB submitted a single number from a reasonable range of accurate responses in response to a question.  The number was provided without commentary or context. As the CME's Letter noted: "A Contributor Panelist who can borrow 'in reasonable market size' at ***any one of a wide range of offered rates*** commits ***no falsehood*** if she bases her response to the daily Libor survey ***upon the lowest of these (or the highest, or any other arbitrary selection from among them)***."  (DX 9044A at 7 (emphasis added)).

Thus, partial falsity and half-truths are inapposite to LIBOR submissions—where a Panel Bank's LIBOR submission can only convey a single data point—and cannot be applied to this case.

## III.    THE GOVERNMENT FAILED TO SHOW THAT ANY COUNTERPARTIES WERE DEFRAUDED

The government attempted to present a "conduit" theory, whereby biased and dishonest LIBOR submissions went through Thomson Reuters as a "conduit" to DB's counterparties.[19] This conduit theory fails as a matter of fact and law because: (1) the Defendants and their co-conspirators owed no duty of disclosure to their counterparties (a point to which the government stipulated in declining to seek an instruction on duty-to-disclose); and (2) the conduit theory is deficient as a matter of law.

_____

[19] The government also was permitted to proceed on another, non-convergent theory of fraud, which alleged that the Defendants caused false submissions to the BBA, which advantaged DB's positions at the expense of its counterparties.  There also was insufficient evidence to support the counts of conviction against Mr. Connolly on this theory as well, for all of the reasons stated herein.

## A.        The Government Did Not Establish a Duty to Disclose

The Second Circuit recognizes two types of contract-based fraud under the wire fraud statute—fraud at the time of contracting (inapplicable here), and fraud that arises from a party's violations of fiduciary duties or independent disclosure obligations during the pendency of the contract.  *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.* ("*Countrywide*"), 822 F.3d 650, 658–64 (2d Cir. 2016).  This Court already struck the first theory,[20] but under *Countrywide*, the latter theory also should be rejected.  *See id.*

In this Circuit, an omission, after the time of contracting, only violates the wire fraud statute "in the context of a duty to disclose." *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000).  As previously noted, however, the government has already conceded that this is "not an omission case" and that it would not "need the duty instruction" in this case.  (Charge Conference Statement from Ms. Sipperly, Tr. 2569:9–11).  These concessions are fatal to the government's sole theory of counterparty fraud.  If there was no duty owed by DB to its counterparties, and moreover, this was not "an omission case" premised on undisclosed information regarding DB's LIBOR submissions, then there is no operable, contract-based theory of wire fraud against the Defendants.

The trial evidence clearly demonstrated that neither Mr. Connolly nor his DB colleagues—nor the Bank itself, for that matter—ever owed fiduciary duties or duties of disclosure to *any* of its swap Counterparties.  (*See* testimony of Mr. Maroun, Tr. 1458:19–

---

[20]  "MS. SIPPERLY: The false statement does work because them signing the contracts saying LIBOR—

THE COURT: No. No. No. I told you in a long writing that wanting to know that something was going on may be a very bad thing, but it ain't federal wire fraud, which depends on a specific misrepresentation." (Tr. 2031:2–7).

1459:2; testimony of Ms. Hunter, Tr. 1591; 6–13; testimony of Ms. Konich, Tr. 2206:1–10).  In fact, the swap confirmation agreements ("Confirms") in evidence clearly showed that the parties *expressly disclaimed* any such reliance or representations. (*E.g.*, GX 1-514; GX-1544; DX-1588).

Likewise, every Counterparty witness acknowledged under oath that, pursuant to both the Swap Confirms and the International Swaps and Derivatives Association ("ISDA") Agreements in question, their bank was "*not relying on any communications (written or oral) of the other party*"; that each party "understands and accepts, the *terms, conditions and risks* of this Transaction"; and that they legally acknowledge that the "other party is *not acting as a fiduciary for*, or an *adviser to* it in respect of this Transaction." (DB "Interest Rate Swap Transaction" with FHLB Boston, GX 1-514 (emphasis added); testimony of Mr. Maroun, Tr. 1453:11 – 1459:25 (referencing GX 1-514); testimony of Ms. Hunter, Tr. 1577:23 – 1591:5 (referencing DX 1542, DX 1543, DX 1544, DX 1545, and DX 1588); testimony of Ms. Konich, Tr. 2201:14 – 2206:15 (citing DX 1588)).

Finally, the government did not point to a single swap contract linked to DB's LIBOR *submissions*—or those of any Panel Bank.  All of the swap transactions in evidence explicitly depended strictly on the final USD LIBOR *settings* across various maturities (or "tenors"), which are not false statements made or caused by the Defendants.

Given that there was no evidence regarding misstatements made to Counterparties at the time of contracting, the express disclaimers within the swap contracts, and the absence of any independent duty to disclose subsequent to the time of contracting, no reasonable juror could have found the Defendants guilty based on the government's theory of counterparty fraud.

**B.      The Trial Record Does Not Support a Conviction for Fraud by "Conduit"**

The government failed to establish fraud by "conduit."  First, the government failed to establish falsity—that the LIBOR submissions themselves were false.  Second, the government failed to establish that, on any given day during the entire Indictment period, any counterparty considered individual Panel Bank submissions or DB's submissions in particular.[21]  Third, to the extent the "conduit" theory of fraud is based on the publication of LIBOR settings,[22] the settings are not statements of the Defendants, DB, or any Panel Bank for that matter.  Thomson Reuters was not a "conduit" merely re-transmitting the Defendants' allegedly false statements to counterparties.  Rather, it generated its *own*, independent statements (*i.e.*, a setting) based on a process and methodology that was entirely in the control and at the discretion of the BBA *and no other party*.  And it was this independent statement by the BBA, *i.e.*, the *setting*, not the individual DB submission, that counterparties considered.  The fact that that statement may (or may not) have been a partial reflection of an allegedly false statement by Defendants does not alter the LIBOR setting's status as an independent statement by the BBA. Thus, in the absence of any false statements that were (1) made or caused to be made by the Defendants and (2) merely

---

[21] "[THE COURT:] I understood that [the government] was adding a theory of convergent fraud based on the publication of LIBORs that had been manipulated. And the government at the time said, of course, and the submissions, the actual submissions themselves, Thomson Reuters sent the actual submissions, but that's out of the case because **not a single witness has testified that anyone looked at, let alone had any interest in, the submissions**. They were only interested in the LIBOR."  (Charge Conference, Tr. 2549:20 – 2550:4.)

[22] There was no evidence at trial that physically showed Thomson Reuters' publication of individual LIBOR submissions or the LIBOR setting and, in fact, Thomson Reuters does not have a record of such transmissions prior to 2008. In other words, it does not have a record of the publication for any date at issue for Mr. Connolly.

transmitted to, and relied upon by, the counterparties, there can be no counterparty fraud by "conduit."

Simply put, the BBA's publication of LIBOR settings cannot be equated with an intermediary acting as a "conduit" under the case law. *Pasternack v. Laboratory Corp. of America Holdings,* 27 N.Y.3d 817 (2016). Foundational cases of common law fraud, including those cited by the Court, emphasize the crucial distinction between (1) "A" making a statement to "B," which "B" then *conveys* to "C"; and (2) "A" making a statement to "B," which affects "B's" *own statement* to "C." The two 19th century cases cited in *Pasternack*—*Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (1880) and *Bruff v. Mali*, 36 N.Y. 200, 205–06 (1867)—support the application of conduit-based fraud only in the first scenario, but not the second.

The difference between Thomson Reuters' publishing a LIBOR setting and the underlying Panel Bank submissions—which the BBA aggregates (and partially discards) through its "trimmed mean" process to yield the LIBOR setting—is fatal to the government's "conduit" theory. The BBA retained absolute and unchecked discretion over all facets of the LIBOR-setting process, and therefore had absolute control over all statements produced as a result. The BBA exercised unchecked authority to apply its own rules (or not) and follow its own processes (or not) in setting LIBOR each day, including by determining:

- **Which banks would provide LIBOR submissions**. GX 1-803 ("The BBA . . . will review the composition of the Contributor Panels at least annually.").

- **When a Contributor Bank could be expelled**. *Id.* (". . . the BBA [may] at its sole discretion, exclude the Bank from the Contributor Panel.").

- **How many LIBOR submissions were used in the calculation**. *Id.* ("Contributor Panels shall comprise at least 8 Contributor Banks.").

- **The manner in which LIBOR submissions were made**. *See generally* DX 0151 (specifying required governance arrangements, staff training, submission methodology, etc.).

- **The circumstances under which individual submissions were challenged**.  Tr. 180:15–19.  *See also* DX 1104 (Thomson Reuters calling James King about the Bank's low LIBOR submission, after which King raised the submission).

- **The method by which BBA LIBOR was calculated**.  DX 1171A, at 9 (evincing the BBA's internal deliberations about altering the calculation methodology).

- **To whom BBA LIBOR was transmitted**.  Tr. 794:9 – 796:4 (discussing the methods Thomson Reuters established to communicate the information to its subscribers).

- **The overall LIBOR rate itself**.  *See* GX 1-803 (noting that after receiving submissions, Thomson Reuters "will make any necessary adjustments to the average rate and publish it as the BBA LIBOR Fixing at 1200hrs," without cabining this discretion whatsoever).

This discretion confirms the independence of the LIBOR setting at the BBA's statement, not the Defendants', and the lack of influence one submission could have over the BBA's calculation, precluding the "conduit" theory here.

In *Securities Investor Protection Corporation v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 705–06 (2001), plaintiff (Securities Investor Protection Corporation, or "SIPC") brought common law claims against defendant-accounting firm for fraudulently misrepresenting the financial state of one of the firm's clients to federal securities regulators (*i.e.*, the SEC and the NASD).  SIPC did not itself receive the defendant's misrepresentations (alleged omissions in annual audit reports), but "relied on a reporting system created by federal securities law for delivery of negative information" by the regulators to whom the defendant sent its reports.  *Id*. at 709.  The SIPC argued that regulators acted as a conduit for the defendant's misrepresentations. The New York Court of Appeals disagreed, and focused on the *discretion and control* conferred on the intermediary-regulators in making statements *that were their own*, which was inconsistent with the role of a mere conduit:

> The omission on which SIPC claims reliance, however, did not come from BDO, it came from the NASD. As a result, **the role of the NASD cannot be ignored**. The inescapable conclusion from the complaint's reference to the reporting rules

and the regulatory 'early warning system' is that the **NASD had a significant role in choosing what information it wanted to receive and, in addition, what it deemed worthy of communicating.** In such a situation SIPC's reliance on silence from the NASD cannot be equated with its reliance on any affirmative misrepresentation or concealment of material fact by BDO. This is so because the reporting system on which SIPC relied put too much discretion in the hands of the NASD for SIPC to be able to claim any significant direct reliance on BDO.

*Id*. at 710.  *See also id*. at 711 ("Where BDO's reports were filtered through the NASD's own process of evaluation, SIPC cannot claim justifiable reliance on the filtered statements, or the absence thereof, as representing either the sum or substance of BDO's representations.").  There, the court recognizes that the NASD still had had significant discretion in determining what information it received and what information it communicated, regardless of whether that discretion was exercised.  *Id*.; *see also Mun. Corp. of Bremanger v. Citigroup Glob. Markets Inc.*, 555 F. App'x 85, 87 (2d Cir. 2014) (quoting *BDO Seidman*, 95 N.Y.2d at 710–11) (treating as irrelevant whether the intermediary "conveyed the substance of defendants' misstatements to plaintiffs either in repackaged or summary form" because the intermediary's role "in choosing what information . . . it deemed worthy of communicating" created an "insurmountable disconnect" between the statements).  The same is the case here.

### C.    The Government Could Not Show that Any Counterparty Bank Was Deprived of the Essential Object of Their Bargain

No counterparty implicated in this case entered into a swap contract with Deutsche Bank promising to pay or receive based on the "DB LIBOR Submission Rate."  All of the swap transactions in this case relied on pay settlements explicitly (and exclusively) dictated by the final rates comprising "USD LIBOR" and that is exactly what every one of DB's Counterparties received.  Short of proving that DB's Counterparties were deprived of anything more than extraneous information they "would have liked to have known," the government's case amounts to nothing more than an impermissible attempt to criminalize a perceived lack of candor.

"Federal wire fraud is an expansive tool, but as best we can tell, no previous case has . . . treated as criminal a person's lack of candor about the negotiating positions. . . ."  *See United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016) (finding that defendant's failure to disclose his conflicted-interests in brokering a transaction between two parties did not constitute wire fraud, granting judgment of acquittal).

In this case, as in *Weimert*, the fact that Counterparties can be called upon to put a price on any extra-contractual information of which they feel they were deprived—despite the fact that it was never legally owed—does not change the fact that "[*a*]*ll the actual terms of the deal, however, were fully disclosed and subject to negotiation*. *Id.* (emphasis added).

As the Defendants clearly established at trial, all derivatives contracts in this case were executed between sophisticated institutions undertaking commitments based solely on "USD-LIBOR-BBA," the trimmed-mean rates (or "fixes") produced by the process implemented by the BBA.  And each DB Counterparty obtained every essential element of that bargain.  Indeed, Ms. Konich (from FHLB Indianapolis) read the relevant provision in the 2000 ISDA Agreement— which governs the vast majority of the Swap transactions referenced in this case—which confirms that the technical definition of "USD-LIBOR-BBA" neither incorporates nor references individual submissions made by DB or any other Panel Bank.  (*See* DX 1588 at 40).

The government failed to show that any of DB's Counterparties were deprived of the essential elements of their bargains with DB.  They received USD LIBOR, as set by the exact process that the BBA implemented.  The fact that witnesses from three Counterparty banks were called to express their personal misgivings about the discretion afforded to submitting Panel Banks, or about perceived problems in the LIBOR-process, has no bearing on the contractual elements of the Swap agreements they executed.  And it certainly does not establish that their banks were criminally defrauded.

22

Mr. Connolly should have never been found guilty for violating policies that did not exist at that time.  Instead, the government pursued a case based on a revisionist view of the LIBOR process.

## IV.   THE GOVERNMENT FAILED TO PROVE THAT ANY STATEMENTS WERE MATERIAL

### A.   The Government Presented Insufficient and Misleading Evidence in Its Attempt to Prove that Submissions Were Material to Counterparty Banks

The government failed to establish that any of DB's LIBOR submissions were material to the Counterparties, even under an objective standard.  *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (stating that "a scheme to defraud" requires that "the government must prove that the defendant engaged in a deceptive course of conduct by making material misrepresentations").  The Counterparty witnesses who testified at trial were neither well-suited nor adequately situated within their banks to speak to the issue presented in this case.  As a result, the testimony they did provide was wholly inadequate, because it improperly begged the question and misled the jury as to the applicable analysis.

### 1.   Counterparty Witnesses Lacked Foundation to Speak to Materiality

The operative standard for materiality is whether a false statement had "a natural tendency to influence" the decision-maker to which it was addressed.  In this sense, the Counterparty testimony at trial was inapposite.  *See United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (When assessing materiality, one "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation").

In this case, two of the three counterparty witnesses were not derivative traders, and the one trader, Mr. Maroun, had no independent recollection of any derivatives trades with DB, much less the ones at issue in this case (Tr. 1425:2–10; testimony of Ms. Konich, Tr. 2187:11–20, 2197:24 – 2199:2; testimony of Ms. Hunter, Tr. 1572:13–22).  As a result, the jury did not

hear testimony on the impact (or lack thereof) related to the pertinent Counterparty *decision* or trade at issue. *See United States v. Gaudin*, 515 U.S. 506, 512 (1995) ("Deciding whether a statement is material requires the determination of . . . [the] question[ ] . . . what decision was the [recipient] trying to make?") (internal quotation marks omitted). In fact, not a single Counterparty witness testified that they looked at DB's LIBOR submissions or that the DB submission otherwise mattered.

Instead, Counterparty witnesses speculated about their theoretical reactions to "manipulations," about which they "would have liked to have known," and provided conclusory testimony accepting the government's misguided interpretation of the LIBOR submission process, and the "unfairness" of it all. *See* testimony of Mr. Maroun, Tr. 1421:24 – 1422:17; testimony of Ms. Hunter, Tr. at 1568:19 – 1569:6; testimony of Ms. Konich, Tr. 2196:23 – 2197:19.

One can hardly imagine a single data point that institutional investors would not "like to know" about their trading partners. All information can be hypothetically "monetized." And the price in real dollars is almost certain to seem "capable of influencing" to a lay juror. But discussing the hypothetical "costs" of perceived "misstatements" cannot salvage a legally erroneous analysis. *See, e.g.*, *United States v. Litvak* ("*Litvak I*"), 808 F.3d 160, 172 (2d Cir. 2015) (overturning misrepresentation convictions, despite establishing "costs" of misrepresentations, relying on materiality testimony of irrelevant "decision" the recipient could not make).

Instead, the relevant question should be whether a change in an individual LIBOR submission impacts the *LIBOR rate* in a manner sufficiently material to impact the *counterparty-trader's* investment decisions, and whether the counterparty had a right to such information in the first place. *See id*. at 173 ("Indeed, the government has failed to identify any evidence

tending to show that these minor variations in the reports' aggregate balances had the capability to influence a decision of the Treasury.").

The Counterparty testimony in this case failed to meet that standard.  The materiality testimony improperly focused on irrelevant questions, and the government failed to call the appropriate witnesses to speak to the relevant analysis.  Due to these failures, the jury's only option was to speculate as to the materiality of the information in question.  As with so many elements of the crimes charged in this case, rather than providing sufficient data for the relevant factual finding, the government simply asked the jury to adopt its characterization of the evidence.  In Counts One, Two, and Nine, they did just that for materiality.

### 2.    *Materiality Testimony Was Legally Misleading*

At trial, the government elicited witness testimony regarding the importance of information DB did not owe, to which the Counterparties had no right.  In doing so, the government guaranteed "idiosyncratic and unreasonable" views "not probative of the views of a reasonable, objective investor" in the LIBOR-derivatives market.  *United States v. Litvak* ("*Litvak II*"), 889 F.3d 56, 69 (2d Cir. 2018).

As the Court has noted, the wire fraud statute does not hinge on whether a particular Counterparty would have "wanted to know" something[23]—*e.g.*, that some of DB's LIBOR submissions may have taken trader positions into account.  That critique is not merely semantic.  The government's case failed to show that such perceived conflicts-of-interest caused any misrepresentations (*i.e.*, false submissions) under the relevant LIBOR definition.  Further, having

---

[23] "THE COURT: No. No. No. I told you in a long writing that wanting to know that something was going on may be a very bad thing, but it ain't federal wire fraud, which depends on a specific misrepresentation." (Tr. 2031:4–7).

failed to prove any Counterparty's right to such information, the testimony elicited by the government misled the jury into believing that any such information was "capable of influencing" Counterparties under the relevant materiality analysis.

Therefore, the government failed to demonstrate why Counterparties had a legal right to know (much less be "influenced by") that supposedly material information, as required by this Circuit's precedents. *See United States v. Gaudin*, 515 U.S. 506, 509 (1995) (holding that the test for materiality is defined as whether the alleged false statement has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed"). "At best, [the] testimony about the supposed [disclosure] relationship had a high probability of confusing the jury by asking it to consider as relevant the perception of a counterparty representative that was entirely wrong." *Litvak II*, 889 F.3d at 69. "At worst, [the] testimony on [such a] relationship would mislead the jury based on the government's argument that a perceived relationship of trust showed materiality. . . . [The] argument itself is flawed because it equates an indisputably incorrect personal belief with an objective test of materiality." *Id*.

Nor did it suffice for Counterparties, with whom Mr. Connolly never traded, to speak to their aversion to trade with banks "abusing" their LIBOR Panel status. The fraud statutes cannot support a conviction where the government has shown only that the alleged victim, had it known "the truth, 'would have refused to deal with [defendant] on general principles.'" *See United States v. Binday,* 804 F.3d 558, 570 n.10 (citing *United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994) (reversing conviction where the court's instructions allowed the jury to convict on the basis that victims were disinclined on general principles to deal with an insider who had abused his fiduciary position.); *United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995) ("[T]he right to make an informed business decision is not . . . protected under the wire fraud statute.").

26

This Circuit's precedents compel a finding that the government elicited misleading and legally inoperative testimony on this key element. The government called for the jury to speculate on the materiality of information the Counterparties had no right to know. *See Litvak II*, 889 F.3d at 68–70. That fundamental error permeates the entire verdict, and it too compels an order of acquittal in this case.

### B. The Government Did Not Prove the Materiality of a Single Submission to the BBA

As to the case that the government indicted, *i.e.*, the case that alleged a non-convergent fraudulent scheme in which the Defendants made or caused to be made allegedly false statements to the BBA, the government did not prove materiality of any allegedly false statements to the BBA. There was no witness testimony at trial to that effect. Instead, the government argues that circumstantial evidence alone suffices for proving materiality under its BBA Fraud theory. It does not. In fact, all of the circumstantial evidence strongly points to the *immateriality* of a single Panel Bank's (or allegedly "false") submission.

Indeed, one of the many problems with the shifting theories of the government's case is that it remains unclear whether the government itself believes it advanced its BBA Fraud theory at trial,[24] and whether it views that as a basis for the jury's verdict. To the extent the government asserts now that it advanced a non-convergent theory of fraud against the BBA at trial, the counts of conviction must be vacated in favor of acquittal.

---

[24] "MS. SIPPERLY: And so I do think the government, you know, has been seriously considering coming back to the Court saying it should go on both theories, and if you'd give us a little longer, we'll come back." (Tr. 2028:5–8).

The materiality standard applicable to the federal fraud statutes asks whether an alleged misstatement is capable of influencing the *recipient* (*i.e.*, the BBA) to which it is sent, not whether it has a mere impact on any of the of the recipient's interests (*e.g.*, LIBOR). The controlling restatements of the materiality standard distinguish between the mere *impact* of a misstatement and the *materiality* (or importance) of that impact *to the recipient*. As applied in this context, such a *res ipsa loquitur* view of materiality based on anything that may impact a LIBOR rate would promote a limitless view of materiality and conflate what is relevant to LIBOR with what is "material" to the BBA—which is exactly what the Second Circuit cautioned against. "In *Rigas*, we evaluated the sufficiency of the evidence [applying the same materiality standard] . . . . [W]e explained that 'relevance' and 'materiality' are not synonymous." *Litvak I*, 808 F.3d at 174.

The fact that a single Panel Bank's submission was one of 16 numbers the LIBOR calculation considered each day prior to rate-setting does not make that impact "material" in the eyes of the BBA. The Second Circuit indicated that one "looks to the effect on the likely or actual *behavior of the recipient* of the alleged misrepresentations" when assessing materiality. *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (citing *Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989, 2002 (2016)). This necessarily looks at "what statement was made [*i.e.*, a single Panel Bank's LIBOR submission]; what decision was the [recipient of the statement (*i.e.*, the BBA)] trying to make; and *whether the statement was material to the decision*" (*i.e.*, its maintenance of the LIBOR process). *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (emphasis added).

If anything, the evidence at trial proved that individual LIBOR submissions were *immaterial* to the BBA during the dates of the Indictment. No more compelling evidence is needed than the fact that the BBA declined to change its rate-setting process in the aftermath of

the "low-balling" allegations that came to light in April 2008.  Despite the low-balling allegations, the BBA's LIBOR Consultation Feedback Statement (dated August 5, 2008) stated its "FX & MM" Committee had decided that the market "supports the current procedures and processes in relation to the fix." (GX 1-176A at § 1.6).

The potential impact that any single LIBOR submission could have on a specific fix— regardless of whether it is included or excluded in the trimmed mean—has a mathematical limitation.  Any submission falling outside the trimmed mean ceases to further impact the LIBOR rate, regardless of its deviation.  But even if a submission were to have had a potential (if minimal) impact on LIBOR on a given date, there is no evidence to suggest that *the BBA* considered such impact material.  In fact, the evidence at trial indicated that the BBA viewed a single submission (and any minute impact therefrom), to be *immaterial*.  In its same consultative paper from 2008, the BBA explained its reason for leaving the LIBOR process unchanged, despite the low-balling allegations, as follows:

> *10.1 Currently rates are created by ranking the contributors, discarding the top and bottom quartiles and then averaging the 2 central quartiles.* ***It is therefore difficult to influence the rates as any submitted rate that is far enough away from the average to move the fixing materially will be discarded.*** *Analysis indicates that the effect of moving to a median is less than 1 basis point in major currencies and less than 2 in smaller currencies. The FX & MM Committee* ***therefore recommended no change to the current trimmed mean methodology****.*  (DX 1171A at 9 (emphasis added)).

In sum, the BBA failed to prove the materiality of any allegedly false statements to the BBA.  The BBA's 2008 guidance in fact rejects the notion that a single submission, particularly where a submission falls out due to the trimmed mean process (as was the case in connection with Count 2 and 9), was material to LIBOR.  The government presented insufficient evidence of materiality to sustain a conviction.

29

## V.     THE GOVERNMENT FAILED TO PROVE THAT MR. CONNOLLY ACTED WITH FRAUDULENT INTENT

### A.     The Government Failed to Disprove Good Faith and Provided an Insufficient Basis for a Juror to Find that Mr. Connolly Acted With Fraudulent Intent

The Indictment alleged that Mr. Connolly knowingly and willfully engaged in a criminal conspiracy and a scheme to defraud.  "Critical to a showing of a scheme to defraud is proof that the defendants possessed a fraudulent intent."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  But the government's evidence against Mr. Connolly as to that element as well was wholly inadequate.

Whether the Defendants committed fraud is inextricably linked to whether they caused DB to make false and fraudulent LIBOR submissions.  This charging decision carried consequences—burdens for the government.  To prove that a person could have formed the deceptive intent to commit a wire fraud, the government needed to prove that the BBA's relevant LIBOR guidelines were sufficiently clear and well-defined in order for an individual to be able to establish the requisite intent.  *See, e.g., United States v. Lanier*, 520 U.S. 259, 266 (1997) (barring prosecutions under the "vagueness doctrine" where the operative rule or statute codifies "terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application"); *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.").

The government failed to show that the BBA guidelines "unambiguously prohibit[ed]" the charged conduct, and failed to negate the proposition that the Defendants' actions fell within "any reasonable interpretation" of the BBA guidelines regarding submissions.  *See United States v. Bryant*, 556 F. Supp. 2d 378, 444 (D.N.J. 2008); *see also United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an

interpretative question of law, the government bears the burden of proving beyond a reasonable

doubt that the defendant's statement is not true under a reasonable interpretation of the law.").

### 1.    *Documentary Evidence Is Inconsistent with Fraudulent Intent*

The entirety of the government's case against Mr. Connolly essentially rested on the

notion that he sent three email exchanges over about three years to Messrs. King and Curtler

reflecting New York desk trade positions and his desk's "preferred" direction of DB's LIBOR

submissions:

- **November 24-25, 2005**:

  o An email from Mr. Connolly stating to Mr. King that "OTC requests 3mo Libor as
    high as possible Thursday and Friday *if you see the market higher*"; after Mr. King
    responded saying, "Matt, we've gone in relatively neutral as high 3s doesn't suit
    london at the moment," Mr. Connolly replied, "*Don't matter to me, may matter to
    OTC/rates NY …* we will all find out I guess" (GX 1-025) (emphasis added);

- **November 28-29, 2005**:

  o A response to Mr. Curtler responding from an email asking if Mr. Connolly or others
    had any 1-month LIBOR requests, after which Mr. Connolly stated that "we *would
    prefer it higher*" due to a large notional trade, and told Mr. Curtler "thanks, *just
    asking is very much appreciated*." (GX 1-026) (emphasis added);

- **August 12-16, 2007**:

  o And a subsequent exchange where Mr. Connolly asks, "[i]f *possible*," for a 1-
    month LIBOR submission "as low as *possible*" over the next few days (GX 1-
    063) (emphasis added), and a later response from Mr. King stating, "1m libor
    *looking like* 53 at this point in time." (GX 3-001) (emphasis added).

All three exchanges were sent over DB email platforms—which the participants knew to

be recorded.  (*E.g*., testimony of Mr. King, Tr. 556:8–10).  All positions and preferences were

expressly stated—without coded language.  (*E.g*., testimony of Mr. King, Tr. 556:11 – 557:3).

All were conditioned, making a general, directional request "if possible"—without a single

request for a specific rate-submission.  (*E.g*., testimony of Mr. King, Tr. 639:21 – 640:6).  Trial

testimony also indicated that one of these exchanges involved a desk not affiliated with Mr.

Connolly.  (*E.g.*, testimony of Mr. King, Tr. 639:17 –640:21).  None of them suggests an intent to defraud or deceive the BBA or a counterparty.  None of them could be read as intending to elicit a LIBOR submission that was false, *i.e.*, deviating from the BBA's LIBOR Instructions.  And, there was no other evidence to establish that these email exchanges were intended to benefit any trading position.  In sum, these conditional, vague emails are insufficient proof of Mr. Connolly's intent.

### 2.    *Testimonial Evidence Does Not Establish Intent*

The testimonial evidence on this element is similarly deficient. The government clearly viewed Timothy Parietti as the key Cooperator against Mr. Connolly.  In fact, as the only former DB New York desk employee who testified, and the only one who knew Mr. Connolly personally, he was also the *only* Cooperator who could have had face-to-face interactions with Mr. Connolly.   Mr. Parietti's testimony failed to counter the simplest and most reasonable interpretation of the conduct at issue in this case—that the participants may have believed that they were wading into unethical gray areas when they made LIBOR requests, but not that they were committing fraud.

- **Timothy Parietti:**

  - Mr. Connolly instructed him to send emails to Messrs. King and Curtler to "let them know what [his] LIBOR fixings were" (*i.e.* positions), so that they could consider it when they made their submission. (Tr. 1009:4–15).

  - His personal view was that "it was *wrong*" (*i.e.*, unethical), and that it "wasn't *fair and objective*" for the submitters to be "biasing" DB's submissions to "make more money." (Tr. 1009:18 – 1010:10 (emphasis added)).

  - When supposedly speaking to his New York colleagues about LIBOR, Mr. Parietti "understood" what they said to mean that they "*shouldn't* be submitting LIBOR based on their positions"—but admitted that Mr. Connolly "never" commented or provided his thoughts on the topic to Mr. Parietti or his colleagues. (Tr. 1045:20 – 1046:6 (emphasis added)).

o Mr. Connolly's instructions to Mr. Parietti merely consisted of sending his "big" trade positions to "the cash guys in London," so that they could "do *whatever they do*, and that's it" —and acknowledging that it was only Mr. Parietti who ever asked Mr. King and Mr. Curtler to "*consider*" his positions when they made a LIBOR submission. (Tr. 1046:13 – 1047:19 (emphasis added)).

o At the start of the financial crisis, while Mr. Parietti was on vacation, he called Mr. Connolly to discuss risk exposures to LIBOR, and that Mr. Connolly indicated he would call Mr. Curtler to try to (in Mr. Parietti's words) "offset" Mr. Parietti's risk. (Tr. 1067:7 – 1070:20 (emphasis added)).

Together with the documentary evidence, the above testimony from Mr. Parietti was an insufficient basis on which to find that Mr. Connolly had the requisite fraudulent intent. Mr. Connolly is innocent—and the communications and testimony purportedly offered to show bad intent were equally consistent with an innocent state of mind.  As noted above, even granting due deference to the jury's assessment of witness credibility, it is not enough for the government to introduce evidence "at least as consistent with innocence as with guilt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991)).  Nothing about the above evidence suggests that Mr. Connolly harbored a conscious intent to defraud or deceive counterparties or the BBA, or was instructing Mr. Parietti do so.  Simply put, the record is too thin to establish guilt, and is consistent with Mr. Connolly's innocence.

### 3. *Good Faith Belief in the Discretion Afforded to Submitters*

Furthermore, other evidence in the trial record demonstrated Mr. Connolly's good faith belief that his communications were consistent with not only internal directives from senior leaders at the Bank, but also with discretion that USD LIBOR submitters were afforded as part of the setting process.  Mr. Parietti conceded that Mr. Connolly's supposed "instruction" to reach out to the Bank's submitters in London was "in line with the mandate from senior management." (Testimony from Mr. Parietti, Tr. 1196:6–9).  Such evidence is reasonable doubt.  *Cf. United*

*States v. Litvak* ("*Litvak I*"), 808 F.3d 160, 189–90 (2d Cir. 2015) (validating the relevance of Defendants' attempt to show "reasonable doubt as to his intent to defraud, *i.e.*, that he held an honest belief that his conduct was not improper or unlawful . . . in light of his supervisors' approval of his colleagues' substantially similar" practices). And the government did not offer sufficient evidence to prove otherwise. In fact, the defense introduced the CME Letter, which expressly sanctioned, as reasonable and permissible, the exact conduct underlying the charges in this case. The government never offered anything additional to overcome the evidence of Mr. Connolly's reasonable, good faith view that his conduct did not run afoul of any law or rule.

Finally, none of the government's witnesses were able to testify as to any evidence or other statements evincing Mr. Connolly's state of mind. The government argued that he acted with fraudulent intent when he expressed a directional "preference" to his LIBOR-setting colleagues in London. And it called on Mr. Curtler, Mr. King, and Counterparty witnesses to say that these sorts of communications were "wrong" or "unfair."[25] But eliciting the Cooperators' testimony attesting to how *they* personally viewed those actions was not sufficient to inform the jury's determination of what *Mr. Connolly* believed. And despite the Cooperators' testimony that their communications were "wrong" or "unfair," no one testified that Mr. Connolly caused them to make a false statement to anyone. When asked on cross-examination whether "Matt Connolly []ever asked [him] to move submissions outside a wide range of offered rates," Mr. Curtler said "[n]o, he did not." (Tr. 2135:17–22).

---

[25] Testimony from Cooperators and Counterparties stating that it was "wrong," "biased," and an "unfair advantage" to consider trade positions in LIBOR submissions. (*See, e.g.*, testimony of Mr. King, Tr: 278:4–25; testimony of Mr. Parietti, Tr. 1010:3–10; testimony of Mr. Curtler, Tr. 1009:4–10; testimony of Ms. Konich, Tr. 2197:15).

#### 4.        *Mr. Connolly's Own Words Negate Fraudulent Intent*

Finally, the government played a telephone recording to the jury from April 2008, a month after Mr. Connolly left his Cash Desk duties.  That audio recording did much more to confirm Mr. Connolly's confusion about the LIBOR process than to portray any semblance of fraudulent intent.  Speaking (unrelatedly) to a former colleague from an offsite DB location in Piscataway, New Jersey, at a time when news reporting from the *Wall Street Journal* published an exposé on LIBOR (regarding so-called "low balling"), Mr. Connolly asked John Hilty how the issue "got started."  (GX 1-133 at 00:02:50).  In response, Mr. Hilty stated that, "while the *official definition of LIBOR is, obviously, you know . . . up for debate . . .* technically, it should just be . . . where banks think they can raise money."  (*Id.*).  But Mr. Hilty went on to note that "*it's kind of a gray area though*, when you think about it because . . .  you can't really say, you know, your view of where you think you can get money, and then, you know, the *market interpretation*, I mean there's just . . . *it's a big guess anyway*."  (*Id.* at 00:04:11).  Agreeing with the notion that LIBOR setting was a substantially imprecise and unclear process, Mr. Connolly shared an even more skeptical, pessimistic view of the process, stating "the real thing is, everyone just wants to be close to somebody else . . . *Nobody has a fucking clue what the definition is*, *where it should be* . . . It's just they all, you know, talk around, 'Where's it going to be? Where's it going to be?' . . . And then everyone just sets it pretty close to where it's going to be."  (*Id.* at 00:04:27).  The most logical—indeed, the only—view of Mr. Connolly's (and Mr. Hilty's) perception was that the LIBOR process was universally confusing and vague, dictated by groupthink and arbitrary formulations, not that the LIBOR setting was the product of a disciplined, clear process.

Even a deferential view of the record points much more strongly to confusion about the applicable guidelines than to the requisite criminal intent.  For the purposes of Rule 29, that

disparity alone suffices. "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," and the Court must enter a judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted).

>   **B.      The Government Failed to Show Mr. Connolly Had Sufficient Constitutional Notice to Act with Fraudulent Intent**

During the government's case, the Defendants clearly established that even sophisticated derivatives traders and market participants held honest disagreements (and confusion) regarding the LIBOR definition and its rate-setting process. But Mr. Connolly stood several steps removed from those expert traders, and the government failed to show how he could have formulated a sufficient understanding of that process to make any of his supposed misconduct criminally knowing or willful. *See United States v. Pirro*, 212 F. 3d 86, 90 (2d Cir. 2000) (noting that "[p]roof of guilt in such cases must be predicated upon a voluntary, intentional violation of a known legal duty."). The vagueness of the LIBOR process itself and the resultant confusion throughout the market were two of the most glaring currents of deficiency in the government's case.

>   ## 1.      *Market Views Belie the Government's Case*

The government failed to show how Mr. Connolly, who was not a derivatives trader and held no LIBOR submission duties, could have understood the precise boundaries of permissible considerations contemplated by the LIBOR submissions process. This is particularly true when even expert traders and DB's LIBOR submitters held reasonable differences of opinion regarding those very issues. *See United States v. Stacks,* 821 F.3d 1038, 1044 (8th Cir. 2016) (finding, without any discussion of the subjective awareness of defendant, that where the government does

not negate a reasonable interpretation for a term that is not defined, no reasonable juror could find that the defendant acted knowingly and willfully).

For example, the government's arguments[26] and elicited testimony[27] repeatedly rejected the validity of a "reasonable range" within which a Panel Bank could input LIBOR submissions. But as the trial evidence demonstrated, the CME disagreed.  And unlike the government's retrospective reinterpretation, the CME shared its view contemporaneously with the conduct at issue in this case.  In its July 3, 2008 letter to John Ewan, then the LIBOR Director, the CME responded to the BBA's consultative paper ("Understanding the construction and operating of BBA Libor – Strength for the future"), which sought market insights regarding the LIBOR process.  (DX9044A).   In its publication, the CME explicitly endorsed the concept of a reasonable LIBOR submission range, noting that a Panel Bank "commits no falsehood if she bases her response to the daily Libor survey upon the lowest of these (or the highest, or any other arbitrary selection from among them)."  (*Id*).

Indeed, the government's overly rigid interpretation even runs afoul of the BBA's own written commentary in that very publication.  The June 2008 consultative paper, disseminated *after* Mr. Connolly effectively departed DB, explicitly showed the BBA's acknowledgement of, and acquiescence to, the fact that LIBOR submitters at some Panel Banks partially held derivatives-trading roles.   "The rates must be submitted by members of staff at a bank with *primary* responsibility for management of a bank's cash, rather than a bank's derivative book." (DX1171A (emphasis added)).

---

[26] (*E.g.*, Sipperly Closing Argument, Tr. 2664:1–17, Tr. 2666:1–7; Ms. Anderson Rebuttal, Tr. 2845:20 – 2846:2).

[27] (*E.g.*, testimony of Mr. King, Tr. 772:10–16; testimony of Mr. Curtler, Tr. 1906:4–8).

Similarly, as previously referenced, other market participants, including non-Panel Banks such as Goldman Sachs, contradicted the key premise in the prosecution's case that the market was misled (indeed, defrauded) when personnel with interests in derivatives trades played a role in formulating a Panel Bank's LIBOR submissions.  In an email exchange dated May 14, 2008, a market commentator from Goldman Sachs noted that it was "worth pointing out that *in many cases*, LIBOR fixings are submitted by a derivative trader that does not even sit on a cash desk." (GX 6-001 (emphasis added)).

The government's evidence was conspicuous for what it did not show.  The government never pointed to a single official BBA (or DB) guideline or publication prohibiting, or otherwise disfavoring, any of the practices or submission-considerations on which this entire prosecution is founded.  Reasonable minds believed that arbitrary estimations within a bank's reasonable funding range were *entirely* accurate.  The BBA never defined the factors that Panel Bank's should consider in making their submissions, and never promoted a specific procedure through which to do so.  And it certainly never prohibited any of the conduct at the heart of this case.

## 2.     *Permissive BBA Guidelines and DB Policies*

Further, it is undisputed that, during Mr. Connolly's time at the bank, neither the BBA nor the Bank promulgated any guidelines, trainings, or policies prohibiting or discussing the propriety of the behavior that the prosecution now characterizes as criminal:

- The BBA did not publish express prohibitions on LIBOR submitters considering trading positions, including their own, until 2013. (*E.g.*, testimony of Mr. Youle, Tr. 183:14–19, 185:12–15. *See also* DX0151, ¶¶ 2.6, 4.5, 4.6, 4.8).

- The BBA's LIBOR definition lacked explicit instructions because it was "an old document" that was "quite short" (testimony of Mr. Youle, Tr. 187:4–11), rendering its guidance "vague" and subject to interpretation. (Testimony of Mr. Maroun, Tr. 1461:8–12. *See* testimony of Mr. Youle, Tr. 175:21–24).

- The BBA's LIBOR definition failed to clearly define key terms (testimony of Mr. Youle, Tr. 175:17–20; GX 1-176A at 4 (noting the ambiguity of a key term meant the

definition "will always require an element of judgment")), thereby introducing "flexibility" into the definition. (Testimony of Mr. King, Tr. 667:14–16; testimony of Mr. Curtler, Tr. 1956:19–24).

The resulting uncertainty was particularly true for cash traders, like Mr. Connolly (*see* testimony of Mr. Parietti, Tr. 1206:6–12), who were even less likely than their derivatives-trading colleagues to develop a granular understanding of LIBOR's nuances.  (Testimony of Mr. King, Tr. 745:4–12).

Moreover, all of the DB policies and practices in effect at the time did more to permit, than restrict, the conduct in question.  (Testimony of Mr. Parietti, Tr. 1196:6–9 (stating Mr. Connolly's actions were "in line with the mandate from senior management")).

- Long before Mr. Connolly took nominal oversight of New York's Money Market Derivatives ("MMD") desk, DB management seated the cash and derivatives desks together to aid communication about trading positions and strategies.  (Testimony of Mr. King, Tr. 744:11 – 745:3; testimony of Mr. Parietti, Tr. 1193:2–14; testimony of Mr. Curtler, Tr. 2132:19–21).

- At the same time, DB management instituted and chaired weekly risk calls (testimony of Mr. Parietti, Tr. 1194:8–18), expressly encouraging the cash and derivatives desks across offices to share trading positions and strategies, including those relating to LIBOR.  (Testimony of Mr. King, Tr. 528:3–13; testimony of Mr. Parietti, Tr. 1196:2–5).

- Prior to and throughout the period in question, DB's LIBOR submitters held parallel roles as traders of derivatives products, (testimony of Mr. King, Tr. 560:3–6), giving them knowledge of the very trade positions about which the government said they could not know.  (Testimony of Mr. King, Tr. 738:5–18).

- All three Cooperators testified to the absence of DB trainings on LIBOR.  (*See* testimony of Mr. King, Tr. 500:19–23; testimony of Mr. Parietti, Tr. 1189:22 – 1190:9; testimony of Mr. Curtler, Tr. 1874:17–19).

- All three Cooperators testified to the absence of DB policies regarding LIBOR submissions.  (*See* testimony of Mr. King, Tr. 501:24 – 502:3; testimony of Mr. Parietti, Tr. 1305:16–18; testimony of Mr. Curtler, Tr. 1875:22–24).

Under these circumstances, there was insufficient evidence for a rational juror to conclude that Mr. Connolly was on fair notice of the unlawful nature of his conduct, such that he could have, and did, form the requisite intent.

The LIBOR Definition was widely understood to be a vague, rate-setting standard, promulgated by a private-sector trade association (*i.e.*, the BBA). It was not a legal statute or subject to government regulation. But even if it were, the basic principles of statutory interpretation informing fair notice and due process militate against relying on a notoriously vague guideline to support a criminal conviction in this case. *See United States v. Lanier*, 520 U.S. 259, 266 (1977) (discussing the *vagueness doctrine*, the cannon of strict construction of criminal statutes, and the rejection of novel interpretations in establishing whether statutes make it "reasonably clear at the relevant time that the defendant's conduct was criminal"); *United States v. Lahey*, 967 F. Supp. 2d 731, 743 (S.D.N.Y. 2013) (noting that the fair warning test compels that "a court must ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed"). Mr. Connolly cannot be held criminally liable based on activities that are consistent with a reasonable interpretation of a constitutionally vague rule.

## VI.   THE EVIDENCE CANNOT JUSTIFY A GUILTY VERDICT ON THE REMAINING SUBSTANTIVE WIRE FRAUD COUNTS TWO AND NINE

As argued above, the government failed to prove falsity, Mr. Connolly's "fraudulent" intent, and materiality. And it did so under both theories of prosecution that it was permitted to pursue at trial—convergent fraud against counterparties by the Thomson Reuters "conduit," and non-convergent fraud against the BBA.

In addition to those deficiencies, even affording the evidence all reasonable inferences, the government's evidence on Counts Two and Nine fell short.

## A.     Count Two

The totality of the government's evidence for Count Two, a substantive wire fraud charge, is comprised of two entirely truthful emails and a LIBOR submission chart.  The Indictment pleading applicable to Count Two describes a wire fraud involving an "international electronic signal between New York, New York and London, United Kingdom"; sent at the "approximate date" of "August 15, 2007"; alleging that "[Mr.] CONNOLLY and [Mr. King] discussed via electronic message the manipulation of Deutsche Bank's USD LIBOR submission."  (SI ¶ 51).

From the evidence presented at trial, there was no evidentiary basis for a reasonable juror to find that any of the "rates" Mr. King submitted after receiving Mr. Connolly's email were false.  Further, the government failed to point to a single defrauded party associated with the wire in Count Two, let alone to prove precisely *how* any such party could have been defrauded. *United States v. Chalmers*, 474 F. Supp. 2d 555, 560 (S.D.N.Y. 2007) (holding that the wire fraud statute requires a showing of a "victim or intended victim").  "It is difficult to imagine how the Government could prove a violation of a statute intended to 'punish[ ] those who had fraudulently deprived others of their property,' *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir.1991) (citing *McNally v. United States*, 483 U.S. 350, 358-61 (1987)), without showing who those 'others' were."  *Id*.

## B.     Count Nine

Similarly, Count Nine charged a wire fraud involving an "international electronic signal and transfer of data from London, United Kingdom to New York, New York"; sent at the "approximate date" of "August 13, 2007"; alleging that "rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates—or LIBORs—were published via

international wire." (SI ¶ 51). The government's case fails for the same reasons as Count Two, but also because it failed to prove the charged wire itself.

Significantly, Count Nine, which charged a different wire than Count Two, was based upon the publication of the LIBOR setting on a specified date. As the Court has already recognized, the government failed to prove the wire in Count 9. (Tr. 2931:16–17 ("There's no wire? There's no wire?")). In fact, trial testimony established that it would be unable to do so because Thomson Reuters does not have logs of requests reflecting submission and publication data *prior to 2008*. (Testimony of Mr. Turner, Tr. 797:24 – 798:12).

For all of these reasons, the government's evidence of substantive wire fraud was insufficient, and the convictions on Counts Two and Nine should be vacated in favor of acquittal.

## VII.   THE GOVERNMENT FAILED TO PROVE A CONSPIRACY, OR THAT MATTHEW CONNOLLY KNOWINGLY JOINED ONE

As argued above, the government's case failed to prove falsity, materiality, or fraudulent intent as to any statement made, or caused to be made, by Mr. Connolly. Indeed it failed to establish how any of the actions alleged in this case legally amounted to criminal fraud.

Where the underlying object of an alleged conspiracy is found to be legally insufficient, the conspiracy count must fail as well. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1219–20 (2d Cir. 1994) (reversing conspiracy charge because the scheme agreed did not amount to mail fraud); *United States v. Garcia*, 992 F.2d 409, 415–16 (2d Cir. 1993) (vacating defendant's conviction for conspiracy because the conviction was based on two legally insufficient theories). Although conspiracy is a crime separate and distinct from the substantive offense, *see United States v. Feola*, 420 U.S. 671, 694–95 (1975), there can be no conspiracy where there is no unlawful purpose. *See United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978) (holding that while the government need not prove commission of the substantive offense or knowledge of the

42

entire conspiracy, but it must prove "that the intended future conduct [the alleged conspirators] . . . agreed upon include all the elements of the substantive crime.'").

Because the government failed to prove anything that was tantamount to wire fraud or bank fraud, it also failed to prove that Mr. Connolly committed the additional crime of "conspiring" or "agreeing" to commit those offenses.  (SI ¶¶ 25–48).  Even affording reasonable deference to the government's evidence, it failed to present sufficient evidence that Mr. Connolly engaged in a scheme to convey *material misrepresentations* (USD LIBOR submissions) to DB's trading counterparties or to the BBA.

Furthermore, no reasonable juror could find that Mr. Connolly knowingly and willfully decided to enter into any criminal conspiracy.  "To convict a defendant as a member of a conspiracy, the government must prove that the defendant agree[d] on the essential nature of the plan . . . and that there was a conspiracy to commit a particular offense and not merely a vague agreement to do something wrong." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal citations and quotation marks omitted).  There simply is no evidence of Mr. Connolly's fraudulent intent, or even an awareness of the illegality of a scheme and a conscious intent to join that scheme.  The evidence that the government points to as indirect evidence of Mr. Connolly's state of mind is equally consistent with innocence and good faith; it was the government's burden to prove more.  For all of these reasons, Mr. Connolly respectfully submits that his conviction on Count One also should be vacated in favor of a judgment of acquittal.

**VIII.** **IF THE COURT DOES NOT ENTER A JUDGMENT OF ACQUITTAL, IN THE INTEREST OF JUSTICE, THE COURT SHOULD GRANT MR. CONNOLLY A NEW TRIAL PURSUANT TO RULE 33**

**A.** **Rule 33 Legal Standard**

A "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). "The Court's broad discretion empowers it to grant relief based not only on the sufficiency *vel non* of the evidence at trial but on any other circumstance that might render the trial 'essentially unfair,' including trial errors." *United States v. D'Amelio*, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009) (internal quotation marks omitted), *rev'd and remanded*, 683 F.3d 412 (2d Cir. 2012). The Court should evaluate these errors for their cumulative effect on the fairness of trial. *See United States v. Cruz*, 785 F.2d 399, 402 (2d Cir. 1986) (affirming new trial order based on totality of factors prejudicing defendant at trial). *See also United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) ("A miscarriage of justice . . . may consist of errors and omissions considered for their cumulative effect on the trial proceedings.") (citing *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007)). In making this determination, the "court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation" as to whether the substantial rights of the defendant were harmed. *Ferguson*, 246 F.3d at 134. Crucially, "[a] reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict." *Tibbs v. Fla.*, 457 U.S. 31, 42 (1982). The court instead takes a "less deferential approach," *United States v. Wilkerson*, 656 F. Supp. 2d 22, 28 (D.D.C. 2009); it "has broader

discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29."
*Ferguson*, 246 F.3d at 134.

### B.     The Indictment was Constructively Amended

The present case stems from the Superseding Indictment, dated August 18, 2016, which alleged that Defendants engaged in a scheme to defraud by causing others to make LIBOR submissions to the British Bankers Association that were false, in that they were shaded higher or lower in order to benefit Deutsche Bank's trading positions, at the expense of its trading counterparties.  (SI ¶¶ 27, 50–51).  In short, the Indictment reflects a specific theory of prosecution—namely, that of a non-convergent fraudulent scheme, in which the recipient of the Defendants' false statements (the BBA) was not the victim who allegedly suffered harm (DB's counterparty) as a consequence of the scheme.

The problem, however, is that the government introduced a new, convergent theory in its April 2018 *in limine* motions; then ostensibly abandoned its non-convergent theory (and its BBA witness) in a letter to the Court dated May 29, 2018 (*see* Dkt. 272), a few weeks before the start of what was then the June 18, 2018 trial date; and then ultimately presented an entirely different case at trial.  The government's trial evidence pursued a tenuous theory in which the Defendants allegedly caused false statements to be made *to DB's counterparties* by means of the BBA (or rather, Thomson Reuters), which acted as a mere conduit for those statements.  To the extent the *in limine* motion practice left any doubt that the government would pursue a convergent theory exclusively—indeed, this Court "hazarded a guess" that the government still might present both theories as recently as the first day of trial—it became clear that the government all but abandoned the theory it actually presented to the grand jury in order to pursue the conduit-convergent fraud theory alone.  (*See* Tr. 2028:5–8 (reflecting the government's self-doubt

regarding this decision and noting it "had[] been seriously considering coming back to the Court saying it should go on **both theories**, and if you'd give us a little while longer, we'll come back.") (emphasis added)).

In sum, the Indictment articulated a specific theory of prosecution; the government advanced an altogether different one at trial. Furthermore, the jury was instructed on the newer, convergent fraud theory (Jury Charge at 26–27 (stating that the indictment charges that "the defendants participated in a scheme to defraud counterparty banks on derivative trades")). The government's late adoption of a convergent theory relies upon—indeed, compels—different allegations and different evidence, none of which are set forth in the Indictment or in the grand jury presentment. Any suggestion that the grand jury somehow approved a convergent scheme is pure speculation; the Fifth Amendment demands more. The government in this case has usurped the province of the grand jury, impermissibly and unilaterally broadened the charging instrument, and through its case-in-chief, violated Mr. Connolly's Fifth Amendment rights.

### 1.    *Legal Standard for Finding a Constructive Amendment*

A defendant has the right to be tried only on charges contained in an indictment returned by a grand jury. U.S. Const. amend. V. "The sweeping powers of the grand jury over the terms of the indictment entail very strict limitations upon the power of prosecutor or court to change the indictment found by the jurors, or to prove at trial facts different from those charged in that indictment." *Gaither v. United States*, 413 F.2d 1061, 1066 (D.C. Cir. 1969). Courts cannot permit defendants to be tried on charges that are not made in the indictment against them. *See Stirone v. United States*, 361 U.S. 212, 217 (1960). The right of a defendant "to be tried only on charges presented in an indictment" is "substantial," and deprivation of "such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Id*. at 217 (Hobbs Act indictment alleging interference with sand importation was constructively

amended when court also admitted evidence of obstruction of steel mill exports).  Permitting an amendment of the Indictment would therefore undermine "[t]he very purpose of the requirement that a man be indicted by grand jury," which is "to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either the prosecuting attorney or judge."  *Id.* at 218.

In recognition of this power and the safeguards embodied by the Fifth Amendment, constructive amendment of an indictment is a *per se* constitutional violation.  *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (vacating conviction on misbranding count because government charged a repackaging theory but presented a sterility case).   "When the trial evidence or the jury charge operates to 'broaden [ ] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended."  *Id*. at 65 (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985)) (emphasis omitted).  Alternatively, a constructive amendment occurs where "the jury convicted based 'on a complex of facts distinctly different from that which the grand jury set forth in the indictment . . . .'"  *United States v. D'Amelio*, 683 F.3d 412, 419 (2d Cir. 2012) (quoting *Jackson v. United States*, 359 F.2d 260, 263 (D.C.Cir.1966)).

To defeat a claim of a constructive amendment, an indictment must "notif[y] the defendant of the 'core of criminality,' and the government's proof at trial [must] not 'modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'"  *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (internal citations omitted). *See also D'Amelio*, 683 F.3d at 417 (noting government assertions that deviations from the indictment *neither* affected the core of criminality *nor* modified an essential element).   Thus, if "the provisions of the indictment to which the government points do not fairly comprehend" the

evidence admitted at trial, the indictment has been constructively amended.  *See, e.g., United States v. Zingaro*, 858 F.2d 94 (1988) (finding constructive amendment after concluding that oblique references to among other means of debt collection could not be read to cover a specific act of debt collection given the indictment's other numerous references to specific acts of debt collection) (also noting that saving language typically involves "additional activities of the same character as those specifically charged in the indictment."  *Id*. at 103).

Concerns that defendants might be convicted for crimes for which they were not indicted are heightened in the context of conspiracy prosecutions.  *See United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) ("Because the instant case involves a prosecution under 18 U.S.C. § 371, we must be especially alert to 'subtle attempts to broaden the already pervasive and widesweeping nets of conspiracy prosecutions.'") (quoting *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir.1977)).   Fraud charges warrant similar scrutiny due to their susceptibility to multiple, fundamentally different theories:

> In order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should "think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial."

*Id*. (quoting *United States v. Weiss*, 752 F.2d 777, 791 (2d Cir) (Newman, J., dissenting in part), *cert. denied,* 474 U.S. 911 (1985)).  The Second Circuit in *Mollica* recognized that specific types of charges—like those at issue here—are particularly capable of eviscerating defendants' Fifth Amendment rights, and must therefore be prosecuted carefully.  Courts analyzing constructive amendments in these particular circumstances have noted the importance of assessing the *theories of criminality* on which the government proceeded to trial.  *See, e.g.*, *United States v. Klein*, No. 16-CR-442 (JMA), 2017 WL 1316999, at *14 (E.D.N.Y. Feb. 10, 2017) (in the context of allegations of conspiracy to commit securities fraud, characterizing prior cases as

48

finding constructive amendments where "the government indicted the defendant under a *specific legal theory* but advanced *another theory* at trial.").

> **2.** ***The Government's Theory Under Which It Convicted Defendants at Trial Was Not Charged by the Grand Jury***

The case that the government presented to the jury at trial was distinctly different than the one reflected in the Indictment and presented to the grand jury in 2016. Defendants were charged solely of a non-convergent scheme in which they defrauded the BBA with the Bank's LIBOR submissions to the BBA. By contrast, the trial record that the government cobbled together in support of a convergent theory—one that relies on indirect statements to the Bank's counterparties—appears nowhere in the Indictment or in the presentment testimony. (*See* Dkt. 262, at 8 (noting the Court's agreement that a convergent fraud theory is nowhere "apparent from the face of indictment.")). Moreover, the government then proceeded to discard the non-convergent theory that was actually charged. (*See* Tr. 2027:7–10 (reflecting the Court's admonishment of the government for its "intransigent refusal to try its indictment.")). In sum, the government advanced a specific theory by the grand jury, abandoned it (thereby eliminating the need for a BBA witness), and presented an entirely new one that "sandbagged" the Defendants and the Court.

While the government claimed, in connection with its *in limine* motions, that its convergent theory was evident all along, this is belied by the text of the Indictment and the presentment transcript. Had the government actually presented a convergent theory to the grand jury, it would have been quite simple to include, somewhere in the 26 pages of the Indictment, at least a passing reference to this theory. But it did not. Nothing close to this theory exists within the four corners of the Indictment—or in the grand jury presentment. There is not one reference to direct or indirect representations to counterparties (false or otherwise), and there is not one

49

suggestion that the BBA (via Thomson Reuters) was a "conduit" that conveyed misrepresentations from the Bank to the market.

Defendants respectfully submit that this new, entirely distinct theory constitutes a constructive amendment of the Indictment.  It does not share the same "core of criminality" as the charged conduct, and modified essential elements of the offenses for which they were tried.  Setting aside the wholesale failures of proof across the elements of the charged offenses, when the government "switched horses" prior to trial, it asserted an entirely distinct concept of the crime, changing the very nature of the conduct at issue.  The recipients of the supposedly false statements in this alleged scheme changed.  The "decision" under consideration by the recipient of the statement (for purposes of materiality) was fundamentally altered.  Otherwise-necessary witnesses, such as a representative from the BBA, became unnecessary.  And the entire object of the scheme changed from deceiving (and avoiding detection by) the BBA to solely defrauding counterparties by (ostensibly) depriving them of the opportunity to unwind trades.

Defendants paid the price for this bait-and-switch.  When they continued at trial to defend against the case actually charged by the grand jury, the government reiterated to the jury that it wanted them to convict on its alternative theory:

> You also heard arguments that kept arguing that the BBA was not defrauded; and that the government is enforcing the rules of the BBA. Ladies and gentlemen, that is not what is happening here. The BBA does not have to be defrauded. There's no argument that the defendants were trying to take money or property from the BBA. It was the counterparties here in the United States that are alleged to have been defrauded, that were defrauded.

(Tr. 2853:18–25).  This is the exact "broadening" of an indictment that the Second Circuit has previously warned about in *Mollica*, 849 F.2d at 729, and recognized as a constructive amendment in *Milstein*, 401 F.3d at 65.  At bottom, the grand jury charged Defendants under a specific theory of criminality, while the petit jury was urged to convict on a *separate and distinct*

*theory* at trial.  This is a clear constructive amendment of the Indictment.  Mr. Connolly is entitled to a new trial.

### 3.      *The Government's New Theory Modified Essential Elements of the Charged Offenses*

The counterparty-fraud-by-conduit theory was never presented to the grand jury, and it is not articulated in the Indictment, yet this is the case that was presented to the jury from the very first day.  The government opened on its theory of counterparty fraud.  (*See, e.g.,* Tr. 53:5–10 ("[GOVERNMENT:] She's [a Counterparty] going to tell you that she did not think that behind her back the defendants and their co-conspirators were stacking the deck against her, moving and skewing the LIBOR rate and their trades for their benefit.  And she's going to tell you that that mattered to her.").  Those very statements portray the problem the government now faces: whether any alleged statements mattered (or did not matter) to a counterparty bank is an issue that was never posed to the grand jury.  The grand jury charged Mr. Connolly and Mr. Black with making fraudulent statements to the BBA, which were material to the BBA, for profit.  In order for the jury to find materiality as to the BBA, it had to ask three questions: (1) "what statement was made"; (2) "what decision was [the BBA] trying to make"; and (3) whether the statement "was material to the decision."  *United States v. Gaudin*, 515 U.S. 506, 512 (1995).  Critically, when the government changed its theory of the nature of the case, shifting the locus of the fraud from the BBA to the counterparties, the nature of all three of these questions fundamentally changed:

1. The "statement" to the BBA was Deutsche Bank's individual LIBOR submission; the statement to the counterparties was now the overall LIBOR fix, which Deutsche Bank's submission may or may not have affected on any given day (and which, in any event, no counterparty ever testified to caring about).

2. The "decision" the BBA was making was how to set LIBOR on any given day; the decision the counterparties were making was whether to attempt to void their pre-existing transactions with Deutsche Bank.

3. Because the "materiality" of the statement is necessarily intertwined with the nature of the statement and the decision to be made, it is profoundly different between the BBA and the counterparties.

Addressing these questions as to the counterparties, and not the BBA, required fundamentally different evidence, up to and including entirely different witnesses. *See generally* Dkt. 206, 216, 222 (reflecting parties' rigorous motion practice on the necessity of the government calling a witness from the BBA under its original, non-convergent theory of contract-based fraud).

Moreover, the constructive amendment upended Defendants' entire understanding of the core of their alleged criminality because it foundationally altered their relationship with the BBA.  Whereas the grand jury charged Defendants with making materially false statements to the BBA, the government's theory at trial not only bypassed this requirement, but also left open the possibility that the BBA was actually *a party to the alleged fraud*.  This is illustrative of the overarching prejudice flowing from the government's constructive amendment: such a finding— that the BBA acquiesced to the fraud—is reconcilable with Defendants' convictions under convergent fraud, but is *completely irreconcilable* with their being charged under non-convergent fraud.  Thus, this constructive amendment effectively "modif[ied] essential elements of the offense charged"   such "that there is a substantial likelihood that" Defendants were convicted of offenses distinct from those for which they were charged.  *Rigas*, 490 F.3d at 228. Allowing a conviction to stand despite this divergence guts the protections of the Fifth Amendment.

### 4.      Alternatively, the Government's Evidence Effectuated a Prejudicial Variance Warranting Dismissal of the Indictment

Even if viewed through the prism of a variance, the substantial injustice visited upon the Defendants by the government's change of course cannot be rendered harmless simply with

additional time or notice.  *See Zingaro*, 858 F.2d at 98 (noting that a successful variance claim requires a showing of prejudice).  For the reasons previously stated, the government's new prosecution has afflicted the Defendants with significant prejudice, and it has deprived them of their constitutional rights to be tried solely on the case the grand jury indicted.  Even a "variance that does not alter an essential element may still deprive a defendant of an opportunity to meet the prosecutor's case."  *United States v. Helmsley*, 941 F.2d 71, 90 (2d Cir.1991).

### C.   Defendants Should Be Granted a Dismissal of the Indictment Due to the Prosecution's Misconduct

Beyond the constructive amendment of the Indictment and the government's constantly shifting theories, its repeated and compounding instances of prosecutorial misconduct require a vacatur of the convictions and dismissal of the Indictment.  Prosecutorial misconduct is a ground for reversal only if it causes the defendant "substantial prejudice," *United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir.1991), *cert. denied*, 504 U.S. 909 (1992), by "so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).  The Defendants have respectfully submitted a joint motion for relief based upon prosecutorial misconduct, and Mr. Connolly incorporates by reference those arguments herein in support of relief under Rule 33.

This Court observed with respect to the government as follows:

THE COURT: If I could count, if I had ten bucks for every time that you have stood up -- Ms. Sipperly, you are a wonderful lawyer, but if I had ten dollars for every time you ever stood up and said that you misspoke, it's more times in one case than the collective misspeaking of the Department of Justice in all of my 20-year criminal docket, and that includes the *Cromitie* case which I did not think could be topped.

(Tr. 2348:20 – 2349:1 (comparing the prosecution's misconduct and misrepresentations in the present matter to a prior case before this Court where, in the Court's words, "[t]he

Government indisputably 'manufactured' the crimes" at issue and where there was "something decidedly troubling about the Government's behavior."  *United States v. Cromitie*, 781 F. Supp. 2d 211, 220, 220–25 (S.D.N.Y. 2011), *aff'd*, 727 F.3d 194 (2d Cir. 2013))).

Defendants' expectations in a fair trial should not be so upended, and prosecutorial misconduct should not be allowed to proceed uncured.  The Court should dismiss the Indictment.

## CONCLUSION

The government has failed to set forth sufficient evidence to prove all essential elements of the charges against Mr. Connolly.  Apart from its utter refusal to engage with the issue of falsity, the government failed to prove multiple necessary elements in this case.  No rational juror could have found that the government met its complete burden as to any indicted count beyond a reasonable doubt.  No reasonable juror should have found Mr. Connolly guilty on any offense.  Applying the proper legal standards, we respectfully move the Court to enter a judgment of acquittal under both Rule 29 and the Fifth Amendment.  *See Jackson v. Virginia*, 443 U.S. 307, 317 (1979).


Dated: New York, New York
      December 10, 2018

By:    */s/ Kenneth M. Breen*
        Kenneth M. Breen
        Phara A. Guberman
        Jane H. Yoon

        **PAUL HASTINGS LLP**
        200 Park Avenue
        New York, NY 10166
        Telephone:  (212) 318-6000
        Facsimile:  (212) 319-4090
        kennethbreen@paulhastings.com
        pharaguberman@paulhastings.com
        janeyoon@paulhastings.com

        *Attorneys for Defendant Matthew Connolly*