**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:16-cr-00370 (CM) |
| v. | ECF Case |
| MATTHEW CONNOLLY and GAVIN CAMPBELL BLACK, | **ORAL ARGUMENT REQUESTED** |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO VACATE CONVICTIONS AND DISMISS THE**
**INDICTMENT ON THE BASIS OF PROSECUTORIAL MISCONDUCT**

**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone: (212) 223-4400
Facsimile: (212) 223-4425

*Attorneys for Defendant Matthew Connolly*

*Attorneys for Defendant Gavin Campbell Black*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

LEGAL STANDARD .......................................................................... 2

ARGUMENT ..................................................................................... 4

I.     THE GOVERNMENT'S REPEATED PRETRIAL MISREPRESENTATIONS AND OTHER CONSTITUTIONAL VIOLATIONS WARRANT VACATUR OF CONVICTIONS AND DISMISSAL OF THE INDICTMENT ................................................................ 4

      A.     The Government Presented False Evidence to the Grand Jury ............................ 6

          1.     ████████████████████████████████████████ ............................................. 6

          2.     █████████████████████████████████ ......................................... 9

          3.     ████████████████████████████████████ ................................... 9

      B.     The Government's Misrepresentations in Connection with the Deutsche Bank Trade Data Violated Brady Obligations and Defendants' Due Process Rights .... 11

          1.     In Connection with Defendants' Request for Particulars Concerning the Trade Data, the Government Directed Defendants to Deutsche Bank's BTM Analysis to Analyze the Trading Data ............................................. 12

          2.     The Government Particularized Trades without Disclosing that It Did Not Believe that There Was Any Reliable Way to Associate the Trades with Members of the Alleged Conspiracy or Determine Whether the Trades Were Consistent with the Traders' Net Trading Positions ...................... 14

          3.     Defendants Expended Substantial Pretrial Resources Analyzing the Trade Data Using BTM ................................................................................ 16

          4.     The Government Changed Its Position on the Reliability of BTM Upon Realizing that Defendants Intended to Rely on It at Trial ........................ 17

          5.     The Government's Change of Position on BTM Violated Defendants' Due Process and Brady Rights in Connection with BTM ........................ 19

      C.     The Government Misrepresented Its Communications With Alleged Counterparty Victims and Failed to Produce Related Brady Information ................................. 22

          1.     The Government Attempted to Mislead the Court in Justifying Its Failure to Disclose Its Communications with Goldman ....................... 23

2. The Government Violated *Brady* by Failing to Disclose Goldman's Unwillingness to Participate ...................................................................... 24

D. The Government's Opposition to Defendants' Motions to Compel Contained a Series of False Statements in Order to Avoid its *Brady* and Discovery Obligations ............................................................................................................ 26

1. The Government's Opposition to Defendants' Initial Discovery Motions Contained False and Misleading Summaries of Its Interactions with Other Governmental Agencies ........................................................................... 27

2. The *Garrity* Hearing Further Revealed the Misleading Nature of the Government's Representations About Its Interactions with the Prosecution Team ................................................................................................................ 36

E. The Government Misled Defendants and the Court Regarding Its Access to and Ability to Produce BBA Materials ............................................................................ 38

F. The Government Actively Hid Evidence In Connection with the Pretrial *Kastigar* Hearing ......................................................................................................................... 41

1. The Government Withheld Evidence that Mr. Prange Asked Questions at Mr. King's Proffer ..................................................................................... 41

2. The Government Concealed Evidence that the DOJ Received a Draft of the FCA Notice ........................................................................................... 45

3. The FCA Letter Was False ............................................................................. 46

4. Ms. Anderson's Misleading Declaration ...................................................... 48

II. THE GOVERNMENT'S KNOWING USE OF FALSE TESTIMONY AND TRIAL MISREPRESENTATIONS WARRANT VACATUR OF CONVICTIONS AND DISMISSAL OF THE INDICTMENT ................................................................................................................... 49

A. The Government Elicited False Testimony and Misleadingly Argued to the Jury that Mr. Black's Requests Were Designed to Benefit His Trading Positions ...... 51

B. The Government Knowingly Suborned Perjury ................................................... 56

C. The Government Misleadingly Attempted to Present New Trade Data Evidence It Knew to Be Unreliable ...................................................................................... 59

1. The Government Attempted to Introduce Screenshots of the Trade Data that Were Created Mid-Trial ........................................................................ 59

2. The Government Attempted to Present Evidence Based on a Method of Associating Trades with Traders that It Knew to be Unreliable .......... 60

D. The Government Elicited False Testimony Based on Cooperator Statements Made for the First Time in the Middle of Trial ................................................... 61

E.    The Government Made Numerous Misrepresentations in Connection with the *Garrity* Hearing .............................................................................................. 63

      1.    Prior to Trial, the Government Falsely Represented that There Was No Governmental Involvement in Deutsche Bank's Decision to Hire Outside Counsel to Conduct an Internal Investigation ............................. 64

      2.    The Government Made Multiple False Statements Concerning the Direction Provided to Paul Weiss by the CFTC ........................................ 65

F.    The Government Deliberately Misled the Jury in an Effort to Undermine Mr. Black's Good Faith Defense .......................................................................... 68

G.    The Government Elicited False Evidence Relating to the Materiality of the Alleged Scheme ................................................................................................... 71

H.    The Government's Prejudicial Statements Designed to Suggest that Defendants Were Responsible for the Financial Crisis ............................................................ 73

I.    The Government Elicited Misleading Testimony at Trial as a Result of Its Fact Bargaining with Cooperators .................................................................................. 74

      1.    Mr. Parietti's Cooperation Agreement Resulted in Misleading Trial Evidence...................................................................................................... 74

      2.    The Government's Agreement With Deutsche Bank Contradicts the Testimony Elicited At Trial ..................................................................... 76

CONCLUSION .................................................................................................................... 79

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Berger v. United States,*
    295 U.S. 78 (1935)......................................................................................... 1

*Drake v. Portuondo,*
    553 F.3d 230 (2d Cir. 2009)........................................................................... 51

*Floyd v. Meachum,*
    907 F.2d 347 (2d Cir. 1990)...................................................................... 6, 74

*Kyles v. Whitley,*
    514 U.S. 419 (1995)...................................................................................... 26

*Miller v. Pate,*
    386 U.S. 1 (1967)........................................................................................... 4

*Napue v. Illinois,*
    360 U.S. 264 (1959)............................................................................. 4, 49, 50

*Shih Wei Su v. Filion,*
    335 F.3d 119 (2d Cir. 2003).......................................................................... 50

*Strickler v. Greene,*
    527 U.S. 263 (1999)................................................................................. 1, 24

*Tenkleff v. Senkowski,*
    135 F.3d 235 (2d Cir. 1998)........................................................................... 4

*United States v. Aguilar,*
    831 F. Supp. 2d 1180 (C.D. Cal. 2011) ..................................................... 3, 5

*United States v. Agurs,*
    427 U.S. 97 (1976)....................................................................................... 50

*United States v. Allen,*
    864 F.3d 63 (2d Cir. 2017)............................................................................ 29

*United States v. Bagley*,
    473 U.S. 667 (1985)...................................................................................................... 39

*United States v. Brito*,
    907 F.2d 392 (2d Cir. 1990)........................................................................................... 5

*United States v. Brown*,
    602 F.2d 1073 (2d Cir. 1979)......................................................................................... 3

*United States v. Chapman*,
    524 F.3d 1073 (9th Cir. 2008) ....................................................................................... 4

*United States v. Chin*,
    934 F.2d 393 (2d Cir. 1991)........................................................................................... 3

*United States v. Cromitie*,
    727 F.3d 194 (2d Cir. 2013)......................................................................................... 51

*United States v. Fields*,
    592 F.2d 638 (2d Cir. 1978)........................................................................................... 3

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002)........................................................................................... 24

*United States v. Lombardozzi*,
    491 F.3d 61 (2d Cir. 2007)................................................................................... 4, 5, 6

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012)......................................................................................... 24

*United States v. Meregildo*,
    920 F. Supp. 2d 434  (S.D.N.Y. 2013)....................................................................... 35

*United States v. Omni Int'l Corp.*,
    634 F. Supp. 1414 (D. Md. 1986) .................................................................................. 4

*United States v. Ruiz*,
    536 U.S. 622 (2002)...................................................................................................... 39

*United States v. Russell,*
  411 U.S. 423 (1973) ..................................................................................... 3

*United States v. Schmidt,*
  105 F.3d 82 (2d Cir. 1997) ......................................................................... 3

*United States v. Thibadeau,*
  671 F.2d 75 (2d Cir. 1982) ......................................................................... 5

*United States v. Valentine,*
  820 F.2d 565 (2d Cir. 1987) ................................................................ 50, 53

*United States v. Vozzella,*
  124 F.3d 389 (2d Cir. 1997) ................................................................ 49, 50

*United States v. Wallach,*
  935 F.2d 445 (2d Cir. 1991) ..................................................................... 50

*United States v. Walters,*
  2018 WL 6314126 (2d Cir. Dec. 4, 2018) ................................................ 3

*United States v. Wang,*
  1999 WL 138930 (S.D.N.Y. Mar. 15, 1999) ............................................ 4

Defendants Matthew Connolly and Gavin Campbell Black ("Defendants") respectfully submit this memorandum of law in support of their motion to vacate their convictions and dismiss the remaining counts of the Superseding Indictment ("Indictment"), or in the alternative, request that the Court order a new trial or an evidentiary hearing on the basis that the Government's pervasive misconduct, including *Brady*, *Jencks*, and *Giglio* violations, deprived Defendants of their constitutional right to due process of law.

## PRELIMINARY STATEMENT

Prosecutors play a special role in our system of justice, and by necessity, courts and defendants rely on the Government to fulfill its responsibilities with integrity. The Government's "'obligation to govern impartially is as compelling as its obligation to govern at all; and [its] interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). As this Court recognized on multiple occasions, the Government failed to uphold its obligations in this case. The Court and the public can have no confidence in the integrity of this proceeding because it can have no confidence in the integrity of the Government's conduct in this case.

The convictions should be vacated and the Indictment dismissed as a result of the Government's systematic and pervasive misconduct throughout this case, which substantially prejudiced Defendants and deprived them of their right to a fair trial. This misconduct infected each stage of this case—from indictment through conviction. The laundry list of prosecutorial bad acts includes subornation of perjury, the knowing presentation of false evidence to the grand jury, the knowing presentation of false evidence during trial, a litany of false representations to the Court and Defendants, *Brady* and other discovery violations, and the creation of after-the-fact reports to paper over misconduct. While many of these acts, standing alone, would justify a

vacatur of the convictions and dismissal of this case, their combined effect deprived Defendants'
of their constitutional rights in a way never seen before in this District.  The Court commented to
this effect at multiple points during the trial as more and more of the Government's false
statements, deceptive acts, and other improper conduct were brought to light:

> "THE COURT:  Boy, that's not what you wrote.  You know, how many times in
> this case do I have to say, The government now says X.  Well, that's not what the
> government wrote.  That's not what the government put in the indictment, which
> is a speaking indictment.  That's not what the government wrote on this motion.
> That's not what the government wrote on that motion.  And that's not what you
> said about that document, because I read that letter last week, that one I
> remember.  I'm sorry, Ms. Sipperly.  I understand the fury at the back table, I
> really do, because I feel a little bit of it.  Every time somebody challenges you,
> you're like a shape-shifter."  [Tr. 362:6-18];

> "THE COURT: And you made a misrepresentation to this Court. . . . I find it
> appalling.  I have never, ever had that happen."  [Tr. 836:25-837:4];

> "[THE COURT]:  I have never had a trial with so many surprises, fiascoes,
> retractions, it hasn't happened."  [Tr. 1891:22-24];

> "[THE COURT]:  [I]f I had ten dollars for every time you ever stood up and said
> that you misspoke, it's more times in one case than the collective misspeaking of
> the Department of Justice in all of my 20-year criminal docket, and that includes
> the *Cromitie* case which I did not think could be topped."  [Tr. 2348:22-2349:1.]

This has been a prosecution by any means necessary.  Given the Government's rampant
misconduct throughout the entirety of this case, this is the extraordinary case warranting the
dismissal of all remaining counts of the Indictment with prejudice.  In the alternative,
Defendants' request that the Court grant Defendants a new trial in the interests of justice and
order an evidentiary hearing to examine the extent to which the Government's misconduct
violated Defendants' right to a fair trial.

## LEGAL STANDARD

An indictment may be dismissed with prejudice for prosecutorial misconduct when the
actions of the Government are "so outrageous that due process principles would absolutely bar

the government from invoking judicial processes to obtain a conviction," *United States v. Russell*, 411 U.S. 423, 431-32 (1973), or when the Government's misconduct "threaten[s] to compromise the integrity of the criminal trial and the administration of justice," *United States v. Brown*, 602 F.2d 1073, 1076 (2d Cir. 1979).   The determination of whether the Government's misconduct rises to the level of a due process violation "'turn[s] on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience.'"   *United States v. Walters*, 2018 WL 6314126, at *11 (2d Cir. Dec. 4, 2018) (alteration in original) (quoting *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991)).   While the Second Circuit recently reiterated that the cases meeting the "shocks the conscience" standard "have 'ordinarily' involved 'coercion' or a 'violation of the defendant's person,'" *id.* (alteration omitted) (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)), the court indicated that there may be circumstances where other types of prosecutorial misconduct "rise[] to the level of outrageous conduct sufficient to warrant dismissal," *id.*

The Court may also dismiss an indictment under its supervisory powers.   *See Brown*, 602 F.2d at 1075-77.   This sanction is designed to "achieve one or both of two objectives:   first, to eliminate prejudice to a defendant in a criminal prosecution; second, to 'help translate the assurances of the United States Attorneys into consistent performance by their assistants.'"   *Id.* at 1076-77 (quoting *United States v. Fields*, 592 F.2d 638, 646, 647 (2d Cir. 1978)).   The Second Circuit has approved the sanction of dismissal of an indictment "when the pattern of misconduct is widespread or continuous."   *Id.* at 1077 (quoting *Fields*, 592 F.2d at 648).   Other courts have similarly found that multiple acts of prosecutorial misconduct can so infect the process as to warrant dismissal of an indictment under the court's supervisory powers.   *See United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206-10 (C.D. Cal. 2011) (reversing the defendants' conviction

based on "multiple acts of misconduct" and noting that "numerous decisions of the Ninth Circuit Court of Appeals have reversed convictions because of multiple wrongful acts that, in the aggregate, warranted the exercise of supervisory power"); *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1436-40 (D. Md. 1986) (dismissing the indictment under the court's supervisory authority based on the government's alteration and creation of documents, presentation of false and incorrect testimony, and lack of candor in colloquies with the court).

Even in the absence of multiple acts of misconduct, certain specific types of governmental misconduct, standing alone, are due process violations that may call for dismissal of an indictment. These include: (1) knowingly or recklessly misleading the grand jury as to an essential fact, *see United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007); (2) failing to search for or timely produce *Brady* material, *see United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008); *United States v. Wang*, 1999 WL 138930, at *36-37 (S.D.N.Y. Mar. 15, 1999); (3) knowingly eliciting false testimony at trial or allowing false trial testimony to go uncorrected where it appears, *see Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); or (4) making an argument known to be factually untrue, *see Tenkleff v. Senkowski*, 135 F.3d 235, 252-53 (2d Cir. 1998). Each of these particularly serious examples of prosecutorial misconduct occurred here.

## ARGUMENT

### I. THE GOVERNMENT'S REPEATED PRETRIAL MISREPRESENTATIONS AND OTHER CONSTITUTIONAL VIOLATIONS WARRANT VACATUR OF CONVICTIONS AND DISMISSAL OF THE INDICTMENT

The Government engaged in substantial misconduct during the pretrial phase of this case, including presenting false evidence to the grand jury; making multiple false statements to the Court and Defendants; and failing to comply with its *Brady* and discovery obligations. These acts prejudiced Defendants because, *inter alia*, they prevented them from obtaining exculpatory

evidence and required them to devote substantial resources to address the Government's numerous false statements and other bad acts.

An indictment is subject to dismissal following conviction based on pretrial prosecutorial misconduct that amounts to "a knowing or reckless misleading of the grand jury as to an essential fact," *Lombardozzi,* 491 F.3d at 79 (internal citation and quotation marks omitted), or "systematic and pervasive prosecutorial misconduct as would undermine fundamental fairness of the process," *United States v. Brito*, 907 F.2d 392, 395 (2d Cir. 1990). The Circuit has recognized that "[j]ustification for such action must be found not in any need for securing justice in the particular case, . . . but rather in a desire to maintain proper prosecutorial standards generally." *United States v. Thibadeau*, 671 F.2d 75, 77-78 (2d Cir. 1982) (internal quotation marks and citations omitted).

As one court stated in dismissing the indictment based on "multiple acts of misconduct" leading to the same type of prejudice suffered by Defendants here:

> This Court is persuaded that the multiple acts of misconduct described above undoubtedly affected the verdicts and thus substantially prejudiced the [Defendants]. The prejudice here is palpable once the prosecution and trial are assessed as a whole. Beginning even before the jury was selected and continuing throughout trial, the Defendants were thrown off balance by being forced to devote enormous effort to responding to and redressing serious and prejudicial wrongs, while at the same time having to defend themselves against the charges. Within only one year after the return of the First Superseding Indictment—an unusually brief period for this kind of case—the docket had almost 700 entries, many of which consist of the motions, *ex parte* applications, oppositions, hearings, and rulings necessitated by the prosecution's astonishing number of "mistakes" (as the Government chooses to characterize them) discussed above.

*Aguilar*, 831 F. Supp. 2d at 1207.

The full measure of detriment caused by the Government's misconduct at each stage of these proceedings is now apparent and the "[t]he prejudice here is palpable once the prosecution and trial are assessed as a whole." *Id.* The Government's actions, whether considered jointly or

separately, should result in a vacatur of Defendants' convictions and dismissal of the Indictment. *See Floyd v. Meachum*, 907 F.2d 347, 356-57 (2d Cir. 1990) (stating that even if "each instance of prosecutorial misconduct, standing alone, might not justify reversal, the effect of all of them requires it."). Alternatively, the Court should grant Defendants a new trial and hold an evidentiary hearing to determine the full scope of the Government's misconduct.

### A.   THE GOVERNMENT PRESENTED FALSE EVIDENCE TO THE GRAND JURY

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████

1.   ██████████████████████████████████
██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████





2   Even though this exculpatory analysis was prepared in 2014—two years before SA Weeks's grand jury testimony—the Government did not produce it to Defendants until August 2018.  [*See* ECF No. 322 at 3, Exs. J & K.]

8





---

[3]   Defendants have added contiguous page numbers to the proposed versions of GX-1-456 at Levine Decl. Ex. 2, for ease of reference.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

**B.** **THE GOVERNMENT'S MISREPRESENTATIONS IN CONNECTION WITH THE DEUTSCHE BANK TRADE DATA VIOLATED BRADY OBLIGATIONS AND DEFENDANTS' DUE PROCESS RIGHTS**

For nearly two years prior to trial, the Government represented to the Court and Defendants that Deutsche Bank's book-to-trader mapping ("BTM") analysis—while imperfect—was the only reasonable method of associating trades with traders. According to the Government, the BTM analysis was necessary because Deutsche Bank's voluminous trade data did not retain information that reliably associated individual trades with the responsible trader, but rather such association was only possible at a trading book level. [*See, e.g.*, ECF No. 322, Ex. A at 5-7, 19-22; *see also* DX 862 at 48.] Deutsche Bank, therefore, expended enormous resources to manually reconstruct each trader's books by applying the BTM analysis. [DX 862 at 48.] Using BTM, Deutsche Bank, at the Government's direction, prepared and produced net position spreadsheets for Mr. Black and other Deutsche Bank employees who traded derivatives, including Mr. King, Mr. Curtler, and Mr. Parietti. [ECF No. 322, Ex. A at 5-7.]

But when the Government realized on the eve of trial that Defendants intended to rely on BTM to associate individual trades with traders, as well as present traders' net positions, Government reversed course and declared that the BTM analysis is without foundation. [ECF No. 314 at 6.] The Government's complete about face leads to one of two possible conclusions: either the Government's repeated pretrial representations to the Court and Defendants designed

11

to induce reliance on BTM to analyze the trade data were false and misleading; or the Government's statements on the eve of trial concerning the unreliability of BTM were false and misleading.  In either case, the Government's conduct substantially prejudiced Defendants.

      **1.**     **In Connection with Defendants' Request for Particulars Concerning the Trade Data, the Government Directed Defendants to Deutsche Bank's BTM Analysis to Analyze the Trading Data**

Given the volume of the trade data and the lack of detail about the trades at issue in the Indictment, Defendants made numerous requests for more information concerning the trades underlying the alleged scheme to make LIBOR submissions "designed to benefit [Defendants'] trading positions."  [Superseding Indictment ("SI") ¶ 26.]  In providing this information, the Government directed Defendants to look at the BTM analysis prepared by Deutsche Bank.

In a letter dated March 2, 2017, the Government responded to Defendants request for, among other things, identification of "counterparties for relevant trades or transactions identified in the indictment."  [ECF No. 68, Ex. B ("March 2 Letter") at 1.]  In addition to directing Defendants to spreadsheets of Deutsche Bank data as the source containing the "information necessary to identify counterparties," the Government attached a spreadsheet that it had created for the purpose of "easing [Defendants'] review."  [*Id*. at 2.]  The spreadsheet attached to the March 2 Letter reflected Deutsche Bank's "net" trading position by reset date and counterparty, explaining that the spreadsheet's fourth column showed "whether Deutsche Bank was a net payer or net receiver of the floating rate with respect to the identified counterparty in the corresponding tenor."  [*Id*.]  With respect to this information, the Government emphasized that:

> [T]he fourth column represents Deutsche Bank's **net** position.  If, on a given reset date, Deutsche Bank had multiple swaps in the same tenor with a particular counterparty, the fourth column does not reflect whether Deutsche Bank paid the floating rate for some swaps and received the floating rate for other swaps with that counterparty.

[*Id.* (emphasis in original).]  As a result of the Government's representation of trading positions by reset date and counterparty on a companywide net basis, Defendants were left trying to reverse engineer the specific trades in the trade data the Government identified that made up each of the "net" positions in the March 2 Letter.  This, as the Court is aware, set off a protracted process by which Defendants sought to understand the Government's methodology for analyzing the trade data—a methodology that the Government repeatedly represented was anchored in the BTM analysis.

At a meeting between the parties on April 18, 2017, the Government purported to present its methodology for assessing the Deutsche Bank trading data that led to the March 2 Letter and the creation of the Government's spreadsheet attached thereto.  In that meeting, the Government highlighted, among other fields of relevance in the data, the trading "book" field.  (*See* Levine Decl. Ex. 4 at 8, 19.)  As a follow up to this meeting, on May 2, 2017, the Government produced its notes from its March 6, 2013 meeting with Deutsche Bank as further guidance to navigate the data.  (*See* Levine Decl. Ex. 5.)  Among other things, those notes indicate that Deutsche Bank used BTM to associate trades with particular traders, explaining that "[e]very trade is put into a book" and that the "[b]ook is the most granular level" for performing "[t]rader mapping."  (*Id.* at 7.)  The Government's notes also reflect that Deutsche Bank analyzed a number of "variables to try to determine who owns a book," but indicated that it was "not a perfect science" because the bank "is not really focused on an individual's performance, it is more concerned with how a particular business is/was doing."  (*Id.* at 6.)

The Government further emphasized that Defendants should look to Deutsche Bank's BTM analysis for the purpose of associating trades with particular traders in a May 14, 2017 joint letter submission to the Court (the "Joint Letter").  [*See* ECF No. 86.]  Ostensibly relying on

the information that it received from Deutsche Bank as part of its cooperation, the Government represented that:

> Deutsche Bank's system did not capture the specific Deutsche Bank trader that booked each individual trade. Instead, the data shows a trading book that is associated with the trade and ***further analysis is needed to link trading books to specific Deutsche Bank traders. This analysis is often referred to as "book-to-trader mapping," a*** post-hoc ***analysis based on the raw data***.

[*Id.* at 5 (emphasis added).]   While the Government acknowledged that there were certain "issues" with BTM [*see id.* ("[T]he Government is agreeing that Deutsche Bank's data did not always capture certain information, such as which trader booked a specific trade.")], the Government explicitly rejected any suggestion that the trade data was "inaccurate or unreliable."

[*Id.*]   To the contrary, the Government suggested that it may offer Deutsche Bank's BTM analysis as evidence at trial:

> As any analysis based off of data does, there are issues of assumptions and potential disagreements regarding the methodology used for this analysis.  To the extent evidence of this nature is offered at trial, the Defendants will have an opportunity to point out that the specific trader was not captured in Deutsche Bank's raw data as well as the opportunity to challenge the assumptions and methodology used for any analysis based off of that data.

[*Id.*]   Significantly, the Government offered no other methodology, outside of BTM, for associating trades with traders, nor did it point Defendants to any other methodology promoted by Deutsche Bank.  Thus, even though the Government acknowledged that certain issues existed regarding BTM, it identified BTM as the only methodology it was aware of to "link trading books to specific Deutsche Bank traders."  [*Id.*]

> **2.**   **The Government Particularized Trades without Disclosing that It Did Not Believe that There Was Any Reliable Way to Associate the Trades with Members of the Alleged Conspiracy or Determine Whether the Trades Were Consistent with the Traders' Net Trading Positions**

Following submission of the Joint Letter on May 24, 2017, the Court ordered the Government to particularize the trades it intended to present at trial, holding that:

14

The Government thus needs to particularize the crimes charged by identifying to the defense a finite universe of trades, from which it will (one hopes, since this trial is not going to consume all of next year) choose a still smaller number of trades in order to explain the scheme to the jury, so the trier of fact can conclude beyond a reasonable doubt that (1) **the object of the conspiracy was to manipulate LIBOR rates for the benefit of DB traders' derivatives position**, and (2) the alleged victims were in fact harmed (or would have been, had the conspiracy worked).

[ECF No. 89 at 12-13 (emphasis added).]  In ordering the Government to particularize trades, the Court recognized that though "the Government does not intend to rely heavily on trade data" at trial, "[i]t is **inarguable that trade data will have to be presented to the jury by the Government**, the party with the burden of proof, to show how the counterparty banks were affected by the scheme to defraud."  [*Id.* at 12 (citing *United States v. Allen,* S4 14 CR 272 (JSR), The Court's Instruction of Law to the Jury, 20-21, ECF No. 146) (emphasis added).]

The Government ultimately produced its "final" list particularizing 215 potential trades on November 28, 2017.  [ECF No. 152 (the "November 28 Letter").]  The Government further refined its list in its production of multiple iterations of proposed summary exhibit GX 1-456, which listed the specific trades that the Government intended to present at trial along with certain corresponding data fields from Deutsche Bank's trading data.  (*See* Levine Decl. Ex. 2 (all proposed versions GX-1-456).)  All pretrial versions of GX 1-456 included the "BOOK" field (*see id.* at p. 1-23), consistent with the Government's pretrial representations that the only reliable method for associating trades with traders was to "link trading books to specific Deutsche Bank traders."  [ECF No. 86 at 5.]

Neither the November 28 Letter nor any of the Government's pretrial disclosures particularizing trades contradicted the Government's defense of BTM in the Joint Letter as the only reasonable method of associating trades with particular traders.  Moreover, at no time prior to trial did the Government disclose what it ultimately revealed mid-trial:  that because the net

positions of Mr. Black and the other co-conspirators "many times supported, and at other times did not support, the government's theory of the case on the reset dates at issue," it would not present them at trial.  [ECF No. 322 at 1.]

### 3.    Defendants Expended Substantial Pretrial Resources Analyzing the Trade Data Using BTM

Defendants had no choice but to use BTM to analyze the trade data to defend against the charges in this case based on: (i) the Government's representation that it may offer the BTM analysis at trial; (ii) the Government's representations that BTM was the only reliable method for associating trades with traders, and therefore for assessing the net trading positions of Mr. Black and the alleged co-conspirators; and (iii) the Court's order that the Government would have to present the particular trades at trial.  Accordingly, Defendants devoted significant time and resources to analyzing the trade data in advance of trial.  This included hiring an expert to review and evaluate the data in the context of the Government's alleged scheme.  [*See, e.g.*, ECF No. 325.]  For over a year-and-a-half, Defendants and their respective teams worked to reconstruct Deutsche Bank's net trading analysis using BTM to assess the "assumptions and potential disagreements regarding the methodology used for this analysis."  [ECF No. 86 at 5.]

In other words, Defendants' teams did precisely what the Government recommended so that, at trial, Defendants would have "the opportunity to challenge the assumptions and methodology used for any analysis based off of that data."  [*Id.*]  In addition to applying BTM to the data for the purpose of assessing its strengths and weaknesses, Defendants' teams also used the methodology to build their affirmative cases based on an analysis of Mr. Black's and the alleged co-conspirators' trading positions over the whole of the seven-year Indictment period.

**4.      The Government Changed Its Position on the Reliability of BTM
Upon Realizing that Defendants Intended to Rely on It at Trial**

On the eve of trial, the Government repudiated its prior representations as to BTM after it realized Defendants' experts intended to rely on BTM for the purpose of presenting net trading position evidence.  In its reply brief in support of its motion to exclude expert testimony filed on September 17, 2018—the first day of trial—the Government objected to Defendants' proposed use of expert testimony based on "'net reset position' analyses prepared by Deutsche Bank in anticipation of litigation, which likely are unreliable and would make the experts' testimony unreliable and prejudicial as well."  [ECF No. 314 at 5.]  The Government asserted:

> These "net reset position" analyses may well be unreliable and inadmissible.  As Deutsche Bank's production letter makes clear, the analyses are "not a record maintained in the ordinary course of business by Deutsche Bank"—to the contrary, they were created in anticipation of litigation by Deutsche Bank, which provided little explanation as to how they were prepared.  Nor did Deutsche Bank make any representation that they were based on complete data.  Bottom line, these analyses, which contain book-to-trader mapping, would have required someone to decide which trades would be attributed to certain traders.  There is simply no foundation established for this process.

[*Id.* at 5-6 (citations omitted).]   Contrary to the Government's assertion, the analyses do not merely "contain book-to-trader mapping."   [*Id.* at 6]   Instead, the "net reset position" ***is*** the application of the BTM to all the trades in a trading book on a particular day, as opposed to the single trade the Government self-servingly plucked out to avoid what it apparently knew all along:  that application of the BTM to entire trading books results in net trading positions on many alleged dates that are not aligned with the direction of alleged manipulation.  [*See* Tr. 981:5-982:17.]  So, while the Government planned to rely on BTM for the purpose of associating specific trades in trading books with traders, it argued that that there was "no foundation" for the same process when applied to the remainder of the trades in the trading book that it did not seek to present at trial.  [*See, e.g.,* ECF No. 317.]

17

The Government further impugned Deutsche Bank's BTM analysis in the following colloquy with the Court:

> The reason that we cannot use Deutsche Bank's data -- and we've said that from the beginning, that's what they've been arguing from the very beginning about the data -- is that we can't do that because there's two reasons:
>
> One is the fact that it's not entirely clear who the trader is.  They do book-to-trader mapping.  And when they did that, they did two things to go from book-to-trader mapping, then to net notional.
>
> One thing they did was they had to sit there and they divided the books and which direction each book went by the people who shared the books.
>
> The second thing they did was futures data.  Futures data was not kept by Deutsche Bank in a way that they could tell on any given day what the futures trades were.  Because if they were unwound or they had switched positions or done something like that, it wasn't captured in the data.  That's our understanding.  And a third of Gavin Black's book was futures data.
>
> So the net notional, what we are realizing is that even if it supported us, there's too many holes for it to be something to use.  We've always been clear though, we are using the communications, along with the cooperator testimony; and that we were not going to have data to prove an entire position of the defense.  It just is not something we can do.
>
> THE COURT:  So let me see if I just heard this correctly.  We are not going to have a showing that Gavin Black could actually have derived some benefit, if indeed the LIBOR submission was influenced by the submitters accepting his suggestion that he'd like a high 1-month fix today.
>
> MS. ANDERSON:  In some of his communications he says his position, that he's 18 billion in one direction.  That's what we have.  We have the cooperator's testimony.  But we have always been clear that we cannot do an analysis of every trade he had on that day and what position he would be in.
>
> THE COURT:  *Well, I'll tell you, you weren't very clear with me*.

[Tr. 981:7-982:19 (emphasis added).]

**5.     The Government's Change of Position on BTM Violated Defendants' Due Process and *Brady* Rights in Connection with BTM**

The Government's reversal, on the eve of trial, about the reliability of the BTM violated Defendants' due process and *Brady* rights for a number of reasons.[4]

*(a)     The Government Never Disclosed Its Belief that the BTM Was "Unreliable"*

The Government never disclosed that it believed that BTM was "unreliable" prior to its reply brief filed on the first day of trial.  While the Government's disclosures identified certain shortcomings in the net position analyses that resulted from application of the BTM, such as issues with the completeness of the underlying data (*see* Levine Decl. Ex. 6 at DOJ-A-0012600), the Government defended the BTM analysis in the Joint Submission as being similar to "any analysis based off of data" and indicated that it may offer "evidence of this nature" at trial [ECF No. 86 at 5].

*(b)     The Government Falsely Represented that Deutsche Bank Did Not Stand Behind the BTM*

Contrary to the Government's representations to the Court during the trial, the Government produced materials to Defendants demonstrating that Deutsche Bank believed that BTM was a reliable process for associating trading books with traders.  [*See* ECF No. 322.]  At trial, the Government sought to conflate "reliability" with "completeness" in an effort to undermine BTM:

> Again, I just feel that we have to respond that what we said about that notional table is simply that Mr. Levine should have been required -- and we get it that he didn't, but that ***it was a foundational problem, and that the government wasn't***

---

[4]     While Defendants are mindful that the Court ruled at trial that the Government's misrepresentations concerning the book-to-trader mapping do not constitute a *Brady* violation [*see* ECF No. 323], Defendants respectfully submit that, in view of the entire record, the Government's statements concerning the BTM analysis constitute not only a *Brady* violation, but also a due process violation.

*aware of the foundation that supported those documents*.  And to some extent we thought that --

\* \* \* \*

No, *what they said was they weren't confident in what they were handing us*. That's the point we're trying to make.

\* \* \* \*

They had said in the letter, we attached it to our brief where *they said they just didn't feel like they did a full comprehensive job*.  That's the point we were trying to make.

[Tr. 361:5-362:5 (emphasis added).]

The Government's representations concerning Deutsche Bank's refusal to stand behind BTM or the net notional analysis that followed from it are false and misleading.  As reflected in multiple documents, Deutsche Bank believed that the BTM was an accurate and reliable process for associating trading books with traders to the extent it was possible.  [*See* ECF No. 322.] It also sought cooperation credit based on its "time-consuming, manual reconstruction of the traders' books," stating:

> Deutsche Bank has also synthesized data potentially relevant to the documents it has highlighted.  Perhaps most notably, Deutsche Bank provided trading data from particular books and conducted analyses of the IBOR-related net positions for various traders, a process that required the time-consuming, manual reconstruction of the traders' books.  These analyses permitted evaluation of traders' positions on particular days.

[DX 862 at 48.]

The Government's representations at trial about the unreliability of Deutsche Bank's BTM and net notional analyses also conflicted with its prior representations, including in the Joint Letter, as the Court indicated in response to the Government's assertions set forth above:

> THE COURT:  Boy, that's not what you wrote.  You know, how many times in this case do I have to say, The government now says X.  Well, that's not what the government wrote.  That's not what the government put in the indictment, which is a speaking indictment.  That's not what the government wrote on this motion.

That's not what the government wrote on that motion.  And that's not what you said about that document, because I read that letter last week, that one I remember.  I'm sorry, Ms. Sipperly.  I understand the fury at the back table, I really do, because I feel a little bit of it.  Every time somebody challenges you, you're like a shape-shifter.

MS. SIPPERLY:  That's not true.

THE COURT:  And the time for shape-shifting is over.  You said what you said. The words say what the words say.

[Tr. 362:6-21.]

### (c)    The Government Misrepresented that It Did Not Know How Deutsche Bank Calculated Net Notional Spreadsheets

The Government falsely represented that Deutsche Bank "provided little explanation as to how [the net notional spreadsheets] were prepared."  [ECF No. 314 at 6.]  To the contrary, the Government had extensive communication with Deutsche Bank concerning its BTM analysis and preparation of the net notional spreadsheets based on that analysis.  (*See, e.g.*, Levine Decl. Exs. 1 & 5-7.)

### (d)    The Government Never Informed Defendants that the BTM Did Not Include Futures Data

The Government falsely represented to the Court during trial that BTM was unreliable based on its failure to account for futures data.  At trial, the Government stated:

Futures data was not kept by Deutsche Bank in a way that they could tell on any given day what the futures trades were.  Because if they were unwound or they had switched positions or done something like that, it wasn't captured in the data. That's our understanding.  And a third of Gavin Black's book was futures data.

[Tr. 981:18-24.]   But contrary to this representation, the Government specifically included "futures contracts" in the spreadsheet attached to the March 2 Letter "out of completeness." [ECF No. 86 at 4.]  It also specifically presented its methodology for analyzing futures data at

the April 18, 2017 trade date meeting, as reflected in the PowerPoint presentation prepared for that meeting.  (*See* Levine Decl. Ex. 4 at 6, 7, 13-15, 18.)[5]

### C. THE GOVERNMENT MISREPRESENTED ITS COMMUNICATIONS WITH ALLEGED COUNTERPARTY VICTIMS AND FAILED TO PRODUCE RELATED *BRADY* INFORMATION

The Government misrepresented and failed to disclose information concerning communications with alleged counterparty financial institutions.  As was revealed mid-trial, the Government made misrepresentations to the Court and Defendants in violation of due process and *Brady* relating to exculpatory statements that alleged counterparty victim Goldman Sachs ("Goldman") made to the Government prior to trial.  The Government did not disclose any of these communications with Goldman prior to trial, despite repeated requests for information related to communications with alleged counterparty victims.  After Defendants raised this issue again in the middle of trial, the Government sent an *in camera* letter to the Court containing the following representation specific to Goldman, which the Court ultimately read, in part, into the record:

> The government further represents that the Department of Justice, and the person is an FBI agent in a different LIBOR-related investigation, I don't know which one, did have some communication with Goldman about participating in that investigation; and that Goldman was, in fact, not interested in participating in that investigation.

[Tr. 2341:7-12.]  This letter also reflected that an unidentified member of the Rabobank trial team communicated with Goldman's outside counsel, who "essentially said that Goldman didn't want to designate a witness to participate in that case."  [Tr. 2341:24-25.]  In order to deflect responsibility, the Government attempted to mislead Defendants and the Court by making a false distinction between the Rabobank investigation and the Deutsche Bank investigation to justify its

---

[5]   To the extent the Court credits the Government's statements at trial concerning the unreliability of Deutsche Bank's analysis based on its failure to include futures data, the Government violated *Brady* by failing to disclose this information to Defendants prior to trial.

failure to disclose its communications with Goldman prior to trial. As the Court noted upon receipt of the letter:

> What they said, in words or in substance, We don't want to be involved. Don't knock on our door. We don't want to be involved with this. My understanding was that the United States of America could compel anybody it wished to be involved. But you were out there doing an investigation, and Goldman Sachs said, Don't involve us. And you handed down an indictment in this case in which Goldman Sachs is identified as a victim. And the representation that you made to me -- this may or may not be a *Brady* violation, but the representation you made to me was you never talked to anyone at Goldman Sachs.

[Tr. 2346:3-13.]

### 1. The Government Attempted to Mislead the Court in Justifying Its Failure to Disclose Its Communications with Goldman

Defendants made numerous requests to the Government seeking any notes or other information from communications with counterparty financial institutions. For example, on December 22, 2016 and January 4, 2017, Defendants sent letters to the Government requesting production of, *inter alia*, all *Brady* information, including asking the Government to "identify all documents and materials, including indices of such documents and materials, produced to the government or Prosecution Team from any counterparty of Deutsche Bank that is referenced in, or relevant to the charges contained in, the Superseding Indictment." (Levine Decl. Ex. 8 at 8.) Based on its communications with Goldman, the Government had no good-faith basis to ask the grand jury to return an indictment that identified Goldman as victim. [*See* SI ¶¶ 24, 26, 27(f), 51.]

Despite these requests, the Government did not disclose its communications with Goldman until the middle of trial. [*See* Tr. 2346:10-2347:6.] The Government explained its failure to disclose its contacts with Goldman on the ground that the FBI's contact with Goldman occurred in what the Government characterized as "a different LIBOR-related investigation"—neither the Court nor Defendants know which one—and the Department of Justice's

communication with Goldman was "with the Rabo[bank] team."  [Tr. 2341:1-18.]   The Government's *post hoc* explanation, however, was knowingly misleading because, at the very least, two members of the trial team in this case were part of what the Government has characterized as the Rabobank team.  [Tr. 2341:15-21.]  In addition, there is no basis on which the Government legitimately can avoid its *Brady* or discovery obligations by characterizing its global LIBOR investigation as being composed of separate parts.  As the Court recognized, "It's all LIBOR."  [Tr. 2351:1.]

### 2.   The Government Violated *Brady* by Failing to Disclose Goldman's Unwillingness to Participate

The Government's nondisclosure of information violates *Brady* when (1) the evidence at issue was favorable to the defendants; (2) the evidence was suppressed; and (3) the defendants were prejudiced by the Government's nondisclosure.  *See Strickler*, 527 U.S. at 281-82.  The Government's failure to make any disclosure concerning its communications with Goldman satisfies all three of these elements.

First, Goldman's refusal to participate in the Government's investigation was favorable for purposes of *Brady* because it was an exculpatory lead.  To be favorable under *Brady*, there is no requirement that the undisclosed information must in and of itself be admissible; rather, *Brady* requires disclosure of information that "'could lead to admissible evidence.'"  *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (quoting *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)).

The fact that Goldman, an alleged victim, refused to participate in the Government's investigation suggests that, contrary to the Government's theory of the case, Goldman did not view itself as a victim of the alleged scheme.  As the Court stated:

I would say this:  I would say that to the extent that the government is seeking to argue to the jury that any particular entity was a victim -- and apparently the government is seeking to argue that Goldman Sachs and Bank of America were victims -- then the government has an obligation, the Department of Justice has an obligation to go through all of its files in all cases.  And I did this -- I've been there, done that in the [*Cromitie*] case.  It has an obligation to go through all of its files and disclose information that would be exonerative to the defense of that position.  ***And it would be exonerative to the defense if those people had said to the government that they didn't want to be involved because they weren't victims.  It would be exonerative of the defense.  Because you are relying -- you are arguing that they are victims.  It is exonerative.***  It is *Brady* if you have in your files -- and I don't care if it's in the Deutsche Bank investigation or the Bank of America investigation or the Goldman Sachs investigation or the overarching LIBOR investigation -- if you have information tending to show that those banks were not in fact victimized.

[Tr. 2020:21-2021:16 (emphasis added); *see also* Tr. 2024:5-9 ("If you know that these people don't want to be involved because they don't feel like they're victimized, that's *Brady*, and the fact that it's written down or not written down, I've also written on this, means it has to be disclosed.").]

Second, there can be no dispute that the Government suppressed the evidence of its contacts with Goldman.  As noted above, Defendants made numerous requests to the Government seeking any notes or other information from communications with counterparty financial institutions.  Despite these requests, the Government did not disclose its communications with Goldman until the middle of trial.  [*See* Tr. 2346:10-2347:6.]  In fact, the Government did not voluntarily disclose the information in the *in camera* letter to the Court.  Rather, the Government's disclosure was prompted by a Court order after Defendants requested information because they did not receive any Jencks Act materials concerning some of the counterparty banks alleged to be victims in this case.  [Tr. 2018:8-2020:20, 2024:5-2025:11.]

Third, the Government's failure to disclose its communications with Goldman was material because it undermined confidence in the outcome of this case especially when viewed in

combination with the Government's other misconduct.  The Supreme Court identified the *Brady*

standard of materiality as follows:

> [A] showing of materiality does not require demonstration by a preponderance
> that disclosure of the suppressed evidence would have resulted ultimately in the
> defendant's acquittal (whether based on the presence of reasonable doubt or
> acceptance of an explanation for the crime that does not inculpate the defendant).
> [The] touchstone of materiality is a "reasonable probability" of a different result,
> and the adjective is important.  The question is not whether the defendant would
> more likely than not have received a different verdict with the evidence, but
> whether in its absence he received a fair trial, understood as a trial resulting in a
> verdict worthy of confidence.  A "reasonable probability" of a different result is
> accordingly shown when the government's evidentiary suppression undermines
> confidence in the outcome of the trial.

*Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (citations omitted).

While the Court ultimately struck the evidence related to Deutsche Bank's trades with

Goldman, in this circumstance, such relief is insufficient.  Like the pattern of prosecutorial

misconduct, the Government's *Brady* violation undermined confidence in the outcome of the

trial and tainted the entire case against Defendants. Moreover, based on the Government's failure

to disclose the Goldman communications, any claim by the Government that it has met its *Brady*

or discovery obligations with respect to communications it may have had with other financial

institutions alleged to be victims is highly suspect.

### D.   THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL CONTAINED A SERIES OF FALSE STATEMENTS IN ORDER TO AVOID ITS *BRADY* AND DISCOVERY OBLIGATIONS

The Government, in several pretrial filings, knowingly misrepresented the nature of its

relationships with its investigative partners—*i.e.*, the other domestic and foreign governmental

agencies that investigated Deutsche Bank's LIBOR submission practices—to avoid its *Brady* and

discovery obligations.  [*See, e.g.*, ECF Nos. 51, 60, 130.]  Prior to trial, some of these

misrepresentations were revealed by the *Kastigar*-related discovery and the Government was

obliged to write a letter of "apology" to the Court.  At trial, the *Garrity* hearing evidence demonstrated that the Government made additional misrepresentations to avoid its discovery obligations.  In fact, after learning of these misrepresentations, the Court noted its surprise as to the Government's coordination with the other investigative agencies.  [Tr. 2316:10-13 ("I didn't really grasp what went on here.  And believe me, I understand what the implications of a ruling are, and they go well beyond this case.").]

The full extent of the Government's misrepresentations about its interactions with its investigative partners is unknown because the Defendants have only received limited discovery about the Government's contacts with other agencies, largely as a result of the pretrial *Kastigar* hearing.[6]  Thus, to the extent the Court does not dismiss the case on the current record, a hearing is appropriate to determine the full scope of the Government's contacts with its investigative partners after Defendants receive full discovery concerning these contacts.

### 1.   The Government's Opposition to Defendants' Initial Discovery Motions Contained False and Misleading Summaries of Its Interactions with Other Governmental Agencies

At the Court's direction, the parties simultaneously briefed the question of the scope of the prosecution team.  Since, at that time, Defendants had not received any discovery from the Government revealing their communications with other investigative agencies, Defendants relied primarily on the public statements of cooperation contained in the various governmental press releases.  For example, the Government stated in its press release announcing charges against Defendants:

> The investigation leading to this case ***has required***, and has greatly benefited from, a ***diligent and wide-ranging assistance*** among various enforcement agencies both in the United States and abroad.  In particular, the department acknowledges and expresses its appreciation for this assistance from the

---

[6] But even this discovery is limited because the Government refused to provide any discovery prior to Mr. Black's October 3, 2013 FCA interview.  (*See* Levine Decl. Ex. 9.)

> Commodity Futures Trading Commission's Division of Enforcement, the U.K. Financial Conduct Authority and the U.K. Serious Fraud Office.  More than 20 individuals have been charged by the U.K. Serious Fraud Office for their roles in engaging in benchmark rate manipulation.

[ECF No. 54, Ex. 34 at 2 (emphasis added).]

The Government's Brief on the Scope of the Prosecution Team [ECF No. 51], and its Response to Defendants' Motion to Compel Discovery [ECF No. 60], contained outright falsehoods and half-truths designed to mislead the Court and Defendants about the Government's interactions with its investigatory partners, including the Commodities Futures Trading Commission ("CFTC"), the Securities and Exchange Commission ("SEC"), the United Kingdom's Financial Conduct Authority ("FCA") and other agencies (collectively, the "Prosecution Team").  Relying on these false statements, the Government argued that the Court should disregard the press releases, characterizing them as merely expressing "broad diplomatic statements of gratitude that should not be conflated with specific facts not discussed in the press releases" and should not "be considered legal admissions related to discovery law." [ECF No. 60 at 2.]

After the Court denied Defendants' Motion to Compel Discovery [ECF No. 61], Defendants renewed their motion to compel discovery and at the same time moved for a *Kastigar* hearing [ECF No. 117 (the "Amended Brady Motion")] following the Second Circuit's decision in *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017), and the Government's production of additional materials.  As detailed below, the Government's additional discovery demonstrated that its characterizations of its interactions with the Prosecution Team members contained multiple false statements and was woefully incomplete.

> (a) *The Government Falsely Stated that It Did Not Share Its Paperwork or Discuss the Resolution of Its Investigation with Other Prosecution Team Members*

In opposing Defendants' first motion to compel, the Government attempted to explain away the factual similarities between its settlement agreements and those of its investigative partners with the following statement:

> The Defendants also assume, based on the similarity of the various settlement paperwork with Deutsche Bank, that the independent agencies that settled with Deutsche Bank must have jointly investigated and then aligned their view of the facts and allegations.   But these factual similarities have a very simple explanation: the facts are the facts.   ***DOJ and these agencies did not share paperwork or have input on what resolution each agency should have (e.g. fine amount, violations, etc[.]).***   And while the various agencies – at the request of Deutsche Bank – coordinated on the timing of the resolutions to the extent possible, the settlement timing cannot, and this Circuit's precedent does not, support a finding that this was a joint investigation.

[ECF No. 60 at 2-3 (emphasis added).]   But the Government's production of Court-ordered *Kastigar* discovery revealed the falsity of the representations set forth in bold above.

These materials showed that the CFTC requested a draft of the FCA's Warning Notice to Deutsche Bank and stated that it "intend[ed] to pass the draft notice, either in entirety or only the P3/P11 portions, to the DOJ."  (Levine Decl. Ex. 10 at 2.)  The CFTC explained that "***[h]aving access to the draft warning notice will better assist both the CFTC and DOJ in assessing the scope of misconduct***, relevance to comparative conduct across multiple currencies, and further inform each agency as to the gravity of such conduct in relation to its own assessment of the evidence and potential resulting penalties."  (*Id.* (emphasis added).)

In response to the CFTC's request, the FCA sent an "excerpt from the current draft of [the FCA's] Warning Notice" to the CFTC and cautioned that it "contain[ed] facts derived from [the FCA's] compelled witness testimony."  (*Id* at 1.)  The CFTC subsequently forwarded the excerpt of the FCA's Warning Notice to Jennifer Saulino, the lead Government prosecutor at the

time.  (*Id.*)  The FCA later cautioned Ms. Saulino concerning the FCA's Notice use of compelled testimony:  "The reality is that even though we don't quote any compelled testimony in the Notice, it has influenced almost every aspect of the P3 and P5 findings so it would be very difficult to identify parts that weren't influenced by compelled testimony and even if we could, it would be such a small part that it would make the Notice meaningless."  (Levine Decl. Ex. 11 at 1.)

Similarly, Ms. Saulino sent the Government's "draft statement of facts," that it planned to attach to its deferred prosecution with Deutsche Bank, to Patrick Meaney of the FCA (the "Draft DPA").  (*See* Levine Decl. Ex. 12.)  Ms. Saulino explained:

> In deference to the FCA's need to plan for our proposed resolution, however, we are providing this draft to you in confidence.  Please note, this is the Statement of Facts that will accompany the DBAG DPA [*i.e.*, Deutsche Bank AG's deferred prosecution agreement].  The Statement of Facts for the subsidiary plea will be a subset of this draft focused only on the London conduct.

(*Id.* at 1.)  The email copied Alison Anderson and Richard Powers (who at one point was on the Government's trial team in this case) (*id.*), rendering any assertion that the Government had somehow overlooked this email in making its false representation to be meritless.

The *Kastigar* materials also contradict the Government's representation that the "DOJ and these agencies did not . . . have input on what resolution each agency should have (*e.g.*, fine amount, violations, etc[.]).''  [ECF No. 60 at 2-3.]  For example, the Government and FCA had several calls in which they discussed the terms of their proposed settlement and fine amounts with Deutsche Bank.  (*See, e.g.*, Levine Decl. Exs. 13-15.)  These included a call on January 22, 2015, involving, among others, Ms. Anderson, Mr. Powers and Special Agent McGillicuddy, for the specific purpose of discussing the "Deutsche Bank Loss Analysis."  (Levine Decl. Ex. 13 at DOJ-DB-KAST-0003529.)  According to the Government's notes, the FBI explained to the FCA the loss calculation it planned to use in connection with the contemplated settlement with

Deutsche Bank, as well as an impact analysis used to determine a global harm number.  (*Id.* at DOJ-DB-KAST-0003530.)  The FBI also, according to the Government's notes, stated that the impact analysis "calculation will have an impact on the fine" and "will be larger than UBS." (*Id.*)  The FCA responded that it "is very interested in seeing if this number is high [sic] than the UBS number and where it compares."  (*Id.*)

During a March 19, 2015 call, the FCA shared with the Government the expected value of its settlement with Deutsche Bank and certain terms of the proposed settlement.  (*See* Levine Decl. Ex. 14.)  And on a March 31, 2015 call, the Government shared its proposed settlement terms with Deutsche Bank, including fine amounts and discussed how those amounts compare to LIBOR settlements with other institutions.  (*See* Levine Decl. Ex. 15.)  As reflected in the notes of the call, Ms. Saulino advised the FCA:

> [W]e do have a proposal that the Department made to the Bank yesterday afternoon.  I can go through the terms, then any details you might need.  The terms are a deferred prosecution agreement (DPA) for Deutsche Bank. . . .  We are also proposing a guilty plea for DB Group Services UK Limited. . . .  The charges included in our DPA are a wire fraud charge and an antitrust charge.  The charges in the sub-plea are wire fraud charges.  We are also seeking a corporate monitor, which is based on our lack of confidence in the Bank's internal processes with regard to remediation.  Those are the terms.  The fine we are seeking is $1 billion.  It is appropriately proportional with other resolutions in the LIBOR matter.

(*Id.* at DOJ-DB-KAST-0003536.)

After Mr. Black introduced some of this evidence during the first day of the *Kastigar* hearing [*see* Dec. 13, 2017 *Kastigar* Tr. 65-71], the Court commented on the Government's misrepresentations, stating:

> And while I must say, now that you all are here – and Ms. Sipperly is on the phone – I'm not thrilled with the way I've been treated by the trial team.  I'm not thrilled at being given information that later has to be taken back by the government, or isn't taken back by the government but turns out to be demonstrably false.

[Dec. 14, 2017 *Kastigar* Tr. 4:4-9.]   While purporting to defend its actions [*see id.* 4:10-15, 11:1-7], the Government proposed to send an "apology" letter to the Court in connection with its prior misrepresentations.  [*Id.* 12:13-15.]

The Government's supposed apology for its false statements, however, fell far short of an actual apology or acknowledgement that it knowingly misrepresented its contacts with the FCA to avoid its *Brady* and discovery obligations.  [*See* ECF No. 176.]  Instead, the Government characterized its representations as "imprecise" and attempted to explain away its misrepresentation as follows:

> The representation as to sharing paperwork made in earlier briefing was intended to rebut the notion that the DOJ and FCA actually collaborated on their respective statements of facts and essentially co-authored work product as part of a unified team.  In responding to that point, the government intended to convey that the DOJ and the FCA did not share paperwork in order to have identical factual conclusions through the sort of back-and-forth exchange of draft charging documents that defense counsel has suggested, and one would expect to see, between two members of a joint prosecution team.

[*Id.* at 1-2.]  Notably, in attaching materials to its "apology" letter, the Government neglected to attach an April 21, 2015 email from Mr. Meaney to Ms. Saulino following up on the Government's disclosure of its draft Statement of Facts.  (*See* Levine Decl. Ex. 11.)  In this email, Mr. Meaney stated that he had "reviewed the draft Statement of Facts to go with your order and confirm[ed] that it is very consistent with the findings in our Notice except your time period for USD goes back to 2003 and ours goes back to 2005 and you make reference to the Euribor submitters and we do not." (*Id.*)  Thus, contrary to the Government's representation in its "apology," Mr. Meaney's follow up email reflects that the purpose of the FCA's request for the Government's settlement paperwork was, in fact, to ensure that the factual findings in their respective settlements were consistent.

      (b)      *The Government Misrepresented the Nature of Its Communications with the Prosecution Team*

Absent from the Government's "apology" letter was any acknowledgement that it also misrepresented the scope of its communications with the FCA, CFTC and other Prosecution Team members, which, as detailed below and *infra* § I(F), were "intensive[]." (*See, e.g.*, Levine Decl. Ex. 16 at DOJ-DB-KAST-0004158.)   In opposing Defendants' first Motion to Compel, the Government falsely described the nature of its interactions with the members of the Prosecution Team as being limited to non-substantive communications about the case.  [*See* ECF No. 51 at 9.]

For example, in addition to understating the number of joint interviews with the CFTC and the FCA [*see infra* § I.D.1(c)], the Government described its contacts with the CFTC as being limited to receiving documents from the CFTC based on an access letter request, discussions about which individuals each planned to interview as well as the logistics of such interviews and discussions concerning the timing of resolutions.  [ECF No. 51 at 11-12.]  As to the FCA, the Government characterized its interactions as limited to "discussions about interviews that focused on reducing any potential negative impact on the other's investigation." [ECF No. 51 at 9.]   The Government's Prosecution Team-related filings also disclaimed participation in any strategic discussions with the CFTC and FCA.   The Government affirmatively stated that it "did not discuss its strategy for prosecuting this case with the FCA" [*id*. at 10] and that it "did not direct either the FCA or the CFTC on what to request or gather for their separately issued document requests and did not strategize about what the DOJ needed and would request for its case."  [ECF No. 60 at 2.]

But even the limited discovery produced in connection with the *Kastigar* hearing demonstrated that the Government had repeated interactions with Prosecution Team members

during which they discussed investigative strategy and other substantive matters, including numerous calls, meetings and social engagements.  These include, but are in no way limited to, the following examples:

- On January 31, 2014, the FCA wrote to the Government, among others, to inform them that the FCA was "chang[ing] the scope of [its] investigation" and would be "happy to discuss[.]"  (Levine Decl. Ex. 17 at DOJ-DB-KAST-0001289.)

- On March 28, 2014, the FCA requested that the Government send "an email setting out what you think the priorities in respect of audio should be and then we can look at in terms of our priorities;" the Government responded three days letter in an email to both the FCA and CFTC attaching a document entitled "Deutsche Bank Production Priority List" that was "organized . . . by category."  (Levine Decl. Ex. 18 at DOJ-DB-KAST-0000441-42.)

- On May 7, 2014, nearly three months before James King's first proffer, the Government provided the FCA with "documents we propose to provide to Mr. King's U.S. lawyer in connection with our ongoing discussion."  The next day, the FCA responded by suggesting and attaching an additional document.  (Levine Decl. Ex. 19 at DOJ_DB_KAST_0000234-35.)

- On March 2, 2015, the FCA sent the DOJ and CFTC an email providing a "list of topics" to be discussed at a meeting between the three Prosecution Team members later that week; the list of topics included, but was not limited to:  "LIBOR and EURIBOR misconduct - currencies, time periods, frequency of making requests (number of requests), frequency of taking requests into account, frequency of taking own positions into account;" "Broker requests;"  whether "DN," *i.e.*, David Nichols, [a member of Senior Management], "was involved in the misconduct;" "[a]reas not likely to be included in our notice;" and getting the Government's views on "'[s]etting the tone' in USD"  (Levine Decl. Ex. 20 at DOJ-DB-KAST-0004180; *see also*  Levine Decl. Ex. 21 at 3.)

- On April 24, 2015, the FCA, DOJ and CFTC emailed congratulating each other on the global Deutsche Bank settlements and stating: "This brings an end to the big LIBOR firm case but I am sure we will interact again, but probably not as intensively as in the past." (Levine Decl. Ex. 16 at DOJ-DB-KAST-004158).]

> (c)    *The Government Misrepresented the Number of Joint Interviews that it Conducted with Prosecution Members*

In their Amended Brady Motion, Defendants pointed out that, based on a recent Government production, it was clear that the Government had significantly understated the number of joint interviews it conducted with Prosecution Team members in prior briefing.  [ECF

No. 117 at 24.]  The Government represented that in connection with its "investigation into manipulation of the LIBOR at Deutsche Bank": (1) the "FCA investigators attended two out of the thirty-four DOJ interviews related to this case;" (2) it did not "conduct any joint interviews with[] the SEC;" and (3) "the CFTC participated in thirteen of the thirty-four interviews related to Deutsche Bank."  [ECF No. 51 at 5, 9, 12.]  After the Court had ruled on Defendants' first Motion to Compel Discovery, the Government produced additional memoranda of investigation that revealed that it conducted at least 11 joint interviews with the FCA, 54 joint interviews with the CFTC and 11 joint interviews with the SEC.  [ECF No. 117 at 24.]

In its Response to the Amended Brady Motion, the Government defended its understatements, arguing that its disclosure was limited to interviews related to the Deutsche Bank-portion of the global LIBOR investigation only.  [ECF 130 at 18-19.]  But the Government's explanation for its deceptive conduct is contrary to law because the Government's discovery and *Brady* obligations extend to materials and information in its possession or of which it has actual knowledge, regardless of whether the Government, after-the-fact, misleadingly characterizes its global LIBOR investigation as being comprised of distinct parts. *See, e.g.*, *United States v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) ("Defendants' due process rights are violated when the Government knows of favorable information and withholds it.  To protect a defendant's right to due process, the Government must disclose favorable material-evidence when it is in the Government's knowledge or possession." (internal citations omitted).

The Government's justification for its false statements also conflicts with its later representations to the Court about the scope of this case.  Specifically, the Government argued, *inter alia*, that the Court should reject Defendants' proposed jury instruction that "the case

involves only one bank and one currency" on the ground that the instruction was "inaccurate." [ECF No. 304 at 4 (recognizing at the *Curcio* hearing that the Government knew that Morgan Stanley was part of this case "since day 1" "because it's all one market. It's all a seamless web.").]   And at trial, the Government repeatedly sought to introduce evidence concerning Rabobank employees, including Anthony Allen (whose conviction was reversed by the Second Circuit on appeal) and Lee Stewart (a Government cooperator).  [*See, e.g.* Tr. 4618-23 (King); 1612:17-1613:4 (Curtler); GX 1-080; GX 1-085.]

As discussed *supra* § I(C), the Government notably reverted to the "one bank" theory during a mid-trial argument in which it attempted to defend its failure to disclose exculpatory evidence concerning the refusal of Goldman Sachs—an alleged victim in this case—to participate in the Government's investigation.  Therefore, when it came to the Government's discovery and *Brady* obligations, the Government narrowly defined the contours of the LIBOR investigation as limited only to Deutsche Bank.  But when it came to its proof in this case, the Government rejected the suggestion that this case was limited to "one bank" and, as discussed below, misleadingly argued to the jury that not just Deutsche Bank's trades with its counterparties, but the entire financial system, was riding on Defendants' alleged conduct.  [*See infra* § II(H).]

2.     **The *Garrity* Hearing Further Revealed the Misleading Nature of the Government's Representations About Its Interactions with the Prosecution Team**

The evidence related to the *Garrity* hearing, as well as the hearing testimony of Walter Ricciardi, further demonstrated that the Government misrepresented its interactions with the Prosecution Team to avoid complying with its discovery obligations.  As revealed during the *Garrity* hearing and as discussed in further detail below [*see infra* § II(E)], the evidence revealed that the Government and the CFTC jointly outsourced substantial portions of the investigation to

counsel for Deutsche Bank, Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss").  [*See,
e.g.*, DX 9072 at 1; Tr. 1484:19-1485:1, 1493:20-23, 1496:1-19, 1503:17-23, 1527:20-1528:5,
1533:22-25 (Ricciardi).]   The Government and the CFTC jointly supervised and directed Paul
Weiss's investigative activities through, *inter alia*, periodic meetings and calls.   [*See, e.g.*,
1527:24-1528:5 (Ricciardi).]   Deutsche Bank provided the following description of these joint
contacts with the Government and CFTC:

> The Bank's substantial efforts to provide the DOJ with the fruits of its
> investigation in real time over a period of years clearly demonstrate the depth of
> its commitment to cooperation.  Since May 2010, the Bank has held at least 230
> telephone calls and 30 in-person meetings with the DOJ (and the CFTC).  And for
> the last 14 months, the Bank has held joint weekly "update" calls with the DOJ
> and the CFTC designed to provide each with the latest developments in the
> investigation and an opportunity to follow up on prior discussions and make new
> requests.

[DX 862 at 49.]   Remarkably, the Government said nothing about these contacts in its various
descriptions of its interactions with the Prosecution Team, nor in its "apology" letter, and did not
produce what Defendants believe to be significant materials related to this internal investigation.

* * * *

While the Government has only produced limited discovery concerning its interactions
with the Prosecution Team, such discovery reveals that the Government's representations as to
the scope of those interactions are replete with false and misleading statements that allowed the
Government to avoid complying with its *Brady* and discovery obligations.   Defendants submit
that, based on the current record, the Court should vacate the convictions and dismiss this action
based on prosecutorial misconduct or, alternatively, conduct an evidentiary hearing after full
discovery to determine the full scope of the Government's interactions with the Prosecution
Team.

E.     THE GOVERNMENT MISLED DEFENDANTS AND THE COURT REGARDING ITS
       ACCESS TO AND ABILITY TO PRODUCE BBA MATERIALS

Defendants repeatedly requested that the Government produce *Brady* material concerning

the BBA's knowledge that LIBOR panel banks considered their trading positions.   The

Government insisted that it had done a diligent search and that it produced all the requisite

documents.   However, the Government never produced the information underlying the FDIC's

allegations that the BBA was aware of the practice of panel banks taking into account their

trading positions when submitting LIBOR.

The FDIC's Particulars of Claim filed in the United Kingdom, FL-2017-000002 ("FDIC

Complaint") alleged that John Ewan, the BBA LIBOR Director, reported that it was a "*construct*

*of the market [and] in the interests of the banks*" to have a LIBOR "set at three to four basis

points above the actual market rate."  [ECF No. 138, Ex. 1 ¶ 74(1)(c) (emphasis in original).]  It

further alleged that the BBA "directed" and "facilitated" conduct similar to what was alleged in

the Indictment; these allegations were seemingly substantiated by the materials that Defendants

repeatedly sought, in particular those from the post-2007 time period.  [*See* ECF No. 182 at 10

(citing paragraphs of the FDIC Complaint).]

The Government did not respond to the FDIC's allegations concerning the BBA by

conducting a diligent, good-faith search for these documents and providing them to Defendants.

Instead, the Government feigned ignorance of the FDIC Complaint at a November 30, 2017

status conference, even though it was filed in July 2017 and was attached to Defendants' Reply

Memorandum of Law in Support of Their Motion to Compel, filed in September 2017.[7]

---

[7] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[*See* ECF Nos. 137 at 4, 138, Ex. 1.]  In fact, the Government defended its *Brady* violation on the ground that the FDIC was "not the United States Department of Justice" and that it therefore had no discovery obligation.  (Nov. 30, 2017 Tr. 21:11-23.)  As the Court rightly noted, it strained credulity that the FDIC Complaint "was kept secret from the Department of Justice," and the FDIC Complaint's contents suggested that the Government "ha[d] evidence in [its] possession about the BBA's knowledge."  (*Id.* 21:24-22:18.)  In response, the Government represented, "To the extent that there is something with the FDIC filed, we'll look at it immediately."  (*Id.* 35:22-23.)

That production never came.  Instead, the Government claimed, "[b]ecause the FDIC is not a member of the prosecution team, the government did not have an obligation to seek discovery from the FDIC."  [ECF No. 159 at 9 n.5.]  It further claimed that "to the extent that there is evidence that the BBA had any knowledge or suspicion of inaccurate submissions, that ***almost exclusively*** relates to low-balling and not the trader manipulation alleged in this case." [*Id.* at 8 n.4 (emphasis added).]  *Brady*, however, does not deal in "almost exclusively."  Rather, it is "based on the requirement of due process," *United States v. Bagley*, 473 U.S. 667, 675 (1985), and is a right that "the Constitution provides as part of its basic 'fair trial' guarantee," *United States v. Ruiz*, 536 U.S. 622, 628 (2002).  The Government's failure to satisfy its *Brady* obligations, even according to its own briefing, violated Defendants' rights.[8]

---

███████████████████████████████████████████████████████████████████████.

[8]   It is Defendants' understanding that the Court never ruled on this issue, and the Government was therefore never compelled by Order of the Court to communicate with the FDIC and share the documents that supported its claims against the BBA.  But the Court's admonition in November 2017 made clear—as does *Brady* and its progeny—that the Government had a responsibility to search the FDIC's files for *Brady* material and make the appropriate production. To our knowledge, that never occurred, irreparably prejudicing Defendants.

This issue with regard to BBA documents extends beyond those related to the FDIC Complaint. In August 2017, after Defendants moved to compel the production of BBA materials [ECF No. 117 at 8-12], the Government responded that it was not withholding any such materials, claiming that its "diligent, good faith search for these documents" did not identify any exculpatory documents for production. [ECF No. 130 at 8.] But three months later, on October 27, 2017, the Government produced over 1,000 pages of documents relating to the BBA, including transcripts of testimony given by Mr. Ewan and Sally Scutt, another BBA employee. (*See* Levine Decl. Ex. 22.) This production not only undermines the Government's previous representation to the Court and Defendants regarding BBA discovery, but also calls into question its subsequent insistence that it did not have any further *Brady* material to produce.

The Court indeed noted the problems with the Government's approach to *Brady* material, cautioning the Government that it "may be playing matters a little too close to the vest for comfort" and noting that the Government's position "ignore[d] the fact that evidence relating to [BBA knowledge] could be introduced for the limited purpose of creating a reasonable doubt about a defendant's intent to defraud." [ECF No. 145 at 26-27.][9] As a final warning, the Court told the Government that "it may find itself in an uncomfortable position during trial—and even afterwards, should it be discovered after a conviction that potentially exculpatory material was not turned over." [*Id.* at 27.] Now, we are at that point. Defendants maintain that the

---

[9]   For example, Defendants were able to obtain on their own a letter from the Chicago Mercantile Exchange ("CME")—one of the largest global derivatives exchanges [Tr. 2060:3-14]—*to the BBA*. [*See* DX 9044A.] In that letter, the CME expressed its understanding that LIBOR submissions fall within a range—a matter critical to the theory of prosecution in this case. [*Id.* at 7] While this document was never produced by the Government, on cross-examination, Special Agent McGillicuddy acknowledged becoming aware of the letter in the course of investigating this case: "Yes, I had seen this [CME] document as case agent [Tr. 2437:4-10 (McGillicuddy).] While Defendants were able to locate this document on their own, the Government should have produced it, and other likely critical *Brady* material that exists, to Defendants in a timely way.

Government failed to investigate and turn over exculpatory material relating to the BBA's knowledge and that failure contributed to unjust convictions. And this decision by the Government was just a single part of the ongoing and systematic misconduct that animated the entire prosecution.

### F. THE GOVERNMENT ACTIVELY HID EVIDENCE IN CONNECTION WITH THE PRETRIAL *KASTIGAR* HEARING

The Government also engaged in systematic misconduct in the context of the pretrial *Kastigar* briefing and hearing. First, the Government withheld evidence concerning the extent of FCA representative Michael Prange's involvement in the proffer of James King ("King Proffer"). Second, the Government concealed that former lead prosecutor Jennifer Saulino received a draft of the FCA Notice documenting the terms of the FCA's resolution with Deutsche Bank (the "FCA Notice"). Third, the Government filed a letter from the FCA containing a number of misrepresentations concerning, among other things, the sharing of Mr. Black's compelled testimony. And fourth, trial team member Alison Anderson filed a misleading declaration that omitted any reference to her involvement in the King Proffer.

#### 1. The Government Withheld Evidence that Mr. Prange Asked Questions at Mr. King's Proffer

In opposing Mr. Black's motion for a *Kastigar* hearing, the Government falsely understated the scope of the FCA's involvement in the King Proffer, and then attempted to cover up its false representations by (i) concealing evidence in violation of its *Brady* and discovery obligations; and (ii) filing false and misleading sworn statements. Specifically, the Government stated in its brief opposing Mr. Black's *Kastigar* motion that "the FCA lawyer who sat in during James King's proffer [*i.e.*, Mr. Prange] asked only a small handful of clarifying questions, and did not discuss Black's compelled testimony with King." [ECF No. 131 at 13; *see also* ECF No. 145 at 21-22 (relying on the Government's representation as to Mr. Prange's involvement at

Mr. King's proffer).]   As was ultimately revealed, this statement was misleading because Mr. Prange assisted the Government in preparing for the King Proffer, which included sending Jennifer Saulino, the prosecutor who led the questioning of Mr. King, an email containing a written "list of questions" for Mr. King (the "Prange Questions") in advance of the proffer.  (*See* Levine Decl. Ex. 24.)  The Government, however, did not disclose Mr. Prange's assistance in preparation for the proffer.  Rather, it attempted to cover up its false statement by not producing to Mr. Black the Prange Questions or the FBI reports that would have revealed the existence of those questions, and by filing a misleading sworn statement from Ms. Saulino that omitted any reference to the Prange Questions.

Prior to the *Kastigar* hearing, the Government made numerous productions of documents, including emails between the Government and the FCA.  None of these productions contained Mr. Prange's email to Ms. Saulino setting forth the Prange Questions.   In addition, the Government refused to produce any Jencks Act materials—which would have undermined the Government's representation—for its hearing witnesses on the ground that such materials were not discoverable.  [*See* ECF No. 171.]

The parties proceeded with the initial part of the *Kastigar* hearing on December 13 and 14, 2017 (the "December Hearing").  At the December Hearing, the Government introduced a number of sworn declarations from current and former Department of Justice employees, including Ms. Saulino.  Neither Ms. Saulino nor any of the other affiants made any reference to the Prange Questions in their declarations.  [*See* ECF No. 158, Exs. 1-32; ECF No. 170 Exs. 33-34.]  The Government also made no mention of the Prange Questions and frivolously opposed Mr. Black's motion for the production of Jencks Act material, notwithstanding that its production letters stated it was producing the materials "pursuant to the Government's Rule 16(a)

of the Federal Rules of Criminal Procedure, *Jencks*, *Brady*, and *Giglio* obligations." (*See* Levine Decl. Exs. 25-27 (emphasis added).)

Following the December Hearing, the Court ordered the Government to produce Jencks Act materials to Mr. Black in connection with the remainder of the *Kastigar* hearing (which had been adjourned due to Mr. Prange's unavailability). [*See* ECF No. 175 at 2 ("Moreover, I do not agree with the Government that the Jencks Act is not applicable at this *Kastigar* hearing, for substantially the reasons articulated by Mr. Levine in his letter dated December 21, 2017.").] Mr. Black received the Government's Jencks Act production on February 14, 2018, and quickly realized that the Government's prior productions were deficient and that its representation concerning Mr. Prange's involvement at the proffer were false.

The Government's Jencks Act production included FBI 302s documenting statements made in connection with the Government's November 16, 2017 interview of Mr. Prange, and December 1, 2017 interview of Ms. Saulino, both of which referenced the Prange Questions and both of which occurred prior to the December Hearing. (*See* Levine Decl. Exs. 58 at 3 & 28 at 4). The FBI 302 for Ms. Saulino's interview states:

> Saulino did not recall receiving an e-mail from Prange which listed questions Prange wanted to ask of King. ***After reviewing the e-mail during the interview***, Saulino stated she did not think the e-mail contained any information or questions she would not have planned to ask. Saulino did not recall doing anything with the information when she originally received the e-mail.

(Levine Decl. Ex. 28 at 4 (emphasis added).)

Ms. Saulino's statements not only demonstrated that the Government had violated its *Brady* and discovery obligations in failing to produce the Prange Questions in advance of the December Hearing, they also established that Ms. Saulino's declaration dated December 6, 2017—***just five days after she reviewed the Prange Questions at the proffer***—was misleading. In her declaration, Ms. Saulino swore:

> I have read the portion of the Court's October 19, 2017 Decision and Order on
> Defendants' Pretrial Motions that refers to the proffer of James King.  I led the
> questioning at that proffer.  I recall that Mr. Prange of the FCA attended that
> proffer, but I do not recall him asking any questions.

[ECF No. 158, Ex. 22 ¶ 14.]   Given that the Government showed Ms. Saulino the Prange Questions during her December 1, 2017 FBI interview, it is not plausible that Ms. Saulino merely forgot about the Prange Questions at the time she swore to her declaration.  (*See* Levine Decl. Ex. 28 at 4; *see also* ECF No. 158, Ex. 22 ¶ 14.)  Nor is it plausible that the Government forgot these questions when it filed Ms. Saulino's misleading declaration with the Court.  That Mr. Prange asked questions in advance rather than at the King Proffer is of no distinction. Ms. Saulino's declaration should have included a reference to the Prange Questions—especially in light of Ms. Saulino's explicit reference to that portion of the Court's October 19, 2017 decision concerning questions asked by Mr. Prange.  [ECF No. 158, Ex. 22 ¶ 14.]  Moreover, the Government should have brought to the Court's attention the existence of this evidence at the December Hearing, rather than resisting making an additional production of materials that the Government knew at the time would have revealed to Mr. Black the existence of the Prange Questions.  [*See* ECF No. 171.]

Ultimately, the Government informed Mr. Black that its failure to produce the Prange Questions was the result of a "technical error," and produced the Prange Questions on March 5, 2018, as part of a production of approximately 3,220 pages, many of which were not previously produced.  (*See* Levine Decl. Exs. 29-31.)  In addition to the Prange Questions, this production revealed that the Government and the FCA had several communications and held several meetings in advance of the King Proffer, all of which cast further doubt on the veracity and completeness of Ms. Saulino's declaration.  (*See, e.g*., Levine Decl. Exs. 19, 24 & 32.)

### 2. The Government Concealed Evidence that the DOJ Received a Draft of the FCA Notice

Ms. Saulino's declaration was also misleading because it did not disclose that she received a draft of the FCA Notice. Ms. Saulino attested: "I never received any transcripts or summaries of the compelled testimony of Mr. Black. I did not read or review his compelled testimony, and I was not and am not, aware of any statements Mr. Black made to the FCA in his compelled testimony." [ECF No. 158, Ex. 22 ¶ 8.]

But, as discussed *supra* § I(D)(1)(a), on March 4, 2015, Ms. Saulino received an excerpt of the draft FCA Notice from James Huth of the CFTC, which contained compelled testimony. (*See* Levine Decl. Ex. 10.) That same day, Ms. Saulino, as well as Ms. Anderson and Mr. Powers, attended a meeting between the Government, the CFTC and the FCA. (*See* Levine Decl. Ex. 20 (referencing meeting scheduled on March 4, 2015.) This meeting was not disclosed in any of the *Kastigar* declarations [*see* ECF No. 158, Exs. 1-32; ECF No. 170 Exs. 33-34], and there is nothing in the record from which the Court can glean what information was shared between the attendees at the meeting.

Accordingly, the Government misleadingly failed to disclose Ms. Saulino's receipt of the draft FCA Notice, as the Court previously recognized:

> THE COURT: Everybody always tells -- everybody from the United States Attorney's office and from the Department of Justice always tells me there was no intention to offend, we did not intend to offend. There was an intention to draft Ms. Saulino's affidavit, which you guys drafted. There was an intention to draft her affidavit without any reference to that email, without her saying what Curtler said, Oh, I got this one's trial testimony and that one's trial testimony and somebody else's trial testimony, oh, and I read the FCA notice. There wasn't anything from Jennifer Saulino about how, well, they sent us -- Mr. CFTC sent me a copy of the P3 and the P11 draft findings and I said, 'No, don't send those to me,' or I said, 'Oh, OK. Well, I can read these because these don't have anything to do with what Gavin Black is indicted for doing.' There is nothing, you know. And it never occurred to you that I wouldn't find this of some modicum of interest?

[April 24, 2018 *Kastigar* Tr. 308:13-309:5.]

### 3.  The FCA Letter Was False

In opposition to Mr. Black's motion for a *Kastigar* hearing, the Government also submitted a letter from FCA representative, Patrick Meaney, dated August 30, 2017 (the "FCA Letter"), which contained a number of misrepresentations that the Government and FCA ultimately acknowledged.  [*See* ECF No. 244 & Ex. 1.]

The FCA Letter falsely stated that: "The FCA did not provide copies of its draft or actual Warning, Decision or Final Notice in respect of Deutsche Bank to the DOJ or the [CFTC] nor did it discuss the substance of these notices pertaining to compelled testimony with those agencies."  [FCA Letter ¶ 5.]  This statement was false because, as discussed above, the FCA sent an "excerpt from the current draft of [the FCA's] Warning Notice in response to a CFTC request on behalf of itself and the DOJ," which was later forwarded to Ms. Saulino.  (*See* Levine Decl. Ex. 10.)

The FCA Letter also stated: "At the request of the DOJ, the FCA did not share any information obtained or derived from any compelled interview, including that of Mr. Black, with the DOJ."  [FCA Letter ¶ 6.]  But, in fact, Mr. Meaney had no basis for making any such representation because, as he advised the Government in an April 2015 email:

> The reality is that even though we don't quote any compelled testimony in the Notice, it has influenced almost every aspect of the P3 and P5 findings so it would be very difficult to identify parts that weren't influenced by compelled testimony and even if we could, it would be such a small part that it would make the Notice meaningless.

(Levine Decl. Ex. 11.)

Moreover, the FCA Letter contained several false representations concerning the sharing of Mr. Black's compelled testimony.  For example, Mr. Meaney stated that the FCA did "not provide[] Mr. Black's transcript to any other Deutsche Bank individual apart from Mr. Black."

[FCA Letter ¶ 2.]   But in a subsequent interview with the Government in November 2017,

Mr. Meaney acknowledged that, in 2014 or 2015, he "may have discussed topics from compelled

testimony, and/or provided transcripts of the testimony to DB's defense council during court

proceedings."   (Levine Decl. Ex. 33 at 4.)   Mr. Meaney also falsely stated that the FCA

"provided a copy of Mr[.] Black's interview to the United Kingdom's Serious Fraud Office on

23 January 2017."   [FCA Letter ¶ 2.]   But, as Mr. Meaney later disclosed to the Government:

> after reviewing records at the FCA, he determined the FCA did indeed provide
> records related to the investigation to the SFO on two occasions.   Records were
> provided to the SFO taint team on September 9, 2015.   Records were again
> provided to individuals from the SFO not on the taint team in January 2017.

(Levine Decl. Ex. 59 at 2.)

Accordingly, the FCA Letter is replete with false and misleading statements as the

Government should have recognized prior to submitting it to the Court.   As the Court stated:

> THE COURT: Well, you have to admit that you say there is no inconsistency, that
> the first letter was incomplete.   I would say were I to accept your representation --
> which, by the way, I do not -- woefully incomplete might be an adequate way of
> describing the first letter.   Woefully incomplete.   I see an inconsistency.
>
> MS. SHAW: Very well, your Honor.   I would submit, however, one difference
> between the two and sort of the format, is that Mr. Meaney drafted that first letter
> to us without --
>
> THE COURT: Right, because you hadn't gone over there and done what the
> lawyers from the United States Department of Justice do, which is put your
> witness through his paces.   Guess what, I made an unwarranted assumption.   I
> could not believe that the United States Department of Justice would be so
> careless as to submit to me a document -- not under oath but that was being
> proffered in lieu of a document under oath -- from somebody who was essentially
> its witness without talking to the witness, prompting the witness, asking questions
> of the witness, getting the witness's full story.   I think you and I would be in
> agreement that Mr. Meaney's letter of last August would have read rather
> differently if you had had with him in July the conversation that you obviously
> had with him in November.   And I actually -- based on my prior dealings over the
> last 19 years with the Department of Justice -- thought that you had. E I thought
> you had.

[Dec. 13, 2018 *Kastigar* Tr. 54:18-55:18.]

4.      **Ms. Anderson's Misleading Declaration**

Ms. Anderson also authored a misleading declaration in connection with the *Kastigar* hearing.  Notably, Ms. Anderson's declaration failed to mention her involvement in the King Proffer in any respect.  [*See* ECF No. 158, Ex. 1.]  But discovery produced after the Government filed this declaration made clear that Ms. Anderson (i) prepared the Government's interview outline for the King Proffer (Levine Decl. Ex. 28 at 4); and (ii) was the source of the Government's assertion that Mr. Prange asked only "a handful of questions," [April 24, 2018 *Kastigar* Tr. 309:5-23.]

With respect to Ms. Anderson's involvement in the preparation of the King Proffer, Mr. Black only learned of that activity after the December Hearing when the Government produced Ms. Saulino's 302 reflecting that Ms. Anderson "wrote the King interview outline." (Levine Decl. Ex. 28 at 4.)  The Government subsequently produced additional materials following discovery of its "technical error" (Levine Decl. Ex. 30) that showed that Ms. Anderson received e-mail communications and attended meetings between the FCA and the Government in the lead up to the King Proffer, including e-mails and calls with Mr. Prange.  (*See, e.g.*, Levine Decl. Exs. 19 & 32.)

Ms. Anderson's declaration was also misleading in that it did not disclose that Ms. Anderson was the source of the Government's assertion that Mr. Prange asked only "a handful of questions."  [April 24, 2018 *Kastigar* Tr. 309:5-23.]  At the continuation of the hearing held on April 24, 2018, the Government was forced to admit that Ms. Anderson was the source of the Government's statement that initially led to the Court's ordering of the *Kastigar* hearing.  [*Id.*]  The Government, therefore, was forced to file a corrected Anderson declaration, which states:

> I recall that during one break, Mr. Prange requested that Ms. Saulino ask Mr. King to clarify something that he had said earlier in his interview.   My recollection is that the general subject of the statements that Mr. Prange wanted to have further explained pertained to the derivatives traders' 3s1s basis position, but I do not recall the specific statements or what questions Ms. Saulino asked in response to Mr. Prange's request.

[ECF No. 253, Ex. 1A ¶ 4.]   The fact that the Court had to order a member of the trial team to file a corrected declaration—no less concerning the fundamental reason for the *Kastigar* hearing in the first place—is a perfect proxy for the Government's systematic and pervasive misconduct throughout this case.

## II.   THE GOVERNMENT'S KNOWING USE OF FALSE TESTIMONY AND TRIAL MISREPRESENTATIONS WARRANT VACATUR OF CONVICTIONS AND DISMISSAL OF THE INDICTMENT

At trial, the Government engaged in misconduct by knowingly misrepresenting the nature of the evidence and eliciting false testimony.   This misconduct came in various forms, including, but not limited to:   false, inflammatory and prejudicial statements made in the Government's opening; the deliberate elicitation of false testimony; and inducing a trial witness to sign perjurious certifications to mislead the Court and Defendants concerning the admissibility of certain business records.

"The fundamental unfairness of a conviction obtained through the use of false evidence has been long recognized by the Supreme Court."   *United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997) (collecting cases).   As such, the Due Process Clause prohibits the Government from obtaining a conviction based on the introduction of false or misleading evidence.   *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Vozzella*, 124 F.3d at 392-93.   The due process protection applies both to the Government's knowing introduction of false evidence and its failure to take action to correct false evidence of which it is aware that has otherwise been introduced in a criminal case.   As the Supreme Court has stated:

> [I]t is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. . . .  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue*, 360 U.S. at 269 (internal citations omitted).  In fact, because the Government's knowing use of false testimony to obtain a conviction is "repugnant to the Constitution," *Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003), the Second Circuit has "interpreted Supreme Court precedent as holding that 'if it is established that the government knowingly permitted the introduction of false testimony reversal is ***virtually automatic***.'"  *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) (emphasis added) (quoting *Shih Wei Su*, 335 F.3d at 127).

Moreover, the Government is not required to have actual knowledge of the evidence's falsity to violate due process.  Rather, the Due Process Clause also prohibits the Government from introducing evidence that it "should have known" was false.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Vozzella*, 124 F.3d at 392-93.  When the Government is on notice that certain evidence may be false, the Government must proceed with "great caution" and cannot consciously avoid determining the falsity of such evidence. *United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) (finding a due process violation where the government consciously avoided confirming that its witness committed perjury); *see also Vozzella*, 124 F.3d at 392-93 (reversing a conviction based on misleading testimony concerning records that the government, but for its willful ignorance, should have known was false).

As shown below, the Government violated Defendants' constitutional rights at the trial in this matter because it committed prosecutorial misconduct through the repeated use of false and misleading evidence and arguments that prejudiced Defendants.  *See United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987) (setting forth "three factors to determine whether prosecutorial misconduct caused the accused substantial prejudice:  the severity of the misconduct; the

50

measures adopted to cure the effects of the misconduct; and the certainty of conviction in its absence.").  Given that the Government's misconduct was intentional and the trial evidence should leave the Court with serious concern that Defendants are innocent of the crimes with which they were charged, the Government's conduct, either alone or in combination with its false statements prior to the trial in this matter, should result in the vacatur of Defendants' convictions and the dismissal of this case.  In the alternative, the Court should grant Defendants a new trial because the Government knowingly elicited and used false evidence that went to the heart of the Government's alleged scheme and in all "reasonable likelihood" affected the judgment of the jury.  *See United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013).

### A.    THE GOVERNMENT ELICITED FALSE TESTIMONY AND MISLEADINGLY ARGUED TO THE JURY THAT MR. BLACK'S REQUESTS WERE DESIGNED TO BENEFIT HIS TRADING POSITIONS

Mr. Black's conviction should be overturned as fundamentally unfair because the entire premise of the Government's case is false—namely, that Mr. Black made the requests introduced into evidence for the purpose of benefitting his trading positions.  As noted above, the FBI prepared an analysis of the Deutsche Bank trade data in 2014 (the "2014 FBI Analysis") that concluded that a number of Mr. Black's alleged LIBOR requests were in the opposite direction of his trading positions or were made on days on which he did not have a position at all.  [*See, e.g.*, ECF No. 322 at 3, Exs. J & K.]  Of course, the Government decided not to present the 2014 FBI Analysis to the jury, but nevertheless elicited false testimony and misleadingly argued to the jury that Mr. Black's requests were made to benefit his trading positions.  The Government's actions in obtaining a conviction based on their knowing use of false and misleading testimony and argument is a clear violation of the Due Process Clause.

Specifically, the Government introduced a LIBOR-related request from Mr. Black pertaining to Deutsche Bank's three-month LIBOR submission on July 27, 2007.

[*See* GX 1-056.]   On that date, the Panel Bank submission data introduced by the Government reflected that Deutsche Bank's three-month submission of 5.35% was tied for the lowest on the Panel and a half of a basis point lower than Deutsche Bank's submission from the day before. [GX 1-455 at 22.]   In Mr. Black's alleged request, he responded to an email from Mr. Curtler dated July 26, 2007 with the subject:   "5.35% 3mth LIBOR tom?" with the following statement: "nice,,, i have 4bio 3*1 vs 3mth libor fixing tom. . . . . ker-ching."  [GX 1-056.]   The 2014 FBI Analysis reflects that Mr. Black's statement was, in fact, sarcastic because Mr. Black's net three month LIBOR position was *receiving* LIBOR on approximately $4 billion net notional.   (Levine Decl. Ex. 35.)[10]   As a result, Deutsche Bank's low LIBOR submission was in the opposite direction of Mr. Black's trading position, as the Government well knew.

Notwithstanding this knowledge, the Government deliberately elicited false testimony from Mr. Curtler speculating that this email reflected that Mr. Curtler's low submission benefitted Mr. Black's trading position.   [Tr. 1663:1-19 (Curtler).]   Mr. Curtler testified on direct as follows:

Q.  And what are you saying there?

A.  I'm saying, do you think three-month LIBOR 5.35 percent for tomorrow.

Q.  And what does he respond?

A.  "Nice. I have 4 billion three ones versus three month LIBOR fixing tomorrow, ker-ching."

Q.  What do you understand him to be saying?

---

[10] Exhibits 34-35 to the Levine Declaration are screenshots, created by Defendants, of the 2014 FBI Analysis, that the Government produced as an Excel spreadsheet at 3500-KD-128.  Defendants filtered a pivot table contained within that spreadsheet (in the worksheet titled "Reset Pivot") to show only those fields relevant to Mr. Black's net position on the relevant date and in the relevant tenor—accounting for the fact that Mr. Black is alleged to have shared a trading book with Mr. Paturel.  As such, the attached screenshots reflect only a subset of the data fields in the 2014 FBI Analysis.  Defendants' use of the pivot table, as well as the fields that they included are reflected in the screenshot.

A. I understand him to say that 5.35 percent three-month LIBOR tomorrow suits the position.

Q. Now, to be clear, do you read this as a request to move your LIBOR submission?

A. No, I don't.

Q. Why not?

A. It was -- it's almost like me soliciting it saying that three-month LIBOR tomorrow 5.35. He's saying back, brilliant, that suits his position.

Q. Can you tell which direction he's interested just from this email?

A. Not just from the email, no.

[Tr. 1663:1-19 (Curtler).]

To make matters worse, in the very first line of its opening, the Government falsely suggested that this email was the prime example of Mr. Black making an improper LIBOR request to benefit his trading position:

Ker-ching. You know what that sound is, right? The sound of making money. Ker-ching. In the words of the defendant Gavin Black, he tells you what his and the defendant Matt Connolly's crime was all about, and it was all about making every extra dollar that they could.

[Tr. 43:19-24 (Gov't Opening).] The Government again made a false and misleading reference to this same email later in opening:

And you're going to see in these messages that every penny mattered to the defendants. You're going to see a message where one of the co-conspirators says, Please keep the LIBOR up today; otherwise, I'll have to work at McDonald's. And you'll see them reacting to small movements in LIBOR with ka-ching, because for them, those movements meant big bucks.

[Tr. 60:4-9 (Opening).] Thus, the Government "misrepresent[ed] the nature of nontestimonial evidence" in opening, the severity of which is only amplified by the fact that such misrepresentation was plainly knowing. *Valentine* 820 F.2d at 570.

And there are additional instances in which the Government presented requests or communications implying that Mr. Black's trading position would benefit, when in fact, the 2014 FBI Analysis demonstrated the contrary.  For example, on September 27, 2005, the Government introduced an email exchange in which Mr. Curtler wrote to a group of employees "libor requests?" to which Mr. Black responded "LOW 1 MUNF . . . . SAME AS YEST, 8375, U CAARNT."  [GX 1-019.]  This communication exculpated Mr. Black because, as reflected in the 2014 FBI Analysis, Mr. Black was receiving one-month LIBOR on $80 million net notional on September 27, 2005—meaning Mr. Black would receive less money the lower one-month LIBOR set.  (Levine Decl. Ex. 34.)  The Government nevertheless elicited testimony from Mr. Curtler that falsely suggested that Mr. Black's trading position would have benefitted from his request for a low one-month LIBOR.  [*See* Tr. 1620:23-1622:19 (Curtler).]  Specifically, Mr. Curtler testified that he understood the purpose of the September 27, 2005 communication to mean that Mr. Black was "looking for the same as yesterday," in reference to a communication from Mr. Black on September 26, 2005 [GX 1-016].  [*See* Tr. 1621:5 (Curtler).]  And with respect to "yesterday," Mr. Curtler testified that a "high three-month fixing, and the low one-month fixing would suit Gavin's position."  [Tr. 1617:13-16 (Curtler).]  Compounding the prejudice, the Government during summation specifically referred to Mr. Black's communication on September 27, 2005 as an example of a request made to benefit his trading position [*see* Tr. 2659:5-21 (Summation) (arguing that GX 1-019 was one of the communications that established Mr. Black's fraudulent intent)].  Thus, the Government knowingly elicited false testimony and misrepresented to the jury that Mr. Black's exculpatory September 27, 2005 communication established his participation in the charged fraudulent scheme.

The Government also falsely led the Court to believe that it had a good-faith basis for arguing that the requests themselves prove that Mr. Black had a position on that was benefitted. [Tr. 977:13-21 ("Our proof about these positions are the communications themselves.").] For example, according to the Government, the jury should infer from Mr. Black's February 21, 2005 request for a six-month LIBOR submission of "095" that Mr. Black's trading position would have benefitted. [See GX 1-003.] But the communication makes no reference at all to Mr. Black's six-month trading position on that day, and the Government did not present one. Similarly, the Government submits that the jury should infer that on April 1, 2005 Mr. Black's trading position would have benefitted from a low six month LIBOR based on his statement to Mr. Curtler "COULD WE PLS HAVE A LOW 6MTH FIX TODAY OLD BEAN?" [See GX 1-006.] But the communication makes no reference to Mr. Black's trading position on that day whatsoever. [See id.] In fact, with the exception of GX 6-001, wherein Mr. Black states he is "paying on 18 bio," Mr. Black does not state his position in the communications admitted at trial in which he makes a request. [See also, GX 1-008, 1-183.]

Notwithstanding its own analysis, the Government elicited testimony that falsely suggested that all of Mr. Black's requests were designed to benefit his trading positions. [See, e.g., Tr. 289:4-20 (King); 1620:23-1622:19, 1663:1-19 (Curtler).] The Government also made false statements in this regard to the Court in defending its actions:

> Our proof -- if we could just say what our proof is. Ou[r] proof about these positions are the communications themselves. Gavin Black and Matthew Connolly, the folks on Matthew Connolly's desk, they are making requests. And they are making requests -- the evidence will show that when you make a request, that means you have positions.

[Tr. 977:13-19.] But this representation was contradicted by its own cooperators who testified that the requests themselves do not evidence the traders' net position [Tr. 625:18-626:1 (King); 1854:2-16 (Curtler).] In fact, the Court expressed "astonish[ment]" that the Government was not

prepared to show that, on a day on which Mr. Black made a request, his book did not reflect a trading position that would be benefitted by the request.  [Tr. 980:14-21.]

Accordingly, based on the Government's knowing introduction of false evidence and deliberate decision to affirmatively mislead the jury, Defendants' convictions should be overturned.

## B.    THE GOVERNMENT KNOWINGLY SUBORNED PERJURY

The Government knowingly induced a Deutsche Bank custodian of records to sign two perjurious affidavits in an effort to lay a foundation for the admissibility of certain business records.  Specifically, the Government attempted to introduce four spreadsheets marked as GX 1-404, 1-405, 1-406 and 1-407 during the examination of Guy Weston-Edwards, who served as Deutsche Bank's head of production support for fixed income and currencies.  [Tr. 802:10-806:13 (Weston-Edwards).  Those spreadsheets, according to the Government, contained the raw trade data that underlay the trades listed in its proposed summary exhibit GX 1-456.  During *voir dire* concerning these exhibits, Mr. Weston-Edwards testified that he met with the Government in 2017 and 2018 and explained that these spreadsheets were not business records of Deutsche Bank, but were created by an outside research firm known as Cornerstone Research. [Tr. 807:3-809:2 (Weston-Edwards).]  After these meetings, Deutsche Bank's lawyers, working with the Government, nevertheless induced Mr. Weston-Edwards to sign a sworn certification that falsely represented that the spreadsheets were "original records or true and accurate copies of records that. . . . were kept in the course of a regularly conducted business activity." (Levine Decl.  Ex. 36  ¶ 3;  [*see also*  Tr.  809:3-811:7 (Weston-Edwards)].)    At  trial, Mr. Weston-Edwards testified that this sworn certification was false: "Q. And so you signed the statement  despite  the  fact  that  it's  not  true,  right?    A.  Yes."  [Tr.  811:12-13.]    Mr. WestonEdwards was also presented with a second certification which again misrepresented that

the spreadsheets were business records of Deutsche Bank and failed to disclose Cornerstone's role in the process.  [Tr. 812:22-815:5, 815:17-22 (Weston-Edwards)]; *see also* Levine Decl. Ex. 37.]

Mr. Weston-Edwards testified that he did not prepare the false certifications, but that they were given to him by Deutsche Bank's lawyers because the Government wanted a sworn statement on this issue and Deutsche Bank was obligated to help the Government under its cooperation agreement.  [Tr. 810:15-811:14 (Weston-Edwards).]  When asked to identify the individuals who directed him to sign the false certifications, he identified an internal lawyer from Deutsche Bank and one of the prosecutors in this case.  [Tr. 815:6-16 (Weston-Edwards).]  Mr. Weston-Edwards also confirmed that he made clear to the Government prior to trial that Cornerstone was responsible for creating the spreadsheets:

> Q.  So -- and you told the Department of Justice not ones [sic], but twice, before you signed your first declaration that you understood this was some data that had been given to Cornerstone and they processed it.  You told them that very candidly, did you not?
>
> A.  Yeah, I was aware.
>
> Q.  You shared that with them, right?
>
> A.  Yeah, everybody was aware.
>
> Q.  And nonetheless they still had you sign these declarations.  Is that right?
>
> A.  Yes.

[Tr. 815:17-816:2 (Weston-Edwards).]

The Court commented on the Government's misconduct in trying to pass the spreadsheets off as Deutsche Bank business records with the assistance of the perjurious affidavits as follows:

MR. KOENIG:  And the reason for the multiple declarations is because --

THE COURT:  Is because the first one was an outright lie, and you all should be ashamed of yourself for having given it to that man because I know damn well he didn't write it.

\* \* \* \*

THE COURT:  You should be ashamed of yourselves.

MR. KOENIG:   Your Honor, it was not a lie because there was no intent to deceive ---

THE COURT:  Oy vey.

MS. SIPPERLY:  It had the word "copies" in there.

THE COURT:  Ms. Sipperly, sit down.

MS. SIPPERLY:  It had the words "copies."

THE COURT:   Forgive me if I'm underwhelmed by the government's bona fideness.

[Tr. 817:22-818:9.]  The Court added the following day:

THE COURT:  Believe me, I heard what he said, and I don't accept any excuses from the front.  I don't accept any excuses from him either.  He shouldn't have signed it.  But it was a lack of intent -- I had to laugh when the government said it couldn't be a lie; lack of intent.  I had to laugh.

\* \* \* \*

THE COURT:  I find it appalling.  I find it -- independent of your application, I must say, I find it appalling.  I have never known the United States Attorney's Office for the Southern District of New York, which is not present in this courtroom today, to try to introduce as a business record something that was manifestly not a business record and to try to slip that by me.  They've never pulled a trick like that.  They've never pulled a stunt like that.

\* \* \* \*

THE COURT:  Insufficient.  You lied to me.  You said he asked all the -- is this data kept by Deutsche Bank in the regular course and ordinary course of its business?  Is it input by a person with -- excuse me.  That was a lie.

MS. SIPPERLY:  No, because in his mind he's thinking it's the data sitting in the cell; not the way it's formatted.

THE COURT:  I don't care what he's thinking.  You are the lawyer, Ms. Sipperly.  You are ultimately responsible for this --

MS. SIPPERLY:  And I take full responsibility.

THE COURT:  And you made a misrepresentation to this Court.

MS. SIPPERLY:  No.

THE COURT:  I find it appalling.  I have never, ever had that happen.

[Tr. 827:11-837:4.]

### C.   THE GOVERNMENT MISLEADINGLY ATTEMPTED TO PRESENT NEW TRADE DATA EVIDENCE IT KNEW TO BE UNRELIABLE

Following exclusion of the raw trade data, the Government scrambled to identify a new method of presenting the Deutsche Bank trade data to the jury.  In doing so, the Government attempted to misleadingly present evidence of that trade data based on: (i) incomplete screenshots of Deutsche Bank trading systems prepared in the middle of trial; and (ii) a methodology for associating trades with traders that it knew to be unreliable.

### 1.   The Government Attempted to Introduce Screenshots of the Trade Data that Were Created Mid-Trial

After the Court sustained Defendants' objection to the introduction of the raw trade data, the Government had Mr. Weston-Edwards stay up all night taking screenshots of Deutsche Bank's internal trade data systems, which were limited to only those trades that the Government listed in its proposed summary exhibit GX 1-456:

The COURT:  . . . What is this?  I want a representation from the government.  What is this?

*** 

MS. ANDERSON:  So it's a screen shot of the RMS platform.  So if you're accessing the RMS platform while sitting at a desk in Deutsche Bank, a platform we don't have, we can't access, but they access, showing the data for each of these trades.  That's what it is.  The data that then was extracted by Cornerstone.

[Tr. 850:4-851:12.]

Screenshots of this nature were never previously produced to the Defendants.  In fact, the Government acknowledged that it never previously possessed such screenshots because it had never asked Deutsche Bank for them.  [Tr. 874:23-875:11.]  The Court properly excluded the mid-trial creation of new trade data exhibits:

> THE COURT:  Look, I can't go back into your endless conversations. I can only deal with what's being produced in the court. I'm telling you that if you're representing to me that you didn't ask Deutsche Bank for this information until last night, it is a violation of the defendants' due process rights to allow you to rely on it in a case they've been trying to prepare for two and-a-half years. So your problem; your bad for not asking sooner.

[Tr. 876:10-17.]

But this exclusion does not cure the due process violation, because exclusion notwithstanding, Defendants were never given the opportunity to probe what other data was available in the form of screenshots of Deutsche Bank's internal systems.

### 2. The Government Attempted to Present Evidence Based on a Method of Associating Trades with Traders that It Knew to be Unreliable

Along with the screenshots, the Government also attempted to have Mr. Weston-Edwards authenticate a revised version of proposed summary exhibit GX 1-456 containing the Government's summary of specific trades.  This version—which was re-marked by the Court as proposed GX 1-460 [Tr. 902]—added the "TRADER" field to the Government's summary of specific trades.  (*See* Levine Decl. Ex. 2 (proposed GX 1-456 at p. 32-35).)  Relying on the "TRADER" field, the Government intended to argue that certain trades were made by alleged members of the conspiracy, even though it knew that this information was unreliable.

Not only did Mr. Weston-Edwards tell the Government, prior to its presentation of the proposed exhibit to Court, that the "TRADER" field was not "entirely reliable" [Tr. 933:21-934:1], but the Government represented to the Court prior to trial that:  "Deutsche Bank's data did not always capture certain information, such as which trader booked a specific trade" and

that "Deutsche Bank's system did not capture the specific Deutsche Bank trader that booked each individual trade" [Joint Letter at 5.]   In fact, in explaining to the Court why it would not present the Deutsche Bank trading data at trial, the Government explained it was in part due to "the fact that it's not entirely clear who the trader is."   [Tr. 981:7-12.]   Moreover, the unreliability of the "TRADER" data is demonstrated by the fact that Deutsche Bank, instead of merely relying on this data, represented that BTM was required to determine traders' net positions and undertook a "time-consuming, manual reconstruction of the traders' books" to provide such analysis to the Government.  [DX 862 at 48; *see* Tr. 856:12-19.]  The Government thus chose to ignore exculpatory evidence and instead proceed with evidence it knew was unreliable and was contrary to its representation to Defendants for the entire pretrial period.

### D.   THE GOVERNMENT ELICITED FALSE TESTIMONY BASED ON COOPERATOR STATEMENTS MADE FOR THE FIRST TIME IN THE MIDDLE OF TRIAL

The Government knowingly elicited false testimony from Mr. Parietti concerning the assignment of trading books in order to plug the gaping hole left in the Government's case when it repudiated Deutsche Bank's BTM analysis.  Though the Government met with Mr. Parietti on dozens of occasions prior to trial [*see* Tr. 1173:1-10 (Parietti)], its interview memoranda reflect that it never substantively probed Mr. Parietti's recollection of trading book assignments on the New York trading desk.  (*See* Levine Decl. Exs. 38-49.)  But, on September 20, 2018—in the middle of trial and after the Government had repudiated BTM—the Government decided, apparently for the first time, to ask Mr. Parietti for his recollection of specific trading book names and assignments from 2001 to 2007.   (*See* Levine Decl. Ex. 3.)   Based on the Government's own evidence in this case and as presented to the grand jury, it is apparent that the information Mr. Parietti recalled is false and misleading for several reasons.



Second, Mr. Parietti's mid-trial recollection of, and trial testimony concerning, trading book assignments conflict with Mr. Parietti's single pre-trial statement about the assignment of trading books.  Specifically, in his December 2017 interview with the Government, Mr. Parietti attributed the "NY BASIS" trading book to Mr. Park.  (*See* Levine Decl. Ex. 43 at 4.)  This statement contradicts what Mr. Parietti told the Government during his mid-trial interview, namely, that the "NYMMDBASIS" trading book was assigned to him—not to Mr. Park—from 2001 until he left the bank.  (*See* Levine Decl. Ex. 3.)  Mr. Parietti's statement at the December 2017 interview also conflicts with his trial testimony in which he testified that one of his trading books was the "NYMMD basis" book [Tr. 1124:17-25 (Parietti)], and that Mr. Park managed the "NYMMD/Prime" trading book [Tr. 1132:5-10 (Parietti)].  Therefore, the Government did not

have a good-faith basis to elicit Mr. Parietti's testimony at trial concerning the assignment of the "NYMMDBASIS" trading book.

Third, Mr. Parietti's mid-trial recitation of trading book assignments conflicts with the methodology of trading book association as articulated by the Government for nearly two years—*i.e.*, BTM. Specifically, Mr. Parietti testified that he could identify the trader responsible for certain trades based on the trade characteristics. [*See* Tr. 1136:2-7 (Parietti) (testifying that Andrew Smoler had responsibility for "fixed versus three-month LIBOR trade[s]" with a maturity date that was "shorter than two years"); 1137:14-21 (testifying that David Park was responsible for "contracts tied to a floating rate USD prime versus LIBOR" in late 2007).] Even setting aside the questionable veracity of Mr. Parietti's recollections made in the Government's time of need more than a decade after-the-fact, this "method" of matching trades to traders was never previously disclosed to Defendants. It was not even disclosed to Defendants in Mr. Parietti's mid-trial 302, which makes no mention of the unique trade characteristics that are apparently so obvious to Mr. Parietti. Critically, this testimony served as the only basis on which the Government laid a foundation for the introduction of specific counterparty trades and the counterparty witness testimony of Mr. Maroun, Ms. Hunter and Ms. Konich. [Tr. 359:3-5.]

### E. THE GOVERNMENT MADE NUMEROUS MISREPRESENTATIONS IN CONNECTION WITH THE *GARRITY* HEARING

The Government made a series of misrepresentations to the Court in connection with the *Garrity* hearing, including that: there was no governmental involvement in Deutsche Bank's decision to hire Paul Weiss to conduct an internal investigation; and that neither it nor its investigative partners directed the internal investigation or made specific requests in connection therewith.

**1.    Prior to Trial, the Government Falsely Represented that There Was No Governmental Involvement in Deutsche Bank's Decision to Hire Outside Counsel to Conduct an Internal Investigation**

In opposing Mr. Black's motion to preclude use of his statements to Paul Weiss, the Government argued that there was no *Garrity* problem because Paul Weiss interviewed Mr. Black pursuant to its own interests.  [*See* ECF No. 251 at 1-7.]  In support of this argument, the Government represented that "the government did not direct Deutsche Bank to conduct an internal investigation," a fact to which it wrongly claimed Mr. Black conceded.  [ECF No. 251 at 6; *see also id.* at 4 ("as the defendant concedes, the internal investigation at Deutsche Bank commenced, not at the behest of the government").]  As we now know, this representation was false because the Government's investigative partner—the CFTC—specifically directed that Deutsche Bank hire outside counsel to conduct an internal investigation.

Mr. Ricciardi testified at the *Garrity* hearing as follows:

Q.  Why did you conduct an internal investigation?

A.  I believed it was initiated because the CFTC wrote a letter to the general counsel of Deutsche Bank, Joe Polizzotto, and said will you have your outside counsel conduct an internal investigation regarding LIBOR issues, and they said yes, and they asked us to do it.  We had already been retained, but they then asked us to do the internal investigation with Slaughters in the U.K.

Q.  As part of that investigation, did you interview Deutsche Bank employees?

A.  Yes.

Q.  Did that include Gavin Black?

A.  Yes.

[Tr. 1484:19-1485:6 (Ricciardi).]

Mr. Ricciardi's testimony in this regard was corroborated by the letter that the CFTC sent to Deutsche Bank on April 19, 2010.  [*See* DX 9072.]  In the letter, the CFTC advised Deutsche Bank that the CFTC's Division of Enforcement was conducting an investigation into whether

LIBOR Panel Banks submitted false or misleading reports of market conditions. [*Id.* at DX 9072-1.] The letter further advised Deutsche Bank, as a market participant, that the CFTC "expect[ed]" Deutsche Bank "to cooperate fully" with its investigation. [*Id.*] The CFTC's letter also made clear that the expected cooperation included the hiring of outside counsel to conduct an internal investigation into Deutsche Bank's LIBOR submission practices:

> Accordingly, the Division requests that Deutsche Bank Securities Inc. (and its parent, subsidiaries, affiliates and divisions, collectively referred to as "Deutsche Bank") voluntarily conduct by **external** counsel a full review of Deutsche Bank's U.S. Dollar LIBOR reporting for the relevant time period, and report on an on-going basis the results of that review to the Division, with the review to be completed by no later than September 1, 2010. Further, the Division requests that Deutsche Bank certify that it was in compliance with the Act and Regulations with respect to its reporting of LIBOR and related trading.

[*Id.* (emphasis original)] The CFTC's letter also enclosed a CFTC advisory memorandum "regarding Cooperation Factors with regard to Sanction Recommendations," which further made clear the negative consequences that would flow from Deutsche Bank's refusal to accede to the CFTC's direction. [*Id.* at DX 9072-2 to 5.]

### 2. The Government Made Multiple False Statements Concerning the Direction Provided to Paul Weiss by the CFTC

After the falsity of the Government's assertions concerning the impetus for Deutsche Bank's internal investigation became apparent, the Government shifted tactics and suggested that, while the CFTC may have directed Deutsche Bank to hire counsel to conduct an internal investigation, "[t]he actions taken during the course of that investigation were not directed by the CFTC." [*See* ECF No. 333 at 2.] The Government further argued that "[w]hile there became [sic] a time when Deutsche Bank's cooperation led to more specific requests from the government, that time was after Mr. Ricciardi left the investigation and after the interviews in question." [*Id.* at 3 n.1.] But again, the documentary evidence produced by the Government contradicts this representation.

Specifically, the evidence established that the CFTC, together with the Government and other agencies, directed and supervised Paul Weiss's internal investigation from the start. As reflected in a letter dated July 14, 2010, the CFTC had multiple telephone conversations shortly after Deutsche Bank hired Paul Weiss for the purpose of obtaining Paul Weiss's agreement as to the "actions to be taken by [Paul Weiss] as part of the first stage of the internal investigation. [DX 9080 at DB-SFO-DOJ_02634011.] The CFTC's letter documented that Paul Weiss had agreed to take numerous specific investigative actions, including conducting "[i]nterviews of all relevant Bank staff, including those who had knowledge/approval/oversight of, input on or discussions regarding the setting and submission of the Bank's LIBOR." [*Id.*] In this same letter, the CFTC again made clear that it expected Paul Weiss to provide regular updates concerning the progress of the internal investigation:

> As we discussed, the CFTC and the SEC further envision regular updates, initially occurring weekly, from [Paul Weiss] concerning the status and progress of the internal investigation. These updates will include simultaneous productions of responsive documents and information uncovered in the internal investigation.

[*Id.* at DB-SFO-DOJ_02634013.]

The CFTC and the Government used these meetings and telephone calls as the primary vehicle for directing and supervising Paul Weiss's internal investigation. As reflected in the Deutsche Bank "white paper," Paul Weiss ultimately had hundreds of calls and dozens of meetings—many of which were attended by both the Government and the CFTC—that were "designed to provide [the Government and CFTC] with the latest developments in the investigation and an opportunity to follow up on prior discussions and make new requests." [DX 862 at 49.]

In fact, the CFTC's direction at one of these periodically meetings specifically caused Deutsche Bank to interview Mr. Black for the first time, as well as several of his co-workers.

Specifically, a Deutsche Bank compliance officer wrote an email dated November 4, 2010 that documented the CFTC's statements during a November 1, 2010 meeting with Paul Weiss, which was also attended by the SEC.  [DX 9075.]  The email stated, *inter alia*:

> The CFTC asked that in addition to completing the email review, we undertake certain additional steps.  In brief, those additional steps are that PW:
>
> (a)  produce all term-hit documents from the document review;  This is approximately 150,000 documents and emails.  ***CFTC asked PW to point out documents that are of interest based on the review****. . . .*
>
> (b) ***interview King, Curtler, and Nicholls again, this time in person, before Thanksgiving, and that at the same time, to the extent PW learn that King or Curtler regularly interact with or obtain information from others, on the same desk or other desks, PW interview those individuals as well****.*  CFTC asked about which traders or others King and Curtler talked to in connection with LIBOR fixings, specifically traders in the FX Forwards area and swaps traders.

[DX 9075 (emphasis added).]

Following this meeting, Joyce Huang, one of the Paul Weiss attorneys responsible for the internal investigation, sent an email to Simon Jackson, who worked in compliance at Deutsche Bank, and copying Mr. Ricciardi that stated:

> [A]s you may recall, the CFTC specifically asked us to look into the extent to which anyone from FX Forwards or Swaps trading was focused on, or involved in conversations about, Deutsche Bank's LIBOR fixings during the relevant period.  [Redacted.]  Do you agree?  If so, and assuming these individuals are still at the bank, could we determine their availability and set up short meetings with them as well?

(Levine Decl. Ex. 50.)  Three days later, on November 15, 2010, Mr. Jackson forwarded Ms. Huang's email to Michael Curtler, James King, and David Nicholls and asked, "Can you confirm the other named members of the team are appropriate for interview by PW?"  (*Id.*)  Mr. Curtler replied that same day with a list of employees to be interviewed.  (*Id.*)  Mr. Black was the first employee set forth in Mr. Curtler's list.  (*Id.*)  Shortly thereafter, Paul Weiss interviewed Mr. Black for the first time during the week of Thanksgiving in November 2010.  [*See* Tr. 1486:7-13 (Ricciardi).]

### F.   THE GOVERNMENT DELIBERATELY MISLED THE JURY IN AN EFFORT TO UNDERMINE MR. BLACK'S GOOD FAITH DEFENSE

The Government also deliberately elicited testimony from Mr. Curtler designed to mislead the jury about Mr. Black's intentions.  Specifically, on May 15, 2008, Mr. Black wrote to Mr. Curtler requesting a lower one-month submission.  [GX 6-001 ("Low 1mth today pls shag, paying on 18 bio").]  On direct, the Government presented this email without any context or any evidence as to whether external market factors supported Mr. Black's request.  [*See* Tr. 1720:19-1722:20 (Curtler).]  On cross, the defense showed that Mr. Black's request was supported by external market factors and events.  These included that Mr. Black was in line with the view of alleged victim Goldman Sachs, expressed in the same email chain, that "the market for LIBORs are going to come down."  [Tr. 1996:17-18 (Curtler); *see* GX 6-001 at 2.]  It also included an email from Mr. Curtler reflecting the rate at which Deutsche Bank bid for one-month cash on that date.  [*See* DX 0673.]  This email demonstrated that Deutsche Bank's bid rate was three basis points ***lower*** than where the Bank ultimately submitted its LIBOR, indicating that a "low" LIBOR, as Mr. Black requested, was in line with market conditions.  [*See* Tr. 1999:14-2002:20 (Curtler) (discussing DX 0673).]

On redirect, the Government elicited testimony from Mr. Curtler designed to mislead the jury into believing that Mr. Curtler's cash run did not evidence Mr. Black's good faith because Deutsche Bank's bid rate was below its offered rate:

MS. ANDERSON:  Now, if we can pull up Defense Exhibit 0673 please.

Q.  Just looking at the top, who is that from?

A.  From myself.

Q.  And what is the subject line?

A.  "DB cash run."

Q.  Do you remember being asked about this message in connection with the email we just saw?

A. Yes, I do.

MS. ANDERSON:  If we can go to the last page.

Q.  Are these your cash bids?

A. Yes, they are.

Q.  Now, what's the "OR" in LIBOR?

A.  Offered rate.

Q.  And can you explain what the difference is between your LIBOR -- or your cash offered rate and your cash bid rate?

A.  Deutsche Bank's cash bid rate and Deutsche Bank's cash offered rate.

Q.  Yes.

A.  So Deutsche Bank would bid for cash and raise cash.  Most of the time Deutsche Bank didn't lend cash to the market, they would only lend internally. So we'd bid cash from the market and lend it to other areas within the bank.

Q.  ***And did your bid rate tend to be lower or higher than your offered rate?***

A.  ***Lower.***

[Tr. 2156:2-2157:2 (Curtler) (emphasis added).]   As the Government knew, the acronym "LIBOR" is a misnomer because, while the "OR" stand for "Offered Rate," the definition calls for Panel Banks to submit the rate at which they borrow cash from (as opposed to the rate that they offer cash to) other banks in the interbank market.  In other words, LIBOR measures the rate that Panel Banks are offered cash, not the rate that they themselves offer cash to the market. [*See* GX 1-803; DX 1171A.]

Mr. Curtler explained this misnomer in an email introduced in evidence in this case, stating:  "The OR in LIBOR stands for 'offered rate' yet the official definition quotes the rate at which banks can BORROW funds this alone can be ambiguous."  [GX 1-127 at 2.]  Mr. King

also explained to the Government the confusion caused by this misnomer during his pretrial proffer sessions.  At a two-day proffer session that occurred on July 31, 2014 and August 1, 2014, Mr. King stated:

> KING always understood that LIBOR was a rate linked to the cash market.  A lot of people thought that it was the rate at which a bank would be willing to lend money (i.e., because of the offered part of LIBOR's name).  That was why CURTLER, DUX, and KING used the offer plus a spread.  ***It was not until 2008, when LIBOR was in the press, that KING had a watershed moment and learned that LIBOR was actually more of a bid rate***.

(Levine Decl. Ex. 51 at 7 (emphasis added).)  Mr. King similarly stated at a proffer that occurred on March 30, 2016:  "At some point during the financial crisis KING and the rest of the cash desk realized that the ***LIBOR rate represented the cost where DB would borrow funds rather than where they would offer funds***."  (Levine Decl. Ex. 52 at 7 (emphasis added).)

The Government deliberately misled the jury by falsely suggesting that Deutsche Bank's cash run was inconsistent with Mr. Black's request for a lower LIBOR because Deutsche Bank's "offered rate," *i.e.* the rate at which it was willing to lend cash, was higher than its bid rate.  The Government compounded the jury's confusion during summation because it mischaracterized Mr. Curtler's testimony concerning the higher "offered rate" as the rate other banks were willing to offer money to Deutsche Bank as opposed to the rate that Deutsche Bank was offering to lend cash to the market.  The Government stated during rebuttal, over Mr. Black's objection, that:

> You also were shown Defense Exhibit 0673 that shows Mr. Curtler's bid numbers on that day.  Well, he explained to you his bid numbers are generally lower than the offered numbers.  LIBOR is the offered rate.  Sometimes banks go out when they don't even necessarily need cash and they bid because they decide, If I'm going to get it that cheap, I might as well get it.  So they have a bid in the market.  But that's not what LIBOR is. LIBOR is what other banks are willing to offer them.  So if they actually were going to get money, what would other banks offer to them?  And there is a difference, and we explained that to you, and that the bid number is often lower than the offered rate.

[Tr. 2843:1-12 (Government Rebuttal Summation).]

70

Accordingly, the Government not only deliberately elicited misleading testimony, but it also compounded the due process violation through statements during rebuttal summation that it knew were contrary to the factual record.

### G.   THE GOVERNMENT ELICITED FALSE EVIDENCE RELATING TO THE MATERIALITY OF THE ALLEGED SCHEME

The Government also misleadingly elicited testimony from Annette Hunter of the Federal Home Loan Bank of Atlanta ("FHLBA") concerning her bank's decision to stop trading with Deutsche Bank.  Immediately after eliciting testimony from Ms. Hunter that her bank does not do business with "fraudulent counterparties" [Tr. 1568:19-1569:6 (Hunter)], the Government elicited testimony from Ms. Hunter that it stopped doing business with Deutsche Bank in approximately 2006 or 2007 and unwound any trades with Deutsche Bank at that time, [Tr. 1569:7-24 (Hunter)].  The Government further attempted to induce Ms. Hunter to falsely suggest that the conduct at issue in this case was one of many reasons for the termination, but the Court intervened and asked a question of Ms. Hunter which clarified that the termination had nothing to do with LIBOR or her bank's trades with Deutsche Bank.  [Tr. 1569:25-1570:13 (Hunter).] The Government thus misleadingly attempted to use FHLBA's termination of its ISDA with Deutsche Bank to buttress its materiality argument when it knew that the termination had nothing to do with the conduct in this case.

The Court ultimately struck that portion of Ms. Hunter's testimony concerning the termination from the record and commented on the Government's duplicity.  [Tr. 1600:16-1601:2.]  The Court also directed the Government to put on the record its good-faith basis for suggesting that FHLBA's termination of its relationship with Deutsche Bank was based, in part, on its LIBOR submission practices.  [Tr. 1600:2-7.]

The Government responded by writing a letter to the Court attaching agent notes that were created *after* Ms. Hunter testified.  [*See* ECF No. 332 & Attachment A.]  The Government represented to the Court that Ms. Hunter met with the Government on the evening of September 30, 2018, two nights before her testimony on October 2, 2018, and at that time advised the Government that her bank "stopped doing business with Deutsche Bank at some point, due in part to their involvement in the LIBOR scandal."  [ECF No. 332, Attachment A.] The Government also represented that it did not create any notes of the meeting until *after* the Court raised this as an issue "[b]ecause the government believed Ms. Hunter conveyed no new information—that is, counsel for the government believed prior FBI 302s for Ms. Hunter included her belief that FHLB Atlanta discontinued doing business with Deutsche Bank in part because of the LIBOR scandal."  [ECF No. 332 at 1.]

The Court should reject both of the Government's claims as false based on the current record or, alternatively, conduct an evidentiary hearing on these issues.  Given that there was no LIBOR "scandal" in 2006 or 2007 at the time of the termination, the Government's claim that it thought that Ms. Hunter not once, but twice, linked the termination to LIBOR is false on its face. The Government's claim that Ms. Hunter made this statement is further belied by the fact that the prosecutor, when questioned by the Court following Ms. Hunter's testimony, did not immediately state that Ms. Hunter made this statement in an interview less than two days prior, but said only that "[t]he witness told us that at some other time."  [Tr. 1600:8-9.]  But this information was not contained in the FBI 302 Interview Memoranda or corresponding notes produced, as 3500 material for Ms. Hunter prior to her testimony.  (Levine Decl. Exs. 53-56 & 60-62.)  The Government's representation that "[t]he witness told us that at some other time." [Tr. 1600:8-9] is therefore not credible.  As a result of the Government's conduct, Defendants

were ambushed by this misleading and highly prejudicial line of questioning at trial, which the

Court rightly described as a "bombshell." [*See* Tr. 1888:13-15.]

### H.   THE GOVERNMENT'S PREJUDICIAL STATEMENTS DESIGNED TO SUGGEST THAT DEFENDANTS WERE RESPONSIBLE FOR THE FINANCIAL CRISIS

Defendants were also denied a fair trial based on the Government's statements during its

opening that suggested that the conspiracy contributed to the global financial crisis that started in

2008.   During its opening, the Government mischaracterized the effect of Deutsche Bank's

consideration of trading positions in making its LIBOR submissions as sending "ripple effects"

through the "entire global financial system," stating:

> You're going to learn that during the time and the height of the defendant's scheme that LIBOR rate was *a critical interest rate for the global financial system*.   It was what was referred to as a benchmark interest rate.   And the defendants knew that.   In other words, what a benchmark interest rate means, the defendants knew that it served as a baseline interest rate, a baseline interest rate for billions of dollars of financial products and trades all around the world.   And that's why this LIBOR rate was so important that it was honest and that it had integrity because so much money throughout *the entire global financial system was riding on it*.
>
>         * * * *
>
> And you will see that they were so greedy and so laser focused on making every extra dollar that they didn't care that that number was the basis of trillions of dollars worth of trades and financial products throughout the world; that they knew that *this handful of guys were sending a ripple effect through the financial market*; and they continued to do this, you will see, all to make more money for Deutsche Bank and in turn hoping for a bigger bonus and to make more money for themselves.

[Tr. 46:18-47:3, 51:25-52:8 (Government Opening) (emphasis added).]

The Government had no good-faith basis for making these grandiose claims in its

opening because the Government knew it would not present any evidence (and Defendants are

aware of none) that the BBA's setting of LIBOR had anything to do with the financial crisis.

Moreover, the Government had no evidence to back up its misstatements concerning the impact,

if any, that Deutsche Bank's LIBOR submission process had on the entire global financial system.   Indeed, the Government did not even present evidence sufficient to demonstrate the impact of Deutsche Bank's alleged adjustment of its submissions on its trading counterparties. The Government presented no evidence of Deutsche Bank's actual borrowing costs to establish the unreasonableness of its LIBOR estimates; nor did the Government create or introduce any analysis showing what effect, if any, Deutsche Bank's adjustment of its submissions had on the overall LIBOR fix.   Given that the BBA's trimming process had as its stated purpose the discarding of any submission "that is far enough away from the average to move the fixing materially" [DX 1171A § 10.1], there was no evidence that the conduct at issue had a material impact on anyone, let alone the entire financial system.   Accordingly, the only purpose of these intentionally improper statements was to prejudice the jury, which undermined the fairness of the proceeding and denied Defendants their right to a fair trial.   *See, e.g.*, *Meachum*, 907 F.2d at 355 (concluding that "the cumulative effect of the prosecutor's improper statements denied [the defendant] a fundamentally fair trial").

## I.   THE GOVERNMENT ELICITED MISLEADING TESTIMONY AT TRIAL AS A RESULT OF ITS FACT BARGAINING WITH COOPERATORS

As a result of its fact bargaining with Mr. Parietti and Deutsche Bank, the Government knowingly elicited misleading testimony at trial.

### 1.   Mr. Parietti's Cooperation Agreement Resulted in Misleading Trial Evidence

The Government entered into a cooperation agreement with Mr. Parietti that allowed him to admit responsibility for conduct only through 2008 [*see* Tr. 1269:1-24; 1272:5-25 (Parietti)], but elicited testimony from Mr. Parietti at trial suggesting his involvement in the alleged conspiracy through 2010, [*see* Tr. 1103:17-1104:8, 1138:3-13 (Parietti)].   On cross-examination, Mr. Parietti testified that he understood that this agreement with the Government conferred a

benefit on him at sentencing, including that it allowed him to retain his $9 million bonus for 2009, and not be sentenced for it.  [Tr. 1269:1-1270:7, 1272:5-25 (Parietti).]

The Government's and Mr. Parietti's statements at his plea proceeding also suggested that Mr. Parietti's involvement in the conspiracy ended in 2008, contrary to his trial testimony. Specifically, Mr. Parietti allocuted at his change of plea proceeding as follows:

> From early 2006 through approximately 2008, while in Manhattan, I was involved in a process of asking the Deutsche Bank employees who submitted the bank's LIBOR submissions, to take my trading positions into account in making their LIBOR submissions so that my trades might be more profitable.  I understood that the counterparties on the opposite side of those trades could be negatively affected by this activity.  I knew that some of the affected parties were American financial institutions and that some of these trades would involve wire transfers beginning or ending in the United States.

[3500-TP-6 at 25:4-13.]  Following Mr. Parietti's initial allocution, the Government and his counsel conferred, which led Mr. Parietti to make the following "clarification":  "Earlier, I had said that the practice I engaged in occurred from early 2006 through approximately 2008.  And I should have said at least 2008."  [*Id.* at 35:1-23.]

Mr. Parietti's allocution left the presiding judge with the impression that his involvement in the alleged scheme ended in 2008 as reflected in the following question from the Court:

> Government, let me ask you the question:  I believe I know the answer to it but most federal crimes have a five-year statute of limitations.  *If the conduct has not been allocuted to having occurred after 2008*, explain to me why this conspiracy is not time-barred.

[*Id.* at 36:1-5 (emphasis added).]  Neither the Government nor Mr. Parietti corrected the Court's understanding as to the end of Mr. Parietti's involvement in the alleged scheme, even when the Court specifically asked the Government whether it needed to follow up with Mr. Parietti as to his clarification.  [*See id.* at 36:6-14.]

At trial in this matter, the Government elicited testimony concerning Mr. Parietti's cooperation agreement without mentioning Mr. Parietti's statements under oath that the scheme

ended in 2008.  [Tr. 1010:11-22 (Parietti).]  To the contrary, the Government elicited testimony

from Mr. Parietti, in contradiction to his allocution, suggesting that he and Mr. Black continued

to engage in the same conduct up through 2010.  [*See* Tr. 1103:17-1104:8, 1138:3-13 (Parietti).]

The Government also tried to introduce materials from 2010 as being in furtherance of the

conspiracy without advising the Court about what transpired at Mr. Parietti's plea allocution.

[*See* Tr. 1161:19-1162:5.]

### 2. The Government's Agreement With Deutsche Bank Contradicts the Testimony Elicited At Trial

The Government knowingly elicited misleading testimony at trial to imply to the jury that

Deutsche Bank senior management had no knowledge or involvement in the alleged conduct.

But the role of senior management in the alleged scheme was in fact well known to the

Government because senior management only escaped responsibility for directing the conduct at

issue in this case as a result of the Government's fact bargaining, as was revealed by the *Kastigar*

discovery.

Specifically, the Government intended to hold senior management responsible for the

alleged scheme in its settlement with Deutsche Bank as late as April 15, 2015—just eight days

before the final settlement was entered.  On that day, the Government forwarded a draft of its

Deferred Prosecution Agreement ("Draft DPA") to the FCA, which included language about the

scope of senior management's knowledge of and role in the alleged conduct.  (*See* Levine

Decl. Ex. 12.)  Specifically, under a heading titled "DB Management Awareness of the Conduct,

Tolerance of the Conflicts of Interest and Promotion of Culpable Individuals," the Draft DPA

stated:

> 98.  Certain DB managers and senior managers were aware of requests by DB
> derivatives traders to submit LIBOR and EURIBOR rates that benefitted trading
> positions.  Evidence suggests that Senior Manager-1, a senior manager and the
> head of GFFX in London, knew that traders and submitters coordinated LIBOR

submissions and encouraged the coordination.  Senior Manager-1 was the head of the primary division at DB engaged in the LIBOR manipulation and was present on occasions when Submitter-1 received requests to manipulate DB's USD LIBOR submissions. . . .

101.  In addition, DB senior managers and managers . . . recklessly disregarded two significant conflicts of interests:  1) having pool traders who submitted LIBOR and EURIBORs on behalf of DB also trade derivatives tied to the same rates and 2) encouraging open communications between traders and submitters and seating many of them together in London and in Frankfurt.

102.  When Senior Manager-1 took over the position of global head of GFFX, he instituted an initiative to promote an open culture where traders across divisions and locations shared information.  At least part of the motivation for this sharing of information was to ensure that the bank coordinated conduct among traders and the submitters to benefit the bank as a whole. . . .

104.  DB managers promoted the sharing of information by sitting traders who stood to benefit from moves in LIBOR and EURIBOR in very close proximity to other traders who had the responsibility to submit LIBOR and EURIBOR rates on behalf of DB. . . .

105.  Managers, in particular Senior Manager-1, presided over all of these efforts to share information . . . .  Senior Manager-1 continued to allow an environment where traders were permitted and even encouraged to share with other traders – including traders with LIBOR and EURIBOR submitting responsibilities – the derivatives trading positions they held and further how these positions would be impacted by upcoming fixings.

(*See* Levine Decl. Ex. 12 at 50-53.)  As part of its deal with Deutsche Bank, the Government's allegations in these paragraphs were largely removed, leaving references only to desk level managers, a mid-level manager, and one senior manager—David Nicholls, identified as "Senior Manager-1".  (*See* Levine Decl. Ex. 57 at 7.)  The Government apparently made this decision because, as was revealed by the *Kastigar* discovery, inclusion of other members of senior management, specifically Anshu Jain, became a "stumbling block" in the Government's efforts to coordinate with the FCA and other agencies.  (Levine Decl. Ex. 23 at 1; *see also* Ex. 15 at DOJ-DB-KAST-0003539 ("FCA:  We basically stop at Nicholls.  We say management knew of the risk, but not about knowing of the conduct.").)

Notwithstanding the Government's knowledge and prior allegations of senior management's responsibility in the alleged scheme, the Government knowingly elicited false testimony from Mr. Curtler suggesting otherwise:

> Q. Mr. Curtler, was there anything about directives from your bosses, so including Anshu Jain, I think we heard Alan Cloete, or **David Nichols** [*sic*], that made you think that it would be okay to submit LIBOR submissions that you skewed in order to benefit traders' positions?
>
> MR. LEVINE: Objection to form.
>
> THE COURT: The objection is overruled.
>
> A. No, there wasn't.

[Tr. 2168:25-2169:7 (Curtler) (emphasis added).]   The testimony elicited from Mr. Curtler is in direct contradiction with the Government's knowledge of senior management responsibility for the charged conduct based on, *inter alia*, seating the cash and derivatives traders in "very close proximity" for the purpose of allowing "an environment where traders were permitted and even encouraged to share with other traders – including traders with LIBOR and EURIBOR submitting responsibilities – the derivatives trading positions they held and further how those positions would be impacted by upcoming fixings."  (*See* Levine Decl. Ex. 12 at 52-53.)  It is also in conflict with the final DPA, which, as noted above, continued to implicate Mr. Nicholls in the alleged scheme, even though it removed the allegations implicating other members of Deutsche Bank's senior management.   Finally, the testimony is also at odds with the Government's own allegations in this case, which name Mr. Nicholls as a co-conspirator.  (*See* Levine Decl. Ex. 63 at 2.)

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion to vacate their convictions and dismiss the remaining counts of the Indictment, or in the alternative, request that the Court order a new trial or an evidentiary hearing, and grant such further and other relief as may be just and proper.

Dated:  New York, New York
        December 10, 2018

                              Respectfully Submitted:

By: /s/ Kenneth M. Breen                 By: /s/ Seth L. Levine
    (electronic signature with permission)     Seth L. Levine
    Kenneth M. Breen                    Scott B. Klugman
    Phara A. Guberman                 Miriam L. Alinikoff
    Jane H. Yoon                        Dylan A. Stern
    Amanda L. Pober

**PAUL HASTINGS LLP**                   **LEVINE LEE LLP**
200 Park Avenue                        650 Fifth Avenue, 13th Floor
New York, New York 10166          New York, New York 10019
Telephone:  (212) 318-6000         Telephone:  (212) 223-4400
Facsimile:  (212) 319-4090          Facsimile:  (212) 223-4425
kennethbreen@paulhastings.com     slevine@levinelee.com
pharaguberman@paulhastings.com    sklugman@levinelee.com
janeyoon@paulhastings.com        malinikoff@levinelee.com
amandapober@paulhasings.com      dstern@levinelee.com

*Attorneys for Defendant Matthew Connolly*   *Attorneys for Defendant Gavin Campbell Black*