UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

UNITED STATES OF AMERICA,

     -against—                           16 Cr. 370 (CM)

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

               Defendants.

———————————————————————— X

**DECISION AND ORDER DENYING DEFENDANTS' MOTIONS FOR A
JUDGMENT OF ACQUITTAL OR NEW TRIAL**

McMahon, C.J.:

This case arises out of the now-infamous "LIBOR-fixing" that took place in the early years of

this century. LIBOR (the London Interbank Offered Rate) was, at all relevant times, the interest rate

benchmark at which banks offered to lend money to one another (at some future date, *e.g.*, one-month,

six-month, one year) in the wholesale money markets in London. Until recently, it was the standard

financial index used in the United States and other capital markets.

Defendants Matthew Connolly and Gavin Campbell Black were convicted by a jury of

conspiring to commit wire fraud and bank fraud (Count 1) and actual substantive wire fraud

(Connolly, Counts 2 and 9; and Black, Count 11) in connection with a scheme to cause their

employer Deutsche Bank—one of the sixteen "Submitter" banks whose estimated borrowing costs

were used by the British Banking Association (BBA), a private entity, to set LIBORs in U.S.

Dollars—to submit "false and fraudulent USD LIBOR submissions" to BBA. The LIBOR

submissions were alleged to be "false and fraudulent" because they were not "unbiased and honest," in

that they took into account considerations other than what the true cost would be for Deutsche Bank to

borrow from other banks at some future date certain—most notably, the trading positions of the

Defendants and their co-conspirators, which had the potential to "benefit their trading positions" at the expense of counterparties to those trades.

Connolly and Black each move for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure Rule 29, or, in the alternative, for a new trial, pursuant to Rule 33—motions that initially were made after the close of the Government's case. They argue that: (1) the Government failed to introduce sufficient evidence to establish the elements of the counts of conviction; and (2) the Government constructively amended the Superseding Indictment and caused a prejudicial variance through its evidence and argument at trial. Each defendant asks that he be allowed to join in his codefendant's motions, to the extent a particular codefendant's motion is relevant to his case.

For the reasons that follow, Defendants' motions are **DENIED**.

## I.   Defendants' Motions for a Judgment of Acquittal Based on Insufficient Evidence

A defendant challenging the sufficiency of the evidence pursuant to Rule 29 "bears a heavy burden." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)); *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003). A jury's verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002); *United States v. Payton*, 159 F.3d 49, 55-56 (2d Cir. 1998). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal citation and quotation omitted).

In considering a Rule 29 motion, the Court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *accord United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted). Thus, the task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not for the reviewing court. *See, e.g., Jackson*, 335 F.3d at 180; *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994).

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999). Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)); *see Martinez*, 54 F.3d at 1042.

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice requires." Fed. R. Crim. P. 33(a). Granting such a motion is subject to the Court's discretion. *See United States v. Stewart*, 433 F.3d 273, 295 (2d Cir. 2006). A court must exercise its discretion under Rule 33 sparingly, granting a new trial only in exceptional circumstances. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Indeed, "motions for a new trial are disfavored" in the Second Circuit. *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). "The ultimate test is

3

whether letting a guilty verdict stand would be a manifest injustice. There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005); *accord Sanchez*, 969 F.2d at 1413.

### A. Defendants Participated in a Conspiracy and Scheme to Defraud Involving the Use of False or Fraudulent Statements

#### *1. Defendants Caused Deutsche Bank to Change Its Predetermined LIBOR Submissions to Benefit Their Trading Positions at Their Counterparties' Expense*

The question posed by the BBA asked panel banks to report the rate at which they could borrow funds by asking for and accepting interbank offers in a reasonable market size. *See, e.g.*, GX 1-801 & GX 1-803 (pages from BBA's website regarding submissions by panel banks); Trial Transcript ("Tr.") 274:1-2 (King explaining this meant "[t]hat the rates that I was supposed to be submitting was to be a reflection of where we could borrow funds in the interbank market"). The jury heard Deutsche Bank had an impartial system—a "pricer"—for calculating what its LIBOR submission should be. *See, e.g.*, GX 1-402A (screenshot of Deutsche Bank's pricer); Tr. 271:14-273:2 (King explaining how the pricer's LIBOR column would show the rates to be submitted on any given day). And the jury heard evidence that, on some days, the conspirators, including Defendants, caused Deutsche Bank to submit a number that was *not* that. Instead, they caused Deutsche Bank to take its determined LIBOR number and move it in a direction (higher or lower) that would take more money from their counterparties on trades tied to LIBOR. *See, e.g.*, Tr. 295:5-296:4 (King testifying he moved the number generated by the pricer higher or lower in an effort to affect the day's overall LIBOR fixing); Tr. 2143:2-8 (Curtler explaining how they would use the pricer to come up with Deutsche Bank's LIBOR submission and then move it per request by "skewing the rates"); Tr. 1608:10-24 (Curtler testifying he changed what otherwise would have been his submissions to take account of trading positions).

4

All three co-conspirator witnesses testified that they understood this conduct was "wrong" because it would give Deutsche Bank an unfair advantage over its trading counterparties. As James King put it, "It's intuitively wrong because we are, you know, as I say, taking advantage of the position. We are benefiting. There was a counterparty on the other side who doesn't know what we're doing and is being affected negatively by what we're doing." Tr. 277:22-278:13; *see also* Tr. 1009:13-1010:10 (Parietti testifying that "I knew it was wrong because, you know, it was pretty obvious that LIBOR is a really important benchmark. . . . And it was clear that it wasn't fair and objective if, you know, the submitters were biasing it to make their own bank more money."); Tr. 1647:12-13 (Curtler acknowledging that "it was wrong what we were doing").

The co-conspirators' testimony also established that Defendants participated in the scheme. King, for example, described how he received requests from Black and Connolly to change Deutsche Bank's LIBOR submissions to suit its trading positions. *See, e.g.*, Tr. 289:4-20 ("On any given day if someone has—for example, Gavin Black had a fixing and needed me to make a LIBOR rate or submission higher or lower than we would have ordinarily have done, then that would be communicated either verbally or electronically and then I would change the rates."); Tr. 293:4-12 ("Matthew Connolly on occasion made requests for me to change our LIBOR rates and to benefit the trader's position."). Curtler received similar requests to move Deutsche Bank's LIBOR submission from both Defendants. *See, e.g.*, Tr. 1657:10-18 (describing how he sat next to Black and received requests from him in person); Tr. 1625:11-1626:9 (describing example of written request from Connolly for the 3- month LIBOR submission to be as high as possible). Parietti also testified that Connolly, his supervisor, instructed him to communicate his trading positions to King and Curtler so they could consider them in making

Deutsche Bank's LIBOR submissions. *See* Tr. 1008:13-1009:12 ("I interacted with them to let

them know what my LIBOR fixings were for the next fixing so that they could consider it when

they made their submission. . . . My boss, Matt Connolly, told me to.").

The testimony was corroborated by numerous trial exhibits showing Black and Connolly

asking Deutsche Bank's LIBOR submitters to move their submissions higher or lower to take

account of the bank's trading positions. For example, in a Bloomberg chat with Curtler,

Connolly responded regarding the 1 month LIBOR, "WE WOULD PREFER IT HIGHER. . .

WE HAVE ABOUT 15BB 1MO RECEIVES. . . ." GX 1-027. Similarly, in an email to King,

Connolly requested, "If possible, we need in NY 1mo libor as low as possible next few days . . .

tons of pays coming up overall . . . thanks!" to which King responded, "Will do our best Matt. . .

. ." GX 2-001. *See also* GX 1-003 (Bloomberg chat with Gurjit Dehl, in which Black asked "can

we have a high 6mth libor today pls gezzer?"); GX 1-006 (Bloomberg chat with King, in which

Black asked "COULD WE PLEASE HAVE A LOW 6MTH FIX TODAY OLD BEAN?"); GX

1-019 (Bloomberg chat with Curtler, in which Black requested "LOW 1 MUNF. . . SAME AS

YEST, 8375, U CAARNT"); GX 1-024 (email to Curtler and King from Connolly, relaying

"OTC requests 3 mo Libor be as high as possible Thursday and Friday if you see the market

higher").

>    2. *The Government Did Not Have to Prove that Deutsche Bank Could Not*
>       *Have Borrowed Funds at the Submitted Rates in Order to Establish*
>       *Falsity*

Defendants' argument that the Government had to present data showing Deutsche Bank's

actual or perceived borrowing costs and "contemporaneous market factors" in order to exclude

the possibility that Deutsche Bank could have borrowed funds at the skewed rates Deutsche

Bank submitted is unavailing. *See* Black Mot. I.A.1.a.i at 6-8; Connolly Mot. II.A-B at 11-12.

However, evidence that Deutsche Bank *could not* have borrowed funds at a rate submitted to the

BBA was not needed to establish the falsity of its LIBOR submissions; and evidence that Deutsche Bank *could* have borrowed funds at a submitted rate would not have rendered the Defendants' statements truthful.

As a factual matter, even if Deutsche Bank could have borrowed funds at a submitted rate, that would not prevent the submission from being false and misleading. Both Curtler and Dr. Youle testified that, if a bank could borrow funds at a particular interest rate, it could also borrow those same funds at higher interest rates. *See, e.g.*, Tr. 2182:18-2183:3 (Curtler explaining that, if a bank could get a loan at a particular rate of interest, it stands to reason that the lender would also have accepted a higher rate of interest on that same loan); Tr. 214:23-25 (Dr. Thomas Youle explaining that, "if you were to go to a broker and ask them, they would give you the lowest, because why would you pay more if you could pay less"). By way of analogy: if an auto dealer were willing to sell a buyer a car for $10,000, it stands to reason that he would happily have accepted $12,000 for the car. But it would not be accurate to say the price of the car was $12,000.

The BBA's question did not call for panel banks to submit any number at which they could theoretically (though not rationally) borrow funds. Rather, it asked banks to report the rate at which they could borrow funds by asking for *and accepting* interbank offers in a reasonable market size. *See* GX 1-801. If Deutsche Bank could have borrowed funds at a rate of 5%, for example, it could also have borrowed the same funds at a rate of 6 or 7 or 8%. But it never would have *accepted* a loan at that higher interest rate. *See, e.g.*, Tr. 2182:7 (Curtler explaining "You would borrow the cheapest money firs.t"). Thus, whether Deutsche Bank *could* have borrowed funds at a submitted rate is not dispositive of the falsity of its LIBOR submissions. What matters, and what the evidence showed, is that Deutsche Bank determined what its LIBOR

7

submissions should be, whereupon Defendants and others caused the bank to change the numbers to suit their private purposes. A jury could reasonably find that those submissions were fraudulent.

More fundamentally, whether or not Deutsche Bank could actually have borrowed at the submitted rates is not a defense to fraud because opinions are not scientifically right or wrong—rather, they are either honestly held or they are not. The fraudulent nature of the false statements thus depends on the intent behind them, not on whether the substance of the statements was reasonable or could be justified after the fact. "The expression of an opinion not honestly entertained is a factual misrepresentation." *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (quoting *United States v. Amrep Corp.*, 560 F.2d 539, 544 (2d Cir. 1977)). Indeed, in fraud cases, material statements made for the purpose of deceiving another party establish a scheme to defraud even where those statements, by luck or design, are factually defensible. *See United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991) (upholding mail fraud conviction of a real estate mogul who intended to defraud the State of New York of tax revenue, notwithstanding the government's failure to prove that the taxes were actually due).

Courts have likewise held in analogous contexts that criminal liability attaches to conduct intended to deceive another party, even when the statements uttered are reasonable, defensible, or even truthful. *See, e.g., United States v. Manton*, 107 F.2d 834, 845-46 (2d Cir. 1939) (in the context of a former judge who accepted bribes, "the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it."); *United States v. Vest*, 116 F.3d 1179, 1183-84 (7th Cir. 1997) ("[I]f in hindsight it turns out that . . . the tests [defendant] ordered were medically necessary, that is merely a fortuitous coincidence. It does not rebut the inference that [defendant] had a fraudulent

8

intent when he ordered the tests with the data he had.") (emphasis in original); *United States v. Dula*, 39 F.3d 591, 593 n. 10 (5th Cir. 1994) ("[W]hether or not the products actually conformed to these specifications is a matter of happenstance and is essentially irrelevant").

Thus, the question for the jury was whether Defendants made LIBOR submissions that reflected something other than honestly held estimates of the rate Deutsche Bank would have accepted in order to borrow funds. The jury heard evidence that Defendants asked Deutsche Bank submitters to change the bank's submissions in line with their trading positions, from which jurors could easily infer that the bank's LIBOR submissions were not a true estimate of borrowing costs, but rather numbers manipulated for its financial gain. The evidence thus showed Deutsche Bank's LIBOR submissions were false and fraudulent statements because they did not actually reflect the conspirators' estimates of the bank's borrowing costs.

The jury also heard sufficient evidence to find that Deutsche Bank's LIBOR submissions were fraudulent because each submission carried with it the implicit certification that it was determined according to the BBA's rules—which is not what happened. *See United States v. Allen*, 160 F. Supp. 3d 698, 701-02 (S.D.N.Y. 2016) (rigged LIBOR submissions constitute express and implied false statements), *rev'd on other grounds* 864 F.3d 63 (2d Cir. 2017); *see also United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (recognizing that fraud liability may attach to implicit statements); *Autuori*, 212 F.3d at 118. By making LIBOR submissions in response to the BBA's question, the conspirators held Deutsche Bank out as a panel member that participated in the process as directed. And the conspirators understood that their counterparties believed that the LIBOR rates used to settle their trades would be determined objectively. *See, e.g.*, Tr. 1678:25-1679:11 (Curtler explaining that if counterparties "found out you were skewing your LIBOR to benefit your positions, they either wouldn't deal with you or

9

report you to the BBA"); Tr. 1168:3-15 (Parietti wanted his counterparties "to think LIBOR was a fair and objective benchmark and that they could trust it"). These implied statements were false because the numbers that the conspirators caused to be submitted were not calculated according to the prescribed considerations, but were instead numbers that would help Deutsche Bank make money at its counterparties' expense.

### 3. The Evidence Did Not Establish a "Reasonable Range" of LIBOR Submissions that Would Allow for Consideration of Trading Positions

Contrary to Defendants' assertion, the evidence at trial did not establish that LIBOR submitters were free to set their submissions within a "reasonable range" that took account of their banks' trading positions. *See* Black Mot. I.A.1.a.ii at 9-12; Connolly Mot. II.B at 13. Defendants made that argument at trial, but the jury rejected it. King, Curtler, and Parietti all testified that they had never heard the concept of a "reasonable range" until after the investigation began, nor was it their understanding that the LIBOR submissions should be set with reference to any sort of range—all of them testified that setting LIBOR submissions to benefit trading positions was contrary to the BBA's question. *See, e.g.*, Tr. 759:9-21 (King explaining, when asked if Deutsche Bank's LIBOR submission was a "range of numbers," that it was instead "a number that our pricer came up with or that we came up with to get a single number, which was a number for us that we would submit in any particular tenor"); Tr. 2148:18-23 (Curtler being asked, "And before this investigation began into LIBOR and at Deutsche Bank, had you ever in any of your discussions and conversations on the trading desk talked about there being some sort of reasonable range or leeway in which you can move your LIBOR positions to benefit trader positions?" to which he responded, "No, I haven't."); Tr. 1379:3-6 (Parietti being asked, "Do you have a view whether or not there is flexibility in LIBOR that would allow you to ask a setter to move his submission to benefit your trading position?" to which he responded,

"My view is that there is not."). Dr. Youle similarly testified that there was no such "range" of true borrowing costs. Tr. 215:12-15 ("Q. . . . Do you agree that there was a range of true borrowing costs at banks? A. Based on what I just said, no.").

 The jury accepted this testimony, and Defendants' argument about other evidence does not change the BBA's definition or establish such a range. For example, Defendants argue that a letter to the BBA from the Chicago Mercantile Exchange (CME), discussing the BBA's failure to define "reasonable market size" meant that there was a range of borrowing costs within which a Panel Bank can make an entirely accurate LIBOR submission. *See* DX 9044A at 7. That the BBA did not define "reasonable market size" does not establish that there was a "reasonable range" of rates at which Deutsche Bank would have asked for and accepted offers to borrow funds. Indeed, the BBA refused to adopt the CME's views in its August 2008 evaluation of procedures for setting LIBOR. *See* GX 1-176A at ¶ 1.6 ("After evaluating the responses received, the FX & MM Committee has decided that as the market supports the current procedures and processes in relation to the fix that these should remain in place. . ."). Importantly, the evidence showed that Deutsche Bank had a method for determining one particular rate—not a range of rates—at which it could ask for and accept interbank offers for each currency and tenor, per the BBA's definition. It also showed that Defendants at times changed some of those rates to benefit their trades at the expense of their counterparties.

  *4. Statements Need Not Be Expressly Prohibited to be False and Fraudulent*

 The Government was not required to prove that the BBA "unambiguously prohibited" the Defendants' conduct, or that Deutsche Bank's trade confirmations with its counterparties prohibited Deutsche Bank from skewing its LIBOR submissions to benefit its trading positions to their detriment. *See* Black Mot. I.A.3 at 22-25. Nor was the Government required to put on evidence of the BBA's specific misimpressions, or to call any particular witness, including a

11

witness from the BBA. *See* Black Mot. I.A.1.b at 13-17. And as the Court instructed the jury, the evidence the Government chose to introduce had to "negate any *reasonable* interpretation of the [BBA's] instruction that would make Deutsche Bank's submission responsive." Tr. 2895:17-19 (emphasis added). The testimony of the co-conspirators and Dr. Youle regarding their understanding of what the BBA was asking, together with their "intuitive" sense of the wrongfulness of moving Deutsche Bank's LIBOR submissions to suit the bank's trading positions and disadvantage its counterparties, did just that. Similarly, when asked if there was anything in a counterparty trade confirmation that led him to believe it was "okay for you to move your LIBOR submissions for traders' positions," Curtler acknowledged that, "No, there's not." Tr. 2147:25-2148:3 (referencing DX 9064, trade confirm with FHLB of Atlanta).

That LIBOR was intended and understood to measure borrowing costs, and not rates skewed to benefit banks' trading positions, is also clear from the language of the BBA's question itself. The Court previously recognized this. *See* Decision on Defs.' Mots. *in Limine*, Dkt. No. 263 at 4-5 ("The question asked by the BBA can reasonably be interpreted to require the banks to do precisely what the Government argues: respond with a LIBOR submission that estimates the cost to the bank of borrowing cash at the rate the bank would accept, and nothing more."). The evidence showed this is not always what Defendants and their co-conspirators actually did.

### 5. The Government Did Not Have to Prove that LIBOR Fixes Were Themselves "False"

The Government did not have to prove that the BBA's *published LIBORs* were actually false, impliedly false, or misleading half-truths. *See* Black Mot. I.A.2.a & b at 18-22. That is, the Government was not required to show, as Black claims, that Deutsche Bank's trades with relevant counterparties did not settle at the contracted rate, *i.e.*, the LIBOR for the particular reset date, *see* Black Mot. at 18-19, or that the Defendants or co-conspirators conveyed any false or

misleading information to the counterparties directly, *see* Black Mot. at 20-21. Black's assertion

that the Government had a "burden of linking the Relevant Counterparties' understandings to

statements or conduct of one of the co-conspirators," *see* Black Mot. at 21, is simply wrong, *see*

*United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (party to whom misrepresentation

was made need not be the party whose property interests were threatened).

Many well-recognized fraud schemes involve the manipulation of a single input that

infects an overall number that is ultimately transmitted to the victim. For example, criminal

liability for a scheme to defraud attaches when a bookkeeper, acting with the purpose of

propping up his company's stock price, alters a factual input concerning a debit or credit that

ultimately influences the net corporate profits reported to the investing public. *See, e.g., United*

*States v. Ebbers*, 458 F.3d 110, 114 (2d Cir. 2006) (defendants reduced line item costs in

WorldCom's general ledger, which had the effect of boosting the company's reported earnings);

*United States v. Block*, 16-cr-595 (JPO), 2017 WL 1608905 at *2-3 (S.D.N.Y. Apr. 28, 2017)

(denying motion to dismiss securities fraud counts where defendant made false entries into a

spreadsheet that totaled numbers ultimately used in a 10-Q because "the Government claims that

the *inputs* on their own fraudulently inflated the ultimate output" (emphasis in original)). Here

too, Deutsche Bank's skewed LIBOR submissions infected or tended to infect the overall LIBOR

fix.[1] That did not result in a "false" LIBOR—LIBOR on a particular day for a particular tenor

was whatever the BBA said it was—but rather, a LIBOR that did not truly reflect the submitting

banks' perceived borrowing costs. This is sufficient to prove falsity for purposes of a scheme to

defraud.

---

[1]    DB was not the only submitter engaged in this particular practice. *See United States v. Allen*, 864 F.3d 63, 67 n.1
(2d Cir. 2017).

6. *The Court Correctly Instructed the Jury that Falsity Can Be Established
   By Evidence of Implied False Statements and Misleading Half-Truths*

As the Court instructed the jury, a representation is "false for purposes of the wire fraud

statute if it is actually false, if it is *impliedly false*, or if it is a *misleading-half truth*." Tr. 2889:8-

11 (emphasis added); *see also Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989,

2001 (2016) ("A statement that misleadingly omits critical facts is a misrepresentation. . .");

*Autuori*, 212 F.3d at 118 ("[I]t is just as unlawful to speak 'half truths' or to omit to state facts

necessary to make the statements made, in light of the circumstances under which they were

made, not misleading."); *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he

concept of a misrepresentation is also broad, reaching not only false statements of fact but also

misleading half-truths and knowingly false promises. . . . It can also include the omission or

concealment of material information, even absent an affirmative duty to disclose, if the omission

was intended to induce a false belief and action to the advantage of the schemer and the

disadvantage of the victim.").

Contrary to Connolly's assertion, half-truths are not "inapposite to LIBOR submissions."

*See* Connolly Mot. at 15. Indeed, the evidence showed that the LIBOR submissions made by,

and at the request of, Connolly and his co-conspirators were, if anything, half-truths in that they

did not reflect the amount the bank would have accepted in order to borrow funds. The jury

could have concluded on that basis that the falsity element was satisfied.

**B. Deutsche Bank's Skewed LIBOR Submissions Were Material to the BBA and
   to Deutsche Bank's Counterparties**

As this Court stated during trial, "all the Government needs to show in order to obtain a

conviction" with respect to materiality is "that the charged misrepresentation is objectively

capable of influencing a decision by the recipient of that misrepresentation." Court's Response

to Recent Submissions by the Parties, Dkt. No. 321 at 1-2; *see also* Tr. 2889:21-25 (instructing

14

jury that a statement is material "if it was capable of influencing the actions of the person to whom it was made"). Again, as this Court stated with respect to misrepresentations to the BBA:

> . . . the Government has introduced evidence tending to show that the DB LIBOR submissions were *objectively capable* of influencing the setting on LIBOR by the BBA on any given day, simply because of the way the LIBOR formula works. The BBA (via Thomson Reuters, its agent) was the recipient of the submissions; it was the entity to which the alleged misrepresentations were addressed. Adding those two things together gets the Government to the jury on the issue of materiality. . . ."

Dkt. No. 321 at 1-2 (emphasis in original).

Accordingly, to show materiality to the BBA or Deutsche Bank's counterparties, the evidence had to show that the Defendants caused statements to be made to the BBA or counterparties that were capable of influencing the actions of the BBA or the counterparties. The Government offered evidence of both, and argued both to the jury.

### *1. Defendants' Fraudulent Scheme Was Capable of Influencing the BBA's Actions*

The evidence established that Deutsche Bank's fraudulent LIBOR submissions were material to the BBA because they were capable of influencing, and in some cases actually influenced, the overall LIBOR fix published by the BBA. Contrary to Defendants' claims, *see* Black Mot. I.B.1 at 27-29; Connolly Mot. IV.B at 29, the BBA's practice of trimming the panel banks' submissions (*i.e.*, omitting the highest four and lowest four prior to averaging) in an effort to avoid undue influence from outlying submissions does not mean that the BBA's LIBOR setting could not be influenced by any particular submission. Dr. Youle established that, in terms of mathematics, a single contributor's submission could influence the overall fix, even if it was not one of the middle eight submissions. Tr. 151:16-155:5 (explaining a hypothetical in which bank E raised its submission so it was one of the four highest submissions and thus trimmed; "even though bank E got excluded, the average is still larger than it was going to be

15

before . . . the reason being, bank D is now included, when it wasn't included before. Bank D has a relatively higher quote. This overall cumulative effect of the change by bank E is going to make it so the LIBOR used to be 2.89 before, now it's 2.8909, slightly larger, because now bank D is replacing it."); GX 1-452 at 31-37 (slides illustrating Dr. Youle's hypothetical). Similarly, King and Curtler identified instances in which Deutsche Bank's submissions changed the overall fix. *See, e.g.,* Tr. 473:12-475:19, 1645:11-18. The evidence thus established materiality as a matter of mathematics.

Contrary to Black's argument, the Government was not required to present "evidence to quantify the impact that Deutsche Bank's adjustment of its submissions had on the ultimate LIBOR rate." *See* Black Mot. at 29 (arguing such evidence was needed to prove materiality). As the following cases make clear, the evidence need not show the *amount* of impact, or even that there *was* impact; instead, the evidence must show that the statement in question was *capable of* having an influence. *See Neder v. United States*, 527 U.S. 1, 16 (1999) ("A false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.") (internal quotation omitted); *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013) ("a misrepresentation is material if it is capable of influencing the decisionmaker"); *see also* Tr. 2890:5-8 (charging the jury that the "government is not required to prove that the false statement actually influenced some decision made by the person to whom the statement was made in order to meet its burden to prove materiality").

Nor was the Government required, as Black claims, to call a witness from the BBA or present evidence that the BBA considered LIBOR submissions that were skewed to benefit a panel bank's trading positions to be improper. *See* Black Mot. at 27. Rather, it was sufficient to

16

show, as the evidence did, (1) that a skewed LIBOR submission was capable of influencing the BBA's overall LIBOR fix, and (2) that such skewing did in fact occur. The evidence showed that and more—it showed that, on certain days, those submissions in fact influenced the LIBOR fix. *See* Tr. 151:16-155:5; 473:12-475:19, 1645:11-18.

In addition, the jury, taking all reasonable inferences in a light most favorable to the Government, could readily find that the accuracy of the world's most important benchmark was important to the BBA. The jury heard evidence that LIBOR was ubiquitous in the financial markets. *See, e.g.*, Tr. 128:1-6 (Dr. Youle describing that "complex contracts that are used by traders, banks, sophisticated entities," as well as consumer products such as "[m]ortgages, student loans, auto loans, and credit cards are often all tied to LIBOR explicitly"); Tr. 129:8-20 (Dr. Youle explaining how "it snowballed over time until it became this truly central interest rate in all of the financial markets where trillions and trillions of dollars of contracts in notion value depend on it"). Jurors also learned the BBA questioned panel banks when numbers appeared to be out of line with other banks' submissions. Tr. 1698:3-22 (Curtler explaining that individual panel banks' LIBOR submissions were published along with the overall LIBOR fix, and the BBA was "very quick to call banks" in response to complaints from market participants that banks were bidding above their submitted rates). These facts support a finding that the BBA intended LIBOR to measure what it asked banks to submit—estimates of borrowing costs acceptable to both lender and borrower—not rates that Defendants wanted to see in the hope of making more money from currency trades. And as a matter of common sense, the jury was entitled to conclude that the BBA did not intend to create and publish a benchmark tied to trillions of dollars in financial instruments that reflected interest rates that major banks believed best advantaged them on a given day, as opposed to one that accurately reflected the banks' best

estimate of their actual borrowing costs.

The co-conspirators' testimony that they concealed the scheme from the BBA further supports materiality (and fraudulent intent). *See United States v. Prieto*, 812 F.3d 6, 14 (1st Cir. 2016) (there would be no reason for the defendant to lie about something immaterial). King admitted that he did not tell the BBA that he was moving his LIBOR submissions to benefit Deutsche Bank's trading positions. *See* Tr. 476:23-477:11, 478:2-11. Parietti further explained that, "I didn't tell the BBA because I didn't want them to know that I was cheating and that I might get in trouble." Tr. 1167:25-1168:2. Indeed, Curtler testified that he believed Deutsche Bank would have been removed from the panel had the BBA learned the truth, testifying that "we thought that if you were spotted doing what we're doing, you'd get kicked off the panel." Tr. 1647:14-16.

### 2. *Defendants' Fraudulent Scheme Was Capable of Influencing the Actions of Deutsche Bank's Counterparties*

The jury could well have concluded that the scheme to defraud was material to Deutsche Bank's counterparties as well.

The evidence established that Deutsche Bank's skewed submissions at times influenced the overall LIBOR, which in turn impacted the amount of money Deutsche Bank's counterparties would pay or receive under their contracts with Deutsche Bank. *See, e.g.*, Tr. 2190:6-2192:20 (Konich describing a "typical trade confirmation" for an interest rate swap between FHLB of Indianapolis and Deutsche Bank in which payments made depended on the direction of LIBOR, such that "the higher the LIBOR, that's going to make LIBOR minus 18 a higher rate"); Tr. 1560:5-9 (Ms. Hunter explaining that when FHLB of Atlanta entered into interest rate swaps, "if we are receiving LIBOR and it goes down, we basically receive less. If we are paying LIBOR and it goes down, we pay less. But if it goes up, we pay more."); Tr. 1416:20-1417:12 (Maroun

describing a trade between FHLB of Boston and Deutsche Bank and explaining that if the FHLB
was paying LIBOR, it would benefit if LIBOR was lower, while Deutsche Bank would benefit if
LIBOR was higher); *see also* Tr. 152:17-155:5 (Dr. Youle explaining that an increase in the
overall LIBOR fix of even .0006 would be large enough to affect financial contracts, and
providing examples of how a small change in the LIBOR fix would change the amount of money
owed by a party to a trade). That is sufficient to show materiality to those counterparties. *See*
Tr. 2890:9-10 (jury instructed that a statement must be "capable of influencing some decision or
action"); Dkt. No. 321 at 2 (government proves its case with evidence that "the higher or lower
setting that was requested would impact whether particular trades by DB traders were or were
not successful").

   Whether or not the calculation of the amounts to be paid on trades can be characterized as
"ministerial," *see* Black Mot. I.B.2.b at 37-38, is irrelevant and a made-up legal requirement.[2]
The conduct was still capable of influencing the amounts of money counterparties paid Deutsche
Bank or received from Deutsche Bank.

   And contrary to Black's further argument, the Government's ability to prove materiality
in no way hinged on the introduction of "evidence of the net trading positions" of certain
counterparties. *See* Black Mot. I.B.2.c at 38. Data reflecting a counterparty's overall "net
exposure" to LIBOR on any given day is unnecessary to establish that Deutsche Bank's skewed
LIBOR submissions were *capable of influencing* the amounts that a counterparty would pay or
receive from its trades with Deutsche Bank.

   Additionally, the counterparty witnesses testified they would have acted differently had

---

[2]   And arguably it was not ministerial; as Konich testified, it involved comparing the applicable LIBOR published
on Telerate and received from Deutsche Bank, confirming the bank's agreement with the amount, and then
making the payment. Tr. 2194:24-2195:17.

they known of Deutsche Bank's conduct. Cindy Konich of FHLB of Indianapolis testified that she would have called the bank's legal counsel and regulators had she known they were influencing LIBOR while a swap contract was ongoing. Tr. 2210:13-22 ("I first would have gone to my legal counsel and asked them to look at the contract that we have, the ISDA contract that was referenced with Deutsche Bank . . . We probably would have also alerted our regulator if we thought there was something going amiss . . . ."). George Maroun of FHLB of Boston similarly testified that, had he known what Deutsche Bank was up to, he would have considered not using them as a counterparty. Tr. 1422:13-17 ("We would have explored our options, not to do business with them, do business with other counterparties, try to negotiate getting out of the trade, those types of things"). And had he learned of Deutsche Bank's conduct after entering into a trade with the bank, he would have looked into unwinding, or terminating, the ongoing trade. Tr. 1422:21-1423:2 ("[A]t that point, we would explore what's called unwinding the trade or negotiating our way out of it to terminate it."). The fact that these witnesses were not familiar with all of the details of how LIBOR was set, *see* Black Mot. I.B.2.a at 34-35, does not diminish their testimony. What matters is that, had they known Deutsche Bank was skewing its LIBOR submissions to benefit its trading positions, they likely would not have continued entering into trades with Deutsche Bank—that is, the Defendants' conduct was capable of influencing their decisions.

Nor did the counterparty witnesses have to be derivatives traders themselves to speak to the impact of Defendants' conduct on their institutions. *See* Connolly Mot. IV.A.1 at 23-25. The evidence established that Ms. Konich and Ms. Hunter were familiar with their institutions' practices of entering into and settling derivatives trades based on LIBOR, including with Deutsche Bank. *See, e.g.*, Tr. 2187:11-14, 2189:13-23 (Ms. Konich, currently CEO and

President of FHLB of Indianapolis, was previously its vice president and treasurer in charge of
financial functions, including its derivatives trades such as interest rate swaps); Tr. 1557:23-
1558:9 (Ms. Hunter serves as senior vice president and director of accounting operations for
FHLB of Atlanta, responsible for their derivative operations including interest rate swaps). And
Maroun was a derivatives swaps trader himself and executed such trades with Deutsche Bank.
Tr. 1410:6-1411:7 (Maroun traded swaps for FHLB of Boston and engaged in "[p]robably
several hundred" LIBOR-based trades); Tr. 1412:6-23 (explaining the process for engaging in
trades with Deutsche Bank). All three witnesses were thus qualified to testify, as they did, about
how the LIBOR fix impacted the amounts their institutions paid on or received from derivatives
trades with Deutsche Bank, and how they likely would not have done business with Deutsche
Bank had they known of the scheme.

Their testimony was not misleading, as Connolly claims, because the counterparties had
no "legal right to know" that Deutsche Bank's LIBOR submissions took trader positions into
account. *See* Connolly Mot. IV.A.2 at 25-26. As the jury was instructed, materiality is proven
by evidence that false or fraudulent statements were capable of influencing a person's actions.
There is no additional requirement that this person have some specified "legal right" to certain
information that was not shared. Similarly, while the International Swaps and Derivatives
Association ("ISDA") contracts between the counterparties and Deutsche Bank provided in their
standard terms that the counterparties understood the risks of the trades into which they entered,
*see* Black Mot. I.B.2.a at 35-36, the counterparties themselves understood that LIBOR was being
set in a transparent, objective, and honest way. *See* Tr. 1413:10-19 (Maroun thought he was
agreeing to "what would be a fair market trade that was representative of a deep and liquid
market" and did not expect that Deutsche Bank's LIBOR submitters may have been moving their

submissions to benefit Deutsche Bank's trading positions); Tr. 2196:14-17 (Ms. Konich expected LIBOR would be set in a manner that was "very transparent, very honest, and fair of what their expectations were in the market"); Tr. 2197:11-14 (Ms. Hunter explaining that LIBOR is "used to set a lot of different rates and indices, particularly like we're talking about here swaps, loans, and etc., and it needs to be something that's working in a fair and honest manner"). This means they would have had no reason to anticipate that there was a risk of the sort raised by the submitter's actions. In any event, the Second Circuit has held that such contractual disclaimers do not defeat materiality for purposes of federal fraud charges. *See United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) ("[C]ontractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes.").

Finally, testimony that the conspirators hid the conduct from the counterparties also tends to prove materiality. Tr. 478:2-11 (King "didn't want them to know because it was—we were giving ourselves—we were taking advantage of the position we had as a LIBOR panel bank"); Tr. 1167:23-24 (Parietti "did not tell my counterparties because I didn't want them to know that I was using an unfair advantage in my trades"). Hearing all of this evidence, the jury could reasonably find that the Defendants' scheme was capable of influencing the actions of Deutsche Bank's trading counterparties, and thus, material to those counterparties.

### C. Defendants Acted with Intent to Defraud by Causing Deutsche Bank to Make LIBOR Submissions Calculated to Harm Its Counterparties

The jury could have concluded that Defendants and their co-conspirators acted with intent to defraud because they understood Deutsche Bank's counterparties would lose money if their scheme to manipulate the LIBOR rate was successful. *See* Tr. 2894:3-7 (instructing jury that a "person acts with intent to defraud when he acts willfully and with the specific purpose— the conscious aim or objective—of depriving someone else of money or property by means of

false pretenses, representations, or promises"); *Binday*, 804 F.3d at 578 ("the deceit must be coupled with a contemplated harm to the victim").

All three co-conspirator witnesses testified that they understood making LIBOR submissions calculated to improve Deutsche Bank's trading positions could give the bank an unfair advantage at the expense of its counterparties. *See, e.g.*, Tr. 277:22-278:13 (King explaining that they were "taking advantage of the position. We are benefiting. There was a counterparty on the other side who doesn't know what we're doing and is being affected negatively by what we're doing."); Tr. 1009:13-1010:10 (Parietti acknowledging that "it was pretty obvious that LIBOR is a really important benchmark. . . . And it was clear that it wasn't fair and objective if, you know, the submitters were biasing it to make their own bank more money."); Tr. 1609:22-24 (Curtler describing "if we had a position fixing that day and we altered our LIBOR just to take into account that position or that fixing, it would give us an unfair advantage.").

Black and Connolly had as much, if not more, knowledge than the cooperators did about how Deutsche Bank's trades with counterparties worked and how they would be affected by changes in the LIBOR fix. Black worked as a U.S. dollar money market derivatives trader at Deutsche Bank, meaning that his main responsibility was to enter U.S. dollar derivatives trades with counterparties on the bank's behalf. *See* Tr. 286:16-288:20. Indeed, Black's counsel emphasized Black's knowledge of the derivatives trading market in his opening statement and cross-examination of the co-conspirator witnesses, and the witnesses agreed. Tr. 68:16-19 ("You're going to see in this trial that Black was a student of the market. He had a very thoughtful view about how he believed interest rates, LIBOR, and the entire market were moving."); Tr. 1294:23-1295:3 (questioning Parietti, "Q.  And Gavin Black was a very smart

trader, right? A. Yes.  Q. He had a very sophisticated view of the market, right? A. Yes.  Q.  He was -- fair to say he was a student of the market? A.  I think we all were."); Tr. 1855:2-9 (questioning Curtler, "Q.  He was a very, very thoughtful trader, right? A. Yes.  Q.  He's a student of the market, right? . . . He's a man that sits all day and studies all kinds of information, and people come and talk to him to get his views. Right? A. Correct.").  And Connolly, as director of Deutsche Bank's pool trading desk in New York, managed and had responsibility for both cash and derivatives trading desks. *See* Tr. 292:16-25; 1005:4-1007:1.  A reasonable juror could readily conclude that Black and Connolly had the same understanding as any rational trader on their desks—*i.e.*, that influencing LIBOR to help Deutsche Bank's trading positions could give the bank an unfair advantage that harmed other market participants.

Black's and Connolly's own words, in written communications and audio recordings, confirmed that they understood LIBOR was supposed to be an estimate only of *cash borrowing costs*. *See, e.g.*, GX 1-122 (Black noting that "THE LIBORS (BOTH 1MTH AND ESPECIALLY 3MTH) ARE WAY TOO LOW AND DON'T ACCURATELY REFLECT THE TRUE COST OF UNSECURED USD CASH"); GX 1-132T at 1 (Black explaining that the U.S. dollar LIBOR uses "exactly the same definition" as LIBOR for other currencies, "it just seems to be that the fixing in dollars is pretty close to the bid side of the cash market than the offer side . . ."); GX 1-159TE at 1 (Black noting that LIBOR "rates are meant to be reflective of lending and borrowing between good names"); GX 1-293 (Connolly explaining the relationship between LIBOR and banks' ability to borrow funds: "Certainly Libors are poised to go lower and spreads have come in a decent amount.  In addition, a few of the banks I spoke to before and during the auction process that were particularly worried received funds in the auction and were much calmer today . . . Very important.").

Black's and Connolly's communications likewise confirmed that they understood the impact that moving LIBOR could have on trades with counterparties, and that they intended their requests to move Deutsche Bank's LIBOR submissions to benefit the bank's trades to the detriment of its counterparties. Black acknowledged the "sort of linkage of that fixing to trillions of derivative contracts all around the world," GX 1-159TE at 2, and at times referenced his own derivatives trading positions in connection with his requests to Deutsche Bank's submitters, *see, e.g.*, GX 1-085 ("it suits me for low 1s and high 3s so will badger them in the morning. . . u need it low too?"); GX 6-001 ("Low 1mth today pls shag, paying on 18 bio").

Connolly similarly referenced Deutsche Bank's trading positions as the reason motivating his requests to move LIBOR submissions in a certain direction. *See e.g.*, GX 1-024 ("OTC requests 3mo Libor be as high as possible Thursday and Friday if you see the market higher. . . Cronin mcteague in rates had 12 yards today and tomorrow. . ."); GX 1-027 ("WE WOULD PREFER IT HIGHER . . . WE HAVE ABOUT 15BB 1MO RECEIVES"); GX 2-001 ("If possible, we need in NY 1mo libor as low as possible next few days. . . tons of pays coming up overall"); *see also* GX 1-036 (email from Parietti copying Connolly: "Regarding Mondays 3mLibor, MMD NY is receiving 3mL on USD 6.5 Bn so hoping for higher 3mL"); Tr. 1051:20-1052:2 (Parietti relating his conversation with Connolly after sending the email—"I said to him: Hey, Matt, did you see my email to London? And he said to me: Yeah, do it just like that."); Tr. 289:4-20, 293:4-12 (King describing requests from Black and Connolly to move LIBOR submissions to benefit the bank). A reasonable juror could easily find from this evidence that the Defendants acted consciously to benefit Deutsche Bank at the detriment of its counterparties, and thus, acted with intent to defraud.

### 1. The Evidence Showed that Defendants Did Not Act in Good Faith

The jury likewise could reasonably find from the evidence that neither Black nor

Connolly acted in good faith, *i.e.*, that neither Black nor Connolly "honestly believe[d] that the representations he made or caused to be made were true or honestly believe[d] that all material facts ha[d] been disclosed," Tr. 2896:2-9. Both Defendants' good faith arguments misconstrue the evidence presented at trial.

Contrary to Defendants' arguments, neither the fact that Deutsche Bank's cash traders and derivatives traders were seated near each other nor the weekly risk calls among traders from various offices indicated that Defendants' supervisors directed or encouraged them to request fraudulent LIBOR submissions to benefit their trading positions—let alone mandated a jury finding of good faith. *See* Black Mot. I.C.1.a.i at 40-41; Connolly Mot. V.B.2 at 39. At most, it showed that supervisors encouraged employees to communicate; not that they encouraged them to communicate to commit fraud. That certain employees had roles related to Deutsche Bank's cash trading and LIBOR submissions and to its derivatives trading similarly does not absolve the Defendants of liability for their criminal conduct. *See* Black Mot. I.C.1.a.ii at 42-43; Connolly Mot. V.B.2 at 39.

More important, even if supervisors directed or encouraged the fraud, that is not a defense to illegal conduct. The "I was following orders" excuse is not equivalent to a good faith defense, *i.e.*, an "opinion honestly held that what the defendant was doing was not wrong." Tr. 2896:2-3 (instructing the jury); *cf. United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (finding that, while evidence of the defendant's supervisors approving similar conduct should have been admitted, such evidence was "less probative" of his intent). Here, the jury heard the evidence and Defendants' arguments, and still found that both Defendants acted with fraudulent intent. As Curtler acknowledged, notwithstanding Deutsche Bank supervisors seating cash and derivatives traders near each other, he still understood moving the bank's LIBOR submissions to

be wrong. Tr. 2152:23-25 ("Q. Do you think because your bosses put you together, that you didn't do anything wrong? A. No."). Similarly, when asked if the "fact that it was your supervisor telling you to do that" made him think his conduct was permissible, Parietti replied "No, I did not think that it was permissible, but I did do it." Tr. 1382:15-22.

Defendants' attempt to shift the blame to Deutsche Bank's training and the prevalence of the fraudulent conduct is likewise rejected. That Defendants were not specifically trained *not* to manipulate LIBOR does not negate their fraudulent intent, any more than does the fact that others were also doing it. *See* Black Mot. I.C.1.a.iii at 43-44; Connolly Mot. V.B.2 at 39. The very nature of a conspiracy is that others agreed to engage in the same unlawful scheme. That such conduct was widespread among Deutsche Bank's traders and at other banks does not diminish Black's or Connolly's intent to participate in it. As the Court instructed the jury in connection with evidence of other banks' conduct, "'everybody is doing it' is not a defense to the crime of wire fraud or conspiracy to commit wire fraud; just as 'everybody speeds' is not a defense if your car happens to get picked up on the radar." Tr. 2913:4-7; *see also* Decision on Gov't Mots. *in Limine*, Dkt. No. 262 at 22 ("[T]he court has already assured the Government that it will deliver a jury instruction to the effect that 'everybody's doing it' is NOT a defense to criminal liability."). And as the co-conspirator witnesses who were also doing it acknowledged, they knew their conduct was wrongful even without any training or being told that it was wrong. King, for example, testified that, despite not having formal training, he knew it was wrong "[i]ntuitively," Tr. 277:25-278:7, and that he did not need training to figure out that he should not consider trading positions, Tr. 467:16-19. Curler testified similarly. Tr. 1787:18-1788:2 ("Q. . . . did you ever receive training while at the bank that said you could not move your LIBOR submissions in order to make more money for yourself or your team? A. No. . . . Q. Did

27

you need training to know that you were not supposed to do that? A. No.").

Similarly, Defendants' and other traders' openness about their behavior at Deutsche Bank does not demonstrate good faith— particularly when the evidence showed they made efforts to conceal their scheme from external entities, including the BBA and Deutsche Bank's counterparties. *See* Black Mot. I.C.1.a.iv at 45-46; *see also supra* I.B.1 & 2. Moreover, the evidence did not show that Defendants and their co-conspirators were open about their conduct beyond their own group. Their self-serving emails and Bloomberg communications sent to broader audiences do not show good faith on Defendants' part, nor do they negate their fraudulent intent. *See* Black Mot. I.C.1.a.v at 46-47 (citing, *e.g.*, GX 1-090 (Bloomberg communication from King to "a large group of other traders and salespeople," Tr. 468:9-14); DX 1240 (email from Curtler to "a whole group of Deutsche Bank employees," Tr. 537:7- 15); DX 1261 (email from Curtler to "about 20 people," including derivatives traders and submitters, Tr. 532:25-533:14)).

That Black may not have made false statements directly to counterparties or the BBA does not matter. *See* Black Mot. I.C.1.b.i at 48-49. Rather, it was sufficient that Defendants intended to cause Deutsche Bank submitters to make false and misleading statements, in the form of LIBOR submissions to the BBA that were manipulated to take trading positions into account, knowing those submissions would be used (one way or another[3]) to calculate LIBOR which were then transmitted to the market generally, including the counterparties. Tr. 2887:6-12 (instructing the jury that "[t]he false or fraudulent representations that allegedly underlay the scheme consisted of submitting, *or causing someone else to submit*, to the British Bankers'

---

[3]   If the Deutsche Bank submission was in the "middle 8," it would be part of the actual calculation; if it were one of the "outlier 8," but would have been in the "middle 8" if submitted without taking trading positions into account, that fact would have resulted in some other submission's being included in the actual calculation. Either way, the submission would have the potential to impact the calculation.

Association on behalf of Deutsche Bank LIBOR submissions that reflected, at least in part, an intent to benefit the trading positions held by the Defendants, their subordinates, or their co-conspirators" (emphasis added)).

Likewise, that Black may have been a "student of the market" or "thoughtful trader," *see* Black Mot. I.C.1.b.ii at 50, or that his requests for skewed LIBOR rates at times moved in a direction consistent with the market, *see* Black Mot. at 51, does not show good faith or change his intent to manipulate Deutsche Bank's submissions in his favor. If anything, it indicates that Black was an experienced trader who knew how to skew LIBOR submissions to his counterparties' disadvantage. And again, the Government was not required to prove that Defendants requested the submission of rates at which Deutsche Bank could not theoretically borrow funds, *see supra* I.A.2. *See* Black Mot. I.C.1.b.iii at 52-53. Black's repetition of this argument is no more availing with respect to his claim of good faith as it is with respect to falsity. As discussed above, the evidence showed that Deutsche Bank determined its LIBOR number, and that Defendants and their co-conspirators caused the bank to change that number and instead submit a different number that would benefit the bank's trades.

Nor was the Government required to establish that the BBA "unambiguously prohibited Black's conduct," *see* Black Mot. I.C.1.c at 53, or that Defendants were "told that the BBA's Instructions prohibited the sharing of trading positions," *see* Black Mot. I.C.1.d at 54; Connolly Mot. V.B.2 at 38 (complaining the "BBA did not publish express prohibitions on LIBOR submitters considering trading positions" until 2013). The BBA's failure to explicitly prohibit submitters from having parallel responsibility for derivatives trading prior to 2013 does not mean that the BBA "sanctioned" the practice before that, *see* Black Mot. at 43, or that it was acceptable for a panel bank to skew its LIBOR submissions to benefit its trading positions. As

discussed above, the evidence only had to "negate any reasonable interpretation of the [BBA's] instruction that would make Deutsche Bank's submission responsive." Tr. 2895:17-19. King, Parietti, Curtler, and Dr. Youle all testified that LIBOR submissions were meant to reflect a panel bank's borrowing costs, and that moving submissions to benefit a bank's trades was obviously wrong. By way of analogy, a school teacher might write "no biting" on the chalkboard after one of his students bit another in class, but that does not mean that biting was previously acceptable or that the biter should not be punished for what he did. *See* Tr. 2653:17-22 (Government's summation).

Contrary to Connolly's assertion, the "entirety of the government's case against [him]" did not rest on three emails. *See* Connolly Mot. V.A at 31 (citing GX 1-025, GX 1-026, and GX 3-001). Of course, there is no minimum amount of evidence required for a reasonable juror to find guilt. *See, e.g., United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face" (internal quotation omitted)). However, in this case, the three cited emails, taken together with similar communications and the testimony of his co-conspirators, established that Connolly made requests for Deutsche Bank's LIBOR submissions to take account of its trading positions and instructed Parietti to do the same. The evidence further established that his co-conspirators believed such activity to be wrong; the jury could reasonably have inferred that Connolly harbored a similar understanding.

Connolly's call with Hilty, his successor at Deutsche Bank, allegedly demonstrated his good faith belief that there was nothing improper about shading LIBOR submissions with trading position considerations. *See* Connolly Mot. at 35. But the Government argued that Connolly's comments—including that "[n]obody has a f[**]king clue what the definition is, where it should

30

be . . ."—actually demonstrated his personal awareness that LIBOR submissions were susceptible to wrongful manipulation. *See* GX 1- 133T at 5. Connolly even acknowledged in the same call that "people f[**]k around with it on their positions," which shows he knew trading positions should not be a relevant consideration for LIBOR submissions. *Id.* The jury was not persuaded that this email demonstrated good faith on Connolly's part, and as it is susceptible to an interpretation consistent with lack of good faith, the Court has no reason to disturb the verdict.

Connolly's claimed inability to understand the LIBOR submissions process because he was not himself a derivatives trader or submitter, *see* Connolly Mot. V.B at 36-37, is also insufficient to override the jury's finding of guilt. Co-conspirator witnesses who were themselves not primarily derivatives traders (King) or LIBOR submitters (Parietti) testified that they understood that changing Deutsche Bank's LIBOR submissions to take account of its trading positions was something other than what was called for by the BBA's definition, and that this deceit could give the bank an unfair advantage over its counterparties. The jury could reasonably have inferred that any rational trader was capable of so understanding—especially in light of Connolly's own emails and the other testimony and documents that were introduced against him. There was more than enough evidence from which the jury could have concluded that the Government proved beyond a reasonable doubt that Connolly did not act in good faith.

> 2. *Countrywide Is Materially Different and Does Not Preclude the Jury's Guilty Verdict*

Black's reliance on the Second Circuit's decision in *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016) is misplaced. *See* Black Mot. I.C.2 at 55-57.

In *Countrywide*, the Government alleged that the defendants violated the mail and wire fraud statutes by selling subprime mortgage loans in 2007 and 2008 to government-

31

sponsored enterprises ("GSEs"), knowing that the loans were not investment quality and thus intending to defraud the GSEs. The Government's theory was that the defendants acted with fraudulent intent when they *subsequently* transferred the poor-quality loans to the GSEs. The Court of Appeals overturned the jury verdict, holding that the Government had proven only that the defendants breached representations made in the relevant contracts with the GSEs, not that they had fraudulently intended to breach those representations *at the time* of contract execution. The Court held that the Government's theory of fraud was invalid because it relied on evidence of post-contractual fraudulent intent alone, without coupling it with evidence of a false post-contractual representation. Thus, the Government failed to prove that the defendants in *Countrywide* possessed fraudulent intent at the time they made the original *representations about the quality of the loans. Id.* at 664-66.

This case is entirely different. The evidence showed that the manipulated submissions were made with the requisite temporal-fraudulent intent. In other words, the Defendants' fraudulent intent—their intent to try to influence a particular LIBOR setting in an advantageous direction—was contemporaneous with the fraudulent action taken by the Deutsche Bank submitters. That fact takes this case out of the rule of *Countrywide*. Tr. 2890:12-14 (jury instruction on intent to defraud).

Additionally, the evidence showed that the scheme was in progress—and thus, that Defendants and their co-conspirators had already formed fraudulent intent—at the time they entered into and settled various swap trades that were based on LIBOR. *See, e.g.,* GX 1-513 (trade confirmation with FHLB of Indianapolis dated April 7, 2006); GX 1-514 (trade confirmation with FHLB of Boston dated May 2, 2006); GX 1-545 (trade confirmation with FHLB of Atlanta dated December 13, 2007). Unlike the defendants in *Countrywide*—who

formed intent only after all contracting was complete, and made no subsequent false

statements—the fact that the conspirators here were already perpetrating a fraud at the time

they entered into and settled trades demonstrates that they acted with intent to defraud at the

time those trades were executed. The federal wire fraud statute applies "to everything

designed to defraud by representations as to the past or present, or suggestions and promises

as to the future." *Countrywide*, 822 F.3d at 664.

### 3. The Government Was Not Required to Present Data Regarding Net Trading Positions

Finally, despite Black's claims, the Government was under no obligation to present trade

data or other evidence "sufficient to establish that all of Black's requests were in the same

direction as his net trading positions." *See* Black Mot. I.C.3 at 58. It is well-established that (1)

a scheme need not be successful, and (2) a defendant need not actually benefit to be guilty of

fraud. *See United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) ("to violate the [wire fraud]

statute, the defendant need not have completed or succeeded in his scheme to defraud"); *United

States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("scheme to defraud need not have been

successful or complete"); *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010) ("[t]o support

a fraud conviction it is not necessary for the Government to demonstrate that the defendant

personally benefitted from the scheme" (internal quotations omitted)). Nor would "all" requests

to move Deutsche Bank's LIBOR submissions need to be successful or benefit Black for a crime

to occur, as Black's motion suggests. *See* Black Mot. at 58. As the Court instructed the jury

here, the Government "need only show that a scheme to defraud existed—it doesn't have to

prove that it succeeded—it is not necessary for the Government to prove that any intended victim

actually lost money or property as a result of the scheme or that the defendant, whichever one

you're considering, personally benefited from the scheme." Tr. 2891:22-2892:3. The jury could

33

reasonably have found, from the multitude of evidence described above, that the Government met its burden as to both Defendants.

Moreover, the evidence showed that Defendants and their co-conspirators did consider their overall, or net, trading positions when making requests to move Deutsche Bank's LIBOR submissions in particular directions. Black, for example, requested a low 1-month LIBOR submission because he was paying 1-month LIBOR on 18 billion notional. *See, e.g.*, GX 6-001; Tr. 1721:9-16 (Curtler explaining that "[h]e's reset 18 billion in 1-month where he needed a low 1-month rate," and that "18 billion is a large position or fixing"). Connolly similarly referenced a position of about 15 billion in his request for a higher and then lower-month LIBOR submission, GX 1-027, as well as "pays coming up overall." GX 2-001; *see also* Tr. 1664:1-11 (Curtler understood Connolly to be saying that "they have a lot of pay sets coming up over the next few days, they need low LIBOR," and thus asking him to move the LIBOR submission to "benefit his positions"). Parietti similarly took account of his desk's overall positions in making requests to move Deutsche Bank's LIBOR submissions. *See* Tr. 1011:19-24 ("When I made my requests for the submitters to consider my positions, I would check with the other traders on my desk with the understanding that I was going to include their position in the net that I sent, in the net position that I sent to the submitters for this purpose.").

The traders' own views of their contemporaneous trading positions at the time they make requests is what matters—not evidence detailing a *post-hoc* attempt to establish trading positions on any given day nearly a decade later.

### D. The Jury Heard Sufficient Evidence that Counterparties Were Defrauded

Connolly separately challenges the Government's "conduit" theory, *see* Connolly Mot. III at 15, which focused on Defendants' making material misrepresentations to counterparties through the BBA/Thomson Reuters acting as a conduit, when they skewed the LIBOR

submissions that were used to calculate LIBOR and to settle swaps and other derivative

contracts. As explained below, Connolly's challenges misapprehend both the Government's

case and the evidence presented at trial.

### 1. The Case Was Not Based On, and the Government Was Not Required to Establish, a Duty to Disclose

Connolly relies on cases discussing the duty to disclose in prosecutions based on

omissions. *See* Connolly Mot. III.A. at 16 ("*an omission*, after the time of contracting, only

violates the wire fraud statute 'in the context of a duty to disclose'") (emphasis added) (quoting

*Autuori*, 212 F.3d at 119). But as the Government made clear, and Connolly acknowledges, this

is not an omissions case. *See* Connolly Mot. at 14 ("this case was not charged as an omission

case"). Rather, the case against Connolly is based on affirmative misrepresentations, including

those made to Deutsche Bank's counterparties both directly and through the BBA/Thomson

Reuters as a conduit. The Court recognized the viability of that theory and instructed the jury

accordingly. *See, e.g.*, Tr. 2887:24-2888:10 (". . . the government argues an alternative theory;

namely, that the defendants caused false or fraudulent representations, those being LIBORs

whose settings were impacted by the alleged misrepresentation that defendants caused the

Deutsche Bank submitters to make to the BBA, to be relayed directly to those banks by

Thomson-Reuters, and that those three counterparties, the ones who testified, settled certain

trades on the basis of LIBORs that had been manipulated by virtue of the alleged

misrepresentations").

It thus does not matter whether the counterparties were or were not relying on

communications from Deutsche Bank, or whether they disclaimed any fiduciary duty by

Deutsche Bank in their ISDA agreements. *See* Connolly Mot. at 17. Rather, the evidence

established that Defendants made and caused to be made misrepresentations; that their

misrepresentations (and the LIBOR submissions those misrepresentations affected) were transmitted to the counterparties and used to settle their trades; and, that the counterparties likely would have terminated their business with Deutsche Bank or taken other corrective action had they known of the scheme. *See supra* I.B.2. Nothing more needed to be shown to prove the Government's case.

> 2. *The Trial Record Shows that Misrepresentations Were Made to the Counterparties Through the BBA/Thomson Reuters as a Conduit*

The use of a conduit to transmit Defendants' misrepresentations does not somehow erase their fraudulent conduct. As discussed above, the evidence at trial established both falsity and materiality to Deutsche Bank's counterparties. *See supra* I.A & I.B.2. Contrary to Connolly's assertion, *see* Connolly Mot. III.B, the Government was not required to establish that counterparties considered the individual submissions of Deutsche Bank or other panel banks on any particular day. Nor does the fact that the BBA used Deutsche Bank's submissions to calculate the overall LIBOR fix preclude such a conduit theory. As discussed above, many well-recognized fraud schemes similarly involve the manipulation of a single input that infects an overall number that is ultimately transmitted to the victim. *See supra* I.A.5; *see also, Ebbers*, 458 F.3d at 114 (defendants reduced line item costs in WorldCom's general ledger, which had the effect of boosting the company's reported earnings); *Block*, 2017 WL 1608905 at *2-3 (defendant made false entries into a spreadsheet that totaled numbers ultimately used in a 10-Q). Thus, the federal fraud statutes are not rendered void by the use of a conduit—or in this case, two conduits, the BBA (which incorporates the misrepresentations into its LIBOR calculation), and Thompson Reuters (which published those numbers—submissions and LIBORS—to the entire market).

The cases cited in Connolly's motion do not prove otherwise. *See* Connolly Mot. at 19.

*Pasternack v. Laboratory Corp. of America Holdings*, 27 N.Y.3d 817 (N.Y. 2016) dealt with the reliance element of civil fraud claims under New York law. In *Pasternack*, the New York Court of Appeals resolved a long-standing conflict in the state as to whether there is a common law civil cause of action under New York law for fraud in favor of a plaintiff where A deceives B, B acts in reliance on A's deception, and B's action in reliance on A's deception injures the plaintiff ("Third-Party Reliance Claims"). The Court of Appeals held in *Pasternack* that there is no cause of action in such circumstances. *Id.* at 829. However, there is no reliance element in the federal criminal fraud statutes. *See Weaver*, 860 F.3d at 95 ("common-law requirements of 'justifiable reliance' and 'damage[s]'. . . plainly have no place in the federal fraud statutes" (quoting *Neder*, 527 U.S. at 24-25)). So *Pasternack* is irrelevant on this point.

*Eaton Cole* and *Bruff*, which date back to the nineteenth century, articulate a permissible civil common law theory of fraud, where the fraudulent statement is conveyed directly to the victim through a conduit. Connolly Mot. at 19 (citing *Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (N.Y. 1880) and *Bruff v. Mali*, 36 N.Y. 200 (N.Y. 1867)). And contrary to cases in which the conduit exercised its own independent judgment over each output ultimately transmitted to the victim, *see* Connolly Mot. at 20-21(citing *Securities Investor Protection Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 705-06 (N.Y. 2001)), here, the process by which the BBA set each LIBOR fix was pre-established by a mathematical formula, which was not subject to case-by-case discretion. The formula itself made it possible for Defendants to conspire to manipulate LIBOR by moving Deutsche Bank's submissions away from the number Deutsche Bank would have accepted from among offers to lend in a reasonable market.

### 3.  *The Evidence Established that the Scheme Was Capable of Influencing the Counterparties' Actions*

That the counterparties' contracts called for trades to be settled using the applicable

37

LIBOR fix—which is exactly what occurred—does not change the false and material nature of the scheme to defraud the counterparties. *See* Connolly Mot. III.C at 21-22. This is not a breach of contract case; it is a criminal fraud case. The evidence established that Deutsche Bank's altered submissions were capable of influencing, and at times did influence, the ultimate LIBOR fix, i.e., the particular rate on a particular day. This, in turn, impacted the amounts that counterparties paid or received under their contracts with Deutsche Bank. *See supra* I.B.1&2. The evidence likewise established that the counterparties expected LIBOR was being set in a transparent and honest manner, and that, had they known of Defendants' scheme, the counterparties likely would have acted differently by terminating their business with Deutsche Bank or taking other measures. *See supra* I.B.2.

### E. Defendants' Scheme to Rig the LIBOR Benchmark Affected Financial Institutions

Defendants challenge the timeliness of the charges, believing a five-year statute of limitations should have applied to the conduct at issue.

The Government proceeded under 18 U.S.C. § 3293(2), which "extends to ten years the statute of limitations for wire fraud offenses (including conspiracy to commit wire fraud) 'if the offense affects a financial institution.'" *United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (quoting § 3293(2)). The "verb 'to affect' expresses a broad and open-ended range of influences." *Id.* (quoting *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 90 (2d Cir. 1999)). Thus, "§ 3293(2) 'broadly applies to any act of wire fraud that affects a financial institution,' provided the effect of the fraud is 'sufficiently direct.'" *Id.* (quoting *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998)).

Defendants' argument rests on the claim that, despite evidence that they rigged the world's most important financial benchmark—to which trillions of dollars in financial

38

instruments were tied—no reasonable juror could have concluded that "a financial institution" was affected thereby. *See* Black Mot. I.D at 61-62; Connolly Mot. I.B at 9-10. This claim defies common sense. Given the evidence of LIBOR's ubiquity in the financial markets, and the fact that it is linked to trillions of dollars' worth of credit cards, mortgages, and derivatives, *see supra* I.B.1, a rational jury could easily have concluded that the scheme naturally had an effect on large institutional banks—simply as a matter of common sense.

But common sense does not prove a case—evidence does. The Government had to introduce evidence to support its common-sense argument. And so it did. It offered particularized evidence establishing that the Defendants' conduct "affected" two categories of financial institutions: (1) five specific institutions that were Deutsche Bank's counterparties on trades, and (2) Deutsche Bank itself. A ten-year statute of limitations thus applies to each count. *See* 18 U.S.C. § 3293(2).[4]

### 1. *Defendants' Scheme Affected Deutsche Bank's Trading Counterparties*

The evidence fully supported a conclusion that Deutsche Bank's counterparties were affected by the fraudulent scheme. These counterparties were federally insured institutions or federal home loan banks—each a "financial institution" for purposes of § 3293(2).[5] As the following table demonstrates, the jury heard evidence that Deutsche Bank had swaps with counterparties that "reset" (*i.e.*, had payments calculated) based on LIBOR on particular days. The evidence also showed that the conspirators schemed to manipulate LIBOR on those days.

---

[4]   For one object of the conspiracy charged in Count One, the conspiracy to commit bank fraud (18 U.S.C. § 1344), no showing of an effect on a financial institution is required for the ten-year statute of limitations to apply. *See* 18 U.S.C. § 3293(1).

[5]   *See* 18 U.S.C. § 20(1) (insured depository institutions); 18 U.S.C. § 20(3) and 12 U.S.C. § 1422 (federal home loan banks).

| Manipulation Exhibit | Date | Tenor | Corresponding Swap Confirmation | FDIC or FHLB Counterparty |
|---|---|---|---|---|
| GX 1-038 | 4/12/2006 | 3M | GX 1-513 | FHLB of Indianapolis (GX 1-911A) |
| GX 1-038 | 4/12/2006 | 3M | GX 1-502 | FDIC-Insured Wachovia (GX 1-913C/ GX 1-913D) |
| GX 1-040 | 5/18/2006 | 3M | GX 1-514 | FHLB Boston |
| GX 1-042 | 9/27/2006 | 3M | GX 1-544 | FHLB of Atlanta (GX 1-912) |
| GX 1-102 | 12/14/2007 | 3M | GX 1-545 | FHLB of Atlanta (GX 1-912) |

Defendants argue that these institutions tried to "hedge" their risk to LIBOR by entering into countervailing or offsetting trades. *See* Black Mot. I.D at 62; Connolly I.B at 9. But the jury heard testimony from counterparty witnesses that it was rare for their institutions to be perfectly hedged on any given day, which meant that these institutions were in fact exposed to LIBOR. *See* Tr. 1559:14-1560:12 (Ms. Hunter testifying "we hedge both sides, but we are not perfectly hedged," and "the way our portfolio has been since I've been working there for 16 years is we've always paid more LIBOR than we had received"); Tr. 1422:11-12 (Maroun explaining how "it would have affected us negatively had it been skewed upward"); Tr. 1430:11-13 (Maroun acknowledging "we would not have been one hundred percent hedged on any given day").

While the jury did not hear what the institutions' overall "net exposure" to LIBOR was on any given day, *see* Black Mot. I.D at 62, such detailed evidence is unnecessary to establish an effect. A victim is no less impacted by a crime if factors (such as hedging) mitigate the harm that would otherwise be caused by the crime. That a person has homeowner's insurance does not justify burglary, for example, any more than a bank's being federally insured makes it lawful to rob the bank.

Nor must the Government prove that any institution suffered an out of pocket loss in order to be "affected." "Courts have repeatedly held that in order to allege such an effect, the

government need not allege actual harm, but only facts that would demonstrate that the bank suffered an *increased risk of loss* due to its conduct." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 630 (S.D.N.Y. 2013) (emphasis added).

In *United States v. Ghavami*, the defendants were charged with engaging in various conspiracies and schemes to defraud municipal bond issuers by manipulating the bidding process for municipal bond investment agreements and other municipal finance contracts, in violation of 18 U.S.C. §§ 371, 1343, and 1349. *Ghavami*, No. 10 CR 1217 KMW, 2012 WL 2878126, at *1 (S.D.N.Y. July 13, 2012), *aff'd sub nom. United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015). My colleague, Judge Wood, found that the Government had offered evidence—in the form of enormous settlement payments made by financial institutions, including UBS, as a result of Defendants' conduct and in return for non-prosecution agreements—to demonstrate a new or increased risk of loss to financial institutions. The Court explained that limiting the reach of § 3293(2) "to cases in which financial institutions suffered a net loss would perversely incentivize financial institutions to participate in frauds in which they expect to earn a net benefit, which is behavior that the statute seeks to discourage," while "requiring a court to perform extremely complex and speculative calculations" to determine "whether a scheme ultimately resulted in a net benefit or a net loss for a financial institution." *See id.* at *6–*10.

Similarly, a court in the Northern District of California recently rejected the proposition that 18 U.S.C. § 3293(2) requires proof that the defendant's action was inconsistent with a financial institution's "net" position (as opposed to being inconsistent with the institution's interest in the discrete transaction in question): "the statute [18 U.S.C. § 3293(2)], again, speaks only to an 'effect' and not, for instance, a 'net effect.' More

importantly, the government need not show that the bank *actually* lost money, but rather only that the bank was exposed to a *risk* of loss." *United States v. Bogucki*, 316 F. Supp. 3d 1177, 1189 (N.D. Cal. 2018) (emphasis in original). Thus, as long as a Deutsche Bank counterparty was exposed to a risk of loss on any particular trade, it has been "affected" regardless of what its "net," or overall, exposure to LIBOR was on that day.

Here, the jury heard evidence that financial institutions were exposed to a risk of loss on the swaps in question because the conspirators schemed to move LIBOR in a direction that would have harmed the counterparties' financial interests on those discrete deals. Indeed, on September 16, 2008, the conspirators schemed to move the rate in a direction that harmed Bank of America. *See* GX 1-188 and Tr. 1765:8-1766:2 (Black and Curtler discussed "keep[ing] the 'LED' wide," meaning keeping 1-month LIBOR low and 3-month LIBOR high); GX 1-455 at 37-38 and Tr. 1766:3-23 (Deutsche Bank's LIBOR submissions were in line with this); GX 1-529 (trade confirm with Bank of America, showing Bank of America receiving 1- month LIBOR and paying 3-month LIBOR). When a counterparty is required to pay more money or receive less profit than it was entitled to under a swap by virtue of a fraudulent scheme, then that counterparty was "affected" by the scheme.

Connolly further argues that evidence of single trade confirmations presented at trial cannot establish a risk of loss. *See* Connolly Mot. I.B at 9. But this argument ignores both the law discussed above as well as the instances when the conspirators were successful in moving LIBOR in a direction that would have disadvantaged the counterparties' financial interests on particular deals. It also ignores the fact that 18 U.S.C § 3293(2) requires proof that the "offense"—a conspiracy or scheme to defraud, 18 U.S.C. §§ 1343, 1349 not any specific act or wire—affected a financial institution. Which is not a specific act or wire. Thus, the

42

Government needed only to prove that the Defendants' fraudulent conspiracy or scheme *as a whole* exposed a financial institution to loss or a risk of loss.

This is exactly what the scheme was intended to do and, in fact, resulted in with mathematical precision. This is more than "sufficiently direct" for purposes of *Heinz. See Heinz*, 790 F.3d at 367 ("§ 3293(2) broadly applies to any act of wire fraud that affects a financial institution," provided the effect of the fraud is "sufficiently direct"). Given the importance of LIBOR to financial markets across the globe, combined with the evidence of Defendants and their co-conspirators scheming to move LIBOR against their counterparties' financial interests on particular days, a rational jury could find that the scheme naturally had an effect on financial institutions.

### 2. *Defendants' Scheme Also Affected Deutsche Bank*

Alternatively, as to Deutsche Bank itself, the Second Circuit has recognized that an employee of a financial institution who engages in misconduct that causes that institution to incur costs in the form of fines and attorney's fees "affects" that institution. *See Heinz*, 790 F.3d at 367; *see also Bogucki*, 316 F. Supp. 3d at 1189 (finding that "[l]itigation risk. . . fits comfortably within the scope of the effects that trigger § 3293(2)"). The jury heard evidence that Deutsche Bank conducted an extensive internal investigation into the conspirators' conduct, for which it paid outside counsel millions of dollars. The jurors could reasonably infer that Deutsche Bank incurred significant attorney's fees and associated expenses in connection with that investigation as a result of the scheme. Tr. 283:23-284:13 (King was interviewed by the law firm Paul Weiss, which Deutsche Bank brought in to conduct the investigation); Tr. 1166:7-17 (Parietti was interviewed during the investigations at Deutsche Bank in 2012); Tr. 1781:13-1782:22 (Deutsche Bank's investigation began in early 2010, and Curtler was interviewed multiple times, by Deutsche Bank's internal and external lawyers).

43

Deutsche Bank is a "financial institution" because it is a "depository institution holding company" under 18 U.S.C. § 20(6). A "depository institution holding company" is defined by the Federal Deposit Insurance Act as "any company which has control over any bank." *See* 12 U.S.C. § 1841(a)(1). 12 U.S.C. § 1841(a)(2) defines what it means to have "control," and the testimony of Carol Saracco, managing director at Deutsche Bank, made clear that Deutsche Bank AG has "control" over Deutsche Bank Trust Companies America ("DBTCA"), a wholly-owned subsidiary that has FDIC insurance. Tr. 2229:19-2230:3. Further, the FDIC certificate shows that DBTCA was FDIC insured during the time of the scheme. GX 1-904C. DBTCA is also the entity that make payments for many of the trades for which confirmations were presented at trial. *See* GX 1-512 at 2, GX 1-544 at 3, GX 1-545 at 4, and GX 1-525 at 3 (trade confirms identifying DBTCA as the Deutsche Bank payor by SWIFT Code "BKTRUS33"). Deutsche Bank AG is therefore a "financial institution" for purposes of § 3293(2).

Additionally, Deutsche Bank is a "financial institution" as defined by 18 U.S.C. § 20(9) because it is a "branch or agency of a foreign bank," as defined by the Banking Act of 1978. Under 12 U.S.C. § 3101(3), a "branch" means any office or any place of business of a foreign bank located in any State of the United States at which deposits are received." Ms. Saracco testified that Deutsche Bank AG takes corporate deposits in the United States, in its New York offices. Tr. 2229:2-3. Given Defendants' objection, however, the Government did not argue to the jury that Deutsche Bank is a financial institution on this basis, nor was the jury so instructed. *See* Tr. 2598:2-18.

Black's and Connolly's claims that there was no nexus between their conduct and Deutsche Bank's investigation is nonsensical. *See* Black Mot. I.D at 63; Connolly Mot. I.A at 8. As all three co-conspirator witnesses testified, they were interviewed as part of an internal

investigation looking into the very conduct—manipulation of Deutsche Bank's LIBOR submissions—for which Black and Connolly were convicted. The investigation and underlying conduct exposed Deutsche Bank to "a new or increased risk of loss" for purposes of § 3293(2). *See Ghavami*, 2012 WL 2878126 at *6 (explaining that "interpreting § 3293(2) to cover conduct that exposes a financial institution to a new or increased risk of loss is also consistent with the statute's legislative purpose, which is 'to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes'") (quoting *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003)). The evidence thus showed an effect on Deutsche Bank's counterparties and Deutsche Bank itself. This was more than sufficient to support the jury's verdict.

### F.   The Jury Heard Sufficient Evidence of Interstate Wire Communications to Support the Substantive Wire Fraud Counts

As the Court instructed the jury, the wire fraud charges required proof that "interstate or international wire facilities would be used [in] furtherance of the scheme to defraud" and that "the defendant could reasonably foresee that the communication would be required in execution of the scheme to defraud." Tr. 2897:19-23, 2898:10-15. But the information that was wired "need not itself be fraudulent or carry any false or misleading representation." Tr. 2898:2-3.

That Defendants' scheme foreseeably involved interstate and international wires is not seriously in dispute. Thomson Reuters's Stephen Turner established that the LIBOR fix was communicated from the U.K. to the United States via international wire. Tr. 794:4-8, 796:5-10. That LIBOR was fixed in the U.K. and published in the United States and around the world, was well known to those in the industry. *See, e.g.*, Tr. 150:22-23 (Dr. Youle describing how the LIBOR "fixings are published around the world publicly"); Tr. 276:8-12 (King explaining that "the calculations made are then published to the public, I guess, or so the rates are made public

and [are] then picked up by whoever needs access to the rates or whatever uses the rates, and then it's used globally in financial markets, financial transactions, etc.").

Deutsche Bank technology manager Neil Guy's testimony regarding the bank's email servers also made clear that when the conspirators were communicating between London and New York regarding their manipulation of LIBOR in their favor, they were sending electronic wires between London and New York. *See* Tr. 251:13-257:12. When Connolly in New York emailed King in London, for example, as a matter of common sense, it was foreseeable that the communications would travel internationally over the wires. There was thus ample evidence from which the jury could find that Defendants "could reasonably foresee that the communications"—the published LIBOR fixes and emailed requests to move Deutsche Bank's LIBOR submissions—"would be required in execution of the scheme to defraud." Tr. 2898:14-15.

Contrary to Defendants' assertions, *see* Black Mot. I.E at 64-66, Connolly Mot. VI at 41-42, there is no additional requirement to prove that the communication underlying each substantive wire fraud count was *itself* false, made with fraudulent intent, or material to Deutsche Bank's counterparties. Rather, it is black letter law, as the Court instructed, Tr. 2898:2-3, that for liability to attach under a federal fraud statute, the mailing or wire need only have been "a step in the plot," *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989); *see also United States v. Tocco*, 135 F.3d 116, 125 (2d Cir. 1998) (wire need not itself contain fraudulent information).

Nor was the Government required to introduce data concerning Black's net trading positions to show that he was poised to benefit from the skewed LIBOR submission on the date of an alleged wire communication, as he claims. *See* Black Mot. I.E at 66. As discussed above, a defendant may be held responsible for his participation in a scheme to defraud regardless of the

scheme's success or any actual benefit he may (or may not) have received from it. *See supra* I.C.3. Moreover, Black's own communications (and the witness testimony) demonstrate that his LIBOR requests were made for the purposes of benefitting him or the bank. *See supra* I.A.1 & I.C.

For each substantive wire fraud count, the Government met its burden by showing that an interstate or international wire was used in furtherance of the fraudulent scheme, as reasonably foreseeable to Connolly and Black.

With respect to Count Two against Connolly, the wire communications consisted of August 12 and August 15, 2007 emails between Connolly and King, in which Connolly requested a low one-month LIBOR submission to benefit Deutsche Bank's trades.  GX 2-001, GX 2-002.

With respect to Count Nine against Connolly, the wire communications consisted of the corresponding publication of Deutsche Bank's and the other panel banks' submissions and the LIBOR fix on August 13, 2007. *See* Tr. 251:13-257:12 (Turner describing how such numbers were communicated from the U.K. to the United States via international wire transfer).

With respect to Count Eleven against Black, the wire communications consisted of a May 15, 2008 email from Black to Curtler requesting a low one-month LIBOR submission to benefit his trading position, GX 6-001, and the publication of the corresponding LIBOR submission and fix via international wire. *See* Tr. 251:13-257:12 (Turner's testimony).  This evidence is summarized below:

| Count | Defendant | Description | Communication Exhibit | Wire Evidence |
|-------|-----------|-------------|----------------------|---------------|
| 2 | Connolly | August 12 and 15, 2007, CONNOLLY and King discussed via electronic message the manipulation of Deutsche Bank's USD LIBOR Submission | GX 2-001, GX 2-002 | Neil Guy, Tr. 251:13-257:12 |
| 9 | Connolly | August 13, 2007, the rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates—or LIBORs—were published via international wire | GX 2-001, GX 2-002 | Stephen Turner, Tr. 794:4-8, 796:5-10 |
| 11 | Black | May 15, 2008, the rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates—or LIBORs—were published via international wire | GX 6-001 | Stephen Turner, Tr. 794:4-8, 796:5-10 |

Combined with all the evidence discussed above—which established Defendants' participation in the scheme to defraud, its materiality to the BBA and Deutsche Bank's counterparties, Defendants' intent to defraud, and the resulting effect on financial institutions—this was more than sufficient to support Black's and Connolly's conviction on the substantive wire fraud counts.

### G. The Jury Heard Sufficient Evidence of the Conspiracy and that Connolly Knowingly Joined It

Connolly's argument concerning the conspiracy count is premised on his contention that the Government failed to prove wire fraud or bank fraud, and so, could not prove a conspiracy to commit those offenses. *See* Connolly Mot. VII at 42-43. The conclusion does not, of course, follow from the premise, since a conspiracy need not succeed in order to be criminal. However, as has been discussed ad nauseum, the evidence established each element of wire fraud and bank fraud—the fraudulent scheme to manipulate Deutsche Bank's LIBOR submissions, the

materiality of the scheme to the BBA and Deutsche Bank's counterparties, Connolly's fraudulent intent to participate in the scheme, and its effect on financial institutions.

The evidence further established that Connolly joined the conspiracy to commit wire fraud and bank fraud, as evidenced by requests he made to others within Deutsche Bank to change LIBOR submissions in accordance with his trading desk's USD trading positions, his instructions to Parietti to do the same, and each testifying co-conspirator's understanding that this was something other than the estimate called for by the BBA's definition and would give Deutsche Bank an advantage over its counterparties. The jury heard sufficient evidence from which it could infer Connolly's fraudulent intent, as well as his intent to enter into and further the charged conspiracy. [6]

For all the above reasons, Defendants' motions for a judgment of acquittal or new trial based on insufficiency of the evidence grounds are denied.

---

[6] The Government also relies on evidence of similar requests made by other traders Connolly supervised. For example, Andrew Smoler and David Park, who were also traders on Connolly's desk in New York, made requests to change Deutsche Bank's LIBOR submissions to benefit their trading positions. *See, e.g.,* GX 1-040 (request from Smoler, "If you can help we can use a high 3m fix tom"); Tr. 388:13-392:10 (King explaining how he raised Deutsche Bank's LIBOR submission in response to Smoler's request); GX 1-049 (request from Park, "LIBOR higher tomorrow?"); Tr. 406:25-408:13 (King interpreting Park's comment as "communicating that he is typically or their trading books typically need higher LIBORs); *see also* Tr. 1011:14-1012:12 and 1029:20-1030:3 (Parietti testifying that he took account of Smoler's and Park's positions in his requests to move Deutsche Bank's LIBOR submissions, and that Connolly supervised him, Smoler, and Park). I do not believe it is possible to infer that Connolly participated in the charged conspiracy simply because traders he supervised did; if that were the only evidence of his knowing participation, I would have to overturn the verdict.

II.   **Defendants' Constructive Amendment Motions**

A. **The Alleged "Core of Criminality" Is the Scheme to Manipulate LIBORs to Benefit the Defendants' Trading Positions at the Expense of Their Counterparties**

The thrust of Defendants' constructive amendment challenge is that, while the indictment alleged a "non-convergent" fraud scheme, the Government sought to prove a "convergent" fraud scheme at trial.[7]

Even if that were true—which, for the reasons discussed below, it is not—this sort of change does not amount to a constructive amendment, which occurs only when the evidence and jury instructions "modify *essential elements* of the offense charged" to a degree that the defendant was convicted of an offense with which he was not charged. *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (emphasis added). As long as the indictment alleges the "core of criminality" of the offense proved at trial, no constructive amendment has occurred. *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007). And the "core of criminality" depends on the defendant's conduct—not on the label attached to the Government's legal theory. *See United States v. Banki*, 685 F.3d 99, 119 (2d Cir. 2012) (no constructive amendment despite change in legal theory because the proof at trial "related to the same statements in the same letters as described in the [i]ndictment"); *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) ("the 'core of criminality' of an offense involves the essence of the crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview").

---

[7]   Actually, at trial the Government went forward on both theories. Specifically, the Indictment alleged that Deutsche Bank's misrepresentation to the BBA worked a fraud on its counterparties in LIBOR-based trade, while at trial, the Government offered evidence that misrepresentations were made directly to the counterparties as well as to the BBA.

In *D'Amelio*, for example, the Second Circuit held that the Government did not impermissibly amend the indictment by proving the defendant enticed a minor through internet *and* telephone communications when the indictment alleged only internet communications as the facility of interstate commerce. 683 F.3d at 414. Similarly, in *United States v. Salmonese*, the core of criminality was a fraud scheme to realize profits from unlawful sales of stock warrants. 352 F.3d 608, 621 (2d Cir. 2003). While the indictment identified certain sales of stripped warrants, this did not preclude the Government from proving other, unalleged sales of stripped warrants or sales of stolen warrants at trial. *Id.* In *Banki*, the core of criminality was the operation of an unlicensed money-transmitting business; though the indictment identified the defendant's cousin as the source of the wire transfers while evidence at trial pointed to his father, there was "no uncertainty" the defendant was convicted of "conduct" that was the subject of the indictment. 685 F.3d at 118-19. And in *United States v. Seabrook*, no constructive amendment was found where the indictment charged a scheme to defraud non-profits controlled by the defendant while the Government alleged at trial that the defendant defrauded a municipality. 613 Fed. Appx. 20, *23-24 (2d Cir. 2015). This was because the factual circumstances and means of the crime were the same under either theory. *Id.* (finding the "essential elements of the scheme described in the indictment were the same as those proved at trial"). The core of criminality was the fraudulent scheme itself; the details of how that scheme was carried out, including the particular parties who were defrauded, were subject to proof at trial.

Here, the core of the indictment is a fraudulent scheme to obtain money by manipulating the LIBOR rate. That is exactly what the evidence at trial proved. The "Manners and Means" portion of the indictment describes a scheme in which Defendants,

who traded LIBOR-based financial products, contacted Deutsche Bank's LIBOR submitters to ask for submissions calculated to suit the bank's derivative positions, rather than submissions reflecting an honest assessment of the bank's borrowing costs. *See* Superseding Indictment, Dkt. No. 22 ("Indictment") at ¶ 27(a)-(i). And the "Overt Acts" section of the indictment identifies the date, currency, and tenor of over twenty LIBOR manipulation requests made in furtherance of the conspiracy. *Id.* at ¶¶ 28-48. The conduct alleged in the indictment is precisely what the Government proved at trial.

Moreover, if the Government essentially "switched victims" between indictment and trial, that would not constitute a constructive amendment. As in *D'Amelio*, *Salmonese*, *Banki*, and *Seabrook*, the fact that the Government proved the indictment's alleged scheme at trial means the indictment was not constructively amended.

Defendants' inability to identify an element of the offense that changed due to the purported shift in theories is also fatal to their claims. To establish a constructive amendment, the defense must show the presentation of evidence at trial altered the "essential elements" of the offense charged. *Mollica*, 849 F.2d at 729. The essential elements of wire fraud are (1) a scheme to defraud, (2) intent to defraud, and (3) use of interstate or international wires. This is so regardless of whether the scheme alleged in the indictment is labeled convergent, non-convergent, or otherwise, and these are the elements that the evidence at trial proved.

### B. Defendants Have Long Been on Notice of the Alleged Misrepresentations to Deutsche Bank's Counterparties

The purported shift in the Government's legal theory, from "non-convergent" to "convergent," does not even constitute a variance, which "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves *facts* materially different from those alleged in the indictment." *Salmonese*, 352 F.3d at 621 (emphasis added). This is

<u>because</u> a variance depends on a difference between *facts* alleged and *facts* proved at trial, not on the legal theory advanced. As indicated above, the indictment alleged that Defendants schemed with Deutsche Bank's LIBOR submitters to submit economically advantageous rates, and that is exactly the proof that the jury saw. The facts alleged—misrepresentations made to the BBA, by providing wrong answers to its question, which had the capacity to (and occasion did) influence the setting of LIBOR, which had the capacity to (and on occasion did) impact the results of particular trades—were the facts proved. That the Government shifted its focus from arguing these facts as a convergent fraud (though it never abandoned that argument) and focused the jury's attention on a non-convergent fraud theory (an easier case to make) works no variance.

But even if a variance had occurred, reversal would be appropriate only if the variance prejudiced Defendants by infringing on the notice requirements of the indictment. *See United States v. D'Anna*, 450 F.2d 1201, 1204 (2d Cir. 1971); *see also* Decision on Gov't Mots. *in Limine*, Dkt. No. 262 at 13 ("variance between allegation and proof is not fatal unless the defendant has been thereby deprived of an adequate opportunity to prepare a defense or has been exposed to a risk of being prosecuted twice for the same offense" (quoting *United States v. Ratliff-White*, 493 F.3d 812, 822 (7th Cir. 2007))). Here, the Court effectively cured any prejudice that could have resulted by continuing the trial for several months so that defense counsel could assess their defenses in light of the Government's submissions about its various legal theories. This "eliminate[d] the possibility that any variance would prove prejudicial to defendants." Gov't Mots. *in Limine*, at 13.

Defendants' feigned surprise at the Government's allegation at trial that one of the objects of the scheme was to defraud Deutsche Bank's counterparties by causing misrepresentations to be made to the BBA (a non-convergent fraud) ring hollow. Defendants

acknowledge, as they must, that the indictment alleges false and fraudulent statements made to the BBA for the purpose of influencing the LIBOR fix. *See* Black Mot. at 68; Connolly Mot. at 49. The indictment describes in detail the process by which Thomson Reuters, acting as an agent for the BBA, receives panel banks' submissions and calculates the LIBOR fix. Indictment at ¶ 2. The indictment further alleges that Black, Connolly, and their co-conspirators engaged in a scheme to obtain money and property "by making false and fraudulent USD LIBOR submissions to the BBA for inclusion in the calculation of USD LIBOR representing that the rates submitted were an unbiased and honest estimate of the bank's borrowing costs when in fact the submissions reflected rates that were designed to benefit their trading positions." *Id.* ¶ 26.

But one can (faintly) discern in the Indictment allegations that suggest the making of false and fraudulent statements to Deutsche Bank's counterparties. The Indictment described how the LIBOR settings were published—transmitted "to servers and traders of LIBOR-based financial products around the world"—and how these published LIBORs were used as the basis for the pricing of derivatives trades among these counterparties. *Id.* ¶¶ 3-4. It explains how the payments to be made on the derivatives contracts were affected by the LIBORs published on certain dates, such that "If the relevant LIBORs moved in the direction favorable to the traders' position, the financial institution and the trader stood to benefit *at the expense of their counterparties.*" *Id.* ¶ 5 (emphasis added). The indictment described how the scheme thus caused Deutsche Bank's counterparties that had "entered into trades throughout the relevant time period in which their positions were opposite to those of the defendants and their co-conspirators" to be "susceptible to substantial risk of loss and to suffer actual loss." *Id.* ¶ 26. And the indictment alleges that the "manipulations and attempted manipulations of Deutsche Bank's USD LIBOR submissions and the published USD LIBOR rate were intended to benefit

the trading positions of Deutsche Bank traders, including the Defendants and their co-conspirators, and others and to the detriment of, among others, parties who entered into derivative contracts with Deutsche Bank, including, but not limited to, Bank A, Bank B, Bank C, and Bank D." *Id.* ¶ 27(f). The indictment thus makes clear that the skewed LIBORs were published to the counterparties, which used the published results to calculate whether they won or lost on trades with Deutsche Bank.

Since filing the indictment in 2016, the Government has maintained that Defendants made material misrepresentations to *both* the BBA and Deutsche Bank's counterparties. In its March 2017 response to Defendants' motions for bills of particulars, for example, the Government explained how the indictment identified "who the Defendants intended to mislead (*trade counterparties* and the British Bankers' Association)." Dkt. No. 71 at 1 (emphasis added). At the November 30, 2017, pretrial conference, the Government noted three times that the BBA was a "conduit" for the Defendants' scheme to defraud counterparties. Nov. 30, 2017 Tr., Dkt. No. 322-14, at 34:24, 35:6-8, 38:18-25 ("we're saying the defendants abused and exploited a system that was in place when it came to submitting its rates so it could benefit and [] either *pay less to a counterparty or get more money from the counterparty.* And we're saying that the BBA in that way is the *conduit*. . ." (emphasis added)). This was well before the Court issued its "Thoughts on the Proof Necessary for Government to Establish Wire Fraud as Charged in this Case" in March 2018, Dkt. No. 203. And in its December 7, 2017 brief, the Government explained: "The Government's position is that the defendants *deceived the counterparties* as well," Dkt. No. 159 at 5 n.2 (emphasis added), and "In short, the United States does not need to call a witness from the BBA because its theory of prosecution is that the defendants *intended to trick their counterparties*, not the BBA," *id.* at 7 (emphasis added).

In its motions *in limine* filed in April 2018, the Government likewise made clear it intended to prove "the defendants and their co-conspirators made and caused to be made false and misleading statements *to its counterparties*, both directly and through a third-party conduit," including that "during the life of the interest swap agreements, the defendants and their co-conspirators further deceived their counterparties by causing manipulated LIBORs to be transmitted to Deutsche Bank' counterparties through Thomson Reuters, which acted as a conduit to the counterparties, and who in turn settled their derivatives based on that rigged rate." Dkt. No. 217 at 1-2 (emphasis added). Accordingly, the Government elicited evidence from those counterparties at trial. Defendants have thus been on notice of the alleged scheme and the alleged misrepresentations to both the BBA and Deutsche Bank's counterparties throughout the case, for more than two years.

Defendants' claim that they were not on notice of the "core of criminality," including alleged misrepresentations to Deutsche Bank's counterparties is particularly disingenuous in light of their own acknowledgments of this allegation. At the January 18, 2017 status conference, defense counsel characterized the Government's theory of the case as one of fraud on Deutsche Bank's counterparty banks: "The theory of this case is that our clients somehow defrauded Goldman Sachs and J.P. Morgan and Bear Stearns. . . ." Jan. 18, 2017 Hrg. Tr., Dkt. No. 49, at 10:21-22. Similarly, at the March 2, 2017 status conference, defense counsel again characterized the Government's theory of the case as fraud on Deutsche Bank's counterparties: "As the Court is aware, the theory of the prosecution is that somehow we defrauded counterparties." Mar. 2, 2017 Hrg. Tr., Dkt. No. 62, at 7:2-4. Shortly thereafter, on March 10, 2017, Black filed a memorandum in support of his motion for a bill of particulars, which characterized the Government's legal theory as one of fraud on the counterparties via fraudulent

submissions made to the BBA: "The Superseding Indictment alleges that Black and Defendant Matthew Connolly (collectively, "Defendants"), while working for Deutsche Bank, defrauded Deutsche Bank's trade counterparties by making false and fraudulent submissions of the London Interbank Offered Rate ("LIBOR") to the British Bankers' Association ("BBA") over a seven-year period." Dkt. No. 67 at 1. Connolly likewise filed a memorandum in support of his motion for a bill of particulars, which acknowledged: "The Superseding Indictment alleges that four such counterparties were defrauded, identifying them as Banks A- D." Dkt. No. 69 at 2.

The Court has acknowledged the Government's allegations with respect to Deutsche Bank's counterparties as well. In its April 20, 2017 order addressing Defendants' motions for a bill of particulars, for example, the Court recognized that the superseding indictment "identifies: who the Defendants intended to mislead (trade counterparties and the British Bankers' Association). . . ." Dkt. No. 76 at 2.

### C. Whether or Not the Grand Jury Heard Sufficient Evidence of Misrepresentations to Deutsche Bank's Counterparties Is Irrelevant and Harmless in Light of the Jury's Guilty Verdict

Connolly protests that the testimony presented to the grand jury before it returned the indictment did not reference misrepresentations to counterparties. Not only does this argument miss the mark legally, but it is also factually incorrect.

As a matter of law, any insufficiency of the evidence presented to the grand jury on a given point is harmless, because a conviction by the petit jury cures any defect in the grand jury presentation. *See United States v. Mechanik*, 475 U.S. 66, 70-72 (1986); *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989). And as a matter of fact, as demonstrated by the grand jury transcript produced to the Defendants in November 2017, the grand jury did, in fact, hear of the misrepresentations to Deutsche Bank's counterparties.



The information presented to the grand jury, as well as the indictment itself, made clear

that Defendants were alleged to have participated in a fraudulent scheme through which false or

fraudulent statements were made to both the BBA and Deutsche Bank's counterparties in an effort to make money at the counterparties' expense.

Accordingly, Defendants' motions for judgments of acquittal or new trial on constructive amendment grounds are denied.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' motions for a judgment of acquittal or new trial. The Clerk of Court is respectfully requested to close the open motions at Dkt. Nos. 390 and 392.

This constitutes the decision and order of the Court.

Dated: May 2, 2019

_____

Chief Judge

BY EMAIL AND ECF TO ALL PARTIES

59