USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5|2|209

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————————x

UNITED STATES OF AMERICA,

    v.            16 Cr. 370 (CM)

MATTHEW CONNOLLY and GAVIN BLACK,

      Defendants.
——————————————————————————x

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO VACATE CONVICTIONS AND DISMISS THE INDICTMENT ON THE BASIS OF PROSECUTORIAL MISCONDUCT

McMahon, C.J.:

   Defendants Matthew Connolly ("Connolly") and Gavin Black ("Black) move to dismiss the indictment on the basis of prosecutorial misconduct. In the alternative, Connolly and Black ask this Court to grant a new trial, or to hold an evidentiary hearing to determine the extent of the Government's misconduct.

   Nearly all of what follows is a "do over" of issues already decided after careful consideration, extensive argument, and even hearings, before and during the trial. The Court did not find misconduct—certainly not misconduct that rose to the almost impossibly high level needed to vacate a conviction—when these issues were raised previously. I see no reason to change my mind simply because the whole has been repackaged as a continuing course of conduct on the Government's part. The motion is DENIED.

## I.  Legal Standard

   The primary relief Defendants seek is vacatur of their convictions and dismissal of the indictment, pursuant to the Court's supervisory authority.

1

A.    **Dismissal of the Indictment**

"As [the Second Circuit] has repeatedly emphasized, the exercise of a court's supervisory authority to dismiss an indictment is a 'drastic remedy' that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (citing *United States v. Brown*, 602 F.2d 1073, 1076 (2d Cir. 1979)); *see also United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) ("[T]he sanction [of dismissal] is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases."). The burden after conviction is even higher: "the social costs of dismissing an indictment because of an imperfect grand jury proceeding are simply too high to accept when the defendant has been convicted after a full and fair trial and no harm has been done." *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990).

"To meet the very heavy burden of establishing a due process violation to dismiss an indictment for outrageous governmental misconduct, a defendant must show that the Government's conduct was so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." *Walters*, 910 F.3d at 27 (internal quotations omitted). "This inquiry turns on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." *Id.* (internal quotation omitted). Even "deeply disturbing" conduct does not necessarily rise to the level of dismissal; rather, "[s]uccessful motions to dismiss on this ground have ordinarily involved coercion or a violation of the defendant's person." *Id.* at 27–28.

Critically, a defendant seeking to invoke this doctrine must demonstrate prejudice as a result of the Government's misconduct. *Id.* at 28. It is true that, previously, "The law of this Circuit [was] that dismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to a defendant; or, pursuant to our supervisory power, to prevent

prosecutorial impairment of the grand jury's independent role." *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983). In *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), however, the Supreme Court held that a court may not dismiss an indictment pursuant to its supervisory powers absent a showing of prejudice (or non-harmless error). *Id.* at 254 ("[A] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."); *see also Walters*, 910 F.3d at 23 (finding dismissal pursuant to the district court's supervisory authority only appropriate when "errors prejudiced the defendant") (quoting *Bank of Nova Scotia*, 487 U.S. at 254)); *United States v. Gonzalez*, 529 F.3d 94, 98 (2d Cir. 2008) ("supervisory powers are not to be used to circumvent the harmless error rule"); *United States v. Magassouba*, 544 F.3d 387, 410 (2d Cir. 2008) ("[A] harmless error certainly would not warrant the relief Magassouba seeks: dismissal of the indictment.").

### B.   New Trial

In the alternative, Defendants ask this Court to vacate their convictions and grant a new trial.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The court's power to grant a new trial "should be exercised sparingly"—a new trial should be ordered "only with great caution and in the most extraordinary circumstances." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *Id.* (internal quotation omitted).

"[I]nvocation" of this remedy "is properly shunned when the misconduct has not substantially prejudiced a defendant's trial. Reversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of

retrying an individual who was fairly convicted." *United States v. Modica*, 663 F.2d 1173, 1184 (2d Cir. 1981).

Here, a defendant must also demonstrate prejudice. "As for new trial motions predicated on prosecutorial misconduct[,] a new trial is reserved only for extreme cases in which the misconduct caused the defendant 'substantial prejudice so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Santiago*, No. 13-cr-39, 2014 WL 4827883, at *8 (S.D.N.Y. Sept. 26, 2014) (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999)).

The Second Circuit examines "three factors to determine whether prosecutorial misconduct caused the accused substantial prejudice:  the severity of the misconduct; the measures adopted to cure the effects of the misconduct; and the certainty of conviction in its absence." *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987).

## C.    Evidentiary Hearing

In the event that the Court does not have enough information to dismiss the indictment or order a new trial, the Defendants ask the Court to hold an evidentiary hearing.

A court has discretion to order an evidentiary hearing where "disputed factual issues exist" and where the court otherwise lacks a sufficient record on which to make its rulings. *Walters*, 910 F.3d at 28.  "[W]here the relevant facts can be ascertained from the record," however, "[n]o rule of law requires a hearing[.]" *United States v. Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993).  Similarly, a district court has discretion to deny a hearing where the defendant "had a fair opportunity to challenge the Government" and "counter [its] submissions." *Walters*, 910 F.3d at 29.

A district court does not abuse its discretion "by denying Rule 33 relief without convening an evidentiary hearing to ascertain the extent of the Government's" misconduct where any "additional evidence . . . is not sufficiently material to undermine confidence in the verdict." *United States v. Stewart*, 433 F.3d 273, 302 (2d Cir. 2006). Similarly, a court properly denies a defendant's post-conviction motion for a hearing when "the record is completely bare as to prejudice." *United States v. Brown*, 511 F.2d 920, 923 (2d Cir. 1975). "[A]n evidentiary hearing 'is not held to afford a convicted defendant the opportunity to conduct a fishing expedition.'" *Stewart*, 433 F.3d at 306 (quoting *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)).

## II.    Discussion

Defendants divide the Government's alleged misconduct into two parts—conduct that took place before trial, and conduct that took place during trial.

### A.    Alleged Misconduct Before Trial

Defendants argue that "The Government engaged in substantial misconduct during the pretrial phase of this case, including presenting false evidence to the grand jury; making multiple false statements to the Court and Defendants; and failing to comply with its *Brady* and discovery obligations. These acts prejudiced Defendants because, *inter alia*, they prevented them from obtaining exculpatory evidence and required them to devote substantial resources to address the Government's numerous false statements and other bad acts." (Defs.' Br. at 4–5.)

The Court considers each instance of alleged misconduct. Because the motion is briefed jointly, while most of the alleged misconduct is said to have affected both Defendants, a few instances relate only to Black, and others only to Connolly.

In each case, the Court finds that Defendants either misstate the relevant facts or cannot demonstrate that anything the government did or failed to do either constitutes "misconduct" or invoked "substantial prejudice."

### 1. Alleged Presentation of False Evidence to the Grand Jury

Defendants first argue that, "the Government knowingly presented false and misleading evidence to the grand jury about an essential fact" through the testimony of Special Agent Jeffrey Weeks ("SA Weeks"), who testified before the grand jury on May 31 and August 18, 2016. (Defs.' Br. at 6.)

With respect to misconduct before the grand jury, "In order for prosecutorial misconduct to require a dismissal of the indictment, the prosecutor's conduct must amount to a knowing or reckless misleading of the grand jury as to an essential fact, . . . or systematic and pervasive prosecutorial misconduct as would undermine fundamental fairness." *United States v. Restrepo*, 547 F. App'x 34, 44 (2d Cir. 2013) (summary order) (internal quotations and citations removed); *see also United States v. Lombardozzi*, 491 F.3d 61, 66, 79–80 (2d Cir.2007); *Brito*, 907 F.2d at 395. "[G]rand jury proceedings ought not be viewed as fertile ground to be combed for evidentiary or other error." *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984).

    a)   <u>SA Weeks' Testimony that Black's Requests Were Made to Benefit His Trading Positions</u>

Defendant Black first takes issue with SA Weeks' testimony—based on Black's own e-mails and Bloomberg chats—that Black's LIBOR requests were designed to benefit his trading positions. (*See* Defs.' Br. at 7 (quoting Dkt. No. 158, Ex. 32A ("GJ Tr.") at 43:20–44:3 ("█

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

(emphasis added).)

Black's argument boils down to the failure of SA Weeks to "qualify" his testimony by informing the grand jury that Black's LIBOR requests on any given day were not steadfastly consistent with his net trading position, as revealed by Deutsche Bank's data. (Defs.' Br. at 7 ("[I]t was indeed false based on Deutsche Bank's . . . analysis of the trade data that often did not support the Government's theory of the case.").) Black argues that this demonstrates SA Weeks had no "good faith basis" for this portion of his testimony. (*Id.*)

However, the record shows that SA Weeks did, in fact, have a good-faith basis for his testimony that Black's requests were designed to benefit him: namely, the various e-mails and Bloomberg chats authored by Gavin Black. It was eminently reasonable for SA Weeks to infer, based on the face of these communications, that Black intended to benefit his trading positions. For example, on May 15, 2008, Black told Curtler he wanted the 1-month LIBOR low because he was "paying on 18 billion," which meant paying 1-month LIBOR on $18 billion notional. (Trial Tr. Dated Oct 2., 2018, at 1721:1–16). Indeed, SA Weeks' interpretation of these communications was subsequently confirmed by three different co-conspirators at trial. (*See* United States' Response to Defs.' Mot. to Vacate Convictions and Dismiss the Indictment on the Basis of Prosecutorial Misconduct ("Gov't Opp."), Dkt. No. 411, at 5 n.2.) And it was obviously accepted by the jury, which took these communications at their face value.

Moreover, the Government was under no obligation to present Gavin Black's defenses to the grand jury for him. In general, a prosecutor is not required to present exculpatory evidence to the grand jury, *see United States v. Williams*, 504 U.S. 36, 52 (1992), unless such evidence is "substantial" and "might reasonably be expected to lead the jury not to indict," *United States v.*

*Casamento*, 887 F.2d 1141, 1183 (2d Cir. 1989); *see also United States v. Romano*, 706 F.2d 370, 374 (2d Cir. 1983) ("[T]he prosecutor is not obligated to present all possible defenses before a grand jury," and dismissal of an indictment "is most difficult to justify in cases involving allegations of failure to make known or properly instruct the grand jury on a potential defense.").

The trade data was far from this kind of exculpatory evidence; rather, only a small subset of that data put a favorable gloss on Gavin Black's intent. (*See* Gov't Opp. at 6 & n.4.) As the Government states in its brief, moreover, the net notional data was heavily reconstructed and occasionally unreliable. (*Id.* at 6 n.4, 11–12.) Finally, if Defendants felt that this evidence— which they had spent many hours developing—was in fact exculpatory, they should have presented it at trial. They cannot complain of prejudice because the Government did not do it for them before the grand jury.

    b)   <u>SA Weeks' Testimony that Deutsche Bank's Trade Data Was an</u>
<u>"████████████████████████"</u>

Black further argues that "SA Weeks had no good-faith basis "for characterizing Deutsche Bank's trade data as an '████████████████████,'" since the Government knew it was incomplete, and later sought to suppress its use at trial. (Defs.' Br. at 7.) However, what SA Weeks actually said was that the trade data was "████████████████████ ████████████████" (GJ Tr. 37:14–19 (emphasis added).) Therefore, while the Government later chose not to rely on the trade data at trial, it was not misleading or incorrect for SA Weeks to tell the grand jury that it was one of many sources relied on during the investigation.

This particular piece of grand jury testimony focused on conduct by Black. Connolly now argues that he was also "significantly impacted" by SA Weeks' testimony regarding Black's

trading positions. (Defs.' Br. at 9.) While Connolly does not elaborate on this one-paragraph argument in his initial brief, he argues on reply that the grand jury was unable to compartmentalize the evidence against him because it was presented through a single agent, jointly with the evidence against Black. (Reply Mem. of Law in Further Supp. of Defs.' Mot. to Vacate Convictions and Dismiss the Indictment on the Basis of Prosecutorial Misconduct ("Defs.' Reply"), Dkt. No. 425, at 9.)

Connolly made a motion to sever prior to trial, which the Court denied. (Trial Tr. Dated Sept. 17, 2018, at 4:13–18.) He does not purport to renew his motion here; rather, he claims that he was prejudiced specifically by SA Weeks' failure to qualify the evidence he was giving to the grand jury related only to Black. (Defs.' Reply at 9.)

However, as the Government states in its brief, there was more than ample evidence submitted at the grand jury hearing to support a finding of probable cause against Connolly, separate and apart from Black. (*See* Gov't Opp. at 7–8 n.5.) This included SA Weeks' testimony that, "█████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████," (GJ Tr. 44:13–17), as well as multiple e-mails from cooperating witness Timothy Parietti, reflecting instructions from Connolly to adjust the LIBOR (*see* GJ Tr. 47:20–24; *id.* at 57:14–23.)

Moreover, the petit jury verdict shows that Connolly was not prejudiced by the combined grand jury proceedings. At trial, the jury was evidently able to consider the two Defendants separately, as they acquitted Connolly on three out of the six charges on which he was ultimately tried, while convicting Black on both of the charges on which he was tried. (*See* Minute Entry

dated Oct. 17, 2018.) Certainly, Connolly cannot argue that he suffered prejudice with respect to the counts on which he was acquitted.

With respect to the counts on which he was convicted, the Second Circuit has held in similar situations that, "Even if it were to be assumed that there was some impropriety" before the grand jury—which I specifically do not find—"dismissal of the indictment is not warranted" when the defendant has been convicted by a "petit jury after a full adversarial hearing." *Romano*, 706 F.2d at 374. In other words, after a defendant's conviction at trial, the reviewing court may conclude that "it is extremely unlikely that the grand jury would have failed to indict, even if it had been presented with all the evidence produced at trial. Since the petit jury must have concluded [guilt] beyond a reasonable doubt . . . , clearly the grand jury would also have" been able to make "the lesser finding of probable cause." *Id.*

c)   SA Weeks' Testimony that a Specific Trade was in Parietti's Book

Defendants contend that SA Weeks lacked a good-faith basis for testifying that a particular trade with the Federal Home Loan Bank of Pittsburgh was located in co-conspirator Timothy Parietti's trading book, because subsequent investigation revealed that it was, in fact, part of another trader's book. (Defs.' Br. at 9.) However, the record shows that, at the time SA Weeks testified, there was indeed a good-faith basis for such testimony: the "trader" field in Deutsche Bank's data listed Parietti as the person who booked the trade. (*See* Gov't Opp. at 8.) To be sure, this data, which was provided to the Government by Deutsche Bank, turned out to be incorrect with respect to this particular data point. However, the Court cannot find that Weeks did not have a good faith basis for his testimony at the time it was given; certainly his statements to the grand jury do not "amount to a knowing or reckless misleading of the grand jury as to an essential fact." *Lombardozzi*, 491 F.3d at 79 (internal quotation omitted). Defendants also do

not even attempt to argue that the error in Deutsche Bank's data prejudiced Connolly, or that he would not have been indicted absent this mistake.

Moreover, even if SA Weeks' attribution of the trade to Parietti influenced the grand jury's decision to indict on the conspiracy charge (Count I), conviction on that count in the absence of the same assertion at trial shows that Defendants were not substantially prejudiced. *See Romano*, 706 F.2d at 374.

In sum, none of SA Weeks' testimony before the grand jury constituted misconduct or substantially prejudiced either Defendant.

### 2. Alleged Misrepresentations in Connection with the Deutsche Bank Trade Data

Both Black and Connolly next argue that, "For nearly two years prior to trial, the Government represented to the Court and Defendants that Deutsche Bank's book-to-trader mapping ("BTM") analysis—while imperfect—was the only reasonable method of associating trades with traders." (Defs.' Br. at 11.) They argue that the Government's decision, on the eve of trial, not to use the BTM analysis—and to suppress its introduction by Defendants' expert— "substantially prejudiced Defendants." (*Id.* at 12; *see also id.* at 19.)

This is, to put it bluntly, revisionist history. The Government made no such representations to the Court; Defendants knew that the Government made no such representations to the Court; and the Court has previously found, in two written opinions, that the Government had made no such representations. In actuality, in the years before trial, defense counsel expended substantial resources either (1) poking holes in the BTM methodology, in the event the Government planned to use it at trial, or (2) reconstructing Connolly's and Black's net trading positions using BTM as an interim step, in the event they chose to put on a defense.

The upshot is that both sides were well aware of the problems with BTM at each stage of the proceedings. To cite just one example, Defendants ripped to shreds the Government's PowerPoint presentation on its use of trade data during a pretrial conference before this Court. (*See* Dkt. No. 89 at 12 (describing hearing held on May 3, 2017).) Defendants' cry that they were unaware of problems with BTM until the eve of trial rings exceptionally hollow.

In any case, the Court already made detailed findings on this very issue, after Defendants made precisely the same arguments in the middle of trial. After hearing Defendants on the *Brady* issue, the Court ordered expedited briefing, and worked overnight on a not insubstantial memorandum opinion (*see* Dkt. No. 323), which ultimately concluded that the Government's behavior did not amount to a *Brady* violation, because the problems with BTM were disclosed well in advance of trial. (*Id.* at 3.)

Defendants sheepishly concede in a footnote that, at least in terms of *Brady*, there is no new information that requires the Court to reconsider its mid-trial ruling. (Defs.' Br. at 19 n.4 ("Defendants are mindful that the Court ruled at trial that the Government's misrepresentations concerning the book-to-trader mapping do not constitute a *Brady* violation[.]") (citing Dkt. No. 323).) Instead, Defendants "respectfully submit, in view of the entire record, the Government's statements concerning the BTM analysis constitute not only a *Brady* violation, but also a due process violation." (*Id.*)

Defendants appear to argue that the Government violated Defendants' due process rights by tricking them into believing its case-in-chief would rely on trade data. (Defs.' Br. at 19–22 (citing various Government representations).)

However, Defendants were well aware that the Government planned to rely on trade data to only a limited extent, if at all. For example, as early as March 2017, the Government stated, in

opposition to Defendants' motion for a bill of particulars, that "trade data is not the crux of its case." (*See* Dkt. No. 89 at 11 (summarizing Government's opposition to Defendants' motion for a bill of particulars).) Two months later, in granting Defendants' motion for a bill of particulars, the Court itself recognized that the Government would not need to rely heavily on trade data at trial: "[T]he fraudulent scheme and statements—that is, the efforts to manipulate particular LIBOR rates on particular days—will no doubt be proved using, *inter alia*, the emails quoted in the Indictment and similar communications, as well as cooperator testimony. [ . . . ] [T]rade data is arguably not needed to establish the elements of the charged crimes." (*Id.* at 11–12.) Later, nearly one year before the trial, at a hearing on November 30, 2017, defense counsel stated, "I understand the Government has told us in a letter that they intend to put on a case with no . . . trading data." (Hrg. Tr. dated Nov. 30, 2017, at 4:17–19.) At the same hearing, the Court and defense counsel engaged in the following colloquy:

> THE COURT:  I don't think the Government intends to present a whole lot of data.
>
> MS. YOON:  Exactly, that's what [*sic*] one issue.
>
> THE COURT:  You intend to defend with a whole lot of data.
>
> MS. YOON:  Exactly.

(*Id.* at 15:1–6.)  Towards the end of the conference, the Court summed up the Government's strategy: "According to [the Government], it's a very simple case.  You are going to [win] on no information about trades or almost none[.]"  (*Id.* at 46:13–15.)  And, finally, in denying the Defendants' mid-trial motion to dismiss the indictment because of the alleged *Brady* violation, the Court once again confirmed, "No one disagree[s] that the Government repeatedly asserted that trade data 'was not the crux of its case' and never committed to introduce any such data." (Dkt. No. 323 at 3 n.2.)  In sum, the idea that the Government falsely induced Defendants'

reliance on a trial strategy involving extensive use of trade data is, in view of the record, preposterous.

Defendants next argue that the "Government's reversal, on the eve of trial, about the reliability of the BTM violated Defendants' due process . . . rights." (Defs.' Br. at 19.)  But in its mid-trial opinion, the Court considered and rejected Defendants' very same invitation to read bad faith into the Government's various course corrections.  (Dkt. No. 323 at 4 ("This could, I suppose, be deemed a disingenuous statement . . . although I think it is more appropriately described as yet another instance, in a long series of instances, in which the Government was (to put it kindly) careless with its phraseology.").)  The Court similarly rejects Defendants' contentions that, once the Government pivoted away from using trade data, Defendants were left with no viable defenses.  In the same opinion, the Court bent over backwards—for represented Defendants, no less—to offer myriad suggestions about how the Defendants could cure any resulting prejudice, to the extent they believed that any existed.  (*See* Dkt. No. 323 at 4–5.)

In short, Defendants were aware well in advance of trial that trade data would not play a major role in the Government's case, and they were provided ample opportunity to cure any prejudice that they believed arose for any misrepresentation about this matter on their part.

### 3. Alleged Misrepresentations About Communications with Counterparty Victims

Defendants next contend that the Government violated *Brady* by failing to disclose certain allegedly exculpatory communications between the Government and Goldman Sachs ("Goldman"), allegedly a victim of the alleged scheme to defraud.

"There are three components of a true *Brady* violation:  [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and

[3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). A *Brady* violation occurs only when "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281; *see also United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016).

Goldman was a counterparty to trades that were specifically identified in the indictment as having been impacted by the charged scheme. The Government did not rely on the Goldman trade at trial, and the count relating thereto (count seven) was not submitted to the jury. Defendants raised the issue of counterparty *Brady* evidence during trial, requesting information from the Government regarding any conversations the Government had with banks named as victims in the indictment, including Goldman. (Trial Tr. dated Oct. 3, 2018, at 2018:8–13.) In response, the Government filed an *in camera* letter, which the Court reviewed during trial. (*See* Gov't Opp. at 25 n.17; *see also* Trial Tr. dated Oct. 5, 2018, at 2350:7–8.)

In this letter, the Government informed the Court that Government officials had two conversations with Goldman, although neither of these conversations involved members of this case's investigative team. First, an FBI agent from a different LIBOR-related investigation team spoke with Goldman's in-house counsel, who said that the firm did not want to be involved in the LIBOR matter. (*See* Trial. Tr. dated Oct. 5, 2018, at 2341:7–12.) Second, a DOJ attorney on the Rabobank trial team spoke with Goldman's outside counsel, who said that Goldman did not want to designate a witness to participate in that case. The Court shared descriptions of these conversations with the Defendants at trial and on the record. (*Id.* at 2341:13–25.) Defendants knew what the Court knew about the Goldman communication mid-trial, and they know what it knows now.

Defendants argue that they still have not seen the letter, and so there is "no reliable record" at present to demonstrate the extent of the communications between Goldman and the Government. (Defs.' Reply at 19.) But this is not true. The Government represented to the Court that these conversations were the extent of its *possibly* relevant conversations with Goldman (Trial Tr. dated Oct. 5, 2018, at 2349:19–24), and the Court conveyed information about these conversations to the Defendants (*id.* at 2342:1). The Court cannot and will not proceed under the assumption that the Government's representation in this letter, which was requested by the Court, is untrue or incomplete, and Defendants point to nothing that would support any other inference. The Court will not permit Defendants to go on a fishing expedition to attempt to establish otherwise. (*Id.* at 2342:8.) And I reject out of hand any suggestion that I withheld pertinent details from the defense.

The question, then, is whether the evidence about the Goldman communications is exculpatory. As was explained at trial, conversations between the Government and Goldman would be favorable to Defendants *if* Goldman had told the Government that it did not want to be involved in a LIBOR investigation *because it was not a victim of the LIBOR rigging scheme.* (*See* Trial Tr. dated Oct. 3, 2018, at 2021:6–9 ("[I]t would be exonerative to the defense if [counterparties] had said to the government that they didn't want to be involved because they weren't victims. It would be exonerative of the defense.").) But Goldman did not say this in either conversation—it said only that it did not want to participate in the investigation—something the Court, at least, does not find at all surprising.

Defendants suggest that this evidence contains an exculpatory lead, and so is favorable for *Brady* purposes. (Defs.' Reply at 19.) But there is no indication in these statements that Goldman did not view itself as a victim, such that Defendants would have been likely to find

admissible evidence based on this "lead." *Cf. United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (finding inadmissible hearsay could be material under *Brady* when the Court identified its potential to lead to admissible evidence). These statements do not provide more information than what Defendants already knew—Goldman was one of the Banks identified as a victim in the indictment. (Trial Tr. dated Sept. 26, 2018, at 844:12-18.) They do not provide exculpatory material.

Defendants have also not established that prejudice resulted from the delayed disclosure of these two conversations. First of all, the Court ultimately struck the evidence related to Deutsche Bank's trades with Goldman, and the only substantive wire fraud count involving Goldman (count seven) was dismissed. (Trial Tr. dated Oct. 10, 2018, at 2395:10–11; *id.*at 2395:19–21.) The Defendants argue that this relief is "insufficient" because the failure to disclose "undermined confidence in the outcome of the trial and tainted the entire case." (Defs.' Br. at 26.) Not until their reply do Defendants identify a theory of taint: the suppression of the evidence prevented them from fully probing the issue of materiality to an objectively reasonable investor. They claim that they would have investigated, or possibly examined, a Goldman witness or others from similarly situated banks. (Defs.' Reply at 20.)

The Court is not convinced. That Goldman did not want to participate in the Government's investigation could have signaled many things. One of those things could have been that it did not consider itself a victim because it considered the allegedly fraudulent statements immaterial, but nothing in Goldman's bare refusal to participate suggests that this was Goldman's belief. It is, therefore, not clear how this material could have changed the outcome of the case.

Most important, Defendants were aware, from the minute the indictment was handed down, that Goldman was identified as a counterparty victim. Defendants could have sought an interview with Goldman at any time thereafter. When Defendants learned of the two conversations during trial, they had the opportunity to file additional briefing related to their importance and to request relief (including a stay so they could talk to Goldman); they chose not to do so. (Trial. Tr. dated Oct. 5, 2018, at 2369:10–11.) There can be no *Brady* violation when "a defendant possesses *Brady* evidence in time for its effective use." *Halloran*, 821 F.3d at 341. Defendants knew about Goldman's alleged involvement in the case as a victim as far back as 2016, so as far as I am concerned, they had plenty of time to explore that issue with Goldman. They could have sought a continuance or adjournment in order to interview Goldman during trial, but they chose not to. *Cf. id.* at 342. It is unconvincing that now, post-trial, Defendants feel that Goldman's refusal to participate voluntarily[1] as a victim—in theory—was so material that it could have undermined the fairness of the trial.

### 4. Alleged Misrepresentations in Connection with the Scope of the Prosecution Team

Defendants argue that the Government engaged in misconduct by misrepresenting the scope of the prosecution team. (Defs.' Br. at 26.)

Briefly and by way of background, "Because of the global nature of the alleged conspiracy within Deutsche Bank to manipulate the LIBOR reference rates, a number of domestic and foreign regulatory and prosecutorial agencies simultaneously investigated this matter." (Dkt. No. 61 at 2.) Whether all of those domestic and foreign regulatory and prosecutorial agencies were "the Government" for *Brady* purposes was a much-litigated issue during the pretrial phase of this litigation, and was the subject of several pretrial motions. (*See,*

---

[1] That the Government chose not to subpoena Goldman is hardly surprising; but it could have been done.

*e.g.*, Dkt. Nos. 61, 76, 89 & 145.) Defendants now contend that the Government's submissions in connection with those motions "contained outright falsehoods and half-truths designed to mislead the Court and Defendants about the Government's interactions with its investigatory partners[.]" (Defs.' Br. at 28.) To the extent this misconduct does not warrant dismissing the indictment, Defendants argue in the alternative that the Court should order an evidentiary hearing into the extent of the Government's *Brady* violations. (*Id.* at 37.)

a)  The Government's Representations That It "Did Not Share Paperwork or Have Input on What Resolution Each Agency Should Have"

Defendants claim that, in opposing Defendants' first motion to compel, the Government falsely represented that it "did not share paperwork" with other agencies or discuss resolutions of ongoing investigations. (Defs.' Br. at 29.) According to Defendants, these claims were false because it was later revealed that the CFTC (1) asked to see portions of the draft Warning Notice prepared by the United Kingdom's Financial Conduct Authority ("UK FCA") and (2) subsequently forwarded portions of the draft to lawyers at DOJ. (*Id.* at 29–30.) The DOJ also sent the UK FCA a draft of the statement of facts from its proposed deferred prosecution agreement ("DPA") with Deutsche Bank. (*Id.* at 30.) According to Defendants, the claim that the Government did not discuss resolutions of ongoing investigations with British investigators was also false, because the DOJ and the UK FCA reviewed proposed settlement terms and fine amounts in a series of calls. (*Id.* at 30–31.)

The fact that the Government received a draft of the UK FCA's Warning Notice and shared a draft of its DPA with the UK FCA does not render the Government's representation that it conducted a separate and independent investigation from the UKA FCA either false or misleading in the context of *Brady*. "[W]hen it comes to *Brady* disclosures, the relevant context

is one of fact-gathering, not charging determinations or otherwise." (Dkt. No. 61 at 10 (citing *United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012).) As Defendants recognize, these documents were merely "draft resolutions" that were exchanged "in advance of their public release." (Defs.' Reply at 21.) In representing that it did not share paperwork with other agencies, the Government's statement "was intended to rebut the notion that the DOJ and [UK] FCA actually collaborated on their respective statements of fact and essentially co-authored work product as part of a unified team." (Dkt. No. 176 at 1–2.) The Court so understood their representations at the time they were made. Exchanging excerpts from draft charging documents (the Warning Notice and DPA) shortly before the charges were finalized—which is to say, after the two separate investigations had been concluded—does not constitute the sort of "joint fact-gathering" activity that permits the Court to impute constructive knowledge to the DOJ under *Brady*.

Moreover, even assuming the Government was careless with its language (as it so often was), Defendants provide no new information that would require the Court to reconsider, for a second time, the issue on which it ruled nearly eighteen months before trial, and again nearly nine months before trial. (*See* Dkt. No. 61.) The Court was fully aware that there was some amount of cooperation between the DOJ and the UK FCA when it decided Defendants' motion to compel in March 2017. As the Court reminded Defendants in a subsequent pretrial hearing:

> [As early as March 2017,] There has never been any question that there has been interaction for years on what appears to be a fairly regular basis between the people who were looking into this in England and the people who were looking into this in the United States. *I don't think the Government has ever suggested otherwise.*

(Hrg. Tr. dated Dec. 14, 2017, at 18:5–10 (emphasis added).)

Several months after the Court's resolution of their motion to compel, Defendants specifically brought to the Court's attention that the DOJ, CFTC, and UK FCA had shared

information, including the draft Warning Notice and DPA. (Hrg. Tr. dated Dec. 13, 2017, at

67:5–70:2.) However, the Court did not find that this altered the *Brady* analysis. The Court

made clear that it had ruled on the *Brady* issue with full knowledge that there had been some

cooperation between the DOJ and other agencies (foreign and domestic), and that it stood by that

ruling: "My background assumption is that there was in fact cooperation between the British and

the American officials on the LIBOR investigation. That's my assumption, which does not

create a joint prosecution and does not necessarily mean that everything in the Brits' files is

*Brady* material." (*Id.* at 78:13–18; *see also id.* at 84:12–13 (observing that defense counsel

raised DOJ's sharing charging documents with the CFTC "the first day [the Court] ever saw

[defense counsel]").)

  In short, it was not misconduct for the Government to oppose the Defendants' motion to

compel by representing that it did not "share paperwork" with the UK FCA; and, in any case, the

Court was well aware of all *relevant* facts when it decided the *Brady* issues prior to trial.

    b) <u>The Government's Representations About the Number of Joint</u>
       <u>Interviews Conducted</u>

  Defendants next argue that the Government "significantly understated the number of joint

interviews it conducted with the Prosecution Team members." (Defs.' Br. at 34.) Specifically,

they argue that the Government attempted to minimize the appearance of joint investigative

activity by disclosing only the number of joint interviews it had conducted in connection with the

Deutsche Bank investigation, rather than the far larger number of joint interviews it conducted in

connection with the LIBOR investigation overall. (*Id.*)

  But the Government was quite clear that these figures it disclosed were limited to the

Deutsche Bank investigation. (*See* Dkt. No. 51 at 9 ("FCA investigators attended two out of the

thirty-four DOJ interviews *related to this case*." (emphasis added)); *id.* at 11 ("The DOJ did not

receive Deutsche-Bank related documents from, or conduct any joint interviews with, the SEC." (emphasis added)); *id.* at 12 ("Overall, the CFTC participated in thirteen of the thirty-four interviews related to Deutsche Bank.") (emphasis added).)

Moreover, there is no indication that Defendants suffered any prejudice as a result of these representations. The Court was aware of the existence of other LIBOR investigations when it denied Defendants' motion to compel in March 2017, and the Court understood that the Government's representations about the number of joint interviews were made with respect to Deutsche Bank only. For example, in March of 2017, the Court expressly acknowledged that the thirteen interviews conducted jointly by the DOJ and CFTC were "related to Deutsche Bank." (Dkt. No. 61 at 14.) Later in that opinion, the Court also denied the Defendants' request to deem the SEC a member of the prosecution team, stating, "Defendants merely point . . . to various press releases *addressed to separate and unrelated LIBOR actions.*" (*Id.* at 15 (emphasis added).) The Court was well aware, in other words, that other banks were targeted in similar LIBOR investigations, but nonetheless deemed this fact inconsequential for purposes of deciding Defendants' *Brady* motion.

<blockquote>

c) <u>The Government's Representations About the Level of<br>Cooperation with the CFTC</u>

</blockquote>

Defendants argue that the Government misrepresented the level of its cooperation with the CFTC because it failed to reveal "that the Government and the CFTC jointly outsourced substantial portions of the investigation to counsel for Deutsche Bank, Paul, Weiss, Rifkind, Wharton & Garrison." (Defs.' Br. at 36–37.) Specifically, Defendants point to an excerpt from the Paul Weiss White Paper (the "White Paper"), which states that, "Since May 2010, [Deutsche] Bank has held at least 230 telephone calls and 30 in-person meetings with the DOJ (and the

CFTC). And for the last 14 months, the Bank has held joint weekly 'update' calls with the DOJ and the CFTC[.]" (*Id.* (quoting DX 862 at 49).)

There is no question that the Government's briefing on the joint prosecution issue should have disclosed more fulsomely the extent to which it was involved, along with the CFTC, in Deutsche Bank's "internal" investigation. There is also no question that, when a DOJ lawyer sat on weekly status calls with both the CFTC and the target, and knew of the CFTC's intimate involvement in directing the quotidian work of the investigation through outside counsel, the agency should have anticipated that its *Brady* obligations might extend outside of DOJ and encompass the CFTC. Finding that the work of Deutsche Bank and its outside counsel is "fairly attributable to the Government"—as this Court has (*see* Mem. Decision and Order Denying Def. Gavin Black's Mot. for *Kastigar* Relief ("May 2 *Kastigar* Decision"), dated May 2, 2019, at 19–29)—was not an impossibility, particularly as one court in this circuit had already found state action in the context of a corporate internal investigation. *See* Samuel W. Buell, *Criminal Procedure Within the Firm*, 59 Stan. L. Rev. 1613, 1641 (2007) (describing the landmark case of *United States v. Stein* (*Stein I*), 440 F. Supp. 2d 315 (S.D.N.Y. 2006)).

Nonetheless, "The government's failure to produce evidence is prejudicial and thereby violates a defendant's rights under *Brady* 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Halloran*, 821 F.3d at 341 (quoting *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011)). Here, however, Defendants simply claim that "the Government . . . did not produce what Defendants *believe to be significant materials* related to this internal investigation." (Defs.' Br. at 37 (emphasis added); *see also* Defs.' Reply at 23 (stating that the Government's misrepresentations about the CFTC "violated Defendant's right to due process" but failing to

show any resulting injury).)  Defendants had the Paul Weiss White Paper all along; they identify no other "significant materials" that they did not have, nor explain how these materials could have exonerated Connolly and Black.

Defendants' inability to articulate prejudice is understandable.  The Government produced extensive materials from the CFTC investigation to the Defendants very early in the criminal proceedings.  (Dkt. No. 61 at 14.)  This material apparently did not contain exculpatory evidence.  Even before Defendants moved to compel in early 2017, the Government had produced to Defendants sixteen interview summaries memorializing joint witness interviews conducted by the CFTC and the DOJ, as well as hundreds of thousands of documents that were first produced as part of the investigation opened by the CFTC in 2008.  (*Id.* at 3.)  Finally, before the Court's order on Defendants' motion to compel issued, the Government preemptively offered to "collect and review for *Brady* and *Giglio* material any notes taken by representatives from [the CFTC] that [*sic*] were present during DOJ interviews"—something the Court subsequently ordered the Government to do.  (*Id.* at 15.)  In view of all this, it is hardly surprising that Defendants cannot articulate what they failed to receive, or how any (unspecified) withheld documents would have changed the outcome at trial.

### 5.  Alleged Misrepresentations About BBA Materials

Defendants claim that the Government engaged in misconduct by not producing materials related to "the BBA's knowledge that LIBOR panel banks considered their trading positions" and "shaded" their submissions accordingly.  (Defs.' Br. at 38; *see also id.* at 38–41.)  In essence, they argue, because the Government's theory of the case required it to prove that the BBA was defrauded, the BBA's awareness of, or complicity in, the LIBOR manipulation would have been exculpatory material, subject to production under *Brady*.  (*Id.*)

From the Court's first conference with counsel in this case, it was clear beyond peradventure that Defendants knew pretty much everything about the BBA's views on the LIBOR matter—all of which had been aired in this country in the trial of the Rabobank LIBOR-rigging case, *United States v. Allen*, 160 F. Supp. 3d 684 (S.D.N.Y. 2016), *rev'd*, 864 F.3d 63 (2d Cir. 2017). Indeed, it is fair to say that defense counsel educated the Court, over a span of years, about the BBA's views on the LIBOR scandal. It is, therefore, disingenuous for Defendants to assert that the Government kept them in the dark about the views of the BBA in this regard. Nonetheless, I will address their specific arguments.

a)      Materials Related to the FDIC Action

First, Defendants claim that the Government was required to produce "exculpatory" materials in the possession of the Federal Deposit Insurance Corporation ("FDIC") that the FDIC had used in drafting a complaint against the BBA for a case that was later filed in London. (Defs.' Br. at 38–39 & n.8.)

The FDIC's lawsuit alleged that the BBA was, in part, to blame for the LIBOR scandal, because it was fully aware of panel banks' attempts to impact the LIBOR fix to benefit their proprietary trading positions. Specifically, the Particulars of Claim that are part of the public record in London alleged that John Ewan, the BBA LIBOR Director, had stated that it was a "*construct of the market as it is in the interests of the banks*" to have USD LIBOR "set at three to four basis points above the actual market rate." (Dkt. No. 138, Ex. 1 ¶ 74(1)(c) (emphasis in original).) The Particulars of Claim further alleged that the BBA "directed" and "facilitated" conduct similar to that alleged in the Indictment. (*Id.* ¶ 3(9).)

Defendants had the Particulars of Claim as early as September of 2017, and sought production of materials related to it in advance of the pretrial *Kastigar* hearing. (*See* Defs.' Br.

at 38.) At that time, Defendants did not argue that the FDIC was part of the prosecution team for *Brady* purposes. (*See* Dkt. No. 137 at 4.) Rather, Defendants initially argued they were entitled to the FDIC documents because, "If the Government does not have the Requested Materials," (*i.e.*, those upon which the Particulars of Claim were based) "the only plausible explanation is that [the Government] actively structured its investigation to avoid obtaining them[.]" (*Id.*)

Prior to the Court's ruling on the *Kastigar* issue, Defendants again brought the Particulars of Claim to the Court's attention, this time, at a pretrial conference held on November 30, 2017. At that hearing, the Court instructed the Government to "go back and look at" the FDIC action (Hrg. Tr. dated Nov. 30, 2017, at 22:12), because the Court assumed, based on past experience, that the DOJ was representing the FDIC in that action and would have access to these materials. "The FDIC has come into this court represented by the Department of Justice on numerous occasions in the past; you're their lawyer." (*Id.* at 22:19–21.)

As the Government later told the Court, however, not only was the FDIC <u>not</u> a member of the prosecution team, but the DOJ was not involved in the FDIC's representation in the BBA matter. (Dkt. No. 159 at 9 & n.5.) In fact, the Government explained, "In the complaint at issue . . . , the FDIC [was] acting in a receivership capacity on behalf of failed banks that were defrauded and [was] represented, in that action, by the private law firm Quinn Emanuel, not the Department of Justice." (*Id.* at 9.) There was, therefore, no relationship that would have given the DOJ either actual or constructive knowledge of the documents underlying that complaint. *United States v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) ("The constructive knowledge of the prosecutor is not limitless. It does not encompass every agency and individual within the federal government.").

"The Government is not responsible for information that is not in its possession." *Id.* at 445. "*Brady* . . . does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel." *Id.* (quoting *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002)). The FDIC was not acting as part of the prosecution team when it brought its case in England; nor did DOJ lawyers have access to background information from that lawsuit.

For the first time in reply, Defendants argue that the Government's failure to inquire about the basis for the FDIC's lawsuit is tantamount to conscious avoidance, which cannot be used to shield the Government from its obligations under *Brady*. (Defs.' Reply at 25–26.)

It is true that "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). But the Court has already ruled that materials in the possession of the FDIC are not *Brady* because they are not exculpatory. As the Court stated at the November 30, 2017 conference, "[A] lawyer coming into the government and arguing that his client didn't commit a crime, because it was tolerated by the BBA is not going to . . . fall within the magic purview of *Brady*." (Hrg. Tr. dated Nov. 30, 2017, at 31:19–22.)

b)     Other Brady Materials Related to the BBA's Knowledge

Defendants next claim that the Government withheld unspecified *Brady* materials related to the BBA's awareness of panel bank misconduct. (Defs.' Br. at 40–41.)

Defendants cite two examples in support of their claim that the Government did not make a complete production of all relevant materials: They note that the Government represented in August 2017 that a "diligent, good faith search" had not uncovered any exculpatory materials relating to the BBA (*id.* at 40 (citing Dkt. No. 130 at 8)), but that months later the Government

found and produced over 1,000 pages of BBA-related documents (*id.* at 40). And, they argue that the Government admitted at trial, through its witness Special Agent Michael McGillicuddy ("SA McGillicuddy"), that it was in possession of a letter from the Chicago Mercantile Exchange ("CME"), which "express[ed]" the CME's "understanding that LIBOR submissions fall within a range"—a letter that was never disclosed to Defendants. (*Id.* at 40 n.9.)

Both examples misstate the record.

First, the Government produced extensive material prior to the production identified by Defendants. In March 2017, the Government produced to Defendants what it termed the "'BBA materials,' a collection of over 330,000 documents that hit on search terms related to the BBA through each LIBOR investigations database." (*See* Dkt. No. 130 at 10.) That same month, the Government also produced FBI 302 interview reports from other LIBOR investigations that hit on search terms for the BBA, among others. (*Id.* at 11.)

In August 2017, Defendants filed a motion to compel discovery, arguing that *Brady* obligated the Government to produce materials similar to a certain group of documents that Defendants had already obtained from public filings made in connection with the re-trial of two Barclays traders by the UK Serious Fraud Office's ("UK SFO"). Specifically, Defendants sought notes pertaining to the BBA's annual meetings with panel banks, and summaries of statements made to the BBA. (*See* Dkt. No. 117 at 8–12.) Defendants' motion to compel attached the documents they had already obtained from the public filings as Exhibit L, and attached similar materials that were publicly filed in connection with the *United States v. Allen* appeal as Exhibit M. (Dkt. Nos. 118-12 & 118-13.) In its opposition, the Government represented that it had "conducted a diligent, good faith search" for the specific documents sought by Defendants, but that they were either not in its possession or were publicly available,

28

which obviated the need for the Government to produce them. (*See* Dkt. No. 130 at 8 (citing Dkt. No. 118-12).) The Government even asked "the Court to have the Defendants explain their basis for believing [these documents] are within the Government's possession[,] so that the Government can be sure to run any leads to ground." (Dkt. No. 130 at 8.) Defendants did nothing.

In September 2017, the Government received from the UK SFO additional materials it had sought pursuant to a mutual legal assistance treaty ("MLAT") request, *i.e.*, transcripts of testimony from John Ewan, the BBA LIBOR Director, and Sally Scutt, another BBA employee. (Dkt. No. 413-21.) The Government was not obligated to ask the UK SFO for these materials, and the UK SFO was not obligated to provide them. But the Government did ask for them, and promptly turned them over to Defendants.

In October 2017, the Court ruled on Defendants' motion to compel. (Dkt. No. 145 at 25–28.) In that opinion, the Court cautioned the Government against construing its *Brady* obligations too narrowly, particularly those respecting BBA materials. (*Id.* at 26–27.) Roughly one week later, the Government produced an additional 1,000 pages of documents relating to the BBA, comprising: (1) documents that the Government had produced to the Defendants the previous March, and (2) the materials it had recently acquired as part of the MLAT request. (*See* Gov't Opp. at 33.)

I cannot infer misconduct from the fact that productions of the BBA documents were made *seriatim*. This is especially true where the Government made a supplemental production of materials that it did not possess in the first place, and which it obtained from a voluntary request to another sovereign.

As for the CME letter, the trial record shows that the Government did not in fact have it. At trial, SA McGillicuddy never testified that he had seen the CME letter in his work as a case agent; he testified he was aware of a final LIBOR consultation paper authored by the BBA in August of 2008. (Trial Tr. dated Oct. 10, at 2436:10–2437:20.) As part of that consultation paper, the BBA had sought comments from, among other parties, the CME. (*Id.* at 2437:2–5.) On cross-examination, SA McGillicuddy repeatedly testified that he had, in fact, <u>not</u> retrieved the CME's comments submitted to the BBA in connection with that consultation paper. (*Id.* at 2437:9–10; 2437:17–20; 2438:1–12; 2438:18–24.) Defendants concede as much on reply. (Defs.' Reply. at 27 n.11.) The record, therefore, does not show that the Government either (1) had the CME comments in its possession during the investigation or (2) withheld them from Defendants. Moreover, Defendants introduced the CME letter at trial to show that the BBA was well aware of panel banks' behavior, so they suffered no prejudice. The jury obviously did not find the letter to be exculpatory.

### 6. Alleged Concealment of Evidence in Connection with Pretrial *Kastigar* Hearing

Black next argues that the Government actively concealed evidence in connection with his motion for a pretrial *Kastigar* hearing. (Defs.' Br. at 41.)

### a) <u>Evidence that UK FCA Lawyer Michael Prange Asked Questions at Cooperator James King's Proffer</u>

The pretrial *Kastigar* motion concerned whether any evidence presented to the grand jury had been tainted by Black's compelled testimony before the FCA. As the Court explained in its *Kastigar* decision, Deutsche Bank submitter James King was a source for certain testimony that SA Weeks provided to the grand jury. (Dkt. No. 274 at 7.) Although Black concedes that King was never *directly* exposed to Black's testimony, Black posited that King might have been

*indirectly* exposed to Black's FCA statement, because UK FCA attorney Michael Prange—who took Black's compelled statement—also attended King's proffer session. (*Id.* at 7–8.)

Black now argues that the Government committed misconduct by concealing that Prange "asked questions at cooperator James King's proffer," on September 13, 2014. (Defs.' Br. at 41, 48.) Black makes much hay of an e-mail from Prange to Jennifer Saulino, Assistant Chief of the Criminal Fraud Section at DOJ, containing eight questions that Prange said he "would be interested in hearing Mr [*sic*] King talk about" at the proffer. (Decl. of Seth L. Levine in Supp. of Defs.' Mot. to Vacate Convictions and Dismiss the Indictment on the Basis of Prosecutorial Misconduct, ("Levine Decl."), Dkt. No. 99, Ex. 24.) According to Black, not only did the Government initially fail to produce the "Prange Questions" e-mail prior to the pre-trial *Kastigar* hearing, but Defendants contend that it also submitted affidavits that were false because they failed to mention the existence of the Prange email. Furthermore, Black argues, to ensure the continued concealment of this information, the Government doubled down by "frivolously" opposing the production of Jencks Act material in connection with the *Kastigar* hearing. (Defs.' Br. at 41–43.)

This misstates the record. First, the Government disclosed in its initial brief opposing Black's *Kastigar* motion that, "the FCA lawyer who sat in during James King's proffer [*i.e.*, Prange] asked only a small handful of clarifying questions, and did not discuss Black's compelled testimony with King." (*See* Gov't Opp. at 38 (quoting Dkt. No. 131 at 13).) This is inconsistent with Black's theory that the Government hid the ball about the involvement of Prange in the proffer session; in reality, Black (and the Court) was aware from the get-go that Prange "asked . . . clarifying questions" at the King proffer. (Dkt. No. 131 at 13.) Prange testified in person at the *Kastigar* hearing; he could have been cross-examined at that time.

Second, as was later confirmed during the *Kastigar* hearing, the information behind Prange's clarifying questions was not compelled testimony before the FCA. As the Court found in its *Kastigar* decision, the "suggested topics" in the Prange e-mail were "quite general, and none of them specifically relate[d] to USD LIBOR or to Black." (Dkt. No. 274 at 10.) The Government did not commit misconduct by focusing its presentation in connection with that hearing on evidence that had a greater probability of being indirectly tainted.

Similarly, Black's argument that Saulino's declaration was misleading holds no water. (Defs.' Br. at 43–44.) Saulino's declaration states, "I recall that Mr. Prange of the FCA attended that proffer, but I do not recall him asking questions of Mr. King." (Dkt. No. 158, Ex. 22 ¶ 14.) The clear import of that statement is that Saulino did not recall Prange asking any questions of King *at the proffer session itself.* Black's suggestion that this statement was an attempt to conceal her receipt of the email containing his questions is frankly nonsense.

Additionally, when ruling on Black's *Kastigar* motion, the Court credited both Saulino's and Prange's testimony that they did not remember Prange's actually asking any questions at King's proffer. This was, in fact, why the Court asked Alison Anderson, a member of the DOJ Trial Team who was present at the proffer, to provide a supplemental affidavit that might shed light on the "small handful of clarifying questions" asked by Prange. (Dkt. No. 274 at 8.) There is simply no evidence of misconduct in connection with Saulino's representations about questions that may or may not have been asked at the proffer itself.

Finally, nothing indicates that the Government opposed the production of Jencks Act materials to conceal what occurred in connection with King's proffer. While the Court found it "passing strange that the Government should suggest" that its declarants in the *Kastigar* hearing were not "witnesses" within the meaning of the Jencks Act, the Court sought briefing on this

question because it was not clear whether a *Kastigar* hearing constituted a "suppression hearing" within the meaning of the Jencks Act. (*See* Dkt. No. 175 at 2.) The proper remedy for a *Kastigar* violation is something the parties disagree on to this day.[2] In any case, the Defendants won their motion, and the Government was compelled to hand over any Jencks Act materials relating to all of its declarants prior to the hearing. Therefore, there was no prejudice.

> b)   Evidence that the DOJ Received a Draft of the UK FCA's Warning Notice

Next, Black argues that the Government exhibited bad faith by concealing that Saulino received an excerpt of the UK FCA's draft Warning Notice from James Huth of the CFTC. (Defs.' Br. at 45.) This was misleading, Black contends, because those excerpts of the UK FCA's draft Warning Notice were derived from compelled testimony, and their receipt tainted Saulino and the Government prosecution team. (*Id.*)

As the Court explained repeatedly, the issue at the *Kastigar* hearing was whether evidence before the grand jury was tainted by the compelled testimony *of Gavin Black*—a concept that continues to elude defense counsel. It is true that UK FCA lawyers had sent Saulino an e-mail cautioning her that the draft Warning Notice contained information that was derived, in part, from "compelled testimony." (Levine Decl. Ex. 10.) However, testimony at the *Kastigar* hearing confirmed that this was entirely the compelled testimony *of other cooperators*. (Hrg. Tr. dated Apr. 24, 2018, at 64:4–22; *see also* Dkt. No. 274 at 14 (finding that the Warning Notice was not tainted "based on Prange's credible testimony [] that the [UK] FCA had a source other than Black's compelled testimony for the P5 findings in the Final Notice that are arguably relevant to . . . Weeks' grand jury testimony") (emphasis removed).) That these independent

---

[2]   Interestingly, with respect to the proper remedy for a *Kastigar* violation, Defendants and the Government have played musical chairs, and now occupy positions in diametric opposition to those they held before trial.

sources included the compelled testimony of other cooperators is of no moment, because none of them was on trial before this Court. In light of these findings, which were consistent with the Government's representations prior to the *Kastigar* hearing in April 2018, nothing about Saulino's declaration was misleading. [▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

c)   Evidence of False Statements in the Declaration of Patrick Meaney, Dated August 30, 2017

Black argues that the Government committed misconduct by submitting a declaration from UK FCA representative Patrick Meaney, dated August 30, 2017, which "contained a number of misrepresentations that the Government and the FCA ultimately acknowledged." (Defs.' Br. at 46.)

In fact, the Government fell on its sword on this one quite early in the proceedings, when it admitted its mistake and submitted a supplemental declaration from Meaney prior to the first *Kastigar* hearing on December 13, 2017. (*See* Hrg. Tr. dated Dec. 13, 2017, at 54:18–55:18.) During the December hearing, the Court was made aware that the Government had failed to put its witness Meaney "through his paces" (*id.* at 55:4), before submitting his sworn declaration. Needless to say, the Court expressed that it "look[ed] with disfavor" on the Government's "casual attitude with respect to the presentation of evidence." *Brito*, 907 F.2d at 395; ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I grant that the Government was negligent in accepting its witness's declaration, without so much as picking up the phone to review it with him. At the same time, the Court does not find that this substantially prejudiced Black with respect to the resolution of his *Kastigar* motion.

34

The Government itself moved to correct this information by filing a supplemental declaration

prior to the first *Kastigar* hearing on December 13, 2017. It did this without being prompted by

Black or by the Court, which suggests to me that this error was not deliberate. Black does not

contend that this subsequent sworn declaration from Meaney was inaccurate or misleading.

Additionally, the Court made clear at the December 13 hearing that it would accord

Meaney's declarations little weight in its final decision. Meaney's erroneous first declaration did

not prevent the Court from holding a full-dress *Kastigar* hearing, with a live FCA witness, nearly

five months after the Government submitted the corrected declaration—more than ample time

for Black to make use of these inconsistencies to smoke out any impermissible use of his

compelled testimony before the FCA.

> d)     Evidence of False Statements in the Declaration of Alison
> Anderson, Dated December 5, 2017

Finally, Black argues that Alison Anderson, of the DOJ Trial Team, authored a

misleading declaration in connection with the *Kastigar* hearing, because the declaration did not

mention that Anderson (i) had prepared the Government's interview outline for the King proffer

or (ii) was the source of the Government's assertion that Prange asked "only a handful of

questions" during the proffer session. (Defs.' Br. at 48 (citing Dkt. No. 158 Ex. 1.)

No part of Anderson's declaration was rendered false or misleading by these omissions.

The declaration was intended to address only whether Anderson had been exposed to Gavin

Black's compelled testimony before the FCA. The Court did ask Anderson to file a

supplemental affidavit explaining which "clarifying questions" Prange had asked at the proffer

session. (*See* Dkt. Nos. 247 & 253.) This supplemental testimony was intended to help the

Court identify precisely what information (if any) Prange might have fed to King—as neither

Saulino nor Prange remembered his asking any questions at all—and to help me rule on Black's

*Kastigar* motion, which was ultimately denied. (*See* Dkt. No. 274 at 8–9.) This Court never intimated that Anderson lied.

In sum, nothing the Government represented or provided in connection with the *Kastigar* hearing constitutes misconduct. Moreover, as all of the relevant facts came to light well before the Court issued its ruling on the *Kastigar* motion, and Black does not identify any other information that would have altered the outcome of the proceedings, there was simply no prejudice.

Having now addressed, for the third time, Defendants' allegations of governmental misconduct prior to trial, the Court now turns to their allegations of misconduct during trial.

### B.    Alleged Misconduct During Trial

Defendants argue that the Government engaged in misconduct during trial by "knowingly misrepresenting the nature of the evidence and eliciting false testimony." (Defs.' Br. at 49.) They contend that, *inter alia*, the Government used false, inflammatory and prejudicial statements; deliberately elicited false testimony; and, attempted to mislead the Court through the use of perjurious affidavits. (*Id.*)

Again, each instance of alleged misconduct is either unsupported or not prejudicial.

### 1.    Alleged False Testimony Regarding Black's Intent

Black first claims that the Government elicited false testimony from cooperators, and misleadingly argued to the jury that Black's requests were designed to benefit his trading positions. (Defs.' Br. at 51.) According to Black, the Government's conduct was duplicitous, because the Government knew the FBI had prepared an analysis of Deutsche Bank trade data in 2014, which "concluded that a number of Mr. Black's alleged LIBOR requests were in the opposite direction of his trading positions or were made on days in which he did not have a position at all." (*Id.*)

Black's argument here—like his earlier argument regarding SA Weeks' grand jury testimony—amounts to a complaint that the Government did not present his theory of the case for him. The Government did not present "false evidence." Black had differing opinions about what the evidence showed, as his lawyers argued at length in closing. (*See* Trial Tr. dated Oct. 16, 2018, at 2819:25–2821:15.) The jury found this argument implausible after reading Black's own words and hearing cooperator testimony about the circumstances surrounding these communications. That is unsurprising.

For example, Curtler testified about a series of communications with Black on July 26, 2007. On that day, Curtler sent an e-mail to Black with the subject, "5.35 percent three-month LIBOR tomorrow?", to which Black responded, "Nice. I have 4 billion three ones versus three month LIBOR fixing tomorrow, ker-ching." (Trial Tr. Dated Oct. 2, 2018, at 1662:22–1663:6.) Curtler testified that Black's response signaled his excitement at the significant spread between the fixed interest rate of 3% and Deutsche Bank's estimated LIBOR submission of 5.35%. (*Id.* at 1663:1-19.)

Black argues that it was misfeasance for the Government *not* to ask Curtler whether this e-mail was, in fact, "sarcastic." According to Black, the Government should have done this because (1) the FBI data showed Black receiving LIBOR on a $4 billion net notional that day and (2) Deutsche Bank's submission on July 27 was actually half a basis point lower than its submission on July 26. (Defs. Br. at 51–52.)

Whether Curtler thought Black was being sarcastic was arguably inadmissible; if Black wanted to put his state of mind in issue, he had many ways to do it, and Curtler's perception of what his state of mind would have been is not one of them. The defense was certainly free to try to cross Curtler on this issue; had an objection been made, the Court would have ruled on

admissibility.  Moreover, the fact that Black stood to make even more money if Curtler had kept the same rate as the previous day, or nudged it higher, does not mean that his reaction of "ker-ching" to the proposed rate was necessarily sarcastic.  This is especially true considering that, at 5.35%, Black already stood to profit handsomely from a spread of 235 basis points.

Similarly, Curtler testified that the e-mail from Black reading "LOW 1 MUNF . . . . SAME AS YEST, 8375," sent in response to Curtler's asking, "libor requests?", constituted a request from Black to submit a low one-month LIBOR, in order to minimize the amount he was paying on LIBOR.  (Defs.' Br. at 54.)  This is, of course, the most natural reading of the communication, and one that the jury obviously credited.  Black, however, argues that this communication was actually a request against interest, and made purely out of concern that the LIBOR mirror market conditions, "because, as reflected in the 2014 FBI Analysis, Mr. Black was *receiving* one-month LIBOR on $80 million net notional on [that day]."  (Defs.' Br. at 54 (emphasis added).)

As the Government observes, Black's argument depends, for its force, on "assum[ing] the FBI's net notional analyses are incontrovertible," when, in fact, they "carr[ied] flaws similar to Deutsche Bank's net notional analyses."  (Gov't Opp. at 44.)  Among other shortcomings, missing data from the "trader" field made it difficult to reconstruct each trader's net position, and the database fields did not properly capture futures data, which comprised a significant chunk of Black's trading book.  (*See* Defs.' Br. at 17–18 (discussing the Government's position on the unreliability of Deutsche Bank's trade data analysis).)  Based on these problems, the Government was clearly justified in relying on the face of a straightforward communication, and was not required to introduce unreliable evidence simply because it favored the defense's version of the facts.  *See, e.g.*, *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000) ("The fact

that certain witnesses denied reimbursement before the grand jury does not preclude the government from arguing that Hartman in fact was involved in a scheme to reimburse them and actually did reimburse them."). Black was equally free to cross Curtler, using the FBI data, to try to undermine any conclusion that might be drawn from the plain wording of the email.

Black next goes so far as to argue that the "LOW 1 MUNF" e-mail, in connection with the FBI data, "exculpated" him. (Defs.' Br. at 54) Of course, if this evidence truly exculpated Black, one expects that he would have presented it at trial. He did not.

Black's remaining salvo is that the Government "elicited testimony that falsely suggested that *all* of Mr. Black's requests were designed to benefit his trading positions," even though the witnesses could not have had firsthand knowledge of this fact. (Defs.' Br. at 55 (emphasis added).) But the Government never argued Black's every trade was tainted by LIBOR fixing. Moreover, Black spelled out his trading positions on particular trades in many of these communications, providing the recipients with the knowledge he now claims they could not have had. Any suggestion that the Government's witnesses based their testimony on anything other than the language in Black's own emails and chats was promptly cured on cross-examination. For example, cooperator James King testified that "Gavin Black *occasionally* asked me to manipulate the rates or to put in a submission that was higher or lower than I would have done *to benefit his trading position*." (Trial Tr. dated Sept. 20, 2018, at 289:6–8 (emphasis added).) On cross, however, King admitted that he had not seen any trade data, did not have access to Black's trading books, and did not know Black's net trading position on any given day. (Trial Tr. dated Sept. 25, 2018, at 625:18–626:1.) That allowed the defense to argue that King was lying when he testified he did what he did for the benefit of Black's book. Black again fails to identify any

prejudice he suffered as a result of the Government's election (perfectly proper) not to introduce

Black's defense for him.  The law imposes no such requirement.

### 2.   Alleged Subornation of Perjury

Defendants contend that the Government knowingly suborned perjury by inducing

Deutsche Bank's prior head of production support for fixed income and currencies, Guy Weston-

Edwards, to sign two perjurious affidavits.

The purpose of these affidavits was to lay a foundation for the admissibility of four

spreadsheets, GX I-404, I-405, I-406, and I-407, which the Government claimed contained the

raw trade data that underlay the trades in summary exhibit, GX I-456.  In the affidavits, Weston-

Edwards represented that these spreadsheets were "original records or true and accurate copies of

records . . . that were kept in the course of a regularly conducted business" (Levine Decl. Ex. 36

¶ 3), and "true and accurate compilations of trade data maintained by Deutsche Bank . . . [that]

are original records or true and accurate copies of records that: a) were made at or near the time

of the occurrence of the matters set forth therein . . . [and] b) were kept in the course of regularly

conducted business activity" (*id.* Ex. 37 ¶ 3).  These affidavits were produced to the defense as

witness statements under 18 U.S.C. § 3500, but were not offered into evidence by the

Government.  (Gov't Opp. at 48.)  Instead, the Government put Weston-Edwards on the stand to

authenticate the exhibits at trial.

Weston-Edwards testified that raw trade data was entered into RMS by people with

knowledge of the trades; the RMS data was kept in the course of regularly conducted business by

Deutsche Bank; Government Exhibits 1-404, 405, 406, and 407 were extracts of RMS trade data

compiled by an external forensic accounting firm; and, these documents represented a true and

accurate copy of RMS data.  (Trial Tr. dated Sept. 25, 2018, at 804:18-805:5, 805:14–16; 806:4–

10.)  The Government viewed this testimony as in line with Weston-Edwards' affidavits,

authenticating GX 1-404, 405, 406, and 407 as business records for Deutsche Bank. In fact, Weston-Edwards acknowledged that the spreadsheets were not compiled by Deutsche Bank at all, but by an outside firm.

The defense then had an opportunity to *voir dire* Weston-Edwards. During this questioning, Weston-Edwards walked back the statements in his affidavits. He testified that he "should have never said" that these exhibits were something maintained by Deutsche Bank (*id.* at 810:7–10), because ultimately, the spreadsheets themselves were in fact created by third-party firm, Cornerstone (*id.* at 808:23–809:2). Weston-Edwards confirmed that the affidavits that he signed were provided to him by an internal lawyer at Deutsche Bank and a member of the prosecution team (*id.* at 815:6–16); as the language used is drawn directly from Fed. R. Ev. 803(6), this comes as no surprise.

The Government erred in having Weston-Edwards sign both affidavits. The Government knew that the exhibits were created by Cornerstone, yet it still had Weston-Edwards sign a document, provided by a lawyer, which indicated the exhibits were created and kept by Deutsche Bank in the regular and ordinary course of its business.

Nevertheless, it is clear that Weston-Edwards' affidavits do not warrant a new trial, as there is no evidence that they prejudiced Defendants in any way.

First, the affidavits themselves were not admitted into evidence.

Second, the Government elicited testimony from Weston-Edwards that the spreadsheets were created by a third-party vendor. (*Id.* at 805:13–15 ("Q. Where did that data come from? A. The data originally sourced from RMS, but I believe it was compiled by an external forensic accountancy firm.").)

Third, when Defendants brought the content of the affidavits into the proceeding during *voir dire* of Weston-Edwards, it exposed any potential perjury. *See United States v. Cromitie*, No. 09 CR. 558 CM, 2011 WL 1842219, at *25 (S.D.N.Y. May 10, 2011), *aff'd*, 727 F.3d 194 (2d Cir. 2013) ("When the perjury was disclosed during the trial, a new trial should not be granted.").

Fourth, the record makes it clear that there was no deception about the underlying documents. The Government never attempted to pass off the spreadsheets as having been created by Deutsche Bank; it always recognized that the documents were created by a third-party firm. In multiple written communications with Defendants during the pre-trial period, the Government explicitly stated that these exhibits were created by a third-party firm (*see* Gov't Opp. Ex. 29 at 3–4; Ex. 32 at ¶ 5), and Defendants conveyed that they understood that the spreadsheets were a summary of underlying data that was created at Deutsche Bank (*see, e.g.,* Decl. of Scott B. Klugman in Further Supp. of Defs.' Mot. to Vacate Convictions and Dismiss the Indictment on the Basis of Prosecutorial Misconduct, Dkt. No. 426, Ex. 6).

Finally, after much back-and-forth, both the spreadsheets and the trade data were not admitted into evidence. (Trial Tr. dated Sept. 26, 2018, at 879:15–18.)

It is hard to believe Defendants could still argue prejudice but they do—they suggest the jury received the impression that there was trade data supporting the Government's theory of prosecution, which would favor the Government. But any such impression potentially made by the Government's direct examination of Weston-Edwards was promptly remedied by defense counsel's *voir dire* and the fact that the Court did not admit the exhibits into evidence. *See Cromitie*, 2011 WL 1842219, at *26 (finding no merit to argument that jurors were misled about a witness's credibility when "jurors watched as each inconsistency was exposed" and listened to

argument from defense attorneys which focused on credibility). And the fact that the Court declined to admit the exhibits means the jury did not pay any attention to them. *See United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (courts must assume a jury will follow instructions to disregard inadmissible evidence).

### 3.   Alleged Presentation of Misleading Trade Data Evidence

Defendants allege that the Government's *attempt* to present trade data it knew to be unreliable constitutes prosecutorial misconduct. The defense points to two instances where the Government sought to have misleading trade data evidence admitted into evidence:

First, when the Government attempted to present into evidence screenshots of the RMS platform that had been taken by Weston-Edwards the prior night; these screenshots were to serve as an alternative presentation of the raw trade data compiled by Cornerstone, which had already been excluded by the Court. (*See supra* II.B.2; Defs.' Br. at 60.)

Second, when the Government sought to introduce a proposed summary exhibit—GX 1-456—which included the "TRADER" field from the RMS data. (Defs.' Br. at 60–61.)

Neither piece of evidence was admitted. The Court excluded the screenshots because they were created in the middle of the trial and had not been presented to the defense before the Government sought to introduce them. (*See* Trial Tr. dated Sept. 26, 2018, at 874:8–13.) It excluded the proposed summary exhibit because Weston-Edwards' testimony demonstrated that it was not sufficiently reliable to be admitted. (*See* Trial Tr., dated Sept. 27, 2018, at 999:9–13.) A jury cannot have been influenced or swayed by evidence it did not see. Thus, any potential misconduct (which, as far as I am concerned, mischaracterizes the Government's actions) was clearly "cured" by the Court's actions.

Nevertheless, Defendants contend that they were still prejudiced by the fact that they were "never given the opportunity to probe what other data was available in the form of

screenshots of Deutsche Bank's internal systems." (Defs.' Br. at 60.) But both the Court and Defendants know that they had access to this information through the documents prepared by Cornerstone, which Weston-Edwards testified were based on the RMS data. Defendants offer no reason why the screenshots would have presented any additional or different information.

### 4. False Testimony Based on Cooperator Statements

Defendants argue that the Government knowingly elicited false testimony from Parietti concerning the assignment of trading books.

The Defense provides three reasons to question the veracity of Parietti's testimony: (1) a statement that is inconsistent with SA Weeks' testimony in front of the grand jury; (2) an inconsistency between an FBI 302 report and Parietti's trial testimony; and, (3) Parietti's recall of trading book assignments conflicts with the methodology underlying Deutsche Bank's BTM analysis. (Defs.' Br. at 61–63.)

"Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Jamison v. Griffin*, No. 15-cv-6716, 2016 WL 1698350, at *39 (S.D.N.Y. Apr. 27, 2016), *report and recommendation adopted*, No. 15-cv-6716, 2016 WL 4030929 (S.D.N.Y. July 27, 2016) (quoting *United States v. Moteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). Discrepancies that amount to "confusion, mistake, or faulty memory" are insufficient to demonstrate that a witness has provided false evidence at trial. *Id.* (quoting *Moteleone*, 257 F.3d at 219.) "The mere fact that a witness's trial testimony is inconsistent with a prior statement does not, standing alone, show that testimony is false or that the witness committed perjury." *Graves v. Cunningham*, No. 09-cv-5837, 2010 WL 2942614, at *22 (S.D.N.Y. May 26, 2010), *report and recommendation adopted*, No. 09-cv-5837, 2010 WL 2985473 (S.D.N.Y. July 27, 2010).

As has already been addressed, SA Weeks had a good-faith basis to testify that the Federal Home Loan Bank of Pittsburgh Trade was in Parietti's book. But a good-faith basis does

not mean that his testimony was accurate, and it does not make Parietti's testimony "false." SA

Weeks based his statement off of the "trader" field in the Deutsche Bank's trade data, which,

according to Defendants, was ultimately not accurate for that particular entry; thus, Parietti's

statement could be true. (Gov't Opp. at 8.) The Defendants had ample opportunity to bring this

inconsistency to the jury's attention through cross-examination.

      Any inconsistency between the FBI 302 statement and trial testimony about which traders

owned which books also does not rise to the level of perjury. Yes, Parietti's statements, in his

mid-trial interview and at trial, while consistent with each other, contradict a statement he made

to an FBI agent in December 2017. But one minor inconsistency is not necessarily evidence of

perjury. It is perfectly reasonable to infer that, nearly one year after his interview with the FBI,

and after he had presumably spent much more time ruminating upon and delving into materials

related to his time at Deutsche Bank, Parietti might correct an earlier misstatement. *See United

States v. Lighten*, 525 F. App'x 44, 47 (2d Cir. 2013) (prior inconsistent statement does not

amount to perjury); *Warren v. Ercole*, No. 07-cv-3175, 2007 WL 4224642, at *10 (E.D.N.Y.

Nov. 27, 2007) (internal inconsistencies in testimony does not necessarily establish perjury).

Furthermore, the defense had ample opportunity to present any inconsistencies in Parietti's

testimony to the jury during cross-examination and cure any potential misconduct. The

Government itself questioned Parietti's ability to identify traders based on books on multiple

occasions. (*See, e.g.,* Trial Tr. dated Oct. 1, 2018, at 1237:13–1239:1; 1319:3–17.)

      Finally, the fact that the Government relied on Parietti's ability to identify the trader

responsible for certain trades—rather than on BTM, as originally planned—was trial strategy,

not a nefarious tactic as Defendants suggest. It is not a conflict with the methodology of BTM; it

is an alternative theory. Defendants effectively argued that the Government did not adequately

present that Deutsche Bank's trade data was sufficiently reliable to prove that particular traders made certain trades and so, the Government had to "pivot." (Trial Tr. dated Sept. 26, 2018, at 884:8–10.) The fact that the Government was able to produce a witness who convinced the jury of <u>his</u> credibility does not amount to misconduct. Would it have been smart for the Government to ask Parietti if he could identify the trades prior to trial? Probably—it would have saved the witness and the Government significant effort during trial. Does the failure to do so lead to the assumption that the attempt to rely on Parietti's identification of trades during trial was suspicious? No. To my knowledge, there is no evidence that Parietti had ever stated that he could not link specific trades to traders, such that his ability to do so mid-trial would be suspect. To the contrary, the 302s the Government produced to Defendants actually implied he would be able to do so, as they demonstrate that Parietti knew which traders owned which books. The fact that the Government (successfully) relied only on Parietti's testimony to match the traders to the trades does not transform their trial strategy into misconduct.

### 5. Misrepresentations in Connection with Black's Motion for a *Garrity* Hearing

Black argues that the Government made significant misrepresentations in its opposition to his motion to exclude his statements made to Deutsche Bank during its internal investigation or, in the alternative, for a *Garrity* hearing. (Defs.' Br. at 63.)

Specifically, Black argues that the Government falsely represented, in opposition to his pretrial motion *in limine*, that the Government did not direct Deutsche Bank to conduct an internal investigation—even though it was later revealed that the CFTC had sent a letter directing Deutsche Bank to open one. (*Id.* at 64; *see also* May 2 *Kastigar* Decision at 3.)

To the extent Black argues that this representation constitutes prosecutorial misconduct sufficient to warrant a new trial, the argument fails for lack of prejudice. Certainly, the

Government was careless. Although the phrase "the Government" in the Government's opposition papers plainly referred to the DOJ and not the CFTC, the Government should have known that the *Garrity* doctrine does not require that the agency compelling the testimony (in this case, the CFTC) and the agency using that testimony at trial (the DOJ) to be the same agency. It was, therefore, misleading—even if not technically false—for the Government to represent that it "did not direct Deutsche Bank to conduct an internal investigation." (Defs.' Br. at 64.)

Ultimately, however, the Government's statement is of no moment. Black does not contend that he was prejudiced in connection with his motion *in limine*—nor could he, as the Government never introduced these statements at trial. Nor does Black contend that the CFTC letter (or other key evidence) was withheld as a result of this misrepresentation. And Black does not contend that he was prejudiced with respect to his post-trial *Kastigar* motion. Indeed, such an argument would have been premature; the Court ordered simultaneous briefing on prosecutorial misconduct and the *Garrity/Kastigar* issue, and Black could not have known how the Court would rule on the latter at the time he filed the former.

Black also points to two misrepresentations by the Government in its mid-trial, overnight letter to the Court, dated October 5, 2018, on the *Garrity* issue: (1) "The actions taken during the course of [Paul Weiss'] internal investigation [for Deutsche Bank] were not directed by the CFTC" (Dkt. No. 333 at 2); and (2) "While there became [*sic*] a time when Deutsche Bank's cooperation led to more specific requests from the government, that time was after Mr. Ricciardi left the investigation and after the interviews in question" (*id.* at 3 n.1).

I disagree with the Government; the CFTC did direct Deutsche Bank to take specific actions during the internal investigation. (*See* May 2 *Kastigar* Decision at 3, 6, 19–29.) But

there is no indication that the Government's statements on this topic prejudiced Black by altering the likelihood of his conviction at trial, because Black's statements were never introduced at trial. When the Court threatened to hold a mid-trial *Garrity* hearing before allowing witness Walter Ricciardi to testify about statements Black made to Paul Weiss lawyers, the Government decided not to call Ricciardi or introduce these statements. Potential prejudice cured.

Nor does Black claim that these misrepresentations denied him access to any evidence. As a matter of fact, the morning after the Government submitted its letter containing these statements, Black came into court brandishing the documents that were intended to rebut them. (*See* Trial Tr. dated Oct. 5, 2018, at 2287:13–2292:21 (discussing evidence that the CFTC requested regular updates from Deutsche Bank via Paul Weiss; and that the CFTC asked Deutsche Bank to interview individuals who "regularly interact" with King and Curtler).)

### 6. Alleged Misleading of the Jury in Connection With Black's "Good Faith" Defense

Black next argues that "The Government also deliberately elicited testimony from [its witness] Mr. Curtler designed to mislead the jury about Mr. Black's intentions" with respect to a Bloomberg message dated May 14, 2008. (Defs.' Br. at 68.) Apart from a conclusory statement in the Defense's reply brief that Black and Connolly were "substantially prejudiced" thereby,[3] Black does not explain how that was so. (*See* Defs.' Reply at 52.)

The Court has done its best to untangle the threads of Black's confusing argument, which ultimately turns on three questions asked by the Government during Curtler's redirect.

By way of background, on May 18, 2008, Black sent Curtler a message that read, "Low 1mth today pls shag, paying on 18 bio." (Defs.' Br. at 68.) Thereafter, Curtler submitted a one-

---

[3]     This is the first time Connolly's name appears in connection with this particular allegation of misconduct.

month LIBOR of 2.48. (*See* Trial Tr. dated Oct. 3, 2018, at 2001:14–16.) At trial, Black argued

that this message merely reflected Black's observations that market forces were pushing the

LIBOR lower. (Defs.' Br. at 69–69.) To accomplish this, Black's counsel introduced an e-mail

authored by Curtler (the "cash run" e-mail), also dated May 18, 2008, in which Curtler stated

that Deutsche Bank was bidding 2.45 for one-month cash. (Trial Tr. Dated Oct. 3, 2018, at

2001:7–8.) Based on the low bid number in the "cash run" e-mail, defense counsel elicited from

Curtler on cross an admission that he was not certain whether his LIBOR submission of 2.48 was

not, in fact, "consistent with the market factors that were occurring on that day." (*Id.* at

2002:12–16.)

On redirect, the following exchange took place:

> Q. Now, what's the "OR" in LIBOR?
>
> A. Offered rate.
>
> Q. And can you explain what the difference is between your LIBOR—or your cash offered rate and your cash bid rate?
>
> A. Deutsche Bank's cash bid rate and Deutsche Bank's cash offered rate.
>
> Q. Yes.
>
> A. So Deutsche Bank would bid for cash and raise cash. Most of the time Deutsche Bank didn't lend cash to the market, they would only lend internally. So we'd bid cash from the market and lend it to other areas within the bank.
>
> Q. *And did your bid rate tend to be lower or higher than your offered rate?*
>
> A. *Lower.*

(Trial Tr. dated Oct. 4, 2018, at 2156:14–2157:2 (emphasis added).) Black claims that this series

of questions was misleading, because the Government fairly implied that LIBOR was the same

thing as Deutsche Bank's offered rate. (*See* Defs.' Br. at 69–70.)

First, that is simply untrue.

Second, Black does not explain how this in any way undermined his good faith defense. Presumably he means to suggest that the Government erred by eliciting testimony about the relationship between Deutsche Bank's cash bids and Deutsche Bank's cash offers, rather than the relationship between Deutsche Bank's cash bids and Deutsche Bank's LIBOR submissions. But the Government committed no error, let alone misconduct.

Black claims that the Government then compounded its error by conflating Deutsche Bank's cash offers and Deutsche Bank's LIBOR submissions during its rebuttal summation (*id.* at 70):

> You also were shown Defense Exhibit 0673 that shows Mr. Curtler's bid numbers on that day. *Well, he explained to you his bid numbers are generally lower than the offered numbers. LIBOR is the offered rate.* Sometimes banks go out when they don't even necessarily need cash and they bid because they decide, If I'm going to get it that cheap, I might as well get it. So they have a bid in the market. But that's not what LIBOR is. LIBOR is what other banks are willing to offer them. So if they actually were going to get money, what would other banks offer to them? *And there is a difference, and we explained that to you, and that the bid number is often lower than the offered rate.*

(Trial Tr. dated Oct. 16, 2018, at 2843:1–12 (emphases added).)

Needless to say, Black is not entitled to post trial relief on these grounds. Even assuming that the jury had misunderstood the phrase "offered rate" to mean "LIBOR submission" (an assumption I am not prepared to make), Curtler's testimony was not misleading. It is perfectly logical to assume that Deutsche Bank's bid rate would have been lower than its LIBOR submission on any given day. (*See* Gov't Opp. at 62–63 (explaining how the LIBOR ordinarily fixes *between* the bid and offer side of the cash market).) Defendants have pointed to no date where it was otherwise.

Moreover, there were ample reasons—separate and apart from the "cash run" e-mail—for the jury to have discredited Black's less-than-compelling defense. For instance, Curtler testified that if Black were merely discussing "market color" with Curtler, there would be no reason for him to mention that he—Black himself—was "paying on 18 bio," since an individual trader's position would not bear on cash interest rates. (Trial Tr. dated Oct. 4, 2018, at 2179:6.) Additionally, while earlier portions of the e-mail chain that did discuss market color were circulated among several Deutsche Bank employees, Black's "Low 1mth pls" message was forwarded only to Curtler—strong evidence that he was not merely continuing the previous discussion, but instead asking Curtler to rig the stats. (*See* Trial Tr. dated Oct. 16, 2018, at 2842:16–25.)

As a result, the Court finds that Black was not "substantially prejudiced" by either the Government's questions to Curtler on redirect, or by its rebuttal summation.

### 7. Alleged False Testimony of Counterparty Representative

Defendants next argue that the Government elicited misleading testimony from Annette Hunter of the Federal Home Loan Bank of Atlanta ("FHLBA")—a counterparty to Deutsche Bank on several swaps using U.S. dollar LIBOR as a benchmark—about why her bank stopped trading with Deutsche Bank. (Defs.' Br. at 71.) Defendants argue that the Government engaged in misconduct by calling this witness, since it emerged at trial that FHLBA's decision to terminate its relationship with Deutsche Bank was wholly unrelated to allegations of LIBOR manipulation. (*Id.*)

Defendants do not explain how Hunter's testimony prejudiced them, in either their initial brief or their reply brief. Admittedly, this would be a tough needle to thread, as Defendants readily acknowledge that the Court, "ultimately struck [the misleading] portion of Ms. Hunter's testimony . . . from the record and commented on the Government's duplicity" (*id.*), thereby

erasing any possibility of prejudice, *see United States v. Mussaleen*, 35 F.3d 692, 695 (2d Cir.

1994) (The "normal assumption [is] that a jury will follow an instruction to disregard

inadmissible evidence inadvertently presented to it.") (internal quotations omitted).

    Defendants' request that the Court, "alternatively, conduct an evidentiary hearing on

these issues" is meritless, as Defendants do not explain what additional facts could possibly be

developed at this hearing that would call into question the jury's verdict. (Defs.' Br. at 72.)

### 8. Remarks During Opening and Summation

    Defendants contend that the Government's opening remarks prejudiced the jury by

suggesting that the conspiracy contributed to the global financial crisis. They point to the

following three statements: (1) the "LIBOR rate was a critical interest rate for the global

financial system, (Trial Tr., dated Sept. 18, 2018, at 46:19–20); (2) the "LIBOR rate was so

important that it was honest and that it had integrity because so much money throughout the

entire global financial system was riding on it," (*id.* at 47:1–3); and (3) "this handful of guys

were sending a ripple effect through the financial market," (*id.* at 52:4–5).

    Defendants made no objections during the opening. *See Bellamy v. City of New York*,

914 F.3d 727, 764 (2d Cir. 2019) ("A defense counsel's failure to object to an improper

summation remark undercuts the probative value of the subsequent lack of a curative measure.").

Had they done so, I would have overruled the objection.

    Defendants' argument for misconduct has no basis. Not one of these statements alludes

to—let alone mentions—the financial crisis. They are true statements. LIBOR is a critical

interest rate, and would have been in the absence of any financial crisis. Lots of money was, and

always has been, riding on LIBOR. And any effort to monkey with the setting of LIBOR would

send a ripple effect into the market. It is not "egregious misconduct" to make a truthful remark

in summation. *United States v. Fell*, 531 F.3d 197, 209 (2d Cir. 2008) ("[R]emarks of the

prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct." (quoting *United States v. Elias*, 285 F.3d 183, 190 (2d. Cir. 2002)); *see also Osorio v. Conway*, 496 F. Supp. 2d 285, 302 (S.D.N.Y. 2007).

Moreover, even if these statements could be considered problematic, the Government and the Court took curative measures that would have obviated any harm. The Government specifically stated in its rebuttal summation that it was not attempting to argue that the Defendants caused the financial crisis: "You also heard argument that the government is somehow arguing that the defendant's use of the threes-ones position alone is sinister or that we somehow are arguing that they caused the financial crisis. That is not the argument." (Trial Tr. dated Oct. 16, 2018, at 2840:15–18); *see also Scott v. United States*, No. 08-cr-360, 2012 WL 2094052, at *3 (S.D.N.Y. June 11, 2012) (prosecutor's remarks during opening statement must be viewed in context of entire case). The Court told the jury that it would "be improper for you to allow any feelings you might have about big banks or Wall Street or the financial markets or the financial crisis or anything related to these topics to influence you in any way as you consider the evidence." (Trial Tr. dated Oct. 16, 2018, at 2883:1–5.) This instruction would have cured potential prejudice, had there been any. *See Osorio*, 496 F. Supp. at 301; *see also Boyde v. California*, 494 U.S. 370, 384 (1990) ("Arguments of counsel generally carry less weight with a jury than do instructions from the court."). But there was none.

### 9. Fact Bargaining with Cooperators

Finally, Defendants claim that the Government acted improperly by failing to disclose to the jury that the testimony it elicited from certain witnesses contradicted facts to which the Government itself had stipulated in various plea agreements. (Defs.' Br. at 74.)

a)    <u>Timothy Parietti's Testimony that the Conspiracy Lasted Through 2010</u>

Defendants contend that the Government knowingly elicited misleading trial testimony from co-conspirator Timothy Parietti, because Parietti testified that his involvement in the LIBOR conspiracy ended in 2010, without revealing that the literal terms of his plea agreement stated that the conspiracy ended "as early as 2008." (*Id.* at 74–75.) Defendants also argue that this plea bargain was the result of an impermissible "side deal," intended to shield from forfeiture a $9 million bonus that Parietti had received in 2009. (*Id.*)

The Government protests that there is nothing incompatible about stipulating to a conspiracy ending "as early as 2008," and then eliciting testimony at trial that the conspiracy extended through 2010. It fervently protests that there was no "fact bargaining" or "side deal." (Gov't Opp. at 70.)

I quite understand why the defense believes there was a side deal with Parietti, made at the time he took his plea, but not disclosed to the judge who took that plea. But whether that be true or not, there was no misconduct that affected the trial of Connolly and Black.

The pertinent facts are these:

The Government's original charging instrument against Parietti charged him with participating in a conspiracy that ran from 2005 until 2011. (*See* Information, Dkt. No. 1, *United States v. Timothy Parietti*, No. 16-cr-373 (PRE).)

Parietti's Pimentel letter said that the conspiracy lasted until 2010. (Trial Tr. dated Oct. 1, 2018, at 1404:6–8.)

At his plea, Parietti originally allocuted to a conspiracy that lasted "from early 2006 through approximately 2008." (*Id.* at 1267:20–1269:4; 1405:20–24.) He then changed his allocution to say that the conspiracy lasted until "at least 2008." (*Id.* at 1279:21-24.)

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████

The first judge to learn that a $9 million bonus was paid to Parietti outside of the allocution period was I. I heard about it at the trial of Connolly and Black. It was the subject of extensive cross-examination by counsel for both Defendants. (Trial Tr. dated Oct. 1, 2018, at 1267:19–1273:3; 1274:5–1284:21, 1390:7–1404:14.) It was, I thought, very effective cross—especially when Parietti testified (credibly, in my view) that: (1) the Government agreed that he could allocute to a period that did not necessarily encompass 2009; (2) that this agreement was not mentioned in his cooperation agreement; and, (3) that he was being allowed to allocute to a shorter period of time "in order to benefit [me] at sentencing." (*Id.* at 1267:20–1272:25).[4] Nonetheless, the defense's questioning did not persuade the jury to conclude that Parietti's testimony was unworthy of belief.

There has been a practice in this district—in effect since before I joined the court in 1998—pursuant to which, when a cooperating witness pleads before one judge and testifies before another, the United States Attorney's Office notifies both judges of that fact. The judges can then decide whether the cooperator should be sentenced by the judge who took his plea or the judge who heard his testimony. If the former judge sentences, he has the opportunity to ask his colleague about the cooperator's testimony and whether the cooperator in fact gave substantial assistance to the Government.

---

[4]    The Government tried to walk this back on redirect; it was, in my opinion, unsuccessful.

Although this case was tried out of Main Justice, not the United States Attorney's Office for the Southern District of New York, both Ms. Sipperly and Ms. Anderson are products of that office—Ms. Sipperly, I believe, worked in that office for well over ten years—and so are presumed to be familiar with that practice.

No such letter was sent to Judge Engelmayer or myself. (*See* Hrg. Tr. dated Feb. 8, 2019, *United States v. Timothy Parietti*, No. 16-cr-373 (PRE) at 4:14–5:4.)

In order to educate himself about Parietti, Judge Engelmayer tracked down who had heard his testimony and contacted me directly. (*Id.* at 4:8–13.) I concluded that no letter had been sent because the Government preferred that I not sentence Parietti or have any communication with Judge Engelmayer on the subject of Parietti. To me, the proof of the pudding was that Judge Engelmayer was not aware, until I told him about it, that Parietti had been spared the possibility of forfeiting a $9 million bonus by allocuting as he had.

On the day of Parietti's sentencing, a junior member of the Government team, Ms. Brown, appeared and addressed the court. Ms. Brown responded to Judge Engelmayer's questions about "why no letter" with an apology and implied that she was unfamiliar with our local practice (*id.* at 5:3–5:6, 5:11–5:12, 5:24–6:4)—a representation that neither of the lead prosecutors could possibly have made.

When Judge Engelmayer asked about forfeiture, he was told that no defendant in the case would be subject to forfeiture (*id.* at 32:25–34:2)—an astounding position to be taken in a financial fraud case by a Government that imposes millions of dollars in forfeiture obligations on impecunious drug dealers who would never be able to pay it off, and does so at the drop of a hat, often on top of Mandatory Restitution Act restitution.

The conclusion I draw from these facts is that the Government did indeed agree that Parietti could allocate to a period that did not necessarily encompass 2009[5]; that it did so because of Parietti's $9 million bonus, which was paid after 2008; and that this qualifies as a "side deal."

But that does not entitle Connolly or Black to a new trial.

All of these matters were revealed on cross-examination, and defense counsel deftly impeached Parietti by exposing the existence of what they and I believe was a side deal between him and the Government. (Trial Tr. dated Oct. 1, 2018, at 1269:21–1273:3.) Parietti himself did not dissemble; he specifically admitted on cross that he "wanted the shorter time period" in his plea deal so that his "$9 million bonus would be outside that range." (*Id.* at 1269:21–1270:23.) As a result, the jury was left with no illusion about Parietti's strong incentive to provide testimony that was favorable to the Government.

### b) Michael Curtler's Testimony About Deutsche Bank Senior Managers

Defendants next argue that the Government knowingly elicited misleading testimony from Deutsche Bank employee Michael Curtler "to imply to the jury that senior management at Deutsche Bank had no knowledge or involvement in the alleged conduct." (Defs.' Br. at 76.) The Government had previously stipulated to the role of senior managers in its plea agreement with Deutsche Bank. (*Id.* at 76–77.)

Defendants take issue with a single question asked by the Government to Curtler on redirect. By way of background, Curtler had testified on cross that his supervisors at Deutsche Bank, David Nicholls and Alan Cloete, had, among other things, "encouraged the sharing of positions between traders at the desk" (Trial Tr. dated Oct.4, 2018, at 2132:6–18); been

---

[5]     "At least 2008" does not necessarily include anything beyond 2008.

"involved in the decision to place the [cash] traders close to derivative traders in the first place" (*id.* at 2132:19–21); and, advocated "increasing the information shared between New York and London" (*id.* at 2132:22–24). This testimony was offered in support of Connolly and Black's defense that they had not committed fraud, because their supervisors at Deutsche Bank actively fostered an environment in which traders were encouraged to share their positions with submitters.

According to Defendants, the Government elicited the following "misleading" testimony on redirect:

> Q. Mr. Curtler, was there anything about directives from your bosses, so including Anshu Jain, I think we heard Alan Cloete, or David Nichols [*sic*], that made you think that it would be okay to submit LIBOR submissions that you skewed in order to benefit traders' positions?
>
> MR. LEVINE: Objection to form.
>
> THE COURT: The objection is overruled.
>
> A. No, there wasn't.

(Trial Tr. dated Oct.4, 2018, at 2168:25–2169:7.) Black argues that this "testimony elicited from Mr. Curtler [was] in direct contradiction with the Government's knowledge of senior management responsibility for the charged conduct based on, *inter alia*, seating the cash and derivatives traders in 'very close proximity.'" (Defs.' Br. at 78.)

There was nothing improper about the Government's questions. The Government sought only to ascertain whether the actions of senior managers, to which Curtler had testified in detail on cross, fairly implied to Curtler that attempting to impact the LIBOR fix to benefit one's trading book was "okay," *i.e.*, acceptable or ethical. The question, in fact, incorporated rather than contradicted earlier testimony about the role of senior managers, and acknowledged that

they had indeed handed down directives that, among other things, encouraged the sharing of information between submitters and traders.

Moreover, Curtler's testimony did not contradict the facts to which the Government had stipulated in its plea agreement with Deutsche Bank. (*See* Dkt. No. 413-37 ¶¶ 98–105.) The allegedly inconsistent paragraphs of the plea agreement stated that one senior manager, later identified as Nicholls, had, among other things: (1) been present when traders and submitters coordinated LIBOR submissions; (2) received communications informing him of fixing; and (3) encouraged a subordinate (not Curtler) to "Increase relationship with FFT MM to control the short date settings with cash and derivatives." (*Id.* ¶¶ 98–101.) The plea agreement also described the bank's poor compliance culture. (*Id.* ¶¶ 102–05.) However, nothing in the plea agreement suggested that senior managers had issued directives sanctioning LIBOR manipulation or communicating that it was acceptable.

Defendants next argue that the Government's questions implied ignorance on the part of senior managers. (Defs.' Br. at 76.) This is flatly contradicted by the record. In fact, the Government had earlier elicited testimony from Curtler that Nicholls "knew . . . what was going on" with respect to LIBOR. (Trial Tr. dated Oct. 4, 2018, at 2158:19–2159:1.)

### C.    Cumulative Prejudice

In addition to arguing that individual instances of misconduct before and during trial require this Court to dismiss the indictment, order a new trial, or hold an evidentiary hearing, Defendants also argue that the Government's "systematic and pervasive misconduct throughout the case . . . substantially prejudiced Defendants and deprived them of their right to a fair trial." (Defs.' Br. at 1.)

Even where individual instances of prosecutorial misconduct, "standing alone, might not justify reversal," a defendant is entitled to post-trial relief when "the cumulative effect of the prosecutor's persistent and clearly improper [tactics] amounted to such egregious misconduct as to render [the defendant's] trial fundamentally unfair." *Floyd v. Meachum*, 907 F.2d 347, 353, 357 (2d Cir. 1990). "It is well-settled in this circuit that the effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal." *Fell*, 531 F.3d at 233.

At the same time, "not every error—whether alone or in combination with others— warrants a new trial." *Id.* "With respect to prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *United States v. Fell*, 944 F. Supp. 2d 297, 338 (D. Vt. 2013) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

Nothing the Government did violated the due process rights of Defendants. The Government did engage in a substantial number of course corrections, some of which significantly altered their strategy at trial. For example, as discussed in this Court's decision on Defendants' Rule 29 motion, the Government wavered repeatedly on whether it would prove its case on a theory of convergent or non-convergent fraud, which required defense counsel to fight a war on multiple fronts. (Eventually, it went forward on both theories.)

The Court would be remiss, however, if it failed to mention that this and other "course corrections" resulted directly from Defendants' consistent nipping at the heels of the Government. Namely every issue raised in this motion was anticipated and/or identified by defense counsel during the course of the prosecution.

It was wrong for the Government, prior to the first *Kastigar* hearing, to submit a sworn declaration from BBA officer Meaney without speaking with him to verify its contents. It was wrong for the Government to commit the same mistake with respect to its counterparty witness from the Federal Home Loan Bank of Atlanta. It was wrong for the Government to commit this mistake yet again with respect to data custodian Weston-Edwards.

At the same time, the Court has already established that most of what the Defendants call "misconduct" did not amount to misconduct at all.

The Court also takes into consideration that it provided Defendants with "the benefit of regulating the government's conduct in this case far more than maybe any [defense counsel] ever worked on." (Trial Tr. dated Oct. 2, 2018, at 1692:18–20.) Black benefited from an extensive *Kastigar* hearing prior to trial, during which the Court went line-by-line through SA Weeks' grand jury testimony and compared it to the independent sources he identified, in order to ensure that none of it had been grounded solely in Black's compelled testimony before the FCA. Both Connolly and Black benefited from the Court's orders (and the Government's generosity) in pretrial discovery, during which they received hundreds of thousands of documents from both U.S. and foreign agencies, including documents sought and received voluntarily pursuant to an MLAT request. (*See* Dkt. No. 89 at 5 ("As a matter of fact, the Government has been unusually forthcoming with the defense when it comes to discovery.").) The Court also delayed the commencement of trial, and lost time after the jury had been empaneled, in order to inquire into alleged *Brady* violations—all of which turned out to be ephemeral.

Ultimately, in deciding whether the Government's behavior crosses the event horizon into actionable misconduct, the Court gives substantial weight to the fact that the jury's verdict was based on "compelling evidence," *United States v. Jackson*, 345 F.3d 59, 78 (2d Cir. 2003),

including extensive cooperator testimony and electronic communications authored by the Defendants themselves.  The e-mails say what they say; the conclusions reached by the jury are hard to escape.

Because the Court finds that both Defendants received "a full and fair trial in which there was overwhelming evidence to support [their] conviction[s]," *Walters*, 910 F.3d at 24, Defendants' motion to dismiss the indictment, order a new trial, or hold an evidentiary hearing on the basis of prosecutorial misconduct, must be denied.

## III.    Conclusion

For the reasons stated above, the Court **DENIES** Defendants' joint motion to dismiss on the basis of prosecutorial misconduct.

The Clerk of Court is respectfully requested to close the motions at Docket Number 397.

This constitutes the decision and order of the Court.

Dated: May 2, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES

62