**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> MATTHEW CONNOLLY and GAVIN CAMPBELL BLACK, <br><br> *Defendants.* | No. 1:16-cr-00370  (CM) <br><br> ECF Case <br><br> **ORAL ARGUMENT REQUESTED** |

<u>**SENTENCING MEMORANDUM ON BEHALF OF MATTHEW CONNOLLY**</u>

**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
kennethbreen@paulhastings.com
pharaguberman@paulhastings.com
amandapober@paulhastings.com

*Attorneys for Defendant Matthew Connolly*

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.      APPLICATION OF THE SECTION 3553(A) FACTORS STRONGLY
SUPPORTS A NON-CUSTODIAL SENTENCE ..................................................... 2

      A.      Mr. Connolly's History and Character Warrants a Downward Variance ............. 4

      B.      The Nature and Circumstances of the Offense Warrant a Downward
Variance (§ 3553)(a)(1)) ....................................................................................... 11

              1.      The conduct was open and pervasive throughout the financial
industry and Deutsche Bank ....................................................................... 12

              2.      Mr. Connolly took no steps to conceal his conduct ................................... 14

              3.      Mr. Connolly did not profit from his conduct ........................................... 14

      C.      The Sentence Calculated under the Guidelines  Is Unjustly  Inflated and
Inconsistent with the Statutory Goals of Sentencing (§ 3553(a)(4)) ................... 15

      D.      Incarceration Is Not Necessary for Deterrence or to Protect the Public  (§
3553(a)(2)) ........................................................................................................... 18

      E.      A Significant  Downward Variance Would  Be Consistent  with Variances
Received by Similarly Situated Defendants (§ 3553(a)(6)) ................................. 20

II.     THE SENTENCING GUIDELINES MERIT A NON-CUSTODIAL SENTENCE ....... 23

      A.      No Loss, Actual or Intended, Resulted from the Offense ................................... 25

              1.      The Sentencing Guidelines  rebut the Government's construction of
"intended loss" ........................................................................................... 25

              2.      The Government's  estimate of intended loss, as described in the
PSR, is incorrect ......................................................................................... 27

                    a)      The Loss Amount  Includes Conduct Unrelated to Mr.
Connolly ........................................................................................... 27

                    b)      The Loss Amount's  Underlying  Assumptions  Are
Unfounded ........................................................................................ 28

                    c)      The Record Lacks Reliable  Data to Support a Loss
Calculation ....................................................................................... 30

      B.      There Are No Victims of the Offense .................................................................. 31

      C.      A Sophisticated Means Enhancement Is Inapplicable ....................................... 33

      D.      An Abuse of Trust Enhancement Is Inapplicable .............................................. 34

CONCLUSION ............................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................. 3, 4, 23

*Kimbrough v. United States*,
    552 U.S. 85 (2007)...........................................................................................3

*Nelson v. United States*,
    555 U.S. 350 (2009).........................................................................................3

*Pepper v. United States*,
    562 U.S. 476 (2011).........................................................................................3

*Spears v. United States*,
    555 U.S. 261 (2009) (per curiam) ..................................................................4

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006),
    *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ....................................................... 15, 19

*United States v. Allen*,
    14-CR-272 (JSR) (S.D.N.Y. filed Apr. 28, 2014) ............................................22

*United States v. Booker*,
    543 U.S. 220 (2005).........................................................................................3

*United States v. Broderson*,
    67 F.3d 452 (2d Cir. 1995) ............................................................................35

*United States v. Brown*,
    843 F.3d 74 (2d Cir. 2016) ..............................................................................3

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) .........................................................................3, 4

*United States v. Collado*,
    No. 07 Cr. 1144 (HB), 2008 U.S. Dist. LEXIS
    44010 (S.D.N.Y. June 5, 2008).......................................................................19

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) ..................................................................... 16, 17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Curtler*,
   15-CR-670 (CM) (S.D.N.Y. filed Oct. 8, 2015).........................................................29, 30, 31

*United States v. Dorvee*,
   616 F.3d 174 (2d Cir. 2010) ...............................................................................................3

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) .........................................................................16, 19

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd,* 747
   F.3d 111 (2d Cir. 2014)....................................................................................................17

*United States v. Hirsh*,
   239 F.3d 221 (2d Cir. 2001) .............................................................................................35

*United States v. Jolly*,
   102 F.3d 46 (2d Cir. 1996) ..........................................................................................35, 36

*United States v. Jones*,
   460 F.3d 191 (2d Cir. 2006) ...............................................................................................3

*United States v. Manatau*,
   647 F.3d 1048 (10th Cir. 2011) ........................................................................................26

*United States v. Parietti*,
   16-CR-373 (PAE) (S.D.N.Y. filed May 26, 2016) ............................................................32

*United States v. Skys*,
   637 F.3d 146 (2d Cir. 2011) ........................................................................................31, 32

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ...............................................................................................19

**Statutes and Guidelines**

18 U.S.C.
   § 3553 .............................................................................................................................2, 17
   § 3553(a) .......................................................................................................................*passim*
   § 3553(a)(1) .......................................................................................................................11
   § 3553(a)(2) .......................................................................................................................18
   § 3553(a)(4) .......................................................................................................................15
   § 3553(a)(6) .......................................................................................................................20

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

United States Sentencing Commission Guidelines Manual (Nov. 2018)
    § 2B1.1 ....................................................................................................25
    § 2B1.1(a)(1) ...........................................................................................24
    § 2B1.1(b)(1) ............................................................................31, 32, 33
    § 2B1.1(b)(1), cmt. (n. 1) .......................................................................31
    § 2B1.1(b)(1), cmt. (n. 3) .......................................................................25
    § 2B1.1(b)(1), cmt. (n. 3(i), (iii)) ..........................................................32
    § 2B1.1(b)(1), cmt. (n. 9(B)) .................................................................33
    § 2B1.1(b)(1)(J) ......................................................................................24
    § 2B1.1(b)(10) ........................................................................................33
    § 2B1.1(b)(10)(B) .............................................................................24, 33
    § 2B1.1(b)(2) ............................................................................31, 32, 33
    § 2B1.1(b)(2)(A)(i) ...........................................................................24, 31
    § 3B1.3 .............................................................................................24, 36
    ch. 5, part B ............................................................................................19

## Other Authorities

James E. Felman, *A Report on Behalf of the American Bar Association Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014)...................................................................................................... 16, 23

James E. Felman, Testimony on Behalf of the American Bar Association Before the United States Sentencing Commission for the Hearing on Proposed Amendments to the Federal Sentencing Guidelines Regarding Economic Crimes, Mar. 12, 2015, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/publichearings-and-meetings/20150312/Felman.pdf .............................................16

Jed S. Rakoff, *Why The Federal Sentencing Guidelines Should Be Scrapped*, 26 Fed. Sent'g Rep. 6 (October 2013)...................................................................17

# INTRODUCTION

We respectfully ask the court to sentence Matt Connolly to no incarceration or a short period of incarceration. On October 17, 2018, following an approximately five-week trial, a jury returned a mixed verdict, finding Mr. Connolly guilty of conspiracy to commit wire fraud and bank fraud and two substantive counts of wire fraud, and not guilty of three additional substantive wire fraud counts asserted against him.[1] Mr. Connolly has vigorously defended his innocence in this case for nearly two and half years, which even this Court has recognized. (*See, e.g.*, ECF No. 262 at 8-9 ("This case has been litigated actively and vigorously since it was indicted some twenty-four months [ago]."); ECF No. 203 at 7 ("In two decades on this bench, the court has had only one other criminal case in which the sufficiency of the Government's proposed case was challenged so vociferously prior to trial.").) As this Court is aware, Mr. Connolly challenged the jury's guilty verdict post-trial and sought a judgment of acquittal on the grounds that there was insufficient evidence to support his conviction.

In sentencing Mr. Connolly, the Court should consider, along with the information relating to his character, the minute amount of evidence presented by the Government at trial linking Mr. Connolly to the alleged conduct. This case is atypical and differs greatly from typical white-collar fraud prosecutions. The Government's case against Mr. Connolly rested on merely three e-mail exchanges involving Mr. Connolly. Mr. Connolly left Deutsche Bank in March 2008, at least three years prior to the end of the alleged conspiracy for which he was indicted. Mr. Connolly was neither a trader nor a LIBOR submitter. In fact, the evidence at trial demonstrated that LIBOR played a very minor role in Mr. Connolly's job at Deutsche Bank. Additionally, there was no evidence presented at trial of any overt attempt to conceal or mislead;

---

[1] Two charges against Mr. Connolly were dismissed prior to the jury's deliberations. (Trial Tr. 2451:1-3.)

rather, this case involved the opposite—an open practice involving many—not just at Deutsche Bank, but at many other Panel banks as well. The defense also credibly demonstrated that the foundation of the charges, that is the LIBOR definition, was vague and did not prohibit the alleged conduct throughout the conspiracy period. Rather, it was generally understood that there was a reasonable range of acceptable LIBOR rates from which a submitter could choose. Finally, Mr. Connolly did not act with a personal profit motive. Mr. Connolly voluntarily left Deutsche Bank in March 2008, and his alleged co-conspirators subsequently went on to make bonuses of up to $9 million. And the Government itself has admitted that it cannot demonstrate how much, if any, the Defendants in this case may have profited from the alleged conduct nor can it prove any actual or intended loss. As to Mr. Connolly's character, the submitted letters demonstrate that he is a humble, beloved family man who lives a modest life and always puts others before himself. He is someone who is motivated not by money and success, but by the family and friends who surround him, to whom he provides unwavering support. The mitigating factors and Mr. Connolly's exceptional character place Mr. Connolly outside the realm of the typical white-collar defendant and should result in no or at most a short period of incarceration.

## ARGUMENT

### I.  APPLICATION OF THE SECTION 3553(A) FACTORS STRONGLY SUPPORTS A NON-CUSTODIAL SENTENCE

18 U.S.C. § 3553(a) instructs courts to consider a number of factors in determining an appropriate sentence for a defendant, with the overarching goal of "impos[ing] a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). While consideration of the Sentencing Guidelines is a factor for consideration under 18 U.S.C. § 3553, numerous seminal cases have established that the Guidelines range is only advisory in nature.

The advisory nature of the Sentencing Guidelines was first established in 2005, when the Supreme Court held that the then mandatory Guidelines system violated the Sixth Amendment. *United States v. Booker*, 543 U.S. 220, 245 (2005). Following *Booker*, the Supreme Court subsequently made clear that the Guidelines are not only advisory, but are just "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). And, while the court is to begin the sentencing process by calculating the applicable Guidelines range, the court "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States,* 552 U.S. 38, 49-50 (2007).

Importantly, a district court's approach to sentencing does not permit any presumption that the applicable Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (citations omitted). Rather, the court must undertake an "independent review of the sentencing factors, aided by the arguments of the prosecution and defense[,]" and give due "consideration [to] . . . what is a fair and just sentence under all the circumstances." *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008); *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). A determination of the reasonableness of a sentence is not determined by the amount from "which a sentence deviates from the applicable Guidelines range," but is instead determined "by the district court's individualized application of the statutory sentencing factors." *See United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal quotation marks omitted).

In situations, such as here, where the sentence calculated under the Guidelines is unjustly harsh, the court must deviate from the Guidelines' advised range. *See United States v. Brown*,

843 F.3d 74, 93 (2d Cir. 2016) (recognizing a court's "responsibility not to stand idly by in cases when it would be manifestly unjust to let the sentence stand.") (internal quotation marks and alterations omitted). And, "[e]ven when a particular defendant . . . presents no special mitigating circumstances–no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post offense rehabilitation–a sentencing court may vary downward from the advisory guideline range." *Spears v. United States*, 555 U.S. 261, 263-64 (2009) (per curiam) (quoting *United States v. Spears*, 533 F.3d 715, 719 (2008) (Colloton, J., dissenting), *rev'd Spears*, 555 U.S. at 261-68). Moreover, courts "may vary from the Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." *See Cavera*, 550 F.3d at 210 (quoting *United States v. Kimbrough*, 552 U.S. 85, 101 (2007)). "The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines . . . ." *Spears*, 555 U.S. at 263-64.

Given the considerations discussed below, application of the § 3553(a) factors strongly supports a non-custodial sentence.

### A.    Mr. Connolly's History and Character Warrants a Downward Variance

At a defendant's sentencing, the court is tasked with assessing the whole of the individual, making "an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. During a weeks-long trial, this Court received into evidence numerous emails, chats, and other documents—snippets from an isolated period in Deutsche Bank offices in London and New York. Few of these involved Matt Connolly directly. Those that did reflected even more isolated events.[2] Because Matt Connolly is so much more than this evidence showed, we

---

[2] The Government's case against Matt, as discussed *infra*, centered on just three email exchanges that involved him.

emphasize that a true "individualized assessment" of Mr. Connolly requires the Court to view him in the whole, a whole marked by selflessness, humility, and devotion to family and friends. His family and friends depend on him for love and support and are desperate to have him in their lives.

Matt Connolly's true character is a far cry from the greedy banker the Government made him out to be in this case. The real Matt is best understood through his closest relationships and the ones to whom he has devoted his life. Those who know Matt know him as a humble family man, whose love and support for his wife is only outshined by his adoration of and dedication to his children. To Beth, Matt's wife of nearly thirty years, Matt has always been her "biggest cheerleader," always believing in her, even when she does not believe in herself. (Ex. D, Beth Connolly.) Matt's mother-in-law, Shirley, found this dedication and support especially meaningful during Beth's two difficult pregnancies, during which Matt "took great care of [Beth]." (Ex. L, Shirley Adams.) "He's a caring and loving husband," Shirley writes of Matt. (*Id*.)

"As a dad, our kids hit the jackpot," Beth writes of her husband. (Ex. D, Beth Connolly.) To his children, Adam and Emily, Matt is a caring and loving father, a "dedicated family man" (Ex. I, Lori A. Marx) who stands as the "backbone" to their close-knit family of four (Ex. D, Beth Connolly). His wife describes him as kind and patient towards their children (according to his daughter, he "had the patience of a saint"), a "father who has given our children the space and opportunity to develop into their own person without judgment." (*Id*.) Matt taught his children the importance of honesty and respect, "that having fun is more important than winning," and that above all, "family has to be the priority." (Ex. H, Emily Connolly.) Ever keeping his eye on the important things, Matt "always made sure to be in attendance at countless dance recitals,

school concerts and plays, [and] sporting events," "[e]ven with long working hours and a lengthy commute." (Ex. I, Lori A. Marx.)  Matt's daughter, Emily, emphasized that her father taught her that "you can not get missed moments back, and that having everything else means nothing without your family." (Ex. H, Emily Connolly.)

Matt's son, Adam, recalls that "he was always there when I needed him." (Ex. A, Adam Connolly.)  Looking back, Adam recalls one example while he was away at college.  Adam and his father usually spoke at least once a week, though this time Adam had not answered his father's texts in a while.  It had been a particularly stressful time for Adam, "one of those times where I was feeling overwhelmed by everything around me and felt like I was drowning." (*Id.*)  When Adam finally answered, Matt "must have sensed how [his son] was feeling . . . because the next day he was there in [Adam's] apartment, a 3 and a half hour drive [away]." (*Id.*)  "That's who my father is, he's the man that is always there when he needs to be." (*Id.*)

Matt's attentiveness as a father and his commitment to family above all else is reflected in the character of Adam and Emily, both of whom are now in their twenties.  "He has shown me the importance of putting family first, honesty, and respect. . . . I owe him my knowledge of relationships, loving childhood, and the ongoing guidance in my young-adult life all to him." (Ex. H, Emily Connolly.)  Beth agrees: "I have two grounded unselfish young adults because of the participation of this man in their lives." (Ex. D, Beth Connolly.)  As does Matt's mother-in-law: "My grandchildren are kind, respectful, well-grounded young adults." (Ex. L, Shirley Adams.)  "Most important [Matt] instilled values in Adam and Emily who are now young, respectable, and responsible adults." (Ex. G, Eileen Petrasovits.)

This attentiveness, generosity, and love are defining characteristics of Matt, and they extend beyond his wife and children.  "Matthew has shown to have a generous, kind and devoted

character towards others." (Ex. J, Melanie Rios.) In simple terms, "[a]s far as Matt's devotion to extended family and friends, he is truly what I would classify as a giver." (Ex. D, Beth Connolly.) Beth has "witnessed [Matt] helping parents and siblings through health crisis, life crisis and everyday menial tasks," pursuits he undertakes with "unbreakable optimism and humor." (*Id.*) For Matt, "[n]o problem is too big or small, just ask and he's first in line"—a quality that Beth refers to as "ride or die, which Matt is for sure." (*Id.*)

This is underscored by countless stories from Matt Connolly's siblings and in-laws documenting his relentless commitment to caring for and supporting his family. During his father's long battle with illness, even from thousands of miles away while his father lived in Florida with Matt's sister, Melanie, a registered nurse, Matt never hesitated to "offer any and all help and guidance." (Ex. J, Melanie Rios.) Several years ago, Matt's sister-in-law, Patricia, suffered a serious infection and underwent emergency brain surgery:

> On the day of my surgery Matt came to the hospital and stayed in the waiting room with my husband and kids. He took the kids to the diner. He drove them where they needed to go. No one from my side of the family showed up that day, but Matt was there.
>
> (Ex. K, Patricia Connolly.)

Matt was also there for his sister Claudia in a time of need:

> When Matt was in college, I was a single mother. I had to work and would ask family members to babysit my young daughter. Matt always volunteered. I especially remember one time when my daughter wouldn't stop crying, Matt drove around with her in his car for hours to calm her. A police officer pulled Matt over at one point to ask him why he was driving aimlessly in the area.
>
> (Ex. F, Claudia Megaro.)

His brother, Christopher, shares these sentiments, telling of Matt Connolly's reassurance when Christopher decided to make a challenging career switch to become a high school teacher:

> This turned out to be quite a challenge for me and my family due to the time commitment and increase in stress. Matt recognized what was happening and made a point of calling and texting to provide positive messages and reassurance that I was meant for this career and that I just have to get through the growing pains. It was this type of reassurance and support that Matt has exhibited to me and other members of the family over the years.

(Ex. E, Christopher Connolly.)

His youngest brother, Andrew, shared a time when Matt "drove 2 hours, on short notice, to be at our house to pick-up my daughter from the bus stop after school so that my wife and I could take our son to the doctor unexpectedly." (Ex. C, Andrew Connolly.) Andrew expressed that his two children, "Taylor and Sarah look up to him as a role model and have always felt his love and support." (*Id*.)

Put simply, Matt Connolly is "a role model for not only his son and daughter, but for the rest of [those] who are close to him." (Ex. E, Christopher Connolly.)

Matt Connolly's willingness to give himself to the causes of others has remained true in the most trying of circumstances. When Matt lost a friend in the September 11th terrorist attacks, he organized a charity golf tournament to raise money for his friend's family. (Ex. J, Melanie Rios.) This charity golf tournament continues to this day. (*Id*.) Recently, in December 2018, Matt's brother-in-law endured a life-threatening issue and underwent a long period of hospitalization. Despite his trial concluding just weeks earlier, Matt committed his full self to supporting his sister while her husband was hospitalized—"he gave me all the support I needed." (Ex. J, Melanie Ross.) Matt also remains an active fundraiser for victims of domestic violence. "He never expects to be thanked for his good deeds. He just helps out." (Ex. K, Patricia Connolly.)

To those who know Matt Connolly well, this behavior is unsurprising. "Matt has *always* stepped up to meet all of his obligations, be they family or work." (Ex. J, Melanie Rios (emphasis added).) "Over the years . . . [w]hether it was providing support with a sibling who was ill, moving into a home, or help during the holidays, he was there for me *every single time*, and never asked for anything in return." (Ex. B, Alyssa Connolly (emphasis added).)

Indeed, it has always been this way. When Matt Connolly voluntarily left Deutsche Bank in 2008, he left behind more than twenty years of combined experience at two of the world's largest financial institutions. (PSR ¶¶ 113-19.) In the early part of those years, at JP Morgan, Matt worked on the same floor as his youngest brother, Andrew. (Ex. C, Andrew Connolly.) Andrew saw firsthand how Matt interacted with his peers and support staff. "He saw the process as a partnership, not a hierarchy. He treated everyone with respect and care." (*Id.*) Many in the office even came up to Andrew to comment on how much they enjoyed working with Matt, "how their work relationship with Matt helped them to develop respectful working relationships, expand their knowledge, and sculpt their career." (*Id.*)

Those sensibilities remained during Matt Connolly's tenure at Deutsche Bank. At no point during this time was he ever the cutthroat, domineering "boss" the Government made him out to be at trial. (*E.g.,* Trial Tr. 55:16 – 56:12 (Anderson).) In fact, Matt did not even want to be head of the Money Market Derivatives desk when he was assigned there in 2005. Matt took the position begrudgingly; thereafter, Matt was a manager in title only. "He did not enjoy working in New York City and disliked the hours spent commuting, but he knew it was the best path for him to provide for his family." (Ex. E, Christopher Connolly.) Consistent with the humility he demonstrated in other facets of his life, he viewed subordinates as equals—and treated them as such—and made countless friends along the way.

As his letters demonstrate, Matt Connolly is not merely a character in this trial, nor is he an embodiment of unrelated wrongs perpetrated by many others in connection with the industry-wide LIBOR scandal.  Matt is not a man motivated by money, prestige, or a desire to get ahead. He was never a LIBOR derivatives trader and did not stand to personally benefit from any extra gains in trades.  When Matt left Deutsche Bank in 2008, his peers went on to make tens of millions more in bonuses, with those bonuses rising precipitously in the years after Matt's departure.

But that he made less than his peers, like Mike Curtler,[3] and even his subordinates, like Tim Parietti,[4] would be of no mind to Matt Connolly.   All who know Matt describe him as humble and reserved.   In 31 years, Patricia Connolly, Matt's sister-in-law, has never known Matt to be "flashy or arrogant."   (Ex. K, Patricia Connolly.)   He "has always been an unassuming, hardworking, humble person."   (Ex. F, Claudia Megaro.)   Matt's sister, Alyssa Connolly, knows Matt "as a reliable, responsible, humble man, who put the needs of his family before his own." (Ex. B, Alyssa Connolly.)   Matt's sister-in-law, Eileen Petrasovits knows Matt as "grounded and down-to-earth."   (Ex. G, Eileen Petrasovits.)   Matt wants only one thing: "to live a simple life and take care of his family." (Ex. K, Patricia Connolly.)   "Although he worked on Wall Street for many years, Matt lives and continues to live a conservative lifestyle where he was always thinking about the future and taking care of his family."   (Ex. E, Christopher Connolly.)   He is a family man, who raised his family in a New Jersey town not far from where he himself grew up. What is important to Matt are the qualities his mother and father instilled in him and his

---

[3] *See, e.g.,* DX 1451C (comparing Mr. Connolly's  salary to that of Mr. Curtler).

[4] *Compare* DX 1451C *with* Trial Tr. 1234:10-1235:3  (Parietti).

siblings—"work hard, do what is right, and treat people as you would want to be treated." (*Id.*) That is how Matt lives his life and is the example he has set for his family, his co-workers, and friends. (*Id.*)

In writing her letter to the Court, in stepping back and reflecting on Matt "as [a] husband and beyond," what struck Beth was the reliable consistency with which Matt—"the backbone to us all"—supports those around him. (Ex. D, Beth Connolly.)  Indeed, in the eyes of all of his loved ones, the term "always" seems to consistently come to mind:

- "My father[] has *always* been there when I needed him" (Ex. A, Adam Connolly (emphasis added));
- "[H]e has *always* shown up for me" (Ex. H, Emily Connolly (emphasis added));
- "Matt has *always* stepped up" (Ex. J, Melanie Rios (emphasis added));
- "Matt is *always* the first one to help" (Ex. K, Patricia Connolly (emphasis added));
- Matt is "*always* . . . my biggest cheerleader" (Ex. D, Beth Connolly (emphasis added));
- Matt "*always* has" been generous, kind and devoted towards others (Ex. J, Melanie Rios (emphasis added));
- "Matt is someone I and the rest of the family have *always* been able to count on" (Ex. F, Claudia Megaro (emphasis added));
- Matt "*always* made sure" to be present for and support his children in spite of long hours and a lengthy commute. (Ex. I, Lori A. Marx (emphasis added).)

This consistency reflects the true whole of Matt Connolly: a selfless, humble man dedicated to his family and friends, always ready to lend a supporting hand.

### B.   The Nature and Circumstances of the Offense Warrant a Downward Variance (§ 3553(a)(1))

Under 18 U.S.C. § 3553(a)(1), courts must consider the nature and circumstances of the offense when determining an appropriate sentence.  The conduct alleged here differs greatly from typical white-collar fraud prosecutions, where a perpetrator takes active steps to conceive of, implement, execute, and then conceal a fraudulent scheme—and Mr. Connolly's sentence should reflect these differences.

1. **The conduct was open and pervasive throughout the financial industry and Deutsche Bank**

The conduct at issue was openly practiced throughout the global financial industry and knowledge of the alleged scheme was widespread in the market. Market participants were well aware of the role that derivatives traders played in formulating a Panel bank's LIBOR submissions. (*See, e.g.*, GX 6-001 (a market commentator from Goldman Sachs noted in May 14, 2008 that it was "worth pointing out that in many cases, LIBOR fixings are submitted by a derivative trader that does not even sit on a cash desk.").) Even the Chicago Mercantile Exchange ("CME"), one of the largest (and most-respected) derivatives exchanges in the world (DX 9044A at 7) recognized the permissibility of LIBOR submitters considering derivatives positions when selecting along a reasonable range of possible LIBOR submissions. In response to the BBA's outreach to the market on the LIBOR process, the CME stated: "A Contributor Panelist who can borrow 'in reasonable market size' at any one of a wide range of offered rates commits no falsehood if she bases her response to the daily Libor survey upon the lowest of these (or the highest, or any other arbitrary selection from among them)." (DX 9044A at 7.) Mr. Curtler also underlined the pervasiveness of the practice when he informed the Government that it was "common knowledge that banks considered trading positions when submitting LIBOR." (Trial Tr. 1986:10-15 (Curtler).)

The conduct at issue was also a regular practice within Deutsche Bank. The sharing of trading positions with LIBOR submitters was well-known, condoned, and encouraged by senior management, who made it simple for traders to share such information. (*See* Trial Tr. 529:21-23 (King testifying that he was "specifically trained to engage in this conduct").) In 2005, Deutsche Bank senior managers Anshu Jain, who later became CEO of the Bank in 2012, and Alan Cloete,

decided to restructure the cash and derivatives groups in order to promote communication between them. (*See* Trial Tr. 1284:22-1288:19 (Parietti); Trial Tr. 1865:1-16 (Curtler), 1867:15-1869:22 (Curtler), 526:3-6 (King), 1862:20-1863:4 (Curtler).)   Cash and derivatives traders (including LIBOR submitters in London) were seated closely together to encourage communication between the traders regarding trading positions and strategies—long before Matt Connolly was appointed to manage New York's Money Market Derivatives desk. (*See* Trial Tr. 744:11-745:3 (King); Trial Tr. 1193:2-14 (Parietti); Trial Tr. 2132:19-21 (Curtler).)   Deutsche Bank senior management also encouraged the sharing of information by instituting and chairing weekly risk calls for the specific purpose of sharing trading positions, including LIBOR positions. (*See* Trial Tr. 1288:2-19 (Parietti).)   In fact, the practice was so open and encouraged at the Bank that the Government's cooperator, Mr. Curtler, told the Government that he did not believe that he was doing anything wrong at the time. (*See* Trial Tr. 1943:4-12 (Curtler).)

In addition to the above procedures, it is undisputed that the Bank had no policies regarding LIBOR submissions and provided no internal training on LIBOR submissions. (*See* Trial Tr. 560:3–6 (King); Trial Tr. 738:5–18 (King); Trial Tr. 1305:16-18 (Parietti); Trial Tr. 1875:22-24 (Curtler); Trial Tr. 1189:22-1190:9 (Parietti).)   The Bank never introduced any ethical walls between the LIBOR submitters and the derivatives traders. (*See* Trial Tr. 1191:3-5 (Parietti).)   Rather, Deutsche Bank assigned its derivatives traders the responsibility of submitting LIBOR. (*See* Trial Tr. 1849:14-1851:5, 1910:8-11 (Curtler); Trial Tr. 1849:14-20 (Curtler).)   And, during Mr. Connolly's time at Deutsche Bank, it is undisputed that the BBA itself never promulgated any guidelines, trainings, or policies prohibiting or discussing the propriety of the alleged conduct. (*See, e.g.*, Trial Tr. 183:14–19, 185:12–15 (Youle); *see also* DX 0151, ¶¶ 2.6, 4.5, 4.6, 4.8.)

13

### 2.      Mr. Connolly took no steps to conceal his conduct

The alleged conduct also differs from a typical white-collar prosecution in that Mr. Connolly took no steps to conceal the alleged scheme from discovery.  As discussed above, the alleged scheme was conceived of and implemented by senior management within the Bank, not Mr. Connolly himself.  Mr. Parietti even conceded that Mr. Connolly's supposed "instruction" to reach out to the Bank's submitters in London was "in line with the mandate from senior management."  (Trial Tr. 1196:6-9 (Parietti).)  Mr. Connolly took no affirmative steps to conceal the alleged practice, and the Government did not produce any evidence of active concealment. In contrast, evidence at trial demonstrated that Mr. Connolly never acted as though the alleged practice was secret, nor did he direct anyone to conceal any part of the practice.  (*See* Trial Tr. 1245:11-1246:13 (Parietti).)   Mr. Connolly's communications were sent over Deutsche Bank platforms, which participants knew were recorded, and Mr. Connolly did not use any type of coded language when sending the alleged requests.  (*See, e.g*., Trial Tr. 556:8–10 (King); Trial Tr. 556:11-557:3 (King).)

### 3.      Mr. Connolly did not profit from his conduct

Moreover, Matt Connolly did not profit from the conduct for which he was convicted. Evidence at trial failed to establish that Mr. Connolly's bonus arose out of a shared bonus pool directly related to the alleged scheme, or that Mr. Connolly was motivated to participate in the alleged scheme because of such a pool.  In fact, the trial evidence clearly established the opposite—that Deutsche Bank employees allegedly involved in the scheme received larger bonuses *after* Mr. Connolly left the Bank.  (*See* DX 1451C (Curtler's bonus was $2.3 million in 2008 and $7.5 million in 2009); Trial Tr. 1234; 19-24 (Parietti) (testifying that his bonus was $1.7 million in 2008 and $9 million in 2009).)   Even if Mr. Connolly's bonus did come from a

shared pool, such a pool would have been divided between thousands of traders at Deutsche Bank, and any gains to Mr. Connolly's bonus from the scheme would have been minimal. Furthermore, even assuming that Mr. Connolly was able to influence Deutsche Bank's LIBOR submission through the three exchanges involving alleged LIBOR requests in which he was involved, there is absolutely no evidence that Deutsche Bank profited as a result and, if Deutsche Bank did profit, how such a profit influenced the shared "bonus pool."  In fact, the Government itself admitted that it "lacks sufficient data to establish the specific portion of the defendants' bonuses that were attributable to the performance of Deutsche Bank's trades." (*See* PSR ¶ 142.)

Because the conduct in this case differs greatly from an ordinary white-collar case, reliance on the Guidelines to calculate Mr. Connolly's sentence would yield a fundamentally unjust outcome.

### C.    The Sentence Calculated under the Guidelines is Unjustly Inflated and Inconsistent with the Statutory Goals of Sentencing (§ 3553(a)(4))

Although the fourth factor of § 3553(a) requires consideration of the sentencing range calculated under the Sentencing Guidelines, it does not require deference to that range, and the Court should not do so here.  In this case, as a result of the loss-driven Total Offense Level, the "calculations under the guidelines have so run amok that they are patently absurd on their face" and should thus be disregarded.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (J. Rakoff), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

The disproportionate impact of loss on the Guidelines calculation has been widely criticized by courts.  "The Guidelines place undue weight on the amount of loss involved in the fraud. . . . In many cases, including this one [involving multiple counts of securities and wire fraud], the amount stolen is a relatively weak indicator of the moral seriousness of the offense or

the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004); *see also United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (tracing a "history of [loss] bracket inflation" to various congressional edicts, issued "without the benefit of empirical study," that "render[ed] the *loss guideline fundamentally flawed*, especially as loss amounts climb" (emphasis added).)

Concern over the structural pitfalls of the Sentencing Guidelines' approach to loss amount enhancements led the American Bar Association to institute a Task Force on the Reform of Federal Sentencing for Economic Crimes.   At the conclusion of its work, the Task Force's report yielded four "Principles of Consensus," one of which was:

> This structural framework [that relies on assigning "fairly specific numeric values to sentencing considerations"] is not ideal because it can be unduly rigid and lead to the arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

James E. Felman, *A Report on Behalf of the American Bar Association Task Force on the Reform of Federal Sentencing for Economic Crimes* at 9-10 (Nov. 10, 2014).   Mr. Felman further testified to the Sentencing Commission on this same issue, criticizing the Guidelines for (1) "undue emphasis on loss"; (2) the "piling on" of numerous offense characteristics that overstate culpability; (3) the overly complex and overlapping nature of the guidelines; and (4) the failure to reflect mitigating culpability factors, among other criticisms.   *See* James E. Felman, Testimony on Behalf of the American Bar Association Before the United States Sentencing Commission for the Hearing on Proposed Amendments to the Federal Sentencing Guidelines Regarding Economic Crimes, Mar. 12, 2015, at 13, available at

https://www.ussc.gov/sites/default/files/pdf/amendment-process/publichearings-and-meetings/
20150312/Felman.pdf.

The Task Force's criticisms of the Guidelines, similarly held by judges and legal scholars alike, has manifested in courts routinely disregarding Guidelines-calculated ranges that are disproportionately inflated by loss amounts. *See*, *e.g.*, Jed S. Rakoff, *Why The Federal Sentencing Guidelines Should Be Scrapped*, 26 Fed. Sent'g Rep. 6, 6-9 (October 2013) (noting that sentencing ranges are seemingly driven by "numbers . . . drawn from nowhere," and finding it "equally bad" that the overwhelming focus in white-collar sentencing is on the "amount of the actual or intended economic loss imposed."). This Circuit, when addressing sentences that were made "shockingly high" by the loss amount enhancement, put it most succinctly:

> The error of accepting intended loss as a proxy for the seriousness of this crime was "compounded by the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires."

*Corsey*, 723 F.3d at 379 (Underhill, J., concurring) (quoting *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010)). Thus, this Circuit advised that in cases where the Guidelines provide "low marginal utility" due to the high loss amount, courts should place "greater, not lesser, reliance" on the other 3553(a) factors. *Id*. at 380; *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (internal citation omitted) (stating that in the Sentencing Commission's decision to make "a Guidelines sentence turn, for all practical purposes, on [the amount of monetary loss or gain] the Commission effectively ignored the statutory requirement that federal sentencing take many factors into account and effectively guaranteed that many such sentences would be irrational on their face"), *aff'd*, 747 F.3d 111 (2d Cir. 2014).

Mr. Connolly's case is a paradigmatic example of the concerns expressed above.  By more than doubling Mr. Connolly's offense level (from 13 to 31), the loss enhancement singlehandedly multiplied his recommended period of incarceration by nine—raising it from 12-18 months to 108–135 months.  (PSR ¶¶ 89, 128.)  Officer Kim recognized the inappropriateness of the Guidelines range to the facts here as a result of the loss enhancement, disregarding the 9-11 year Guidelines range and recommending a sentence of five months.  The structural flaws in the Guidelines and arbitrary increase in the sentencing range that resulted compel the conclusion that the calculated range here is not only "greater than necessary," but far exceeds that required to provide just punishment.  *See* 18 U.S.C. § 3553(a).  Because a defendant's sentence cannot be greater than necessary to achieve the statutory goals of sentencing (18 U.S.C. § 3553(a)), the Court must disregard the Guidelines range.

### D.    Incarceration Is Not Necessary for Deterrence or to Protect the Public (§ 3553(a)(2))

Under 18 U.S.C. § 3553(a)(2), the court must impose a sentence that "afford[s] adequate deterrence to criminal conduct" and "protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2).  Here, the need for deterrence would be sufficiently accomplished with a non-custodial sentence.

The LIBOR scandal and surrounding indictments have been extremely well-publicized, and Matt Connolly, and his family, have faced public humiliation from the beginning of his indictment in 2016.  The message that financial fraud is never worth it has been made clearly—both to society and to Mr. Connolly himself.  Moreover, "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial

punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (internal quotation marks omitted).

Even if one were to believe Matt Connolly was motivated by personal profit (despite the lack of evidence), the amount of minimal personal gain Matt Connolly may have received has been far outweighed by the public humiliation, career loss, and financial struggles he has experienced as a result of his conduct. Matt Connolly has been personally responsible for his legal fees throughout the post-trial process, and the costs to defend such a case are significant. Further, the public humiliation and permanent smear on Matt Connolly's reputation will forever serve as a powerful deterrent effect. *See Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

Additionally, Mr. Connolly poses no risk of recidivism. He has not worked in the financial industry since March 2008. He has no active financial licenses and is not registered as a broker. His career is permanently over, and the conduct at issue was "particularly adapted to his chosen career." *See Emmenegger*, 329 F. Supp. 2d at 428 (finding that where defendant "committed a crime particularly adapted to his chosen career," defendant posed no chance of recidivism because his "career is over"). A sentence of supervised release for Mr. Connolly would be sufficient, yet not greater than necessary to achieve the goals of sentencing. Courts, as well as the United States Sentencing Commission, have recognized that supervised release, equivalent to probation, "is both rehabilitative and punitive." *See United States v. Collado*, No. 07 Cr. 1144 (HB), 2008 U.S. Dist. LEXIS 44010, at *15-16 (S.D.N.Y. June 5, 2008); USSG Ch.5, Pt.B, intro. comment. And, while the PSR recognizes the absurdity of the Guidelines range through its recommendation of five months imprisonment (*see* PSR at 40), a non-custodial

sentence remains most appropriate under these circumstances.   Sentencing Mr. Connolly to a

punishment more severe than supervised release would be unjust and unreasonable.

### E.   A Significant Downward Variance Would Be Consistent with Variances Received by Similarly Situated Defendants (§ 3553(a)(6))

A sentencing court must also consider the need to avoid unwarranted sentence disparities

before imposing a sentence.   18 U.S.C. § 3553(a)(6).   A custodial sentence would create an

unwarranted sentencing disparity as compared to defendants who actively participated in

LIBOR-related conduct as shown below.

| Defendant | Received a 5K for Cooperation? | Guidelines Range | Sentence |
|---|---|---|---|
| Michael Curtler (DB) 15-cr-670-VSB | Yes | 78-97 months | Time served, 2 years supervised release, $300,000 fine |
| Timothy Parietti (DB) 16-cr-373-PAE | Yes | 78-97 months | Time served, 3 years supervised release, 500 hours of community service, $1 million fine, continued cooperation |
| Paul Robson (Rabo) 14-cr-272-JSR | Yes | 41-51 months | Time served, 2 years supervised release |
| Takayuki Yagami (Rabo) 14-cr-272-JSR | Yes | 33-41 months | Time served, 2 years supervised release |
| Lee Stewart (Rabo) 14-cr-272-JSR | Yes | 33-41 months | Time served, 2 years supervised release, continued cooperation |
| Paul Thompson (Rabo) 14-cr-272-JSR | No[5] | 33-41 months | Custodial sentence of 3 months, no supervised release |

---

[5] Paul Thompson pleaded guilty to the charges.

| Defendant | Received a 5K for Cooperation? | Guidelines Range | Sentence |
|---|---|---|---|
| Anthony Allen (Rabo) 14-cr-272-JSR | No | 87-108 months | Custodial sentence of 24 months, conviction later overturned on Kastigar issues |
| Anthony Conti (Rabo) 14-cr-272-JSR | No | 57-71 months | Custodial sentence of 12 months and 1 day, conviction later overturned on Kastigar issues |

In the related LIBOR cases above, this Court imposed sentences *significantly* below the suggested Guidelines ranges, and it should do the same here with a non-custodial sentence for Mr. Connolly.   Mr. Connolly's conduct stands in stark contrast to that of Anthony Allen and Anthony Conti, who received significantly reduced sentences prior to their convictions being overturned.   Mr. Conti was convicted of all counts at trial, in contrast to Mr. Connolly, who was acquitted of three of the six remaining counts.   (*See* Trial Tr. 2946:7-10, 11-15, 20-23 (jury finding Mr. Connolly not guilty of Counts 3, 8, and 10).)   Mr. Conti was also the LIBOR submitter for Rabobank, placing him in a more central position to the alleged LIBOR manipulation schemes.   Mr. Connolly, by contrast, was neither a LIBOR submitter for Deutsche Bank nor a trader in LIBOR-based derivatives.

Anthony Allen was also convicted of all counts at trial and his conduct at Rabobank differed significantly from Mr. Connolly's alleged conduct.   During the relevant period, Mr. Allen was Rabobank's Global Head of Liquidity and Finance, and he oversaw Rabobank's entire LIBOR submission process.   Moreover, Mr. Allen stood as Rabobank's representative to the BBA's FX and Money Market Committee ("FXMMC"), an advisory body that provided advice

precisely about the administration of the LIBOR benchmark. *United States v. Allen*, 14-CR-272 (JSR) (ECF No. 225 at 3). Unlike Mr. Connolly, who neither managed the LIBOR submission process nor had any reason to otherwise understand its intricacies, Mr. Allen not only commanded significant responsibility over LIBOR but directly and regularly communicated with the BBA. In his dual role as a global head at his bank and as a FXMMC member, he was in a far greater position to understand LIBOR and interpret its rules.

Mr. Connolly's conduct also stands in stark contrast to that of Mr. Curtler and Mr. Parietti. Mr. Curtler had significantly more responsibility than Mr. Connolly—he directly supervised the LIBOR submission process throughout the entire alleged conspiracy period and was paid exponentially more. Mr. Connolly had no part in the submission process and voluntarily left the bank in 2008, prior to the end of the alleged conspiracy period. Mr. Parietti also earned significantly more than Mr. Connolly, whom he reported to in name only. And, Mr. Parietti continued his conduct after Mr. Connolly left the bank, directly profiting from the conduct by increasing his bonus astronomically in the year following. Unlike Mr. Parietti, Mr. Connolly did not personally profit from any of the alleged fraud.

In addition to those defendants charged with LIBOR-related fraud, it is important to note that a significant number of individuals who actively participated in the alleged scheme were not charged. Anshu Jain, Alan Cloete, Joe Randazzo, and Dave Nicholls (Mr. Connolly's boss) were not indicted, despite the fact that, in their roles as senior management, they condoned and even encouraged the alleged conduct. (*See* Trial Tr. 2132:6-18 (Curtler) (Cloete, Randazzo and Nicholls were not charged criminally despite their encouragement of traders to share positions); Trial Tr. 1191:21-1192:10 (Parietti) (Nicholls and Randazzo encouraged coordination and

sharing between New York and London and there is no question both knew that traders were sharing information with LIBOR submitters about positions).)

Courts, including this one, have recognized the failures of the Sentencing Guidelines to provide just sentences when loss was the principal factor used in the Guidelines calculation. Mr. Connolly's case is a textbook example of the type of case at the heart of concern of the ABA's Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes when it submitted its proposal to the Sentencing Commission for revisions to the Sentencing Guidelines for financial crimes. The Task Force recommended:

> Where the motive for the offense was not entirely predatory, where the loss was largely intended rather than actual, where the defendant's gain from the offense was significantly less than the loss . . . the guideline may produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted. Where the totality of the circumstances demonstrate that the offense is not otherwise serious and the defendant is a first offender, a departure to a sentence other than imprisonment is generally appropriate.

James E. Felman, Testimony on Behalf of the American Bar Association Before the United States Sentencing Commission for the Hearing on Proposed Amendments to the Federal Sentencing Guidelines Regarding Economic Crimes, at 14 (Mar. 12, 2015). When taking into account Mr. Connolly's conduct in comparison to the conduct in the cases noted above, sentencing Mr. Connolly to serve time in prison would be grossly disproportionate to the deviations received by similarly-situated defendants. The Court should therefore sentence Mr. Connolly to a non-custodial sentence.

## II.    THE SENTENCING GUIDELINES MERIT A NON-CUSTODIAL SENTENCE

Though a sentencing court need not follow the Sentencing Guidelines, it is required to "correctly calculat[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49. The final Presentence Investigation Report for Mr. Connolly, dated September 24,

2019, (the "Report" or "PSR") computes a total offense level of 31, with a Guideline imprisonment range of 108 to 135 months. (PSR ¶¶ 89, 128.) It contains the following analysis under the Sentencing Guidelines:

| CATEGORY | POINTS |
|---|---|
| Base Offense Level - § 2B1.1(a)(1) | +7 |
| Loss Enhancement - § 2B1.1(b)(1)(J) | +18 |
| Victim Enhancement - § 2B1.1(b)(2)(A)(i) | +2 |
| Sophisticated Means - § 2B1.1(b)(10)(B) | +2 |
| Role in the Offense - § 3B1.3 | +2 |
| **Total Offense Level:** | **31** |

(PSR ¶¶ 77-89.) Mr. Connolly disagrees with the 108 to 135 months applicable Guidelines range contained in the PSR.[6] When calculated correctly, the Guidelines result in a total offense level of 7 and a Guidelines range of 0 to 6 months. Recognizing the inappropriateness of the Guidelines range as to Mr. Connolly, even the PSR recommends a sentence a significantly below the Guidelines range—only five months. Because of the foregoing, and also that Mr. Connolly is a first offender,[7] the imposition of a non-custodial sentence is appropriate here.

---

[6] Mr. Connolly objects to this Guidelines analysis and has filed formal objections with the U.S. Probation Officer Johnny Y. Kim and this Court. (*See* Ex. M and Ex. N). Mr. Connolly incorporates these objections by reference.

[7] Mr. Connolly "has no prior criminal history and thus, no criminal history points, which according to the sentencing table in Chapter 5, Part A, establishes a Criminal History Category of I." (PSR ¶ 92.)

### A.    No Loss, Actual or Intended, Resulted from the Offense

The PSR concludes that an 18-level increase in Mr. Connolly's sentence is warranted because Mr. Connolly is responsible for a total intended loss of $4,657,570.48.  (PSR ¶¶ 62, 67-70, 80.)   The intended loss amount, calculated by the Government, is not based on any reliable methodology disclosed by the Government.   Rather, it is based on a total of "228 requests to change Deutsche Bank's LIBOR submission to benefit the bank's trading positions" (PSR ¶ 67), with the assumption that each request was "intended to skew Deutsche Bank's submission by one basis point . . . [such that] the intended effect of an individual manipulation request on the ultimate LIBOR fix was 1/8 of a basis point in the direction of the request."  (PSR ¶ 70.)

Mr. Connolly objects to this enhancement because the PSR provides no basis on which the Court could find, by a preponderance of the evidence, that Mr. Connolly personally and purposefully sought to inflict a loss of approximately $4.66 million on Deutsche Bank's counterparties.   The Government's loss calculation ignores the language of the Sentencing Guidelines, and belies the factual record and the Government's previous representations that such an amount was too difficult  to even attempt to calculate.

### 1.    The Sentencing Guidelines rebut the Government's construction of "intended loss"

The Sentencing Guidelines make clear that any estimate of "intended loss" must be based solely on "the pecuniary harm that the defendant *purposefully sought to inflict*."  § 2B1.1(b)(1), cmt. (n.3) (emphasis added).  The Sentencing Commission amended the definition of "intended loss" to this current formulation in 2015,[8] when it clarified that a *subjective* inquiry into the

---

[8] The provision previously defined intended loss as "pecuniary harm that was intended to result from the offense."   Sentencing Comm'n, Amendments to Sentencing Guidelines, dated April 30, 2015, at 24 ("[T]he amendment revises the commentary at § 2B1.1, Application Note 3(A)(ii),

defendant's purpose was required, specifically stating that the updated language "adopts the approach taken by the Tenth Circuit" in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011). Sentencing Comm'n, Amendments to Sentencing Guidelines, dated April 30, 2015, at 24-25. According to the Tenth Circuit in *Manatau*, "intended loss does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." *Manatau*, 647 F.3d at 1050. Rather, "intended loss" for purposes of the Guidelines includes only those losses that a defendant "had as a '*conscious object*' to cause." *Id*. (emphasis added). Even losses of which a defendant is "aware" are "practically certain" to result from a defendant's conduct do not qualify. *Id*.

In defiance of this notion, the Government seeks to hold Matt Connolly responsible for 228 requests for which it has utterly failed to demonstrate Mr. Connolly's conscious objective to inflict pecuniary harm. For each of the 228 requests, the Government would need to show not only that Mr. Connolly knew what each of the swap counterparties' trade positions were, but what loss, if any, would result from a change in Deutsche Bank's LIBOR submission pursuant to each specific request. At trial, however, the Government was unable to demonstrate that any Deutsche Bank traders, let alone Mr. Connolly, knew the trading positions and potential loss exposure of any of Deutsche Bank's counterparties at the time of a particular swap transaction, particularly in light of the fact that the counterparties were routinely hedged (*see* Trial Tr. 1426:4-11 (Maroun).)

These legal and factual challenges fundamentally undermine the basis of the Government's loss calculations. Because the Government has not shown, by a preponderance of

which has defined intended loss as 'pecuniary harm that was intended to result from the offense.'").

the evidence or not at all, that Mr. Connolly purposefully sought to inflict any particular monetary loss, any sentencing enhancement based on intended loss amount is unwarranted.

       2.      **The Government's estimate of intended loss, as described in the PSR, is incorrect**

          a)      <u>The Loss Amount Includes Conduct Unrelated to Mr. Connolly</u>

The Government's intended loss estimate in the PSR is overstated. The Government admits that its intended loss calculation is based not on LIBOR requests made by Mr. Connolly, but rather is based on hundreds of LIBOR requests in which Mr. Connolly had no involvement.[9] In fact, of the requests enumerated in the PSR, approximately one-quarter occurred after March 2008, when Mr. Connolly had already left Deutsche Bank, (PSR ¶¶ 57-61) and some of the requests relate to Counts for which Mr. Connolly was found not guilty. (PSR ¶ 36; *see* Trial Tr. 2946:11-15, 20-23 (jury finding Mr. Connolly not guilty of Counts 8 and 10, which both relate to requests by Mr. Parietti to London).)

The Government's subsequent attempt to detail the alleged requests underlying its loss calculation with greater particularity only further highlights their irrelevance to Mr. Connolly's culpability. (*See* Addendum to PSR, at 35.) Of the 154 alleged written requests that the Government has enumerated, 147 requests do not include Mr. Connolly as the "Requesting Trader"; 54 requests occur after Mr. Connolly left Deutsche Bank in March 2008; 15 requests are tied to three different individuals not identified as co-conspirators in the case, and numerous other requests relate to counts that were dismissed prior to jury deliberation or for which Mr. Connolly was found not guilty. (*See* PSR at 35.)

_____

[9] (*See* PSR ¶ 68 ("Some of the 228 requests to change the LIBOR submission were made by CONNOLLY and BLACK, while others were made by their co-conspirators as part of the scheme to defraud.").)

The Government's intended loss calculation also includes losses to alleged counterparty "victim" banks for which no evidence was introduced at trial, including Bank of America (referred to as "Bank A"), which was a Panel Bank and participated in the alleged conduct.[10] (*See* PSR ¶¶ 33, 60.)  The Government never called a Bank of America witness at trial and failed to present any evidence supporting its assertion that it was a victim.  In fact, all counts related to unproved counterparty "victim" banks were dismissed prior to jury deliberations.[11]  (Trial Tr. 2451:1-3.)  Losses to alleged counterparty "victims" for which no evidence was presented at trial is not a viable basis upon which to support a loss calculation under the Guidelines and accordingly, the loss calculation in the PSR should be rejected.

b)  <u>The Loss Amount's Underlying Assumptions Are Unfounded</u>

In addition to including hundreds of alleged requests that are completely irrelevant to Mr. Connolly, the Government has failed to put forth a reliable methodology that would allow it to accurately estimate loss, even if the Government tried to rely on the mere three email exchanges directly involving an alleged LIBOR request by Matt Connolly.

There is no support under the law or the facts offered at trial to support the Government's baseless assumption of a "1/8 of a basis point" impact on the ultimate fix.  The Government adduced no evidence from any witness as to the specific amount of Mr. Connolly's alleged

---

[10] Bank of America advised the BBA in 2006 that it took its trading positions into account when setting LIBOR.  According to the BBA's notes of that interview, a bank representative stated that Bank of America "sets its rates 4[bp] above where they could raise funds, which is the return they need."  (Trial Tr. 2561:7-10.)

[11] In the case of at least one of the banks, the Government acknowledged it had not been interested in participating in the LIBOR investigation and *declined* to designate a witness for the Government's prior LIBOR case.  (Trial Tr. 2341:7-25.)  It is therefore improper under the Guidelines to consider these banks "victims" for the purpose of calculating intended loss.

requests, let alone that his specific "intended effect of an individual manipulation request on the ultimate LIBOR fix was *1/8 of a basis point* in the direction of the request."[12]  (PSR ¶ 70 (emphasis added).)   The Government's own cooperator (Mr. Curtler) admitted as much, explaining in his sentencing memorandum that the loss amount offered against him was "based on a *guess* that every request for a manipulated LIBOR submission successfully moved the actual LIBOR fix by 1/8 of a basis point." *United States v. Curtler*, 15-CR-670 (CM) (ECF No. 23 at 14) (emphasis added).

Put simply, the Government assumes too much and proves too little.  The Government offered no evidence at trial that each of the alleged requests underlying its loss calculation were made with the intent to skew Deutsche Bank's submissions  by one basis point.

Moreover, the Government's intended loss estimate assumes that none of the affected counterparties had hedged their positions, an assumption which is contradicted by the record.  In fact, the evidence at trial demonstrated that hedging was not only an "extremely common" practice in the financial industry generally (Trial Tr. 1426:4-11 (Maroun)), but that each alleged counterparty victim bank offered at trial engaged in the practice of hedging in *all* trades with Deutsche Bank, including those at issue in the case.  (*See, e.g.*, Trial Tr. 1430:2–17 (Maroun); Trial Tr. 1576:1–7 (Hunter); Trial Tr. 2199:3–16 (Konich).)

These facts undermine the Government's loss calculation under the Guidelines. Testimony at trial established that the alleged counterparty victim banks "only enter[ed] into [derivatives] to hedge exposure" they had elsewhere.  (Trial Tr. 1428:25-1429:3 (Maroun).)  This

---

[12]  According to the Government, "a given request was intended to skew Deutsche Bank's submission by one basis point . . . [and] because the LIBOR fix was taken by averaging the middle eight panel bank submissions, the intended effect of an individual manipulation request on the ultimate LIBOR fix was 1/8 of a basis point in the direction of the request." (PSR ¶ 70.)

means that any exposure remaining was minimal.  Even if the alleged counterparty victim lost a small amount of money on a particular swap with Deutsche Bank as a result of an alleged request, it likely earned off-setting profits on its other swap transactions.  (Trial Tr. 1429:6-9 (Maroun); Trial Tr. 1578:3 - 1585:2 (Hunter).)  This cannot be viewed in a vacuum.  Nearly every swap transaction was part of a larger trading strategy designed to eliminate—or nearly eliminate—risk.

As Mr. Curtler explained in his sentencing memorandum, "the loss amount used in the Guidelines calculation assumes that none of the trading counterparties hedged their trades with Deutsche Bank with trades going the other direction; *basing the Guidelines range on an estimated loss amount that ignores counterparties' other trades ignores the reality of financial trading*." *United States v. Curtler*, 15-CR-670 (CM) (ECF No. 23 at 14 n.9) (emphasis added). Because the Government's loss calculation fails to account for hedging, its loss calculation is inaccurate and unreliable.

> c)   The Record Lacks Reliable Data to Support a Loss Calculation

Any reliable loss calculation must consider the parties' net positions.  Because the Government's loss amount did not and cannot reliably determine the parties' net positions, it must be rejected and no sentencing enhancement based upon the loss amount is warranted.  At trial, the Government admitted that its information relating to the net positions of traders was "unreliable," explaining that "even if it supported us, there's too many holes for it to be something to use." (Trial Tr. 979:11-12;  982:1-2.)

It is on this basis that this Court concluded at Mr. Curtler's sentencing hearing that any purported loss amount in his case was "incalculable" and thus, "irrelevant" to sentencing determinations.  *See United States v. Curtler*, 15-CR-670 (CM) (ECF No. 28 at 3:10-4:1)

("[W]hatever loss amount you calculated, the incalculable loss amount you calculated, makes very little difference to me for the reasons that Judge Rakoff articulated and I need not articulate, that he articulated in connection with the *Rabobank* case."). The Government should not be permitted to use that same "unreliable" data to calculate an intended loss amount here, and Mr. Connolly's sentence should not be subject to an enhancement known to be based on a completely unreliable foundation.

The Government has not shown by a preponderance of the evidence that Mr. Connolly purposefully sought to inflict $4,657,570.48 in intended losses. The 18-level increase cannot stand.

### B.     There Are No Victims of the Offense

Paragraph 81 of the PSR asserts that, pursuant to § 2B1.1(b)(2)(A)(i), a two-level increase is warranted "[s]ince the offense involved ten or more victims." (PSR ¶ 81.) But under the Guidelines, the definition of "victim" is any person or entity which "sustained any part of the *actual loss* determined under subsection b(1)." § 2B1.1(b)(1), cmt. (n.1) (emphasis added). The Government has failed to establish any actual loss suffered by any of the alleged victims in this case. Because no actual loss can be established, the counterparty banks cannot be included as victims under § 2B1.1(b)(2). *United States v. Skys*, 637 F.3d 146, 154 (2d Cir. 2011) ("Without any determined amount of actual loss to the financial institutions, the district court inappropriately included the institutions as victims under § 2B1.1(b)(2)"); *see id*. at 155 ("[T]he PSR and the district court, for purposes of identifying the proper step on the subsection (b)(1) loss table, *simply assumed*—no doubt correctly—that the defrauded individuals' actual losses totaled less than $83 million. *But that assumption did not suffice to permit the court to consider the defrauded individuals to be victims within the meaning of § 2B1.1(b)(2), given the definition*

*of victims as those who sustained any part of the actual loss "determined" under subsection (b)(1)."*) (emphasis added)).

The Government's inability to determine any actual loss amounts suffered by the allegedly defrauded counterparties is fatal to a victim enhancement given the Guidelines' definition of a "victim." As discussed, at trial the Government claimed that any data it had reflecting the counterparties' net notional positions was "unreliable" and contained "too many holes for it to be something to use" to determine net loss or benefit for a particular trader. (Trial Tr. 979:12; 982:1-2.) At Mr. Parietti's sentencing hearing, the Government advised the Court that it would not be seeking restitution against any of the cooperators or defendants in this case for this very reason: to calculate how much a counterparty actually lost, "one would need to look at those counterparties' practices of hedging, for example, [and] other ways of mitigating and passing on their risks . . . . Given how large many of these institutions are, how many trades they do, and how many trading partners they have, it becomes very complex." *United States v. Parietti*, 16-CR-373 (PAE) (ECF No. 21 at 30:18-31:1).

Despite its admittedly complete inability to determine how much of a loss, if any, the alleged counterparties actually suffered, the Government nonetheless insists that there were at least ten victims who sustained actual losses. But absent quantifiable "pecuniary harm"—defined as harm that is "readily measurable in money"—it is impossible to find "actual loss." § 2B1.1(b)(1), cmt. (n.3(i), (iii)). Because actual loss cannot be established, there can be no "victims," as that term is defined in the Guidelines, and the two-level enhancement in the PSR is unwarranted. *Skys*, 637 F.3d at 155 (remanding because the "court did not determine the amount of actual losses suffered by the four financial institutions—or even whether they suffered actual

32

losses at all" and therefore the "court's findings were insufficient to support the 10-victim enhancement under subsection (b)(2)").

### C.    A Sophisticated Means Enhancement Is Inapplicable

Paragraph 82 of the PSR states a two-level increase is warranted under section 2B1.1(b)(10)(B) of the Sentencing Guidelines based on the fact that Deutsche Bank employees involved in the offense in the New York and London offices communicated and interacted with each other, and as such, a substantial part of the fraudulent scheme was committed from outside the U.S.  (PSR ¶ 82.)  This assertion is inconsistent with the record and fails as a matter of law pursuant to the Guidelines.

Section 2B1.1(b)(10) punishes a defendant where he relocated a fraudulent scheme outside the United States to evade law enforcement or regulatory officials; where a substantial part of the scheme was committed outside the United States; or where the offense otherwise used sophisticated means pertaining to its execution or concealment.  § 2B1.1(b)(1); § 2B1.1(b)(1), cmt. (n.9(B)) ("Application of Subsection (b)(10)").   The emphasis of the enhancement rests upon a defendant's engaging in extraterritorial conduct specifically designed to conceal the underlying scheme or otherwise evade domestic regulation and enforcement.

Here, the alleged extraterritorial conduct—sending communications containing alleged LIBOR requests to employees in the London office—occurred outside of the U.S. not because Mr. Connolly was attempting to conceal the underlying scheme or evade domestic enforcement, but rather because the alleged conduct involved a U.K. benchmark, published by the British Bankers' Association, a U.K.-based trade group.   Deutsche Bank's LIBOR submissions were entered by a trader in London as a matter of course, not evasion or concealment.  Other than the fact that LIBOR was set in the U.K., Matt Connolly's alleged conduct did not occur outside of

the U.S.  Mr. Connolly resided in the U.S. and worked in the U.S.; his only involvement in the alleged scheme took place in the U.S., and he did not supervise any U.K. employees.

To impose an enhancement in these circumstances would effectively double-punish Mr. Connolly for being charged with a scheme involving a financial benchmark which, though regularly used in the U.S., was devised, managed, calculated, and published outside of the U.S.  A sophisticated means enhancement does not apply here.

### D.    An Abuse of Trust Enhancement Is Inapplicable

Paragraphs 71 and 84 of the PSR state that a two-level enhancement to Mr. Connolly's sentence is warranted because he "abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense."  (PSR ¶¶ 71, 84.)  In support of this enhancement, the Government asserts only that Mr. Connolly and Mr. Black used their positions within Deutsche Bank to "influence Deutsche Bank's USD LIBOR submission and inform other Deutsche Bank traders of their intentions to do so"; had a "responsibility" as Deutsche Bank employees to "operate and conduct themselves in a lawful manner"; and as a result of this conduct, they "tarnished Deutsche Bank's reputation and exposed the bank to legal action, including civil penalties."  (PSR ¶ 71.)  These assertions are unsupported by the trial evidence and fail as a matter of law under the Guidelines.

The Guidelines make clear that an abuse of trust "adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."  § 3B1.3.  Accordingly, the abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because he violated an obligation to be truthful, and a "victim" relied on the alleged misrepresentation.  *See United States v. Hirsh*, 239 F.3d 221, 227-228 (2d Cir. 2001).  Doing so would constitute a double-punishment, as "[e]very fraud involves these

elements." *Id.* at 227; *United States v. Broderson*, 67 F.3d 452, 455-56 (2d Cir. 1995) (defendant's fraudulent conduct involving falsely signing a certificate of compliance did not trigger § 3B1.3 enhancement, as any "abuse of trust" was inherent in the fraud itself).

Thus, the "trust" contemplated by the enhancement is not, as the Government suggests, a general "responsibility" to behave lawfully as corporate employees, nor is it an abuse of this trust to "tarnish[] Deutsche Bank's reputation." (PSR ¶ 71.) Rather, the enhancement contemplates only factual situations in which "the defendant occupies a position vis-à-vis the victim that is in the nature of a fiduciary relationship," the opposite of being an arm's length counterparty. *See United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) (enhancement did not apply where defendant borrower-lender relationship with victim was not in the nature of a fiduciary, but rather one "at arm's-length, [where] a firm's obligations to creditors are generally regarded solely as contractual.").

No such relationship of trust existed here. The Government could not establish that any of the counterparty witnesses even knew who Matt Connolly was. (*See, e.g*, Trial Tr. 1571:18-19 ("I don't even know who Matt Connolly is even in the courtroom right now."); *see also* Trial Tr. 1423:11-15.) Mr. Connolly was not a derivatives trader, did not enter into derivative swap agreements at Deutsche Bank, and never once communicated or otherwise interacted with counterparty swaps traders.

Further, at trial, every counterparty witness acknowledged that, pursuant to their contractual relationships with Deutsche Bank, their bank was "not relying on any communications (written or oral) of the other party"; each party "understands and accepts, the terms, conditions and risks of this Transaction"; and they legally acknowledge that the "*other*

*party is not acting as a fiduciary for, or an adviser to it in respect of this Transaction.*"[13]  In other words, the trades at issue were arms-length transactions, and "[w]here fraud occurs in arm's-length transactions not involving fiduciary-like relationships, the 'trust' that is 'abused' is simply the reliance of the victim on the misleading statements or conduct of the defendant." *Jolly*, 102 F.3d at 49.  In such cases, the general trust that the Government puts forth is a specific offense characteristic of the fraud charged, and a Section 3B1.3 enhancement is therefore inappropriate.  *Id*.

The Government also did not and could not elicit any evidence at trial about what the BBA expected from Mr. Connolly, or what conduct would constitute a violation of its "trust" in Mr. Connolly.[14]  To the contrary, the evidence at trial established that during Mr. Connolly's time at Deutsche Bank, neither the BBA nor Deutsche Bank promulgated any guidelines, trainings, or policies discussing its expectations regarding the conduct at issue in the case.[15] Even if there had been such expectations, it is unlikely that Mr. Connolly would have been aware of such expectations, by virtue of his position as a cash trader who did not trade derivatives. (*See* Trial Tr. 745:4-12 (King); Trial Tr. 1206:6-12 (Parietti).)  Mr. Connolly had no relationship with

---

[13] (*See* DB "Interest Rate Swap Transaction" with FHLB Boston (GX 1-514); Trial Tr. 1453:11–1459:25 (Maroun) (referencing GX 1-514); Trial Tr. 1577:23–1591:5 (Hunter) (referencing DX 1542, DX 1543, DX 1544, DX 1545, and DX 1588); Trial Tr. 2201:14–2206:15 (Konich) (citing DX 1588).)

[14] To the extent the Government may now be asserting that the BBA's trust is the trust that was abused, this is wholly inconsistent with its representations at trial.  During its summation, the Government stated, point-blank: "Ladies and gentlemen, that is not what is happening here.  The BBA does not have to be defrauded.  ***There's no argument that the defendants were trying to take money or property from the BBA.***" (Trial Tr. 2853:20-23  (emphasis added).)

[15] The BBA did not publish express prohibitions on LIBOR submitters considering trading positions, including their own, until 2013.  (*See, e.g.*, Trial Tr. 183:14–19, 185:12–15 (Youle). *See also* DX 0151, ¶¶ 2.6, 4.5, 4.6, 4.8.)

the BBA, never communicated with anyone from the BBA, and as a result, could not have abused its trust in any way. A two-level increase on the basis of an abuse of trust enhancement is improper.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a noncustodial sentence, which we submit is sufficient but not greater than necessary to satisfy the objectives of sentencing.

Dated: New York, New York
      October 10, 2019

              By:     */s/ Kenneth M. Breen*_____
                        Kenneth M. Breen
                        Phara A. Guberman
                        Amanda L. Pober

                        **PAUL HASTINGS LLP**
                        200 Park Avenue
                        New York, NY 10166
                        Telephone:  (212) 318-6000
                        Facsimile:  (212) 319-4090
                        kennethbreen@paulhastings.com
                        pharaguberman@paulhastings.com
                        amandapober@paulhastings.com

                        *Attorneys for Defendant Matthew Connolly*