**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

　　　　　　　　*Defendants*.

No. 1:16-cr-00370 (CM)

ECF Case

**ORAL ARGUMENT REQUESTED**

## DEFENDANT GAVIN CAMPBELL BLACK'S SENTENCING MEMORANDUM

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

GAVIN'S BACKGROUND ...................................................................................................... 5

    A.    Gavin's Upbringing ................................................................................. 5

    B.    Gavin as a Child and Adolescent .......................................................... 6

    C.    Gavin at University ................................................................................. 9

    D.    Gavin as a Young Adult and Deutsche Bank Employee ....................... 10

    E.    Gavin's Family Life .............................................................................. 12

    F.    The Impact of this Case on Gavin ......................................................... 19

    G.    The Impact of this Case on Gavin's Family ......................................... 23

RELEVANT SENTENCING CONSIDERATIONS ................................................................ 26

I.    OUR PROPOSED SENTENCE IS SUFFICIENT TO PROVIDE A JUST
PUNISHMENT ................................................................................................................ 27

    A.    A Sentence that Includes a Term of Imprisonment Is Unnecessarily Harsh
Given the Significant Collateral Consequences Already Visited on Gavin ............. 28

    B.    A Sentence that Includes a Term of Imprisonment Would Be Unnecessarily
Harsh Due to Gavin's Immigration Status ................................................. 31

II.    OUR PROPOSED SENTENCE IS SUFFICIENT TO FURTHER THE GOALS OF
DETERRENCE, PROTECTION OF THE PUBLIC AND REHABILITATION ............... 36

III.    OUR PROPOSED SENTENCE AVOIDS UNWARRANTED SENTENCING
DISPARITIES ................................................................................................................. 40

    A.    Our Proposed Sentence Avoids Unwarranted Disparities with Other Deutsche
Bank Employees Who Participated in the Scheme .................................................. 41

    B.    The Sentencings of the Rabobank Defendants Further Support the Conclusion
that a Sentence of Imprisonment for Gavin Is Unwarranted ..................................... 43

    C.    Other More Culpable Participants in the Scheme Were Not Prosecuted ................. 45

IV.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WEIGH IN FAVOR
     OF A SENTENCE THAT DOES NOT INCLUDE IMPRISONMENT ............................. 46

V.   SHOULD THE COURT DEEM CONFINEMENT NECESSARY, IT SHOULD BE
     SERVED AS HOME DETENTION IN THE UNITED KINGDOM ................................... 49

CONCLUSION.................................................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arias v. Lynch*,
   834 F.3d 823 (7th Cir. 2016) ................................................ 35

*Dean v. United States*,
   137 S. Ct. 1170 (2017) ...................................................... 26

*Gall v. United States*,
   552 U.S. 38 (2007) .......................................................... 28

*Mejia-Rodriguez v. Holder*,
   558 F.3d 46 (1st Cir. 2009) ................................................ 35

*Mendez v. Mukasey*,
   547 F.3d 345 (2d Cir. 2008) ................................................ 35

*Planes v. Holder*,
   652 F.3d 991 (9th Cir. 2011) ............................................... 35

*United States v. Allen*,
   864 F.3d 63 (2d Cir. 2017) ......................................... 43, 44, 50

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ........................................ 37

*United States v. Gardellini*,
   545 F.3d 1089 (D.C. Cir. 2008) ............................................. 51

*United States v. Leitch*,
   2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ................................. 27, 48

*United States v. Leung*,
   40 F.3d 577 (2d Cir. 1994) ................................................. 50

*United States v. Manzella*,
   475 F.3d 152 (3d Cir. 2007) ................................................ 39

*United States v. Sindzingre*,
   17-CR-0464 (JS), 2019 WL 2290494 (E.D.N.Y. May 29, 2019) ................... 45

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ......................................... 28, 29, 36

*United States v. Thavaraja,*
   740 F.3d 253 (2d Cir. 2014) ....................................................... 34

*United States v. Vigil,*
   476 F. Supp. 2d 1231 (D.N.M. 2007) ....................................... 29

<u>STATUTES</u>

8 U.S.C. § 1182(a) ..................................................................... 34, 35

8 U.S.C. § 1226(c) ........................................................................... 34

18 U.S.C. § 3553(a) .................................................................... *passim*

18 U.S.C. § 3582(a) ........................................................................ 39

18 U.S.C. § 3624(c) ........................................................................ 32

18 U.S.C. §§ 4100-4115 ................................................................. 59

28 C.F.R. § 527 .............................................................................. 51

28 U.S.C. § 994(j) ..................................................................... 47, 48

USSG § 5C1.1.................................................................................. 48

<u>OTHER AUTHORITIE</u>

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421 (2007) ............................ 38

Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (2013) ........... 37

Sylvia Royce, *International Prisoner Transfer*, 21 Fed. Sent'g Rep. 186 (Feb. 2009)................ 50

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006) ................... 38

Defendant Gavin Campbell Black, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits to assist the Court in sentencing.

## PRELIMINARY STATEMENT

We respectfully submit that a sentence that is "sufficient, but not greater than necessary" to achieve the aims of sentencing is:   time served; two years supervised release in the United Kingdom; and a substantial fine.  18 U.S.C. § 3553(a) ("Section 3553(a)").  As the record evidences, Gavin Black has lived a good and honorable life devoted to family, friends, and his community.  Accepting the jury's verdict for the purpose of sentencing, the conduct that brings him before the Court is an aberration.  Gavin is a humble man who cares deeply about others; and he finds the shame from his involvement in this case unbearable.  His wife, Trudy Ross, explains:

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████  (T. Ross Letter at 2.)

In view of the unique factors of this case, we submit that a sentence of supervised release (that could include a special condition of home confinement in the United Kingdom, as detailed *infra*) satisfies the Section 3553(a) factors, applied collectively and individually—especially given Gavin's serious health issues and because, as a foreign citizen, he would receive disproportionate treatment should he be sentenced to imprisonment.  We therefore submit that our proposed sentence is "sufficient" to satisfy the purposes of sentencing and that it is not necessary to separate Gavin from his family by imprisoning him in the United States.  *See* Section 3553(a).

***Punishment.***   Our proposed sentence is sufficient, but not greater than necessary, to achieve the sentencing goal of just punishment for several reasons.  First, our proposed sentence would significantly restrict Gavin's liberty.  Second, Gavin has already incurred severe collateral consequences as a result of this case, including the loss of his job at the bank where he spent his

entire career—effectively barring him from his profession—and the notoriety and shame that accompanies being one of the few people prosecuted for a global financial scandal.  Third, the imposition of any term of imprisonment in the United States would be unnecessarily harsh based on Gavin's health conditions ███████████████████████████████████████████

███████████████  A term of imprisonment in the United States would exacerbate these health conditions, especially given the harsher treatment that Gavin would face as a non-citizen inmate, including, but not limited to, the likelihood that he would serve any term of imprisonment in a private, for-profit prison facility and spend an indeterminate period following any imprisonment in an immigration facility awaiting removal from the United States to his home country.  It is highly unlikely that Gavin would receive adequate medical care in such facilities based on recent Office of Inspector General ("OIG") reports.  Further, imprisonment in the United States would prevent Gavin from having contact with his children and his elderly parents, compounding the harshness of such a penalty.

Moreover, in accordance with the Court's May 2, 2019 order [ECF No. 434], we have identified multiple instances, in addition to this Court's sentence of Michael Curtler, of non-citizen defendants being sentenced to terms of supervised release to be served in their home countries. Further, to the extent the Court concludes that confinement is necessary, we have also identified a reasonable and effective manner to allow the Court to impose a special condition of home detention to be served in the United Kingdom that could include a program of electronic monitoring.  Such a special condition would satisfy any need for confinement while ensuring that Gavin's foreign citizenship/residency does not disqualify him from a form of punishment otherwise available to citizens/residents of the United States.  (*See* Declaration of Seth L. Levine in Support of Defendant Gavin Campbell Black's Sentencing Memorandum ("Levine Decl.") Ex. A.)

*Deterrence.*   Our proposed sentence is also sufficient to achieve the sentencing goal of deterrence.   There is no risk of recidivism as the conduct at issue is a severe aberration for Gavin, who has otherwise lived an honest, law-abiding life.   With respect to general deterrence, that goal has been achieved based on the significant publicity that this case has received.   If a similarly-situated member of a financial institution is not deterred from engaging in fraudulent conduct by the prospect of being subjected to, *inter alia*:   a multi-year global investigation; a highly-publicized trial and felony conviction; a loss of liberty and substantial financial penalty; and the permanent loss of one's career and reputation, then any term of imprisonment in a United States institution would almost certainly not serve as a deterrent.   In fact, as his former Deutsche Bank colleague writes: "The very public nature of the trial has already been a severe personal and professional punishment as well as a powerful deterrent."   (J. Van Praagh Letter.)

*Proportionality.*   Our proposed sentence also avoids unwarranted sentencing disparities among Gavin, his conspirators, and others who engaged in the same conduct.   As noted in the Presentence Investigation Report ("PSR"), none of the more culpable individuals at Deutsche Bank who were involved in the charged conspiracy have received sentences of imprisonment, and most were not even charged.   This includes the bank's LIBOR submitters, Michael Curtler and James King, and members of Deutsche Bank's senior management who were never charged.   In addition, the treatment and sentences of others outside of Deutsche Bank who participated in the same conduct also militate in favor of a sentence that does not include imprisonment.   Most of the Rabobank defendants received non-custodial sentences, and each of the three Rabobank defendants that were sentenced to terms of imprisonment were—unlike Gavin—decision-makers, supervisors, or mentors for other charged conspirators.   Furthermore, apart from Deutsche Bank and Rabobank, the Government did not charge anyone at the other Panel Banks with USD LIBOR

manipulation—notwithstanding that the Government extracted hefty settlements from many of these institutions in connection with their acknowledged role in adjusting their LIBOR submissions based on their trading positions.

*Nature and Circumstances of the Offense.*  Our proposed sentence is also supported by the unique nature and circumstances of the offense.  Gavin is a first-time, non-violent offender who was convicted for participating in a practice that was widespread in the industry and endorsed by his supervisors.  He neither set bank policy nor exercised any decision-making authority in connection with this practice.  Rather, Gavin made requests for higher or lower submissions that were either honored or not by the decision-making submitters, including his boss Mr. Curtler.  Because, as acknowledged by one of the Government's cooperators (again Mr. Curtler), Gavin primarily traded with other Panel Banks, most of his counterparties not only were aware of his conduct but were engaged in identical conduct themselves.  This is why none of the counterparties called as witnesses at trial ever traded with Gavin.  Moreover, unlike nearly all fraud offenses that come before the Court, the Government is neither seeking forfeiture nor restitution because, as conceded, it cannot show that any victim suffered an actual loss nor that Gavin, or any other member of the conspiracy for that matter, achieved any financial gain from the offense.  These unique circumstances render this case outside the heartland of fraud offenses and support leniency in sentencing Gavin.

* * * *

Accordingly, and consistent with the Section 3553(a) factors, we respectfully submit that a punishment of time served, two years supervised release in the United Kingdom, and a substantial fine is sufficient but not greater than necessary to achieve the goals of sentencing.

## GAVIN'S BACKGROUND

Those who know Gavin well consistently describe him as a modest, humble man who puts the needs of others ahead of his own.  His caring and loyal nature is echoed in letter after letter submitted to the Court, both by those who knew Gavin as a child and those who have befriended him later in life.  Family is the priority above all else in Gavin's life, and the purpose of his work was to provide that family with a good life, and hopefully leave a little room for friends and sport.  These letters make clear just how much of an aberration the conduct at issue is for Gavin, which lends some insight into why this process has been so tragic and crippling for him.

### A.    Gavin's Upbringing

Gavin has lived in the United Kingdom his entire life.  He was born and raised in Harrold, a quiet village in the countryside in north Bedfordshire, ten miles from the market town of Bedford and sixty miles north of London.  Gavin is the youngest of four children, ██████████████

███████.  His parents, Gordon and Stella, relocated more than sixty years ago ████████████

███████████████████████████████████████████  His parents live in that bungalow to this day.

Gavin's dad, Gordon, has a PhD in biochemistry and spent his entire career, spanning more than 30 years, as a research biochemist for ██████ before retiring in 1993.  Gavin's mother, Stella, was a primary school teacher until she stopped working to raise Gavin and his older brother and sisters:  Niall, Lyndsay, and Moira.  When her children were older, Stella returned to work at ████████████████.

Gavin grew up in a home focused on education, hard work, and commitment to community.  Gavin attended primary school at Walmsley House from 1974-78, and what is known as "senior school" at Bedford Modern School from 1978-88.  Both schools were private, and with

four children, money for tuition was tight for the Black family.  Gavin's parents made many

difficult sacrifices for their children's education.

     **B.**       **Gavin as a Child and Adolescent**

     Gavin was an incredibly bright and shy child, endowed with his "father's scrupulous sense

of fair play and was dogged in his determination to gain merit only through diligence and hard

work." (L. Hope Letter at 1.)  According to Gavin's parents:

> He was very shy as a child and a real home-boy:  we discovered after some years
> that he had not brought home letters from school, inviting him on different trips, as
> he was painfully anxious about staying away from home and operating successfully
> in a strange environment.  While at home Gavin would spend time in studying, in
> playing cricket with a close-knit circle of friends from the villages around us, and
> in looking after our dogs.

(G. and S. Black Letter at 1.)  His parents also recall an 11-year-old Gavin who won an essay prize

which came with the honor of delivering his essay at a school assembly.  Typical of Gavin's

"inherent ability and desire to do well, but also his profound reticence and humility," he was

horrified by the thought of this public exposure.  (*Id.*)

     Even as a child, Gavin exuded a love for family and kindness of heart.  Gavin was "an

athletic, academic and kindly child who, when not competing in various sports, enjoyed helping

raise pups and look[ing] after our menagerie." (L. Hope Letter at 1.)  Gavin exhibited a real love

of animals from an early age.  His family "bred Border Collies, German shepherds and Labradors,"

and from "an early age, Gavin would take responsibility for their care, helping to feed, comfort

and train them." (G. and S. Black Letter at 1.)

     Gavin's adolescence was marked by hard work, both in academics and sports, and devotion

to family and community.  Gavin's older brother, Niall, recalls that Gavin "was always a hard-

working scholar, often sitting in his bedroom studying most evenings till late at night and over the

weekends, he would worry if he doubted meeting his set targets, however due to the way Gavin

worked he always achieved top grades.  Gavin always went above and beyond in everything he did."  (N. Black Letter at 1.)

Gavin brought this same work ethic to sports.  While he was a naturally gifted athlete, demonstrating an innate talent in both table tennis and cricket, Gavin worked hard to excel and valued sportsmanship more than anything else.  Indeed, he won the Great Britain National Schools table tennis competition in four different age brackets:  Under 11, 13, 17, and 19.  Gavin also "played in the U19 squad when only 17 and represented England three times in international competition."  (G. and S. Black Letter at 1.)  And he was awarded the Perpetual Cup school prize for Consistently Outstanding Sportsmanship due to his honorable gamesmanship and generosity toward his peers.  (*Id.*at 2.)  Reflective of his humble nature, Gavin did not brag about these tremendous successes, as he "only ever described himself as 'playing a bit of ping-pong.'"  (*Id.*)

Gavin also excelled at cricket.  He played first for the village team and then at the highest level while at his university.  (*Id.*)  Despite these successes, Gavin never forgot his roots and showed enormous devotion to his village team.  As Fraser Glennie, Gavin's friend for over forty years and his teammate on the village team for over twenty, recounts:

> Gavin was a talented sportsman but beside this he showed great commitment to the club.  He soon took up volunteering roles within the club to help it run smoothly.  As time went on and he moved away firstly to university then to London he always made the effort to travel back to Harrold to play when it would have been easier for him to find another club closer to him, but staying loyal to his friends and local club was always important to him.

(F. Glennie Letter at 1.)  Gavin also provided "considerable help to any younger members who joined the club," including "valuable coaching advice as well as making new members feel extremely welcome."  (S. Reynolds Letter at 1.)  Childhood friend Steven Mark Reynolds recalled that Gavin always "had time for everyone."  (*Id.*)

Gavin's village team reciprocated his loyalty, as reflected in multiple other letters from childhood friends, including Andy Trott and Russell Beard. The team, "full of mainly working class lads . . . loved Gavin's easy going manner and ability to not take the game too seriously whatever the result." (A. Trott Letter.) They also appreciated that "despite his obvious intelligence and natural sporting ability, Gavin was very self-effacing and had the ability to get on with just about anybody." (*Id.*) "Any hint of jealousy from those less gifted or fortunate . . . would be swiftly extinguished by Gavin's easy going, humorous and basic down to earth character. His modest and self-deprecating style makes him a very easy person to like." (R. Beard Letter at 1.)

These friendships were about more than just sport for Gavin—they speak directly to his deep sense of loyalty and community. For example, several letters note Gavin's childhood friendship ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮.

(F. Glennie Letter at 1-2; *see also* S. Reynolds Letter at 1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); G. and S. Black Letter at 2).) And Gavin showed similar kindness to other members of the team, all of whom he helped without fanfare or desire for anything in return. As his parents recount:

> We were approached by parents of a younger boy in the village who wanted to speak with us about our son. On the annual Cricket tour, where the team visit another part of the UK to play several matches over a week against other teams – another boy on his first tour ran out of funds; Gavin gifted him funds and supported him through the tour, without telling anyone. We only discovered this when the boy's parents told us how grateful they were for Gavin's care and kindness.

(G. and S. Black Letter at 3.)

Even as an adolescent, Gavin brought this same compassion and loyalty to his family. His sister, Lyndsay, recalls that at the age of 17, when most teenagers can hardly bear to exchange a word with their family, ███████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ (L. Hope Letter at 1.) As Lyndsay states, "[t]his kind of care for others, overcoming his worries to put their wellbeing first, typifies Gavin's approach to life." (*Id.*)

## C.     Gavin at University

After graduating from senior school, Gavin worked at Unilever Research in their Pathology Laboratory before starting university in September 1989. Gavin attended the University of Leeds from 1989 to 1993, where he earned a Bachelor's degree in Economics and a Master's degree in Economics and Finance. At University, Gavin "studied hard staying on for an extra year due to qualifying through obtaining top grades." (N. Black Letter at 1.) True to his nature, he was "generous with his time" and spent "many late nights helping [friends with their] studies and final year dissertations." (J. Ramsay Letter at 1.)

While at University, Gavin remained devoted to his family. While other friends had "Bay-watch babes and super-cars on dormitory walls, [Gavin] had photos of his family and his beloved dog." (*Id.*) And as his University friend recalls, to reduce the financial burden on his parents, he spent summer breaks working odd jobs, such as bricklaying and performing manual work in the paint shop of a fire door factory, rather than going backpacking with friends. (*Id.*)

9

### D.       Gavin as a Young Adult and Deutsche Bank Employee

Upon graduating from University, Gavin was interested in applying to banking jobs.  He knew very little about investment banking or investment banking firms, but he was drawn to the City of London because of its history and reputation.  At the time, a godson of Gavin's parents worked as a bond trader at ███████.  He gave Gavin an ISDA directory—an index of financial institutions based in London.  Gavin made a general application to the companies listed, in alphabetical order, and stopped when he was offered a job at Deutsche Bank in October 1993.

When he first joined Deutsche Bank, he lived with his sister, Lyndsay, and her husband David Hope.  Despite working long hours—Gavin had to be at his desk by 6:30 a.m. and had a more than one-hour commute—Gavin "insisted on doing his fair share of chores . . . without ever being asked."  (D. Hope Letter at 1-2.)  David also recalled an incident where Gavin intervened to help stop an assault by a troubled neighbor who had attacked a truck driver who had stopped to use a phone booth.  (*Id.* at 2.)

Gavin's former Deutsche Bank colleagues and friends observe that Gavin does not fit the archetype of a trader and that, despite trading derivatives at one of the world's largest financial institutions, Gavin stayed true to his modest and humble Harrold roots.  Gavin's first role at the bank was in the Risk Management Group, where he joined a team of two other people, analyzing risk for the trading areas in the London arm of the bank.  As Jason Ramsay, a friend from University and former Deutsche Bank colleague notes:  "It was clear when Gavin started his career in DB that he was never impressed by money or status," which, Mr. Ramsay suspects "is why [Gavin] started in a Middle Office Risk role unlike myself and several other friends from University, who were hell bent on a trading career."  (J. Ramsay Letter.)

In February 1997, Gavin joined the Money Market Derivatives ("MMD") desk, where he stayed until leaving Deutsche Bank in April 2015.  According to Mr. Ramsay, this job change

occurred because "after a few short years [Gavin's] sharp intelligence was spotted and he was pulled into the dealing floor environment." (*Id.*) Can Bitirim, another former Deutsche Bank colleague, echoed this sentiment, writing that Gavin "was so very capable and hardworking and grasped the business of the traders so well this was very quickly recognized and as such he eventually joined the derivative team." (C. Bitirim Letter at 1.)

Gavin's move to the MMD desk coincided with a change in philosophy at Deutsche Bank, which had recently brought in senior employees as part of a merger with Morgan Grenfell. (*Id.*) As a result, Deutsche Bank "became very aggressive in its pursuit of its global ambitions" and had an "aggressive and punishing mandate from upon high" that created an "excess of bravado." (*Id.*) Despite this, Gavin remained true to himself and the laudable qualities apparent in his character since childhood: decency, humility, reliability, and integrity. For example, Mr. Bitirim, who first met Gavin at Deutsche Bank in 1997, stated:

> Gavin was then and is still today a very humble and forthright individual and did not partake in anything remotely political. He came in to work and kept his head down and did his job with good grace and with regards to proper protocols. He was affable fair and honest. The trading room environment was overtly hostile, but Gavin mostly "bunted" any nonsense back with his usual dry wit.

(*Id.*) Another colleague who joined the derivatives desk in 1998, Jerry Beck, refers to Gavin as his "mentor" and recalls that "Gavin was far from the stereotypical, testosterone fuelled image of a trader that the media has come to make us imagine." (J. Beck Letter.) In fact, Mr. Beck writes: "in my 20 years in the world of finance, he is by far the most mild-mannered, decent, modest and honest person that I ever came across, almost to a fault." (*Id.*) According to Mr. Beck, "Gavin was the moral compass of the desk." (*Id.*) Former Deutsche Bank trader Jason Van Praagh echoes these sentiments: "Throughout my life I cannot think of someone more trustworthy, reliable and charitable than Gavin Black. He is a man of integrity and tradition." (J. Van Praagh Letter.) Similarly, Mark Luter, also a former Deutsche Bank colleague, remarks that he was "never [ ]

11

given any reason either within the workplace or as a friend to question his morality or his honesty. [Gavin] has always displayed courageous integrity in his actions and as a result has earned the respect of his peers." (M. Luter Letter.) And Mr. Ramsay states that "Gavin's integrity, loyalty and compassionate nature never fitted the profile of a heavy hitting trader." (J. Ramsay Letter.)

### E. Gavin's Family Life

Being a trader is not what defines Gavin; rather, it is his kindness and dedication to his family that "typifies Gavin's approach to life." (L. Hope Letter at 1.) Since he was a child, Gavin has put "others before himself: care, loyalty and honour are written through him like letters through a stick of rock." (*Id.*)

#### (1) *Gavin as a Husband and Father*

The keystone of Gavin's life is his commitment to his wife, Trudy, and three young daughters. Gavin met Trudy in 1997 when they were both working at Deutsche Bank. Trudy was born in Te Puke, a small town in the Bay of Plenty on the east coast of the North Island of New Zealand, about three hours south of Auckland. Similar to Gavin, Trudy's upbringing was traditional and modest, growing up on an avocado and kiwifruit farm.

The same qualities that come through in the letters of Gavin's former colleagues are what drew Trudy to Gavin. Trudy writes:

> One of the characteristics that attracted me to Gavin was that he [was] not a typical City banker. We both come from grounded, rural, family-oriented backgrounds. Despite working on a bank trading floor full of typical City types he was not at all ostentatious, preferring instead an uncomplicated family life and grateful for the opportunities that came his way.

(T. Ross Letter at 2.)

Trudy's and Gavin's eldest daughter ▮▮▮▮ was born in ▮▮▮▮▮▮▮. Gavin's parents remember: "



████████████████████████████████████████   When

we visited him in their small London apartment Gavin was bathing the baby (in the bidet!) with

great gentleness, and we discovered how he was coping single-handedly as a new father. Since

then we've seen him grow as a father, shepherding Sunday-evening baths and nail-clipping,

finding wellies and mittens, steadying bicycles, and walking miles with the children, feeding the

ducks and playing rounders in the park." (G. and S. Black Letter at 3.)

    The couple's second daughter, ████, was born in ████████. And finally, their third

daughter, ████, was born in ████████. They are all student-athletes with interests in the

arts and moving up through what is known in the United Kingdom as the grade exams. ████

rows crew and takes ballet classes; ████ plays lacrosse and piano; and ████ enjoys

swimming and running and takes singing lessons. Gavin and Trudy spend most of their weekends

carpooling the girls to various practices and events, and they are incredibly proud of their

daughters' achievements, both in and out of the classroom.

    Gavin's dedication to his daughters is readily apparent to his family and friends. His sister

Lyndsay notes that "Gavin's strengths came to the fore as he became a father," and that his "caring

nature led naturally to him being an engaged father, closely involved in the minutiae of his

children's lives." (L. Hope Letter at 2.) She also states that:

> [Gavin] has therefore been integrally involved in his children's daily lives from the
> beginning. He's made a point of being there, of cooking for and with them, and of
> supporting the girls in their many activities in and outside school. He's the parent
> on the riverbank at the rowing, he runs the bar at the school charity fund-raisers,
> he's by the lacrosse field supporting his girls, and he will play hours of rounders
> and cricket in the park with the kids.

(*Id.*) Gavin's parents describe him as "a family-orientated man, treasuring time with family and

especially his children." (G. and S. Black Letter at 3.) They also explain that Gavin's

> tenderness with his children has continued through the years: he has three sporting
> daughters and spends much time coordinating, taxiing, and supporting each of them.

> He is a thoughtful cook, always making their meals from scratch, supports at their school events and fund-raisers, helps them with homework, takes them to and attends daily training sessions with them for example rowing, lacrosse, swimming and athletics, and coordinates their many activities.

(*Id.*)  And Gavin's sister-in-law, Robynne Ross, notes, "It has always reassured me that my nieces have had such a calm, steady and loving male role model in their home as their uncles and grandfather are so far away [in New Zealand]."  (R. Ross Letter at 1-2.)

These sentiments are echoed by Gavin's lifelong friends.  For example, Rafe Morton, a friend for over thirty years, writes that Gavin "is such a good and devoted father to his three daughters, two of whom I am Godfather to.  He brings up his children in his own image, with respect, manners and decency.  His daughters are very polite, kind, charming and welcoming girls, Gavin has clearly had a very . . . strong influence over how they have shaped their characters." (R. Morton Letter at 2.)  Similarly, James Mackay, a friend of over forty years, describes Gavin as "the ultimate family man devoted to his girls and maintaining the importance of his family in his demanding and accomplished life," whose "devotion can also be measured in the time Gavin spends on the road at weekends, driving his kids to sporting events and hanging around - supporting and attending the matches & activities his girls take part in."  (J. Mackay Letter at 1-2.) And Christopher Michael Hyslop recalls, "To have seen him with his daughter ███████████ ████████████████████████████████████████████████ was to see him at his most caring, be that helping her ███████████████████████ or just simply giving her a hug or looking to make her laugh when she was down!"  (C.M. Hyslop Letter at 1.)

### (2) *Gavin as a Son to Aging Parents*

Gavin "has always been a loving, dedicated son."  (D. Hope Letter at 2.)  But his support of and dedication to his parents has significantly increased in recent years.███████████ ████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███ Despite the many stresses of this case, "Gavin has increasingly become a mainstay in their support, doing tasks they are no longer able to, with medical appointments, driving them distances, and helping them to continue supporting the elderly in the community whom they have helped for years, without realising they were becoming older themselves." (*Id.*)  His brother Niall describes Gavin as "a dream son to his parents" (N. Black Letter at 1), and his sister Moira reports that Gavin has "a wonderful relationship with them" and "fusses over them, cooks and undertakes jobs around the house that they are unable to do themselves in their elderly years" (M. Brown Letter).

### (3) *Gavin's Commitment to his Extended Family*

Gavin's kindness extends beyond his wife, daughters, and parents to his extended family.

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████





(E. Hope Letter at 1.)  Gavin's support was similarly crucial for Lyndsay who provided the

following summary: ████████████████████████ [Gavin] was there

for us:  quietly, solidly there.  This event characterizes Gavin entirely." (L. Hope Letter at 3.)

The letters of support are replete with similar stories of Gavin going the extra mile in

support of his family, in good times and in bad. ███████████████████

████████████

████████████████████████

█████ and Gavin kindly stepped in to his Uncle shoes, taking our two young children
out in London to see the sights and a visit to Pizza Hut, in the evening he surprised
us all with theatre tickets to see Beauty and the Beast which we were all very
delighted as the children had never been to a show before.  Gavin spoiled the
children in a fatherly way, and we are very grateful to him for the love and affection
he showed them at such a young age.  This was a very worrying time for my family
and I and Gavin helped tremendously in helping us get through such a difficult
time.

(N. Black Letter at 2.)  When Trudy's parents were able to spend two Christmases (2004 and 2007)

with Gavin, Trudy, and their grandchildren in London:

Gavin made sure we had memorable trips on both of these of these occasions.  He
went out of his way to take us to shows and wonderful historic places that we just
don't have in New Zealand.  It takes a certain kind of son-in-law to take his in-laws
to a historic Castle and look interested! On one trip, I said to Gavin that I had never
had goose for Christmas (which is an English Christmas tradition).  Next thing I
knew I was off to his local butcher to buy a goose and then, overseen by Gavin, I
found myself cooking a goose for Christmas for the first time.  That is a small
example of how I see Gavin.  He is thoughtful and encouraging, he is a great cook
and could easily have produced a goose for Christmas dinner but instead wanted
me to have the experience and feel a part of things.  I look back fondly on that
experience.

16

(B. Ross Letter at 1.)

### (4) *Gavin's Commitment to his Friends*

Gavin similarly goes the extra mile for his friends. A number of Gavin's friends have noted that, despite the trauma he has been going through in his own life, he has still found ways to be supportive of his friends during times of need. For example, Andy Trott writes: ████████ ███████████████████████ and realising Gavin had his own troubles, I neglected to inform him of my loss. Somebody must have told him as I received a call the day before the funeral from him and sure enough he appeared in person on the day to offer support to my mother, sister, myself and family." (A. Trott Letter.) Another friend, Emma Murray, had a similar experience, explaining: "████████████████████████████████████████████ ███████████████████████████████, and each time Gavin either sent an email, wrote a card, or gave me a call to check on how I was doing. It was a pure example of what an amazingly thoughtful person he can be. He has always been there for other people." (E. Murray Letter at 1.) And Fraser Glennie, a childhood friend, experienced the same, writing: "█████████████████████████████████ ████████████████████████████████████ ██████████████████████████." (F. Glennie Letter at 2.)

His friends similarly benefitted from Gavin's thoughtfulness in good times. For example, Peter Parkin recalls that:

> A few years ago, we had an idea of taking our daughters camping, and it turned into 9 Dads and Daughters from the school heading off to a campsite for a weekend, whilst our wives had a well-earned break! Central to organising this was Gavin, who offered to do all the shopping. As he opened the tailgate of his car and we saw the plethora of supplies he had procured we knew we'd picked the right man for the job! It was a job he was to keep as the Dad's and Daughters camping weekend is now an annual event.

17

(P. Parkin Letter at 1.)  Rafe Morton writes that Gavin "is also godfather to my son, ███ and he has active role in ███████, watching him play sport and on occasions taking him to Lords to watch cricket.  My son adores Gavin and for a quiet, shy boy is very relaxed and comfortable in Gavin's company.  Gavin is everything that you could ask for in a Godfather, as he has been a great role model for my son, as he is a decent, caring, honourable and fun-loving human being." (R. Morton Letter at 1-2.)   Another friend, Cherie Denham describes Gavin as "naturally thoughtful, kind and helpful."  (C. Denham Letter at 2.)  Ms. Denham recalls vacations and get togethers when Gavin is always doing something to make the experience more enjoyable for her and her family from watching and entertaining her boys to the smallest kindnesses such as cooking, cleaning or doing laundry.  (*Id.* at 1-2.)  Others recall how he has taken active roles in their children's lives (C.M. Hyslop Letter at 1; A. Denham Letter at 1); and provided support when they or their family members were ill (R. Morton Letter at 2; P. Parkin Letter at 2).

As reflected in these letters, Gavin "is one of life's good guys . . . a man to turn to for help, support and perhaps most importantly, friendship."  (P. Parkin Letter at 2; *see also* R. Booker Letter at 1-2.)  From the most mundane, such as cooking and cleaning, to the most exceptional, such as intervening on behalf of a victimized stranger, Gavin is "generous to a fault and the first to step forward when a hand is required" and "[a] man that can be relied on and whose word is his bond."  (J. Van Praagh Letter.)

### (5) *Gavin's Commitment to His Community*

Over the past fifteen years, Gavin and Trudy have dedicated their time and financial resources to charitable organizations.  Gavin and Trudy have regularly contributed to Princess Alice Hospital, a local hospice that provides end-of-life care; Royal National Lifeboats Institution, a charity with a mission to save lives at sea and around the coasts of the United Kingdom and the Republic of Ireland; Wooden Spoon, a charity that changes children's lives through rugby; and

The Primary Club, a charity that raises money to provide sports to the visually impaired.   In addition, Gavin and Trudy are both committed to supporting the school that their daughters attend, ███████████████████████████.   In particular, Gavin has been in charge of refreshments at fundraising events for the school, and Trudy is the deputy chairperson of the parents' association, organizing the annual Christmas Fair and sitting on a school advisory board.   Trudy also volunteers for the Great Ormond Street Children's Hospital and is a supporter of Macmillan, a cancer society. Gavin also volunteers with Shooting Star Children's Hospices and Marylebone Cricket Club in the Community, which brings together many goodwill initiatives, including introducing cricket to deprived inner-city London children.

Gavin and Trudy have instilled this same sense of charity and responsibility to community in their daughters. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

### F.     The Impact of this Case on Gavin

By all accounts, Gavin defines himself by how well he takes care of others.   But while Gavin has been there for everyone else, he is unable to be there for himself.   As his sister Lyndsay reports:   "Throughout this legal process Gavin has acted entirely in character, sheltering those around him, while bearing the brunt of it alone. . . .   His first thought, and sole concern in terms of having help, was to protect his family and our parents.   He was appalled that they may suffer stress and anxiety for him."  (L. Hope Letter at 3.)   Therefore, since Deutsche Bank began its internal investigation over nine years ago, Gavin has slowly isolated himself from his family and friends to spare them from the consequences of this case.   Over that time he has lost all sense of dignity—

finding it difficult even to face his wife and daughters— ███████████████████████

███████████████████.

    In her letter to Your Honor, Trudy tries to put into words the toll that this case has taken

on Gavin:

> ████████████████████████████████████████████████████████
> ████████████████████████████ It is important
> to remember too the timescale of the impact – this experience began for us all back
> in November 2010 when Gavin had his initial interview with Deutsche Bank. From
> the outset his principles and strongly held beliefs made him unable to lie.  For
> almost 9 years all of us have been hugely disturbed by the lack of any certainty or
> control over events and their outcomes.  Unfortunately, it is part of the narrative to
> the girls' childhood.



> There have been several watershed moments in those 9 years.  From the moment
> he lost his job in April 2015 it was clear that his career in financial services was
> ruined, his reputation shattered.  As he sat at his office desk he was told on his work
> mobile phone by a Bloomberg journalist that he had been terminated from the bank
> after 21.5 years of loyal and productive service.  Predictably, he was shocked and
> desperately upset to have his livelihood snatched from him in this manner and
> vowed to at least clear his name.  Gavin is a proud and honest man, characteristics
> that first attracted me to him. ███████████████████████████
> ████████████████████████████████████

(T. Ross Letter at 1-2.)

██████████████████████████

█████████████████████████████████████████████████████

████████████████████████████ He was left in a state of limbo from that time until he was

ultimately terminated in January 2015, following his cooperation with the bank, the DOJ, and the

FCA. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Not wanting to burden others with his problems, he kept his symptoms to himself for years, riddled with guilt about the impact of this case on his family.  His sister Lyndsay explains:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

(L. Hope Letter at 4.)

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████
████████████████████████████████████████████████
████████████████████████████████████████████████





### G.    The Impact of this Case on Gavin's Family

Notwithstanding Gavin's efforts to shield his family from the consequences of this case, their lives have endured significant upheaval.  While Trudy has been steadfast in her support of Gavin, there are times that she has been at her breaking point.  As Trudy's sister Robynne recounts:



(R. Ross Letter at 2.)

Trudy has also had to change her life plans by going to back to work, which resulted in her spending less time with her daughters and being unable to assist in the care of her elderly parents. After a twenty-year career in financial services at various firms, Trudy hoped to retire from permanent work "to fulfill her dream of being a full-time mother."  (T. Ross Letter at 2.)  She established a limited company in 2013 to allow her to work part time on her own property

---

[1]

renovation projects and offer secured financing to other developers. Gavin and Trudy also planned for her to take their daughters to New Zealand frequently so that Trudy could care for her aging parents, ███████████████████████ —

Trudy's father, Grahame Ross, ████████████████████████████



████████████████████ (T. Ross Letter at 3; R. Ross Letter at 3.)

Given Gavin's inability to work in finance and his health issues, Trudy went back to work full time in March 2016 for a financial services firm, then a small startup in London with only a handful of employees. Since that time, the company has grown significantly to more than sixty employees, and Trudy is now its COO. In fact, the company is expanding rapidly into Asia and the Americas and significant travel is required. As a result, Trudy now spends a lot of time away from Gavin and her daughters. This has "radically" changed Gavin's and Trudy's plans for the future. (T. Ross Letter at 3.) Given Trudy's work obligations, she is not able to take regular trips with their daughters to spend time with their maternal grandparents and aunts and uncles, all of whom live in New Zealand. (*Id.*) Trudy writes:

> The pressures of the current situation, together with a feeling of missing out on the girls' childhood development through spending long hours working and not being at home, combined with having family on the other side of the world and █████ ████████████████████████ The possibility that Gavin's ability to visit or stay in New Zealand is affected as a result of sentencing is also a source of great concern.

(*Id.*) Gavin feels a deep sense of remorse and guilt over the impact that his actions have had on Trudy and her plans for the future.

With Trudy returning to work, Gavin has taken over the role of the primary caretaker for his daughters. While he has taken to this role naturally, Gavin cannot accept the guilt he feels from having created upheaval in his daughters' lives. As Trudy writes: ████████████

████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████ For example, Susan

Hyslop states:

██████████████████████████████████████████████████

(S. Hyslop Letter at 1.)

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████." (R. Ross Letter at

2.) ██████████████████████████████████████████████

██████████████████████████████████████████████

██████ (T. Ross Letter at 3.)  Trudy describes this as ██████████████████ (*Id.*)

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

██████████████████████████████████████████████████



(T. Ross Letter at 3-4.)

(*Id.* at 3.)

## **RELEVANT SENTENCING CONSIDERATIONS**

Under Section 3553(a), the overarching principle of federal sentencing is that the Court should arrive at a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of federal sentencing.  18 U.S.C. § 3553(a); *see Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (referring to this "broad command" as the "parsimony principle").  Applying the Section 3553(a) factors, the Probation Department recommended that the Court sentence Gavin to five months' imprisonment, to be followed by two years' supervised release.  (PSR at 37-39.)  The factors on which the Probation Department based this recommendation include:  (i) Gavin's status as "a first-time offender," (ii) he "appears to pose a low risk of recidivism," and (iii) the "need to avoid unwarranted sentence disparities among defendants with similar records who have been

26

found guilty of similar conduct," *i.e.*, the need to impose a sentence that is proportional to the sentences of Gavin's co-conspirators and the defendants in the Rabobank LIBOR case presided over by Judge Rakoff.  (PSR at 38-39.)

Our proposed sentence acknowledges the Probation Department's recommendation and satisfies the Section 3553(a) factors, both alone and in combination.  *First*, it provides for a just punishment that is sufficient but not greater than necessary because it includes a significant restriction on Gavin's liberty while taking into consideration the potential collateral consequences in terms of both his health conditions and his status as a non-citizen.  *Second*, it furthers the sentencing goals of deterrence, protection of the public, and rehabilitation because it accounts for the fact that Gavin has lost his ability to continue to work in financial services and that general deterrence has been accomplished through, *inter alia*, the highly publicized nature of this case.  *Third*, a sentence that includes a term of imprisonment would create unwarranted sentencing disparities with more culpable and similarly-situated individuals at Deutsche Bank and elsewhere who engaged in the charged conduct.  *Fourth*, the nature and circumstances of the offense, including the fact that Gavin is a first-time, non-violent offender, weigh in favor of a sentence that does not include imprisonment.  *Finally*, to the extent the Court concludes confinement is necessary, a sentence of supervised release with a special condition of home detention to be served in the United Kingdom balances the need for confinement with the collateral consequences of Gavin's status as a non-citizen and  would enable him to continue treatment for ████

████

## I.    OUR PROPOSED SENTENCE IS SUFFICIENT TO PROVIDE A JUST PUNISHMENT

A sentence of supervised release provides for a sufficient and just punishment in this case. *See, e.g.*, *United States v. Leitch*, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) ("as the Supreme Court has recognized, probation is *significant* punishment.") (emphasis in original)

(citing *Gall v. United States*, 552 U.S. 38, 48-49 (2007).  This proposed sentence would result in a substantial restriction of Gavin's liberty, *see Gall*, 552 U.S. at 48-49, while properly taking into account other factors that would render a term of imprisonment unnecessarily harsh, including the collateral consequences that Gavin has already experienced and the disparate treatment afforded non-citizen inmates.

### A.     A Sentence that Includes a Term of Imprisonment Is Unnecessarily Harsh Given the Significant Collateral Consequences Already Visited on Gavin

Our proposed sentence properly accounts for the fact that Gavin has already suffered severe collateral consequences as a result of the Government's investigation and prosecution of this case. The Second Circuit has stated that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' [under Section 3553(a)(2)(A)] if it does not consider the collateral effects of a particular sentence."  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).  The collateral consequences to Gavin include, but are not limited to, the loss of his job, career, and reputation. As his former Deutsche Bank colleague observes: "Gavin has been met with a significant punishment by way of reputation and damage to his life and ███████████."  (C. Bitirim Letter at 2.)

As a result of this case, Gavin was terminated from Deutsche Bank after more than 21 years of employment—the only bank at which he had ever worked—at the explicit direction of the New York Department of Financial Services.   [ECF No. 54-23.]   Significantly, Gavin was never interviewed by DFS nor was his counsel ever contacted; rather, his termination came years after the bank had terminated numerous individuals in connection with not only its own investigation, but also the DOJ's and FCA's—and all the while, Gavin remained on the desk trading derivatives. [*See* DX 862 at 28-29 n.22.]  Gavin's termination was all the more humiliating because he first

learned of it from a reporter who called his mobile phone to ask him about the case.  (T. Ross

Letter at 2.)

   The collateral consequences of this case are not limited to Gavin's loss of his job; they also

extend to his permanent loss of his career.  *See Stewart*, 590 F.3d at 141 (finding that the district

court properly considered the defendant's likely loss of career under Section 3553(a)).  Based on

his indictment and conviction in this case, Gavin will never again work for a bank, financial firm,

or any other entity that is regulated by United States or United Kingdom authorities.  Given that

he is nearly 50 and is effectively barred from working in the only field in which he has experience,

Gavin has been unable to find meaningful employment.  ██████████████████████████

████████████████████████████████████████████████  (T. Ross Letter at 2.)

   Gavin has also had to endure the stigma, shame, and humiliation of being one of the few

public faces of the LIBOR scandal.  Such stigma has been recognized as a "form[] of punishment"

that should be considered in determining an appropriate sentence.  *See United States v. Vigil*, 476

F. Supp. 2d 1231, 1315 (D.N.M. 2007) (considering the "incalculable damage to [the defendant's]

personal and professional reputation as a result of tremendous media coverage of his case,"

including his "unflattering[] portray[al] as the face of public corruption"), *aff'd*, 523 F.3d 1258

(10th Cir. 2008).  There are hundreds of articles reporting on Gavin's indictment and conviction

in this case.  Immediately following his conviction, he was followed by a photographer as he exited

the courthouse, and these photographs were sold to news outlets and are readily available on the

internet.  This notoriety has been highly punitive and exceedingly difficult for Gavin to bear.

Indeed, as a former Deutsche Bank colleague notes:  "The very public nature of the trial has already

been a severe personal and professional punishment as well as a powerful deterrent." (J. Van

Praagh Letter.)

Other collateral consequences include ███████████████████████████. As

addressed in detail above, Gavin ███████████████████ (T. Ross Letter at 2.)

Significantly, ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ But in the short term, █████████████

██████████████████████████████████—necessary

care that he is unlikely to receive if incarcerated in the United States given his status as a foreign

citizen, as discussed *infra*. ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ He is riddled with guilt because

he feels responsible for the complete upheaval in his family circumstances that has resulted from

this case.

What is more, an incarceratory sentence in the United States would have punishing

consequences for Gavin's family, including his children and elderly parents—neither of whom

would have the ability to readily visit Gavin. With respect to his immediate family, Gavin has

been his daughters' primary caretaker since his termination from Deutsche Bank. A term of

imprisonment in the United States, therefore, would not only deprive his family of this invaluable

resource, but also would exacerbate the emotional and financial strain that they have endured since

Trudy assumed of the role of sole breadwinner. *Supra* at 23-26. Moreover, Gavin's children have

had tremendous difficulty coping with his absences and deteriorating health during the pendency of this case; the trauma of a more permanent separation is ███████████████ (T. Ross Letter at 3.)  In addition, if incarcerated in the United States, Gavin's elderly and ailing parents would not only have no way of seeing him, as they are too frail to travel, but they would also lose a vital pillar of support on which they rely.  (*E.g.*, N. Black Letter at 2; L. Hope Letter at 3; J. Mackay Letter at 2; A. Denham Letter at 2.)

Accordingly, the significant collateral consequences to Gavin and his family resulting from his indictment and conviction support the conclusion that it is not necessary for a just punishment to include a term of imprisonment.

**B.    A Sentence that Includes a Term of Imprisonment Would Be Unnecessarily Harsh Due to Gavin's Immigration Status**

A term of imprisonment is also unnecessarily harsh because, as a non-citizen, Gavin would be subject to harsher conditions of confinement, including, but not limited to, likely serving any such term in a private, for-profit prison facility and spending an indeterminate period following any imprisonment in an immigration facility awaiting removal from the United States.  Recent OIG reports have identified substandard conditions and inadequate medical care at each of these types of facilities, and the Court should have real concern that Gavin would not receive proper medical care for his significant health problems during any such confinement.

**1.    *Should Gavin Receive a Sentence of Imprisonment, His Conditions of Confinement Will Be Significantly Harsher Based on His Immigration Status***

Should the Court impose a sentence that includes a term of imprisonment, Gavin would be subject to harsher conditions of confinement due to his immigration status.  But for his status as a non-citizen, Gavin would receive "minimum" security status and qualify for placement in a federal prison camp as a first-time, non-violent offender.  (*See* Levine Decl. Ex. E at ch. 1, p. 2 & ch. 5, p. 12 Table 5-2.)  Under BOP policy, however, non-citizen inmates are designated as "Deportable

Alien[s]" and required to be "housed in at least a Low security level institution." (*Id.* at ch. 5, p.

9.) Gavin's immigration status therefore renders him ineligible to serve his time in a federal prison

camp. Gavin similarly would not be eligible to serve any portion of a sentence of imprisonment

in a community correctional facility, also referred to as a federal halfway house. While the BOP

is required by statute to ensure "to the extent practicable" that an individual serving a term of

imprisonment spend a portion of the final months of that term in a halfway house or other

conditions that will provide a reasonable opportunity to prepare for reentry into the community,

18 U.S.C. § 3624(c)(1), the BOP has concluded that it is impracticable for non-citizen inmates to

serve their sentences in a federal halfway house, (Levine Decl. Ex. F at p. 10, 10.b (excluding

inmates with "Deportable Alien" status as ineligible for placement in a halfway house); *see also*

*id.* p. 11, 10.f & 10.j (deeming detainee inmates ineligible for halfway house placement).)

Compounding this disparity, Gavin would be required under BOP policy to serve any

incarceratory sentence in a privately-run, for-profit prison facility based on his immigration status.

As reflected in a report by the DOJ OIG:

> To help alleviate overcrowding and respond to congressional mandates, in 1997 the
> BOP had begun contracting with privately operated institutions (often referred to
> as "contract prisons"), at first on a smaller scale and later more extensively, to
> confine federal inmates who are primarily low security, criminal alien adult males
> with 90 months or less remaining to serve on their sentences. . . . These contract
> prisons were operated by three private corporations: Corrections Corporation of
> America; GEO Group, Inc.; and Management and Training Corporation.

(Levine Decl. Ex. G at i (the "2016 OIG Report").) In January 2018, the Trump Administration

required that the BOP re-designate all low-security male, non-U.S. citizen inmates with 90 months

or less remaining in their sentence for transfer to a for-profit prison. (Levine Decl. Ex. H.)[2]

---

[2]   Despite this policy, Gavin's legal team would try to have Gavin placed in a BOP facility if
the Court finds it necessary to impose a term of imprisonment.

As the 2016 OIG Report found, for-profit prisons are significantly more abusive, violent and dangerous than those run by the BOP. The OIG found that these for-profit prisons "incurred more safety and security incidents per capita than comparable BOP institutions." (Levine Decl. Ex. G at ii.) It also faulted the BOP for failing to verify that these private prisons provide basic medical services to inmates. (*Id.* at iii.) Specifically, as part of required oversight of for-profit prisons, the BOP developed a checklist with "seven observation steps . . . for onsite monitors to verify that a contract prison's health services comply with its contract." (*Id.* at 32.) The 2016 OIG Report found, however, that none of the observation steps "individually or when considered together, examined whether the contractors were providing basic medical care to the inmates." (*Id.*) The OIG therefore concluded that "the BOP onsite monitors were not verifying each month whether inmates in contract prisons were receiving basic medical care." (*Id.*)

The lack of BOP oversight is a significant problem because these for-profit facilities have a history of failing to provide adequate medical care to the inmates entrusted to their supervision. For example, the 2016 OIG report found that these facilities were medically understaffed and "raised concerns that ***medical understaffing on the part of the contractor was financially incentivized because it cost the contractor less to pay penalty deductions for understaffing than to staff the prison adequately***." (*Id.* at 33 n.62 (emphasis added).) The 2016 OIG report also found similar problems during one of its site visits to a checklist-compliant for-profit prison, finding, *inter alia*, that "there was no full-time physician, as required by its approved staffing plan, for the 8-month period between December 2013 and August 2014." (*Id.* at 33.) Another review conducted by the BOP at this same facility "resulted in a significant adverse finding in health services." (*Id.* at 33.)

Based in part on the 2016 OIG Report, the Obama administration decided to phase out the use of for-profit prisons.  (Levine Decl. Ex. I at 1.)  In February 2017, however, then-Attorney General Jefferson B. Sessions III rescinded this policy in a one-paragraph memorandum and reinstated the prior policy.  (Levine Decl. Ex. J.)  Attorney General Sessions's memorandum did not reference any fact findings or studies that determined that the significant deficiencies identified in the 2016 OIG Report had been corrected, and Gavin's legal team is not aware of any such study. In addition, as noted above, the Trump administration also implemented a policy in January 2018 requiring all non-citizen inmates to be housed in for-profit prisons.

Gavin's conditions of confinement during any term of imprisonment would therefore be significantly harsher than United States-citizen inmates, and there are serious concerns that he would not receive proper medical care.  These factors provide further support for the conclusion that imprisonment would be an unnecessarily harsh punishment.

### 2.   *Any Term of Imprisonment Would Be Followed by Post-Sentence Detention in an Immigration Facility Raising Additional Health Concerns*

To the extent Gavin receives a sentence of imprisonment, he would also likely be required to serve time in an Immigration and Customs Enforcement ("ICE") detention facility where he would await deportation back to the United Kingdom.  The uncertainties presented by the immigration process further support the imposition of a sentence that does not include imprisonment.  *See United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings.")  (citation omitted).

Under 8 U.S.C. § 1226(c)(1)(A), post-sentence immigration detention is required for any non-citizen convicted of an offense covered in 8 U.S.C. § 1182(a)(2)—which includes fraud

offenses[3]—upon release from BOP custody.  While Gavin would not challenge removal so that he

can return home to his family, his removal would almost certainly not be immediate.  In 2017—

the most recent year for which statistics are publicly available—the average length of stay of a

non-citizen detainee awaiting removal was approximately 49 days.  (Levine Decl. Ex. K at 4.)

    As revealed in a recent Department of Homeland Security OIG (DHS-OIG) report issued

on June 3, 2019, the conditions in ICE detention facilities are deplorable.  (Levine Decl. Ex. L.)

During its review, DHS-OIG "observed immediate risks or egregious violations of detention

standards" at certain facilities, including "nooses in detainee cells, overly restrictive segregation,

inadequate medical care, unreported security incidents, and significant food safety issues."  (*Id.* at

DHS OIG Highlights Page under "What We Found").)  The DHS-OIG's summarized its findings

as follows:

> This report summarizes findings on our latest round of unannounced inspections at
> four detention facilities housing ICE detainees.  Because we observed immediate
> risks or egregious violations of detention standards at [two of the] facilities, we
> issued individual reports to ICE after our visits to these two facilities and
> recommended ICE conduct a full review of the facilities to ensure compliance with
> ICE's 2011 PBNDS.  Overall, our inspections of the four detention facilities
> revealed violations of ICE's detention standards and raised concerns about the
> environment in which detainees are held.  Although the conditions varied among
> the facilities and not every problem was present at each, our observations,
> interviews with detainees and staff, and reviews of documents revealed several
> persistent issues.  All four facilities had issues with expired food, which puts
> detainees at risk for food-borne illnesses.  At three facilities, we found that
> segregation practices violated standards and infringed on detainee rights.  Two
> facilities failed to provide recreation outside detainee housing units.  Bathrooms in
> two facilities' detainee housing units were dilapidated and moldy.  At one facility,
> detainees do not receive appropriate clothing and hygiene items to ensure they
> could properly care for themselves.  Lastly, one facility allowed only non-contact
> visits, despite being able to accommodate in-person visitation.  Our observations

---

[3]     Section 1182(a)(2) covers a "crime involving moral turpitude," which has been construed
to include fraud offenses.  *See, e.g.*, *Arias v. Lynch*, 834 F.3d 823, 827-28 (7th Cir. 2016); *Planes
v. Holder*, 652 F.3d 991, 997 (9th Cir. 2011); *Mejia-Rodriguez v. Holder*, 558 F.3d 46, 48 (1st Cir.
2009); *Mendez v. Mukasey*, 547 F.3d 345, 347-48 (2d Cir. 2008).

confirmed concerns identified in detainee grievances, which indicated unsafe and unhealthy conditions to varying degrees at all of the facilities we visited.

(*Id.* at 3.)

In view of the unique circumstances of this case, as reflected by the Probation Department's recommended sentence, the fact that any term of imprisonment would be extended by detention of uncertain duration in a deplorable ICE detention facility further supports the conclusion that imprisonment is an unnecessarily harsh punishment for Gavin. Such circumstances include not only Gavin's immigration status, but also, as discussed *infra*, the sentences imposed on other more culpable individuals and the nature and circumstance of the offense.

## II.   OUR PROPOSED SENTENCE IS SUFFICIENT TO FURTHER THE GOALS OF DETERRENCE, PROTECTION OF THE PUBLIC AND REHABILITATION

Our proposed sentence is also sufficient "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."   18 U.S.C. § 3553(a)(2)(B)-(C). Gavin does not pose a recidivism risk given that, apart from the conduct charged in this case, it is undisputed that Gavin has lived a law-abiding life and has been a productive and valued member of his community. As the Probation Department stated:

> Black is a first-time offender who began his involvement in the offense at age 34. He is well-educated, and he has a steady employment history, including having worked for Deutsche Bank for 18 years prior to being terminated because of the instant offens ████████████████████████████████████████
> Black also appears to have the support of his wife, and he has three children who are in their formative adolescent years (ages 10, 14, and 15). Based upon these factors, the defendant appears to pose a low risk of recidivism.

(PSR at 38.) The sentencing goals of specific deterrence and protection of the public also do not justify imprisonment because Gavin has lost his livelihood as a punitive consequence of this case. *See Stewart*, 590 F.3d at 141 (stating that "the need for further deterrence and protection of the public is lessened" when the conviction results in the defendant's loss of livelihood "because the

conviction itself already visits substantial punishment on the defendant") (internal quotation marks omitted); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (finding no risk of recidivism for offenses "particularly adapted to [a defendant's] chosen career" where the conviction results in the defendant's loss of livelihood because "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated").

Our proposed sentence is also sufficient to further the goal of general deterrence.  Relying on "a large body of research," the National Institute of Justice (the "NIJ")—which serves as the DOJ's research, development and evaluation agency—concluded that the imposition of a sentence of imprisonment does not generally deter criminal conduct.  (Levine Decl. Ex. M.)  In a paper entitled "Five Things About Deterrence," the NIJ determined, *inter alia*, that:  (1) "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment"; (2) "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime"; and (3) "[i]ncreasing the severity of punishment does little to deter crime."  (*Id.* at 1 (emphasis in original).)  The NIJ further stated:

> *Certainty* refers to the likelihood of being caught and punished for the commission of a crime.  Research underscores the more significant role that *certainty* plays in deterrence than severity — it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment.  Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases.  Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

(*Id.* at 2 (emphasis in original).)  Numerous studies support the NIJ's conclusions.  *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 199 (2013) ("The evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment.  However, the evidence in support of certainty's effect pertains almost exclusively to apprehension probability.  Consequently, the more precise statement is that certainty

of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28-29 (2006) (citing the studies of three National Academy of Science panels, as well as "every major survey of the evidence," that concluded that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"). With respect to white-collar crime in particular, the evidence reflects that there is no difference in the deterrent effect between a custodial and non-custodial sentence. Gabbay, 8 Cardozo J. Conflict Resol. at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Moreover, any goal of general deterrence has been accomplished through the highly publicized nature of this case. The Government and its investigative partners have collectively entered into settlement agreements with at least seven Panel Banks. [*See* ECF Nos. 118-02 (Deutsche Bank), 118-05 (Rabobank), 118-06 (Barclays), 118-07 (Citibank), 118-08 (UBS), 118-09 (RBS); *see also United States v. Lloyds Banking Group plc*, No. 14-cr-165, ECF No. 6 (D. Conn. July 28, 2014) (Lloyds).] And in connection with each of these settlements, the Government and its investigative partners issued press releases announcing the settlements, including the substantial financial sanctions imposed on these institutions. [*See* ECF Nos. 54-1 – 54-24.] For example, the various press releases announcing the settlements with Deutsche Bank touted the fact that Deutsche Bank alone paid approximately $2.5 billion to the Government and its investigative partners. [*See* ECF No. 54-23 at 1 (noting that Deutsche Bank paid $600 million

to DFS, $800 million to the CFTC, $775 million to the DOJ, and approximately $340 million to the FCA.]  The Government and the United Kingdom's Serious Fraud Office similarly issued press releases in connection with charges brought against multiple individual defendants.  [*See* ECF Nos. 54-25 – 54-47.]  And DFS's press release announcing its settlement with Deutsche Bank touted the fact that Deutsche Bank terminated "numerous employees that were involved in the wrongful conduct . . . including those in management positions," and that DFS ordered the bank to "take all steps necessary" to terminate and ban seven others, one of whom was Gavin.  [ECF No. 54-23 at 4]; (*see also* Levine Decl. Ex. N.)  To anyone listening, the message that "you will be caught and punished" for the charged conduct has been sent, loud and clear, without regard to whether Gavin is sentenced to a term of imprisonment.

The sentencing goal of rehabilitation also supports the imposition of a sentence that does not include imprisonment.  Under 18 U.S.C. § 3553(a)(2)(D), a court must consider the need for the sentence imposed to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  While a court must consider a defendant's need for rehabilitation under this provision, Congress directed in the applicable statute that a court "may not carry out that goal by *imprisonment*."  *United States v. Manzella*, 475 F.3d 152, 158 (3d Cir. 2007) (emphasis in original) (citing 18 U.S.C. § 3582(a)). Rather, this statute provides that a court must "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation" in determining whether to impose any term of imprisonment.  18 U.S.C. § 3582(a).  A sentence that permits Gavin to remain in his community and ████████████████████████████████████████████████, especially given the concerns raised above about whether he will receive adequate medical care if imprisoned.

III.     OUR PROPOSED SENTENCE AVOIDS UNWARRANTED SENTENCING DISPARITIES

Section 3553(a)(6) provides that the Court "shall consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    In connection with the Court's sentencing of Mr. Curtler, the Government acknowledged that the Court should evaluate this factor based on the individuals charged in the United States in relation to the LIBOR investigations and submitted a table identifying the individuals it charged and the sentences these individuals received, if any.  (*United States v. Curtler*, No. 15-CR-670 ("*Curtler*"), ECF No. 24 at 3 n.2 & ECF No. 24-1.)   The Probation Department agreed, stating in the PSR that:

> in considering the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, we reviewed the sentences for the co-conspirators who worked for Deutsche Bank and those co-conspirators who committed similar conduct at different banks.  Of the Deutsche Bank employees who have been sentenced, to date, Timothy Parietti and Michael Curtler were each sentenced to non-custodial sentences, understandably due to their respective cooperation in this case and others.  James King, who held a higher position within Deutsche Bank than Black, was granted a deferred prosecution.  Furthermore, it is reasonable to believe that other Deutsche Bank employees were aware of the conspiracy, while other Deutsche Bank employees may have benefitted from the offense conduct, though no others within Deutsche Bank were criminally indicted.  In 2015, Deutsche Bank agreed to pay a $2.5 billion fine for its involvement in the LIBOR manipulation scheme.

> In assessing the sentences for the six defendants named in Dkt. #14 CR 272 (JSR), all Rabobank employees who committed conduct similar to the instant offense (but which focused mainly on Yen LIBOR), only one defendant, Paul Thompson, has served a term of imprisonment.  Thompson, a foreign national who was a managing director at Rabobank's derivatives unit in Asia, was sentenced to three months' imprisonment before the Honorable Jed S. Rakoff, of which he served a total of 67 days.  Anthony Allen and Anthony Conti were both convicted, via jury trial, and sentenced to 24 months' imprisonment and 12 months and 1 day of imprisonment, respectively.

> However, Allen and Conti's cases were overturned on appeal, and the Government has indicated that they have no plans to retry their cases.  Neither Allen nor Conti served any time in prison.  Paul Robson, Takayuki Yagami, and Lee Stewart, all foreign nationals, were each sentenced to Time Served (no days in custody) and two years' supervised release.

(PSR at 38-39.)   Based on the sentences received by the Deutsche Bank employees who participated in the charged conduct and other similarly-situated individuals, the proportionality factor strongly suggests that Gavin should not be sentenced to a term of imprisonment.

### A.  Our Proposed Sentence Avoids Unwarranted Disparities with Other Deutsche Bank Employees Who Participated in the Scheme

None of the individuals who organized, managed or exercised decision-making authority in connection with the charged scheme will be sentenced to imprisonment.  For example, as the head of the USD cash desk, Mr. Curtler oversaw the LIBOR submission process at Deutsche Bank during the entirety of the relevant period.  [Tr. 266:4-10, 284:14-18, 510:6-15 (King).]  Mr. Curtler similarly supervised Deutsche Bank's primary LIBOR submitter, James King, throughout the relevant period.  [Tr. 266:4-10, 284:14-18, 510:10-15 (King); 1790:18-22 (Curtler).]  There is no dispute that Mr. Curtler and Mr. King had the final say, *i.e.*, decision-making authority, as to what LIBOR estimates to submit, including whether to accept or reject any traders' requests.  [Tr. 640:7-9 (King); 1790:23-1791:2, 1797:1-10 (Curtler).]  As Mr. Curtler admitted, he "made the decisions ultimately what LIBORs got submitted."  [Tr. 1790:23-1791:2 (Curtler); *see also* Tr. 1797:24-1798:2 (Curtler) (admitting that he was "the person supervising the decision as to where Deutsche Bank submitted U.S. dollar LIBOR").]  In addition, unlike Gavin, Mr. Curtler and Mr. King both recruited others to join the charged scheme and solicited requests for adjustments from others.  [Tr. 529:21-530:19 (King); GX 1-015, 1-018.]   In fact, Mr. King was trained, under Mr. Curtler's supervision, to proactively solicit requests for LIBOR submissions from the derivatives traders, as reflected in a note that he wrote during the time of his training.  [Tr. 529:21-530:19 (King).]  Neither Mr. Curtler (who was Gavin's boss during the charged time frame) nor Mr. King (who was not charged) were sentenced to imprisonment.

Similarly, Deutsche Bank's senior managers who orchestrated the scheme, including Anshu Jain, Alan Cloete and David Nicholls, were not even charged, much less sentenced to imprisonment.   In fact, in arguing that he should not receive a sentence of imprisonment, Mr. Curtler distanced himself from these and other more culpable members of senior management:

> Mr. Curtler did not create Deutsche Bank's LIBOR manipulation, which predated his joining the U.S. dollar cash desk in 2001.  The cash desk, staffed with traders who traded both dollars and derivatives, was tasked with also submitting U.S. dollar LIBOR, which created an inherent conflict of interest that placed control over LIBOR submissions with the very people and group which could benefit the most from skewing LIBOR.  That structure and conflict also predated Mr. Curtler joining Deutsche Bank.  It was created by the company itself, and by Mr. Curtler's supervisors, who encouraged and incentivized information sharing between other traders and the LIBOR submitters, to the point of physically pushing together the desks of the derivatives traders and the LIBOR submitters.

(*See Curtler*, ECF No. 23 at 15.)  These arguments apply with greater force to Gavin who is at least several steps further down in culpability from Mr. Curtler.

In addition, no other Deutsche Bank derivatives trader will be sentenced to imprisonment. While the Government identified a total of 11 Deutsche Bank derivatives traders as Gavin's co-conspirators,[4] it charged only one—Mr. Parietti—and he was not sentenced to imprisonment. Accordingly, a sentence of imprisonment for Gavin would create significant unwarranted disparities between his punishment and that of the more culpable supervisors, managers and decision-makers in the scheme, as well as the other similarly-situated derivatives traders.

---

[4]      *See* Levine Decl. Ex. P (identifying Christian Bittar, Jeroen Brinkman, Matthias Dux, Greg Hale, Timothy Parietti, David Park, Ed Patrylow, Yves Paturel, Andrew Rivas, Andrew Smoler, and Olesya Skofenko).  Of these individuals, the British Government criminally charged Mr. Bittar for his participation in a different criminal scheme which involved colluding with other banks to fix Euribor rates.  [*See* ECF No. 54-47.]

B.      **The Sentencings of the Rabobank Defendants Further Support the
        Conclusion that a Sentence of Imprisonment for Gavin Is Unwarranted**

The sentencings in the Government's Rabobank prosecution also support the imposition of

a sentence that does not include imprisonment to avoid unwarranted sentencing disparities.  Two

of the Rabobank defendants—Anthony Allen and Anthony Conti—were convicted at trial, prior

to having their convictions reversed on appeal.  While both of these defendants received sentences

of imprisonment, they were both significantly more culpable than Gavin based on their roles in

that scheme.

As to Mr. Allen, the Government sought and Judge Rakoff imposed a four-level

aggravating role enhancement under Section 3B1.1 on the ground that Mr. Allen was an organizer

or leader of the charged criminal activity at Rabobank.  (*See United States v. Allen*, No. 14-CR-

272, ECF No. 225 (Government brief) at 17-19 & ECF No. 242 (Sentencing Transcript) at 18:11-

13.)  The factors that the Government pointed to in arguing that Mr. Allen should receive an

aggravating role adjustment include that (1) Mr. Allen headed Rabobank's cash desk and

Rabobank's LIBOR submitters reported to him; (2) he recruited accomplices to join the scheme

by training Rabobank's submitters to accommodate trader requests; and (3) he always resolved

disputes as to conflicting trader positions in favor of his own trading books.  *See Allen*, No. 14-

CR-272, ECF No. 225 at 17-19; *see also United States v. Allen*, 864 F.3d 63, 72 (2d Cir. 2017).

None of these aggravating factors applies to Gavin.

Mr. Conti was sentenced to a term of imprisonment of one year and one day.  (*United States

v. Conti*, No. 14-CR-272, ECF No. 239 at 3.)  Mr. Conti served as Rabobank's primary USD

LIBOR submitter and, as a result, is similarly-situated to Mr. King.  *See Allen*, 864 F.3d at 72

(stating that Conti "assumed primary responsibility for USD LIBOR submissions starting in 2005

and continuing through 2009").  As reflected in the trader-to-submitter communications in that

case, the derivatives traders requested that Mr. Conti adjust Rabobank's LIBOR submissions without directing him as to what rate to submit and Mr. Conti exercised discretion in deciding whether to honor the request and in determining the submission rate. *See id.* at 73-74.  In addition, "every morning" Mr. Conti "led*"* a discussion with the Rabobank traders involved in the scheme regarding the "best way to influence LIBOR."  *Id.* at 73.  Unlike Gavin, Mr. Conti therefore exercised decision-making authority in connection with submitting LIBOR at Rabobank.

Leaving aside the one fugitive defendant, the other four Rabobank employees charged in the scheme pleaded guilty.  (*See Curtler*, ECF No. 24-1.)  Three of these defendants—Paul Robson, Lee Stewart and Takayuki Yagami—received non-custodial sentences.  (*Id.*)  While the other pleading Rabobank defendant—Paul Thompson—who was sentenced to a term of three-months imprisonment and served 67 days (*id.*) he is more culpable that Gavin for several reasons.  (*See United States v. Thompson*, No. 14-CR-272, ECF No. 262.)  Mr. Thompson was in charge of Rabobank's Asian-based derivatives trading operations, serving as the Head of Money Markets and Derivatives Trading for Northeast Asia.  (*Id.* at 3.)  While "not technically a supervisor," Mr. Thompson was a "senior trader" and "acted as something of a mentor to more junior traders like Mr. Yagami [another charged member of the scheme.]"  (*Id.*)  Moreover, unlike Gavin, Mr. Thompson initially refused to surrender and voluntarily appear in the United States to face the charges.  (*Id.* at 4 & n.1.)  As a result of this decision, the Government was required to initiate extradition proceedings against Mr. Thompson, leading to his arrest in Australia.  (*Id.*)  While Mr. Thompson consented to extradition following his arrest, the Government identified his initial refusal to voluntarily appear as an aggravating factor that distinguished him from charged defendants who agreed to appear without contesting extradition.  (*Id.*)  Indeed, because

Mr. Thompson fought extradition for a year, he was not part of the Government's trial against Mr. Allen and Mr. Conti and only agreed to plead guilty after they were convicted. (*Id*. at 10 n.5.)

Accordingly, the sentences imposed on the Rabobank defendants, each of whom is more culpable than Gavin, as well as the Probation Department's recommendation with respect to those defendants, further militate against a sentence of imprisonment and support our proposed sentence.

### C.      Other More Culpable Participants in the Scheme Were Not Prosecuted

The proportionality principle also supports a sentence that does not include imprisonment because other more culpable participants—including individuals at other Panel Banks and senior members of the BBA—who had knowledge of the scheme were not prosecuted.

With respect to other Panel Banks, as discussed *supra* at II, the Government and its investigative partners entered into settlement agreements and extracted significant fines with at least seven Panel Banks in connection with the international scheme to manipulate USD LIBOR. [*See* ECF Nos. 118-02 (Deutsche Bank), 118-05 (Rabobank), 118-06 (Barclays), 118-07 (Citibank), 118-08 (UBS), 118-09 (RBS); *see also United States v. Lloyds Banking Group plc*, No. 14-cr-165, ECF No. 6 (D. Conn. July 28, 2014) (Lloyds).] But notwithstanding these highly publicized settlements, in which institutions conceded that their employees schemed to manipulate USD LIBOR based on trading positions and the banks' privileged position on the USD LIBOR Panel, no other individuals—aside from this case and Rabobank—have been prosecuted in connection with the scheme to manipulate USD LIBOR.[5]

---

[5]      Separate from the scheme to manipulate USD LIBOR at issue in this and the Rabobank case, the Government charged two managers at Société Générale with directing subordinate employees in Paris to engage in the conduct of lowballing, *i.e.*, to submit artificially low LIBOR submissions to make it appear that Société Générale was able to borrow money at more favorable rates than it actually was. *United States v. Sindzingre*, 17-CR-0464 (JS), 2019 WL 2290494, at *2 (E.D.N.Y. May 29, 2019). The defendants are French citizens who have not submitted to the court's jurisdiction. *Id.* at *3.

With respect to the BBA, there is no dispute that LIBOR was owned by the BBA, that the BBA had the sole responsibility for setting LIBOR each day.  [*See, e.g.*, GX 1-801.]  It is also beyond dispute that the BBA and others, including the Bank of England, were aware that USD Panel Bank submissions were influenced by derivatives trading positions.  [*See generally* ECF No. 118-12.]  Indeed, the Federal Deposit Insurance Corporation has sued the BBA and a number of other Panel Banks in the United Kingdom on the basis of such knowledge.  [ECF No. 138-1.]  But no member of the BBA has been prosecuted for their knowledge of and/or participation in the scheme to manipulate USD LIBOR.

Accordingly, where more culpable individuals in this vast international scheme to manipulate LIBOR have not been prosecuted, let alone imprisoned, Gavin's sentence should not include imprisonment to avoid unwarranted sentencing disparities.

**IV.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WEIGH IN FAVOR OF A SENTENCE THAT DOES NOT INCLUDE IMPRISONMENT**

Gavin is a first-time, non-violent offender who—as  the Probation Department appears to acknowledge and as discussed in more detail in our Submission Regarding the Applicable Sentencing Guidelines (the "Guidelines Submission")—should be found to be in Zone A of the Guidelines.[6]  He will never work again in the financial services industry and thus there is no chance of recidivism.  Under such circumstances, a sentence that does not include imprisonment is both sufficient and appropriate.

---

[6]    The largest discrepancy in the parties' Guidelines calculations pertains to the amount of intended loss for which the Government can prove that Gavin is responsible.  The resolution of this issue should have no bearing on Gavin's sentence for the reasons this Court stated in sentencing Mr. Curtler.  *See* Guidelines Submission at 2 n.2 (*Curtler*, ECF No. 28 at 3:25-4:4 (advising the Government that "whatever loss amount you calculated, the incalculable loss amount you calculated, makes very little difference to me for the reasons that Judge Rakoff articulated . . . in connection with the Rabobank case.").)

In November 2014, the American Bar Association's task force ("ABA Task Force") published a report proposing amendments to the economic crimes Sentencing Guidelines. (Levine Decl. Ex. O.)  The ABA Task Force was composed of members of legal academia, criminal law practitioners, and federal judges, including the Hon. Gerard Lynch of the United States Court of Appeals for the Second Circuit and the Hon. Jed Rakoff of this Court. (*Id.* at 8.)

The ABA Task Force Report proposed a comprehensive overhaul of the Guidelines for economic crimes with a particular focus on sentences for first time non-violent offenders.  The ABA Task Force recommended that "[i]f the defendant has zero criminal history points under Chapter 4 and the offense was not 'otherwise serious' within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and ***a sentence other than imprisonment is generally appropriate***." (*See id.* at PDF p. 2 (emphasis added).)  The ABA Task Force did not introduce this guideline for economic crimes as its own creation; it was taken directly from the Sentencing Reform Act, which provided the original authority for the Sentencing Commission to promulgate guidelines to the courts of the United States.   In describing the duties of the Sentencing Commission, Congress directed:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j).  As one federal district court has recognized, this Congressional mandate to the Sentencing Commission:

> was supposed to ensure the general appropriateness of probationary sentences for first-time offenders unless they commit crimes of violence or otherwise serious offenses. Instead, [the Sentencing Commission] unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is otherwise serious, and thus no more eligible for a sentence of probation, even when committed by a first time offender, than would a crime of violence.

*Leitch*, 2013 WL 753445, at *1 (internal citations, quotation marks, and alterations omitted).

Effective November 2018, the Sentencing Commission took steps to implement the ABA

Task Force's recommendation through the addition of a new Application Note to USSG § 5C1.1,

which provides:

> If the defendant is a nonviolent first offender and the applicable guideline range is
> in Zone A or B of the Sentencing Table, the court should consider imposing a
> sentence other than a sentence of imprisonment, in accordance with subsection (b)
> or (c)(3). *See* 28 U.S.C. § 994(j). For purposes of this application note, a 'nonviolent
> first offender' is a defendant who has no prior convictions or other comparable
> judicial dispositions of any kind and who did not use violence or credible threats of
> violence or possess a firearm or other dangerous weapon in connection with the
> offense of conviction. The phrase 'comparable judicial dispositions of any kind'
> includes diversionary or deferred dispositions resulting from a finding or admission
> of guilt or a plea of *nolo contendere* and juvenile adjudications.

USSG § 5C1.1 cmt. n.4.  In adding this Application Note, the Commission referenced the statutory

sentencing policy contained in 28 U.S.C. § 994(j) "regarding the 'general appropriateness of

imposing a sentence other than imprisonment' for 'a first offender who has not been convicted of

a crime of violence or an otherwise serious offense.'"  U.S. Sent'g Comm'n, Amendments to the

Sentencing Guidelines, at 73 (Apr. 30, 2018). The Commission also cited "a recent Commission

recidivism study, which demonstrated that offenders with zero criminal history points have a lower

recidivism rate than offenders with one criminal history point, and that offenders with zero

criminal history points and no prior contact with the criminal justice system have an even lower

recidivism rate." *Id.*

As a first-time, non-violent offender, Gavin falls squarely within the type of defendant to

whom the ABA Task Force's recommendation and the Commission's new Application Note was

designed to apply.  Indeed, Mr. Curtler argued in his sentencing submission that this Application

Note applied to his offense of conviction [*see Curtler*, ECF No. 23 at 23-24], and the Government

did not object.  Accordingly, a term of imprisonment for Gavin is not necessary.

48

In addition, there are several unique features of Gavin's conduct that render the offense of conviction outside the heartland of fraud offenses. First, many of Gavin's counterparties, *i.e.*, the alleged victims, were Panel Banks that, according to the Government's settlements with these institutions, were engaging in the same conduct as he and his colleagues at Deutsche Bank. [Tr. 1852:4-21 (Curtler) ("[m]ost people [Gavin] traded with" were from the "panel banks.").] Second, the Court should consider the fact that Gavin was trained and encouraged by his supervisors, including Mr. Curtler, to make requests to the submitters. As Mr. Curtler wrote in his sentencing memorandum, "[t]he issues at Deutsche Bank were endemic to the entirety of the bank's trading operations, and not isolated to just Mr. Curtler or his U.S. dollar cash desk, or even to those traders dealing in U.S. dollar derivative instruments." [*Curtler*, ECF No. 23 at 16.] While, as the Court found, the "'I was following orders' excuse is not equivalent to a good faith" [ECF No. 431, at 26], the pressure that Gavin received from management at the only bank at which he ever worked is a mitigating factor for sentencing purposes. These unique features of Gavin's offense conduct each provide important context for the purpose of sentencing that render Gavin's conduct outside the heartland of fraud offenses and further support a sentence that does not include imprisonment.

V.      **SHOULD THE COURT DEEM CONFINEMENT NECESSARY, IT SHOULD BE SERVED AS HOME DETENTION IN THE UNITED KINGDOM**

For the reasons set forth above, we respectfully submit that a sentence of time served, two years supervised release in the United Kingdom, and a substantial fine is "sufficient but not greater than necessary" to satisfy the Section 3553(a) factors. However, to the extent that the Court concludes confinement is necessary, we respectfully submit that a sentence of supervised release with a special condition of home detention to be served at Gavin's residence in the United Kingdom balances the need for confinement with the collateral consequences of Gavin's status as a non-citizen.

In an Order dated May 2, 2019, the Court stated it "would like the relevant sentencing submissions to address whether Mr. Black could serve any sentence of any sort that might be imposed in the United Kingdom."   [ECF No. 434.]   If the Court follows the Probation Department's recommendation, it is unlikely that Gavin could serve any portion of a sentence of imprisonment in the United Kingdom.   While the International Prisoner Transfer Program ("IPTP") provides a mechanism for a United Kingdom citizen to serve a portion of a United States sentence of imprisonment in his home country in certain circumstances, *see* 18 U.S.C. §§ 4100-4115; 28 C.F.R §§ 527.40-527.48, the transfer process does not start until the defendant arrives at his designated facility and typically takes months.  *See* 28 C.F.R. §§ 527.44, 527.45; *see also* Sylvia Royce, *International Prisoner Transfer*, 21 Fed. Sent'g Rep. 186, 188 (Feb. 2009).   In addition, under the applicable treaty, the IPTP generally does not allow for transfer unless at the time of receipt of the request for transfer, the sentenced person has at least six months of the sentence to serve.  (Levine Decl. Ex. Q at art. 3, § 1.)  Thus, Gavin would not likely be able to serve any portion of a sentence of imprisonment in the United Kingdom.

But Gavin's status as a foreign citizen should not subject him to "adverse" sentencing treatment.  *See e.g., United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994) ("A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing."); *see also United States v. Allen*, 864 F.3d 63, 90 (2d Cir. 2017) (foreigners hailed into the courts of the United States should not be denied fundamental rights.).  As reflected in Mr. Curtler's and the Rabobank LIBOR defendants' cases, non-citizen defendants commonly serve their supervised release terms in the United Kingdom.  (*See Curtler*, ECF No. 28 at 16 (sentencing Mr. Curtler to a two-year term of supervised release to be served in the United Kingdom); *United States v. Robson*, No. 14-CR-272, ECF No. 267 (same); *United States v. Stewart*, No. 14-CR-272, ECF No.

277 (same); *United States v. Yagami*, No. 14-CR-272, ECF No. 282 (sentencing defendant to a two-year term of supervised release to be served in Hong Kong)); *see also United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming district court's sentence to a term of probation to be served in Belgium); *United States v. Saltsman*, No. 07-CR-641, ECF No. 163 at 42:6-43:4 (sentencing defendant to probation to be served in Israel, including community service).

Gavin similarly should not receive disparate treatment from citizen defendants in connection with a possible sentence of home confinement with electronic detention. Given technological advances, including, but not limited to, smartphones with GPS tracking, Skype and other readily available technology, the fact that Gavin's residence is in the United Kingdom would not be an impediment to confirming his presence in his residence at the appropriate time. Moreover, given that Gavin waived extradition, appeared in this case voluntarily and has complied with all bail conditions during the more than three years he has been on pre-trial release, there is no reason to believe that he would not comply with any special conditions of supervised release in accordance with the Court's and the Probation Department's direction, including home confinement and reporting.

In addition, should the Court require greater assurances, we have worked with the Subrosa Group, with the assistance of Guidepost Solutions, to identify a proposal that would allow for a sentence of home confinement with electronic monitoring to be administered in the United Kingdom under the same conditions as that would apply to United States residents. (*See* Levine Decl. Ex. A.)[7] The Subrosa Group includes "elite Special Forces operatives, Government Security Services and Senior Police Officers" whose services included providing manned security

---

[7] Guidepost Solutions is comprised of "a global team of investigators, experienced security and technology consultants, and compliance and monitoring experts" that provide security, investigative and compliance services. *See* www.guidepostsolutions.com/about-us/.

services and security through electronic security systems.  *See* www.subrosagroup.co.uk.  Under this proposal, the Subrosa Group will report to, and take direction from, the Court and Probation, and would set up a system of "24-hour, 7 days a week monitoring and assurance of [Gavin's] adherence to home detention conditions," as well as the same level of monitoring of any approved movements away from Gavin's home address.  (*Id.* at 9.)  While any such services could be delivered to comply with Court-imposed sentencing conditions, the Subrosa Group's services could include, *inter alia*, fitting Gavin with a GPS tracker bracelet, the construction of a perimeter security system and indiscriminate and unannounced visits to Gavin's residence by a former law enforcement officer.  (*Id.* at 8.)  For the Court's convenience, we have also included the resumes of the Subrosa Group employees who would be primarily responsible for any such Court-order electronic monitoring.  (Levine Decl. Ex. A.)[8]

---

[8]     We have offered to discuss our proposal with the Probation Department so that we can modify it based on their input.

52

## CONCLUSION

For the foregoing reasons, Gavin Black respectfully submits that a punishment that is "sufficient, but not greater than necessary" is time served, two years supervised release, and a substantial fine.

Dated: New York, New York
      October 10, 2019

By: _____
    Seth L. Levine
    Scott B. Klugman
    Miriam L. Alinikoff
    Dylan A. Stern

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425
slevine@levinelee.com
sklugman@levinelee.com
malinikoff@levinelee.com
dstern@levinelee.com

*Attorneys for Defendant Gavin Campbell Black*