UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|                                        |   |                |
|----------------------------------------|---|----------------|
| UNITED STATES OF AMERICA               | ) |                |
|                                        | ) |                |
| v.                                     | ) |                |
|                                        | ) | No. 16-cr-370  |
| MATTHEW CONNOLLY AND                   | ) |                |
| GAVIN BLACK,                           | ) |                |
|                                        | ) |                |
| *Defendants.*                          | ) |                |

_____)

**UNITED STATES' SENTENCING MEMORANDUM REGARDING
<u>DEFENDANT MATTHEW CONNOLLY</u>**

## TABLE OF CONTENTS

I.   The Nature and Circumstances of the Offense .................................................... 3

II.  Defendant Connolly's History and Characteristics ............................................. 5

III. The Need for the Sentence Imposed to (A) Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense; (B) Afford Adequate Deterrence; (C) Protect the Public from Further Crimes of the Defendant; and (D) Provide the Defendant with Appropriate Education or Vocational Training ..................................... 6

IV.  The Kinds of Sentences Available ...................................................................... 7

V.   Defendant Connolly's Sentencing Guidelines Calculations and Sentencing Range ............. 7

    A.   The Defendants' Base Offense Level Is Seven......................................................... 8

    B.   The Defendants Intended for Their Scheme to Cause a Loss of More than $3,500,000 Under § 2B1.1(b)(1)(J) .......................................................... 8

    C.   The Court Should Apply a Two-Level Enhancement Under § 2B1.1(b)(2)(A)(i) Because the Defendants' Scheme Involved Ten or More Victims .......................... 14

    D.   The Court Should Apply a Two-Level Enhancement Under § 2B1.1(b)(10)(B) Because the Crime Was Substantially Committed Outside the United States .......... 16

    E.   The Court Should Apply a Two-Level Enhancement Under § 3B1.3 Because the Defendants Abused a Position of Trust.................................................... 17

    F.   The Court Should Apply a Three-Level Enhancement to Defendant Connolly's Sentence Under § 3B1.1(b) for Acting as a Manager/Supervisor in a Criminal Activity Involving Five or More Participants ............................................ 19

VI.  The Need to Avoid Sentencing Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct ................................................................ 20

VII. A Substantial Fine Is Warranted Because the Nature and Breadth of the Crime Renders Restitution and Forfeiture Impracticable ......................................... 22

# TABLE OF AUTHORITIES

**Cases**

*United States v. Singh*, 291 F.3d 756, 761-62 (11th Cir. 2002)....................................................17

*R. v. Hayes*, [2015] ECWA Crim. 1944, Court of Criminal Appeal (Dec. 21, 2015) .................22

*United States v. Allen*, 864 F.3d 63 (2d Cir. 2017) ....................................................................21

*United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999) .......................................................17

*United States v. Broderson*, 67 F.3d 452, 455-56 (2d Cir. 1995) ...............................................17

*United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012)...................................................24

*United States v. Gallant*, 537 F.3d 1201, 1247 (10th Cir. 2008).................................................23

*United States v. Harris*, 38 F.3d 95, 99 (2d Cir. 1994)...............................................................12

*United States v. Hayes*, 99 F. Supp. 3d 409, 411 (S.D.N.Y. 2015) ...............................................4

*United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) ..........................................................19

*United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir. 1994) ...................................................13

*United States v. Ojemen*, 465 Fed. App'x 69, 71 (2d. Cir. 2012)................................................19

*United States v. Parietti*, 16-cr-373(PAE)................................................................................25

*United States v. Roberts*, 660 F.3d 149, 164 (2d Cir. 2011) .......................................................18

*United States v. Wolfe*, 71 F.3d 611, 618 (6th Cir. 1995) ...........................................................12

**Statutes**

18 U.S.C. § 1343 ....................................................................................................... 2, 7, 8, 27

18 U.S.C. § 1344 ..............................................................................................................2, 27

18 U.S.C. § 1349 ....................................................................................................... 2, 7, 8, 27

18 U.S.C. § 3663A .................................................................................................................23

18 U.S.C. § 3664 ...................................................................................................................23

18 U.S.C. § 3571 ........................................................................................................2, 27

**Other Authorities**

U.S.S.G. § 2B1.1 .......................................................................................................passim

U.S.S.G. § 3B1.1 ...............................................................................................................19

U.S.S.G. § 5E1.2 ........................................................................................................27, 28

Defendant Matthew Connolly conspired to commit—and, in fact, took an active role in committing—one of the most appalling financial crimes in recent history. He, along with Defendant Gavin Black and numerous co-conspirators at Deutsche Bank, manipulated a global interest rate with callous and knowing disregard for the far-reaching effects of their actions. Defendant Connolly, unconcerned with the countless people and organizations with mortgages, student loans, credit cards, derivative contracts, and the like, impacted by LIBOR manipulation, cast it all aside to squeeze extra money out of Deutsche Bank's counterparties in an effort to line his own pockets. And as supervisor of the bank's New York trading desk, Defendant Connolly leveraged his position of authority and explicitly directed his subordinate, Timothy Parietti, to email the London-based submitters with the desk's positions so they could manipulate LIBOR in New York's favor. Along the way, Defendant Connolly, Defendant Black, their co-conspirators, and several others similarly situated—all of whom found themselves positioned to abuse the trust conferred upon LIBOR panel banks—contributed to the fatal damage to LIBOR's credibility and eroded public confidence in the integrity of the financial markets.

Notwithstanding the overwhelming evidence against him, the jury's unanimous guilty verdicts, or even "the benefit of [the Court] regulating the government's conduct in this case far more than maybe any [defense counsel] ever worked on," Trial Tr. 1692:18-20, Defendant Connolly remains openly defiant, showing no signs of remorse or acceptance of responsibility. Instead, he wrote a book about his trial replete with often-obscene aspersions: referring (without the redactions applied here) to the prosecution as "sneaky f***ers," "the best scumbags in the world," "slime," and to Mr. Parietti as "the little f***er," "a**clown," "coward," "feeble little a**hole." Matthew Connolly, *Target: A Scapegoat's Guide to the Federal Justice System* at

136, 164, 171, 173, 186, 232 (2019) (hereinafter "*Target*") (Exhibit A).  He even has some very choice words for the Court:

- "Prosecutors can run rampant over everyone, including the judge.  I was watching it in real time and it was starting to make my sphincter pucker up."  *Id.* at 183.

- "This trial was a sham.  There is no way we should have gotten to this point.  Not putting on a defense was a little middle finger to the broken system."  *Id.* at 234.

- "I blame prosecution lies, the rules, and the judge's decisions for making it useless to put up a defense."  *Id.* at 250.

- "I think the judge made up her mind a month after the trial to do whatever she thinks is best for her.  Whether that is good or bad for me is irrelevant.  I'm just a piece of meat in the process."  *Id.* at 272.

- "The judge wrote a fifty-nine page opinion denying all of our motions and sending us to sentencing and appeal.  It was total destruction.  Reading it I wondered if she sat through the same case that I did.  She took the government's word for every single argument.  It even looked like she just copied and pasted a lot of the government arguments from their motions.  I speculate that once she flipped her coin and it landed on 'jail,' she needed to destroy us in her opinion so that we would lose our appeal."  *Id.* at p. 274.

In his view, apparently, many people are to blame for Defendant Connolly's predicament, but he is not one of them.

In accordance with the U.S. Sentencing Guidelines and associated statutory provisions, the Court should impose a substantial term of incarceration—at offense level 34, by the government's calculation, the Guidelines call for 151-188 months—and the maximum available fine of $3,000,000.[1, 2]

---

[1] $1,000,000 is the maximum criminal fine for each of the three counts of conviction pursuant to 18 U.S.C. §§ 1343, 1344, 1349, and 3571(b).

[2] As Defendants Connolly and Black were tried jointly and convicted of participating in the same scheme, the government incorporates by reference into its sentencing memorandum for Defendant Black those portions of this memorandum that describe the nature and circumstances of the offense as well as the sentencing considerations and guideline enhancements that the government seeks for both defendants.

## I.     The Nature and Circumstances of the Offense

The nature and circumstances of Defendant Connolly's offense are egregious; they are emblematic of the abuses and arrogance that have arisen in the financial sector; and they erode the foundation of trust essential to the national and global economy.  Here is an educated man, drawing an income the vast majority Americans will never experience, who enjoys a privileged status with all the attendant benefits—in Defendant Connolly's own words: "My last two or three years [at Deutsche Bank] I was in the 1 million to 1.5 million total compensation range." *Target* at 194.  However, his desire for more led him to knowingly and intentionally engage in a years-long, criminal scheme to defraud by rigging LIBOR.

The scheme itself was simultaneously simple and devilishly difficult to detect.  As the Court knows, the LIBOR setting process relied on submitters at panel banks to report honest and unbiased assessments of their respective banks' borrowing costs.  Because the British Bankers Association, and anyone else on the outside of a panel bank looking in, had limited information with which to evaluate the submissions, the process relied crucially on the honest-and-unbiased piece.  Deutsche Bank's LIBOR submitters dispensed with an honest assessment of the banks' creditworthiness and instead submitted borrowing estimates skewed to suit the London trading desk's derivative positions.  Although Defendant Connolly, the supervisor of the New York trading desk, fully appreciated the wrongfulness of the scheme, he decided, not to blow the whistle or merely to sit idly by, but rather to join in.  Defendant Connolly directed his subordinate, Timothy Parietti, to ensure that the submitters at the London desk accounted for the New York desk's trading positions as part of their fraudulent scheme.  Indeed, as the evidence at trial showed, when Mr. Parietti was out of the office, Defendant Connolly even made requests himself.  *See, e.g.*, Trial Tr. 1069:7-1070:6.

3

All the scheme needed to flourish—and flourish it did—was the defendants' and the co-conspirators' privileged access to the LIBOR setting process, in the form of Deutsche Bank's corrupt submitters. Those submitters could—and did—put their thumbs on the scale and were able to do so without being caught by using a modicum of discretion. Moreover, the conspirators and schemers at Deutsche Bank, with those in New York acting at Defendant Connolly's direction, did not merely try to manipulate LIBOR once or twice; they lied and cheated over-and-over again—hundreds of times—for several years, to the point where the fraudulent scheme became casual and routine. The government conservatively estimates that the intended loss to Deutsche Bank's counterparties was over $4,000,000. Counterparty loss, however, pales in comparison to the market-wide losses that accompany a scheme to manipulate a highly important—possibly the most important, at the time—global financial benchmark.[3] The government's rough approximation of market-wide intended losses is greater than half-a-billion dollars.

The scheme also caused harm that goes beyond dollars and cents, for it severely damaged the credibility of the world's most widely referenced interest rate benchmark. Countless market participants relied on LIBOR with the mistaken understanding that it was what it purported to be—a good faith estimate of borrowing costs—to make important financial decisions. The revelation of widespread and routine LIBOR manipulation revealed that their reliance was misplaced and contributed significantly to the benchmark's ultimate demise. As a further result of Defendant Connolly's and his co-conspirators' abuse of Deutsche Bank's privileged position

---

[3] *See* Decision and Order Denying Defendants' Motions for a Judgment of Acquittal or New Trial, ECF No. 431 at 1 ("Until recently, [LIBOR] was the standard financial index used in the United States and other capital markets."); *United States v. Hayes*, 99 F. Supp. 3d 409, 411 (S.D.N.Y. 2015) ("LIBOR is the primary global benchmark for short-term interest rates") (internal quotation omitted).

on the LIBOR panel, the scheme fueled the public perception that the financial markets are rigged in favor of a handful of elite financial institutions. That Defendant Connolly and others subordinated the integrity of the financial markets, disregarding the ripple effects of their actions, to their own pecuniary interests speaks volumes about the gravity of the offense.

## II.    Defendant Connolly's History and Characteristics

After receiving a B.A. in business administration, Defendant Connolly worked for several years as a vice president at the money market desk of JP Morgan Chase Bank. He joined Deutsche Bank in 1995 as a manager at a trading desk, and after 10 years at Deutsche Bank, in 2005, he was promoted to a director position and made the head of Deutsche Bank's pool trading desk in New York. As director of the pool trading desk, Defendant Connolly managed and had responsibility for both cash and derivatives trading desks. *See* Trial Transcript ("Tr.") 292:16-25; 1005:4-1007:1. His background makes clear that he fully understood the impact of his fraud and should have acted to stop it, especially in his capacity as a supervisor. Yet, he saw an opportunity to exploit his position and took full advantage, asking Deutsche Bank's LIBOR submitters to secretly skew the bank's submissions to increase its gains or minimize its losses. *See, e.g.*, Tr. 293:4-12 (Mr. King explaining that "Matthew Connolly on occasion made requests for me to change our LIBOR rates and to benefit the trader's position."); Tr. 1625:11-1626:9 (Mr. Curtler describing an example of a written request from Defendant Connolly for the 3-month LIBOR submission to be as high as possible); GX-2-001 (email from Defendant Connolly to Mr. King requesting, "If possible, we need NY 1mo libor as low as possible next few days …. tons of pays coming up overall … thanks!").

Not only did Defendant Connolly personally join in the fraud, but he also directed his subordinate, Mr. Parietti, to partake in the fraud as well. Tr. 1008:13-1009:12 ("I interacted with them to let them know what my LIBOR fixings were for the next fixing so that they could

consider it when they made their submissions. . . . My boss, Matt Connolly, told me to."). Thus, instead of shielding his team from pressure to engage in fraud, Defendant Connolly magnified the problem in order to advance his own career. That is the polar opposite of what a supervisor should do, but he did it anyway with callous disregard for Mr. Parietti or anyone else on his desk that looked to him for leadership.

## III.   The Need for the Sentence Imposed to (A) Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense; (B) Afford Adequate Deterrence; (C) Protect the Public from Further Crimes of the Defendant; and (D) Provide the Defendant with Appropriate Education or Vocational Training

LIBOR manipulation and other financial industry scandals have exposed a culture of cheating on the trading desks of many of the world's largest financial institutions that can be deterred only by the significant incarceration of the wrongdoers. Eight LIBOR panel banks entered into resolutions with the U.S., U.K., European, and Asian regulators and prosecutors related to their traders' participation in schemes to rig interest rate benchmarks: UBS ($1.52 billion in 2012); Barclays ($453.6 million in 2012); Royal Bank of Scotland ($1.14 billion in 2013); Rabobank ($1.07 billion in 2013); Citigroup ($108.4 million civil settlement in 2013); Deutsche Bank A.G. ($2.5 billion in 2013 and 2015); Societe Generale ($604.7 million civil settlement in 2013); and Lloyds Bank ($370 million in 2014). Similarly, in connection with the Foreign Exchange (FX) manipulation scheme, Citigroup, JPMorgan Chase, Barclays, and Royal Bank of Scotland pled guilty in May of 2015 to conspiring to manipulate the price of U.S. Dollars and Euros exchanged in the FX spot market, and UBS pled guilty to a related charge. In the United States alone, the five banks paid criminal fines totaling $2.7 billion. Those resolutions and guilty pleas serve important and constructive purposes, but they are not a substitute for individual accountability. Notably, UBS and Barclays admitted that their traders

participated in the conspiracy to rig the FX spot market during the pendency of the non-prosecution agreements that resolved allegations of LIBOR rigging.   The breadth of the LIBOR and FX conspiracies demonstrates that large numbers of traders worldwide have the means and incentive to take advantage of others by rigging the markets in their favor. The imposition of substantial custodial sentences for Defendant Connolly and Defendant Black the most effective deterrent for traders confronted with similar opportunities to commit fraud.

Additionally, only a considerable custodial sentence will reflect the seriousness of the offense and promote respect for the law. The LIBOR manipulation cases are among the most significant financial fraud cases in recent history because they involved a select group of individuals entrusted with setting a number that played such a fundamental and consequential role in the financial system and their manipulation caused significant market-wide losses. Declaration of Special Agent Michael McGillicuddy in Support of United States' Sentencing Memoranda ("McGillicuddy Declaration") (attached here as Exhibit B) ¶ 16.

## IV.     The Kinds of Sentences Available

Wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343 and conspiracy in violation of 18 U.S.C. § 1349 carry a maximum sentence of 30 years' incarceration and up to three years of supervised release. Each count also carries a fine of up to $1,000,000 and a special assessment of $100.

## V.     Defendant Connolly's Sentencing Guidelines Calculations and Sentencing Range

The government submits that Defendant Connolly's adjusted offense level is 34, representing seven levels for a base offense under § 2B1.1(b)(1); eighteen levels for intended loss exceeding $3.5 million under § 2B1.1(b)(1)(J); two levels for a scheme involving ten or more victims under § 2B1.1(b)(2)(A)(i); two levels for substantial commission of the crime outside the United States under § 2B1.1(b)(10)(B); two levels for abuse of trust under § 3B1.3;

and three levels for acting as a manager/supervisor in a criminal activity involving five or more participants under § 3B1.1(b).

A.   The Defendants' Base Offense Level Is Seven

Because wire fraud affecting a financial institution and conspiracy to commit wire fraud and bank fraud carry 30-year terms of incarceration, 18 U.S.C. §§ 1343, 1349, the defendants' base offense level is seven under § 2B1.1(b)(1).

B.   The Defendants Intended for Their Scheme to Cause a Loss of More than $3,500,000 Under § 2B1.1(b)(1)(J)

While the calculation of loss in this case is challenging and likely underinclusive, two things are abundantly clear: (1) the defendants intended to benefit Deutsche Bank's trades to the detriment of its counterparties, thereby harming the counterparties; and (2) they understood that their scheme would have consequences for countless individuals and institutions who stood to gain or lose money from incremental movements in LIBOR. As set forth in the McGillicuddy Declaration, the government's conservative estimate is that the defendants intended to cause a loss of at least $4,243,710.27 to Deutsche Bank's counterparties, and that their conduct caused losses to others of over $500 million throughout the global financial markets. McGillicuddy Decl. ¶¶ 8, 16. The Sentencing Guidelines define "intended loss" as the "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 Application Note 3(a)(ii). The government takes a conservative approach focused on only the actual counterparties to Defendant Connolly's employer and thus seeks to prove a loss as measured by the amount that he, Defendant Black, and their co-conspirators sought to exact on Deutsche Bank's counterparties. The government's approach does not include the enormous impact on others whose financial transactions turned on the LIBOR rate and who the government approximates suffered more than $500 million in losses.

The McGillicuddy Declaration explains the government's conservative intended loss estimate.[4] Such loss need not be calculated with precision, but need only be a "reasonable estimate of the loss, given the available information." *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009). Because the swaps market is a zero-sum system in which one party's gain is another party's loss, the loss amount should be measured by the amount of money Deutsche Bank traders hoped to gain from their efforts to manipulate the LIBOR rates. Because Application Note 3 specifies that "intended loss" includes "intended pecuniary harm that would have been impossible or unlikely to occur," the Defendants Connolly and Black should be held to account even for instances in which the manipulated rate Deutsche Bank submitted could not, as a matter of mathematics, have changed the overall average. That would have happened where, for example, the illicit attempt to move the overall fix was thwarted by submissions of other panel banks.

The intended loss also should include losses resulting from manipulation attempts undertaken by co-conspirators, as the jury convicted them of participating in conspiracy to commit a scheme to defraud. The Sentencing Guidelines ask the Court to determine the "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 Application Note 3(A)(ii). Because § 2B1.1 focuses on the characteristics of the "offense," which, in this case, was a conspiracy and scheme to defraud (and not the loss resulting from each step taken individually by Defendant Connolly or Defendant Black) the question is how much loss was intended for the *conspiracy* and *scheme* to inflict. Where a defendant was convicted of a "jointly undertaken criminal activity," such as a conspiracy or scheme to defraud, specific offense

---

[4] The government also provided the defendants with a list of the bates numbers identifying each communication that served as the basis of a "request" in its loss calculation. Of course, the documents themselves had been produced long before trial.

characteristics should be determined on the basis of "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

Defendants Connolly and Black are responsible for the losses caused by their co-conspirators' and co-schemers' attempts to manipulate LIBOR—including manipulation attempts of which they were not directly aware, but which were foreseeable to them—because they were active and informed participants in the conspiracy and scheme. Every attempt by Deutsche Bank traders to manipulate the bank's LIBOR submissions is within the scope of the conspiracy and scheme, the purpose and object of which was to rig the resulting LIBOR rates to Deutsche Bank's advantage. As the jury found, both defendants participated intentionally and knowingly in the conspiracy and scheme and were well aware that others were doing the same. *See, e.g.*, Trial Tr. 1663:20-1664:22 (Mr. Curtler discussing Defendant Connolly's request for low one-month LIBOR in GX 2-001); Trial Tr. 1620:23-1622:14 (Mr. Curtler discussing Defendant Black's request for low one-month LIBOR in GX 1-019). The defendants were not simply *aware* that their colleagues were manipulating the rate, they *intended* for their co-conspirators to do so because one of the objects of the conspiracy was to increase the trading desks' bonus pool, which was determined by the overall performance of the desks and not just trades executed by them personally or by their subordinates. Trial Tr. 1031:10-24; *id.* 1032:21-1033:2

As set forth in the McGillicuddy declaration, the government's loss analysis is based on a total of 204 requests (130 written and 74 verbal) to change Deutsche Bank's LIBOR submission to benefit trading positions, many of which did not include the defendants personally as

10

participants.[5]  McGillicuddy Decl. ¶ 4.  The inclusion of those manipulation requests is

appropriate because Defendants Connolly and Black intended for other traders to attempt to

enlarge the bonus pool by manipulating the LIBOR rate to favor their derivative positions.  The

government used conservative estimates of the number of verbal manipulation requests.

*Compare id.* (assuming two verbal requests per month from September 2007 through October

2008—due to the 3s1s strategy which involved raising 3-month and lowering 1-month—and one

verbal request per month for the remainder of the January 2005 through December 2009 period)

*with* Trial Tr. 1657:10-18 (co-conspirator testifying that Defendant Black made verbal requests

weekly or monthly).

Having identified 130 written manipulation requests, the government used Deutsche

Bank trading data to calculate the net exposure per basis point of each counterparty that would

have suffered a loss on its trades with Deutsche Bank had the manipulation attempt been

successful.  McGillicuddy Decl. ¶¶ 5-6.  The government also calculated the average net

exposure per basis point of the counterparties on the dates of those written requests.  *Id.*  The

average net exposure was used as a proxy for net exposure arising from the 74 verbal

manipulation requests, which were not tied to particular dates like the written requests.  *Id.* ¶ 7.

Assuming that a given request was intended to skew Deutsche Bank's submission by one basis

point—a conservative estimate considering that the submissions were moved by several basis

points after the start of the financial crisis, when the market was more volatile, Tr. 1647:6-9—

---

[5] The government originally counted 154 written/recorded requests (228 total requests), and
provided that number to probation.  However, in the process of double-checking our work, we
decided that 24 of those are sufficiently ambiguous and should not be included in the count.
With 130 written/recorded requests, and 204 total requests, the intended loss calculation
decreased from $4,657,570.48 to $4,243,710.27, but the 18-point enhancement remained the
same under U.S.S.G. § 2B1.1(b)(1)(J).

and because the LIBOR fix was taken by averaging the middle eight panel bank submissions, the intended effect of an individual manipulation request on the ultimate LIBOR fix was 1/8 of a basis point in the direction of the request. McGillicuddy Decl. ¶ 5. Multiplying the net counterparty exposure per basis point for each of the written requests and the verbal requests by 1/8, the government was able to calculate the total intended loss for the counterparties as a whole. *Id.* ¶ 6. The intended loss for the 130 written requests amounted to $2,613,214.84, and the intended loss for the 74 verbal requests amounted to $1,630,495.43—for a total intended counterparty loss of $4,243,710.27. *Id.* ¶ 8.

The government's loss analysis does not adjust for any hedge positions that could have mitigated counterparty losses because swaps trading is a zero-sum game. Thus, even if a direct counterparty had an offsetting hedge trade, by definition the intended loss had to come from counterparties one or more degrees removed. Moreover, the extent to which the counterparties were hedged is a wholly fortuitous event for which the defendants cannot claim credit. *United States v. Wolfe*, 71 F.3d 611, 618 (6th Cir. 1995) (defendant was not entitled to offset funds returned to victims of his Ponzi scheme by a bankruptcy trustee because "the agency of another cannot be used to reduce the amount of loss"); *United States v. Harris*, 38 F.3d 95, 99 (2d Cir. 1994) (defendant was not entitled to offset tax write-offs taken by victims of his fraud scheme); *United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir. 1994) (defendant was not entitled to take credit for the "victim's receipt of something of value").

As a practical matter, whether or not Deutsche Bank's counterparties took positions that offset the damage caused by the defendants' conduct has no bearing on the defendants' culpability. As evidenced at trial, all the defendants cared about was making more money. and they did not stop to consider whose pockets that money specifically came from whether a direct

counterparty or someone else. In limiting intended loss to the damage that defendants "purposefully sought to inflict," the Sentencing Commission underscored the notion that a district court's analysis of loss "should focus more specifically on the defendant's culpability." Amendments to the Sentencing Guidelines, April 30, 2015 at 25. Because there is no evidence or reason to believe that the defendants reconstructed the net LIBOR sensitivity of Deutsche Bank's counterparties and decided to defraud only those counterparties that they perceived as hedged, whether or not Deutsche Bank's counterparties had offsetting positions has no bearing on their culpability. Indeed, given that swaps trading is a zero-sum venture, the defendants understood that any profits realized on a swap contract with a perfectly hedged counterparty (if such a thing exists) came from the pocket of another market participant; from whose pocket, the defendants did not care. Because, based on the government's calculation, the defendants intended for the scheme to cause losses of well over $3,500,000, the Court should apply an eighteen-level enhancement under § 2B1.1(b)(1)(J).

The Sentencing Guidelines also recognize that "[t]here may be cases in which the offense level determined under [§ 2B1.1(b)] substantially understates the seriousness of the offense . . . such as [where the offense created] a risk of significant disruption of a rational financial market." U.S.S.G. § 2B1.1 Application Note 21(A)(iv). This is one of those cases because the loss amount measured by § 2B1.1(b) understates both the economic harm that the defendants caused and their culpability. The methodology yielding the loss figure of $4,243,710.27 is based on the conspirators' written and verbal requests to move Deutsche Bank's LIBOR submission and its counterparties' resulting exposure on those days. McGillicuddy Decl. ¶¶ 4-8. Those calculations are themselves based on conservative estimates of the number of verbal

manipulation requests, *Id.* ¶ 4, and thus result in a conservative estimate of the counterparties' intended losses.

By tying loss to the injury the scheme caused on Deutsche Bank's counterparties, the government's proposed loss calculation understates the defendants' culpability for the harm they knew would be felt throughout the global financial market. The evidence does not indicate that Defendants Connolly and Black purposefully set out to wreck the credibility of the world's most important financial benchmark—indeed, their scheme's continuing success depended on continuing to dupe the financial world into believing LIBOR was a reliable benchmark—nor does it show that they wanted to cause hundreds of millions of dollars in losses to others. But Defendants Connolly and Black acted with a high level of culpability when they knew such losses would be the natural and probable consequence of the scheme and did not change course. The premise that loss amount can be used to accurately measure severity does not hold true when, as here, the decision to commit a scheme with such wide-ranging impact to achieve relatively modest returns reveals a character of callous indifference. Indeed, the gravest harm in this case—damage to the integrity of LIBOR and to the public's confidence in the financial markets—is unquantifiable. Accordingly, the guidelines adjusted offense level of 34 may actually understate the severity of the offense and the culpability of the offenders.

C.  The Court Should Apply a Two-Level Enhancement Under § 2B1.1(b)(2)(A)(i) Because the Defendants' Scheme Involved Ten or More Victims

The defendants' scheme involved ten or more victims, which the Sentencing Guidelines define as any individual or company that "sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 Application Note 1. The Guidelines further define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 Application Note 3(a)(i). Because victims, for the purposes of this enhancement, must sustain an

"actual loss," the government may make the required showing by identifying instances in which the conspirators successfully changed the LIBOR rate to the detriment of at least ten Deutsche Bank counterparties.

The trial record established at least three instances in which Deutsche Bank skewed its LIBOR submissions such that the overall LIBOR fixes were higher or lower than they otherwise would have been. McGillicuddy Decl. ¶¶ 18-20. Based on LIBOR submission data, the government determined that, in those instances, even half of a basis point change in Deutsche Bank's submission would have resulted in a different overall LIBOR fix. *Id.* ¶ 17. The government then used Deutsche Bank's trading data to identify counterparties whose net positions vis à vis Deutsche Bank were adversely affected by the movement in the LIBOR fix.

First, on September 26, 2005, Defendant Black asked Mr. Curtler for a low 1-month LIBOR, resulting in Deutsche Bank's 1-month submission being three-quarters of a basis point below the actual fixing. (GX 1-016; Tr. 1616:22-1618:22.) Using Deutsche Bank's trading data, the government determined that Merrill Lynch and Standard Chartered Bank held positions that were adversely affected by the movement in the 1-month fix. McGillicuddy Decl. ¶ 18.

Second, on November 24, 2005, Mr. Connolly asked Mr. Curtler and Mr. King for a high 3-month LIBOR, resulting in Deutsche Bank's 3-month submission being higher than the actual fixing the following day. (GX 1-025.) Using Deutsche Bank's trading data, the government determined that ING Bank held positions that were adversely affected by the movement in the 3-month fix. McGillicuddy Decl. ¶ 19.

Third, on September 26, 2007, Mr. Parietti contacted Mr. King seeking low 1-month and high 3-month LIBORs, which were in line with the positions of Deutsche Bank traders in London and resulted in Deutsche Bank's 1-month submissions being lower than the actual

fixings and 3-month submissions being higher than the actual fixings on the days following Mr. Parietti's request and throughout most of October 2007. (GX 7-001; Tr. 421:14-426:20.) Using Deutsche Bank's trading data, the government determined that Bank of Montreal, Unicredit Bank, SMBC Capital Markets, Bank of Nova Scotia, Bank of New York-Mellon, National Australia Bank, and Svenska Handelsbanken held positions that were adversely affected by the movements in the 1-month or 3-month fixes. McGillicuddy Decl. ¶ 20.

Because this evidence demonstrates that the conspirators successfully moved the LIBOR rate to the detriment of positions held by more than ten different institutions, their actions caused "actual loss" to those institutions. For the reasons stated above, because the conspirators moved LIBOR in a way that benefitted Deutsche Bank's trades with those counterparties, it does not matter whether those counterparties executed offsetting hedge trades or whether they had a net sensitivity to LIBOR. What matters for this analysis is that they paid more money or gained less money on their trades with Deutsche Bank than they would have absent the LIBOR manipulation.

### D. The Court Should Apply a Two-Level Enhancement Under § 2B1.1(b)(10)(B) Because the Crime Was Substantially Committed Outside the United States

The Sentencing Guidelines provide a two-level enhancement where "a substantial part of a fraudulent scheme was committed from outside the United States," which the Sentencing Guidelines define as "each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa." U.S.S.G. § 2B1.1(b)(10)(B) & Application Note 9(A). While the same guideline provides for an enhancement under other circumstances as well, including where a scheme was relocated to another jurisdiction to evade law enforcement or involved sophisticated means, those are distinct circumstances that are not required for the enhancement for commission

outside the United States.  U.S.S.G. § 2B1.1(b)(10)(A) & (C).  Nor must a defendant personally act outside the United States to warrant the enhancement if his co-conspirators have done so. *See, e.g.*, *United States v. Singh*, 291 F.3d 756, 761-62 (11th Cir. 2002).  Here, the defendants' and their co-conspirators' scheme involved manipulation requests from both Deutsche Bank's New York and London desks, as well as the skewed LIBOR submissions made by Deutsche Bank submitters who sat in London.  A substantial portion of the scheme was thus committed from outside the United States, and the enhancement of Section 2B1.1(b)(10)(B) is appropriate.

    E.    <u>The Court Should Apply a Two-Level Enhancement Under § 3B1.3 Because the Defendants Abused a Position of Trust</u>

According to the Sentencing Guidelines, a two-level enhancement applies where a defendant's position of trust "significantly facilitated the commission or concealment of the offense," U.S.S.G. § 3B1.3, and, in that position, the defendant was afforded "substantial discretionary judgment that is ordinarily given considerable deference," *id.* § 3B1.3 Application Note 1.  Although the position of trust "must be entrusted to the defendant by the victim," *United States v. Broderson*, 67 F.3d 452, 455-56 (2d Cir. 1995), abuse-of-trust enhancements are not limited to fiduciary relationships, *United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999).  Indeed, "a § 3B1.3 enhancement may apply whether the person whose trust a defendant abused was the 'primary' or a 'secondary' victim of the crime." *United States v. Roberts*, 660 F.3d 149, 164 (2d Cir. 2011).

Here, the testimony at trial established without question that the conspirators abused a position of trust.  The submitters were entrusted by the BBA, counterparties, and the market generally to make objective assessments of Deutsche Bank's borrowing rates to send to the BBA, but instead—with the encouragement and insistence of the defendants—skewed their submissions to the traders' advantage. *See, e.g.*, Tr. 278:5-20 (King: "We were in the position

where we were one of 16 banks in the LIBOR panel, and we were taking advantage of that position to benefit or to benefit trades. . . . It's intuitively wrong because we are, you know, as I say, taking advantage of the position. We are benefiting. There was a counterparty on the other side who doesn't know what we're doing and is being affected negatively by what we're doing. . . . We had an unfair advantage because of the position that we were in in the panel being one of the 16 contributing banks."); Tr. 1010:7-10 (Parietti: "So it was clear that [LIBOR] needed to be fair and objective. And it was clear that it wasn't fair and objective if, you know, the submitters were biasing it to make their own bank more money."); Tr. 1168:6-21 (Parietti: "At the time, since these trades were settled to LIBOR, I wanted [counterparties] to think LIBOR was a fair and objective benchmark and that they could trust it. . . . I wanted them to think that I had no influence on LIBOR and that it would be a fair and objective rate that the payment was calculated by. . . . What was happening was when I had a big position, I was requesting the submitters to influence it in my behalf so that I would make more money on the trades."); Tr. 1377:25-1378:2 (Parietti: "[I]t was obvious that it was an important benchmark that was trusted by the market, and it needed to be fair and objective.").

The defendants also abused the trust of their employer, Deutsche Bank. In *Roberts*, the defendant's employer was found to be a secondary victim because his criminal conduct exposed the employer to harm in the form of "public criticism . . . with possible adverse consequences to . . . business operations," and "to criminal scrutiny and the possibility of fines or forfeiture." 660 F.3d at 164-65. *See also United States v. Ojemen*, 465 Fed. App'x 69, 71 (2d. Cir. 2012) (holding that the defendant's criminal conduct "cast [the employer] in an unfavorable light with possible adverse consequences for its operations"); *cf. United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (concluding that "Defendants' wire fraud offenses 'affected' the three banks in

this case within the meaning of § 3293(2)" because "the banks executed the Bank Agreements prompted in part by the fraudulent conduct of the Defendants and their co-conspirators" thus incurring "significant payments and related fees, which were foreseeable to the Defendants at the time of their fraudulent activity"). The application of a § 3B1.3 enhancement is appropriate because the defendants used their employment in furtherance of a scheme that required Deutsche Bank to pay hundreds of millions of dollars in fines and caused considerable damage to the bank's reputation.

F.  <u>The Court Should Apply a Three-Level Enhancement to Defendant Connolly's Sentence Under § 3B1.1(b) for Acting as a Manager/Supervisor in a Criminal Activity Involving Five or More Participants</u>

A three-level enhancement under § 3B1.1(b) for Defendant Connolly's aggravating role as a manager or supervisor of a criminal activity that involved five or more participants is appropriate in this case. Defendant Connolly's exercise of decision-making authority, his participation in the commission of the offense, and the degree of control and authority he exercised over others strongly support a manager/supervisor enhancement. *See* U.S.S.G. § 3B1.1 Application Note 4 (listing such factors as relevant to the manager/supervisor enhancement, as well as to the four-level leader/organizer enhancement).

Evidence adduced at trial demonstrates that Defendant Connolly played a managerial and supervisory role in the fraudulent scheme. He was the director of Deutsche Bank's pool trading desk in New York, and managed and had responsibility for both cash and derivatives trading desks. *See* Tr. 292:16-25; 1005:4-1007:1. In that role, Defendant Connolly not only made manipulation requests, *see, e.g.*, Tr. 293:4-12; Tr. 1625:11-1626:9; GX-2-001; but also explicitly directed his subordinate, Mr. Parietti, to make requests on behalf of the New York desk, Tr. 1008:13-1009:12 ("I interacted with them to let them know what my LIBOR fixings were for the next fixing so that they could consider it when they made their submissions. . . . My boss,

19

Matt Connolly, told me to."). On at least one occasion, when his request was not initially accommodated, he followed up with the London desk to ensure that it would be the next day. Tr. 314:12-320:12 (in response to Defendant Connolly's communication, Mr. King explained that he would "talk to Gavin Black about the positions in London tomorrow again, and see if we can get something sorted as in see if we can – see if I can agree to put the rate higher tomorrow"); *id.* 322:18-23 (Mr. King describing that Deutsche Bank's submission was, in fact, higher the following day).

Unlike Mr. Curtler, Defendant Connolly explicitly directed Mr. Parietti to request manipulations of Deutsche Bank's LIBOR submissions. Defendant Connolly also supervised David Park and Andrew Smoler, who the evidence at trial established were co-conspirators and whose positions were considered when making requests to change Deutsche Bank's LIBOR submissions. *See, e.g.*, GX 1-040 (Smoler request); GX 1-049 (Park request); Trial Tr. 388:13-391:19 (Mr. King discussing GX 1-040); *id.* 406:25-408:21 (Mr. King discussing GX 1-049); *id.* 1011:17-1012:2 (Mr. Parietti testifying that his practice was to consult with Smoler and Park when making requests); *id.* 1058:3-11 (same).

Instead of using his supervisory role to prevent or stop the fraudulent scheme, Defendant Connolly used his power to further it. A three-level manager/supervisor enhancement is thus warranted under § 3B1.1(b).

## VI.   The Need to Avoid Unwarranted Sentencing Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct

To date, eight defendants in the United States have pled guilty to or been convicted by a jury for manipulating LIBOR. Two, Anthony Allen and Anthony Conti, were former traders at Rabobank, who were convicted after a jury trial and received custodial sentences. Their convictions were later reversed on appeal. *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017).

Another former Rabobank trader, Paul Thompson, pled guilty but declined to cooperate with the government's investigation; he too received a custodial sentence. The remaining five defendants, who pled guilty and received § 5K1.1 motions in recognition of their substantial assistance in the government's investigation, received noncustodial sentences, though some were required to pay substantial fines – including the defendants' co-conspirators, Mr. Parietti ($1 million fine) and Mr. Curtler ($300,000 fine). These defendants and the sentences they received are summarized in the table below:

| Defendant | Status | Guidelines Range | Sentence |
|---|---|---|---|
| Anthony Allen (Rabobank) 14-cr-272 (JSR) | Convicted at jury trial (reversed on appeal) | 87-108 months | Custodial sentence of 24 months |
| Anthony Conti (Rabobank) 14-cr-272 (JSR) | Convicted at jury trial (reversed on appeal) | 57-71 months | Custodial sentence of 12 months and 1 day |
| Paul Thompson (Rabobank) 14-cr-272 (JSR) | Pled guilty | 33-41 months | Custodial sentence of 3 months |
| Lee Stewart (Rabobank) 14-cr-272 (JSR) | Pled guilty, government made § 5K1.1 motion | 33-41 months | Time served (one day), 2 years supervised release, continued cooperation |
| Paul Robson (Rabobank) 14-cr-272 (JSR) | Pled guilty, government made § 5K1.1 motion | 41-51 months | Time served (one day), 2 years supervised release |
| Takayuki Yagami (Rabobank) 14-cr-272 (JSR) | Pled guilty, government made § 5K1.1 motion | 33-41 months | Time served (one day), 2 years supervised released |
| Timothy Parietti (Deutsche Bank) 16-cr-373 (PAE) | Pled guilty, government made § 5K1.1 motion | 78-97 months | Time served (one day), 3 years supervised release, 500 hours community service, $1 million fine |
| Michael Curtler (Deutsche Bank) 15-cr-670 (CM) | Pled guilty, government made § 5K1.1 motion | 78-97 months | Time served (one day), 2 years supervised release, $300,000 fine |

Additionally, in the United Kingdom, former UBS and Citigroup derivatives trader Tom Hayes ultimately received an eleven-year custodial sentence. *See R. v. Hayes*, [2015] ECWA Crim. 1944, Court of Criminal Appeal (Dec. 21, 2015). Like Messrs. Hayes, Allen, and Conti, the defendants here have fought the charges against them tooth and nail and required the government and the Court to expend significant resources to prosecute and hear their cases. Like Mr. Allen, Defendant Connolly was a manager who helped implement a policy of manipulation by instructing his subordinate to join the scheme. While the government concedes that the circumstances of Mr. Hayes' case were particularly egregious, the precedent demonstrates that substantial custodial sentences are appropriate for defendants who refuse to take responsibility for their roles in fraudulent schemes that have such a large impact on the global financial markets via manipulation of a critical benchmark interest rate.

Similarly, it would be inconsistent and unfair for Defendant Connolly and Defendant Black to evade monetary fines for their crimes when Mr. Parietti and Mr. Curtler, who participated in the same scheme but took responsibility for their conduct and cooperated extensively with the government's investigation, received significant fines of $1 million and $300,000 respectively. Neither Defendant Connolly's nor Defendant Black's financial circumstances warrant different treatment in terms of fines. To avoid disparities with the defendants previously sentenced for their roles in LIBOR manipulation in the exact same conspiracy and scheme then, Defendant Connolly's and Defendant Black's sentences should include substantial periods of incarceration as well as significant monetary fines.

## VII.   A Substantial Fine Is Warranted Because the Nature and Breadth of the Crime Renders Restitution and Forfeiture Impracticable

Restitution for wire fraud and conspiracy is mandatory under the Mandatory Victim Restitution Act ("MVRA") where an "identifiable victim" has suffered a "pecuniary loss." *See*

18 U.S.C. § 3663A(c)(1)(B).  The MVRA does not apply, however, to cases in which "the court finds, from facts on the record, that (A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3).  "Unlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain."  *United States v. Gallant*, 537 F.3d 1201, 1247 (10th Cir. 2008).  For the reasons set forth below, the United States submits that the MVRA is inapplicable under both prongs of § 3663A(c)(3).

As to the first prong, the vastness of the market of instruments linked to LIBOR makes the identification of victims impracticable.  Any credit card holder, mortgagor, derivatives trader (including swaps, futures, and forwards), debtor, or lender with an interest tied to LIBOR is a potential victim of the scheme. Even the universe of victims in the swaps market who sustained losses as a result of the defendants' efforts to defraud Deutsche Bank's counterparties is extraordinarily difficult to ascertain.  Unlike intended loss pursuant to U.S.S.G. § 2B1.1, restitution under the MVRA would require the Court to determine whether any of the counterparties, by virtue of hedging transactions with other entities, passed any portion of their losses on to other downstream swaps traders.  *See* 18 U.S.C. § 3664(j)(1) ("if a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obliged to provide the compensation").  Hence, the MVRA arguably could require identification of any entity to which any of Deutsche Bank's counterparties passed on even a portion of the loss.

As to the second prong, even if the identification of such a large class of victims were feasible, it is impractical to determine the net exposure to LIBOR of each of Deutsche Bank's counterparties as well as the out-of-pocket losses that those counterparties passed on to downstream counterparties. Complex financial institutions frequently have sensitivity to LIBOR that comes from sources other than their swaps with Deutsche Bank (for example, a financial institution that was "short the fixing" on its swap with Deutsche Bank may nonetheless reap a net profit from rising interest rates because it financed mortgage loans pegged to LIBOR). Because the defendants' crime involves an extremely large number of victims who each sustained various losses (frequently as small as tens or hundreds of dollars per swap), the burden of reconstructing the net sensitivity to LIBOR for thousands of financial institutions far outweighs the societal benefits of restitution.

Moreover, in light of difficulties in determining what percentage of the defendants' bonuses were attributable to the performance of Deutsche Bank's swap trades, the United States is not seeking forfeiture, which "focuses on the disgorgement by a defendant of his 'ill-gotten gains'" and which "is usually based on the defendant's actual gain." *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012). Although the object of the conspiracy was to benefit Deutsche Bank's financial position, which would in turn increase the size of the trading desks' bonus pool, the government lacks sufficient data to establish the specific portion of the defendants' bonuses that were attributable to the performance of Deutsche Bank's trades affected by their felonious conduct.

While the Court has questioned the government's position of not seeking forfeiture from one of the defendants' co-conspirators, Mr. Parietti, the government has not insisted that any LIBOR defendants ultimately pay forfeiture. Takayuki Yagami, the very first individual to plead

guilty for LIBOR manipulation, signed a cooperation agreement in June 2014 that required

forfeiture of approximately $26,000. *See* Agreement between Mr. Yagami and the U.S.

Department of Justice Criminal Division, Fraud Section and Antitrust Division, June 5, 2014

(attached hereto as Exhibit C). However, the government subsequently came to believe that the

method of calculating forfeiture was overly complicated and insufficiently reliable. Therefore,

although the various charging instruments for later defendants contained forfeiture allegations,

the government did not end up seeking forfeiture from any of those defendants and, out of

fairness, successfully moved to vacate the forfeiture order previously entered against

Mr. Yagami. *United States v. Yagami*, 14-cr-272 (JSR), Mar. 9, 2017 Hrg. Tr. 3:14-4:9 (attached

hereto as Exhibit D).

In Mr. Parietti's case, because the forfeiture calculation continued to be questionable and

the government remained uncertain, the decision to forego forfeiture merely reflects the

government's view that there is insufficient data to reliably calculate the portion of his bonus

attributable to the manipulation scheme. As the government explained at Mr. Parietti's

sentencing, a significant portion of the bonuses were attributable to legitimate conduct. *United

States v. Parietti*, 16-cr-373(PAE), Feb. 8, 2019 Hrg. Tr. 38:11-17 (attached hereto as Exhibit E)

("The bank just made a huge amount of money on a position that they had on. So while the

scheme helped that position, they did have a position during the financial crisis basically as the

difference between short-term lending and a little bit long-term lending spread. They had sort of

bet that it was going to do that. So they just made a ton of money on that view."). Indeed, Judge

Engelmayer came to appreciate that bonuses were not fully attributable to the fraudulent scheme,

and calculating the portion attributable to the scheme would be an exercise fraught with

difficulty and imprecision. *Id.* at 56:20-58:22; 58:24-59:6 (Defense counsel: "[I]t's a highly

complex legal issue. . . . I didn't want your honor to think that there is a one-to-one correlation between [fraudulent] practice and bonus." Judge Engelmayer: "Point taken. That is in line with what the government represented to me as well, and I credit all of you on that.").

Moreover, the government reiterates that there was no "side deal" to shield Mr. Parietti from forfeiting the $9 million bonus he received in 2009 by allocuting to conduct continuing until "at least" 2008. As explained above, the government's decision not to seek forfeiture from Mr. Parietti was consistent with prior LIBOR defendants; while there was a general forfeiture allegation in his criminal information, just as with other defendants (except Mr. Yagami) there had been no calculation of a specific forfeiture number. Mr. Parietti himself disclaimed the existence of any side deal on re-direct examination at trial. *See* Tr. 1405:20-1406:6 (explaining that he changed his allocution to include conduct occurring until "at least" 2008 in order to "include the years after"). The absence of a side deal was also unambiguously confirmed by Mr. Parietti's counsel at his sentencing hearing:

> The notion that there was some side deal with the government is completely false. The notion that the dates were somehow manipulated to avoid any risk of the big bonus year is completely false. Not only was there no agreement on it, to my recollection, we never discussed anything remotely relating to that issue.

*Id.* 51:19-25. The government likewise confirmed the absence of any side deal, *id.* at 44:11-49:22, and Judge Engelmayer credited counsel's explanation, *id.* at 57:18-22 ("The fact that [not seeking restitution or forfeiture] is not a practice that is uniquely being applied to benefit a cooperator is reassuring to me. The government can do what it's going to do. My chief concern here was that there was a different rule being applied for a cooperator, and I'm reassured that that's not the case.").

Nor should the government's failure to adhere to the local practice of writing a letter to facilitate coordination between the trial judge and the sentencing judge, ECF No. 433 at 55-56,[6] be viewed as evidence of a side deal. As explained in a subsequent letter to the Court dated February 11, 2019, the government simply did not adequately familiarize itself with the local practice and overlooked the fact that although the extensive cross-examination of Mr. Parietti at trial about his plea allocution and then-impending sentencing before Judge Engelmayer was known to the Court, the date of his sentencing was not likewise brought to the Court's attention. Even if the sentencing date had been elicited on cross, the government should have written a letter anyway. All of those things the government acknowledges. Nevertheless, it was an honest mistake and nothing more. The government certainly did not send Ms. Brown—who was and continues to be a crucial member of the trial team—to handle the sentencing in the hopes that a she would be afforded more leeway for not knowing the local practice. The participation of Ms. Sipperly and Ms. Anderson at the Parietti sentencing dispels any notion that she was sent there for any reason other than as a capable and respected representative of the United States.

Because Defendant Connolly participated in a fraudulent scheme in which the identification of restitution and forfeiture is impracticable, the Court should impose a fine of $3,000,000—based on the $1,000,000 maximum per-count fine permitted under 18 U.S.C. §§ 1343, 1344, 1349, and 3571(b). "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The Presentence Investigation Report makes clear that Defendant Connolly has the financial means to pay a fine. PSR ¶ 123. Lastly, perhaps the most compelling reason

---

[6] To clarify the record, although Ms. Sipperly was an AUSA in this district from 1988 to 1999, Ms. Anderson has never been an AUSA in this district, nor participated in any sentencing in this district prior to Mr. Parietti's.

for the imposition of a fine is that, due to the difficulties in calculating restitution and forfeiture, the defendants would otherwise avoid a monetary penalty. *See* U.S.S.G. § 5E1.2(d)(4) and (8) (courts should consider the defendant's restitution obligation as well as "pertinent equitable considerations" in determining the amount of a fine). Defendant Connolly engaged in a scam designed to enrich himself at the expense of others. The equities thus favor the imposition of the maximum fine in addition to a substantial term of incarceration.

Respectfully submitted.

ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

JAMES J. FREDRICKS
Chief, Washington Criminal II Section
Antitrust Division
United States Department of Justice

_____
ALISON L. ANDERSON
Acting Assistant Chief
Criminal Division, Fraud Section
United States Department of Justice

_____
CAROL L. SIPPERLY
Senior Litigation Counsel
MICHAEL T. KOENIG
CHRISTINA J. BROWN
Trial Attorneys
Antitrust Division
United States Department of Justice